IN THE UNITED STATES DISTRICT COURT OF MISSISSIPPI

SOUTHERN DISTRICT

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
APR 2 6 2006
J.T. NOBLIN, CLERK
BY_____ DEPUTY

UNITED STATES OF AMERICA EX REL. CORI RIGSBY, AND KERRI RIGSBY,

        Relators,

vs

CASE NO.  1:06 cv 433 WJG-JMR

STATE FARM INSURANCE COMPANY

**TO BE FILED IN CAMERA AND UNDER SEAL**

Pursuant To 31 Usc § 3731

NATIONWIDE INSURANCE COMPANY

ALLSTATE INSURANCE COMPANY

USAA INSURANCE COMPANY

FORENSIC ANALYSIS ENGINEERING CORPORATION

EXPONENT FAILURE ANALYSIS

HAAG ENGINEERING CO.

JADE ENGINEERING

RIMKUS CONSULTING GROUP INC.

STRUCTURES GROUP.

**RELATOR'S COMPLAINT FOR DAMAGES UNDER THE FALSE CLAIMS ACT, 31 USC § 3729 ET SEQ.**

COMES NOW Relators in the above-entitled action, and for their cause of action state and aver as follows:

## CAUSE OF ACTION

1.    This is an action to recover damages and civil penalties on behalf of the United States of America arising out of the false claims presented for payment by the defendants under the National Flood Insurance Program, 42 USC § 4001, et seq.  This is a cause of action brought by a relator pursuant to 31 USC § 3729 and the qui tam provisions of that statute found at 31 USC §§ 3730 and 3731.

2.    31 USC § 3730(b)(2) provides that "The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information."  Plaintiff is filing this matter under seal.

3.    A copy of the evidentiary disclosure required by the False Claims Act has already been served on the United States.

## JURISDICITON AND VENUE

4.    31 USC § 3732 provides that: "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred. A summons as required

by the Federal Rules of Civil Procedure shall be issued by the appropriate district court and served at any place within or outside the United States."

5.     As established by the pleadings, infra, defendant State Farm Insurance Company transacts business in this judicial district and this action may properly be brought against it in this district.

6.     As established by the pleadings, infra, defendant Nationwide Insurance Company transacts business in this judicial district and this action may properly be brought against it in this district.

7.     As established by the pleadings, infra, defendant Forensic Analysis Engineering Corporation transacts business in this judicial district and this action may properly be brought against it in this district

## PARTIES

8.     Relator, Cori Rigsby is a citizen and resident of the State of Mississippi and is employed by E. A. RENFROE, a company that is an independent contractor for State Farm Insurance Company, USAA and Nationwide Insurance Company. She is a claims manager and from time to time has witnessed the events set forth herein.

9.     Relator Kerri Rigsby is a citizen and resident of the State of Mississippi and is employed by E. A. RENFROE,  a company that is an independent contractor for State Farm Insurance Company, USAA and Nationwide Insurance Company. She is a claims manager and from time to time has witnessed the events set forth herein.

10.    Defendant State Farm Insurance Company is a company authorized by the Federal Emergency Management Agency (FEMA) to write flood insurance under the Standard Flood Insurance Policy ("SFIP"), 44 CFR §§ 61.4(b), 61.13(d), (e), 62.23(c). See also 44 CFR 62, App. A.  Federal regulations characterize this company as a "WYO" or "write your own" company.  At all times relevant herein it has done business in this judicial district and the acts complained of occurred here.

11.    Defendant Nationwide Insurance Company is a company authorized by the Federal Emergency Management Agency (FEMA) to write flood insurance under the Standard Flood Insurance Policy ("SFIP"), 44 CFR §§ 61.4(b), 61.13(d), (e), 62.23(c). See also 44 CFR 62, App. A.  Federal regulations characterize this company as a "WYO" or "write your own" company.  At all times relevant herein it has done business in this judicial district and the acts complained of occurred here.

12.    Defendant USAA Insurance Company is a company authorized by the Federal Emergency Management Agency (FEMA) to write flood insurance under the Standard Flood Insurance Policy ("SFIP"), 44 CFR §§ 61.4(b), 61.13(d), (e), 62.23(c). See also 44 CFR 62, App. A.  Federal regulations characterize this company as a "WYO" or "write your own" company.  At all times relevant herein it has done business in this judicial district and the acts complained of occurred here.

13.    Defendant Allstate Insurance Company is a company authorized by the Federal Emergency Management Agency (FEMA) to write flood insurance

under the Standard Flood Insurance Policy ("SFIP"), 44 CFR §§ 61.4(b), 61.13(d), (e), 62.23(c). See also 44 CFR 62, App. A.   Federal regulations characterize this company as a "WYO" or "write your own" company.   At all times relevant herein it has done business in this judicial district and the acts complained of occurred here.

14.    Defendant Forensic Analysis Engineering Corporation is a Mississippi engineering firm providing forensic analysis for insurance agencies for the purpose of categorizing damage as one type or another.   In this case FAEC provided materially false engineering reports at the request of State Farm Insurance for the sole purpose of convincing FEMA to pay property damage claims out of flood insurance rather than hurricane or homeowner's insurance, as is more fully set forth herein.

15.    Defendant Exponent Failure Analysis is an engineering firm providing consulting services to defendants State Farm and on information and belief, Nationwide, Allstate, and USAA Insurance Companies for the purpose of determining whether claims arose from wind or water damage.   On information and belief these firms provided false or fraudulent engineering reports at the request of defendants Nationwide and State Farm, and materially participated in the conspiracy to defraud the United States.

16.    Defendant Haag Engineering Company is an engineering firm providing consulting services to defendants State Farm and on information and belief, Nationwide, Allstate, and USAA Insurance Companies for the purpose of determining whether claims arose from wind or water damage.   On

information and belief these firms provided false or fraudulent engineering reports at the request of defendants Nationwide and State Farm, and materially participated in the conspiracy to defraud the United States.

17.   Defendant Jade Engineering is an engineering firm providing consulting services to defendants State Farm and on information and belief, Nationwide, Allstate, and USAA Insurance Companies for the purpose of determining whether claims arose from wind or water damage.  On information and belief these firms provided false or fraudulent engineering reports at the request of defendants Nationwide and State Farm, and materially participated in the conspiracy to defraud the United States.

18.   Defendant Rimkus Consulting Group, Inc., is an engineering firm providing consulting services to defendants State Farm and on information and belief, Nationwide, Allstate, and USAA Insurance Companies for the purpose of determining whether claims arose from wind or water damage.   On information and belief these firms provided false or fraudulent engineering reports at the request of defendants Nationwide and State Farm, and materially participated in the conspiracy to defraud the United States.

19.   Defendant Structures Group is an engineering firm providing consulting services to defendants State Farm and on information and belief, Nationwide, Allstate,  and USAA Insurance Companies for the purpose of determining whether claims arose from wind or water damage.  On information and belief these firms provided false or fraudulent engineering reports at the request of

defendants Nationwide and State Farm, and materially participated in the

conspiracy to defraud the United States

## BACKGROUND FACTS

RELATORS

20.   Relators work for E. A. Renfroe, a company that provides disaster claims

management services (and claims representatives) for defendants State Farm

Insurance Company, USAA and Nationwide Insurance Company.   In the

course of their duties as employees of this firm, they have been personally

pressured by defendants' supervising claims personnel to change claims

payments.   They have full and independent knowledge of the facts and

circumstances surrounding the allegations made in this complaint, and learned

this information in their capacity as employees, and through no other source.

21.   Relators began their efforts as independent adjusters and team managers for

the State Farm Insurance Company Catastrophe Team (aka "CAT" team), on

September 2, 2005, when State Farm brought them, as leased employees, to

Gulfport MS for the purposes of adjusting claims for victims of Hurricane

Katrina.

22.   On or about April 19, 2006, Relators presented a full evidentiary disclosure to

the United States Attorney for the State of Mississippi, turning over

substantially all material evidence in their possession, as well as providing a

detailed personal account of the wrongdoing and fraudulent conduct engaged

in by the Defendants.  Relators did not file this action until full disclosure had been made to the United States Attorney.

### HOW FLOOD INSURANCE WORKS

23.     The United States Government, acting through the Federal Emergency Management Agency, (FEMA) is the only entity in the United States that underwrites flood insurance.

24.     In most cases, as here, the government only acts as the funding source, and the coverage is sold through private insurance companies called "WYO" or Write Your Own companies.

25.     When there is a claim under a Standard Flood Insurance Policy ("SFIP"), the private WYO insurance company is required to adjust the claim in accordance with the federal regulations.  The applicable regulation, 44 CFR § 62.23(d) provides: "A WYO Company issuing flood insurance coverage shall arrange for the adjustment, settlement, payment and defense of all claims arising from polices of flood insurance it issues under the [National Flood Insurance Program], based on the terms and conditions of the Standard Flood Insurance Policy."

26.     In acting as the claims adjuster for the government, the WYO companies are fiscal agents of the government and payments on SFIP claims are a direct charge on the United States Treasury. See *Wright v. Allstate Ins. Co.*, 415 F.3d 384, 386-87 (5th Cir. 2005).  To the extent that an insurer presents a claim for reimbursement under the SFIP to the federal government, that claim

is presented to an officer or agent of the United States Government, specifically, to the Director of the Federal Emergency Management Agency.

27.    Whenever an insurer has sold a homeowner's policy (or hurricane policy) that it underwrites, and also issues a flood insurance policy under the National Flood Insurance Program ("NFIP"), the flood insurance policy is never more than the homeowner's insurance policy or the accompanying hurricane insurance policy.

28.    In acting as the government's agent in adjusting the claim, the company has an incentive to charge off all damage to the government as flood damage because when they do so, the government, acting through FEMA, pays the entire claim, thereby relieving the company of its obligation under its own policy of insurance.

29.    The term "flood" is narrowly defined by statute and rule:

   a.    42 USC § 4121(1) states "the term 'flood' shall have such meaning as may be prescribed in regulations of the Director, and may include inundation from rising waters or from the overflow of streams, rivers, or other bodies of water, or from tidal surges, abnormally high tidal water, tidal waves, tsunamis, hurricanes, or other severe storms or deluge;"

   b.    The director has provided the following definition of flood:

   Flood, as used in this flood insurance policy, means:

   1. A general and temporary condition of partial or complete inundation of two or more acres of normally dry land area or of two or more properties (one of which is your property) from:

9

a. Overflow of inland or tidal waters,

b. Unusual and rapid accumulation or runoff of surface waters from any source,

c. Mudflow.

2. Collapse or subsidence of land along the shore of a lake or similar body of water as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels that result in a flood as defined in A.1.a. above.

44 CFR Pt. 61, App. A(1)

30. During Hurricane Katrina, FEMA identified only small parts of the Mississippi coast as flood damaged, generally around Bay St. Louis. The remainder was identified as hurricane damage.

31. In most locations where a defendant insurance company has written flood insurance policies and collected premiums under the NFIP, the company has also written homeowners and hurricane insurance.

32. Under the arrangement between the company and FEMA, (44 CFR Pt. 62, App. A), the government requires when the company writes coverage for other perils and flood insurance, that one adjuster be used.

REALLOCATION OF WIND CLAIMS TO FLOOD CLAIMS

33. On information and belief, beginning at about the time the first claims began to come through adjusters for Hurricane Katrina, defendant insurance companies made a corporate decision to misdirect and misallocate claims from those of hurricane coverage (which a company would be required to pay

from its reserves or reinsurance) to flood claims that could be submitted and paid directly from the United States Treasury.

34.     In order to facilitate the misallocation, State Farm ordered an engineering survey on every claim that involved a "slab" (a loss where there was nothing left but foundation), a "popsicle stick" (a loss where there were only beams or pilings remained standing), or a "cabana" (a loss where a roof remained but the main interior of the building had been damaged due to wind, flood, or otherwise).

35.     State Farm's view was that it was better to pay $1,500 for an engineering report if it would save them up to $350,000 on a homeowner's claim.

36.     On information and belief, defendant State Farm directed its employee adjusters and independent contractor adjusters to show flood damage whenever and wherever there was any amount of water damage, and to adjust the claim as flood insurance rather than hurricane insurance even though the primary mechanism for damage was wind, not flood waters.

37.     In addition, when directing adjusters to categorize claims as flood damage and shift responsibility to the government for payment of the claim under flood insurance, State Farm insisted that adjusters "hit limits" when adjusting flood claims.

38.     Specifically, adjusters were told that if they initially analyzed a claim and found that the insured had less damage under flood coverage than policy limits allowed, the adjuster was told to go back through the claim a second

time to ensure that the flood claim "hit limits."  Adjusters used a computer program designed by State Farm known as "XACT Total" as a shortcut to determine the amount of damage for a claim.  XACT Total was used to make determinations of total flood loss even in homes that sustained moderate flood damage.

39.  On information and belief, particularly where the wind (and not the water) made a structure unsalvageable, the claims were misallocated into flood insurance claims because flood insurance claims were paid by the US Treasury and did not come out of the company's reserves.

40.  This misallocation of claims has resulted in significant damage to the federal treasury.

## SPECIFIC INSTANCES OF REALLOCATION OF WIND CLAIMS TO FLOOD CLAIMS

41.  Relators are aware of two specific instances where Defendant State Farm has engaged in reallocation of claims from wind damage to flood damage.

42.  On October 4, 2005, State Farm Insurance Adjuster Cody Perry issued an assignment to defendant Forensic Analysis Engineering Corporation (FAEC) for the purpose of having FAEC determine the nature of the destruction of the property located at 2558 S. Shore Dr., Biloxi, MS.  FAEC carried out the assignment on October 7, 2005.  The firm did a site inspection and reached conclusions based on the inspection.

43.    The engineering firm concluded that the damage that occurred to the insured's home at the time of the hurricane was due principally to wind, and not to water.

44.    That report was dated October 12, 2005. The report said:

**CONCLUSIONS**

Based upon the information that has been presented to FAEC and evidence gleaned during our inspection, FORENSIC ANALYSIS & ENGINEERING CORPORATION has made the following conclusion concerning the damage to the structure.

- The tree failures in the northwesterly direction are the result of the winds out of the southeast from the approaching hurricane.

- The roof, door, carport, and window damage was caused by wind and wind driven debris.

- It is FAEC's opinion that the interior damage of the structure is primarily the result of the failure of the windows, walls, and doors due to wind.

The conclusions and opinions presented in this report are based on the results of FAEC's field investigation of the subject residence, as well as our analysis of the available wind and localized water level data and upon all of the other associated information that we have gathered during the course of our investigation efforts to date. If additional information or facts become available which materially affect these stated conclusions and opinions, then, FAEC reserves the right to amend or change its opinions and conclusions as needed.

45.    This report never became part of the permanent record of the McIntosh claim because it was recognized as contrary to the direction given to State Farm adjusters.   On information and belief, State Farm CAT Corrdinator Alexis "Lecky" King wrote the following note on the report: "Put in Wind file – DO NOT pay bill.  Do Not Discuss".  A copy of that note is shown below:

Forensic Analysis & Engineering (FAEC) is pleased to provide the following report of
our engineering investigation and evaluation of the reported damage to the residence
located at 2558 S. Shore Drive in Biloxi, MS.

We initially received this assignment on October 4, 2005.  FAEC performed a field
investigation of the subject insured residence ~~~~~~~~~~~~~~~~~~~~~~~~~~ assignment
we we ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ porch to the
dining

This si ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ this matter.

**BACK**

On the ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ y of Biloxi,
was in ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ hurricane
when i

FAEC ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ if the
damag ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ or a
combir ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ During our
on site ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ r inspection.

*[Handwritten annotation: "Put in Wind file — DO NOT Pay Bill   Do not discuss"]*

**SITE OBSERVATIONS**

46.    Thereafter, on October 20, FAEC was commissioned to write a completely
different report.  The second report was based on a site visit of October 18,
2005, and never disclosed the prior site visit.  The observations in this second
report did not contain any observations from the previous report, and
contained numerous observations that were completely contrary to the
findings in the first report.  Thereafter, the report found:

**CONCLUSIONS**

Based on the information that has been presented to FAEC and evidence gleaned
during our inspection, FORENSIC ANALYSIS & ENGINEERING CORPORATION has
made the following conclusions concerning the damage to the structure:

- The tree failures in the northwesterly direction are the result of the winds out of
  the southeast from the approaching hurricane.

- There appears to have been damage to the structure by wind as evidenced by
  missing shingles on parts of the roof structure.  Damage to the second story floor
  and first floor ceilings was predominately caused by wind and intruding rainwater.

- The damage to the first floor walls and floors appears to be predominately
  caused by rising water from the storm surge and waves.

14

47.    On or about September 26, 2006, State Farm Adjuster Christy Sims commissioned a study by FAEC on the Mullins home at 6057 Pine Tree Drive, Kiln, MS.

48.    Among the observations made by the engineers were that the structure had already been removed from the site, as required by FEMA, and that much of their analysis was based on photographs provided to the engineers by the homeowners.:

**SITE OBSERVATIONS**

The following are the observations made during FAEC's inspection of the structure:

- Upon approaching the property the house had been already removed from the site as required by FEMA.

- From attached photographs provided by the insured, the entire house had been taken off from its support piers and came to a rest against the house across the street. The house had rotated about 180 degrees and its front was facing south. The porch area was about in line with the center of the street.

- No significant damage to the house was observable in the insured's photos, except for the contact point with the neighboring house across the street.

- According to the insured, the water had rose to 10 inches above the floor level at a neighboring residence close by. No water damage to the house could be appreciated from the photographs nor observed from the surroundings.

- The 24 inches high concrete block piers were in complete disarray. The blocks were not joined to each other nor anchored to the ground.

- With very few exceptions, all the trees around the observable area were standing straight and with all their foliage remaining.

49.    The report concluded that the damage was due primarily to wind, and not to flooding.

50.    The report's conclusion section stated:

**CONCLUSIONS**

Based on the information that has been presented to FAEC, evidence gleaned during our inspection, and our understanding of the storm water and wind conditions associated with Hurricane Katrina and how those conditions affected the neighborhood area of the insured residence conditions at the time of the storm, FORENSIC ANALYSIS & ENGINEERING CORPORATION makes the following conclusions regarding the claimed damage and the integrity of the property investigated:

- FAEC has concluded that the primary and predominant cause of damage to the subject property was due to hurricane force winds. This is based on the displacement of the house and the absence of water damage to the same. However, this displacement was facilitated by the poor anchoring and supporting observed.

51.    Thereafter, or on about January 3, 2006, FAEC submitted a different report

predicated on the same site visit of October 11, 2005, but not mentioning the

prior report.  Observations from the second report included:

- There was tree damage in the neighborhood with trees falling to the west northwest.

- There was shingle damage to houses nearby.

- The owner of the trailer across the street, whose home was impacted by the insured's, indicated that the water had come up to the bottom of her trailer. This was estimated to be between 2 and 3 feet above grade.

- The foundation for the insured's home consisted of concrete block piers about 2 feet above grade. No tie downs were observed, however one photograph furnished by the insured pictured, what appeared to be, a minimally effective tie down.

52.    In addition, the conclusion of the second report stated a completely different

finding than the original report of October 11, 2005.

53.    The second report concluded that the damage was due to flood waters, saying:

16

**CONCLUSIONS & OPINIONS**

Based on the information that has been presented to FAEC, evidence gleaned during our inspection, and our understanding of the storm water and wind conditions associated with Hurricane Katrina and how those conditions affected the neighborhood area of the insured residence conditions at the time of the storm, FORENSIC ANALYSIS & ENGINEERING CORPORATION makes the following conclusions regarding the claimed damage and the integrity of the property investigated:

- The tree failures in the northwesterly direction were the result of winds out of the southeast from the approaching hurricane.

- The damage to the interior of the house could not be determined as no evidence was available.

- The movement of the house across the street with minimal obvious wind damage is consistent with a buoyant force applied to the building by rising water allowing the wind to blow the house northwards until it reached an obstruction.

SPOLIATION OF EVIDENCE

54.     On our about April 12, 2006, relators learned that defendant State Farm

Insurance Company had in fact engaged the services of a commercial

document shredding company, "Shred It."   Relators were told by at least one

State Farm employee that some claims data and/or engineering reports

associated with the fraudulent conduct in this case were being shredded.

Whether or not Shred-It was employed to shred particular documents is

unknown to the relators, but relators' strong suspicion is that data necessary to

prove fraud were and are being shredded.

55.     At some point prior to being subpoenaed by the Attorney General of

Mississippi and private civil lawyers, Alexis King and Richard Moore sent out

a memorandum to all staff adjusters at State Farm that indicated that the

original engineering reports on all claims files were held under lock and key,

and only those two people could release them.

17

56.    Sometime later, with respect to these original engineering reports that had been stacked on Ms. King's desk at a height of more than one foot tall, State Farm went to a "paper lite" system that caused them to "scan" into the computer one engineering report and discard, scan, shred, spoliate or destroy any other engineering reports generated by the purported independent engineering firms.

57.    On or around November 11, 2005, State Farm sent facsimile transmissions to many of the Engineering firms.   That fax stated, for example, "Structure Group.  Please cancel this assignment.  Claim Number 24-Z455-169.  Insured: Balius.  Thanks.  Catastrophe Team Manager David Haddock, 11-11-05.  If you have already inspected this loss, do not write the report.  Send your investigation material with your bill.  Send the report if completed."

58.    The purpose of these cancellations and facsimile transmissions was to recall the directive requiring engineering reports to be submitted with all claims and to prevent further engineering reports from being submitted containing determinations that damages were the result of causes other than water.

59.    State Farm, while ordering these engineering reports, did not allocate blocks of claims in particular regions to specific engineering companies, and in fact, assigned some claims early on to engineering companies like Dreux Seghers who reported the cause of the damage as wind, and who, when contacted by the Defendants, refused to change their report to reflect that the damage was caused by water.

60.    A compilation of all claims assigned to some of the engineering firms shows the Defendants caused an exceptionally high rate of cancellation of engineering reports from those firms, like Dreax Seghers, that routinely concluded that wind, and not water, was the causative agent of the damage. The compilation of claims shows that engineering reports were requested from Dreux Seghers' firm only 79 times and that 32 of those reports were subsequently cancelled (41% cancellation rate).   By contrast, Defendants requested 214 engineering reports from Exponent Failure Analysis and that only 36 of those reports were subsequently cancelled (17% cancellation rate).

## INCONSISTENT ENGINEERING ASSESSMENTS

61.    Because there was not an area-by-area assignment of engineering firms, great disproportionality resulted in the reports received.  One example can be found in the claim of Anna Vela of Biloxi.

62.    Vela's claim was evaluated by Dreux Seghers who concluded that the cause of the damage was wind.

63.    The team manager, Mark Drain, concluded that the engineering report required him to pay the full policy limits under the wind coverage.

64.    The supervisor, Alexis "Lecky" King told Drain that the engineer was a "moron" and that the report should be sent back to the engineer to get him to correct his report to show flood damage.

65. King then left the office for a few days and Drain, seeing an issue with an engineering report he commissioned being used as the basis to deny rather than pay the claim, paid the full policy limits under the wind coverage.

66. There were numerous other claims for wind and water damage on the same street (Baywood Drive).  All of those claims by State Farm (and other insurers) were denied for wind damage, resulting in inconsistent determinations.

## GRANT FRAUD

67. In October, Congress passed a grant program for gulf coast Katrina victims.

68. The flood grant program was designed to provide a source of rebuilding funds for persons who suffered casualty losses due to flood but who did not live in a flood plain and did not have flood insurance, and their homeowner's claims were denied for that reason.

69. On or about April 18, 2006, Ryan Murphy, a State Farms Claims Team Manager ordered after a mediation that payments originally destined to compensate under Coverage A (Homeowners) be reallocated to Coverage C (contents) so as to permit the policy-holders to apply for the grant program.

70. By employing engineering reports that reallocated losses to "flood" instead of homeowners, State Farm, Nationwide, and other insurers essentially pushed off their responsibility to pay claims onto the federal government.

71.    By refusing to pay based on false engineering reports, the defendants caused Katrina Victims to submit false claims to the federal government's flood grant program.

## BACKDATING OF CLAIMS

72.    On information and belief State Farm Agent Mike Myers did not have Flood Insurance through the NFIP before Katrina hit the Biloxi area.

73.    In addition to Myer's own failure to have insurance, several of his friends and associates did not have flood insurance.

74.    In spite of the failure to have flood insurance in place before the storm hit, Myers, working with someone in underwriting at State Farm, backdated a policy for himself and for several others who did not have flood coverage.

75.    This permitted Myers, among others, to submit claims for flood insurance even though the victims did not have flood insurance before the storm hit.

## ADJUSTING EXPENSES

76.    Under the rules of the NFIP and pertaining to adjustment of claims, the insurance company must use the same adjuster to adjust the claim for homeowners and flood insurance.

77.    During Katrina, independent adjusters were employed to adjust claims.

78.    As noted earlier, adjusters were told, when adjusting claims involving flood insurance, to "hit the limits" regarding the flood coverage.

79. When an independent adjuster handles a claim for the flood program and the policy holder has the maximum policy limits ($250,000 structure, $100,000 contents), the adjuster is paid by the federal government a fee of approximately $7,000.

80. This $7,000 amount is passed along to the Flood Insurance Administrator as an adjusting cost with a markup by State Farm.

81. By passing a loss over to the FIA and the NFIP, State Farm not only benefited by not having to pay the claim, but was able to transfer their adjusting costs to the FIA through the NFIP.

82. The amount of administrative fees that State Farm receives from the FIA and the NFIP is a sliding scale based on the amount of the claim being paid. The amount of the administrative fee goes up in accordance with the amount of the flood loss claim.

## COUNT I
## VIOLATION OF 31 USC § 3729(a)(1)

83.     Relators restate, replead and incorporate by reference the information set forth in paragraphs 1 – 82 as if fully set forth herein.

84.     Defendants, acting through their employees, officers, agents and independent contractors knowingly presented claims for payment of flood damage.

85.     Defendants' claims are direct charges against the United States Treasury and were presented to the Federal Insurance Administrator, FEMA, or its agents who are officers or employees of the United States Government.

86.     The claims presented by Defendants were false or fraudulent in that:

   a.   Damage to property that was more properly reflected as wind damage, and structural damage due to wind and flying debris was characterized in adjusters reports as "flood damage" even though it did not meet the definition of "flood" found in the Standard Flood Insurance Policy, 44 CFR Pt. 61, App. A(1).

   b.   Claims were submitted for property that were outside the area designated as flood damaged by FEMA, where there was no evidence that the damage met the definition of "flood" found in the Standard Flood Insurance Policy, 44 CFR Pt. 61, App. A(1).

      c.  Defendants submitted costs and expenses for adjusting flood claims that were in fact wind or hurricane claims.

      d.  Defendants permitted agents to backdate insurance applications for flood coverage and submit damage claims when, in fact, there was never any coverage for the flood damages.

87.    The claims were submitted or caused to be submitted and presented or caused to be presented by Defendants for payment or approval.

88.    The claims were paid by the United States Government, through withdrawals of funds held by the United States Treasury, consistent with the procedure set up under the National Flood Insurance Program.

89.    As a direct and proximate result of paying millions of dollars in flood insurance claims that were in fact claims for hurricane damage, the United States Treasury sustained millions of dollars in damages.

WHEREFORE, Relators demand judgment against the Defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the Defendants each jointly and severally in an amount between Five Thousand, Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, including any alternate remedy provisions, for its court costs and reasonable attorneys fees at

prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT II

### VIOLATION OF 31 USC § 3729(a)(2)

90.    Relators restate, replead and incorporate by reference the information set forth in paragraphs 1 – 89 as if fully set forth herein.

91.    Defendants, acting through their officers, employees, agents, adjusters, and independent contractors knowingly made, used, or caused to be made or used, false records.

92.    Those false records included, but were not limited to:

    a.    False adjustment reports which were false in that they misidentified the nature of the damage as flood damage where there was no evidence that the damage met the definition of "flood" found in the Standard Flood Insurance Policy, 44 CFR Pt. 61, App. A(1).

    b.    False factual findings reported to FEMA or the FIA that showed that property was damaged by flood when in fact these properties were outside the area designated as flooded by FEMA.

    c.    False statements of adjusters reflecting findings of flood damage when the real structural damage had been caused by wind, or rain.

    d.    False attestations of facts on forms directing payment to be made under flood policies.

e.  False statements to homeowners, engineers, adjusters, and others in that one report by the same company concluded that the damage was due to wind, and a second, later, re-written report reflected that the damage was caused by flood.

f.  False expense reports submitted to the FIA for NFIP adjustment expenses.

93.  Defendants submitted or caused to be submitted these false records or statements in order to get false or fraudulent claims paid or approved by the Government under the National Flood Insurance Program.

94.  As a direct and proximate result of the submission of the false claims and false records and reports, the United States Treasury paid millions of dollars in claims for flood insurance that should have been paid by the Defendants.

95.  As a direct and proximate result of paying millions of dollars in flood insurance claims that were in fact claims for hurricane damage, the United States Treasury sustained millions of dollars in damages.

WHEREFORE, Relators demand judgment against the Defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the Defendants each jointly and severally in an amount between Five Thousand, Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, including any alternate remedy provisions, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT III
## VIOLATION OF 31 USC § 3729(a)(3)

96.  Relators restate, replead and incorporate by reference the information set forth in paragraphs 1 – 95 as if fully set forth herein.

97.  Defendants, acting through their officers, employees, agents, adjusters, and independent contractors conspired to defraud the Government by getting false or fraudulent claims allowed or paid.

98.  Defendants conspired with:

a.  outside adjusters, including adjusters specially hired to adjust the losses in the Hurricane Katrina area, and directed them to service homeowners with claims.   The names of these individual adjusters and adjustment companies are not all known to the Relators but are discoverable by the government.

b.  Agents, officers, employees or servants of Forensic Analysis Engineering Corporation, FEAC, to have those agents, officers, employees or servants issue false and misleading engineering analysis reports, and to "correct" any analysis reports that showed that the damage was due to any cause other than flooding.

c.  Agents, officers, employees or servants of other Engineering firms, whose names are unknown to Relators presently but who are discoverable by the government.

d.  Defendants conspired, on information and belief, with certain homeowners by instructing them to fill out their homeowners insurance claims and hurricane damage claims as flood insurance claims promising to maximize flood insurance claim damage in exchange for not collecting under homeowner's coverages.

i.  Defendants, on information and belief, instructed their insureds to fill out their claim forms in this manner so as to misallocate the liability for payment to FEMA, the FIA, and the National Flood Insurance Program.

99.  Defendants conspired with engineers who were independent contractors offering them material inducements (continuing business relationships) to submit flood insurance claims instead of hurricane or homeowners claims.

100.  Defendants conspired with purportedly independent FEAC and other engineering firms (John Does 1 – 4) yet to be discovered directing them to find flood damage instead of wind damage so as to permit the maximum payout from federal funds rather than from the Defendants' Nationwide and State Farm Insurance Company's reserves.  On information and belief, if an engineering firm refused to change a determination to "flood" State Farm and Nationwide would no longer hire that engineer to provide engineering consulting services.

101.  When the engineering firm neglected to find flood damage, the insurance companies would refuse to pay invoices until the reports were reclassified as flood, thereby placing undue pressure upon and exercising control over

purportedly independent contractors for the purpose of furthering the conspiracy to defraud the government.

102. Defendants and their co-conspirators acted with the intent to deceive and defraud the United States Government by pushing off the responsibility for paying hurricane claims on the US Government and by causing purportedly independent engineering firms to re-write reports to transfer responsibility to the FEMA funds available under the NFIP.

103. Defendants took material steps in furtherance of the conspiracy, to wit:

    a.  State Farm Insurance Company submitted claims through the FIA to the NFIP and paid losses from federal funds instead of from its reserves.

    b.  Nationwide Insurance Company submitted claims through the FIA to the NFIP and paid losses from federal funds instead of from its reserves.

    c.  Defendant FAEC submitted replacement reports that were modified as a part of the conspiracy to reflect flood water damage instead of wind damage.

104. As a direct and proximate result of the conspiracy to submit false claims the United States Treasury paid hundreds of millions of dollars in claims for flood insurance that should have been paid by the Defendants.

105. As a direct and proximate result of paying hundreds of millions of dollars in flood insurance claims that were in fact claims for hurricane damage or homeowners' insurance damage payable from the reserves of the Defendants'

insurance companies, the United States Treasury sustained millions of dollars in damages.

WHEREFORE, Relators demand judgment against the Defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the Defendants each jointly and severally in an amount between Five Thousand, Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, including any alternate remedy provisions, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

### COUNT IV

### VIOLATION OF 31 USC  3729(a)(7)

### (Reverse False Claims)

106. Relators restate, replead and incorporate by reference the information set forth in paragraphs 1 – 105 as if fully set forth herein.

107. Defendants knew or in the exercise of reasonable care should have known that claims presented to the United States Treasury for payment under the National Flood Insurance Program were false or fraudulent, and should not have been paid from federal funds.

108. As such, Defendants knew or in the exercise of reasonable care should have known that they were in possession of money that was rightfully that of the

United States Government, since the reserves saved by paying claims from the NFIP should in fact have been paid out to policy-holders, and instead, those losses were passed along to the federal treasury.

109. Defendants knew that false records, specifically, false engineering and inspection reports were created in order to justify payment of claims from the NFIP.

110. Defendants also knew that they were in possession of initial engineering reports that showed that the true cause of the damage was wind.

111. The original engineering reports should have been maintained in the claims folders along with all other records associated with the claims.

112. Instead, the engineering documents were pulled and any "original" documents showing wind damage were shredded by "Shred It" or by employees of Defendants.

113. When a document that would normally be a part of a record is removed, spoliated and/or destroyed it is the creation of a false record because the omitted documents create a false impression in the record.

114. Defendants knowingly created false records by omitting, concealing, suppressing, spoliating or destroying the original engineering reports and original invoices.

115. The suppression, omission, concealment, spoliation or destruction of the original reports and records was done to conceal, avoid, or decrease the Defendants' liability to repay the federal government.

116. The actions of the Defendants in creating false records in order to avoid or decrease a liability to the federal government resulted in damage to the federal treasury.

WHEREFORE, Relators demand judgment against the Defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the Defendants each jointly and severally in an amount between Five Thousand, Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, including any alternate remedy provisions, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

Respectfully submitted,

THE SCRUGGS LAW FIRM

Richard F. Scruggs
Sid Backstrom
Zachary Scruggs
120A Courthouse Square
P.O. Box 1136
Oxford, MS. 38655
662-281-1212

BARTIMUS, FRICKLETON,
ROBERTSON & GORNY, P.C.

Edward D. Robertson, Jr., MO Bar #27183
Anthony L. Dewitt, MO Bar #41612
Mary Doerhoff Winter, MO Bar #38328
Co-Counsel for Relators
715 Swifts Highway
Jefferson City, MO 65109
573-659-4454
Fax: 573-659-4460

Todd Graves, Esq.
Bartle, Marcus & Graves, PC
1100 Main Street # 2600
Kansas City, MO  64105
(816) 305-6288

ATTORNEYS FOR RELATORS

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues for which a jury is available.

Respectfully submitted,

THE SCRUGGS LAW FIRM

BARTIMUS, FRICKLETON,
ROBERTSON & GORNY, P.C.

*Richard F. Scruggs*

Richard F. Scruggs
Sid Backstrom
Zachary Scruggs
120A Courthouse Square
P.O. Box 1136
Oxford, MS. 38655
662-281-1212

Edward D. Robertson, Jr., MO Bar #27183
Anthony L. Dewitt, MO Bar #41612
Mary Doerhoff Winter,  MO Bar #38328
Co-Counsel for Relators
715 Swifts Highway
Jefferson City, MO 65109
573-659-4454
Fax: 573-659-4460

Todd Graves, Esq.
Bartle, Marcus & Graves, PC
1100 Main Street # 2600
Kansas City, MO  64105
(816) 305-6288

ATTORNEYS FOR RELATORS

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 26th day of April, 2006, a copy of the foregoing

Complaint and the required disclosure statement was served on the individuals below by

first class mail, certified, return receipt requested to Dunn O. Lampton, US Attorney's

Office, 188 E. Capitol St., Suite 500, Jackson, MS, 39201, and by placing the same in the

United States Mail, first class postage affixed, certified, return receipt requested, and

addressed to Alberto Gonzales, Esq., at the address below:

Dunn O. Lampton, Esq.
United States Attorney
188 E. Capitol Street Ste 500
Jackson, MS  39201




Hon. Alberto Gonzales, Esq.
Attorney General of the United States
5111 Main Justice Building
10th & Constitution Ave. N.W.
Washington, DC 20210


Attorneys for Relators