Excerpts from Fisher Deposition in Lott v. State Farm Fire & Cas. Co.

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                    SOUTHERN DIVISION
3
   TRENT AND TRICIA LOTT                          PLAINTIFFS
4
   VERSUS                    NO. 1:05-cv-671 LG-RHW
5
   STATE FARM FIRE & CASUALTY COMPANY
6  AND JOHN DOES 1 THROUGH 10                     DEFENDANTS
7  _____
8
9
10
11
           VIDEOTAPED DEPOSITION OF RACHEL FISHER
12
13
14
15
           Deposition Taken at the Instance of
16                 THE PLAINTIFFS
17              In the Offices of
           Baker, Donelson, Bearman & Caldwell, PC
18              Jackson, Mississippi
19              On Tuesday, April 24, 2007
                Commencing at 10:28 a.m.
20
21
   REPORTED BY:  LORI P. GALLASPY
22          Registered Professional Reporter
            MS CSR #1630
23 _____
            STATE-WIDE REPORTERS
24      A MERRILL COMMUNICATIONS COMPANY
          4400 Old Canton Road, Suite 160
25          Jackson, Mississippi 39211
              (601) 366-9676

1  APPEARANCES:
2
   David Zachary Scruggs, Esq.
3   THE SCRUGGS LAW FIRM, P.A.
   Post Office Box 1136
4   Oxford, Mississippi  38655-1136
   Telephone:  (662) 281-1212
5       REPRESENTING PLAINTIFFS
6
   W. Scott Welch, III, Esq.
7   William N. Reed, Esq.
   BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
8   4268 I-55 North
   Meadowbrook Office Park
9   Jackson, Mississippi  39211
   Telephone:  (601) 351-2440
10       REPRESENTING DEFENDANT STATE FARM FIRE &
        CASUALTY COMPANY
11
12   Victoria L. Helms, Esq.
   HELMS & GREENE, LLC
13   115 Perimeter Center Place, Suite 635
   Atlanta, Georgia  30346
14   Telephone:  (770) 206-3371
       REPRESENTING RACHEL FISHER
15
16
17  Also present:
   Heather Usry, videographer
18
19
20
21
22
23
24
25

1   TABLE OF CONTENTS:

2

3   Appearances  ...............................   2

4   Table of Contents ...........................

5       Exhibit 1 marked ......................   4
            Notice of Videotape Deposition

6
        Examination by Mr. Scruggs .................   4

7
            Exhibit 2 marked ......................   77

8           Lott Homeowners Policy

9       Exhibit 3 marked ......................   85
            Insurance Dept. Bulletin

10
            Exhibit 4 marked ......................   88

11          Wind/Water Protocol

12      Exhibits 5 and 6 marked ...............   144
            Claim Files

13
            Exhibit 7 marked ......................   164

14          Code of Conduct

15  Examination by Mr. Welch ...................   184

16  Certificate of Reporter  ...................   188

17  Certificate of Deponent  ...................   189

18  Correction Sheet  ...........................   190

19

20

21

22

23

24

25

## *Training on Flood Claims*

41

4  Q   So you're hired on at Renfroe in '98, but
5  Renfroe itself gave you no training on how to adjust
6  claims.
7      A   You were to train with the adjuster as an
8  assistant.
9      Q   Okay.  So the training you received in how to
10  adjust claims came from Kerri Rigsby by virtue of the
11  fact that you were her assistant.
12     A   Correct.
13     Q   Okay.  Did Renfroe offer any courses on how to
14  adjust certain kind of claims or anything like that?
15     A   During the course of that time, yes.
16     Q   Okay.  But would it be fair to say your primary
17  training on how to adjust claims came from working hands
18  on as an assistant to an adjuster?
19     A   Yes.
20        MS. HELMS:  Object to form.
21  BY MR. SCRUGGS:
22     Q   The answer?
23     A   Yes.
24     Q   Okay.  Well, I think you testified that Renfroe
25  offered or gave some courses.  Can you tell me about

42

1  those?
2      A   We were given courses on how to work the
3  software programs, Xactimate, for estimating; we were
4  given courses on making sure we knew how to diagram
5  roofs, measure roofs; courses on identification of
6  damages.
7      Q   What do you mean by that, identification of
8  damages?
9      A   What hail damage looks like on a roof, what
10  wind damage looks like on a roof.
11     Q   Let's stick with that for a minute.  Renfroe
12  offered courses on various things, how to use certain
13  softwares, estimating softwares, and the last thing you
14  hit on was identification of damage and to determine what
15  wind damage looked like.  Is that correct?
16     A   Uh-huh.
17     Q   What about water damage?
18     A   Same.
19     Q   Okay.  Tell me about those courses and that
20  instruction on identifying damage, wind and water.
21     A   I don't understand what you're asking me.
22     Q   I'll try to ask it a better way.  You had
23  courses on identifying how to identify damage.  Tell me
24  about those courses and instruction that you received
25  from Renfroe.

43

1    A   They were instructional classes to -- with
2  photographs, with documentation just so that you would
3  know what was hail damage, what wasn't hail damage, what
4  we -- what they felt like would constitute wind damage on
5  a shingle, if there was flood damage, what to look for.
6    Q   Did Renfroe offer these courses itself or did
7  someone else?  Who conducted these courses?
8    A   Usually it was a State Farm training team.
9  Often it would be a Renfroe training team.  It -- it
10  could be both.
11    Q   How many of these courses do you remember
12  attending?
13    A   I don't remember.
14    Q   More than one?
15    A   More than one.
16    Q   More than ten?
17    A   I don't remember.
18    Q   Okay.  And it's your testimony that either
19  State Farm or Renfroe or a combination of the two would
20  conduct these courses on how to identify what was wind
21  damage and what was water damage.
22    A   Yes.
23    Q   Where did these -- were these -- was this a
24  seminar type class?
25    A   Sometimes it would be a seminar, sometimes it

44
1  would be on the site of the catastrophe training.
2    Q   Were they -- did they give you documents or
3  manuals or anything in these courses to help you --
4  strike that.  I can ask it a better way.
5        During these instructional courses where you
6  were taught on how to identify wind damage and water
7  damage, did they give you any manuals or pamphlets or
8  instructions?
9    A   Yes.
10    Q   Okay.  Do you still have those?
11    A   Probably.
12    Q   Okay.  And these would have been informational
13  documents that State Farm would've given you?
14        MS. HELMS:  Object to form.
15    A   I'm trying to remember.  If there were things
16  that were given to us, they probably would have come from
17  State Farm.
18  BY MR. SCRUGGS:
19    Q   And it's your testimony that you still might
20  have some of that material in your possession?
21    A   I may.
22    Q   Okay.  Would it be fair to say that the only
23  training you received on how to identify what was wind
24  damage and what was water or flood damage came from these
25  State Farm courses?

45
1        MS. HELMS:  Object to --
2        MR. WELCH:  Object to --

3       MS. HELMS:  -- form.
4       MR. WELCH:  -- form.
5 BY MR. SCRUGGS:
6    Q    You can answer.
7       MR. WELCH:  You can still answer, if you can.
8    A    It would have been those courses and on-the-job
9 training.


                                47
8  Q    Would State Farm have conducted some of these
9 courses?
10    A    State Farm does conduct the flood certification
11 courses.
12    Q    Okay.  Have you been to a State Farm flood
13 certification course?
14    A    Yes.
15    Q    Tell me when.
16    A    2005, 2006, 2007.
17    Q    So the annual convention in Biloxi in March
18 2005, the annual meeting in I think it was Austin in
19 2006, and the annual meeting a couple months ago, State
20 Farm sponsors a flood certification class.
21    A    Yes.
22    Q    And you've attended all three of those.
23    A    Yes.


## *State Farm instructing Renfroe to pay Flood Immedately on September 4, 2005*


                                65
5  Q    Okay.  Correct me if I'm wrong.  I think your
6 prior testimony was that at these annual conventions that
7 there would be flood certification classes at these
8 annual conventions, these Renfroe --
9    A    Uh-huh.
10    Q    Okay.  Were there also State Farm personnel
11 there that conducted seminars?
12    A    Yes.
13    Q    Tell me who some of these people would've been.
14    A    The flood certification was usually conducted
15 by a State Farm representative with an NFIP person
16 present.
17    Q    Who was the State Farm person that conducted
18 the certification?
19    A    Lecky King twice and Mike Ferrier this past
20 year.
21    Q    When you first were certified in 2005, was it
22 Lecky King that certified you?

23    A   Yes.
24    Q   Okay.  Other than the flood certification
25  class, what other seminars would State Farm conduct at

66

1  these conventions?
2    A   We would do roof analysis, sketch programs,
3  basic estimatics, rope and harness training.  Several
4  different variables necessary for adjusting.
5    Q   Okay.  Anything related specifically to
6  hurricane claims?
7    A   Wind adjustments.
8    Q   Okay.  Well, what -- what training did State
9  Farm personnel give you regarding wind?
10    A   It wouldn't always be State Farm personnel.  It
11  might be Hague Engineering, it might be another
12  engineering firm.  To determine the difference between
13  what was wind damage primarily, and then we would do our
14  flood certification to determine the flood damage.
15    Q   So --
16    A   We were also given -- there was also -- there's
17  also a component in the flood damage to distinguish
18  between wind and water damages.
19    Q   Who conducted that?
20    A   Whoever was conducting the flood certification.
21  It's built into the flood certification itself.


69

18  Q   Okay.  How did Renfroe come to be assigned or
19  dispatched down to the Gulf Coast to adjust these claims?
20      MS. HELMS:  Object to form.
21    A   How they were?  I don't have knowledge of how
22  that --
23  BY MR. SCRUGGS:
24    Q   Why was Renfroe assigned?
25      MS. HELMS:  Object to form.

70

1    A   They're an adjusting firm, and they needed
2  adjusters.
3  BY MR. SCRUGGS:
4    Q   And every catastrophe you worked prior to
5  Katrina was on behalf of State Farm.
6    A   Yes.
7    Q   When were you assigned to go down to the Gulf
8  Coast to adjust this catastrophe?
9    A   September the 4th.
10    Q   Do you know why you were assigned?
11    A   Because I have experience working hurricane
12  claims.
13    Q   Okay.  And your first real experience was the
14  hurricanes in September 2004.  Is that correct?
15    A   Yes.
16    Q   And you first came down -- well, were you

17  already down here --
18      A   Yes.
19      Q   -- on the Gulf Coast?
20      A   Yes.
21      Q   But the first day on the job as far as
22  adjusting claims for State Farm would've been
23  September 4th.
24      A   Yes.
25      Q   Do you know how many Renfroe adjusters were

71

1   assigned down here --
2       A   I do not.
3       Q   -- on the Gulf Coast?
4       A   I do not.
5       Q   To your knowledge, did Renfroe adjust claims on
6   the Gulf Coast for any carrier other than State Farm?
7       A   I have no way of knowing that.
8       Q   But you didn't adjust any claims other than
9   State Farm claims.
10      A   No.
11      Q   Okay.  Were you given any instruction or
12  training on how to adjust Hurricane Katrina claims prior
13  to assignment?
14      A   No.
15      Q   Okay.  What about after you were assigned?
16      A   No.
17      Q   Okay.  Did you attend any kind of -- was there
18  any kind of orientation?  I believe you testified there
19  was something in Birmingham?
20      A   Yes.
21      Q   Help me out with that.  What was that?
22      A   I did not attend the orientation in Birmingham.
23      Q   Okay.
24      A   There were other similar classes as other
25  catastrophes when we first arrived as far as how we were

72

1   going to set up the paperwork and how they wanted the
2   pictures done and how they wanted the forms -- format of
3   the claim itself.
4       Q   Okay.  But you didn't attend -- there was a
5   preadjustment orientation session in Birmingham --
6       A   Yes.
7       Q   -- but you didn't attend that.
8       A   I did not.
9       Q   Who conducted that?
10      A   I have no idea.
11      Q   Was it Renfroe's headquarters?
12      A   I have no idea.
13      Q   So is it your testimony you didn't have any
14  orientation training prior to being sent out in the field
15  to adjust claims?
16          MS. HELMS:  Object to form.
17      A   I did not attend the formal orientation in
18  Birmingham.

19  BY MR. SCRUGGS:
20     Q    Any other orientations?
21     A    I attended all other orientations that were
22  conducted during Katrina at the job site.
23     Q    Tell me the first.  When was the first
24  orientation session that you actually attended that
25  related to how to adjust these claims?

73

1     A    I don't remember the exact date.  It would've
2  been within the first few days of the storm.
3     Q    Okay.  Couple days after you were assigned on
4  September 4th?
5     A    Yes, probably.
6     Q    Okay.  Tell me about that orientation session.
7     A    It was specifically to how we were going to
8  work the paperwork behind the claims, how they were going
9  to set up satellite offices for us to be able to take our
10  claims there to get payment, what information would be
11  needed for the claim.  It was strictly how to set up the
12  file and conduct the file items.  We were instructed that
13  we were going to pay the flood now and assess wind damage
14  at a later date.
15     Q    Who gave you that instruction?
16     A    I believe it was the section manager that was
17  there at the time.
18     Q    And who was that?
19     A    Dave Randall.
20     Q    So Dave Randall instructed you and the other
21  people adjusting claims to go ahead and pay flood.  If
22  there was flood coverage available, to pay it right away.
23     A    Uh-huh.
24     Q    And then later on try to determine if there was
25  any wind damage.

74

1     A    Correct, unless -- unless the wind damage was
2  obvious at the time of the inspection.
3     Q    Okay.  And that would've been a couple days
4  after the storm that you were given this instruction to
5  pay flood right away.
6     A    Yes.
7     Q    Okay.  How were you instructed on -- strike
8  that.
9         What instructions did you receive at this
10  orientation session on how to adjust a slab claim when
11  there was nothing there?
12     A    We were to pay -- if they had a flood policy in
13  effect, we were to pay the flood, and we were to evaluate
14  the wind when more wind data was there.
15     Q    So pay the flood coverage if it's available
16  right away.
17     A    Yes.
18     Q    And evaluate the wind damage later.
19     A    Yes.
20  Q    What if a slab -- what if you were adjusting a

21  slab case where there was no flood coverage, what were
22  your instructions on how to adjust that claim?
23      A   To meet the individuals, try to get as much
24  information from them as possible, and discuss the fact
25  that we were adjusting the flood first but that we would

75

1  evaluate the wind as more data came in.
2      Q   Do you know why you were instructed to adjust
3  and pay the flood first?
4      A   Because the surge data was more readily
5  available than the wind data.
6      Q   Did you yourself see any surge data?
7      A   I saw the surge.
8      Q   You saw the surge everywhere on the Gulf Coast?
9      A   No, in Ocean Springs.
10      Q   Okay.  But not all the claims you adjusted were
11  in Ocean Springs, were they?
12      A   No, they were not.
13      Q   Okay.  In fact, most of them weren't.  Is that
14  correct?
15      A   Most of them were not.

***

89

25  Q   Okay.  During the time you were there adjusting

90

1  claims in Katrina, were you ever provided any weather
2  data from anybody?
3      A   No.
4      Q   Okay.
5      A   Not other than what appeared in engineering
6  reports I looked at.
7      Q   Okay.  But other than the engineering reports
8  that were coming back to you, nothing that was given to
9  you that would indicate what the wind speeds or the water
10  levels were.
11      A   No.

## *State Farm's Adjustment Of The Lott Claim*

98

16  Q   Let's get to the actual adjustment of the Lott
17  claim.  How did you come to be assigned Trent and
18  Tricia's claim?
19          MS. HELMS:  Object to form.
20      A   I was at the time being assigned any
21  time-sensitive insureds.
22  BY MR. SCRUGGS:
23      Q   And the Lotts were considered time-sensitive

24  insureds?
25      A   Any insured that we needed to have their claim

99
1  adjusted so they could continue to service either the
2  policyholders or constituents and didn't have -- we
3  didn't have a lot of time to be fooling around with back
4  and forth and back and forth type claims.
5      Q   Who assigned you to the Lott claim?
6      A   I don't know.
7      Q   Do you know why you were assigned?
8      A   I'm not certain why I was assigned.
9      Q   Do you have any idea at all?
10      A   Because I have prior expertise in both flood,
11  hurricane, and working with more sensitive claims.
12      Q   Okay.  Were you the only person down there for
13  Renfroe that had that kind of experience?
14      A   No.
15      Q   When you were assigned the claim, tell me the
16  date you were assigned the Lott claim.
17      A   September the 5th.
18      Q   Right after you started work.
19      A   Yes.
20      Q   Okay.  Were you assigned both the flood and
21  homeowners claim?
22      A   I was assigned the flood first.  I think the
23  homeowners claim followed shortly.
24      Q   Okay.  So the answer is, you were adjusting
25  both claims.

100
1      A   Yes.

110
24      Q   Well, we'll -- we'll come back to it.
25          I think you testified earlier, Ms. Fisher, that

111
1  you are trained to determine the cause of a loss.
2      A   Yes.
3      Q   And you feel qualified to do so.
4      A   Yes.
5      Q   Okay.  But in a slab case, a case where there's
6  nothing there, it's hard to determine what caused a loss,
7  is it not?
8      A   It's difficult.
9      Q   Okay.  It's not easy, is it?
10      A   No.
11      Q   Okay.
12          THE VIDEOGRAPHER:  Zach, I'm sorry, would you
13  put on the microphone?  I'm getting a lot of paper noise.
14          MR. SCRUGGS:  Yeah.  I didn't have it on all
15  along.  Did you get what I --
16          THE VIDEOGRAPHER:  Yeah, I could hear, but when
17  you turn the paper it --
18          MR. SCRUGGS:  Okay.  I'm sorry.

19      THE VIDEOGRAPHER:  That's fine.
20      MR. SCRUGGS:  I don't know how long I've had it
21  off.
22  BY MR. SCRUGGS:
23      Q    I mean, in some of these cases you're not quite
24  sure what caused the loss -- when I say these cases, I'm
25  talking about a slab case -- is that fair to say?

                            112
1       A    Sometimes you're not quite sure.
2       Q    Okay.  Back to the assignment of the Lott
3  claim, who actually assigned you, told you you got the
4  Lott claim?
5       A    Lecky King.
6       Q    Okay.  Tell me what she told you about it.
7       A    Nothing.  "You have this claim.  Make sure you
8  contact them and proceed with the loss."
9       Q    What did you know about this claim before you
10  contacted them and started adjusting it?  Anything?
11      A    I knew who the insured was, and that is all.
12      Q    Did you know the condition of their house?
13      A    I did not.
14      Q    Okay.  Did Lecky or anyone at State Farm give
15  you any particular instructions on how to handle this
16  particular claim?
17      A    No.
18      Q    When did you first -- what's the first thing
19  you did once you got the assignment?
20      A    Tried to contact the insured.
21      Q    Were you successful in that?
22      A    It took me a couple of times to contact the
23  insureds.
24      Q    Who did you talk to?
25      A    I talked with Mr. and Mrs. Lott.

                            113
1       Q    Okay.  Do you remember when you first spoke
2  with them?
3       A    It would have been on or around September the
4  6th.
5       Q    Okay.  Tell me about that.  What did you tell
6  them, what did they tell you?
7       A    I told them that I was the adjuster that was
8  handling their claim and I needed to schedule a time to
9  meet at the risk if at all possible.  I asked them the
10  condition of the risk, tried to get some initial
11  information, and we scheduled an appointment time with
12  Mrs. Lott on September the 8th.
13      Q    What information did you undertake to get from
14  her?
15      A    Prior to the inspection?
16      Q    Right, in this first phone call you were
17  discussing.
18      A    Phone numbers to be able to reach them, the
19  condition of the property, for them to go ahead and start
20  making contents inventory lists, and any other numbers

21  where I could reach them in the event that something
22  happened prior to the inspection.  I also gave them my
23  contact information and my numbers, made sure they had
24  their claim number, made sure the address was correct
25  that I was going to inspect the property.

114

1    Q    Okay.  Did you talk to both of them?
2    A    I did.
3    Q    And this would've been September 8th?
4    A    No, it would've been on or around the 6th of
5  September.
6    Q    And you were going to schedule an inspection
7  for -- or a visit for the 8th.
8    A    Correct, an inspection for September the 8th.
9    Q    Okay.  So you only -- you talked to them one
10  time on the 6th prior to the visit on the 8th.
11   A    Yes.
12   Q    Okay.  Now, September 8.
13   A    Yes.
14   Q    You visited the property?
15   A    I did.
16   Q    Okay.  Tell me about that.
17   A    I met Mrs. Lott at the property.  She had a
18  gentleman with her, which I do not remember who he was.
19  He was in some way related, but I don't remember how.  We
20  inspected the property.  Mark Drain was present with me
21  at the time of the inspection.
22        And we measured the perimeter, we discussed the
23  claim, we discussed what I would be able to do for her at
24  the immediate time and that we would possibly send an
25  engineer, because her concerns were already how would --

115

1  we would determine what was wind, what was water.  And I
2  said, well, it would be possible if we cannot determine
3  it that we would send an engineer to determine it for us
4  or help us make a determination.
5        And I issued her a payment at that time for
6  incidentals toward her personal property that was lost
7  during the storm under her flood policy.
8    Q    When you say you discussed the claim, one of
9  the first -- when you -- you -- let me back up to make
10  sure I'm clear.
11        You visited the property on September 8th with
12  Mark Drain.
13   A    Uh-huh.
14   Q    And Tricia Lott was there and one other
15  gentleman.
16   A    Yes.
17   Q    And that was it.
18   A    Yes.
19   Q    Okay.  And you measured where -- strike that.
20        When you got there, was there any house there?
21   A    There was no house there.
22   Q    Okay.  So what did you inspect?

23    A   We -- we tried to find the foundational
24   footings so that we could measure the foundational
25   footings to get a, you know, relatively close square

116

1   footage of the home.  We met with her to get her to
2   describe, you know, exactly where was your living room,
3   dining room, what types of furnishings did she have so
4   that we could have an assessment that we could make an
5   attempt to form some type of a assessment of what the
6   loss to the property was.
7    Q   Okay.  But there was nothing there to look at,
8   was there?
9    A   There were some brick columns and some
10  footings.  We were able to determine pretty much the
11  foundational footings so we could determine the square
12  footage of the home.  But that was about it.
13    Q   Okay.  You said you discussed the claim.  Tell
14  me about that.
15    A   I discussed the claim process with her, what I
16  was doing there today, what I was going to do as far as
17  take back the numbers, come up with a Coverage A
18  assessment.  What I needed from her was a list of her
19  contents with years and values attached to that list of
20  contents, the process that we would go through as far as
21  from what I was going to do from the time we met until
22  payment was issued on the claim.  We addressed her
23  concerns.
24       Mark Drain, I think, talked with her concerns
25  about how are you going to determine if it was water or

117

1   wind.  I believe he addressed the concerns of, you know,
2   we would probably, you know, send an engineer or possibly
3   send an engineer out.  And I collected whatever
4   information I could get from her as far as, you know, if
5   I was issuing additional drafts, where did I send that
6   and made sure she just understood the claim process and
7   what was going to occur in her claim.
8    Q   When you say discussed the claim, were you
9   talking about both the flood and the homeowners claim?
10    A   Yes.
11    Q   Okay.  So you were adjusting both at that time.
12    A   Yes.

121

2   Q   Okay.  You testified that Mrs. Lott had some
3   questions about the wind versus water issues.
4    A   Uh-huh.
5    Q   Did she discuss those with you or Mr. Drain?
6    A   She discussed them with Mr. Drain primarily.  I
7   mean, I was standing there, but her questions were
8   addressed to him primarily.
9    Q   And what did he tell her?
10    A   That we would be evaluat- -- that we were
11  handling the flood at the time, and we were going to be

12  evaluating the wind damages.  If it -- we couldn't make a
13  determination on our own, that we would send an
14  engineering firm out to make a determination for us.
15      Q    Okay. But you were there adjusting both the
16  homeowners and the flood claim, were you not?
17      A    Yes.
18      Q    Okay.  So -- but Mr. Drain told Mrs. Lott that
19  y'all were there to adjust the flood claim?
20      A    No, no --
21          MS. HELMS:  Object to form.
22      A    No.  He stated that we were -- we could handle
23  the flood claim right now, today, meaning that moment,
24  and that we would reserve the wind until we could do
25  further investigation.

                              122
1  BY MR. SCRUGGS:
2      Q    Okay.  Well, what investigation was that?
3      A    As to determine how much of the wind damage was
4  to the home.
5      Q    Okay.  Is it fair to say from your and
6  Mr. Drain's initial inspection you weren't sure what
7  caused the loss?
8      A    That would not be fair to say.
9      Q    Okay.  You knew what caused the loss on your
10  first visit?
11      A    I felt like I knew what caused the loss on my
12  first visit.
13      Q    And what was that?
14      A    Surge.
15      Q    Okay.  Did you order an engineer for the Lott
16  house?
17      A    I'm not able to order engineer reports.
18      Q    Okay.  Well, let me back up for a minute.  I
19  think you testified that Mr. Drain told Mrs. Lott that
20  there needed to be further investigation on the wind.  Is
21  that correct?
22      A    That's correct.
23      Q    And what did that entail?
24      A    That would entail if we could not make a
25  determination of wind damage ourselves that we would, in

                              123
1  fact, hire an engineering firm.
2      Q    Did y'all hire an engineering firm for the Lott
3  house?
4      A    Yes, we did.
5      Q    Okay.  Well, why did you hire an engineer and
6  assign an engineer if you were sure what caused the loss?
7          MS. HELMS:  Object to form.
8      A    I wasn't sure what caused the loss.  You asked
9  me if I was fairly certain, and I said I was.  I'm not an
10  engineer, so we asked for an expert opinion.
11  BY MR. SCRUGGS:
12      Q    Well, that's what I'm trying to get at.  At the
13  time of your inspection on September 8th, you weren't

14  certain what caused the loss, were you?
15     A   Not absolutely certain.
16     Q   Okay.  I mean, you weren't 100 percent certain,
17  were you?
18     A   I wasn't 100 percent certain that only surge
19  caused the loss.
20     Q   Well, is it fair to say you had some doubt on
21  what caused the loss?
22         MS. HELMS:  Object --
23         MR. WELCH:  Object --
24         MS. HELMS:  -- to form.
25         MR. WELCH:  -- to form of the question.  You're

                              124
1  misstating what the witness just answered.
2         MS. HELMS:  Same --
3         MR. SCRUGGS:  I'm --
4         MS. HELMS:  -- objection.
5         MR. SCRUGGS:  -- asking her a question.
6         MS. HELMS:  Same objection.
7  BY MR. SCRUGGS:
8     Q   Is it fair --
9         MR. WELCH:  No, you --
10  BY MR. SCRUGGS:
11     Q   -- to say you had some doubt on what caused the
12  loss?
13     A   I was not 100 percent certain that surge was
14  the only cause of loss.
15     Q   And that's why you ordered an engineer.  Right?
16         MS. HELMS:  Object to form.
17  BY MR. SCRUGGS:
18     Q   That's why an engineer was assigned, because
19  you weren't sure what caused the loss, were you?
20         MS. HELMS:  Object to form.
21     A   An engineer was ordered to verify all of the
22  causes of loss.
23  BY MR. SCRUGGS:
24     Q   But you're qualified to determine the cause of
25  loss, aren't you?

                              125
1     A   Sure.
2     Q   Okay.  And you've done it many a times.
3     A   Yes.
4     Q   Many times without an engineering firm.  Right?
5     A   Yes.
6     Q   But on this particular case you had to call in
7  an engineering firm, didn't you?
8     A   I didn't have to call in an engineering firm.
9  We called in an engineering firm to try to determine if
10  there was other damages besides surge.
11     Q   Okay.  Which would mean that you weren't
12  exactly sure what caused the loss.
13         MR. WELCH:  Object to --
14         MS. HELMS:  I object to form.
15         MR. WELCH:  -- argumentative.

16      MS. HELMS:  Same objection.
17  BY MR. SCRUGGS:
18    Q   Ms. Fisher?
19    A   I've already answered the question.
20    Q   And what's the answer?
21    A   The engineering firm was sent because we were
22  not 100 percent sure that surge was the only cause of
23  loss.
24    Q   But you didn't need a engineering firm to
25  determine that flood caused any of the loss, did you?

126

1    A   No.
2    Q   Okay.  So you didn't need an engineer to
3  determine the loss was caused by flood.  You paid that
4  right away.  Is that right?
5    A   That's correct.
6    Q   Okay.  But you felt you needed an engineer to
7  determine whether wind was caused and there'd be any
8  payment under the homeowners policy.  Is that right?
9      MS. HELMS:  Object to form.
10    A   We needed an engineer to verify that storm
11  surge was not the only cause of loss.
12  BY MR. SCRUGGS:
13    Q   Because you weren't sure at the time.
14    A   We needed an engineer to verify that storm
15  surge was not the only cause of loss.
16    Q   Because you weren't sure at the time.
17    A   Because we were not 100 percent certain that
18  only storm surge caused the loss.

134

17  Q   Okay.  Did you ever on your visit on
18  September 8 try to determine the height of the storm
19  surge?
20    A   No, I did not.
21    Q   Okay.  But your testimony was that you were
22  fairly certain that surge caused the damage to the Lott
23  house after your first visit.  Is that right?
24    A   Yes.
25    Q   Okay.  But you had no idea how high the surge

135

1  was.
2    A   There was no measurable item there to measure
3  the storm surge at his home.
4    Q   That's right.  And not withstanding that lack
5  of evidence, you still decided to pay on the flood claim.
6  Is that right?
7    A   I was --
8      MR. WELCH:  Object --
9      MS. HELMS:  Object --
10      MR. WELCH:  -- to the form of the question.
11      MS. HELMS:  I join that objection.
12    A   I was instructed to pay flood first.
13  BY MR. SCRUGGS:

14    Q   Okay.  Who instructed you?
15    A   State Farm.
16    Q   Okay.  Even though you didn't know what the
17  surge level was on the Lott property.
18        MS. HELMS:  Object to form.
19    A   The data on all that had not even come in yet.
20  BY MR. SCRUGGS:
21    Q   Right.  But my answer -- but my question is,
22  you didn't know what the surge line was on the Lott
23  house, did you?
24    A   No, I did not.
25    Q   Okay.  Did you ever try to make any

                            136
1  determination on how -- on whether the wind, hurricane
2  wind, came prior to the hurricane water during Katrina
3  over the Lott residence?
4    A   I was not at the Lott residence during that
5  storm.
6    Q   I understand that, but did you ever try to make
7  any determination of the timing of the wind versus the
8  water during the hurricane for the Lott residence?
9    A   I did not.

                            139
19  Q   My question is -- and I'm going to ask this one
20  more time, I hope, that if you were certain on the cause
21  of loss, you wouldn't have needed a engineer, would you?
22        MR. WELCH:  And I object --
23        MS. HELMS:  I --
24        MR. WELCH:  -- one more time to being
25  argumentative.

                            140
1        MS. HELMS:  I object also.
2    A   Engineer was ordered to assess the cause of
3  loss of damages.
4  BY MR. SCRUGGS:
5    Q   Okay.  And that wasn't a determination you or
6  Mr. Drain were prepared to make on September 8th, was it?
7    A   The engineer was ordered to determine the cause
8  of loss to the Lotts' property.
9    Q   And that was not a determination that you or
10  Mr. Drain were prepared to make on your visit on
11  September 8th, was it?
12    A   Without all the data present, no.


## *State Farm Defrauding the Flood Program with the Lotts claim*

                            146
17  Q   And do you recognize this as the JADE
18  Engineering report for the Lott residence?

19    A    It appears to be the cover sheet for it, yes.
20    Q    Okay.  And is this the report that you would
21  have reviewed from JADE on the Lott property when it came
22  in?
23    A    Yes.
24    Q    Okay.  Go through just a couple things here.
25  Under background information on the first page of the

147

1  report, do you see that?
2    A    Page 13?
3    Q    Uh-huh.
4    A    Okay.
5    Q    Says, "The Lott home was a wooded-framed
6  structure elevated atop brick columns, located about
7  11 feet above sea-level."
8    A    Okay.
9    Q    Okay.  But the house was elevated another 7,
10  8 feet above that, was it not?
11    MS. HELMS:  Object to form.
12    A    I have no idea.
13  BY MR. SCRUGGS:
14    Q    Okay.  But you understood from the insured that
15  the house was elevated.
16    A    I understood --
17    MR. WELCH:  I'm going --
18    A    -- that it was --
19    MR. WELCH:  -- to object to the form of the
20  question.  I think the document speaks for itself.
21    MR. SCRUGGS:  I understand, but this is -- this
22  is something that Ms. Fisher reviewed in the adjustment
23  of the claim, and I'm going to ask her some questions
24  about it.
25  BY MR. SCRUGGS:

148

1    Q    That was your understanding, that --
2    A    What it says.
3    Q    -- it was elevated?
4    A    I understood it was elevated from her.
5    Q    So with that understanding, the house would've
6  been a lot higher than 11 feet above sea level, wouldn't
7  it?
8    MR. WELCH:  Object to the form of the question.
9  It's argumentative, and that's not what the sentence
10  says.
11    MS. HELMS:  I join the objection.
12    A    I have no idea how high the house was above sea
13  level.
14  BY MR. SCRUGGS:
15    Q    But you under- --
16    A    This says it was located about 11 feet above
17  sea level.
18    Q    But you understood it was elevated from that
19  point.  Right?
20    A    No, I -- I have no way of knowing that.

21    Q    Okay.
22    A    I only know what it says right here.
23    Q    Okay.  You didn't make any effort to determine
24   whether the house was elevated?
25    A    The house was elevated, but there was no way

149

1   for me to determine what sea level was at that location.
2    Q    Okay.  So you never tried to determine how high
3   the house would've been above sea level.
4    A    No, I did not.
5    Q    Okay.  Have you reviewed any engineering -- or
6   strike that.
7        Have you reviewed any expert reports prepared
8   in conjunction with this litigation from State Farm?
9    A    No.
10    Q    Okay.  If those expert reports said that the
11   house was 18 feet above sea level, would you doubt that
12   at all?
13        MS. HELMS:  Object to form.
14        MR. WELCH:  Object.
15    A    I would have no way of knowing.
16   BY MR. SCRUGGS:
17    Q    Okay.  That's not something you did in the
18   adjustment of your claim to determine --
19    A    No.
20    Q    -- how high the house was.
21    A    No.
22    Q    And you also testified you didn't know how high
23   the surge level got at the time of your inspection.  Is
24   that right?
25    A    That's correct.


157

13    Q    Okay.  This is a -- purports to be a check
14   issued September 8th, '05, for $10,000.  Is that right?
15    A    That's correct.
16    Q    And is this what you testified you paid the
17   Lotts for the content claim on the flood claim?
18    A    Yes.
19    Q    Okay.  So you paid the Lotts $10,000 on
20   September 8th, '05.
21    A    Yes.
22    Q    Okay.  And this was on the day of your
23   inspection.
24    A    That is.
25    Q    Okay.  And -- I tell you what, I goofed.

158

1   There's one thing -- if you can go back to the homeowners
2   claim file, which is Exhibit 5, page 61.
3    A    Okay.
4    Q    What is -- what is the document that's on page
5   61 of the homeowner file?
6    A    I have a request for engineer.

7    Q    Okay.
8    A    Form.
9    Q    And who filled that out?
10    A    I completed the upper portion where it is
11   typed, and the handwritten portion I have no idea who
12   completed.
13    Q    Okay.  But you -- you've -- you filed out the
14   typed part --
15    A    I did.
16    Q    -- for request for engineer on September 23rd,
17   2005?
18    A    I did.
19    Q    Okay.  And the reason was to determine the
20   cause of loss, wind versus flood.  Right?
21    A    Correct.
22    Q    Okay.  All right.  You can put that away and go
23   back to -- so you issued this check to the Lotts on
24   September 8th, '05, under the flood claim.
25    A    I did.

                              159
1    Q    And that was about two weeks before you ordered
2   an engineer to -- or requested an engineer to go to the
3   Lott property?
4    A    I guess it was, yes.
5    Q    Okay.  If you could turn the page to 0008 --
6   actually, strike that -- 0009, and tell us what this is.
7    A    It's a draft payment to Mr. and Mrs. Lott under
8   their flood policy.
9    Q    For how much?
10    A    For their Coverage A limits.
11    Q    Which was?
12    A    $250,000.
13    Q    Okay.  When was this check issued?
14    A    September the 22nd, 2005.
15    Q    So you paid the Lotts $250,000 for their
16   Coverage A damage the day before you ordered an engineer
17   or requested an engineer to go out and determine the
18   cause of loss.
19    A    Okay.
20    Q    Is that right?
21    A    That's what the check says.
22    Q    Okay.  Well, I'm asking you.  Is that -- is
23   that question correct, that you --
24    A    This check was entered -- was issued a day
25   before the request, yes.

                              160
1    Q    Okay.  For 250,000.
2    A    Correct.
3    Q    Okay.  So is it fair to say that State Farm had
4   already made the decision that the Lotts' claim was
5   caused by flood?
6         MS. HELMS:  Object to form.
7    A    That would be incorrect.
8   BY MR. SCRUGGS:

9    Q    But you just paid them $250,000.  Right?
10   A    We were instructed to pay all flood coverages
11  now.
12   Q    Okay.  So you determined that --
13   A    All flood coverages.  If they had flood
14  coverages, all flood coverages were paid immediately.
15   Q    Okay.  So you made the -- you wouldn't have
16  paid the flood coverage if you didn't think the loss was
17  caused by --
18   A    All --
19   Q    -- flood, would you?
20   A    -- flood coverages were paid --
21   Q    Let me finish my --
22   A    -- immediately.
23   Q    -- question, Ms. Fisher.  And I don't need the
24  same answer to every question.
25          State Farm paid the Lotts by September 22nd

                            161
1  300 -- excuse me, $260,000.  Is that right?
2    A    Correct.
3    Q    Okay.  And this is before an engineer was ever
4  requested to determine the cause of loss.
5    A    Correct.
6    Q    Okay.  So is it fair to say that State Farm
7  already made the decision on what caused this loss?
8    A    No --
9          MS. HELMS:  Object to form.
10   A    -- it is not.
11  BY MR. SCRUGGS:
12   Q    So you paid $260,000 in flood money when you
13  weren't sure if flood caused the loss?
14   A    We paid $260,000 worth of flood money because
15  we believed flood to be the primary cause of loss.
16   Q    So you made that determination.
17   A    It was determined to be the probable primary
18  cause of loss.
19   Q    Okay.
20   A    We paid all flood claims up front.
21   Q    Okay.  Before even sending an engineer out to
22  determine the cause of loss --
23          MR. WELCH:  Object to argumentative.  Answered
24  and answered -- asked and answered.
25          MS. HELMS:  Same objections.

                            162
1  BY MR. SCRUGGS:
2    Q    Okay.
3    A    We paid the flood claims up front.
4    Q    Before determining what caused the loss.
5          MR. WELCH:  Objection --
6          MS. HELMS:  Object.
7          MR. WELCH:  -- that's not what the witness has
8  said.  Now you're misstating her testimony.
9          MR. SCRUGGS:  Well, I object to you testifying
10  what she did or didn't say.  Not really quite sure what

11  she's saying, so I'm going to ask it again.

12  BY MR. SCRUGGS:

13      Q    State Farm decided to pay the flood money up

14  front before it made any determination in this case what

15  caused the loss.  Is that right?

16          MS. HELMS:  Object --

17          MR. WELCH:  And I object --

18          MS. HELMS:  -- to form.

19          MR. WELCH:  -- to the form of the question.

20      A    We were instructed to pay all flood losses if

21  insureds had flood coverage and there was evidence of

22  flood immediately.

23  BY MR. SCRUGGS:

24      Q    What evidence of flood was there on the Lott

25  residence?  You didn't know what the surge line was, did

                                    163

1   you?

2       A    The surrounding properties were visible.

3       Q    Didn't you testify earlier that you didn't go

4   look at any surrounding properties?

5       A    I didn't have to walk up to a surrounding

6   property to see surge damage to that property.

7       Q    You could tell from a mile away?

8       A    I could tell from the front yard.

9       Q    Okay.  What could you tell from the front yard?

10      A    That the upstairs was intact, the roof was

11  intact, and the lower level was completely gutted.

12      Q    But the house was still there.  Right?

13      A    Yeah.

14      Q    And your testimony is --

15      A    That I believe that was surge damage, yes.

16      Q    Okay.  Though you had no idea what the surge

17  level was on the Lott residence.

18          MS. HELMS:  Object to form.

19      A    No, I did not.