**Westlaw.**

**NewsRoom**

10/20/05 CONGTMY (No Page)

Page 1

10/20/05 Cong. Testimony (Pg. Unavail. Online)
2005 WLNR 16997746

Congressional Testimony via FDCH
Copyright 2005 Voxant

October 20, 2005

H.R. 3669;

xfdte FLOOD-INSURANCE-PROGRAM sked

TESTIMONY

October 20, 2005

DAVID I. MAURSTAD

ACTING DIRECTOR AND FEDERAL INSURANCE ADMINISTRATOR

DEPARTMENT OF HOMELAND SECURITY

HOUSE FINANCIAL SERVICES

HOUSING AND COMMUNITY OPPORTUNITY

FLOOD INSURANCE PROGRAM

H.R. 3669;

CQ Transcriptions, LLC

1255 22nd Street N.W.

Washington, D.C. 20037

Transcript/Programming: Tel. 301-731-1728

Sales: Tel. 202-419-8500  ext 599

sales@cq.com

www.cq.com

CQ Transcriptions, LLC

is a private firm not affiliated with the U.S. Government.

Copyright 2005 by CQ Transcriptions, LLC

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.


EXHIBIT 1

Washington, D.C. U.S.A. All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.

Statement of David I. Maurstad Acting Director and Federal Insurance Administrator, Mitigation Division Federal Emergency Management Agency Department of Homeland Security

Committee on House Financial Services Subcommittee on Housing and Community Opportunity

October 20, 2005

Good morning Chairman Oxley, Ranking Member Frank, and Members of the Committee. I am David Maurstad, Acting Mitigation Division Director and Federal Insurance Administrator for the Federal Emergency Management Agency (FEMA) within the Department of Homeland Security. I appreciate the opportunity to appear today before the Committee to discuss the status of the National Flood Insurance Program (NFIP), particularly after the devastating effects of Hurricanes Katrina and Rita.

FEMA`s Mitigation Division manages the NFIP - the cornerstone of the Nation`s strategy to prepare communities for flood events. When I accepted the position of Acting Director of Mitigation, the NFIP became one of my most important responsibilities and a top priority. During my tenure, I have used my 25 years of experience in the insurance industry to help guide the successful implementation of this program. This year`s hurricane season represents a significant challenge for the NFIP.

Hurricane Katrina was a monumental flooding event that was further exacerbated by the impact of Hurricane Rita. The magnitude and severity of flood losses related to these storms are unprecedented in the history of the NFIP. The challenges these storms have presented to the Mitigation Division - in terms of flood insurance claims handling, floodplain management, and mitigation planning and grants management - have never been encountered, on this scale, before. Let me provide a context for what the NFIP, and the Nation, is facing. Since the NFIP`s inception in 1968, $15 billion has been paid out to cover more than 1.3 million losses. In 2001, Tropical Storm Allison resulted in the NFIP`s first billion-dollar storm with over 30,291 claims received totaling $1.1 billion. Just last year the 2004 hurricane season resulted in over 75,022 claims totaling close to $2 billion dollars paid out in NFIP coverage.

We estimate that Hurricanes Katrina and Rita will result in flood insurance claims that significantly exceed the highest number of claims filed from any single event in the NFIP`s history, and well more than triple the total number of claims filed in 2004. Katrina and Rita-related NFIP claims could exceed $22 billion, far surpassing claims paid in the entire history of the NFIP. These claims from those

whose homes and businesses have been damaged or destroyed by Hurricane Katrina are not a new obligation - they are the result of a legal promise we made to these homeowners and business owners when Congress passed the National Flood Insurance Act of 1968 and subsequent revisions.

Homeowners and business owner agreed to pay premiums, communities agreed to adopt building codes to mitigate flood dangers, and the federal government agreed to provide insurance coverage to policyholders after a disaster. Every single one of these claims represents someone who has taken the responsible course of action by purchasing flood insurance and paying premiums to the government.

We not only have a legal obligation to honor our commitments, but we have a moral obligation to provide the coverage we`ve promised to provide. Since the tragic events of the past six weeks, I have traveled to the Gulf Coast to meet and work closely with the Insurance Commissioners from the affected areas. After seeing the devastation first-hand and listening to State and local government representatives, insurance industry representatives, and flood victims, we have developed a post-disaster mitigation strategy that will carry us forward in the days, months, and years ahead. Now, more than ever, we must build on these already strong partnerships and remain engaged in developing and implementing innovative approaches and solutions to meet the many challenges we will face as we help the Gulf Coast rebuild stronger, safer, and smarter. Today, I will focus on the National Flood Insurance Program`s financial status, and highlight several aspects of our post-disaster mitigation strategy. This strategy aggressively provides critical flood insurance information to State and local officials, adjusters, home and business owners, and policyholders in the affected areas so that they may rebuild a stronger, less vulnerable Gulf Coast.

NFIP Financial Status and Related Issues

Congress authorized NFIP in 1968 following a series of hurricanes in the mid-1950`s and 1960`s. At that time, affordable flood insurance was not generally available from the private insurance industry.

The concept was that the Federal government would make flood insurance available to the people if local governments would adopt and enforce measures to make future construction safer from flooding.

Today, more than 20,100 communities in all 50 States and U.S. Territories voluntarily participate in the NFIP, representing about 95 percent of all properties in the Nation`s Special Flood Hazard Areas. The NFIP provides these communities with maps that identify flood risks and help local government decision makers determine how flood-prone areas are used and how buildings in these areas should be constructed. These maps, which we are in the process of modernizing and making more accessible to homeowners, are also used to determine flood insurance rates. As previously stated, $15 billion has been paid out since the NFIP`s inception to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

cover more than 1.3 million losses. Many of these claims occurred as a result of smaller flood events where no other Federal disaster assistance was available. Yet these property owners endured as much of an individual loss as those in larger events. In this regard, studies have indicated that insurance is the most efficient and equitable method of providing disaster assistance.1 Since 1986, the NFIP has been financially self supporting for the average historical loss year. During periods of high losses, consistent with the law, the NFIP has borrowed from the U.S. Treasury. These loans have been repaid, with interest, from policyholder premiums and related fees, and at no cost to the Nation's taxpayers. Last year's claims activity represented a significant loss year for the NFIP, and the program exercised its borrowing authority in the amount of $225 million. This was only the fourth time since 1990 that the Program was in a borrowing position. The NFIP currently insures in excess of $800 billion in assets.

This covers more than 4.7 million policies for homes, businesses, and other non-residential property owners. Each year the NFIP collects approximately $2 billion in premiums and fees. Hurricane Katrina was a catastrophic event. More than 225,000 flood insurance claims are likely to be filed. The NFIP provides insurance at actuarial (risk-based) rates, including consideration for catastrophic losses, for newer construction, with approximately 76 percent of policyholders paying actuarial rates. For structures built prior to the mapping and imposition of NFIP floodplain management requirements less than full-risk rates are charged because flood risks were not fully known when these structures were built. Approximately 24 percent of policyholders pay less than full-risk rates. It is important to note the NFIP has never been capitalized. Our authority to borrow from the Treasury is an essential part of the NFIP's financing for heavy loss years. Because of Hurricane Katrina, on September, 20, 2005, the President signed into law H.R. 3669, which increased the NFIP's borrowing authority by $2 billion.

Current flood insurance claims projections for Hurricanes Katrina and Rita indicate additional borrowing authority will be 1 necessary. The total payout for Katrina alone may be as much as 10 times the highest annual loss, and 20 times the program's average historical annual losses. As it has become increasingly apparent that Katrina/Rita-related claims will exceed the new borrowing authority by a substantial margin, the Administration will request that $5 billion be added to this authority. This ``stop-gap`` measure should allow sufficient borrowing authority to cover claims through mid- to late November, and also would enable us to work with this Committee and others to complete meaningful program reform recommendations. Such recommendations will be based on FEMA's long-term commitment to reduce the Nation's flood risks, as well as the NFIP's comprehensive mitigation principles to:

-- Protect the NFIP's integrity by covering existing commitments and liabilities;

-- Charge policyholders fair and actuarially sound premiums by phasing out subsidized premiums;

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

-- Increase NFIP participation incentives and improving mandatory purchase enforcement where warranted;

-- Increase risk-awareness among homeowners and consumers by improving information quality; and

-- Reduce risk through proven mitigation practices and exploring new mitigation opportunities.

Protecting the NFIP's Integrity - Streamlining the NFIP Claims Process

Based on the first principle above, it is my job to ensure that, consistent with statute and regulations, flood insurance claims are handled fairly, equitably and in a timely manner. Given the catastrophic impact these events have had in the Gulf, a critical first step was to implement a simplified and streamlined claims process to help policyholders settle their claims quickly. Utilizing state-of-the-art aerial imagery, up-to-date water-depth data, and information from extensive underwriting files, the Write-Your-Own (WYO) insurance companies are rapidly identifying insured properties that have been washed off their foundations, have had standing water in them for an extended period, or have only pilings or concrete slabs remaining. Under such circumstances, adjusters are waiving proof of loss requirements and fast-tracking claims up to the maximum insured value. Using these streamlining methods, we expect to substantially reduce our normal adjustment times from what one would normally see under such extreme circumstances. To ensure all claims are handled quickly and fairly, we are closely monitoring the performance and procedures of the WYO carriers that are using these Katrina- specific processes.

Phasing Out Subsidized Premiums by Addressing Repetitive Loss Properties

As Gulf Coast reconstruction gets underway, and elements of the second principle - phasing out subsidized premiums - become salient, FEMA will continue seeking ways to remove repetitive loss properties (properties with two or more $1,000 flood insurance claims within a 10-year period) from the NFIP policy base. FEMA will work with the States, local governments, and Community Rating System (CRS) communities to mitigate these properties through elevation, relocation, flood proofing, localized flood control, and acquisition/demolition. The Alabama and Mississippi areas affected by Katrina contain about 2,200 and 2,500 repetitive loss properties respectively (as of October 5, 2005).

The Louisiana Parishes affected by Katrina contain nearly 20,000 repetitive loss properties. Title I of the 2004 Flood Insurance Reform Act authorized FEMA to establish a Severe Repetitive Loss pilot program to address properties that flood more frequently and severely than the repetitive loss properties I just described. I am pleased that the FY 2006 Department of Homeland Spending bill that Congress recently passed authorized FEMA to transfer up to $40 million from the National Flood Insurance Fund to mitigate these properties. Louisiana Parishes affected by

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Katrina contain nearly 2,000 Severe Repetitive Loss Properties. FEMA has designed a Severe Repetitive Loss Pilot and we are looking forward to implementing that pilot.

Increasing Program Participation through Incentives

The NFIP's foundation embodies the principle of increasing incentives for communities to participate in the Program, and a significant part of FEMA's Gulf Coast Mitigation Strategy looks to encourage communities to rebuild stronger. Our Community Rating System will play a major role in this effort. CRS provides insurance discount incentives to communities that are actively reducing their flood risk by implementing comprehensive floodplain management criteria that go beyond the NFIP's minimum requirements. CRS communities that continually reduce their flood risks receive flood insurance premium discounts for their citizens representative of the degree of risk reduction achieved. Over 66 percent of the NFIP's policy base resides in CRS communities, and 3.1 million NFIP policyholders residing in these communities receive over $150 million in discounts annually. There are currently 68 CRS communities in the Gulf Coast area. Our goal is to increase that number as our Gulf Coast area participating communities become engaged in a process that focuses on rebuilding stronger and smarter.

Improved Information to Increase Risk Awareness

Increasing risk awareness among homeowners and consumers with improved, succinct information also is one of the NFIP's basic principles. FEMA, through an aggressive education and outreach campaign, is continuously designing and upgrading informational material to increase the public's awareness of flood risks and to effectively keep our policyholders informed. For instance, immediately following Hurricane Katrina, we distributed two documents to policyholders to help them through the claims process: The NFIP Summary of Coverage and the Flood Insurance Claims Handbook. With the Chairman's permission, I would like to submit copies of these documents for the record. These easy-to- understand documents have been available in our Joint Field Offices, Disaster Recovery Centers, and Flood Response Centers - as well as in Town Meetings - since September 1, 2005. I have personally handed these materials to State Insurance Commissioners in Alabama, Mississippi, and Louisiana, and we have distributed an informational CD containing these documents and other ready-to-print materials to field offices, State and local government offices, and the media. Also, recognizing that a significant number of policyholders were displaced, FEMA has implemented several systems to reach policyholders early in the claims process. These systems have been particularly useful to those who are cut off from their usual sources of information and communication. For example, in the days immediately following Katrina, we cross-referenced a National Processing Service Center report of all callers who applied for disaster assistance and indicated they had flood insurance. We matched the addresses of damaged properties to NFIP policy addresses and connected insurance companies to their flood insurance policyholders. This system will now become

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

standard operating procedure in future flooding events. It has enabled the WYO Companies to reach out to their NFIP policyholders and help them immediately when they needed it most. This innovative system, and others, reflect FEMA's initiative to reach out to policyholders as early in the claims process as possible, with easy-to- understand information, recognizing that the sooner claims are settled, the sooner people can start rebuilding their lives and communities. For comprehensive information on the NFIP and flood insurance, policyholders can access our FloodSmart website at www.floodsmart.gov.

Reducing Future Risks through the NFIP

As the focus shifts from disaster response to disaster recovery, areas impacted by Hurricanes Katrina and Rita will begin considering the opportunities for rebuilding a less vulnerable Gulf Coast. However, the overwhelming desire to rebuild immediately must be balanced with the need to rebuild wisely.

Effective planning - based on updated risk assessments, sound floodplain management, solid mitigation principles, and applicable environmental management and historic preservation considerations - is a primary principle of our mitigation and NFIP strategies, and a critical first step in the Gulf's recovery process. We are teaming up with our Federal, State, and local partners to (1) provide communities with the resources they need to get the job done right; and (2) integrate NFIP code compliance assistance and incentives into our mitigation grant processes. (1) Providing Resources FEMA is committed to working with its partners to provide communities with state-of-the-art tools and resources they need to make informed planning and rebuilding decisions. We are working closely with our Federal partners, such as the Army Corps of Engineers and the National Oceanographic and Atmospheric Administration, to gather and use the best available data for developing advisory information and NFIP recovery maps. We are also working with the Environmental Protection Agency and the Department of Health and Human Services on cleanup issues related to reconstruction. Finally, we are engaged with the Heritage Emergency Task Force to ensure that mitigation strategies in the Gulf region adequately consider historic preservation and related matters. Our Mitigation Assessment Teams are in the field gathering data on the performance of buildings and infrastructure. These teams are working closely with State and local officials to recommend improved building design and construction techniques, advocate new building codes and enforcement measures, and suggest mitigation activities that will improve community-wide disaster resistance. Overall, FEMA, along with its Federal, State, community, and private sector partners, is making sure that technology, information, and resources are expeditiously provided to the Gulf coast and properly used during the rebuilding process. (2) Increased Cost of Compliance and Mitigation FEMA also is coordinating with States, local governments, and CRS communities to integrate Increased Cost of Compliance funds - money for NFIP policyholders to bring their structures up to existing flood-related building codes - into all relevant mitigation efforts.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Finally, our Federal, State, and local government partnership will ensure that all Gulf-area mitigation proposals are based on sound risk assessments and approved mitigation plans. Sound floodplain management planning and regulations save this country an estimated $1.1 billion in prevented flood damages annually, and structures built to NFIP criteria experience 80 percent less damage than structures not built to such standards. FEMA is determined to help Gulf Coast communities make reconstruction decisions that are based not only on sound floodplain management, risk assessment, and mitigation planning principles, but on higher protection standards. Creating stronger and safer communities reduces loss of life and property, enables individuals and localities to rapidly recover from future events, and lessens the financial impact on State, Tribal and local governments, as well as the United States Treasury.

Conclusion

In the wake of Hurricanes Katrina and Rita, FEMA is committed to supporting the Gulf Coast's recovery. In the near term, this will require ensuring adequate funding to fulfill our commitment to our NFIP policyholders. For the longer term, it will require working closely with the Gulf Coast's affected States, local governments, communities, and private-sector entities to support a reconstruction effort that results in safer places to live, work, and do business.

I would be pleased to answer any questions Committee Members may have.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Local Government (1LO75); Natural Disasters (1NA67); Government (1GO80))

INDUSTRY:  (Financial Services Products (1FI16); Business Services (1BU80); Online & Electronic Publishing (1ON84); I.T. in Government (1IT22); Financial Services (1FI37); I.T. Vertical Markets (1IT38); I.T. in Financial Services (1IT24); Publishing (1PU26); I.T. in Insurance (1IT17); Insurance Software (1IN05); I.T. (1IT96); Environmental Solutions (1EN90); Insurance Liability (1IN26); Internet (1IN27); Security (1SE29); Financial Services Convergence (1FI45); Security Systems & Services (1SE50); Homeland Security (1HO11); Insurance Losses (1IN47); Insurance (1IN97))

REGION:  (North America (1NO39); Louisiana (1LO72); Americas (1AM92); Mississippi (1MI74); District of Columbia (1DI60); USA (1US73); Alabama (1AL90))

Language:  EN

OTHER INDEXING:  (ACTING; ALABAMA; ARMY CORPS OF ENGINEERS; CD; COAST MITIGATION STRATEGY; CONGRESS; CQ TRANSCRIPTIONS; CQ TRANSCRIPTIONS LLC; CRS; DEPARTMENT; DEPARTMENT OF HEALTH; DEPARTMENT OF HOMELAND; ENVIRONMENTAL PROTECTION AGENCY; FEDERAL EMERGENCY MANAGEMENT AGENCY; FEDERAL INSURANCE ADMINISTRATOR; FEMA; FLOOD IN-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

10/20/05 CONGTMY (No Page)                                                Page 9

SURANCE CLAIMS HANDBOOK; FLOOD INSURANCE REFORM ACT; FLOOD RESPONSE; FLOODSMART;
FY; HR; HERITAGE EMERGENCY TASK FORCE; HOUSE FINANCIAL SERVICES; HOUSING; HUMAN
SERVICES; HURRICANE KATRINA; HURRICANES KATRINA; INCREASE; INCREASE NFIP; INCREAS-
ING; INCREASING PROGRAM PARTICIPATION; INSURANCE COMMISSIONERS; JOINT FIELD OF-
FICES DISASTER RECOVERY CENTERS; KATRINA; LLC; LOUISIANA; LOUISIANA PARISHES; MIT-
IGATION ASSESSMENT TEAMS; MITIGATION FEMA; NATIONAL FLOOD INSURANCE ACT; NATIONAL
FLOOD INSURANCE FUND; NATIONAL FLOOD INSURANCE PROGRAM; NATIONAL OCEANOGRAPHIC AND
ATMOSPHERIC ADMINISTRATION; NATIONAL PROCESSING SERVICE CENTER; NFIP; NFIP CLAIMS
PROCESS; NFIP FINANCIAL STATUS; NFIP SUMMARY OF COVERAGE; PROGRAM; REDUCING FUTURE
RISKS; RESOURCES FEMA; RITA; SPECIAL FLOOD HAZARD AREAS; STATE; STATE INSURANCE
COMMISSIONERS; TESTIMONY; TRANSCRIPT; TREASURY; TRIBAL; TROPICAL STORM ALLISON; US
TERRITORIES; WYO; WYO COMPANIES)  (Acting Director; COMMUNITY OPPORTUNITY; Creat-
ing; DAVID I. MAURSTAD; David Maurstad; Division; Division Director; FEDERAL IN-
SURANCE; FLOOD INSURANCE; Oxley; Title; Utilizing)

KEYWORDS:  (BC-FLOOD-INSURANCE-PROGRAM, sked,3049);   (w)

Word Count: 4024
10/20/05 CONGTMY (No Page)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.