UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**UNITED STATES OF AMERICA**
**EX REL. CORI RIGSBY and KERRI RIGSBY**                     **RELATORS**

**V.**                                    **CIVIL ACTION NO.1:06CV0433 LTS-RHW**

**STATE FARM INSURANCE COMPANY, ET AL.**              **DEFENDANTS**

## OPINION AND ORDER

The Court has before it the motion [184] of Relators Cori and Kerri Rigsby (Relators or the Rigsby sisters) for reconsideration of the opinion and order I entered on May 19, 2008.  For the reasons set out below, this motion will be denied.

The Relators have asked me to set aside my earlier order and permit Bartimus, Frickleton, Robertson & Gorny, PC (BFRG) and Bartle, Marcus & Graves, PC (BMG), the law firms disqualified by this order, to continue to represent them in this False Claims Act case.  To make the discussion of this motion easier, I will treat this motion as if the attorneys themselves were the movants so that I may avoid the stilted language this discussion would otherwise require.

BFRG and BMG have filed supplemental affidavits reiterating that they did not learn of the payments Richard Scruggs (Scruggs) had agreed to make to the Relators until the Fall of 2006.  These affidavits also emphasize the undisputed fact that these firms made no direct or indirect payments to the Relators.  Edward Robertson, Jr. (Robertson), of BFRG states:

7.   *Once I learned of the arrangement [between Scruggs and the Relators] through the public media, I sought and received assurances from members of the Scruggs Law Firm that relators had not been hired to do any work for and had not been paid in connection with the False Claims Act Case.  I further informed members of the Scruggs Law Firm that BFRG could not and would not participate in any payment to Kerri or Cori Rigsby for any purpose.*

8.   *I also received assurances that the Scruggs Law Firm and/or Scruggs Katrina Group had obtained an opinion from an expert in matters relating to attorney ethics that the arrangement was ethical.*

> 9. *I did not learn of the specific terms of the arrangement between Scruggs Katrina Group and Cori Rigsby and Kerri Rigsby until the late Summer or early Fall of 2007, when I was asked to represent the Scruggs Katrina Group to defend this Court's initial ruling denying the disqualification motion of State Farm after State Farm filed its Petition for Mandamus with the United States Court of Appeals for the Fifth Circuit, challenging this court's ruling [denying State Farm's motion for disqualification on grounds of waiver].*

Robertson's supplemental affidavit is offered in support of BFRG and BMG's basic argument that since many people who were involved in the litigation of the State Farm/Hurricane Katrina cases knew that Scruggs had hired the Rigsby sisters as "consultants," BFRG and BMG should not be disqualified just because it had this same knowledge and did no more than is set out in Robertson's supplemental affidavit.

BFRG and BMG cannot or will not take into account that at the time Robertson learned about these payments BFRG and BMG were engaged, with Scruggs, in the joint representation of the Rigsby sisters and that the testimony the Rigsby sisters were expected to give in support of their False Claims Act case was the same testimony they were expected to give in the other State Farm cases Scruggs was handling.  Since this same testimony (concerning State Farm's post-Katrina claims handling practices) supports both the False Claims Act case and all the other State Farm cases Scruggs was handling, I cannot see how the payments Scruggs made in connection with that testimony can logically or validly be allocated to one set of cases and not the other.

When BFRG and BMG learned of these payments it then knew that its co-counsel in this False Claims Act case was regularly paying their mutual clients a substantial amount of money.  In his supplemental affidavit Robertson tacitly acknowledges that the receipt of this information called for an inquiry concerning the reason the payments were being made and the basis of the "consulting" arrangement Scruggs had established with the Rigsby sisters.  The inquiry Robertson made resulted in his receiving "assurances" that the Rigsby sisters were not being paid to work on the case at bar, i.e. the Rigsby sisters' own False Claims Act case.  Nearly a full year elapsed before Robertson went beyond these assurances and made an inquiry sufficient to "learn the specific terms of the arrangement."

As I said in my prior opinion, I believe the BFRG and BMG attorneys should have made a specific inquiry into the terms of the arrangement as soon as it came to their attention, and, having failed to make that specific inquiry, they are charged with knowledge of what such an inquiry would have revealed, i.e. with knowledge that Scruggs was paying each of the Rigsby sisters an annual stipend of $150,000 for which the Rigsby sisters were not required to perform regular duties or keep regular hours. Such an inquiry would have revealed that the Rigsby sisters were material witnesses in many of the State Farm cases Scruggs and the SKG were litigating, and such an inquiry would have quickly led to the conclusion that the testimony the Rigsby sisters

were likely to give in this False Claims Act case was identical to the testimony they would be expected to provide in these other State Farm cases.

The BFRG and BMG attorneys are attempting to draw a distinction between the Rigsby sisters' roles as "consultants," material witnesses, and clients.  The BFRG and BMG attorneys apparently take the position that as long as Scruggs assured them he was not paying the Rigsby sisters *in their role as clients*, and as long as Scruggs assured them the payments were, in some unidentified expert's opinion, ethical, the BFRG and BMG attorneys could reasonably conclude, without further inquiry, there was no impropriety involved.

I believe that a reasonable investigation of the circumstances surrounding these payments would have revealed that the arrangement was, at least from Scruggs's point of view, a sham and that  Scruggs was using this financial arrangement to secure the cooperation of the Rigsby sisters in connection with Scruggs's clients' claims against State Farm.  Scruggs may have convinced himself that this was a legitimate and not just an expedient arrangement, and Scruggs certainly tried to make the arrangement look like a legitimate employment relationship, but the Rigsby sisters' testimony indicates that the payments were not made for work the Rigsby sisters actually performed.

Robertson clearly draws a distinction, in his own mind, between payments that were made for work on Scruggs's other State Farm cases as distinguished from work on the False Claims Act case.  This distinction might have at least some validity if it were not for the fact that the very same testimony is relevant to all of these cases.  As he states in paragraph 7 of his supplemental affidavit: "*I sought and received assurances from members of the Scruggs Law Firm that relators had not been hired to do any work for and had not been paid in connection with the False Claims Act Case*." (Emphasis mine).  This is a distinction without a difference.  Robertson knew that Scruggs was regularly paying the Rigsby sisters substantial sums, and he must have known that Scruggs was paying the Rigsby sisters because they had valuable information, i.e. their inside knowledge of State Farm's conduct, and it is the Rigsby sisters' inside knowledge of State Farm's conduct that factually underpins this False Claims Act case.

The long and the short of it is that Robertson knew, no later than the Fall of 2006, that his co-counsel was paying their mutual clients a substantial stipend, and he must have known these payments were connected to the subject matter at issue in the False Claims Act case.  Robertson and the other BFRG and BMG attorneys were engaged with Scruggs in the equivalent of a joint venture in representing the Rigsby sisters, and when they learned of these payments they had a duty to make a sufficient inquiry to assure themselves that the payments were not improper or unethical.  The facts set out in Robertson's supplemental affidavit do not, in my opinion, satisfy this duty.

Regardless of how Scruggs and Robertson articulated the purpose of these payments, and no matter how the payments may have been verbally compartmentalized, the simple fact is that Scruggs was paying substantial sums to individuals who were both material witnesses in the State Farm/Katrina litigation and clients and key witnesses in this False Claims Act case, and all of these cases are directly tied to the Rigsby sisters' knowledge of State Farm's post-Katrina conduct.

With his knowledge concerning Scruggs payments to the Rigsby sisters, Robertson asserts that he took appropriate action by 1) refusing to "participate in any payment to Kerri or Cori Rigsby for any purpose", and 2) receiving "assurances that the Scruggs Law Firm and/or Scruggs Katrina Group had obtained an opinion from an expert in matters relating to attorney ethics that the arrangement was ethical." BFRG's refusal to participate in making these payments was proper, and this refusal clearly indicates that BFRG reasonably questioned the propriety of the payments. But this refusal to participate in the payments does not diminish BFRG's knowledge that Scruggs was making the payments to their mutual clients, and, in my view, these circumstances called for further inquiry by BFRG.

As for the assurance that the payments were ethical, Robertson does not say who gave this opinion, what facts were disclosed to the expert, and whether the opinion was sound. I have seen, in *McIntosh v. State Farm Fire & Cas. Co.*, Civil Action No 1:06cv1080 LTS-RHW, expert opinions defending Scruggs's decision to accept claims documents from the Rigsby sisters (specifically the opinions of Geoffrey C. Hazard, Jr., Esq. and W.C. Trotter, III, Esq., Exhibit 1-6 to Plaintiffs' Response to Defendant State Farm's Motion To Disqualify Plaintiffs' Counsel, Docket Number 347), but I do not recall ever seeing an expert opinion defending the propriety or the ethics of Scruggs's financial arrangement with the Rigsby sisters. Neither Robertson nor any of the other BFRG or BMG attorneys ventures his own opinion on the ethics of this arrangement. Robertson does not state that he read the opinion he refers to for himself, despite his obviously having some misgivings about this arrangement. In my view, Robertson did not make a sufficient inquiry once he learned about the payments Scruggs was making, and Robertson's supplemental affidavit does not indicate that he undertook any independent determination whether the arrangement at issue was ethical.

In my view, Robertson and the other BFRG and BMG attorneys were obliged to do more than make a superficial inquiry and accept assurances that the arrangement they carefully avoided participating in was, in someone's opinion, ethical. Given their own obvious trepidations, they had a duty to find out exactly what the arrangement was and to make their own decision whether it was ethical. I based my original disqualification decision on what these attorneys would have discovered if such an inquiry had been made.

The BFRG and BMG attorneys go to great lengths to demonstrate that others were aware of the impropriety of these payments, but they lose sight of their unique position as co-counsel, with Scruggs, for the Rigsby sisters and of the unique

responsibilities and access to information these relationships entail.  In my view, these attorneys had a duty to find out the specifics of the arrangement their co-counsel had with their mutual clients, and they are charged with the knowledge of every detail of that arrangement.  Such is not the case with the others who may have known about the payments and who were not then in a position to make direct inquiries to Scruggs or the Relators and insist on straight answers.

The first time I considered the issue of disqualification, that issue was presented by State Farm.  By the time the issue was raised, State Farm and the SKG had had extensive involvement in the post-Katrina litigation and had at one point jointly presented the Court a proposed settlement of all the remaining State Farm cases.  It appeared to me that in light of the extensive dealings that had gone on between the SKG and State Farm the issue of disqualification was being raised to gain an unfair tactical advantage.  For this reason I determined that State Farm had waived its right to seek SKG's disqualification.  This was not the case with E. A. Renfroe, Inc. (Renfroe).  I granted Renfroe's motion to disqualify because Renfroe had not waived its right to seek SKG's disqualification.

Under applicable Mississippi law, BFRG and MG became joint venturers with Scruggs in representing the Relators in this False Claims Act suit.  As joint venturers, BFRG and MG are jointly responsible for the actions of Scruggs with respect to their clients.

I stand by my earlier decision.  The motion for reconsideration is hereby **DENIED**.

**SO ORDERED** this 16th day of June, 2008.

s/ L. T. Senter, Jr.
L. T. SENTER, JR.
SENIOR JUDGE
