**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*;<br>    CORI RIGSBY; AND KERRI RIGSBY | RELATORS/COUNTER-DEFENDANTS |
| v. | CASE No. 1:06-cv-433-LTS-RHW |
| STATE FARM MUTUAL<br>    INSURANCE COMPANY | DEFENDANT/COUNTER-PLAINTIFF |
| and | |
| FORENSIC ANALYSIS<br>    ENGINEERING CORPORATION;<br>EXPONENT, INC.;<br>HAAG ENGINEERING CO.;<br>JADE ENGINEERING;<br>RIMKUS CONSULTING GROUP INC.;<br>STRUCTURES GROUP;<br>E. A. RENFROE, INC.;<br>JANA RENFROE;<br>GENE RENFROE; AND<br>ALEXIS KING | DEFENDANTS |

**RELATORS' OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS
THE AMENDED COMPLAINT UNDER RULES 12(b)(6) AND 9(b)**

August J. Matteis, Jr. (admitted *pro hac vice*)
Craig J. Litherland (admitted *pro hac vice*)
Benjamin Davidson (admitted *pro hac vice*)
GILBERT RANDOLPH LLP
1100 New York Avenue NW
Suite 700
Washington, DC 20005
Phone No.     (202) 772-2200
Fax No.         (202) 772-3333

C. Maison Heidelberg          MB #9559
Ginny Y. Kennedy              MB #102199
MAISON HEIDELBERG P.A.
795 Woodlands Parkway, Suite 220
Ridgeland, Mississippi  39157
Phone No.     (601) 351-3333
Fax No.         (601) 956-2900

Attorneys for Kerri Rigsby and Cori Rigsby

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................. iii

I.   PRELIMINARY STATEMENT ................................................................. 1

II.  STATEMENT OF FACTS ......................................................................... 4

    A.   State Farm Had A Motive To Find Flood Damage.......................... 4

    B.   State Farm Created A Fabricated Flood Model ............................... 5

    C.   State Farm Directed Adjusters To Maximize Flood Damage.......... 6

    D.   State Farm Directed Engineers To Categorize Claims As
        Flood Damage .................................................................................. 7

    E.   Relators Discover The McIntosh And Vela Claims ........................ 8

    F.   State Farm And Renfroe Retaliate After Learning
        That Relators Revealed Their Fraud To The Government ............... 9

III. ARGUMENT .......................................................................................... 11

    A.   Legal Standards............................................................................. 11

    B.   Relators Have Pled FCA Violations With Particularity ............... 14

        1.   Relators Do Not Need To Provide Specific Instances
            Of False Claims In Order To Satisfy Rule 9(b) ................. 14

        2.   Relators Have Alleged Specific Instances Of False Claims ............. 18

            a.   McIntosh ............................................................. 18

            b.   Vela ..................................................................... 20

        3.   Relators Have Adequately Pled Scienter .......................... 21

    C.   Relators Adequately Pled Their Conspiracy Claim ..................... 22

        1.   The Notice Pleading Standard Should Apply
            To The Conspiracy Claim.................................................. 22

        2.   The Amended Complaint States A Claim For Conspiracy ............... 24

Page

D.    Relators Adequately Pled Their Claim For Retaliatory Discharge................ 25

E.    The FCA Neither Requires Nor Justifies Dismissal For
Seal Violations ........................................................................................... 28

1.    The Government Was Not Harmed ................................................... 29

2.    Any Seal Violation Was Immaterial ................................................ 31

3.    The Disqualification Of The Scruggs Law Firm
Was The Appropriate Sanction For Any Seal Violations.................. 32

F.    Relators Did Not Breach The *Qui Tam* Provision of the FCA ...................... 32

G.    State Farm Cannot Defend Its Fraud As "Professional Judgments".............. 33

IV.    CONCLUSION........................................................................................................ 35

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page(s)

*Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795 (D. Utah 1988)..................................34

*Brown v. Nationsbank Corp.*, 188 F.3d 579 (5th Cir. 1999).......................................11, 19

*Cates v. Intern. Telegraph & Telegraph Corp.*, 756 F.2d 1161 (5th Cir. 1985)...............13

*Clark v. Amoco Prod. Co.*, 794 F.2d 967 (5th Cir. 1986)..................................................11

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000)...............................4

*Guidry v. Bank of LaPlace*, 954 F.2d 278 (5th Cir. 1992)................................................12

*Guidry v. U.S. Tobacco Co.*, 188 F.3d 619 (5th Cir. 1999)..............................................23

*Hall v. Thomas*, 190 F.3d 693 (5th Cir. 1999)..................................................................11

*Hart v. Bayer Corp.*, 199 F.3d 239 (5th Cir. 2000) ..........................................................13

*Hill v. Morehouse Medical Associates, Inc.*, No. 02-14429,
    2003 WL 22019936 (11th Cir. 2003) ...................................................................13, 17

*Lovick v. Ritemoney Ltd.*, 378 F.3d 433 (5th Cir. 2004)............................................ *passim*

*Lucky v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034 (N.D. Ill.. 1998)........................34

*In re Natural Gas Royalties Qui Tam Litigation*,
    467 F. Supp. 2d 1117 (D. Wyo. 2006)................................................................30, 31

*Payne v. United States*, 247 F.2d 481 (8th Cir. 1957) ......................................................12

*Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948 (5th Cir. 1994) .........................25

*Ruiz v. State Farm Fire & Cas. Co.*, 2007 WL 1514015, at *4
    (S.D. Miss. May 21, 2007).......................................................................................6

*Schuer v. Rhodes*, 416 U.S. 232 (1974) ..........................................................................11

*Tuchman v. DCS Commc'n Corp.*, 14 F.3d 1061 (5th Cir. 1994).....................................22

*Tyger Const. Co. v. United States*, 28 Fed. Cl. 35 (1993)................................................34

Page(s)

*U.S. ex rel Graves v. ITT Educational Services, Inc.*,
284 F. Supp. 2d 487 (S.D. Tex. 2003) ...................................................................25, 28

*United States ex rel. Bartlett v. Tyrone Hospital, Inc.*,
234 F.R.D. 113 (W.D. Pa. 2006) .........................................................................22

*United States ex rel. Capella v. Norden System, Inc.*, No. 3:94-cv-2063,
2000 WL 1336487 (D. Conn. Aug 24, 2000) .........................................................23

*United States ex rel. Clausen v. Laboratories Corp. of America, Inc.*,
290 F.3d 1301 (11th Cir. 2002) ...............................................................15, 16, 17

*United States ex rel. Doe v. Dow Chemical Co.*,
343 F.3d 325 (5th Cir. 2003) ...............................................................................16

*United States ex rel. Downy v. Corning, Inc.*, 118 F. Supp. 2d 1160
(D.N.M. 2000)......................................................................................................12

*United States ex rel. Farmer v. City of Houston*, 523 F.3d 333
(5th Cir. 2008)................................................................................................22, 25

*United States ex rel. Fellhoelter v. Valley Milk Products, L.L.C.*,
2008 WL 217116 (E.D. Tenn. Jan. 24, 2008)...........................................................31

*United States ex rel. Hagood v. Sonoma County Water Agency*,
929 F.2d 1416 (9th Cir. 1991) ..............................................................................21

*United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204
(E.D. Tex. 1998) ...............................................................................................12, 14

*United States ex rel. Karvelas v. Melrose-Wakefield Hospital*,
360 F.3d 220 (1st Cir. 2004)...............................................................................15, 25

*United States ex rel. Kozhukh v. Consolidation Tech. Corp.*,
64 F. Supp. 2d 1239 (MD. Fla. 1999) ....................................................................14

*United States ex rel. Lissack v. Sakura Global Capital Markets, Inc.*,
2003 WL 21998968 (S.D.N.Y. Aug 21, 2003),
*aff'd* 377 F.3d 145 (2d Cir. 2004) ...........................................................................16

Page(s)

*United States ex rel. Lujan v. Hughes Aircraft Co.*,
   67 F.3d 242 (9th Cir. 1995) ...........................................................................29, 30, 31

*United States ex rel. McKenzie v. BellSouth Telecomm, Inc.*,
   219 F.3d 508 (6th Cir. 2000) ..................................................................................28

*United States ex rel. Pilon v. Martin Marietta Corp.*,
   60 F.3d 995 (2d Cir. 1995)......................................................................................31

*United States ex rel. Pogue v. America Healthcorp, Inc.*,
   977 F. Supp. 1329 (M.D. Tenn. 1997)....................................................................12

*United States ex rel. Riley v. St. Luke's Episcopal Hospital*,
   355 F.3d 370 (5th Cir. 2004) ............................................................................23, 33

*United States ex rel. Roby v. Boeing Co.*, 184 F.R.D. 107 (S.D. Ohio 1998)...................15

*United States ex rel. Roby v. Boeing, Inc.*, 100 F. Supp. 2d 619 (S.D. Ohio) ..................34

*United States ex rel. Russell v. Epic Healthcare Management Group*,
   193 F.3d 304 (5th Cir. 1999) ............................................................................13, 20

*United States ex rel. Satalich v. City of Los Angeles*,
   160 F. Supp. 2d 1092 (C.D. Cal. 2001) ..................................................................27

*United States ex rel. Singh v. Bradford Reg'l Med. Ctr*,
   No. 04-186 ERIE, 2006 WL 2642518, at *4.  (W.D. Pa. 2006) ..................................15

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
   20 F. Supp. 2d 1017 (S.D. Tex. 1998) ......................................................................15

*United States ex rel. Thompson v. Columbia/ HCA Healthcare Corp.*,
   125 F.3d 899 (5th Cir. 1997) .....................................................................11, 14, 16

*United States, ex rel. Tucker v. Nayak*, No. 06-cv-662,
   2008 WL 140948 (S.D. Ill. Jan. 11, 2008)................................................................25

*United State ex rel. Walker v. R&F Properties of Lake County, Inc.*,
   433 F.3d 1349, 1360 (11th Cir. 2005) ........................................................ 16-17, 17

*United States ex rel. Walsh v. Eastman Kodak Co.*,
   98 F. Supp. 2d 141 (D. Mass. 2000) ......................................................................16

*United States ex rel. Wang v. FMC Corp.*, 975 F.2d 1412 (9th Cir. 1992) ................21, 34

Page(s)

*United States ex rel. Wilkins v. State of Ohio*,
    884 F. Supp. 1055 (S.D. Ohio 1995) ..................................................................17, 21

*United States ex rel. Willard v. Humana Health Plan of Texas, Inc.*,
    336 F.3d 375 (5th Cir. 2003) ...............................................................................11, 16

*United States ex rel. Yesudian v. Howard University*,
    153 F.3d 731 (D.C. Cir. 1998) ...................................................................................26

*United States v. Kensington Hospital*, 760 F. Supp. 1120 (E.D. Pa. 1991) ......................14

*Williams v. WMX Technologies, Inc.*, 112 F.3d 175 (5th Cir. 1997).......................2, 11, 25

*X Corp. v. Doe*, 816 F. Supp. 1086 (E.D. Va. 1993) ..........................................................28

**FEDERAL STATUTES**

31 U.S.C. § 3729..................................................................................................................21

31 U.S.C. § 3730...................................................................................................25, 28, 29

Fed. R. Civ. P. 8..................................................................................................................28

Fed. R. Civ. P. 9...............................................................................................................2, 11

Fed. R. Civ. P. 12..................................................................................................................2

**STATUTES**

S. Rep. No. 345, 99th Cong., 2d Sess. 24,
    *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289 .............................................................31

**RELATORS' OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS
THE AMENDED COMPLAINT UNDER RULES 12(b)(6) AND 9(b)**

Cori and Kerri Rigsby ("Relators" or the "Rigsbys"), through undersigned counsel,

respectfully submit this Opposition to Defendants' Motion to Dismiss the Amended Complaint

Pursuant to Rules 12(b)(6) and 9(b) (docket entries [98], [108], [115], [156], and [161]) filed by

State Farm Mutual Insurance Company ("State Farm"), Haag Engineering Company ("Haag"),

and Renfroe & Company, Inc. ("Renfroe") (collectively, "Defendants").  Relators oppose

dismissal of the following counts of their Amended Complaints as to the following Defendants:

| State Farm | Count I | Submitting false claims |
|---|---|---|
| | Count II | Making or using false records in support of false claims |
| | Count III | Conspiracy to submit false claims |
| | Count V | Retaliatory discharge |
| Haag | Count III | Conspiracy to submit false claims |
| Renfroe | Count III | Conspiracy to submit false claims |
| | Count V | Retaliatory discharge |

Accordingly, Relators do not oppose the motions to dismiss Count IV against State Farm,

Counts I, II, and IV against Haag, and Counts I, II, and IV against Renfroe.

Four additional Defendants, Exponent Engineering Company, Jade Engineering

Company and Gene and Jana Renfroe, filed motions to dismiss the Amended Complaint.

Relators do not oppose those motions, and intend to file voluntary motions to dismiss all of

their claims against those four Defendants.

## I.      PRELIMINARY STATEMENT

The Rigsbys are true whistleblowers whose allegations are based on their eyewitness

observations and direct knowledge obtained as insiders at State Farm.  Their Amended

Complaint is a detailed account of how State Farm defrauded the United States during the

aftermath of Hurricane Katrina through a complex scheme that resulted in over-billing the

National Flood Insurance Program ("NFIP").

Nontheless, State Farm argues that Counts I and II of the Amended Complaint should be

dismissed because Relators fail to state a claim upon which relief can be granted and fail to plead

with adequate particularity that State Farm committed fraud.  Under the Federal Rules of Civil

Procedure (the "Rules"), however, Relators' complaint need only contain only a "short and plain

statement" of general allegations, which must include the "who, what, when, where, and how" of

State Farm's massive intentional fraud.  *See* *Williams v. WMX Technologies, Inc.*, 112 F.3d 175,

179 (5th Cir. 1997); Rules 12(b)(6) and 9(b).

The Amended Complaint does just that by detailing:

**Who:**      Alexis King, Richard Moore, and other State Farm managers and claims
             adjusters in conjunction with Renfroe and the named engineering firms.
             Am. Compl. ¶¶ 57, 60-61, 89, 90.

**What:**     Overstating homeowners' property damage claims by intentionally
             characterizing wind damage as flood damage and submitting false flood
             claims to the government.  Am. Compl. ¶¶ 59-61.

**When:**     Immediately after Hurricane Katrina, from September 2005 to
             at least April 2006.  Am. Compl. ¶¶ 28-29.

**Where:**    In State Farm's catastrophe offices that were handling the claims adjusting
             for the NFIP in the aftermath of Hurricane Katrina.  Am. Compl. ¶ 28.

**How**:      By, among other things:
             (1)    commissioning Haag to create a false engineering report.
                    Am. Compl. ¶¶ 43-44.
             (2)    coercing engineers and engineering firms to attribute property
                    damage to flood rather than wind.  Am. Compl. ¶¶ 59, 89.
             (3)    canceling engineering reports.  Am. Compl. ¶¶ 81-82.
             (4)    changing and causing to be changed engineering reports that
                    attribute damage to wind.  Am. Compl. ¶ 89.
             (5)    instructing adjusters to "hit the limits" of the flood policies.
                    Am. Compl. ¶¶ 60-61.
             (6)    shredding engineering reports and other documents.
                    Am. Compl. ¶¶ 78-80.

Moreover, even though Rule 9(b) does not require Relators to identify any specific false claim that was submitted, the Amended Complaint does in fact contain very specific examples, such as the McIntosh claim, that illustrate exactly how State Farm executed the fraud. State Farm attempts to discredit the false claim examples provided by Relators, but State Farm does nothing more than raise disputed issues of fact that should be resolved by a jury at trial.

Next, State Farm (joined by Haag Engineering) and Renfroe argue that Count III of the Amended Complaint should be dismissed because it fails to state a claim for conspiracy under the FCA. The conspiracy claim should not be dismissed because the underlying elements of the FCA violations are stated with particularity and Relators sufficiently alleged that the Defendants conspired to perpetrate the fraud at issue.

Renfroe also argues that Count V of the Amended Complaint should be dismissed against Renfroe because Relators have not sufficiently stated a claim for retaliatory discharge under the FCA.[1] Renfroe's argument fails because (1) Renfroe and State Farm do not contest that Relators engaged in a protected activity; (2) State Farm and Renfroe knew Relators provided information to the government; and (3) State Farm and Renfroe clearly discriminated against Relators when they locked them out of their jobs shortly after the employers discovered that they were engaging in protected activity.

Finally, State Farm offers a number of additional specious arguments in an attempt to dismiss the Amended Complaint in its entirety. First, State Farm argues that violations of the FCA seal provision mandate dismissal. The case law, however, provides that an action should not be dismissed unless, among other things, the government is harmed by a seal violation.

---

[1] State Farm does not move to dismiss Count V of the Amended Complaint.

Here, the government was not harmed because before Relators even filed their initial complaint, State Farm knew that it was being investigated and was actively destroying evidence and concealing its fraud.  Second, State Farm argues that the Rigbys' consulting arrangement with their former counsel somehow requires dismissal, but State Farm offers neither a reasoned basis nor logical support for that argument.  Third, State Farm argues that the false engineering reports cannot be relied upon to assert a FCA violation because "differences in professional judgment . . . cannot support an FCA claim."  In addition to misstating the law, State Farm misstates the facts.  Indeed, the engineers at issue did not exercise professional judgment, but rather obeyed State Farm's direct orders to attribute the property damage at issue to flood rather than wind.

Accordingly, the Motions to Dismiss filed by State Farm, Renfroe and Haag should be denied except to the extent that Relators have consented to the dismissal of certain claims, as set forth above.  Even if the Court grants any portion of the Defendants' motions, which it should not, any dismissals should be without prejudice.

## II.   STATEMENT OF FACTS[2]

### A.   State Farm Had A Motive To Find Flood Damage.

The United States Government, acting through the Federal Emergency Management Agency ("FEMA"), is the only entity in the United States that underwrites flood insurance. Am. Compl. ¶ 46.  While the government acts as the funding source, the coverage is sold through private insurance companies called "WYO" or Write Your Own companies.  *Id.* ¶ 47.  In

---

[2]   This Statement of Facts is based entirely on the Amended Complaint.  If necessary, this Court may also consider the allegations made in the Evidentiary Disclosure because that document was referenced in the Amended Complaint.  *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).  Also, pursuant to the Court's Order dated August 7, 2008 (docket entry [205]), Relators have not attached documents previously produced as exhibits in this matter or excerpts from deposition testimony quoted or cited in this Opposition.

addition to selling the flood policy, the WYO also acts as the claims adjuster for the government with respect to claims under the policies. *Id.* ¶ 49.[3]   Thus, when a private insurance company submits a claim for payment under a flood policy, the claim is submitted to an officer or agent of the United States Government and any reimbursement is a direct charge on the United States Treasury. *Id.* ¶ 49.

State Farm serves as a WYO for thousands of flood policies in Mississippi and other states along the Gulf Coast and often sells both flood policies and homeowners policies to the same policyholders. *Id.* ¶ 54.  Because State Farm adjusted claims under both the flood policies and the homeowners' policies with respect to many properties, State Farm had an incentive to characterize damage to those properties as flood damage (covered by the flood policy) rather than wind damage (covered by the homeowners' policy), because the former would be reimbursed by the United States while the later would not. *Id.* ¶ 51.

**B.      State Farm Created A Fabricated Flood Model.**

After Hurricane Katrina devastated the Gulf Coast on August 29, 2005, State Farm was faced with potentially billions of dollars of claims from homeowners whose houses were damaged or destroyed.  To lessen the impact of Hurricane Katrina on its reserves, State Farm made a corporate decision to misdirect and misallocate claims by characterizing them as arising from flood damage rather than wind damage. *Id.* ¶ 56.

To execute this decision, State Farm commissioned Haag Engineering Co. to craft an engineering report (the "Haag Report") to describe the science behind the storm in a way that was favorable to State Farm.  *Id.* ¶ 43.  The Haag Report decisively concluded that Katrina's

---

[3]      The applicable regulation provides that "A WYO Company issuing flood insurance coverage shall arrange for the adjustment, settlement, payment and defense of all claims arising from policies of flood insurance it issues under the [National Flood Insurance Program], based on the terms and conditions of the Standard Flood Insurance Policy."  Am. Compl. ¶ 48.

"storm surge" water preceded the hurricane-force winds.  *Id.*  State Farm gave the Haag Report

to its adjusters and claims handlers and adopted it as the "bible" for handling Katrina claims.

*Id.* ¶ 44.

In fact, however, the Haag Report was refuted by a century of science and

engineering that had long ago determined that hurricane winds precede a storm surge by six

to seven hours.  *Id.*; *see also Ruiz v. State Farm Fire & Cas. Co.*, No. 1:07cv89 LTS-RHW,

2007 WL 1514015, at *4 (S.D. Miss. May 21, 2007) (noting that "Every expert who has

rendered an opinion in the Hurricane Katrina cases [the Court has] heard has acknowledged that

the storm's maximum winds preceded the storm surge flooding.").

## C.    State Farm Directed Adjusters To Maximize Flood Damage.

State Farm directed its adjusters, many of whom were supplied by Renfroe, to show flood

damage whenever possible.  Am. Compl. ¶ 59.  The fabricated flood model provided by Haag

enabled adjusters to credibly, but falsely, attribute home damage to flooding under the theory

that the storm surge flooding preceded and accompanied the strongest hurricane force winds.

*Id.* ¶ 45.

State Farm also told adjusters that if their initial calculations of a flood insurance claim

did not reach a policyholder's flood limits, the adjusters should recalculate that claim in order to

"hit the limits."[4]  *Id.* ¶¶ 60-62.  Because the adjusting costs paid to State Farm were directly

related to the size of the flood claim, instructing adjusters to hit the limits maximized revenue

from adjusting claims.  *Id.*  This instruction was also a *quid pro quo* to Renfroe for its

---

[4]    State Farm used a computer program called "XACT TOTAL" to calculate flood claims and help them hit
the policy limits.  *Id.*  The program, which permitted the agent to enter the square footage and amenities to "rebuild"
the home, was first developed for "slabs" but was later used for "cabanas" and other structures without total losses.
One of the Relators witnessed an elevated house that had no damage to its roof, siding, or other structural elements.
*Id.*  The house was submitted as a total flood loss (to hit the limits) using the XACT TOTAL software.  *Id.*

compliance in the conspiracy because Renfroe's fees were also related to the size of the adjusted claim.  *Id.*

### D.   State Farm Directed Engineers To Categorize Claims As Flood Damage.

Relying on the conclusions of the Haag Report, in September 2005, Alexis "Lecky" King and Richard Moore, State Farm's catastrophe managers for the Mississippi region, took the unusual step of ordering engineering reports on every property where a claim involved a "slab" (a loss where there was nothing left but foundation), a "popsicle stick" (a loss where only beams or pilings remained standing), or a "cabana" (a loss where a roof remained but the main interior of the building had been damaged due to wind, flood, or otherwise).  *Id.* ¶ 57.  State Farm had ordered these blanket engineering reports with the belief that the engineers would follow the Haag Report and conclude that most or all of the policyholders' homes had been damaged by flooding rather than wind.  *Id.* ¶ 57.  State Farm was willing to pay $1,500 per report in those circumstances because a conclusion that a home was damaged by flood rather than wind would save the company hundreds of thousands of dollars on each homeowner's insurance claim.  *Id.* ¶ 58.

Having made that investment, however, State Farm was not willing to accept any engineer's independent finding of wind damage in areas that also had been flooded.  Rather, when Lecky King and Richard Moore realized that engineers generally were concluding that wind, rather than flood, caused the majority of damage, they ordered the engineering firms to cancel and/or change their reports.  *Id.* ¶¶ 65-77, 81-84.  King also tried to intimidate and coerce engineers and adjusters, and referred to one that found wind damage as a "moron" who needed to change his report.  *Id.* ¶ 89.

In November, State Farm realized that its blanket order for engineering reports was producing inconsistent results, so State Farm directed adjusters not to request any other engineering reports on slabs or popsicle-sticks. *Id.* ¶¶ 81-82. Where engineering reports already had been requested, State Farm sent a fax to the engineers that directed them to cancel the request, send along the investigation materials, and not write a report. *Id.* ¶ 81.

King and Moore also sent out a memorandum instructing all staff adjusters at State Farm that original engineering reports were to be kept under lock and key and be accessible only by King and Moore. *Id.* ¶ 79. Some time later, State Farm went to a "paper lite" system, "scan[ning]" into the computer one engineering report and then discarding any other engineering reports. *Id.* ¶ 80. On or about April 12, 2006, Relators learned that State Farm had engaged the services of a commercial document shredding company called "Shred It." *Id.* ¶ 78. Relators were told by at least one State Farm employee that claims data and/or engineering reports associated with State Farm's fraudulent conduct were being shredded. *Id.*

**E.   Relators Discover The McIntosh And Vela Claims.**

State Farm's fraud is perhaps best illustrated through the McIntosh and Vela claims. The first demonstrates State Farm's typical Hurricane Katrina claims adjusting practices, while the second shows the conflicting results of a lone claim for which fraud was not committed.

On October 4, 2005, State Farm commissioned Forensic Analysis Engineering Corporation ("Forensic") to inspect the McIntosh home. *Id.* ¶ 66. After conducting an extensive site inspection, Forensic wrote a report that concluded that the McIntosh home was damaged principally by wind and not water. *Id.* ¶¶ 67-68. This initial report never became part of the McIntosh claim file because Lecky King placed a sticky note on the report that stated, "Put in

8

Wind File – Do NOT Pay Bill Do NOT discuss." *Id.* ¶ 69. Later, on October 20, 2005, Forensic was commissioned to write a different report. *Id.* ¶ 70. The second report directly contradicted the first report's conclusions. *Id.* The second report also did not disclose the previous report or a previous site visit. *Id.*

In stark contrast to its handling of the McIntosh claim, State Farm properly adjusted Anna Vela's claim because neither Lecky King nor Richard Moore had the opportunity to cause the claim to be misallocated. The Vela's property was evaluated by the engineering firm of Dreux Seghers, which concluded that the home was damaged by wind. *Id.* ¶ 87. Mark Drain, State Farm's team manager, concluded that he was required to pay the full policy limits under the wind coverage. Lecky King, however, told Drain that the engineer who drafted the report was a "moron" and that the report "should be sent back to the engineer to get him to correct his report to show flood damage." *Id.* ¶¶ 88-89. Despite King's attempts to coerce him, however, Drain paid the Vela claim while King was on vacation. *Id.* ¶ 90.

Vela's neighbors were not so fortunate. Indeed, numerous other claims for wind and water damage on the same street (Baywood Drive) were denied upon findings that there was no wind damage to those properties. *Id.* ¶ 91. Accordingly, since these homes were on the same street as Vela's house, a reasonable inference is that State Farm submitted false claims for payment to the federal government for Ms. Vela's neighbors, whose homes likely were evaluated by engineering firms that succumbed to the extreme pressure applied by King and Moore.

### F.   State Farm And Renfroe Retaliate After Learning That Relators Revealed Their Fraud To The Government.

Relators were joint employees of Renfroe and State Farm. *Id.* ¶ 146. Renfroe "leased" Relators to State Farm to help adjust claims following Hurricane Katrina. *Id.* ¶ 28. Renfroe

maintained a supervisory presence over Relators, while State Farm controlled the manner of their work.  *Id.* ¶ 147.

On or about April 19, 2006, Relators presented a full evidentiary disclosure to the government, and they turned over all material evidence in their possession.  *Id.* ¶ 29.  Relators then filed this action on April 26, 2006.  *Id.*  After filing their complaint, Relators continued to work for Renfroe and State Farm.  They learned more about the fraud and collected additional information from inside the company.  *Id.* ¶ 30.  Over the weekend of June 2-4, 2006, Relators worked steadily to copy claims files and create a record of what remained.  *Id.* ¶ 31.  Relators then provided the additional documents to the federal government.  *Id.* ¶ 33.

On or about June 5, 2006, Relators informed State Farm that they had taken documents and given them to federal prosecutors on the advice of their attorneys.[5]  *Id.* ¶ 32.  The next day, State Farm's attorneys attempted to interrogate the Relators.  *Id.* ¶ 33.  Relators refused to answer questions and went on a scheduled vacation.  *Id.*  When they returned, State Farm retaliated against them by locking them out of their offices, escorting them from the building under a security escort, and telling Relators that they would not be allowed back into the building.  *Id.*  After State Farm discharged Relators from employment, Renfroe claimed to "accept their resignations," despite the fact that resignations had never been tendered.  *Id.* ¶ 152.  Renfroe in fact discharged the Relators while working hand-in-hand with State Farm.  *Id.*.

Then, in September 2006, Renfroe filed a strategic lawsuit against Relators in the United States District Court for the Northern District of Alabama.  *See E.A. Renfroe & Co., Inc. v. Moran, et al.*, No. 06-cv-1752 (N.D. Ala., filed Sept. 1, 2006).

---

[5]     At this time, State Farm already suspected that a "mole" was providing information to the government.  Evidentiary Disclosure at 18.

## III.   <u>ARGUMENT</u>

### A.   <u>Legal Standards</u>

A Rule 12(b)(6) motion "is a disfavored motion and is rarely granted."  *Clark v. Amoco Prod. Co*., 794 F.2d 967, 970 (5th Cir. 1986).  In evaluating 12(b)(6) motions, the "complaint is construed in the light most favorable to plaintiff, accepting as true all well-pled factual allegations and drawing all reasonable inferences in plaintiff's favor."  *Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004).  A Rule 12(b)(6) motion "should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Hall v. Thomas*, 190 F.3d 693, 696 (5th Cir. 1999).  The issue is not whether a claimant will prevail, but "whether the claimant is entitled to offer evidence to support the claims.  Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."  *Schuer v. Rhodes*, 416 U.S. 232, 236 (1974).  "The question therefore is whether, in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief."  *Brown v. Nationsbank Corp.*, 188 F.3d 579, 586 (5th Cir. 1999).

Fraud claims brought under the FCA are subject to Rule 9(b)'s requirement that a plaintiff "state with particularity the circumstances constituting the fraud."  Fed. R. Civ. P. 9(b); *see also United States ex rel. Thompson v. Columbia/ HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997).  Rule 9(b) must be read "as part of the entire set of rules, including Rule 8(a)'s insistence upon simple, concise, and direct allegations," and Rule 9(b) does not "reflect a subscription to fact pleading."  *Williams*, 112 F.3d 175 at 178.  A plaintiff must generally lay out the "who, what, when, where, and how" of the alleged fraud.  *Id.* at 179; *see also United States ex rel. Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 384 (5th Cir. 2003).

The "particularity" requirement "will necessarily differ with the facts of each case and hence the Fifth Circuit has never articulated the requirements of Rule 9(b) in great detail," *Guidry v. Bank of LaPlace*, 954 F.2d 278, 287 (5th Cir. 1992).  *See also United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206 (E.D. Tex. 1998) (quoting *Payne v. United States*, 247 F.2d 481, 486 (8th Cir. 1957) ("It is only common sense that the sufficiency of pleadings under Rule 9(b) may depend 'upon the nature of the case.'")).

Moreover, Rule 9(b)'s particularity requirement should be relaxed in this case for two reasons.  First, as noted in *Johnson*, one of the factors that can lessen the Rule 9(b) requirements is "the complexity . . . of the transaction."  183 F.R.D. at 206.  Indeed, "where the number of allegedly fraudulent acts is large, . . . less specificity is required to satisfy the heightened pleading requirements of Rule 9(b)."  *United States ex rel. Downy v. Corning, Inc.,* 118 F. Supp. 2d 1160, 1173 (D.N.M. 2000) (Because defendants were engaged in a complex scheme, the relator was not required to provide a specific instance of a false claim submitted to the government)(internal citation omitted); s*ee also United States ex rel. Pogue v. Am. Healthcorp, Inc.*, 977 F. Supp. 1329, 1333 (M.D. Tenn. 1997) ("Although no specific dates or West Paces employees are identified, the complaint alleges that the hospital participated in a systematic, fraudulent scheme . . . requiring Plaintiff to refer to specific instances underlying each Medicare and Medicaid claim submissions that he claims was fraudulent in his compliant would undermine Rule 8's admonishment to keep pleadings simplistic.") (internal quotation omitted).  Here, Relators allege a complicated scheme by State Farm involving false weather data, pressuring engineering companies to attribute home damage to flood and not wind, firing engineering companies who refused to cooperate, and instructing adjusters to overstate flood

damage.  This scheme has caused the government to pay hundreds of millions of dollars in flood claims that it should not have paid.  By any estimation, the alleged fraud is complex.

Second, Rule 9(b) should be relaxed in this case because many of the facts at issue are exclusively within State Farm's knowledge.  *See, e.g., United States ex rel. Russell v. Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 308 (5th Cir. 1999) (when "facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the Rule 9(b) standard is relaxed, and fraud may be pled on information and belief, provided the plaintiff sets forth the factual basis for his belief.") (*citing Thompson*, 125 F.3d at 903); *Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *2 (11th Cir. 2003) (Relator was not required to "identify patent names nor exact dates that the fraudulent claims were submitted . . . because the confidential documents containing such information are in the exclusive possession of the [defendant].").  Relators' belief that State Farm defrauded the government is based on their experiences adjusting claims for State Farm, but certain specific facts (like how many duplicate engineering reports were kept under lock and key by Lecky King and Richard Moore and how many claims for flood payments were submitted with a square footage estimate that was higher than the square footage estimate State Farm used in calculating a homeowner's policy premium) are exclusively in State Farm's possession, and accordingly, the Rule 9(b) standard should be relaxed.

However, as more fully laid out below, the Amended Complaint is sufficiently detailed to meet any pleading standard.[6]

---

[6]       And even if a court dismisses a complaint for failure to state a claim, that dismissal should usually be without prejudice.  *See, e.g., Cates v. Intern. Tel. & Tel. Corp.*, 756 F.2d 1161, 1180 (5th Cir. 1985) ("such deficiencies do not normally justify dismissal of the suit on the merits and without leave to amend, at least not in the absence of special circumstances"); *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n. 6 (5th Cir. 2000) ("Although a court may dismiss the claim, it should not do so without granting leave to amend, unless the defect is simply incurable or

(Continued …)

### B.        Relators Have Pled FCA Violations With Particularity.

#### 1.        Relators Do Not Need To Provide Specific Instances Of False Claims In Order To Satisfy Rule 9(b).

State Farm contends that "courts have repeatedly held that describing a scheme without the particular details of a specific false claim submitted for payment is insufficient." State Farm's Memorandum In Support of Its Motion to Dismiss (Def's Mem.) at 11 (docket entry [99]).  But, as explained above, the Fifth Circuit only requires that the complaint allege the who, what, when, where and how of the fraud; there is no requirement that details of specific false claims be provided.  *See Johnson*, 183 F.R.D. at 206 (defendants unsuccessfully noted that complaint "does not identify any specific royalty amounts withheld from the government by any of the Defendants.  Nor does the Complaint specify even one particular oil value improperly used by any of the Defendants"); *United States ex rel. Kozhukh v. Consolidation Tech. Corp.*, 64 F. Supp. 2d 1239, 1245 (MD. Fla. 1999) (allegations were sufficient even though complaint apparently did not list specific fraudulent time entries billed to the government); *see also United States v. Kensington Hosp.*, 760 F. Supp. 1120, 1125-26 (E.D. Pa. 1991) (relator was not required to mention specific false claims because "Rule 9(b) was not intended to require a plaintiff to know every detail before he or she could plead fraud.  Its purpose was to prevent general allegations of fraud that did not give defendants fair notice of charges against them.").

On remand from the Fifth Circuit, the district court in *Thompson* found that the relator had sufficiently alleged that the defendants violated the FCA by making false statements to

---

(… Continued)

the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so.") (internal quotation omitted).

obtain payment.  *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,

20 F. Supp. 2d 1017, 1020 (S.D. Tex. 1998).  The court found that

> The basic framework, procedures, the nature of fraudulent scheme, and the
> financial arrangements and inducements among the parties and physicians
> that give rise to Relator's belief that fraud has occurred have been alleged
> with specificity; Plaintiffs are entitled to discovery before being required
> to list every false claim, its dates, the individuals responsible, and why
> each patient was not eligible for Medicare.

*Id.* at 1049.  Similarly, in *United States ex rel. Singh v. Bradford Reg'l Med. Ctr*, the Court found

that the relator adequately alleged that the defendants engaged in a fraudulent scheme to receive

payments in violation of an anti-kickback statute, even though the relator did not mention any

specific instances of false claims.  No. 04-186 ERIE, 2006 WL 2642518, at *4.  (W.D. Pa. 2006).

The court found that the defendants' contention – "that a relator must provide details that

identify particular false claims for payments that were submitted to the government . . . [sought]

not particularity but proof . . . , which, in our view, is inappropriate on a Rule 9(b) motion to

dismiss."  *Id.* at *3, 5.[7]

   Other courts have applied a relaxed 9(b) standard and found that relators did not need to

identify specific instances of fraud when information was exclusively in the defendant's

possession.  *See United States ex rel. Roby v. Boeing Co*., 184 F.R.D. 107, 111 (S.D. Ohio 1998)

(relator, a former employee of Boeing, was not required to specifically identify individual

employees who participated in the fraud because that "may be exclusively within the knowledge

of Boeing"). State Farm contends that a relaxed 9(b) standard "must not be mistaken for license

to base claims of fraud on speculation and conclusory allegations," and it argues that without

---

[7]      Like State Farm, the defendant in *Singh* relied on *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 230 (1st Cir. 2004) and *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.* 290 F.3d 1301, 1311 (11th Cir. 2002).  The district court rejected those arguments.

specific instances of false claims, Relators can only allege a general scheme by which a false claim could have been submitted to the government.  Def's Mem. at 11 (docket entry [99]).  To support that contention, State Farm cites several cases where speculative and unsupported allegations were found to be insufficient to state a claim.  *See e.g., Clausen*, 290 F.3d at 1311 (Rule 9(b) does not allow a relator "to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted").[8]

But the fundamental difference between this case and the cases State Farm cites is that Relators have direct inside knowledge of State Farm's fraud.  Relator's complaint does not speculate that State Farm *may* have defrauded the government.  Relators *know* that State Farm defrauded the government because they saw it happening while they were managing State Farm claims adjusters.  Several courts have found that relators do not need to provide specific instances of false claims when the relators directly experienced the alleged fraud while being employed by the defendant.  In *United State ex rel. Walker v. R&F Properties of Lake County, Inc.*, the Eleventh Circuit found that the relator, a nurse practitioner, adequately alleged that the defendants had violated the FCA by improperly billing her time as if she were a doctor, even

---

[8]      *See also Thompson*, 125 F.3d at 903 ("Thompson provided no factual basis for his belief that defendants submitted claims for medically unnecessary services other than his reference to statistical studies.  There is no indication however, that these studies directly implicate defendants"); *Willard,* 336 F.3d at 385 (agreeing with the district court that "Willard's fraud in the inducement claim is a 'one-sentence allegation, devoid of any factual information that arguably did not even meet the pleading requirements of Federal Rule of Civil Procedure 8(a).'"); *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003) (relator merely alleged that "over a period of several months in late 1998 to early 1999 a series of discharges took place which were illegal." ); *United States ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d 141,148 (D. Mass. 2000) (relators provided a "striking lack of detail" to support his allegations); *United States ex rel. Lissack v. Sakura Global Capital Mkts., Inc.*, No. 95-cv-1363, 2003 WL 21998968 (S.D.N.Y. Aug 21, 2003), *aff'd* 377 F.3d 145 (2d Cir. 2004) (without providing any additional detail, the relator attached to his complaint a list of transactions he alleged were affected by the defendant's  fraud).

though the relator did not identify specific instances of false claims.  433 F.3d 1349, 1360 (11th

Cir. 2005).  In explaining its decision, the 11th Circuit distinguished a case on which State Farm

now relies:

> This is not a case like *United States ex rel. Clausen v. Laboratory
> Corporation of America, Inc.*, in which a 'corporate outsider' made
> speculative assertions that claims 'must have been submitted, were
> likely submitted or should have been submitted to the government. . . .'
> Walker's complaint identifies her as a nurse practitioner who was
> employed at LFM.  Walker alleges that during her employment at
> LFM . . . she was instructed each day 'which doctor she would be billing
> under.'

*Id.* at 1360. [9]  *See also Hill*, 2003 WL 22019936 at *4 (Relator was not required to identify

particular false claims because  "[u]nlike the plaintiff in [*Clausen*], however, Hill worked in the

very department where she alleged the fraudulent billing schemes occurred-MMA's billing and

coding department.  Thus, she has firsthand information about MMA's internal billing practices

and the manner in which the fraudulent billing schemes were implemented."); *United States ex

rel. Wilkins v. State of Ohio*, 884 F. Supp. 1055, 1060 (S.D. Ohio 1995) (Court relaxed the

pleading standard because "this is not a case in which a plaintiff completely unfamiliar with [the

defendants] has brought a *qui tam* action," and accordingly the relator should not "be expected to

allege the relevant facts based on memory.").

Like the relators in *Walker*, *Hill,* and *Wilkins*, Relators' allegations that State Farm

defrauded the federal government are based on the knowledge they obtained while employed by

State Farm.  Relators are not speculating that State Farm *may* have submitted claims for payment

that overstated a home's flood damage – they were told that if their initial analysis of a claim

found that the damage was below the flood policy's limits, then they should readjust the claim

---

[9]      Given the Eleventh Circuit's holding in *Walker*, State Farm's reliance on *Clausen*, 290 F.3d at 1311 is
misplaced.  As State Farm employees, Relators were corporate insiders like the relator in *Walker*, not outsiders like
the relators in *Clausen* and *Karvelas*.

until they hit the limits.  Am. Compl. ¶ 62.  The Rigsbys are not speculating that State Farm *may* have pressured engineering companies to change the contents of their reports – they heard Lecky King tell Mark Drain that the engineer who inspected Anna Vela's home was a "moron" and that he should change his report (Am. Compl. ¶ 89), and they saw conflicting engineering reports.  Am. Compl. ¶¶ 68-76.

## 2.   Relators Have Alleged Specific Instances Of False Claims.

For the reasons demonstrated above, Relators' detailed allegations based on their eyewitness accounts do not need specific instances of false claims to satisfy Rule 9(b).  But even if they were required to provide details of specific false claims, Relators have met that burden at least twice over.

### a.   McIntosh

Relators allege that the flood claim filed by Pamela and Thomas McIntosh (the "McIntosh Claim") is a "specific instance[] where Defendant State Farm has engaged in reallocation of claims from wind damage to flood damage." *Id.* ¶ 65.  Relators further allege that the McIntoshes' initial engineering report attributed damage to wind, that this report never became part of the McIntoshes' record because it was contrary to State Farm's instructions, and that State Farm commissioned a second report that attributed damage to flooding. *Id.* ¶¶ 67, 69-70.  Accordingly, State Farm's contention that "nowhere is it alleged that a false claim for payment under the NFIP was submitted to the government" is simply incorrect.  Def's Mem. at 13 (docket entry [99]).

State Farm's remaining argument, that the allegations in the McIntosh Claim are "deficient on their face" for the reasons provided in State Farm's 12(b)(1) motion, amounts to nothing more than asking this court to reject the truth of the allegations in the complaint, which is improper under Rule 12(b)(6).  *See Lovick*, 378 F.3d at 437.  Indeed, State Farm essentially

argues that the evidence will show that the McIntosh home sustained a substantial amount of flood damage and that the flood claim was accurate and properly submitted by State Farm. But whether the flood claims submitted by State Farm were actually fraudulent is one of the ultimate disputed questions of fact in this case, and should be decided by a jury at trial.   *See* Pls' Mem. in Opp'n to Mot. to Dismiss for Lack of Subject Matter Jurisdiction  (docket entry [223]) at 28-30.  Even if these contested facts create doubt as to the McIntosh Claim, in a 12(b)(6) motion, the plaintiff is entitled to have "every doubt resolved in his behalf."   *Brown*, 188 F.3d at 586.

State Farm also may attempt to argue that the McIntoshes' recent motion to dismiss voluntarily all extra-contractual and punitive damage claims is relevant to whether the *McIntosh* case demonstrates fraud on the federal government.  Indeed, the suspicious timing and content of the motion strongly suggest that State Farm intends to use the motion in this case.  *See* Mot. for Dismissal with Prejudice of Extra-Contractual and Punitive Damage Claims, *McIntosh, et ano. v. State Farm Fire & Cas. Co.*, 1:06-cv-1080 (docket entry [1312]) (the "McIntosh Dismissal"). Upon information and belief, the *McIntosh* case was settled in its entirety late in the evening on Saturday, September 6, 2008.[10]  The next day, Sunday, September 7th, the plaintiff filed a motion to dismiss that was laden with gratuitous praise with respect not only to the wind claims at issue in that case, but also to the *McIntoshes' flood claim*.  The motion reads like a document written by (or for) State Farm for use in this case, and the timing alone raises enormous issues of credibility.  The motion also fails to provide any basis for its conclusory statements.  As a result,

---

[10]       In fact, earlier today the *McIntosh* case was dismissed. *See McIntosh* docket entry [1360].

any attempt to use the *McIntosh* motion to dismiss in this case will only raise more material issues of disputed facts.

In any event, while the parties should be allowed to take discovery into the circumstances surrounding the motion in *McIntosh* before it could be used as evidence at trial, there is no need to consider these issues at this stage of the litigation.

b.   **Vela**

Anna Vela's flood claim provides another specific instance of State Farm submitting false claims for payment to the government.  Vela's house was evaluated by the engineering firm of Dreux Seghers, which concluded that the home was damaged by wind.  Am. Compl. ¶ 87. Mark Drain, the team manager, concluded from the engineering report that he was required to pay the full policy limits under the wind coverage, but Lecky King told Drain that the engineer was a "moron" and that the report "should be sent back to the engineer to get him to correct his report to show flood damage."  *Id.* ¶¶ 88-89.  Drain, however, paid the Vela claim while King was on vacation.  *Id.* ¶ 90.  Numerous other "claims for wind and water damage on the same street (Baywood Drive) . . . were denied for wind damage, resulting in inconsistent determinations."  *Id.* ¶ 91.  A reasonable inference of these allegations is that State Farm submitted false claims for payment to the federal government for Ms. Vela's neighbors.  *See Lovick*, 378 F.3d at 437 (in evaluating a 12(b)(6) motion courts should "draw[] all reasonable inferences in plaintiff's favor.").  At the very least, Rule 9(b) pleading requirements should be relaxed with respect to this instance of fraud because State Farm effectively is in sole possession of facts detailing which of Vela's neighbors had flood claims that were paid by the government. *See Russell*, 193 F.3d at 308 (when "facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the Rule 9(b) standard is relaxed, and fraud may be pled on information and belief, provided the plaintiff sets forth the actual basis for his belief").

### 3.   Relators Have Adequately Pled Scienter.

Liability under section 3729(a)(1) and section 3729(a)(2) of the FCA requires that the defendant act knowingly, and a person acts knowingly if he or she: "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b). This scienter requirement is "something less than the elements of fraud at common law." *Wilkins*, 885 F. Supp. at 1060, *quoting United States ex rel. Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992).  Rule 9(b) provides that "knowledge, and other conditions of a person's mind may be alleged generally," and in evaluating a Rule 12(b)(6) motion the complaint should be construed "in the light most favorable to plaintiff . . .  drawing all reasonable inferences in the plaintiff's favor."  *Lovick*, 378 F.3d at 437.  Accordingly, if it can be inferred from the complaint that Relators have generally alleged that State Farm acted at least with reckless disregard for the truth of the claims it submitted to the NFIP, then Relators have adequately pled scienter.  As the Amended Complaint makes clear, Relators exceed that threshold by alleging that State Farm acted knowingly and intentionally.

For example, Relators allege that State Farm told adjusters to overstate intentionally the amount of damage caused to homes if their initial assessment was below a homes' flood policy limits (Am. Compl. ¶ 62); that State Farm canceled and recalled "engineering reports in order to prevent further engineering reports from being submitted containing determinations that damages were the result of causes other than water" (Am. Compl. ¶ 82); and that State Farm destroyed copies of duplicate engineering reports (Am. Compl. ¶ 80).  Each of these allegations demonstrates that State Farm acted knowingly.  *See generally United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) (relator adequately pled scienter in alleging the defendant knowingly violated a federal statute even though it could not

be determined from the complaint whether the defendant merely relied on the advice of counsel

or whether the defendant also acted with reckless disregard for the truth).

State Farm relies on several Fifth Circuit securities fraud cases to challenge the adequacy

of Relators' scienter pleadings (*see* Def's Mem. at 16-17 (docket entry [99])), but these cases are

not instructive because they were applying a different and more stringent scienter requirement

than the FCA.  *See, e.g., Tuchman v. DCS Commc'n Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)

(in securities fraud cases, scienter may be satisfied by "proof that the defendant acted with severe

recklessness, which is 'limited to those highly unreasonable omissions or misrepresentations

that involve . . . an extreme departure from the standards of ordinary care. . . .'") (internal

quotation omitted).  In any event, because Relators have adequately alleged that State Farm

knowingly defrauded the federal government, they have pled scienter for their FCA claim

under any standard.

**C.      Relators Adequately Pled Their Conspiracy Claim.**

Conspiracy under the FCA requires: (1) the existence of an unlawful agreement

between defendants to get a false or fraudulent claim paid; and (2) at least one act performed in

furtherance of that agreement.  *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333,

343 (5th Cir. 2008).  Conspiracy claims are subject only to notice pleading requirements, but the

Relators would also meet a heightened pleading standard.

**1.      The Notice Pleading Standard Should Apply
To The Conspiracy Claim.**

While district courts are divided over whether conspiracy claims under the FCA are

subject to Rule 9(b)'s heightened pleading requirements, *compare United States ex rel. Bartlett

v. Tyrone Hosp., Inc.*, 234 F.R.D. 113, 123 (W.D. Pa. 2006) ("Rule 8(a) pleading requirements,

and not the heightened pleading requirements of Rule 9(b) apply to the conspiracy alleged"

under the FCA) *with United States ex rel. Capella v. Norden Sys., Inc.*, No. 3:94-cv-2063, 2000 WL 1336487, at *11 (D. Conn. Aug 24, 2000) (applying the Rule 9(b) pleading requirements to a conspiracy claim), the Fifth Circuit implicitly has held that it will not impose Rule 9(b)'s particularity requirements on conspiracy claims under the FCA.  *See United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 380 (5th Cir. 2004).

The relator in *Riley* generally alleged that the defendants conspired to defraud the United States government and that they took substantial steps in furtherance of their conspiracies.  *Id.* In denying the defendants' motion to dismiss and remanding the case for further consideration, the Fifth Circuit explained that "[w]hether this *general allegation of conspiracy* survives will depend largely on whether the underlying allegations of false statements and false claims survive the specificity challenge under Rule 9(b), a matter we leave to the district court . . . ."  *Id.* (emphasis added).  If conspiracy allegations under the FCA were subject to Rule 9(b), remand would not have been necessary because "general allegation[s] of conspiracy" could never survive.  In distinguishing the "underlying allegations" from the "allegation[s] of conspiracy," the Fifth Circuit implicitly held that conspiracy allegations are not subject to Rule 9(b).  *Id.*

If the specific pleading requirements of 9(b) do not apply to conspiracy claims, the allegations in the amended complaint undoubtedly are detailed enough to satisfy the general pleading requirements of the Federal Rules of Civil Procedure.  *See Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 632 (5th Cir. 1999) (a complaint states a cause of action for conspiracy if it contains "sufficient information to show that a valid claim for relief has been stated and to enable

the opponent to prepare adequate responsive pleadings.") (internal citation omitted).  As set forth below, the Amended Complaint also states a claim for conspiracy under any standard.[11]

## 2.   The Amended Complaint States A Claim For Conspiracy.

Relators allege specific facts that state a claim for conspiracy in the amended complaint. First, they allege that Defendants "conspired to defraud the Government by getting false or fraudulent claims allowed or paid."  Am. Compl. ¶ 124.  The conspirators "acted with the intent to deceive and defraud the United States Government by pushing off the responsibility for paying hurricane claims on the US Government and by causing purportedly independent engineering firms to rewrite reports to transfer responsibility to the FEMA funds available under the NFIP."  *Id*. ¶ 131.  Moreover, Renfroe joined this conspiracy in order to profit directly from the fraud.  Because the adjusting costs received from the federal government are linked directly to the amount of damages, Renfroe had a financial incentive to ensure that its adjusters "hit the limits" when adjusting flood claims.  *Id*. ¶ 61.[12]

Second, they allege that overt acts were performed in furtherance of that conspiracy. Some of these acts included: Haag creating a weather report with false weather data; State Farm and others using the Haag report as a basis for engineering companies to attribute damage to flood rather than wind; State Farm pressuring engineering companies to change the conclusions in their reports; and State Farm and Renfroe adjusters exaggerating the damage to homes in order

---

[11]     The Court should hold that the notice pleading standards of Rule 8 apply, but even if the Court applies the heightened pleading standards of Rule 9(b), those standards should be relaxed in this case for the reasons provided in section III.A, *supra*.

[12]     This allegation provides the factual basis for Renfroe's intent to defraud the government.  Renfroe's Mem. in Support of Mot. to Dismiss at 16 (docket entry [116]) ("Renfroe Mem.").  It also refutes Renfroe's assertion that the only allegations that refer to its misconduct are based on information and belief.  *Id.* at 9.

to "hit the limits" when adjusting flood claims.  *Id*. ¶¶ 43-61.  These detailed allegations address both elements of a conspiracy claim, *see Farmer*, 523 F.3d at 343, and they provide the "who, what, when, where, and how" of the conspiracy.  Accordingly they would meet even a heightened pleading requirement under Rule 9(b).  *See Williams*, 112 F.3d at 179. [13]

### D.      Relators Adequately Pled Their Claim For Retaliatory Discharge.

To state a claim, an employee must allege that: (1) she engaged in protected activity, (2) the employer knew of the protected activity, and (3) she was discriminated against because of that activity.  *See U.S. ex rel Graves v. ITT Educational Servs., Inc.*, 284 F. Supp. 2d 487, 510 (S.D. Tex. 2003); s*ee also Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951(5th Cir. 1994).[14]  Rule 8(a)'s liberal pleading standards, and not Rule 9's requirement of specificity apply to a retaliatory discharge claim. *See, e.g., United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220 at 238 n.23.[15]

---

[13]      State Farm argues that conspiracy claims under the FCA also have a third requirement, that "the government suffered damages as a result of the acts alleged."  Def's Mem. at 19 (docket entry [99]).  Though the Fifth Circuit did not recognize this requirement in *Farmer*, Relators' complaint also alleges that as a result of this conspiracy, the federal government has paid "flood insurance claims that were in fact claims for hurricane damage or homeowners' insurance damage" payable by State Farm.  Am. Compl. ¶ 134.  State Farm is best positioned to identify all of those claims, and a complaint is not required to identify every specific false claim.  *See, e.g., United States ex rel. Tucker v. Nayak*, No. 06-cv-662, 2008 WL 140948, at *4 (S.D. Ill. Jan. 11, 2008) (holding that it would be impractical and inefficient" to require detailed allegations for every single false claim).

[14]      Section 3730(h) of the FCA states:

Any employee who is discharged, demoted suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee . . . in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

[15]      Renfroe admits this point.  *See* Renfroe's Mem. at 20, n.5 (docket entry [116]).

State Farm's Motion to Dismiss does not contest the sufficiency of Relators' allegations that State Farm retaliated against them.[16]  Nor could it; the complaint alleges that after Relators notified State Farm that they had provided information to the government, State Farm locked Relators out of their offices and escorted them from the building.  Am. Compl. ¶ 33.

Renfroe does not contest the first element (Relators' allegations that they engaged in protected activity), but rather argues only that it did not know about Relators' protected activity and did not fire Relators because of that protected activity.  Renfroe's Mem. at 21 (docket entry [116]).  While Renfroe's arguments may raise disputes of fact, they do not demonstrate that Relators failed to state a claim.

In any event, the Amended Complaint clearly alleges that Renfroe and State Farm knew of Relators' protected activity.  Am. Compl. ¶ 148.  First, to establish a defendant's knowledge, a relator need only allege that the "employer was aware of his protected activity."  *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 743 (D.C. Cir. 1998).  Renfroe and State Farm engaged in a conspiracy to defraud the government, and during that conspiracy, Renfroe provided claims adjusters to State Farm.  *Id.* ¶¶ 24, 56, 61.  Relators were joint employees of Renfroe and State Farm.  *Id.* at ¶ 148. Renfroe "leased" Relators to State Farm, and maintained a supervisory presence over Relators while State Farm controlled the manner of their work.  *Id.* ¶¶ 24, 28, 147.  On June 5, 2006, Relators "informed State Farm that they had taken the documents and given them to federal prosecutors on the advice of their attorneys."  *Id.* ¶ 32. Given that the complaint alleges that Renfroe and State Farm conspired to defraud the government, and that Relators were joint employees of Renfroe and State Farm, it is a reasonable

---

[16]     State Farm asks this Court to dismiss only Counts I-IV of the Amended Complaint.  Def's Mem. at 31 (docket entry [99]).  The Retaliatory Discharge allegation is Count V.  Am. Compl. ¶¶ 146-154.

inference that Renfroe also learned that Relators had taken documents and provided them to federal prosecutors.

Second, the Relators were discriminated against because of that activity.  Gene and Jana Renfroe concede that "Renfroe Inc. accepted the Relators' resignations after they appeared on television and gave statements to the media in August 2006."  *See* Renfroe Individual Mem. at 9 n.3 (docket entry [180]).  Although Relators never tendered their resignations, (Am. Compl. ¶ 152), Renfroe's statement implies that it accepted the resignations because Relators appeared on television and gave statements to the media.  Moreover, the Amended Complaint alleges Relators were discharged by State Farm shortly after notifying State Farm they had provided documents to the government.  *Id.* ¶ 34.  The complaint further alleges that Renfroe "'accepted [the Relators'] resignations' (which had never been tendered) . . . in retaliation for their protected concerted activity."  *Id.* ¶ 152.

Those facts clearly constitute a *prima facie* case of conspiracy and retaliation under the FCA – State Farm and Renfroe worked together to adjust Katrina claims and conspired together to defraud the government, then fired Relators simultaneously after learning of Relators' protected activity.  A reasonable jury could infer that State Farm would have informed its co-conspirator of Relators' protected activity, and that both State Farm and Renfroe would then have retaliated by discharging Relators.  *See United States ex rel. Satalich v. City of Los Angeles*, 160 F. Supp. 2d 1092, 1108 (C.D. Cal. 2001) ("Plaintiff appears to allege that City officials and subcontractors conspired to improperly obtain federal funds, [and therefore that] the City might have a motive to retaliate against Plaintiff for his investigation . . . .").

Renfroe makes the red herring argument that Relators "must sufficiently allege activity with a nexus to a *qui tam* action, or fraud against the *United States Gov't*"  Renfroe Mem. at 24

(docket entry [116]) (emphasis in original) (quoting *United States ex rel. McKenzie v. BellSouth Telecomm, Inc.*, 219 F.3d 508, 516 (6th Cir. 2000)).  From that statement, Renfroe somehow draws the conclusion that the Amended Complaint must "assert[] that Renfroe understood Relators' conduct to be in furtherance of a *qui tam* action." *Id*.  That argument has no support in the FCA or the caselaw; *McKenzie* actually held only that the conduct for which a relator is discharged must be in furtherance of a *qui tam* action (or other protected activity) to invoke the FCA's shield.  219 F.3d at 516.  Nothing in *McKenzie* suggests that an employer had to know about the existence of a *qui tam* action when it imposed an adverse employment decision; it would have been enough to know that the relator was engaging in protected activity.  *Id*.[17]

Under notice pleading standards, Relators need only a "short and plain statement" of their claim, like the one provided in their Amended Complaint that includes all of the necessary elements of their retaliatory discharge claim.  Fed. R. Civ. P. 8(a).

### E.   The FCA Neither Requires Nor Justifies Dismissal For Seal Violations.

State Farm also argues that Relators' complaint should be dismissed for violations of the FCA's seal provision.  *See* Def's Mem. at 23 (docket entry [99]).  The FCA provides that a relator's initial complaint "shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders."  31 U.S.C. § 3730(b)(2).  But as the Ninth Circuit noted in a case cited by State Farm, "[n]o provision of the False Claims Act explicitly authorizes dismissal as a sanction for disclosures in violation of the seal requirement."

---

[17]     Similarly, in *United States ex rel. Graves v. ITT Educ. Servs., Inc.* 284 F. Supp. 2d 487 (S.D. Tex. 2003), the district court specifically noted that relator had alleged no facts, other than the filing of her sealed complaint, that could have put the defendant on notice.  *Id*. at 510.  And in *X Corp. v. Doe*, 816 F. Supp. 1086 (E.D. Va. 1993), the relator's known actions likewise were not in furtherance of a *qui tam* action.  *Id*. at 1095.  Thus, in each of the cases cited by Renfroe, the relators had done nothing to suggest even the possibility of a *qui tam* action or other protected activity.

*United States ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242, 245 (9th Cir. 1995).  A court must consider three factors in deciding whether dismissal is warranted under section 3730(b)(2): (1) whether the government actually was harmed; (2) the nature of the violation; and (3) the presence or absence of bad faith or willfulness.  *See id*. at 245-46.  Each of these factors weighs against dismissal of Relators' action.

### 1.     The Government Was Not Harmed.

Although State Farm argues that the FCA was somehow intended to protect the rights of those who defrauded the government, Congress was not motivated by any concern for the rights of defendants when it enacted the seal provision.  *See Lujan*, 67 F.3d at 247 (exploring legislative history).  Instead, Congress sought to protect the government's ability to investigate before a defendant realized that its behavior was subject to scrutiny.  *See id*.  For that reason, the first and foremost factor a court must consider is "whether the Government was actually harmed by [a relator's] disclosure"; the "mere possibility" of harm "is not alone enough to justify dismissal of the entire action."  *Id*.  A court dismissing on that basis would be subject to reversal, as was the district court in *Lujan*.  *See id.* at 247.

In this case, State Farm had realized that it might be subject to investigation, and had already begun shredding documents and spoilating evidence, *before* the Relators filed their complaint.  *See* Evidentiary Disclosure at 14-16; Am. Compl. ¶¶ 78-85.  The Mississippi Attorney General's office subpoenaed State Farm in Mississippi after meeting with Relators, *see McIntosh* Dep. of C. Rigsby dated Nov. 19, 2007, at 379:10-14, and State Farm directed Relators and other employees to shred materials in conflict, hired a document disposal company, and moved documents out of Mississippi in April.  *See* Evidentiary Disclosure at 14-16; Am. Compl. ¶¶ 78-85.  The first alleged seal violation did not take place until July 27, 2006,

months after State Farm knew it might fall under investigation and began destroying evidence. *See* State Farm's Attachment to its Mot. to Dismiss at 4-9 (docket entry [203]).

Since State Farm was obstructing justice long before the first alleged seal violations, nothing the Relators did or said could have affected the government's investigation. *See Lujan*, 67 F.3d at 246 ("if [defendant] Hughes'] knowledge of the investigation pre-dated [relator] Lujan's breach of the seal, and was in no way enhanced [by that breach] . . . then it would be illogical to assume that Hughes took any action based on" the breach).  Moreover, State Farm itself has argued that its fraud was public knowledge long before the alleged seal violations occurred.  *See* Def's Mem. for Lack of Subject Matter Jurisdiction at 6-8 (docket entry [92]) (arguing that "[a]llegations of fraudulent overpayments to flood victims [by State Farm] surfaced publicly soon after Hurricane Katrina struck the Gulf Coast on August 29, 2005, and months before Relators provided their information to the government on April 24, 2006.").  As a result, it cannot credibly allege that it took any significantly different actions as a result of Relators' actions.  Accordingly, the government could not have been harmed by any seal violations.

Because the government was not harmed, Relators' claims should not be dismissed. State Farm argues that any violation of the seal order warrants dismissal, but that argument fundamentally misstates the law.  Indeed, a case cited by State Farm notes that "a substantial body of federal case law" has "uniformly rejected" that blanket argument, and "[t]he overwhelming weight of authority suggests that unless a seal violation incurably frustrates the purposes of the seal provision, the sanction of dismissal is inappropriate."  *In re Natural Gas Royalties Qui Tam Litig.*, 467 F. Supp. 2d 1117, 1228-29 and 1238 (D. Wyo. 2006).  The seal provision's central purpose is the prevention of harm to the government, and an action should not be dismissed unless actual harm to the government is shown.  *See Lujan*, 67 F.3d at 247; *see also*

30

*In re Natural Gas Royalties Qui Tam Litig.*, 467 F. Supp. 2d at 1228 ("No less than seven federal district court decisions have concurred with the conclusion reached in *Lujan*.").[18]

<strong>2.      Any Seal Violation Was Immaterial.</strong>

Courts properly are reluctant to dismiss an FCA claim unless a relator completely failed to meet any of the sealing requirements; in both of the cases cited by State Farm where a court dismissed an FCA action, the relator either failed to file the complaint under seal or immediately served the defendant with a copy.  *See United States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 998 (2d Cir. 1995) ("*Pilon*") (complaint not filed under seal); *United States ex rel. Fellhoelter v. Valley Milk Prods., L.L.C.*, No. 3:05-cv-343, 2008 WL 217116, at *1 (E.D. Tenn. Jan. 24, 2008) ("*Fellhoelter*") (complaint filed under seal, but immediately served on defendants).  State Farm's own argument notes that any seal violations that took place occurred more than three months after the Relators filed their complaint.  *See* State Farm's Attachment to its Motion to Dismiss (docket entry [203]) at 4-9.

The rulings in *Pilon* and *Fellhoelter* underscore the primary purpose of the seal provision: allowing the government to investigate a defendant's wrongdoing before that defendant knows it is under investigation.  *See Lujan*, 67 F.3d at 247.  When a defendant learns of an FCA claim before the government's investigation even has a chance to begin, it has a chance to destroy evidence and obstruct the government's investigation.  That concern is not present here.  First, as discussed above, State Farm was already destroying evidence before the complaint was even filed.  And second, Relators' actions gave the government months to

---

[18]      State Farm also fundamentally misrepresents the FCA's seal provision when it argues that protecting defendants is a "central purpose behind the FCA's strict seal provision[.]"  Def's Mem. at 26 (docket entry [99]).  State Farm itself cited *Lujan*, which noted that the FCA's seal provision was solely designed to protect the *government* and was "not intend[ed] to affect defendants' rights in any way."  S. Rep. No. 345, 99th Cong., 2d Sess. 24, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289, *quoted in Lujan*, 67 F.3d at 247.

investigate State Farm before the first whisper of their FCA claim became public.  Accordingly, any seal violation by Relators after that point would not merit a dismissal of their claim.

### 3. The Disqualification Of The Scruggs Law Firm <u>Was The Appropriate Sanction For Any Seal Violations.</u>

State Farm asserts that Relators' former counsel, the Scruggs Law Firm, violated the seal provision on several occasions.[19]  There is no allegation that Relators themselves had any knowledge of any violation or any malice or bad faith in connection therewith.  Accordingly, because any violations (1) did not harm the government; (2) were immaterial; and (3) do not reflect bad faith on the part of Relators, the appropriate sanction for the violations, if any, was the disqualification of the Scruggs Law Firm.

Accordingly, the Court should not dismiss this action.

### F. <u>Relators Did Not Breach The *Qui Tam* Provision Of The FCA.</u>

State Farm argues, without citing a single case, that consulting fees paid to Relators by the Scruggs Law Firm somehow require dismissal of this action.  Def's Mem. at 27-28 (docket entry [99]).  According to State Farm, those payments supposedly conflict with the Relators' right to receive a portion of the government's eventual recovery in this case.  Notably lacking, however, is any logical or precedential support for that argument, which appears to be predicated on wishful thinking rather than any basis in the law.

As State Farm notes, the FCA provides that a successful relator is entitled to twenty-five to thirty percent (25-30%) of the government's recovery in a *qui tam* claim, and thus only successful relators are entitled to receive money from the government.  Def's Mem. at 27-28

---

[19]     State Farm documents these alleged seal violations in a separately-filed "Attachment" to its Motion to Dismiss.  Docket entry [203].  State Farm also refers to its "Attachment" as an "evidentiary supplement."  *Id.* at 2.  By any name, the ten-page supplement added to the thirty-one page memorandum puts State Farm over the thirty-five page limit for its original and rebuttal memoranda.  *See* Uniform Local Rule 7.2(E).

(docket entry [99]).  But State Farm's argument provides absolutely *no* support for the leap it then takes: that the risk of "strike suits" somehow requires this Court to dismiss this valid and meritorious action because Relators' former counsel once employed Relators.  *Id*. at 28.  Nothing in the FCA says, or even suggests, that its compensation provisions were designed for the protection of companies like State Farm that defrauded the government.  Moreover, although this Court found that the Scruggs Law Firm committed ethical violations, it also noted that Relators are not subject to, or even aware of, the Rules of Professional Responsibility that govern attorneys.  Docket entry [177] at 5.  Accordingly, nothing in the FCA would support a dismissal of this action.

As noted in section III.D.3 above, this Court already executed the proper response to the Scruggs Law Firm's conduct; it disqualified the Scruggs Law Firm.  State Farm's attempt to evade responsibility for its fraud as a result of that conduct should be rejected out of hand.

### G.      State Farm Cannot Defend Its Fraud As "Professional Judgments."

State Farm's final argument attempts to hide its fraud behind the mantle of "professional judgments."  Def's Mem. at 20 (docket entry [99]).  But State Farm cannot credibly contend that the fraudulent engineering reports it commissioned represent "professional judgments" or "professional opinions," because no professional judgment was exercised.  Rather, State Farm *ordered the engineers to report flood damage*.  Am. Compl. ¶¶ 83-84.  State Farm commissioned the Haag Report to provide cover for its denial of claims, allowed non-engineers like Lecky King to order the engineering companies to change reports, told its adjusters to handle the damage as flood claims, then submitted those claims to the NFIP.  At every step of the way, State Farm had a predetermined conclusion in mind.  *See United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376-77 (5th Cir. 2004) (reversing district court because complaint

adequately alleged that purported "expressions of opinion or scientific judgment" were known to be false by defendants when made").

State Farm also fundamentally misrepresents the cases it cites. For example, State Farm quoted *Boisjoly v. Morton Thiokol, Inc.* for the proposition that "an engineering judgment . . . is clearly not a statement of fact that can be said to be either true or false, and thus cannot form the basis of an FCA claim." Def's Mem. at 29 (quoting *Boisjoly*, 706 F. Supp. 795, 810 (D. Utah 1988)). But *Boisjoly* actually said only that an opinion and recommendation on a novel and hypothetical situation never before presented to science is "clearly not a statement of fact[.]" *Boisjoly*, 706 F. Supp. at 810. Moreover, NASA (and thus the government) actually pressured the defendant into making that specific recommendation, which "negate[d] any element of falsity or fraud that might otherwise exist," according to the court. *Id.* at 811.

State Farm presents a similarly misleading argument when it quotes cases such as *Tyger Const. Co. v. United States*, 28 Fed. Cl. 35, 56 (1993) and *United States ex rel. Roby v. Boeing, Inc.*, 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000) for the proposition that "expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false." Def's Mem. at 29 (quoting *Roby*, 100 F. Supp. 2d at 625). What *Roby* actually held is that courts "consistently recognize that *innocent mistakes or negligence* are not actionable under the FCA." *Roby*, 100 F. Supp. at 626 (emphasis added).[20] State Farm's conduct was not merely negligent and certainly was not innocent; like the defendant in *Roby*, State Farm "has

---

[20]    *See also Tyger Const. Co.*, 28 Fed. Cl. at 56, n.29 (court was hesitant to apply FCA in contract dispute, but noted that expressions of opinion could be false); *Lucky v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1047 (N.D. Ill.. 1998) (noting that "the knowing presentation of what is known to be false" would serve as the basis for FCA liability); *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992) (holding that "*without more*, the common failings of engineers and other scientists are not culpable under the Act" and protecting honest scientific dispute from FCA liability, but not addressing situations in which engineers were ordered to reach specific findings) (emphasis added).

attempted to escape responsibility . . . by engaging in a semantic debate about 'scientific disputes.'" *Id*. at 632-36 (rejecting defendant's motion for summary judgment).  The cases State Farm itself cited demonstrate that it cannot hide behind falsely obtained "professional judgments."

## IV.  **CONCLUSION**

For the foregoing reasons, Defendants' Motions to Dismiss Pursuant to Rule 9(b) and 12(b)(6) should be denied.

THIS the 15th day of September, 2008.

Respectfully submitted,

/s/ C. Maison Heidelberg
C. MAISON HEIDELBERG, MB #9559
GINNY Y. KENNEDY, MB #102199

OF COUNSEL:
MAISON HEIDELBERG P.A.
795 Woodlands Parkway, Suite 220
Ridgeland, Mississippi  39157
Phone No.      (601) 351-3333
Fax No.        (601) 956-2900

August J. Matteis, Jr. (admitted *pro hac vice*)
Craig J. Litherland (admitted *pro hac vice*)
Benjamin Davidson (admitted *pro hac vice*)
GILBERT RANDOLPH LLP
1100 New York Avenue NW
Suite 700
Washington, DC 20005
Phone No.      (202) 772-2200
Fax No.        (202) 772-3333

Attorneys for Kerri Rigsby and Cori Rigsby

## <u>CERTIFICATE OF SERVICE</u>

  I, Maison Heidelberg, attorney for Cori Rigsby and Kerri Rigsby, do hereby certify that I have this day caused a true and correct copy of the foregoing instrument to be delivered to the following, via the means directed by the Court's Electronic Filing System or as otherwise set forth below:

      Larry G. Canada, Esq.
      Kathryn Breard Platt, Esq.
      GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
      701 Poydras Street, Suite 4040
      New Orleans, LA 70139
      (p) 504-525-6802
      ATTORNEYS FOR HAAG ENGINEERING CO.

      William C. Bell, Esq.
      WILLIAM C. BELL, ATTORNEY
      P.O. Box 1876
      Ridgeland, MS 39157
      (p) 601-956-0360
      ATTORNEY FOR JADE ENGINEERING

      James C. Simpson, Jr., Esq.
      MONTGOMERY, BARNETT, BROWN,
       READ, HAMMOND & MINTZ, LLP
      2310 19th Street
      Gulfport, MS 39501
      (p) 228-863-6534

      David A. Ward, Jr., Esq.
      THE WARD LAW FIRM
      10003 Woodloch Forest Drive, Suite 100
      The Woodlands, TX 77382
      (p) 281-362-7728
      ATTORNEYS FOR RIMKUS CONSULTING GROUP, INC

      Frank W. Trapp, Esq.
      Kelly R. Blackwood, Esq.
      PHELPS DUNBAR
      P.O. Box 23066
      Jackson, MS 39225
      (p) 601-352-2300
      ATTORNEYS FOR STRUCTURES GROUP

H. Hunter Twiford, III, Esq.
MCGLINCHEY STAFFORD
P. O. Drawer 22949
Jackson, MS 39225
(p) 601-960-8400

Beth C. McClain, Esq.
John T. Boese, Esq.
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, DC 20004
ATTORNEYS FOR E. A. RENFROE, INC.,
GENE RENFROE, AND JANA RENFROE

Robert C. Galloway, Esq.
Emerson Barney Robinson, III, Esq.
Jeffrey A. Walker, Esq.
BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
P.O. Box 22567
Jackson, MS 39225
(p) 601-948-5711

Michael B. Beers, Esq.
BEERS, ANDERSON, JACKSON, PATTY & FALWAL, PC
250 Commerce Street, Suite 100
Montgomery, AL 36104
(p) 334-834-5311
ATTORNEYS FOR STATE FARM MUTUAL
INSURANCE COMPANY

Philip Williams Thomas, Esq.
PHILIP W. THOMAS, P.A.
P.O. Box 24464
Jackson, MS 39225
(p) 601-714-5660
ATTORNEY FOR EXPONENT, INC.

Felicia C. Adams, Esq.
U. S. Attorney's Office
188 E. Capitol Street, Suite 500
Jackson, MS 39201
(p) 601-965-4480
ATTORNEY FOR UNITED STATES OF AMERICA

<u>Via U.S. First Class Mail</u>
Robert K. Kochan, President
3401 Atlantic Avenue, Suite 101
Raleigh, NC 27604
FORENSIC ANALYSIS
ENGINEERING CORPORATION, PRO SE

This 15th day of September, 2008

/s/ C. Maison Heidelberg
Maison Heidelberg  MSB #9559
MAISON HEIDELBERG P.A.
795 Woodlands Parkway
Suite 220
Ridgeland, MS 39157

3