IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA ex rel.
CORI RIGSBY and KERRI RIGSBY                RELATORS/COUNTER-DEFENDANTS

v.                                          CASE NO. 1:06cv433-LTS-RHW

STATE FARM FIRE AND CASUALTY COMPANY   DEFENDANT/COUNTER-PLAINTIFF

and

FORENSIC ANALYSIS ENGINEERING CORPORATION;
HAAG ENGINEERING CO.; and ALEXIS KING                      DEFENDANTS

**STATE FARM FIRE AND CASUALTY COMPANY'S
RESPONSE IN OPPOSITION TO THE RIGSBYS' [573] & [576]
MOTION TO COMPEL AND FOR SANCTIONS**

Defendant/Counter-Plaintiff State Farm Fire and Casualty Company ("State Farm")

submits this Response in Opposition to the Rigsbys' [573] & [576] Motion to Compel and for

Sanctions.

1.      This case is not going well for the Rigsbys.  Last week's testimony from three

FEMA representatives establishes conclusively that State Farm properly adjusted and paid the

McIntosh flood claim.

2.      David Maurstad, the former head of the National Flood Insurance Program

("NFIP"), testified that, in light of the unprecedented storm surge on the Mississippi coast, there

was "no way the flood adjuster" could have determined that a property was destroyed by wind

before the storm surge arrived.[1]  Mr. Maurstad expressly rejected the Rigsbys' suggestion that an

adjuster should have withheld payment under the flood policy until the wind damage was

assessed, explaining that employing such grounds to deny flood insurance payments would have

been an "unconscionable" act that would have violated the letter and spirit of the NFIP.[2]  Mr. Maurstad further testified that FEMA guidelines and "common sense" permitted a flood claims adjuster to forego an "itemized line-by-line claim adjusting process" where (as here) the "damage far exceeded the policy limits."[3]

3.      James Shortley, FEMA's Director of Claims for the NFIP at the time of Katrina, similarly testified that – contrary to the Rigsbys' central theory of the case – a stick build estimate would not have been necessary where (as here) the flood adjuster performed a site visit, determined that the property was a constructive total loss, and documented that loss with photographs, scope notes, and diagrams.[4]

4.      Finally, Gerald Waytowich, who was responsible for conducting routine FEMA reinspections of flood adjustments done by companies such as State Farm to ensure compliance with FEMA policies and procedures, reviewed the McIntosh flood claim file and found:  (i) the photographs of the McIntosh property indicate flood damage "way beyond the $250,000" policy limits;[5] (ii) the McIntosh flood claim was properly scoped and documented;[6] (iii) the use of XactTotal was consistent with the training given by FEMA for handling Katrina claims;[7] and (iv) the McIntosh flood claim file justified a $250,000 flood payment.[8]

---

*(cont'd from previous page)*
[1] Maurstad Dep. at 10:8-11:21; 31:13-32:12; 36:24-38:20; 126:1-127:12, excerpts attached as Exhibit A.

[2] *Id.* at 126:1-127:12.

[3] *Id.* at 149:5-150:20.

[4] Shortley Dep. at  9:20-10:6; 27:5-25, excerpts attached as Exhibit B.

[5] Waytowich Dep. at 15:7-16:3; 26:8-22; 47:13-18, excerpts attached as Exhibit C.

[6] *Id.* at 46:18-22.

[7] *Id.* at 47:6-25.

[8] *Id.* at 48:17-24.

5.    Stung by this testimony, the Rigsbys have filed this motion in a desperate but misplaced effort to shift the momentum and to shift the attention away from the substance of this matter by creating a procedural tempest in a teapot.  Their motion does not withstand scrutiny.

6.    The Rigsbys' complaints are particularly ironic considering that on June 3, 2010, just one day before they filed their motion, they notified State Farm that they would supplement *their* discovery responses with materials that State Farm "requested previously" ([574] at 1), and which were "readily available" (*id.*), to the Rigsbys.  (Letter from C. Litherland to J. Walker, dated June 3, 2010, attached as Exhibit D.)

7.    State Farm incorporates by reference herein its Response Memorandum of Authorities, filed of record following this Response, including all arguments, authorities and other matters set forth therein.

WHEREFORE, PREMISES CONSIDERED, for all of the foregoing reasons, State Farm respectfully requests that this Court deny the Rigsbys' ([573] & [576]) motion to compel and for sanctions in its entirety.

This the 11th day of June, 2010.

Respectfully submitted,

STATE FARM FIRE AND CASUALTY COMPANY

By:    /s/ *Jeffrey A. Walker* (MSB #6879)
       Jeffrey A. Walker (MSB # 6879)
       Robert C. Galloway (MSB # 4388)
       E. Barney Robinson III (MSB #09432)
       Benjamin M. Watson (MSB # 100078)

       ITS ATTORNEYS

3

BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
Post Office Drawer 4248
Gulfport, MS   39502
(P) (228) 575-3019
(E) bob.galloway@butlersnow.com

BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
200 Renaissance at Colony Park, Suite 1400
1020 Highland Colony Parkway (39157)
Post Office Box 6010
Ridgeland, MS 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) jeff.walker@butlersnow.com
(E) barney.robinson@butlersnow.com
(E) ben.watson@butlersnow.com
(E) amanda.barbour@butlersnow.com

Michael B. Beers (ASB-4992-S80M), PHV
BEERS, ANDERSON, JACKSON, PATTY & FAWAL, P.C.
Post Office Box 1988, Suite 100
250 Commerce Street (36104)
Montgomery, Alabama 36102
(P) (334) 834-5311
(F) (334) 834-5362
(E) mbeers@beersanderson.com

*PRO HAC VICE*

James R. Robie (CA State Bar # 67303), PHV
ROBIE & MATTHAI
Biltmore Tower, Suite 1500
500 South Grand Avenue
Los Angeles, California  90071
(P) (213) 706-8000
(F) (213) 706-9913
(E) jrobie@romalaw.com

*PRO HAC VICE*

## CERTIFICATE OF SERVICE

I, Jeffrey A. Walker, one of the attorneys for State Farm Fire and Casualty Company, do hereby certify that I have this day caused a true and correct copy of the foregoing instrument to be delivered to the following, via the means directed by the Court's Electronic Filing System:

C. Maison Heidelberg
Ginny Y. Kennedy
HEIDELBERG HARMON, PLLC
795 Woodlands Parkway, Suite 220
Ridgeland, MS 39157
(P) (601) 351-3333
(F) (601) 956-2090
(E) maison@heidelbergharmon.com
(E) gkennedy@heidelbergharmon.com

August J. Matteis, Jr.
Craig J. Litherland
Benjamin R. Davidson
GILBERT LLP
11 New York Avenue, NW
Suite 700
Washington, DC 20005
(E) matteisa@gotofirm.com
(E) litherlandc@gotofirm.com
(E) davidsonb@gotofirm.com

COUNSEL FOR CORI RIGSBY AND KERRI RIGSBY

Jeffrey S. Bucholtz
Joyce R. Branda
Patricia R. Davis
Jay D. Majors
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
(P) (202) 307-0264
(F) (202) 514-0280
(E) joyce.branda@usdoj.gov
(E) patricia.davis@usdoj.gov
(E) jay.majors@usdoj.gov

Stan Harris
Alfred B. Jernigan, Jr.
Felicia C. Adams
UNITED STATES ATTORNEY'S OFFICE
Southern District of Mississippi
Suite 500
188 East Capitol Street
Jackson, MS 39201
(P) (601) 965-4480
(F) (601) 965-4409
(E) felicia.adams@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

Larry G. Canada
Kathryn Breard Platt
GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, A PLC
2510 14th Street, Suite 910
Gulfport, MS 39501
(P) (228) 214-4250
(F) (228) 214-9650
(E) lcanada@gjtbs.com
(E) kplatt@gjtbs.com

ATTORNEYS FOR HAAG ENGINEERING CO.

Robert D. Gholson
Daniel D. Wallace
GHOLSON, BURSON, ENTREKIN & ORR, P.A.
535 North 5th Avenue (39440)
P.O. Box 1289
Laurel, MS 39441-1289
(P) (601) 649-4440
(F) (601) 649-4441
(E) gholson@gbeolaw.com

ATTORNEY FOR FORENSIC ANALYSIS ENGINEERING CORPORATION


This the 11th day of June, 2010.


/s/ *Jeffrey A. Walker* (MSB #6879)
Jeffrey A. Walker (MSB #6879)


Jackson 5238463v1

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2     FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3              SOUTHERN DIVISION

4        Case No. 1:06:cv-433-LTS-RHW

5     _____

6    UNITED STATES OF AMERICA ex rel, CORI      )

7    RIGSBY and KERRI RIGSBY,                    )

8           Relators/Counter-Defendants,        )

9        v.                                      )

10   STATE FARM MUTUAL INSURANCE COMPANY,        )

11          Defendant/Counter-Plaintiff,         )

12   and                                         )

13   FORENSIC ANALYSIS ENGINEERING               )

14   CORPORATION, HAAG ENGINEERING CO., and      )

15   ALEXIS KING,                                )

16          Defendants.                          )

17   _____    )

18

19        DEPOSITION OF DAVID R. MAURSTAD

20              Washington, D.C.

21              June 2, 2010

22

23   Reported by:

24   Mary Ann Payonk, Certified Realtime Reporter

25   Job No. 30584

**Exhibit A**

1          D. Maurstad

2   the policyholder premiums support along with

3   direct appropriation for that work.

4       Q.   Do any of your engineers or

5   architects perform any independent expert

6   evaluations of claim sites?

7       A.   Not that I'm aware of.

8       Q.   Okay.  What was your previous

9   position prior to taking your current position

10  with PBS&J?

11      A.   I was the assistant administrator for

12  the mitigation directorate and the

13  administrator of the National Flood Insurance

14  Program with FEMA.

15      Q.   And how long did you serve in that

16  position, please, sir?

17      A.   I started in acting position in June

18  of 2004 and would have become -- the acting

19  part would have been dropped I think in

20  February-March of 2006.  So I essentially

21  served in that position from June of 2004 until

22  September of 2008.

23      Q.   Could you describe more specifically

24  your roles and responsibilities as director?

25      A.   Well, as the -- the way that the

1                       D. Maurstad

2    agency was -- FEMA was organized, the

3    mitigation directorate housed two main program

4    areas.  One was the mitigation program, which

5    is essentially mitigation grant work, building

6    science work, all of the mitigation grant

7    programs, and then the other main component of

8    the mitigation directorate was the National

9    Flood Insurance Program.

10            And by statute, I was the -- the

11   federal insurance administrator or

12   administrator of the National Flood Insurance

13   Program, which was responsible for the

14   operation of the program.

15       Q.   Okay.  Am I to understand basically

16   in that position you would have been the --

17   kind of the manager of the National Flood

18   Insurance Program itself and all aspects of

19   that program?

20       A.   Yes.  Uh-huh.  Yeah, the

21   administrator, manager, leader.

22       Q.   And included within that area of

23   management or supervision would have been the

24   claims mitigation portion of that program; is

25   that correct?

1                 D. Maurstad

2 before, and this was similar devastation for

3 miles, literally for miles.

4         And then in the -- of course, in the

5 New Orleans area where you -- because of the

6 levy failures and levy overtopping had 8-plus

7 feet of water throughout a majority of the

8 area, and was told very early on by the Corps

9 of Engineers that it was going to take months

10 to pump that water out; that we were looking at

11 claims situations unlike the program had faced

12 before.

13     Q.   Did you consider, after your visit

14 and your observations, that Katrina was a

15 monumental flooding event that had to be

16 addressed by your agency?

17     A.   Well, I mean, it was catastrophic.

18 Every disaster is.  But, I mean, it -- again,

19 it was unprecedented in my history of the

20 knowledge and understanding of the program.  It

21 was unprecedented.

22         And the charge that we were -- that

23 the federal government was given, but that FEMA

24 was responsible for coordinating, was to

25 respond and help the citizens of the Gulf Coast

D. Maurstad

1  recover as quickly as possible.

3       I took that responsibility very
4  seriously and with my understanding of the way
5  that the disaster assistance programs within
6  other parts of FEMA worked and the limited
7  nature of the assistance that's available to
8  people, individuals, that those people that did
9  have a flood insurance policy were going to be
10 able to get back on their feet much, much
11 faster if we were able to get them the payments
12 from the policies that they purchased.

13     Q.   Did you reach out and communicate
14 this desire and concern to the Write Your Owns
15 as to seeking assistance and getting everyone's
16 heads together to address this issue?

17     A.   Yeah.  Again, as I indicated, you
18 know, after I provided my initial assessment to
19 the administrator of FEMA and to the
20 administration and OMB and reached out to the
21 insurance commissioners because I believed it
22 was very critical to have -- you know, start a
23 dialogue with the insurance commissioners, work
24 with them shoulder to shoulder was the term
25 that I used in making sure that their citizens

1                        D. Maurstad

2    hope, is what I've been trying to share with

3    you already.

4         Q.   Yes, sir.

5         A.   And within the context of the date of

6    August 31, you can understand or potentially

7    appreciate what I've been trying to indicate,

8    and that's the urgency that I had in making

9    sure that we were approaching this disaster in

10   the context of the magnitude of it and very

11   much reaching out very quickly, days within the

12   time that Katrina hit.

13            And we made some decisions very

14   quickly.  We started -- we didn't -- you know,

15   I was not going to be ambiguous with how we

16   were going to approach this.  And this

17   reflects, I believe, the intent of what I

18   was -- what I was sharing in those early days

19   of Katrina.

20        Q.   This --

21        A.   Maybe not as vociferous as I would

22   want it to, but it's good enough, I guess.

23        Q.   Yes, sir.

24            This communication where it says FEMA

25   will be developing procedures to streamline

1                    D. Maurstad

2   payments in cases where losses exceed policy

3   limits, was this a communication that

4   Mr. Russell with IBHS obviously received from

5   someone at FEMA under your direction or

6   supervision?

7        A.   Yeah, I would have shared that with

8   the IBHS who would have been on the calls that

9   I've been talking about.

10            So -- and I indicated that we were --

11  again, within the context of my insurance

12  experience and with the understanding that,

13  unfortunately, most people when they buy a

14  flood insurance policy don't buy it to value.

15            And so it was my belief very early on

16  that we were going to have an extraordinary

17  number of policy limit claims because of the

18  devastation of the coast and because of the

19  inundation of homes for an extended period of

20  time.  So I started talking very quickly about

21  ways that we could, as it is indicated here,

22  streamline the processes.

23            I'm not sure that expediting came

24  about in these early discussions, but that was

25  my intent.  We wanted -- again, my general

1          D. Maurstad

2   charge was I want people to be taken care of as

3   quickly and as fairly as possible within the

4   context of their policies.  It was an

5   opportunity for the flood program to

6   demonstrate what we had been talking to people

7   about, and that's you're better off in the

8   aftermath of a flood disaster with an NFIP

9   policy than without one.

10          I mean, this was a time when we would

11   be able to use and indicate for the benefit of

12   property owners around the country in the

13   future that in Katrina, the worst disaster --

14   natural disaster to strike this country, the

15   worst flooding disaster to ever occur within

16   this country, people that had a flood insurance

17   policy got paid promptly, fairly, and recovered

18   quicker than people that didn't, that had to

19   rely on either disaster assistance or some type

20   of charity.

21      Q.   Did you have an occasion,

22   Mr. Maurstad, shortly after Katrina hit to

23   attend a summit of various insurance

24   commissioners in Atlanta, if you recall?

25      A.   Yes, I did.

1         D. Maurstad

2     Q.    Okay.   Now let me give you a

3 hypothetical.

4         If the adjuster went out to the

5 property and the home was completely destroyed

6 and there was a big strip of other homes and

7 trees and other things that were gone leading

8 right up to the home, there was also a bunch of

9 water in the area, while you were out at the

10 NFIP, would you have expected that adjuster to

11 have looked into whether any wind damaged the

12 property first?

13         MR. BEERS:  Object to the form.

14     A.    The -- what -- clearly, the situation

15 in Katrina on the Mississippi coast with the

16 recorded storm surge, the situation of trying

17 to parse whether, you know, wind caused that or

18 whether the storm surge caused that, it would

19 have been, in my opinion, an uncontroble

20 (phonetic) position for the flood program to

21 have denied claims on your hypothetical basis.

22         So the adjuster, knowing what the

23 facts are and the storm surge and the area, the

24 way it's damaged, again goes back to

25 determining there was a flood event and then

1                     D. Maurstad

2    pays for the damaged property.

3        Q.   So even if the flood adjuster knew

4    the home was completely destroyed by wind --

5        A.   There's no way the flood adjuster

6    could know that is what I'm trying to

7    articulate in this case.

8             And if the flood adjuster can't

9    determine that, then it would be, you know,

10   again uncontroble (phonetic) to -- for the

11   flood program to have come in and denied

12   hundreds of claims on that basis.

13       Q.   Did the flood adjuster have any

14   obligation to look into the cause of loss after

15   Hurricane Katrina?

16       A.   The flood adjuster did.  The flood

17   adjuster determined that storm surge caused the

18   damage and paid the flood loss accordingly.

19       Q.   For every house that was damaged by

20   Hurricane Katrina was the storm surge?

21            MR. BEERS:  Object to the form.

22       A.   I'm not sure every house was --

23   that's the case for every house.

24       Q.   Well, I'm not sure I'm following your

25   testimony, Mr. Maurstad.

1          D. Maurstad

2    could try to envision likely scenarios to be

3    and what processes we could put in place to

4    help Write Your Own companies and the

5    policyholders get the claim adjusted, people

6    that interpret these in a limiting -- in

7    limiting fashion are -- that was not the intent

8    in the development of them.

9          Q.   Okay.  But the -- what -- sounds like

10   what -- and correct me if I'm wrong, but the

11   way you just described process 2 is properties

12   where they were washed off their foundation or

13   if the company could get its own flood depth

14   data.

15          Was that sort of getting at the same

16   point as process 1, which is essentially if it

17   was difficult or impossible to access the

18   property to get information about it such as if

19   it's been sitting in water for ten days or, you

20   know, and it's still in water or if there's

21   just nothing there so you can't really gather

22   evidence about what happened to it?  Is that

23   what -- do they both sort of go to that point?

24          MR. BEERS:  Object to form.

25          A.   That's part of the process, but it's

1                          D. Maurstad

2    just one factor.  Access to the property was

3    just one factor of trying to come up with a way

4    to streamline the claim handling.

5              Another was simply if it was common

6    sense and reasonable for one to look at the

7    policy and know what the policy limits were and

8    look at the damaged property and know that if

9    the damage far exceeded the policy limits, that

10   in this circumstance, in the aftermath of

11   Katrina, it didn't make sense to go through the

12   normal, all itemized line-by-line claim

13   adjusting process.

14       Q.   And you did -- does FEMA 5054 say

15   that?

16            MR. BEERS:  Object to the form.

17       A.   I think FEMA -- I think 5054,

18   reasonably interpreted, leads one to that

19   conclusion, that that's what we were trying to

20   accomplish.

21       Q.   So you were trying to accomplish that

22   by 5054.  Whenever adjuster thought it made

23   sense to do it, they didn't have to do a

24   line-by-line estimation, they could just use --

25       A.   No.

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3            SOUTHERN DIVISION

4        Case No. 1:06:cv-433lLTS-RHW

5    _____

6    UNITED STATES OF AMERICA ex rel, CORI    )

7    RIGSBY and KERRI RIGSBY,                 )

8        Relators/Counter-Defendants,         )

9        v.                                   )

10   STATE FARM MUTUAL INSURANCE COMPANY,     )

11       Defendant/Counter-Plaintiff,         )

12   and                                      )

13   FORENSIC ANALYSIS ENGINEERING            )

14   CORPORATION, HAAG ENGINEERING CO., and   )

15   ALEXIS KING,                             )

16       Defendants.                          )

17   _____ )

18

19       DEPOSITION OF JAMES S.P. SHORTLEY

20            Washington, D.C.

21            June 3, 2010

22

23   Reported by:

24   Mary Ann Payonk, Certified Realtime Reporter

25   Job No. 30585                    **Exhibit B**

1                    J. Shortley

2      insurance.

3          Q.    And how long have you performed this

4      consulting work?

5          A.    Well, I retired in November of '07,

6      and I have been doing it since then, but it's

7      not something that I do every day.  I don't go

8      to an office and work every day or --

9          Q.    And you don't consult for one

10     specific company --

11         A.    No.

12         Q.    -- or individual?

13         A.    Anybody that will pay me.

14         Q.    And when did you retire?  November of

15     '07?

16         A.    Yes.

17         Q.    And what did you retire from?

18         A.    The Federal Emergency Management

19     Agency.

20         Q.    And could you tell me what your last

21     position was with FEMA?

22         A.    I was the director of claims for the

23     National Flood Insurance Program for FEMA.

24         Q.    And how long did you serve in that

25     position, please, sir?

1                        J. Shortley

2        A.   Since November of 1990.

3        Q.   So from November of 1990 to November

4   of 2007, you served as director of claims for

5   FEMA?

6        A.   I did.

7        Q.   Okay.  Did you hold any other

8   positions with FEMA or the National Flood

9   Insurance Program prior to serving as director

10  of claims?

11       A.   I was what they called a government

12  technical monitor from 1983 to 1990.  My office

13  was at the office building for the NFIP Bureau

14  and Statistical Agent, and my job there was to

15  show -- not show, but see that the contractor

16  was fulfilling its contractual obligations in

17  the claims area.

18       Q.   And when you say "the contractor,"

19  who do you mean?  What do you --

20       A.   At that time, it was Computer

21  Sciences Corporation.

22       Q.   And what services did Computer

23  Science Corporation perform for FEMA?

24       A.   Well, they handled -- they had the --

25  from my area, they had the general adjusters.

1                        J. Shortley

2     water remained in these structures for a week

3     to ten days.  We didn't have to go out and look

4     at that.

5          Q.    I know.  But with regards to those

6     that they did site visits for --

7          A.    Oh, yeah, we would want them to take

8     photographs and measurements and that kind of

9     thing.

10         Q.    Scoping the damage and --

11         A.    Right.

12         Q.    And once they were -- once they

13    photographed it, scoped it and diagrammed it,

14    if they determined through looking at their

15    scope and their observation of the flood damage

16    that the damage would exceed the coverage

17    limits, they would not have to stick build an

18    estimate?

19         A.    Right.

20              MR. MATTEIS:  Objection to form.

21         Q.    Do you recall also having discussions

22    in addition with Ms. King but with Mr. Guevara

23    where this process was discussed and

24    authorized?

25         A.    Right, yes.

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                  SOUTHERN DIVISION

4           Case No. 1:06:cv-433-LTS-RHW

5    _____

6    UNITED STATES OF AMERICA ex rel, CORI      )

7    RIGSBY and KERRI RIGSBY,                    )

8           Relators/Counter-Defendants,        )

9        v.                                      )

10   STATE FARM MUTUAL INSURANCE COMPANY,        )

11          Defendant/Counter-Plaintiff,         )

12   and                                         )

13   FORENSIC ANALYSIS ENGINEERING               )

14   CORPORATION, HAAG ENGINEERING CO., and      )

15   ALEXIS KING,                                )

16          Defendants.                          )

17   _____    )

18

19      DEPOSITION OF GERALD BRIAN WAYTOWICH

20              Washington, D.C.

21              June 4, 2010

22

23   Reported by:

24   Mary Ann Payonk, Certified Realtime Reporter

25   Job No. 30840                    **Exhibit C**

1                    G. Waytowich

2    Partners?

3        A.    They lost the contract back in -- end

4    of 2007 when FEMA broke up the contract and

5    gave it to different portions of different

6    companies.

7        Q.    I see.  Now, when you were serving as

8    claims manager for the NFIP through Computer

9    Service -- Science Corporation, what area were

10   you responsible for?

11       A.    I was responsible for the general

12   adjusters, the reinspection program and again,

13   the training program for the certification for

14   the adjusters.

15       Q.    And how long did you serve as a

16   claims manager with CSC for the National Flood

17   Insurance Program?

18       A.    I was made claims manager just after

19   Katrina, 2005.

20       Q.    And in these areas of general

21   adjusting, reinspection, and training, as a

22   claim manager, what were your responsibilities

23   and duties?

24       A.    Overseeing the general adjusters and

25   assigning different reinspections, whether they

1                    G. Waytowich

2    were routine reinspections, special

3    reinspections, or congressional inquiries.

4         Q.   Okay.  And as to the training as the

5    claim manager, what was your responsibility?

6         A.   My responsibility was to organize the

7    training sessions, put the presentation

8    together as far as PowerPoint and that area

9    there, and again assign the different classes

10   to the different general adjusters and make

11   sure that everything went good on the training

12   end of it and certification end of it.

13        Q.   And how long did you serve as the

14   claims manager with CSC?

15        A.   That would have been three years.

16        Q.   Prior to that, did you have any other

17   positions with CSC?

18        A.   I was -- I started off as a general

19   adjuster and became the supervisor for the

20   general adjusters and then became claims

21   manager.

22        Q.   When did you start out as a general

23   adjuster?

24        A.   2000.  I believe it was June of 2000.

25        Q.   And when did you become a supervisor?

1                      G. Waytowich

2        Q.    Okay.

3        A.    -- because we were understaffed.

4        Q.    Were you assigned any particular

5   areas for these response offices?

6        A.    Each response office was in the area

7   that were -- that had devastation.

8        Q.    Did you have general adjusters

9   working in these response offices that were

10  involved in reinspections of claims handled for

11  Mississippi flood claims?

12       A.    Yes, I did.

13       Q.    Now, did these reinspections -- were

14  they the same type of reinspections that you

15  have spoken about earlier with regards to the

16  reinspection of a flood claim?

17       A.    Right.   Those would be the routine

18  reinspections.

19       Q.    Okay.   Would these reinspections take

20  place involving claims from all WYO carriers,

21  or any specific ones?

22       A.    From all Write Your Owns.

23       Q.    And upon reinspections, if any of

24  your general adjusters had any concerns with

25  regards to the way these claims were being

1              G. Waytowich

2          MR. MATTEIS:  Objection to form.

3      A.    It wouldn't be that difficult.

4      Q.    And why do you say that?

5      A.    It's pretty straightforward.  The

6  water lines and the damage relate to the

7  damages that were written.

8      Q.    Did you look to see what

9  documentation, if any, was contained within

10  Exhibit 1 in order to support the payments

11  authorized in this file?

12          MR. MATTEIS:  Objection to form.

13      A.    It's clearly, you know, from the

14  photographs, it's showing the damages in there

15  which would definitely exceed the policy's

16  limits on -- based on, you know, the file

17  itself and what was out there.

18      Q.    Did you see any evidence of any lack

19  of documentation necessary to support the

20  payments made in this file?

21          MR. MATTEIS:  Objection to form.

22      A.    No, I didn't.

23      Q.    Were you able to review the type of

24  estimates utilized by the adjusters who

25  adjusted this claim?

1          G. Waytowich

2      A.   Yes, I did.

3      Q.   Do you have an opinion as to the

4  appropriate use of that estimate?

5      A.   In my opinion, it was done correctly.

6      Q.   Did you have any criticism as to the

7  use of an Exact Total estimate for this

8  particular file?

9          MR. MATTEIS:  Objection to form.

10     A.   No, I didn't.

11     Q.   Why is that?

12         MR. MATTEIS:  Objection to form.

13     A.   Because it's clearly to -- like I

14  say, from the photographs I've looked at in

15  here and the damages to the structure itself

16  and knowing the policy limits of $250,000,

17  the -- you know, it's clearly damages way

18  beyond 250,000.

19     Q.   And I'll ask you whether or not the

20  use of this Exact Total estimate contained

21  within Exhibit 1 was consistent with the

22  training and instruction that were given by you

23  and your people during Katrina adjustment.

24         MR. MATTEIS:  Objection to form.

25     A.   Yes, it would have.

1          G. Waytowich

2     Q.    Did you have any criticism of the

3  lack of a line item estimate in this file

4  regarding flood damage?

5          MR. MATTEIS:   Objection to form.

6     A.    No, I didn't.

7     Q.    Were you able to determine whether or

8  not the adjusters appropriately separated and

9  identified wind damage from flood damage?

10          MR. MATTEIS:   Objection to form.

11     A.    In this file, yes, they definitely

12  did not -- they separated it.  There was no

13  overlap, that I could see.

14     Q.    Was there an estimate for wind damage

15  contained within the flood file, if you recall?

16     A.    I don't recall at this point.

17     Q.    After review of this flood file, did

18  you form an opinion as to whether or not the

19  payment of $250,000 under the dwelling coverage

20  afforded under the flood policy was appropriate

21  or not?

22          MR. MATTEIS:   Objection to form.

23     A.    Yes, the claim file justifies a

24  $250,000 payment.

25     Q.    Based upon your experience and

 **Gilbert** LLP

1100 New York Avenue, NW
Suite 700
Washington, DC 20005
O 202.772.2200
F 202.772.3333
gotofirm.com

Craig J. Litherland
O 202.772.2264
F 202.772.2266
LitherlandC@gotofirm.com

June 3, 2010

**VIA ELECTRONIC MAIL**

Jeffrey A. Walker, Esq.
Butler, Snow, O'Mara, Stevens & Cannada, PLLC
1300 25th Avenue, Suite 204
Gulfport, MS 39502

Re:    *United States ex rel. Rigsby v. State Farm Mutual Insurance Co., et al.*, No. 1:06-cv-433
       (S.D. Miss.)

Dear Jeff:

I write in response to your June 2 letter to Derek Sugimura. Derek is traveling this week for depositions in this case and thus I am responding.

Your statement related to a failure to disclose to State Farm the existence of computers provided by The Scruggs Law Firm to Kerri and Cori Rigsby is inaccurate. The fact that computers were provided to the Rigsbys was specifically referenced in the supplemental response to Interrogatory No. 2 contained in the Relators' Revised Supplemental Responses and Objections to Defendant/Counter-Plaintiff State Farm Fire and Casualty Company's First Interrogatories dated May 25, 2010.

We are not aware of any other discovery request in this case that would have required "disclosure" of these computers. If there is some other such discovery request, perhaps you can identify it specifically.

We have no knowledge of what discovery requests may have been propounded in the McIntosh case as we were not counsel to any party in that matter. That case has, I believe, been closed for some time. So, we will not attempt to respond to any contentions regarding any purported discovery issues in that case.

The information and documents that are stored on these computers were taken into account as we responded to discovery requests in this case. In response to your request, we have reviewed again the materials on the computers to verify that we have made all reasonable efforts to identify information responsive to discovery requests. We have located one additional group of documents that may be responsive. We are not certain that this additional group of documents has been produced and will

**Exhibit D**

Jeffrey A. Walker, Esq.
June 3, 2010
Page 2



produce them shortly.  The documents are invoices indicating services provided by the Zuckerman
Spaeder firm to the Rigsbys.  We will redact the invoices in a manner similar to the previous such
invoices that we produced.  We expect to be able to produce this group of documents tomorrow.
Beyond this supplemental production, it does not appear that any further supplementation of discovery
responses is required from information on these computers.

You also indicate that State Farm should be given access to these computers.  We are not aware of any
outstanding discovery request or other requirement that would mandate that the Rigsbys turn over to
State Farm any computers they may have used or may be using.  If there is such a request or
requirement, would you please identify it specifically.

Sincerely,

Craig J. Litherland

cc:     E. Barney Robinson, III, Esq.
        Benjamin M. Watson, Esq.
        Robert C. Galloway, Esq.
        Amanda B. Barbour, Esq.
        James Robie, Esq.
        Michael B. Beers, Esq.