IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA ex rel.
CORI RIGSBY and KERRI RIGSBY                    RELATORS/COUNTER-DEFENDANTS

v.                                              CASE NO. 1:06cv433-LTS-RHW

STATE FARM FIRE AND CASUALTY COMPANY    DEFENDANT/COUNTER-PLAINTIFF

and

FORENSIC ANALYSIS ENGINEERING CORPORATION;
HAAG ENGINEERING CO.; and ALEXIS KING                          DEFENDANTS

**STATE FARM FIRE AND CASUALTY COMPANY'S
RESPONSE MEMORANDUM IN OPPOSITION TO
THE RIGSBYS' [604] MOTION TO COMPEL**

Robert C. Galloway (MSB # 4388)
Jeffrey A. Walker (MSB # 6879)
E. Barney Robinson III (MSB # 09432)
Benjamin M. Watson (MSB # 100078)

BUTLER, SNOW, O'MARA, STEVENS &
CANNADA, PLLC
Post Office Drawer 4248
Gulfport, MS  39502
(P) (228) 575-3019
(E) bob.galloway@butlersnow.com

BUTLER, SNOW, O'MARA, STEVENS &
CANNADA, PLLC
200 Renaissance at Colony Park, Suite 1400
1020 Highland Colony Parkway (39157)
Post Office Box 6010
Ridgeland, MS 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) jeff.walker@butlersnow.com
(E) barney.robinson@butlersnow.com
(E) ben.watson@butlersnow.com

Michael B. Beers (ASB-4992-S80M), PHV
BEERS, ANDERSON, JACKSON, PATTY &
FAWAL, P.C.
Post Office Box 1988
250 Commerce Street, Suite 100 (36104)
Montgomery, AL  36102
(P) (334) 834-5311
(F) (334) 834-5362
(E) mbeers@beersanderson.com

*PRO HAC VICE*

James R. Robie (CA State Bar # 67303), PHV
ROBIE & MATTHAI
Biltmore Tower, Suite 1500
500 South Grand Avenue
Los Angeles, CA  90071
(P) (213) 706-8000
(F) (213) 706-9913
(E) jrobie@romalaw.com

*PRO HAC VICE*

The Rigsbys write their motion as if they, State Farm, and this Court were unaware of the facts of this case.  The central but unfounded assumption of the Rigsbys' motion is that State Farm "coerced" engineers "to change their conclusions on the cause of damage to homes so that the damages would be paid under flood policies" ([605] at 1), and they point to the October 12, 2005 report from Brian Ford of Forensic as their prime example.  (*Id.*)  This misdirection has been shown to be false time and again.

It ignores the testimony of Kerri Rigsby and Brian Ford, which rejects the conclusions in Ford's report.  It ignores the emails from Forensic's president, Robert Kochan, which question the lack of support in the Ford report.  It ignores the testimony of Jack Kelly that no one suggested any particular conclusion on his reexamination of the McIntosh property.  It ignores the many Orders of this Court limiting the scope of this case to the McIntosh claim.  It ignores the fact that the McIntosh flood claim was paid before Forensic received its assignment and, necessarily, before the Ford report was created.

What the Rigsbys do not ignore, they distort.  For example, they argue that David Maurstad, the former head of the National Flood Insurance Program ("NFIP"), testified that he would assume that changed conclusions in an engineering report would mean a flood claim was overpaid.  Careful review of his testimony, and the highly misleading questioning that led to it, reveals that he said no such thing.

The Rigsbys' motion is their second attempt to compel this type of discovery.  As with their prior papers, the Rigsbys' motion, filed nearly two months after State Farm objected to their interrogatories and less than three weeks before the close of discovery, reflects their desperate effort to find something – anything – to distract from the facts of their discredited allegations.  But parties do "not have *carte blanche* in the discovery process." *Gagne v. State Farm Fire & Cas. Co.*, 1:06cv711-LTS-RHW, 2008 U.S. Dist. LEXIS 115913, at *4 (S.D. Miss. Dec. 12, 2008).  Their newest attempt to collateralize the issues in this action and to ignore the limitations of the prior Orders of this Court should be denied.

### THE FORD REPORT HAS BEEN THOROUGHLY DISCREDITED

Trafficking in rank speculation, the Rigsbys assert that "State Farm had an ulterior motive when it reviewed Forensic's engineering reports."  ([605] at 3.)  Indeed, the Rigsbys contend that the Ford

report – which documented that "[t]he watermark line in the [McIntosh] house is approximately five and one-half feet above the main floor interior flooring" (Ex. A, Ford Rep., at 2), but nonetheless concluded that the property's interior damage was primarily caused by wind – "is perhaps the strongest evidence illustrating ... the nature of [State Farm's] fraudulent scheme." ([348] at 20.)  Yet conspicuously absent from the Rigsbys' briefing is the fact that Mr. Ford testified that there is "no doubt" that there was "five and a half feet" of water damage caused by storm surge on the main floor of the McIntosh house, and that he agrees with the conclusions of the later October 20 report on the McIntosh home, including the conclusion that there was extensive damage to the first floor *from storm surge flooding and waves*.  (Ex. B, Ford *McIntosh* Dep. at 251:2-24, 270:22-271:14, 301:17-303:8.)  Likewise, Kerri Rigsby, who also inspected the damage, testified that the "severe" and "substantial damage" to the house was bottom-up flood damage (Ex. C, Hr'g Tr. at 261:2-10, 276:17-22), and that she "absolutely" "believed" "in good faith" that there was $250,000 in flood damage to that home.  (*Id.* at 258:23-259:3, 274:14-16, 277:15-18, 286:14-17, 287:9-14, 302:3-7, 302:14-19; *see also id.* at 290:22-23, 293:22-294:1.)

These conclusions are buttressed by photographs of the McIntosh house taken during Hurricane Katrina – after the floodwaters had already receded about two feet from their peak (*see* Ex. D, Denny Dep. at 9:1-12, 14:10-15:5, 16:8-20:3; Ex. E, Briscoe Dep. at 16:18-17:10) – that reveal significant storm surge with superimposed wave action.




Before State Farm commented, Forensic president Bob Kochan noticed the lack of evidentiary support in Ford's reports. After noting the lack of "supportive evidence of the wind direction and surge levels," he told his colleagues: "I am concerned that we maybe relying too heavily on what some desperate homeowner who is also concerned about their own insurance coverage may have told us." (Ex. F, Kochan 10/13/05 email.) Mr. Kochan later expressed his doubts about the McIntosh report directly to Mr. Ford, stating: "When I did the peer review of this home loss, I wondered to myself how you found it to be a wind loss when so much of the structure appeared to be unaffected by the wind," and "we both have to admit that it looks very much like flood damage from the photos that you used in your report." (Ex. G, Kochan 10/17/05 email.) And it is easy to understand why the Ford report has been roundly criticized. The photographic evidence eviscerates its conclusion.[1]







---

[1]    Beyond extensive flood damage, the upper left photo also shows a section of the ceiling that had been cut out by Mr. McIntosh before Hurricane Katrina to repair an air conditioning leak. (Ex. H, McIntosh Dep. at 132:8-133:3.)

So, too, the fact that the McIntosh property experienced massive flooding was readily apparent to this Court. "My review of the material from the McIntosh case discloses that the McIntosh home was inundated with approximately six feet of water." ([261] at 3.) Likewise, after the evidentiary hearing, the Court observed that "[t]he Relators acknowledge [that] the McIntoshes' property sustained substantial flood damage." ([343] at 3.)

This consensus is in full accord with the later October 20, 2005 report on the McIntosh house by Forensic engineer Jack Kelly, whose conclusion that "the damage to the first floor walls and floors appears to be predominately caused by rising water from the storm surge and waves" (Ex. I, Kelly Rep., at 3), is agreed with by Kerri Rigsby and Mr. Ford. (Ex. B, Ford *McIntosh* Dep. at 251:2-24, 270:22-271:14, 301:17-303:8; Ex. C, Hr'g Tr. at 290:22-23, 293:22-294:1.) Mr. Kelly also categorically rejects the Rigsbys' claim that State Farm somehow "coerced" him into arriving at a particular conclusion.

> Q.    Did anyone at State Farm or any information from State Farm play a role in your investigation and conclusion regarding the McIntosh home?
> A.    No, sir.
> ….
> Q.    Whose conclusions are in that report that you signed?
> A.    Those are my conclusions.

(Ex. C, Hr'g Tr. at 344:10-22.) Mr. Kelly further makes clear that the only information he received about the McIntosh assignment was the name and address – not how to conduct his investigation, not what conclusions to reach, not whether the McIntoshes had made a flood claim, not anything about their insurance, and not what findings or conclusions Mr. Ford had made. (*Id.* at 342:11-344:9.)

The Rigsbys cannot use the flawed Ford report – disavowed by its author, rejected by Kerri Rigsby, and refuted by the photographic evidence – "as a springboard to rationalize the aggressive approach they believe should be taken in discovery." *Marion v. State Farm Fire & Cas. Co.*, No. 1:06cv969-LTS-RHW, 2008 WL 723976, at *1 (S.D. Miss. Mar. 17, 2008). "It is not enough for Plaintiff to charge State Farm with sinister conduct or motives as far as the discovery process

4

goes ... and the Court is not going to allow Plaintiff to pursue *a never-ending story backed by speculation*." *Gagne*, 2008 U.S. Dist. LEXIS 115913, at *4.  Here, the Rigsbys' "ulterior motive" theory ([605] at 3), is backed by nothing more than speculation, and, more fundamentally, is contradicted by the facts.  Their motion should be denied.

### THE RIGSBYS' INTERROGATORIES HAVE NO CONNECTION TO THE MCINTOSH CLAIM

This Court has recognized that "the allegations of the Amended Complaint identify only one specific instance of misconduct:  the McIntosh claim."  ([343] at 10.)  Accordingly, "the only relevant discovery at this stage of litigation involves Defendants' alleged fraud in adjusting the McIntosh insurance claim."  ([490] at 1.)  The Court, having already struck the discovery "balance," cautioned that it "will limit the presentation of evidence in this action to facts relevant to the McIntosh claim" in order to prevent "a far ranging and expensive discovery process that relates only to claims that are not, for now, specifically identified."  ([343] at 10.)  Discovery that the Court has deemed not "relevant to the McIntosh claim" has been quashed.  (*See, e.g.*, [413], [447].)

This motion constitutes the Rigsbys' *second* attempt to obtain information on supposedly altered engineering reports.  This Court rejected their first attempt to obtain information regarding all engineering reports "prepared by Forensic for which State Farm challenged or disputed in any way the final written report" ([395] at 2), as "overly broad and not sufficiently tailored to the facts of the McIntosh claim."  ([413] at 1.)

In an attempt to remedy these defects, the Rigsbys claim that they "carefully narrowed" their interrogatories.  ([604] at 1.)  They have not.  Interrogatories 15 and 16 demand that State Farm "[i]dentify each engineering report prepared by Forensic for which State Farm challenged or disputed the final written report for":  (i) "lacking sufficient scientific data, explanation, or analysis," or (ii) "improperly attributing the cause of damage to be wind instead of flood."  ([604-2] at 3.)  They argue that "the current interrogatories seek engineering reports altered under circumstances very close to – if

not identical to – the McIntosh facts." ([604] at 2.)  As with the Rigsbys' first attempt, their second bite

is "overly broad and not sufficiently tailored to the facts of the McIntosh claim." ([413] at 1.)

> ➢ The Rigsbys seek information on engineering reports regardless of whether the properties were insured by both homeowners and flood policies.  But this Court has recognized that this case involves only situations where State Farm supposedly sought to "reduce the exposure under State Farm homeowners policies" "by exaggerating the extent of the flood damage where **both** types of policies were in force on the same property." ([261] at 2 (emphasis added).)

> ➢ The Rigsbys seek information on engineering reports involving any type of property.  But this Court, having already struck the "balance" on the scope of discovery by "limit[ing] the presentation of evidence in this action to facts relevant to the McIntosh claim" ([343] at 10), recognized that "the **outer** limits of the potential claims involved in this action" comprise properties:  (i) that were not "slabs, pilings, or empty shells"; (ii) where flood policy limits "were paid on the grounds the property was a constructive total loss"; and (iii) "[f]or which no 'stick built' or Exactimate estimation of the flood damage was made before the SFIP limits were paid." (*Id.* at 10-11 (emphasis added).)

> ➢ The Rigsbys seek information on other insurance claims regardless of their geographic location.  But to the extent the Court has allowed discovery into other claims, it has limited it to properties within a **half-mile** of the McIntosh house ([413] at 2-3), and those materials have already been produced to the Rigsbys.

> ➢ The Rigsbys seek information regarding engineering reports where State Farm "challenged or disputed the **final** written report" ([604-2] at 3 (emphasis added)), but State Farm questioned the **initial** written report from Forensic on the McIntosh house.

> ➢ The Rigsbys seek information regarding "challenged or disputed" and "final" engineering reports regardless of whether the initial engineering report was ever provided to State Farm.

Contrary to the Rigsbys' representations, their overbroad requests are nowhere "close to" – let alone

"identical to" – "the McIntosh facts." ([604] at 2.)  Their interrogatories are infirm and their motion

should be denied.

"Rule 26 does not require the Court to rewrite discovery requests for the parties." *Robin Singh*

*Educ. Servs., Inc. v. Excel Test Prep*, 2004 WL 2554454, at *1 (N.D. Cal. 2004).  Because the requests

"are grossly overbroad," this Court should "decline to rewrite them." *Copantitla v. Fiskardo Estiatorio,*

*Inc.*, 2010 WL 1327921, at *11 (S.D.N.Y. 2010); *see also Gonzales v. Detroit Robin, Inc.*, 2009 WL

3460322, at *3 (E.D. Mich. 2009) ("The Court will not re-write Plaintiff's discovery requests.");

*Finkelstein v. Guardian Life Ins. Co. of Am.*, 2008 WL 2095786, at *2 (N.D. Cal. 2008) (similar). Especially since this Court previously told the Rigsbys that their overly broad discovery requests about supposedly "challenged" engineering reports would be denied (*see* [413] at 1), this Court should deny their instant motion.

**THE RIGSBYS' NEW "PATTERN" THEORY IS A SHAM**

Perhaps recognizing that their re-tinkered interrogatories, like their original ones, are "overly broad and not sufficiently tailored to the facts of the McIntosh claim" ([413] at 1), the Rigsbys also argue that "State Farm's [purported] pattern of dealing with engineering reports under conditions similar to the McIntosh report may directly support the existence of a common scheme and are thus related to the intent element of the McIntosh claim." ([605] at 4.)  This new "pattern" theory is fabricated out of whole cloth.

In support of their so-called pattern, the Rigsbys assert that there are "19 engineering reports for which Forensic changed its conclusions" from wind to flood. (*Id.* at 5.)  They contend that "the Forensic documents show a consistent pattern and practice of fraud." (*Id.* at 5, 7.)  And they made the same fictitious "factual" representations to Mr. Maurstad at his deposition when they repeatedly asked him to admit that he would be "troubled" or "concerned" by "the possibility that NFIP was overpaying on" flood claims because of "the fact" that the conclusions in 19 reports "were changed" from wind to water. Indeed, the Rigsbys' counsel made these express misrepresentations in quick succession:

> ➢  "Q.    I mean, if you knew for a *fact* that State Farm influenced one engineering firm to change at least 19 reports from conclusions that said wind damage to property to conclusions that flood damaged a property, would that be troubling to you?"

> ➢  "Q.    But isn't the *fact* that 19 reports were changed, wouldn't that be a concern to you if you have known it at the time?"

> ➢  "Q.    But if you had known new *facts* that an insurance company did, in *fact*, influence ... an engineering company to change its conclusions ... with respect to 19 properties from wind predominantly caused the damage to flood predominantly caused the damage, would that be at least a concern that you would – should be looked into by the NFIP?"

7

(Ex. J, Maurstad Dep. at 131:18-134:9.)  But these are *not* "the facts."  Far from it.

> ➢ At least 3 of the 19 initial reports concluded that *flooding* was the predominant cause of the damage and, thus, there was no change from wind to water.

> ➢ At least 7 of the 19 reports concern properties reduced to a *slab* and are, therefore, beyond "the outer limits of the potential claims involved in this action."  ([343] at 10-11.)

> ➢ At least 15 of the 19 reports concern properties *without* a State Farm flood insurance claim and, thus, could not be the basis for any supposed "fraud" by State Farm on the NFIP.  *See* ([343] at 10-11) ("the outer limits of the potential claims involved in this action" involve those "[f]or which SFIP limits were paid on the grounds the property was a constructive total loss").  And, of the 4 properties with a State Farm flood insurance claim, one is McIntosh and another is a waterfront property that was reduced to a slab.

Rather than revealing flood fraud, the Rigsbys' motion and deposition practice raise serious questions about their approach to taking and characterizing witness testimony.

In addition, the Rigsbys' new and unsubstantiated "pattern" theory will open this case up to the precise collateralization of issues that this Court sought to preclude here and in other Hurricane Katrina cases.  Should the Rigsbys seek to prove this so-called "pattern" at trial, State Farm will necessarily be forced to delve into the facts of these 18 other claims to defend itself against the Rigsbys' spurious charges.  This matter will then devolve into 19 mini-trials, exponentially increasing the trial time, the complexity of the issues, and the burdens on the Court and the jury, and distract the jury's focus from the McIntosh claim (which, because the McIntosh claim is so fatal to them, is the Rigsbys' ultimate goal).  "No judge wants to see one trial turn into several," *Olson v. Ford Motor Co.*, 481 F.3d 619, 623, 624 (8th Cir. 2007), and Judge Senter has already "learned some important lessons" from having tried several Katrina cases, especially that there are "many differences between" one claim and another:

> 1) the forces exerted by Hurricane Katrina varied substantially from one location along the Mississippi Gulf Coast to another; 2) the forces exerted against a particular building varied substantially depending on the building's proximity to the shore line; 3) the damage any given building may have sustained varied substantially depending on its age, quality of construction, and even its design (e.g. gable roof compared with hip roof) and orientation to the forces exerted by the storm, particularly the wind; and 4) claims were handled by Defendant in a variety of ways.

*Guice v. State Farm Fire & Cas. Co.*, 1:06cv001-LTS-RHW, 2007 WL 912120, at \*1 (S.D. Miss. Mar. 22, 2007).  The Rigsbys nonetheless seek to collateralize the issues in this action and perform an end-run around this Court's Orders limiting the scope of the discovery and trial of this matter.

Yet this is exactly what this Court sought to avoid.  This Court has already rejected the Rigsbys' desire to engage in a "far ranging and expensive discovery process that relates only to claims that are not ... specifically identified" ([343] at 10), and has already stated – repeatedly – that "[t]he trial of this action will be limited to the McIntosh claim" ([363] at 1), and "the only relevant discovery at this stage of litigation involves Defendants' alleged fraud in adjusting the McIntosh insurance claim."  ([490] at 1.) Accordingly, this Court has instructed the parties "to avoid to the extent possible inquiry regarding specific insurance claims or properties other the McIntoshes."  ([595] at 2); *see also* ([343] at 10 ("I will limit the presentation of evidence in this action to facts relevant to the McIntosh claim"); [413] at 1 ("at this stage of the litigation [the McIntosh claim] is the only claim that is at issue"); [447] at 1 ("this lawsuit is proceeding with respect to the McIntosh claim only").)  The Rigsbys' transparent attempt to collateralize the issues in this action and collaterally attack this Court's Orders should be rejected.

## THE RIGSBYS DISREGARD THE MCINTOSH TIMELINE

The Rigsbys also engage in revisionist history.  They argue that "[s]ome of the primary evidence" of State Farm's supposed "intent to defraud is based on State Farm's coercion of engineers like Forensic ... to change their conclusions on the cause of damage to homes so that the damages would be paid under flood policies." ([605] at 1.)  But the Rigsbys have their timeline backwards.

The Ford report had nothing to do with the McIntosh flood claim.  Based on their inspection, it was apparent to Kerri Rigsby and Cody Perry that the flood damage to the McIntosh property exceeded the flood policy limits.  (Ex. C, Hr'g Tr. at 302:3-7, 302:14-19; Ex. K, Perry Dep. at 177:12-179:21.) During that inspection, Mr. McIntosh requested an engineer in connection with his **homeowners** claim. (*See* Ex. L, Flood Activity Log.)  On October 2, 2005, full policy limits were paid on the McIntosh flood

9

claim. Thereafter, Forensic received its assignment and it was not until October 12, 2005, that the Ford report was issued. (*See, e.g.,* Ex. C, Hr'g Tr. at 288:5-13.) Not surprisingly, Kerri Rigsby has freely admitted that the Ford report had no influence over the adjustment of the McIntosh flood claim because it did not even exist "when we adjusted the claim." (*Id.* at 288:15-22.)

At his deposition, Mr. Maurstad, the former head of the NFIP, expressly rejected the Rigsbys' suggestion that an adjuster should have withheld payment under the flood policy until the wind damage was assessed, explaining that to do so would have been an "unconscionable" act that would have violated the letter and spirit of the NFIP. (Ex. J, Maurstad Dep. at 126:1-127:12.) In fact, Mr. Maurstad further testified that determining wind damage was "not needed to determine the amount of damage caused by flood" and that, under a flood policy, "determining [the] amount [of flood damage] is what is critical to appropriately adjusting the claim." (*Id.* at 121:23-122:21.)

> Q.    But by that, are you also saying that you didn't think it was necessary for the flood adjuster to have information about wind and wind damage to the property they were adjusting?
>
> A.    Correct.
>
> Q.    They didn't need to know anything about the wind?
>
> A.    That's correct.

(*Id.* at 122:22-123:6 (objection omitted).)

Since the McIntosh flood claim was paid before the Ford report was written, and since that report had no bearing on the adjustment of that claim, the Rigsbys' "primary evidence" is, as a matter of law, no evidence at all. While the Rigsbys concede they "are required to prove State Farm's intent to defraud the government on the McIntosh claim" ([605] at 1), they omit that they must prove that the McIntosh flood claim was knowingly false **when it was made**. "'The falsity of a claim is determined **at the time of submission**.'" *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 513 F. Supp. 2d 866, 875 (S.D. Tex. 2007) (quoting *United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 681 (5th Cir. 2002) (emphasis in original), *vacated on other grounds on reh'g en banc*, 326 F.3d 669 (5th Cir. 2003)), *aff'd*,

575 F.3d 458 (5th Cir. 2009); *see also United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171-72 (9th Cir. 2006) ("false claims must in fact be 'false when made.' ...  In short, a palpably false statement, known to be a lie *when it is made*, is required for a party to be found liable under the False Claims Act") (quoting *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996)) (emphasis added); *United States v. Nat'l Wholesalers*, 236 F.2d 944, 950 (9th Cir. 1956) ("The test of whether a claim is false must be *as of the date when the claim is made*.") (emphasis added); *United States ex rel. Frazier v. IASIS Healthcare Corp.*, 554 F. Supp. 2d 966, 971 (D. Ariz. 2008) (claim must be "false *at the time it was made* – the defendant must have knowingly made the false claim ....") (emphasis added).[2]  Because the Ford report has no bearing on whether the McIntosh flood claim was knowingly false when it was made, the Rigsbys' motion to compel, which seeks to expand on these irrelevant engineering reports, should be denied.

### THE RIGSBYS GROSSLY DISTORT DAVID MAURSTAD'S TESTIMONY

In a misguided effort to resuscitate their case, the Rigsbys argue that Mr. Maurstad "admitted that 'it would certainly be inappropriate for [State Farm] to influence another professional to change their opinion,' and that, in such an event, he would 'assume[e] [sic] that means there was an overpayment of the claim.'"  ([605] at 6 (alterations as in Rigsbys' memorandum, misquoting Maurstad Dep. at 129:15-130:7, 133:18-134:9).)  The Rigsbys' disregard for the facts in their highly misleading questioning of Mr. Maurstad carries through to this motion, and those questions must be unpacked.

Fundamentally, the Rigsbys *never* asked whether a supposedly "changed" engineering report would automatically result in an overpayment by the NFIP.  Rather, the Rigsbys repeatedly asked Mr.

---

[2]   The Rigsbys have freely admitted in open court that this case does *not* involve a reverse false claim.  "*[A] reverse false claim is not what's at issue here*.  A reverse false claim is if the government – if you falsely represent that you don't need to make a payment that you owe to the government, so, like, a tax return might be a good example of it.  *This is a false claim*.  There's only one claim at issue here.  There was a continuing duty to make sure that that claim was not false.  So *we're not in the reverse false claim situation at all*."  (Ex. C, Hr'g Tr. at 237:20-238:11.)

Maurstad whether he would have been "concerned" or "troubled" by supposedly "changed" reports. The Rigsbys' proffered quotations are wrenched wildly out of context, and were made only after the same question – which itself was based on an entirely false premise – had been asked three times.

The Rigsbys' first attempt to manufacture concern over "changed" engineering reports was spurned by Mr. Maurstad, who testified that his concern was that flood claims were handled appropriately.

> Q.      I mean, if you knew for a fact that State Farm influenced one engineering firm to change at least 19 reports from conclusions that said wind damage to property to conclusions that flood damaged a property, would that be ***troubling*** to you?
>
> MR. BEERS:  Object to the form.
>
> A.      What our – what my ***concern*** was ... was whether or not when we reviewed a claim, whether or not that it was handled appropriately and whether the policyholder received the claim payment that they were entitled to.

(Ex. J, Maurstad Dep. at 131:18-132:9.)

Though Mr. Maurstad's answer was fully responsive – but not the response the Rigsbys were hoping for – they immediately tried again, asking Mr. Maurstad if he would be "concerned" had he known about "the fact that 19 reports were changed" from wind to flood.  But Mr. Maurstad testified that:  (i) the government would only be concerned if the "changed" reports affected the government's expenditure of flood funds, and (ii) the hypothetical posed by the Rigsbys did not actually occur.

> Q.      But isn't the fact that 19 reports were changed, wouldn't that be a ***concern*** to you if you had known it at the time?
>
> MR. BEERS:   Same objection.
>
> A.      The ***concern*** of the government I believe, would be whether the changing of the reports affected the ***amount*** of the flood claim that was paid.
>
>          And it's my understanding, upon review of the claims and, quite frankly, the conclusion of the IG and the GAO was that there ... ***weren't*** instances of that that occurred, and that's what I relied on.

(*Id.* at 133:5-17.)

Though Mr. Maurstad's testimony was fully responsive – but, again, not the response the Rigsbys were hoping for – they asked the question a third time. Since it was the third time the Rigsbys asked the same question, Mr. Maurstad, obviously thinking that perhaps he was missing something, attempted to unpack the assumptions underlying the question. Thus, in the process of thinking out loud, Mr. Maurstad suggested that, due to the Rigsbys' continued (and fictitious) harping on "the fact" of 19 "changed" reports, the question whether the NFIP would be "concerned" seemed to assume the 19 "changed" reports resulted in overpayments of the flood policies.

> Q.      Okay. But if you had known new facts that an insurance company did, in fact, influence an insurance company to change its conclusions – an engineering company to change its conclusions from – with respect to 19 properties from wind predominantly caused the damage to flood predominantly caused the damage, would that be at least a *concern* that you would – should be looked into by the NFIP?
>
> MR. BEERS: Object to the form.
>
> A.      Well, *given those facts*, then I'm – *I'm assuming* that *that means*, then, that there was an overpayment of the claim, which would be contradictory to what I said was the obligation of the government. So yes, we would be interested in that.

(*Id.* at 133:18-134:9.) In short, the subject of the Rigsbys' repeated and factually false question was about a hypothetical "concern" of the NFIP. Their attempt to twist Mr. Maurstad's remark, prompted by their improper and repeated questions, into some sort of smoking gun statement is highly disingenuous.

Moreover, the proposition that the Rigsbys ask this Court to accept – that State Farm should have blindly accepted demonstrably false engineering reports, even if the Ford report had existed at the time the flood claim was paid (which it did not) – not only defies common sense but would also violate the NFIP regulations, which state that "[i]t is important that the [Write-Your-Own] Company's Claims Department verifies the correctness of ... coverage interpretations." 44 C.F.R. § 62.23(i)(2) (2004).

John Conser, the State Farm team manager who authorized the payment of the McIntosh flood claim limits following his review of the flood file with Kerri Rigsby and Cody Perry, concluded that "there was definitely more than $250,000 worth of damage to that structure caused by flood." (Ex. M,

13

Conser Dep. (Rough Tr.) at 96:11-20, 97:23-98:11, 139:21-140:3, 140:20-141:13.)   Similarly, Gerry Waytowich, who was responsible for conducting routine FEMA reinspections of flood adjustments done by companies such as State Farm to ensure compliance with FEMA policies and procedures, easily concluded, based on his review of the claim file, that the McIntosh property sustained flood damage "way beyond" the $250,000 flood policy limits.  (Ex. N, Waytowich Dep. at 15:7-16:3, 26:8-22, 47:13-18.)   The conclusion of the Ford report has been rejected by Kerri Rigsby, Mr. Ford, and many others. The only place where anyone attempts to resuscitate its discredited conclusion is in this Court when it is convenient to do so.  The Rigsbys' continued misplaced reliance on the Ford report ignores the facts and the law on multiple levels.  It does not provide a proper foundation for their interrogatories or their motion, which should, once again, be denied.

CONCLUSION

For all of the foregoing reasons, State Farm respectfully requests that this Court deny the Rigsbys' [604] motion to compel in its entirety.

This the 23rd day of June, 2010.


                              Respectfully submitted,

                              STATE FARM FIRE AND CASUALTY COMPANY

              By:    /s/ E. Barney Robinson III (MSB #09432)
                     Robert C. Galloway (MSB # 4388)
                     Jeffrey A. Walker (MSB # 6879)
                     E. Barney Robinson III (MSB #09432)
                     Benjamin M. Watson (MSB # 100078)

                     ITS ATTORNEYS

BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
17th Floor, Regions Plaza
Post Office Box 22567
Jackson, Mississippi 39225-2567
(P) (601) 948-5711
(F) (601) 985-4500
(E) bob.galloway@butlersnow.com
(E) jeff.walker@butlersnow.com

14

(E) barney.robinson@butlersnow.com
(E) ben.watson@butlersnow.com

Michael B. Beers (ASB-4992-S80M)
BEERS, ANDERSON, JACKSON, PATTY & FAWAL, P.C.
Post Office Box 1988, Suite 100
250 Commerce Street (36104)
Montgomery, Alabama  36102
(P) (334) 834-5311
(F) (334) 834-5362
(E) mbeers@beersanderson.com

*PRO HAC VICE*

15

## CERTIFICATE OF SERVICE

I, E. Barney Robinson III, one of the attorneys for State Farm Fire and Casualty Company, do hereby certify that I have this day caused a true and correct copy of the foregoing instrument to be delivered to the following, via the means directed by the Court's Electronic Filing System:

C. Maison Heidelberg
Ginny Y. Kennedy
MAISON HEIDELBERG P.A.
795 Woodlands Parkway, Suite 220
Ridgeland, MS 39157
(P) (601) 351-3333
(F) (601) 956-2090
(E) maison@heidlebergpa.com

Scott D. Gilbert
August J. Matteis, Jr.
Craig J. Litherland
Benjamin R. Davidson
GILBERT LLP
11 New York Avenue, NW
Suite 700
Washington, DC 20005
(E) gilberts@gotofirm.com
(E) matteisa@gotofirm.com
(E) litherlandc@gotofirm.com
(E) davidsonb@gotofirm.com

COUNSEL FOR CORI RIGSBY AND KERRI RIGSBY

Jeffrey S. Bucholtz
Joyce R. Branda
Patricia R. Davis
Jay D. Majors
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
(P) (202) 307-0264
(F) (202) 514-0280

16

Stan Harris
Alfred B. Jernigan, Jr.
Felicia C. Adams
UNITED STATES ATTORNEY'S OFFICE
Southern District of Mississippi
Suite 500
188 East Capitol Street
Jackson, MS 39201
(P) (601) 965-4480
(F) (601) 965-4409

ATTORNEYS FOR THE UNITED STATES

Larry G. Canada
Kathryn Breard Platt
GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
701 Poydras Street
Suite 4040
New Orleans, LA 70139
(P) (504) 525-6802
(F) (504) 525-2456

ATTORNEYS FOR HAAG ENGINEERING CO.

Robert D. Gholson
Daniel D. Wallace
GHOLSON, BURSON, ENTREKIN & ORR, P.A.
535 North 5th Avenue (39440)
P.O. Box 1289
Laurel, MS 39441-1289
(P) (601) 649-4440
(F) (601) 649-4441

ATTORNEY FOR FORENSIC ANALYSIS ENGINEERING CORPORATION

This the 23rd day of June, 2010.

/s/ E. Barney Robinson III (MSB #09432)
E. Barney Robinson III (MSB #09432)