IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA ex rel.
CORI RIGSBY and KERRI RIGSBY                     RELATORS/COUNTER-DEFENDANTS

v.                                                CASE NO. 1:06cv433-LTS-RHW

STATE FARM FIRE AND CASUALTY COMPANY   DEFENDANT/COUNTER-PLAINTIFF

and

FORENSIC ANALYSIS ENGINEERING CORPORATION;
HAAG ENGINEERING CO.; and ALEXIS KING                          DEFENDANTS

**STATE FARM'S MEMORANDUM IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

Robert C. Galloway (MSB # 4388)
Jeffrey A. Walker (MSB # 6879)
E. Barney Robinson III (MSB # 09432)
Benjamin M. Watson (MSB # 100078)
Amanda B. Barbour (MSB # 99119)

BUTLER, SNOW, O'MARA, STEVENS &
CANNADA, PLLC
Post Office Drawer 4248
   13    ort, MS  39502
(P) (228) 575-3019
(E) bob.galloway@butlersnow.com


BUTLER, SNOW, O'MARA, STEVENS &
CANNADA, PLLC
200 Renaissance at Colony Park, Suite 1400
1020 Highland Colony Parkway (39157)
Post Office Box 6010
Ridgeland, MS 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) jeff.walker@butlersnow.com
(E) barney.robinson@butlersnow.com
(E) ben.watson@butlersnow.com
(E) amanda.barbour@butlersnow.com

Michael B. Beers (ASB-4992-S80M), PHV
BEERS, ANDERSON, JACKSON, PATTY &
FAWAL, P.C.
Post Office Box 1988
250 Commerce Street, Suite 100 (36104)
Montgomery, AL  36102
(P) (334) 834-5311
(F) (334) 834-5362
(E) mbeers@beersanderson.com

*PRO HAC VICE*


James R. Robie (CA State Bar # 67303), PHV
ROBIE & MATTHAI
Biltmore Tower, Suite 1500
500 South Grand Avenue
Los Angeles, CA  90071
(P) (213) 706-8000
(F) (213) 706-9913
(E) jrobie@romalaw.com

*PRO HAC VICE*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

I.      Preliminary Statement ......................................................................................1

II.     The Rigsbys' Burden under the False Claims Act ............................................5

III.    The Rigsbys Cannot Establish That the McIntosh Flood Claim Was False .......................6

        A.      The Actual Repair Cost to the McIntosh Property Far Exceeded $250,000............6

        B.      Photographs and Eyewitness Accounts Establish Catastrophic Flood Damage.....11

IV.     The Rigsbys Cannot Show the Claim Was Knowingly False When Made ......................12

        A.      The FEMA Testimony Shows That the Payment of the McIntosh Claim Was
                Proper ...........................................................................................13

                1.      David I. Maurstad ...........................................................................13

                2.      James S.P. Shortley...........................................................................18

                3.      Gerald B. Waytowich.........................................................................22

        B.      FEMA's Knowledge of State Farm's Adjustment Practices Precludes a Finding
                That State Farm Acted with the Requisite Scienter ...............................................23

        C.      The Record before the Court Demonstrates That State Farm Representatives
                Believed in Good Faith That the McIntosh Claim Was Not False .......................26

V.      Brian Ford's Report Is Not Evidence of a Fraud ............................................27

        A.      The Ford Report Post-Dates the Payment of the McIntosh Flood Claim and
                Cannot Demonstrate That It Was Knowingly False at the Time It Was Made .....28

        B.      The Ford Report Is Inadmissible Hearsay ...........................................29

                1.      Mr. Ford's Report Is Based on Hearsay Statements of an "Eyewitness
                        Account" That Did Not Occur, Rendering It Wholly Unfounded............30

                2.      The Ford Report Is Not Subject to the Business Records Exception
                        Because the Circumstances Surrounding Its Preparation Indicate a
                        Complete Lack of Trustworthiness...........................................................32

VI.     The Rigsbys' Reverse False Claim Should be Dismissed ................................34

CONCLUSION................................................................................................35

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Chow v. Aegis Mortgage Corp.*,
   185 F. Supp. 2d 914 (N.D. Ill. 2002)..................................................35

*Hanover Building Materials, Inc. v. Guiffrida*,
   748 F.2d 1011 (5th Cir. 1984)......................................................9

*Lacroix v. State Farm Fire & Casualty Co.*,
   No. 09-0609, 2010 WL 2265577 (E.D. La. June 2, 2010) ...................................9

*Legacy Condominiums, Inc. v. Landmark American Insurance Co.*,
   No. 1:06cv1108-KS-MTP, 2008 WL 80373 (S.D. Miss. Jan. 4, 2008) ...................2, 3, 6, 8

*Matthews v. State Farm Fire & Casualty Co.*,
   No. 06-4758, 2007 WL 2127581 (E.D. La. July 24, 2007).................................6, 9

*McAshan v. Jack's Pest Control*,
   782 So. 2d 1 (La. Ct. App. 2000) ....................................................8

*In re Menell*,
   160 B.R. 524 (Bankr. D.N.J. 1993), *aff'd*, 37 F.3d 113 (3d Cir. 1994) ..........................35

*Nyiri v. Aktiebolaget Electrolux*,
   2005 WL 6032846 (S.D. Miss. June 16, 2005)..........................................32

*Pan-Islamic Trade Corp. v. Exxon Corp.*,
   632 F.2d 539 (5th Cir. 1980), *abrogated on other grounds sub nom.*
   *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438 (11th Cir. 1991).........................34

*Rock v. Huffco Gas & Oil Co.*,
   922 F.2d 272 (5th Cir. 1991).....................................................30, 32, 34

*Romano v. Howarth*,
   998 F.2d 101 (2d Cir. 1993)........................................................34

*Salas v. Carpenter*,
   980 F.2d 299 (5th Cir. 1992).........................................................29

*Scott v. Harris*,
   550 U.S. 372 (2007) ..............................................................11

*SingleEntry.com, Inc., v. St. Paul Fire & Marine Insurance Co.*,
   117 F. App'x 933 (5th Cir. 2004)....................................................17

*Stallard v. United States*,
  12 F.3d 489 (5th Cir. 1994) ................................................................................................35

*TK-7 Corp. v. Estate of Barbouti*,
  993 F.2d 722 (10th Cir. 1993) ............................................................................................30

*United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*,
  355 F.3d 1140 (9th Cir. 2004) ............................................................................................12

*United States ex rel. Burlbaw v. Orenduff*,
  548 F.3d 931 (10th Cir. 2008) ............................................................................................12

*United States ex rel. Butler v. Hughes Helicopters, Inc.*,
  71 F.3d 321 (9th Cir. 1995) ................................................................................................26

*United States ex rel. Costner v. United States*,
  317 F.3d 883 (8th Cir. 2003) ..............................................................................................26

*United States ex rel. Doe v. Dow Chemical Co.*,
  343 F.3d 325 (5th Cir. 2003) ..............................................................................................34

*United States ex rel. Durcholz v. FKW Inc.*,
  189 F.3d 542 (7th Cir. 1999) ..............................................................................12, 13, 25

*United States ex rel. Farmer v. City of Houston*,
  523 F.3d 333 (5th Cir. 2008) ........................................................................... *passim*

*United States ex rel. Gray v. Lockheed Martin Corp.*,
  No. 05-4201, 2010 WL 672016 (E.D. La. Feb. 19, 2010) .....................................4, 24, 26

*United States ex rel. Gudur v. Deloitte & Touche*,
  No. 07-20414, 2008 WL 3244000 (5th Cir. Aug. 7, 2008) .................................................24

*United States ex rel. Hendow v. University of Phoenix*,
  461 F.3d 1166 (9th Cir. 2006) ....................................................................................5, 27, 28

*United States ex rel. Hopper v. Anton*,
  91 F.3d 1261 (9th Cir. 1996) ........................................................................................24, 28

*United States ex rel. Laird v. Lockheed Martin Engineering & Science Services Co.*,
  491 F.3d 254 (5th Cir. 2007) ........................................................................................13, 25

*United States ex rel. Longhi v. Lithium Power Technologies, Inc.*,
  513 F. Supp. 2d 866 (S.D. Tex. 2007), *aff'd*, 575 F.3d 458 (5th Cir. 2009) ..............5, 27, 28

*United States ex rel. Owens v. First Kuwaiti General Trading & Contracting Co.*,
  2010 WL 2794369 (4th Cir. July 16, 2010) ..........................................................................5

*United States ex rel. Quirk v. Madonna Towers, Inc.*,
    278 F.3d 765 (8th Cir. 2002) ...................................................................12

*United States ex rel. Ramadoss v. Caremark Inc.*,
    586 F. Supp. 2d 668 (W.D. Tex. 2008) ....................................................24

*United States ex rel. Taylor-Vick v. Smith*,
    513 F.3d 228 (5th Cir. 2008) ........................................................12, 13, 27

*United States v. National Wholesalers*,
    236 F.2d 944 (9th Cir. 1956) ..............................................................27, 28

*United States v. Prabhu*,
    442 F. Supp. 2d 1008 (D. Nev. 2006) .......................................................18

*United States v. Skilling*,
    2006 WL 1006622 (S.D. Tex. Apr. 13, 2006)......................................30, 34

*United States v. Southland Management Corp.*,
    326 F.3d 669 (5th Cir. 2003)..............................................................13, 24

*United States v. Spano*,
    421 F.3d 599 (7th Cir. 2005).....................................................................34

*United States v. Vigneau*,
    187 F.3d 70 (1st Cir. 1999) .......................................................................30

*Vance v. North Panola School District*,
    No. 98-60719, 1999 WL 548772 (5th Cir. July 16, 1999) .........................29

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*,
    529 U.S. 765 (2000) ..................................................................................17

*Volkswagen of America, Inc. v. Robertson*,
    713 F.2d 1151 (5th Cir. 1983) .....................................................................9

*Wang ex rel. United States v. FMC Corp.*,
    975 F.2d 1412 (9th Cir. 1992)...................................................................26

*Wright v. Allstate Insurance Co.*,
    500 F.3d 390 (5th Cir. 2007)........................................................................9

## STATUTES

Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4,
123 Stat. 1617 ............................................................................................................... 5

31 U.S.C. § 3729(a)(1) (2006) ........................................................................................ 12

31 U.S.C. § 3729(a)(7) (2006) ........................................................................................ 34

31 U.S.C. § 3729(b) (2006) ........................................................................................ 5, 12

31 U.S.C. §§ 3729-3733 .................................................................................................. 1

42 U.S.C. §§ 4001-4129 .................................................................................................. 9

Fed. R. Evid. 801(a)-(c) ................................................................................................. 29

Fed. R. Evid. 803(6) ....................................................................................................... 30

Fed. R. Evid. 805 ............................................................................................................ 30

44 C.F.R. pt. 61, app. A(1), § IX (2004) ......................................................................... 9

## I.   PRELIMINARY STATEMENT

On August 10, 2009, this Court issued an order finding that the Rigsbys' allegation that the payment of the McIntosh flood claim violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, "must be resolved by further proceedings."  ([343] at 9.)  Extensive discovery has since been taken. Among the forty-four depositions were those of:  (i) three former Federal Emergency Management Agency ("FEMA") officials directly responsible for overseeing and implementing the National Flood Insurance Program ("NFIP") – the government program that State Farm allegedly defrauded; (ii) the contractor who repaired the flood damage to the McIntosh home; (iii) fourteen of State Farm's current and former employees; and (iv) a multi-part deposition of State Farm under Federal Rule of Civil Procedure 30(b)(6).  Experts were also deposed.  And State Farm furnished the Rigsbys with more than 28,000 pages of documents and answered dozens of interrogatories and requests for admissions. Discovery is now closed.

In order to prevail on their FCA claims, the Rigsbys must prove, *inter alia*, that:  (i) the McIntosh flood claim was false; and (ii) State Farm knew that the McIntosh claim was false at the time it was made.  The comprehensive record that has been assembled establishes as a matter of law that the Rigsbys cannot proffer any evidence that would raise a genuine issue of material fact on either of these elements.  The Rigsbys cannot prove that the McIntosh claim was "false" because the flood damage to the McIntosh home far exceeded the flood policy limits of $250,000.  In addition to the physical and photographic evidence of catastrophic flood damage to the McIntosh home, Robert C. McVadon, Jr. – the contractor who repaired the McIntosh house in the wake of Katrina – produced scores of receipts for labor and materials and testified that the actual cost to repair the flood damage exceeded $525,000. While some of the flood-damaged items are not covered by the NFIP (*i.e.*, the decking, landscaping, and septic system), ***$473,630.76*** in repairs qualified for coverage under the flood policy.  Where, as here, "repairs have been completed," the damages caused by Katrina have been quantified.  *See Legacy*

*Condos., Inc. v. Landmark Am. Ins. Co.*, No. 1:06cv1108-KS-MTP, 2008 WL 80373, at *2-3 (S.D. Miss. Jan. 4, 2008) (Starrett, J.).  Thus, the Rigsbys' estimated repair costs have no evidentiary value and cannot preclude summary judgment.  *Id.* at *3.

Unable to identify any competent evidence to prove an overpayment, the Rigsbys instead attempt to turn this proceeding into a regulatory inquest by alleging that the adjustment of the McIntosh claim did not meet certain FEMA guidelines.  As a threshold issue, the Fifth Circuit has held that "the 'FCA is **not** an appropriate vehicle for policing technical compliance with administrative regulations.'"  *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 340 n.12 (5th Cir. 2008) (emphasis added) (citation omitted).

More fundamentally, the testimony of three former officials of FEMA – the agency the Rigsbys purport was defrauded – establishes that:  (i) the adjustment of the McIntosh flood claim was proper and in full compliance with all pertinent FEMA policies and procedures; and (ii) the McIntosh flood claim was not "false," let alone knowingly false.

- **<u>David Maurstad</u>**, the head of the NFIP at the time of Katrina, testified that, in light of the unprecedented storm surge on the Mississippi coast, there was "no way the flood adjuster" could have determined that a property was destroyed by wind before the storm surge arrived.[1]  He expressly rejected the Rigsbys' suggestion that an adjuster should have withheld flood policy payments until wind damage was assessed, explaining that it was unnecessary to do so and that employing such grounds to deny flood policy payments would have been an "unconscionable" act in derogation of the letter and spirit of the NFIP.[2]  He made clear that, after Katrina struck, FEMA solicited suggestions from its Write Your Own ("WYO") partners, including State Farm, as to how the adjustment process could be expedited to handle the unprecedented number of flood claims, and the extraordinary human suffering and economic dislocation caused by Katrina.  He further testified that FEMA guidelines and "common sense" permitted flood claims adjusters to forego an "itemized line-by-line claim adjusting process" where (as here) the "damage far exceeded the policy limits."[3]

---

[1]   Maurstad Dep. at 126:1-127:12 (excerpts are attached as Ex. A to State Farm's Motion for Summary Judgment).  All other exhibits referenced in this brief are similarly attached to the Motion.

[2]   *Id.*; *see also id.* at 121:23-123:6.

[3]   *Id.* at 149:9-150:13.

- **James Shortley**, FEMA's Director of Claims for the NFIP at the time of Katrina, confirmed that – contrary to the Rigsbys' most recent theory of their case – a stick-build estimate would not have been necessary where (as here) the flood adjuster performed a site visit, determined that the property was a constructive total loss, and documented that loss with photographs, scope notes, and diagrams.[4]  He further testified that in the wake of Katrina, he was in regular contact with State Farm's NFIP liaison who told FEMA "exactly what was going on."[5]

- **Gerald Waytowich**, a General Agent for FEMA at the time of Katrina, reviewed the McIntosh flood claim file and concluded that:  (i) the photographs of the McIntosh property show extensive damage to the lower portion of the house that is indicative of storm-surge damage; (ii) the photographs show "very little wind damage to the structure itself";[6] (iii) the flood damage is "clearly damages way beyond [the] $250,000" policy limits;[7] (iv) the McIntosh flood claim was properly scoped and the claim file was adequately documented;[8] (v) the McIntosh property was considered a "total loss" under FEMA adjusting guidelines because the flood damage exceeded policy limits;[9] (vi) the use of XactTotal was consistent with the training given by FEMA for handling Katrina claims;[10] and (vii) the McIntosh flood claim file "justifie[d] a $250,000 flood payment."[11]

The testimony of these three FEMA officials dismantles the Rigsbys' claim that State Farm defrauded FEMA and the NFIP.  First, the testimony shows that State Farm's payment of the McIntosh flood claim was fully "justified" and that the claim was not "false."  Second, the testimony negates any finding of scienter.  Contrary to the Rigsbys' false and ever-changing narrative, the FEMA witnesses demonstrated that State Farm partnered with FEMA to help ameliorate the misery suffered by thousands of Katrina victims along the flood-ravaged Gulf Coast.  If the Rigsbys had it their way, none of these flood victims would have been paid a penny until a team of engineers could rule out pre-existing wind damage to a metaphysical certainty.  As Mr. Maurstad rightly recognized, withholding flood insurance payments in order to rule out potential wind damage would have been "unconscionable," inconsistent

---

[4]     Shortley Dep. at 27:5-25 (excerpts are attached as Ex. B to the Motion).

[5]     Id. at 25:12-19, 110:1-13, 154:20-25, 178:15-18.

[6]     Waytowich Dep. at 53:16-23 (excerpts are attached as Ex. C to the Motion).

[7]     Id. at 47:13-18.

[8]     Id. at 46:18-22.

[9]     Id. at 158:19-159:19.

[10]    Id. at 47:6-25.

[11]    Id. at 48:17-24.

with NFIP requirements, and at odds with FEMA's mandate to its WYO partners, like State Farm, to make sure that flood policyholders would "be taken care of as quickly and as fairly as possible."[12] Where, as here, "the government and a contractor have been working together to reach a common solution to a problem[,] no FCA claim arises. This is because such a close working relationship negates the required scienter." *United States ex rel. Gray v. Lockheed Martin Corp.*, No. 05-4201, 2010 WL 672016, at *7 (E.D. La. Feb. 19, 2010) (citation omitted).

Now that their attempt to base their FCA claim on a purported regulatory violation has been thoroughly discredited by the FEMA witnesses, the Rigsbys once again rally around the Brian Ford engineering report on the McIntosh property. Yet at deposition, Mr. Ford conceded that his conclusion that wind was the primary cause of the damage to the McIntosh home was ***not*** based on the empirical evidence he observed – including the five and one-half foot flood line in the first floor of the McIntosh house. Rather, Mr. Ford's conclusion was based almost entirely on Mike Church's putative "eyewitness account" of wind-driven debris that Mr. Church supposedly saw blown into the McIntosh house.[13] But Mr. Church stated under oath that he "did ***not*** see any debris blown into the McIntosh home during Hurricane Katrina" and he "***never*** told Chris McIntosh that [he] saw debris blown into his house during Hurricane Katrina."[14] In other words, Mr. Ford's conclusion of wind damage – which the Rigsbys claim was the catalyst for this entire case – is based on an eyewitness account that ***never*** occurred.

In short, after years of litigation and voluminous discovery, the Rigsbys cannot point to any competent evidence demonstrating that the payment of the McIntosh flood claim was improper, let alone knowingly false at the time it was made. From the beginning, the Rigsbys' allegations have been in a constant state of flux. As the Fourth Circuit recently observed in a *qui tam* suit raising analogous issues:

---

[12]   Ex. A, Maurstad Dep. at 37:10-38:20.

[13]   *See* Ex. D, Ford Dep. at 127:6-14.

[14]   Ex. E, Church Aff. ¶ 4 (emphasis added).

The impression – of a suit in search of a wrong, rather than a wrong in search of a verdict – is borne out by the fact that [relator] has not produced any evidence of deceit on [defendant's] part. [Relator's] strategy seems to be to throw as many allegations as it can against the wall in the hope one of them will stick, an approach at odds with the purposes of the FCA. A litigant is not entitled to a trial simply by dint of determination.

*United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 2010 WL 2794369, at *9 (4th Cir. July 16, 2010) (to be published in F.3d). Thus, the court held that the defendant was properly granted summary judgment dismissing the case. *See id.* at *11. The same result is mandated here.

## II. THE RIGSBYS' BURDEN UNDER THE FALSE CLAIMS ACT

In order to prevail on their FCA claims, the Rigsbys must prove, *inter alia*, that the McIntosh flood claim was knowingly false at the time it was made. It is well settled that the test for whether a claim is knowingly false under the FCA is determined as of the time when the claim is made. *See United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 513 F. Supp. 2d 866, 875 (S.D. Tex. 2007), *aff'd*, 575 F.3d 458 (5th Cir. 2009); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171-72 (9th Cir. 2006); *see also* 31 U.S.C. § 3729(b) (2006).[15]

Here, "[t]he trial of this action [is] limited to the McIntosh [flood] claim." ([363] at 1.) Thus, to avoid summary judgment on their FCA claims, the Rigsbys must raise a genuine issue of material fact showing that: (i) "in light of the damage done to the McIntosh house by storm surge flooding, the payment of the limits of [the] flood insurance policy was [not] reasonable as a matter of law" (Ex. F, Hr'g Tr. at 10:5-9 (quoting Senter, J.)); and (ii) the payment of the McIntosh flood claim was knowingly false at the time it was made. The Rigsbys' failure of proof on either of these elements of their FCA claim "'necessarily renders all other facts immaterial' and 'mandates the entry of summary judgment'"

---

[15]    In 2009, Congress enacted certain amendments to the FCA. *See* Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621-1625. While limited portions of the amendments apply retroactively, the substantive provisions affecting this lawsuit do not. *See id.* § 4(f), 123 Stat. at 1625. The Rigsbys' Amended Complaint alleges violation of the pre-amendment version of the FCA and has not been amended. Accordingly, State Farm will cite the pre-amendment version of the FCA, which controls this lawsuit.

for State Farm.  *Farmer*, 523 F.3d at 337 (citation omitted).  The Rigsbys cannot meet their burden on either element.

## III.   THE RIGSBYS CANNOT ESTABLISH THAT THE MCINTOSH FLOOD CLAIM WAS FALSE

### A.   The Actual Repair Cost to the McIntosh Property Far Exceeded $250,000

Since "[t]he trial of this action [is] limited to the McIntosh [flood] claim" ([363] at 1), the Court has previously recognized that if "the McIntosh flood insurance payments were justified," the case must be dismissed.  ([261] at 3.)  The Rigsbys do not dispute that "the McIntoshes' property sustained substantial flood damage" ([343] at 3), but claim that the flooding only caused about $130,000 in damages.  "It is the difference between the flood damage the McIntoshes sustained and the [$250,000] policy limits payment State Farm made that the Relators charge is a false and fraudulent claim State Farm presented to the United States."  (*Id.*)  In other words, the Rigsbys' entire case boils down to a dispute over an alleged overpayment of about $120,000.

The Rigsbys cannot point to any competent evidence to support their allegation of a $120,000 overpayment.  To the contrary, scores of receipts for labor and materials establish conclusively that the flood damage to the McIntosh property cost over $525,000 to repair, of which ***$473,630*** qualified for coverage under a flood policy.  Yet the Rigsbys ignore the McIntoshes' ***actual*** flood repair costs in favor of a flood repair ***estimate*** by their so-called damages expert, David Favre.  But "where repairs have been completed, [a party's] estimates of anticipated repair costs are ***irrelevant***," *Legacy Condos.*, 2008 WL 80373, at *3 (emphasis added), and "do[] not suffice ***as evidence*** of plaintiffs' actual repair expenses." *Matthews v. State Farm Fire & Cas. Co.*, No. 06-4758, 2007 WL 2127581, at *2 (E.D. La. July 24, 2007) (emphasis added).  Because the Rigsbys' proffered estimate is "irrelevant" and has no evidentiary value, it cannot avert summary judgment as a matter of logic and law.

Indeed, the extensive record in this case demonstrates that the flood damage to the McIntosh home far exceeded $250,000.  Robert C. McVadon, Jr., whom the McIntoshes hired to repair their home

after Hurricane Katrina, testified that the actual cost to repair the flood damage to the McIntosh home exceeded $525,000.  (*See* Ex. G, McVadon Dep. at 62:16-63:12.)  A Mississippi native, Mr. McVadon has designed, engineered, and constructed over sixty custom homes on the Gulf Coast of Mississippi over the past seventeen years, and has extensive experience repairing hurricane-related damages, including damage caused by Hurricane Katrina.  (*See* Ex. H, McVadon CV.)  Mr. McVadon's total bill to Mr. McIntosh was about $946,000, which the McIntoshes paid in full.  But since this bill reflected certain repairs and upgrades that were not flood-related (*see* Ex. G, McVadon Dep. at 34:12-17, 36:23-25), Mr. McVadon and his staff spent two and a half weeks reviewing invoices and receipts to determine what portion of the $946,000 cost was attributable to flood damage.  (*See id.* at 16:9-17:12.)  Mr. McVadon's report includes over 75 pages of invoices, receipts, and subcontractor bids supporting his determination that "the cost to repair the flood damage to the McIntosh home to its Pre-Katrina condition [is] $525,689.78" – more than twice the $250,000 flood insurance payment on the McIntosh home.  (*See* Ex. I, McVadon Rep.; Ex. G, McVadon Dep. at 62:16-63:12.)  Notably, because the McIntoshes were not reimbursed under their flood policy for any amount above the $250,000 flood policy limit, they had every incentive to keep their actual repair costs as low as possible.  Indeed, Mr. McIntosh testified that while Mr. McVadon's repairs included certain alterations to the design of the flood-damaged rooms, the replacement products were of a similar quality to those that were destroyed. (*See* Ex. J, T. McIntosh Dep. at 198:25-200:8.)

Mr. McVadon's conclusion that the flood damage to the McIntosh home vastly exceeded the $250,000 flood payment was also confirmed by Gerald Waytowich.  Mr. Waytowich, a former FEMA inspector, was responsible during Katrina for inspecting flood claim files adjusted by WYO carriers, including State Farm, to ensure that the WYOs complied with FEMA policies and procedures.  He determined that of the $525,689.78 the McIntoshes spent to repair flood damage, certain of the flood-damaged items would not have been covered under the NFIP, *i.e.*, the decking, landscaping, and septic

system.  After adjusting for these items, he concluded that $473,630.76 qualified for coverage under the McIntoshes' flood policy.  (*See* Ex. K, Waytowich Rep. at 3.)  Mr. Waytowich further concluded that: (i) the photographs of the McIntosh property indicate flood damage "way beyond [the] $250,000" policy limits (Ex. C, Waytowich Dep. at 47:13-18); (ii) the McIntosh flood claim was properly scoped and documented (*id.* at 46:18-22); and (iii) the McIntosh flood claim file "would easily justify" a $250,000 payment (Ex. K, Waytowich Rep. at 3; *see also* Ex. C, Waytowich Dep. at 48:17-24).

Discovery is now closed and the Rigsbys have not identified – and cannot identify – any competent evidence to support their theory that the McIntoshes were overpaid on their flood claim, let alone that any overpayment was knowingly false at the time it was made.  In fact, Kerri Rigsby swears that she does not know whether the McIntosh home sustained less than $250,000 in flood damage.  (Ex. L, K. Rigsby Dep. at 89:17-25; *see also* Ex. F, Hr'g Tr. at 300:14-301:3.)  Nor can Cori Rigsby rule out that the McIntosh house sustained $250,000 in flood damage.  (Ex. M, C. Rigsby Dep. at 175:14-176:8.)

Though the Rigsbys, who are both experienced flood insurance adjusters, have no idea whether the McIntosh home sustained less than $250,000 in flood damage, they hired another adjuster, David Favre, who ***estimates*** the flood damage to be $129,850.03.  The fatal flaws in Mr. Favre's analysis are extensively chronicled in State Farm's motion to exclude his testimony, which is currently pending before this Court.  ([300], [301], [325], [334], [706].)  But irrespective of whether Mr. Favre's testimony is ultimately excluded (which it should be), his flood damage ***estimate*** is insufficient to create a genuine issue of material fact as to whether the McIntosh property sustained less than $250,000 in flood damage, because the McIntoshes ***actually*** spent over $525,000 to repair the flood damage to their house.

Where, as here, "repairs have been completed, [a party's] estimates of anticipated repair costs are ***irrelevant***."  *Legacy Condos.*, 2008 WL 80373, at *3 (emphasis added); *accord McAshan v. Jack's Pest Control*, 782 So. 2d 1, 7 (La. Ct. App. 2000) ("[T]he 'actual [repair cost] governs over the theoretical' [estimate].").  "'Damages may be predicated on estimation ***only*** when the loss has not been repaired.  If

8

the damaged property has been restored to its former condition by repair, the ***proper*** basis for assessing the damage is ***the repair bill***.'" *Volkswagen of Am., Inc. v. Robertson*, 713 F.2d 1151, 1169 (5th Cir. 1983) (emphasis added) (citation omitted).[16]

Moreover, where, as here, repairs have been completed and paid for, estimates for repairing those damages – such as Mr. Favre's estimates – are not competent evidence.  For example, in *Matthews*, a case arising out of Hurricane Katrina, the plaintiffs attempted to use repair estimates to prove their damages under a Standard Flood Insurance Policy.  *See Matthews*, 2007 WL 2127581, at *1-2.  But because they had completed some repairs to their home, the court rejected their proffered estimates, explaining that repair estimates "do[] ***not*** suffice as evidence of plaintiffs' ***actual*** repair expenses."  *Id.* at *2 (emphasis added).  Likewise, in *Lacroix v. State Farm Fire & Casualty Co.*, No. 09-0609, 2010 WL 2265577 (E.D. La. June 2, 2010), another Hurricane Katrina property insurance case, the court held that because the property had been repaired, an "estimate of the cost of repairing the interior damage will ***not*** assist the finder of fact in determining damages for those items."  *Id.* at *4 (emphasis added).

The application of this rule is particularly appropriate here, where the record demonstrates that Mr. Favre purposefully ignored all evidence of the actual repair costs.  Tellingly, even Mr. Favre agrees that actual repair costs trump theoretical estimates.  In another Hurricane Katrina case before this Court, he testified that invoices and repair contracts are key to determining "accurate" repair costs.

> Q.     My question is, once repairs are made to a dwelling, would the better way to determine the cost of those repairs not be to look at invoices for the actual work that was done, as opposed to looking at an estimate?

---

[16]    The Standard Flood Insurance Policy that insured the McIntosh home is governed by the National Flood Insurance Act of 1968, as amended, 42 U.S.C. §§ 4001-4129, flood insurance regulations issued by FEMA, and federal common law.  *See* Standard Flood Insurance Policy, 44 C.F.R. pt. 61, app. A(1), § IX (2004).  In interpreting the provisions of the Standard Flood Insurance Policy, courts "'draw[] upon standard insurance law principles.'"  *Hanover Bldg. Materials, Inc. v. Guiffrida*, 748 F.2d 1011, 1013 (5th Cir. 1984) (quoting *West v. Harris*, 573 F.2d 873, 881 (5th Cir. 1978)); *see also Wright v. Allstate Ins. Co.*, 500 F.3d 390, 394 (5th Cir. 2007) ("[T]he reference to federal common law in the SFIP directs courts to employ standard insurance principles when deciding ***coverage*** issues under the policy.").

A.     To get an accurate amount, the – I would say the invoices and any contracts that had been signed would put it to the penny.  I mean, that's typically how we do replacement cost estimates at the end for insurance companies.

(Ex. N, Favre Dep. in *Pipkins v. State Farm Fire & Cas. Co.*, No. 1:07CV779-LTS-RHW (S.D. Miss.) at 60:4-24.)  Yet in this case, departing from the way he "typically" does it, he ignores the ***actual*** repair costs and relies instead upon his own ***estimated*** repair costs.  Moreover, his estimate is based on the fictitious premise that the flooding inside the McIntosh house only reached 2.1 feet (Ex. O, Favre Dep. at 42:24-43:8), while every other witness who evaluated the McIntosh house, including Kerri Rigsby, Cody Perry, Brian Ford, Jack Kelly, Robert McVadon, and Mark Watson, determined it had a waterline of about five feet.  (Ex. P, K. Rigsby *McIntosh* Dep. I at 274:12-275:5; Ex. Q, Perry Dep. at 162:16-163:6, 168:7-169:11; Ex. D, Ford Dep. at 114:1-115:23, 119:12-14; Ex. R, Kelly Dep. at 125:17-126:17; Ex. G, McVadon Dep. at 10:7-16, 12:4-13:8; Ex. S, Watson Rep. [417-4] at 5, App. B at ECF 11-17.)

Perhaps recognizing that Mr. Favre's estimate is facially unreliable, the Rigsbys hired Joe Gregg, another expert witness, in an effort to bolster their case.  But Mr. Gregg only further demonstrated that Mr. Favre's estimate is based on several material fallacies.  Mr. Gregg testified that there was "obvious" "flood damage to the home," and explained that he had no reason to doubt that the McIntosh home sustained five feet of flood damage.  (*See* Ex. T, Gregg Dep. at 10:18-11:5, 30:20-31:2, 67:19-68:1.)  In fact, Mr. Gregg specifically testified that the same rub marks Mr. Favre assiduously dismissed in his pursuit of a mythical 2.1-foot flood line are, in fact, consistent with a five-foot flood line.  (*See id.* at 66:4-17.)  Further, Mr. Gregg identified Mr. Waytowich, whose testimony dismantles the Rigsbys' case, as his former NFIP certification instructor, and stated:  "He's a very smart man."  (*Id.* at 22:7-23:4.)  Not surprisingly, on July 1, 2010, the Rigsbys withdrew Mr. Gregg as an expert, leaving Mr. Favre as their only damages expert in the case.  ([676].)  But Mr. Favre's theoretical damage model is not competent evidence and, as a matter of law, is insufficient to defeat summary judgment.

**B.      Photographs and Eyewitness Accounts Establish Catastrophic Flood Damage**

At the May 2009 hearing, State Farm introduced more than 200 photographs showing substantial damage to the McIntosh property that is consistent with storm surge and inconsistent with wind damage. (*See* Hr'g Ex. D7.)  Through additional discovery, State Farm has obtained photographs of the McIntosh house taken ***during*** Hurricane Katrina.  These photos – taken after the floodwaters had already receded about two feet from their peak (*see* Ex. U, Denny Dep. at 16:8-20:3; Ex. V, Briscoe Dep. at 16:18-17:10) – reveal significant storm surge with superimposed wave action and debris battering the McIntosh house. (Ex. W, Photo Exhs. from Denny & Briscoe Deps. at 2-3.)  Earlier photos show storm surge careening through the McIntoshes' next-door neighbors' (the Briscoes') front door, which was dislodged by floodwaters.  (*Id*. at 1.)  The Supreme Court has instructed district courts to view the summary judgment record in light of clear photographic evidence and to disregard self-serving testimony that is contradicted by such evidence.  *See Scott v. Harris*, 550 U.S. 372, 378-81 (2007).

Despite the Rigsbys' contention that the McIntosh flood claim should have been reopened in order to interview potential eyewitnesses (Ex. F, Hr'g Tr. at 286:6-13), the Rigsbys and their experts turn a blind eye to the pictures taken of the house during the storm.  (*See* [706], [715].)  They also ignore the testimony of Kacie Denny, who was in the house next door to the McIntosh house at the time of Katrina.  Ms. Denny testified that she and her family were not worried about Katrina's winds but feared for their lives and property, which were being threatened by Katrina's storm surge.

Q.      Do you know whether the peak wind damage, whatever it may have been, was before or after the highest waters arrived?

A.      I have no idea.

Q.      Why do you say you have no idea?

A.      Because I didn't pay attention to, you know, peak wind damage versus – ***what we were worried about was water***.  We were worried about our family and our house and the lives of the people that we had in the house, and ***what was threatening that was water***.  You know, we had a pretty stable structure.  ***We had no damage to the Briscoe house from wind***.  We had – the upstairs was absolutely, you know, safe and secure.  ***But we knew that if we were going to have a problem, it was going to be from water pushing the bottom out from under us***.

(Ex. U, K. Denny Dep. at 40:23-41:14; *see also id.* at 52:21-53:3.)

In short, ***all*** of the competent evidence demonstrates that the McIntosh property sustained flood damage far in excess of the $250,000 policy limits.  That makes one critical point clear beyond doubt: the claim for flood insurance submitted and paid by FEMA on behalf of the McIntoshes was not "false." The Rigsbys' failure of proof concerning this essential element of their FCA claim "'necessarily renders all other facts immaterial' and 'mandates the entry of summary judgment'" for State Farm.  *Farmer*, 523 F.3d at 337 (citation omitted).  As this Court has previously recognized, if "the McIntosh flood insurance payments were justified" there was no false claim and the case must be dismissed.  ([261] at 3.)

## IV.   THE RIGSBYS CANNOT SHOW THE CLAIM WAS KNOWINGLY FALSE WHEN MADE

The Rigsbys also must establish that State Farm "knowingly present[ed], or caus[ed] to be presented . . . a false or fraudulent claim."  31 U.S.C. § 3729(a)(1) (2006).  "Knowingly" is defined as acting with "actual knowledge of the information," "in deliberate ignorance of the truth or falsity of the information" or "in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b). The Fifth Circuit has made clear that the "knowingly" requirement is not satisfied "by mere negligence or even gross negligence."  *Farmer*, 523 F.3d at 338.[17]  Rather, "to show a violation of the FCA, the evidence must demonstrate "'guilty knowledge of a purpose on the part of [the defendant] to cheat the Government.'"  *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (alteration in original; citations omitted).  Moreover, "'[w]hat constitutes the offense is not intent to deceive but knowing presentation of a claim that is either fraudulent or simply false.'"  *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 544 (7th Cir. 1999) (alteration in original; citation omitted).  A claim for payment from the government is not "knowingly" false when it is reasonable.  "Where there are legitimate grounds for disagreement over the scope of the contractual or regulatory provision, and

---

[17]   *Accord United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 949 (10th Cir. 2008); *United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1150 (9th Cir. 2004); *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767 (8th Cir. 2002).

the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 684 (5th Cir. 2003) (en banc) (Jones, J., specially concurring).   A relator's failure to proffer competent proof of scienter mandates summary judgment.   *See Farmer*, 523 F.3d at 343-44; *Taylor-Vick*, 513 F.3d at 231-32; *see also United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 491 F.3d 254, 262-63 & n.25 (5th Cir. 2007).

**A.     The FEMA Testimony Shows That the Payment of the McIntosh Claim Was Proper**

The Rigsbys cannot proffer competent evidence demonstrating that "the payment of the limits of [the] flood insurance policy was [not] reasonable as a matter of law."   (Ex. F, Hr'g Tr. at 10:5-9.) Despite this fact, and even though the FCA is not intended to police compliance with federal regulations and guidelines, the Rigsbys nonetheless assert that State Farm is somehow liable under the FCA because it implemented certain expedited claims-handling procedures.   This assertion is unavailing because the testimony from FEMA demonstrates that the procedures State Farm used for handling Katrina-related flood claims were:  (i) developed with FEMA; (ii) approved by FEMA; (iii) implemented in accordance with FEMA guidelines; and (iv) fully consistent with FEMA claims-handling practices.

**1.     David I. Maurstad**

From 2004 to 2008, Mr. Maurstad was the Administrator of the NFIP and FEMA's Assistant Administrator for Mitigation.   He was directly responsible for overseeing the NFIP when Katrina struck the Gulf Coast.   He testified that Katrina was "the  worst flooding disaster to ever occur within  this country," that it caused unprecedented "devastation of the coast" (Ex. A, Maurstad Dep. at 37:7-38:20), and presented "challenges that . . . [the NFIP] hadn't faced before" (*id*. at 29:20-30:8).   Mr. Maurstad determined that it was crucial to "work very closely with the Write Your Own communities" (*id.*) to "streamline the processes" for adjusting flood claims (*id.* at 37:7-38:20), and that FEMA wanted to make sure that flood policyholders "would be taken care of as quickly and fairly as possible."   (*Id.*)

13

Mr. Maurstad further explained that because "most people when they buy a flood insurance policy don't buy it to value" (Ex. A, Maurstad Dep. at 37:7-38:20), FEMA anticipated "very early on that we were going to have an extraordinary number of policy limit claims because of the devastation of the coast." (*Id.*) Thus, he instructed his staff to work with the WYO community to develop ways to identify and pay these "total loss" claims, *i.e.*, properties where the loss exceeded the policy limits, as expeditiously as possible. (*Id.* at 60:22-63:24.)

Crucially, Mr. Maurstad expressly rejected ***all*** of the positions advanced by the Rigsbys in ostensible support of their FCA claim. First, he flatly rejected the Rigsbys' contention that a flood adjuster must determine the extent of the wind damage to the property before paying flood policy limits.

> Q.      [By Mr. Matteis]  But by that, are you also saying that you didn't think it was necessary for the flood adjuster to have information about wind and wind damage to the property they were adjusting?
>
> A.      Correct.
>
> Q.      They didn't need to know anything about the wind?
>
> A.      That's correct.

(Ex. A, Maurstad Dep. at 122:22-123:6.)  Thereafter, in response to a hypothetical – which was the Rigsbys' best effort to frame the wind issue in a way most favorable to their (erroneous) theory of the case – Mr. Maurstad again rejected the Rigsbys' contention out of hand, explaining that it would have been "unconscionable" to delay payments under a flood policy in order to rule out pre-existing wind damage.

> Q.      Okay.  Now let me give you a hypothetical.  If the adjuster went out to the property and the home was completely destroyed and there was a big strip of other homes and trees and other things that were gone leading right up to the home, there was also a bunch of water in the area, while you were out at the NFIP, ***would you have expected that adjuster to have looked into whether any wind damaged the property first?***
>
> A.      The – what – clearly, the situation in Katrina on the Mississippi coast with the recorded storm surge, the situation of trying to parse whether, you know, wind caused that or whether the storm surge caused that, it would have been, in my opinion, ***an unconscionable position for the flood program to have denied claims on your hypothetical basis***.  So the adjuster, knowing what

14

the facts are and the storm surge and the area, the way it's damaged, again goes back to determining there was a flood event and then pays for the damaged property.

Q.      So even if the flood adjuster knew the home was completely destroyed by wind –

A.      There's no way the flood adjuster could know – that is what I'm trying to articulate in this case.  And if the flood adjuster can't determine that, then it would be, you know, again **unconscionable** to – for the flood program to have come in and denied hundreds of claims on that basis.

(*Id*. at 125:10-127:12 (objections omitted).)

Mr. Maurstad also confirmed that there was nothing improper about using XactTotal to adjust the McIntosh flood claim, explaining that FEMA guidelines and "common sense" permitted a flood claims adjuster to forego an "itemized line-by-line claim adjusting process" where (as here) the "damage far exceeded the policy limits."  (*Id*. at 149:9-150:20.)  He also made clear that the expedited claims-handling procedure outlined in FEMA Directive W-5054 ("W-5054") did ***not*** supersede normal claims-handling procedures, which permitted adjusters to forgo a stick-build model when the flood damage exceeded policy limits.  He also rejected the Rigsbys' argument that W-5054 mandated the use of a stick-build estimate for claims adjusted pursuant to "Category 3," *i.e.*, claims that were neither slabs or in certain flood zones.

A.      [I]f it was common sense and reasonable for one to look at the policy and know what the policy limits were and look at the damaged property and know that if the damage far exceeded the policy limits, ***that in this circumstance, in the aftermath of Katrina, it didn't make sense to go through the normal, all itemized line-by-line claim adjusting process.***

Q.      And you did – does FEMA 5054 say that?

A.      I think FEMA – I think 5054, reasonably interpreted, leads one to that conclusion, that that's what we were trying to accomplish.

(Ex. A, Maurstad Dep. at 150:5-20 (objection omitted).)

Recognizing that this testimony was fatal to their theory of their case, the Rigsbys' counsel attempted to strong-arm Mr. Maurstad into changing his testimony.

Q.      Okay.  But if an insurer can use a square foot – could have used a square foot methodology rather than a line-by-line estimation prior to [5054] being issued, why did you even issue it?  What did it add?

15

> A.      It put in place a framework by which the program could be comfortable with claim losses being handled without a site inspection; that claims could be handled on a reasonable basis when it was clear to anybody that would look at it that the policy limits would far exceed the amount of damages and does so as expediently as possible.  That's what this policy achieved.

(Ex. A, Maurstad Dep. at 215:15-216:4.)  And when that did not work, counsel badgered Mr. Maurstad and tried to put words in his mouth.

> Q.      I'm asking you whether 5054 means anything.

> A.      Of course it means something.  I mean, *that's again confrontational.*  And it's clear it means something or you wouldn't be spending so much time on it, and it wouldn't have been reviewed by the IG and given a clean mark, and it wouldn't have been referenced as actually providing an expedited process and getting – and being a part of getting people's claims handled appropriately.  So, you know, I'm trying to be responsive, but *I'm getting a sense you're trying to pull something from me that isn't there to pull.*

(Ex. A, Maurstad Dep. at 220:18-221:8.)

In fact, the Rigsbys' counsel's questioning of Mr. Maurstad was so aggressive and confrontational that Mr. Maurstad felt he was being accused of perjury.

> A.      Well, *I'm a little taken aback by your inference*, with all due respect.  So *I think you've just asked me whether I have selective memory.*

> Q.      No, I didn't.

> A.      That's what it sounded like.

(*Id.* at 217:18-23.)

The Rigsbys' counsel also had no problem grossly misrepresenting the record to Mr. Maurstad in an improper attempt to extract imaginary "concessions."  The Rigsbys' counsel repeatedly asked Mr. Maurstad to admit that he would be "troubled" or "concerned" by "the possibility that NFIP was overpaying on" flood claims because of "*the fact*" that the conclusions in "19 [engineering] reports" were "changed" from wind to water.  The "19 reports" ostensibly pertain to nineteen reports identified by Forensic Analysis Engineering Corporation ("Forensic").  Indeed, the Rigsbys' counsel made these express misrepresentations in quick succession:

Q.     I mean, if you knew for a *fact* that State Farm influenced one engineering firm to change at least 19 reports from conclusions that said wind damage to property to conclusions that flood damaged a property, would that be troubling to you?

Q.     But isn't the *fact* that 19 reports were changed, wouldn't that be a concern to you if you have known it at the time?

Q.     But if you had known new *facts* that an insurance company did, in *fact*, influence . . . an engineering company to change its conclusions . . . with respect to 19 properties from wind predominantly caused the damage to flood predominantly caused the damage, would that be at least a concern that you would – should be looked into by the NFIP?

(Ex. A, Maurstad Dep. at 131:18-134:9.)  But the record shows that these are *not* "the facts."  Far from it.

In reality:  (i) 10 of the 19 reports concern properties *without* a State Farm flood insurance claim (Ex. X, Blalock Aff. ¶ 5), and thus could not be the basis for any supposed "fraud" by State Farm on the NFIP;[18] (ii) at least 4 of the 19 initial reports concluded that *flooding* was the predominant cause of the damage, and thus there was no "change" from wind to water;[19] and (iii) at least 9 of the 19 initial reports were *never* even provided to State Farm,[20] thereby undermining the false premise of the Rigsbys' questions.

The Rigsbys' counsel's blatant misrepresentations to, and sharp attacks on, the NFIP's former administrator are not simply unprofessional and discourteous; they dramatically underscore why this case must be dismissed.  As *qui tam* relators, the Rigsbys are assignees of a portion of any claim that FEMA might have for damages based on the adjustment of the McIntosh flood claim.  *See Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773-74 & n.4 (2000).  "An assignee steps into the shoes of the assignor and takes the assigned rights subject to all defenses that an opposing party might be able to assert against the assignor."  *SingleEntry.com, Inc., v. St. Paul Fire & Marine Ins. Co.*, 117 F. App'x 933, 935 (5th Cir. 2004).  Thus, the Rigsbys, as assignees, are bound by

---

[18]     Based on an initial investigation, State Farm initially believed that several additional of these 19 properties did not have State Farm flood insurance claims relating to Hurricane Katrina.  (*See* [645] at 9.)  After further investigation, State Farm has determined that 10 of the 19 reports concern properties without a State Farm flood insurance claim.

[19]     *See* Forensic Prod. 5-27-10 754-58, 794-97, 900-04, 4088-95.

[20]     *See* Forensic Prod. 5-27-10 13755-60.

the testimony of the NFIP's former administrator, just as the government would be if it had brought this claim directly. *See, e.g.*, *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1028-31 (D. Nev. 2006) (dismissing the government's FCA claim alleging Medicare billing fraud where the government's witnesses stated that the government's rules concerning billing procedures were "rife with confusion"). Here, Mr. Maurstad testified that State Farm's claims-handling procedures were fully consistent with FEMA policies and procedures, and that he "believed that State Farm is a company with integrity." (Ex. A, Maurstad Dep. at 195:15-196:5.) This testimony negates any argument that the McIntosh claim was "false" or that State Farm acted with the requisite scienter.

### 2.    James S.P. Shortley

James Shortley was FEMA's Director of Claims for the NFIP from 1990 to 2007. (Ex. B, Shortley Dep. at 10:3-6.) He was at FEMA at the inception of the WYO program in 1983. (*Id.* at 11:16-25.) As Director of Claims, he was responsible for everything concerning the adjustment of NFIP flood policies. He and his staff interfaced extensively with WYO carriers, oversaw the training and certification of flood adjusters, and conducted operational reviews of flood claim files to determine whether those claims were handled correctly. (*Id.* at 12:2-13:10.) After Katrina struck, he recognized immediately that some "fairly major" expedited claims-handling procedures would have to be put in place in order to "settle the [flood] claims as quickly as possible." (*Id.* at 17:11-18:2.) Mr. Shortley and Mr. Maurstad were in contact with WYO companies and industry trade groups almost immediately, seeking their input and informing them that FEMA would be developing expedited claims-handling procedures to deal with the overwhelming number of Katrina-related flood claims. (*Id.* at 22:2-21.)

Like Mr. Maurstad, Mr. Shortley expressly rejected the Rigsbys' contention that a flood adjuster must rule out potential wind damage to the property before paying flood policy limits. Mr. Shortley explained that FEMA had made a policy decision ***not*** to delay payment of flood claims in storm surge areas, such as the Mississippi coast, on the basis that there might have been pre-existing wind damage.

Mr. Shortley testified that in these surge areas, "imagine us saying to the adjusters . . . let the other company figure out what their wind is and then we'll pay the balance.  I mean, we'd never settle any claims. . . .  [Y]ou have a 20-foot wall of water coming at a house, forget the wind.  You know, the wind damage is going to be very, very minor."  (Ex. B, Shortley Dep. at 95:24-97:7.)

Mr. Shortley's testimony further demonstrates that State Farm's adjustment of the McIntosh flood claim was perfectly proper.  <u>First</u>, Mr. Shortley's testimony firmly dispels the Rigsbys' suggestion that State Farm was utilizing rogue adjustment practices that were not in keeping with FEMA guidelines.  To the contrary, Mr. Shortley testified that, in the aftermath of Katrina, he was in regular contact with State Farm personnel – especially State Farm's NFIP liaison, Juan Guevara.  Mr. Shortley spoke to Mr. Guevara "[a]ll the time.  You know, especially during Katrina.  Probably three, four times a week."  (*Id.* at 154:20-25; *see also id.* at 25:12-18.)  Mr. Shortley made clear that "Juan . . . liked to tell us exactly what was going on" and that Mr. Shortley considered Mr. Guevara to be a man of high integrity who employed a cautious and conservative approach to flood claims adjustment.  (*Id.* at 110:1-13, 178:15-18.)

<u>Second</u>, Mr. Shortley's testimony establishes that State Farm's use of XactTotal for the adjustment of the McIntosh flood claim was perfectly proper and consistent with sound claims-handling practices.  In particular, Mr. Shortley testified that as early as August 31, 2005 – three days after Katrina struck – FEMA told WYO companies and industry trade groups that it was ***not*** necessary to construct a stick-build damage model if the flood damage exceeded policy limits.

> A.     Well, we were telling the [WYO] companies and adjusters that if there is a structure that is damaged beyond policy limits, that they didn't have to write a line-by-line unit or line-by-line, room-by-room estimate beyond that [when a site inspection was done].

(Ex. B, Shortley Dep. at 22:2-21.)

Moreover, Mr. Guevara's notes of a meeting that he and several other State Farm representatives had with Mr. Shortley and Mr. Maurstad in early September 2005 specifically reflect the fact that Mr. Shortley agreed that a house like the McIntosh property, which had sustained "heavy structure damage as a result of flood waters or wave action," would be considered a total loss, and further "[a]gree[d] that

19

XactTotal evaluation could be used as the basis to pay policy limits if the amount exceeded the policy

limits." (Ex. Y, Guevara Notes at 2.)

Third, Mr. Shortley testified that W-5054 did **not** "revoke" FEMA's prior authorization to forego

a stick-build estimate if the flood claims adjuster conducted a site inspection and "observed damages

that would exceed the coverage limits." (Ex. B, Shortley Dep. at 47:9-25.) In fact, Mr. Shortley

testified that a stick-build estimate would not have been necessary where (as here) the flood adjuster

performed a site visit, determined that the property damage exceeded policy limits, and documented that

loss with photographs, scope notes, and diagrams.

Q.     [W]ith regards to [the adjustment of properties] that [the adjusters] did site visits for –

A.     Oh, yeah, we would want them to take photographs and measurements and that kind of thing.

Q.     Scoping the damage and –

A.     Right.

Q.     And once they were – **once they photographed it, scoped it and diagrammed it, if they determined** through looking at their scope and their observation of the flood damage **that the damage would exceed the coverage limits, they would not have to stick build an estimate?**

A.     **Right.**

Q.     **Do you recall also having discussions in addition with Ms. King but with Mr. Guevara where this process was discussed and authorized?**

A.     **Right, yes.**

Q.     **And was it authorized by you?**

A.     **Yes.**

(Ex. B, Shortley Dep. at 27:7-28:3 (objection omitted); *see also id*. at 175:3-176:16 (he had "no problem

with" State Farm's use of XactTotal where a site inspection revealed damages in excess of flood policy

limits).)

Faced with the testimony of yet another FEMA witness that established conclusively that the

Rigsbys' fraud allegations were built on a pyramid of falsehoods, the Rigsbys' counsel once again went

on the attack.  This time, they tried to impeach Mr. Shortley by noting that:  (i) Mr. Shortley could not

recall specifically discussing XactTotal with Mr. Guevara after W-5054 was issued on September 21,

2005; and (ii) there was no written FEMA document issued after W-5054 that expressly authorized State

Farm to use XactTotal.  But Mr. Shortley rebuffed these suggestions, explaining that he had hundreds of

conversations with WYO companies following Katrina, and the fact that he did not specifically recall

this one was insignificant.  He testified that, based on his years of experience working with Mr. Guevara

and knowing Mr. Guevara's cautious approach to handling flood claims, he did not doubt that Mr.

Guevara told him that State Farm was using XactTotal in appropriate cases.

> Q.     [By Mr. Matteis]  What do you mean by "his caution"?
>
> A.     Juan liked to know – liked to tell us exactly what was going on and if we asked him, for instance, for a – you know, to reply on – based on this paragraph, my guess is he would have done it, knowing Juan or – and would have been done.  I don't know if it would have been Juan or not, but it would have been done.
>
> Q.     Was part of his being cautious him wanting things in writing?
>
> A.     No.  I had a hundred conversations with – you know, not only Juan but other people where there was no – nothing in writing.

(Ex. B, Shortley Dep. at 110:2-20 (objection omitted).)  Unsatisfied with this answer, the Rigsbys'

counsel again tried to challenge Mr. Shortley's testimony that not all FEMA directives were reduced to

writing.

> Q.     And that would be conveyed in some form of writing?
>
> A.     You would think so, but, you know, things slip through the cracks when you're dealing with a catastrophe the size of Katrina.  I was on the move a lot.

(Ex. B, Shortley Dep. at 167:21-168:2.)

Although the Rigsbys' counsel did everything within their power to impeach and discredit the

testimony of FEMA's former director of the NFIP, the Rigsbys, as government assignees, are bound by

Mr. Shortley's testimony, which confirms that the Rigsbys' fraud allegations are baseless.

### 3.    Gerald B. Waytowich

Gerald Waytowich served as claims manager for the NFIP shortly after Katrina struck.  (Ex. C, Waytowich Dep. at 17:3-9.)[21]  He was and is an NFIP trainer who trains and certifies flood adjusters pursuant to FEMA and NFIP guidelines.  (Ex. K, Waytowich Rep. ¶ 1.)  He also performed routine reinspections of WYO carriers to ensure compliance with FEMA policies and procedures.  (*Id.*)  As claims manager, Mr. Waytowich oversaw a staff of fifteen disaster analysts assigned to conduct random audits of flood claims.  Three of these analysts were specifically assigned to review Mississippi flood claims.  (*Id.*)  Mr. Waytowich's analysts had specific instructions to determine if "adjusters were pushing wind damage to water."  (*Id.*)  After reviewing scores of files, "[t]here were no findings of flood paying for wind damage."  (*Id.*)

Mr. Waytowich testified both as a fact witness with respect to his experience as a flood claims trainer and reinspector, and as an ***unpaid*** expert with respect to his review of the McIntosh flood file. After reviewing the McIntosh flood file using the same standards and criteria that he would employ if he were performing a reinspection for FEMA, Mr. Waytowich concluded that:  (i) the photographs of the McIntosh property show extensive damage to the lower portion of the house that is indicative of storm surge damage (Ex. C, Waytowich Dep. at 51:13-18); (ii) the photographs show "very little wind damage to the structure itself" (*id.* at 53:16-23); (iii) the flood damage is "clearly damages way beyond [the] $250,000" policy limits (*id.* at 47:13-18); (iv) the McIntosh flood claim was properly scoped and the claim file was adequately documented (*id.* at 46:18-22); (v) the McIntosh property was considered a "total loss" under FEMA adjusting guidelines because the flood damage exceeded policy limits (*id.* at 158:19-159:19); (vi) the use of XactTotal was consistent with the training given by FEMA for handling

---

[21]    Mr. Waytowich was subcontracted to work for FEMA through Computer Science Corporation, which provided FEMA with certain services related to the NFIP, such as underwriting, training, claims handling, and reinspections of WYO flood claim files.  (Ex. L, Waytowich Rep. ¶ 1.)

Katrina claims (*id.* at 47:6-25); and (vii) the McIntosh flood claim file "easily" justified a $250,000 flood payment. (*Id.* at 48:17-24; Ex. K, Waytowich Rep. at 3.)

Under cross-examination by the Rigsbys' counsel, Mr. Waytowich testified that he had not previously reviewed Brian Ford's October 12, 2005, engineering report, but stated that he would not expect to find the Ford report in the McIntosh flood file because it was ordered in connection with the adjustment of the wind claim and was not even issued until ten days after the flood claim was closed. (Ex. C, Waytowich Dep. at 155:10-156:15.)  Mr. Waytowich further testified that, even if the report was in the flood file or otherwise provided to him, it would not have changed his opinion that State Farm properly handled the flood claim based on the substantial documentation of flood damage in the file:

> Q.     [By Mr. Matteis]  Knowing now that Mr. Ford's report exists, do you believe you saw enough to make any determination as to whether the $250,000 flood payment on the McIntosh flood claim was appropriate?  . . .
>
> A.     Yes.
>
> Q.     You think you've seen enough?
>
> A.     I've seen enough of the file to make the determination the damage by flood was more than $250,000.

(Ex. C, Waytowich Dep. at 147:3-17; *see also id.* at 141:19-143:17 (Ford report did not change his opinion "that based on what I've seen in this file, they exceeded the $250,000 on flood damage").)

In sum, not only does Mr. Waytowich's testimony establish that the McIntosh flood claim was adjusted in full accordance with FEMA requirements and easily justified a $250,000 flood payment, it further demonstrates that the Rigsbys' attempt to transform the facially erroneous and after-the-fact Ford report into a "smoking gun" has no basis in fact or law.

**B.     FEMA's Knowledge of State Farm's Adjustment Practices Precludes a Finding That State Farm Acted with the Requisite Scienter**

The testimony from three separate FEMA representatives demonstrates that State Farm operated in compliance with all FEMA policies and regulations.  Although the Rigsbys have already attempted to argue that the FEMA depositions somehow show that State Farm did not comply with FEMA guidelines,

the larger point is that the Rigsbys' entire effort to predicate their FCA claim on a regulatory violation, whether real or imagined, must be rejected as a matter of law.  Every United States Court of Appeals to consider the issue – including the Fifth Circuit – has expressly recognized that "[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA."  *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996).  As the Fifth Circuit explained:

> "[C]laimants [do not] 'knowingly' present[ ] false claims where there were instances of 'mere' contractual or regulatory noncompliance," ***because the "FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of [agency] regulations are not fraud*** unless the violator knowingly lies to the government about them."

*Farmer*, 523 F.3d at 340 n.12 (second through fourth alterations in original; emphasis added) (quoting *Southland Mgmt.*, 326 F.3d at 682 (Jones, J., specially concurring)); *see also United States ex rel. Ramadoss v. Caremark Inc.*, 586 F. Supp. 2d 668, 691 (W.D. Tex. 2008) ("[T]he FCA is not a catch-all enforcement vehicle for all government regulations . . . .").

Similarly, in *United States ex rel. Gudur v. Deloitte & Touche*, No. 07-20414, 2008 WL 3244000 (5th Cir. Aug. 7, 2008) (per curiam), the relator argued that the defendant violated certain federal guidelines in order to receive a higher reimbursement rate.  The Fifth Circuit affirmed the grant of summary judgment, explaining that the relator failed to proffer competent evidence of scienter.

> Gudur essentially argues that evidence of a regulatory violation coupled with Deloitte's profit motive is sufficient to create a fact issue as to knowledge and intent. ***The FCA is an anti-fraud statute and not the appropriate vehicle for policing regulatory compliance.  Gudur's argument, if accepted, would collapse the FCA into such a vehicle and eviscerate the knowledge and intent elements*** . . . .

*Id.* at *2 (emphasis added; footnote omitted).

Moreover, where, as here, "the government and a contractor have been working together to reach a common solution to a problem[,] no FCA claim arises.  This is because such a close working relationship negates the required scienter."  *Gray*, 2010 WL 672016, at *7 (citation omitted).  For instance, in *Durcholz*, the United States Navy needed to remove sediment from two sediment ponds at

24

the Crane Naval Surface Warfare Center ("Crane"), which had become clogged by debris from a demolition range.  *See Durcholz*, 189 F.3d at 543-44.   In order to remain compliant with various environmental regulations, Crane officials determined that they had to move quickly and took several measures to fast-track the project, including implementing an expedited bidding process.  *Id.*   The project was awarded to the subcontractor who had submitted the second-lowest bid.  *Id.* at 544.   After the project was completed and paid for, the lowest bidder, Durcholz, brought a *qui tam* action against the general contractor, alleging that it had defrauded the Navy by manipulating the bidding and billing process.  *See id.*   The court recognized that there may have been certain irregularities, but held that there was no false claim as a matter of law because Crane ordered the expedited bidding process in the first place and was aware of what steps the contractors were taking.   In affirming summary judgment dismissing the claims, the court explained:

> From the start, Crane officials were more interested in speed than cost and made their decisions in accordance with these priorities. . . .   In essence, then, Durcholz is alleging that the government was defrauded by the very activities that its agents ordered.   We decline to hold [general contractor] FKW liable for defrauding the government by following the government's explicit directions.  ***The government knew what it wanted, and it got what it paid for.  In this case, the government's knowledge is an effective bar to Durcholz's FCA claim, and we therefore affirm the district court's grant of summary judgment in favor of FKW*** . . . .

*Id.* at 545 (emphasis added; footnote omitted).

Similarly, "'[i]f the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim.'"  *Laird*, 491 F.3d at 263 (quoting *Durcholz*, 189 F.3d at 545); *see also Laird*, 491 F.3d at 262-63 (affirming summary judgment for defendant on FCA allegation because defendant who followed NASA's "'oral guidance'" on billing could not have knowingly submitted a false claim).   Informal talks between a contractor and an agency are sufficient to apprise the government of the contractor's actions. If the government does not object to the contractor's actions, there is no false claim.

For instance, in *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321 (9th Cir. 1995), the court held that a particular statement regarding radio testing, though perhaps factually false, was not "knowingly" false because the "discrepancy was the subject of dialogue" between the contractor and the Army, which knew of and approved of the tests. *Id.* at 328. Many other courts have similarly held that agency involvement negates a finding that the defendant acted knowingly. *See Gray*, 2010 WL 672016, at *7-9 (granting summary judgment on FCA claim because the "close working relationship negates the required scienter"); *United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003) ("Thus, the district court did not err in finding that the defendants' openness with the EPA about their problem and their close working relationship in solving the problems negated the required scienter regarding these issues."); *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992) (no scienter where contractor had "a dialogue with the Army" and "[t]he government knew all the deficiencies . . . and discussed them with [the contractor]").

Here, the testimony of three separate FEMA witnesses establishes that the claims-handling procedures used to adjust the McIntosh flood claim were developed in conjunction with FEMA and approved by FEMA. The McIntosh property was scoped, photographed, documented, and paid in full accord with these claims-handling policies and procedures. Thus, FEMA awareness and involvement negate a finding that State Farm acted knowingly. *Gray*, 2010 WL 672016, at *7-8. State Farm cannot be held liable for defrauding the NFIP by following FEMA's directions.

## C. The Record before the Court Demonstrates That State Farm Representatives Believed in Good Faith That the McIntosh Claim Was Not False

Scienter is also lacking because the three State Farm representatives involved in the adjustment of the McIntosh claim – Cody Perry, Kerri Rigsby, and John Conser – all testified that they believed in good faith that the McIntosh claim was not false at the time it was made. Mr. Perry, who adjusted the flood claim, testified that he was able to conclude that flood damage to the McIntosh property vastly exceeded the flood policy limits based on his detailed inspection of the property. (Ex. Q, Perry Dep. at

178:25-179:21.)   Kerri Rigsby, who was on site to supervise Mr. Perry, similarly testified that she "believed there was $250,000 worth of flood damage" to the McIntosh home (Ex. F, Hr'g Tr. at 220:13-221:7), and "absolutely" "believed it" "in good faith."   (*Id.* at 258:23-259:3, 274:14-16, 277:15-18, 286:14-17, 287:9-14, 302:3-7, 302:14-19.)   Based on this shared belief, Kerri Rigsby and Mr. Perry jointly asked their State Farm supervisor, Mr. Conser, if they could expedite their adjustment of the McIntosh flood claim by using XactTotal.  (*See* Ex. Q, Perry Dep. at 178:25-181:3; Ex. Z, Conser Dep. at 98:4-18.)   Indeed, it was Kerri Rigsby who first suggested using XactTotal to adjust the McIntosh flood claim, and she did "a lot of the talking" at the meeting with Mr. Conser.  (Ex. Q, Perry Dep. at 182:10-183:25.)

Following his review of the flood file with Kerri Rigsby and Mr. Perry, Mr. Conser concluded "without a shadow of a doubt" that "there was definitely more than $250,000 worth of damage to that structure caused by flood," and authorized the payment of the McIntosh flood claim limits without requiring a stick-build estimate that would have taken "another three or four days' worth of just sit-down work" that "would have delayed the payment to Mr. McIntosh probably by at least a month."  (Ex. Z, Conser Dep. at 149:12-151:11; *see also id.* at 104:11-17, 105:24-106:12, 148:13-20.)  This good-faith belief negates any claim that State Farm acted with "guilty knowledge of a purpose on the part of [the defendant] to cheat the Government."  *Taylor-Vick*, 513 F.3d at 231 (alteration in original; citations omitted).

## V.   BRIAN FORD'S REPORT IS NOT EVIDENCE OF A FRAUD

The Rigsbys contend that the Brian Ford engineering report "is perhaps the strongest evidence illustrating . . . the nature of [State Farm's] fraudulent scheme."  ([348] at 20.)  But the Ford report did not even exist until ***after*** State Farm paid the McIntosh flood claim.  Since as a matter of law, whether a claim is knowingly false is determined as of the time it is made, *see Longhi*, 513 F. Supp. 2d at 875; *Hendow*, 461 F.3d at 1171-72; *United States v. Nat'l Wholesalers*, 236 F.2d 944, 950 (9th Cir. 1956), a

report that did not even exist when State Farm paid the McIntosh flood claim cannot be "evidence" that the claim was knowingly false at the time it was made.

Moreover, the Ford report is not competent summary judgment evidence; it is based on multiple layers of false hearsay and is demonstrably untrustworthy. Thus, it is neither admissible nor sufficient to defeat summary judgment. For all of these reasons, the Rigsbys' "strongest evidence" of fraud is simply more evidence that the Rigsbys' theories lack any evidentiary support and must be dismissed.

### A.    The Ford Report Post-Dates the Payment of the McIntosh Flood Claim and Cannot Demonstrate That It Was Knowingly False at the Time It Was Made

The Ford report is not competent evidence of either the falsity of the McIntosh claim or State Farm's scienter because the McIntosh flood claim was paid on October 2, 2005, before the Ford report was even ordered, and had no bearing on the adjustment of that claim. (*See, e.g.*, Ex. F, Hr'g Tr. at 288:5-13.) Thus, the Rigsbys' "strongest evidence" is, as a matter of logic and law, no evidence at all because it is not probative of whether the McIntosh flood claim was knowingly false when it was made. It is well settled that whether a claim is knowingly false is determined at the time it was made. *See Longhi*, 513 F. Supp. 2d at 875 ("'[T]he falsity of a claim [under the FCA] is determined *at the time of submission*.'") (alteration in original; citation omitted); *Hendow*, 461 F.3d at 1171-72 ("[F]alse claims must in fact be 'false when made.' . . . In short, . . . a palpably false statement, known to be a lie *when it is made*, is required for a party to be found liable under the False Claims Act.") (emphasis added) (quoting *Hopper*, 91 F.3d at 1267); *Nat'l Wholesalers*, 236 F.2d at 950 ("The test of whether a claim is false must be *as of the date when the claim is made*.") (emphasis added).

The Ford report simply had nothing to do with the adjustment of the McIntosh flood claim. It was commissioned on October 4, 2005, at the request of Mr. McIntosh, in connection with the adjustment of the McIntosh homeowners claim. (*See* Ex. AA, Ford Rep. at 1; Ex. BB, Flood Activity Log.) As noted above, all three State Farm representatives involved in the adjustment of the McIntosh claim – Cody Perry, Kerri Rigsby, and John Conser – testified that they had no trouble concluding that,

28

based on the site inspection and the abundant physical evidence, the McIntosh property sustained catastrophic flood damage well in excess of policy limits.  (*See* Ex. Q, Perry Dep. at 177:12-179:2; Ex. F, Hr'g Tr. at 220:13-221:7, 258:23-259:3, 274:14-16, 277:15-18, 286:14-17, 287:9-14, 302:3-7, 302:14-19 (K. Rigsby); Ex. Z, Conser Dep. at 104:11-17, 105:24-106:12, 148:13-20, 149:12-151:11.)  There was simply no need to retain an engineer to complete the proper adjustment of the McIntosh flood claim.  Nor does FEMA require an engineering opinion.  Indeed, Mr. Maurstad testified that where, as here, the property sustained obvious flooding, it would have been "unconscionable" to deny payment of flood claims until wind damage could be ruled out as a potential cause of the damage.  (Ex. A, Maurstad Dep. at 121:23-127:12.)  In keeping with this mandate and the overwhelming physical evidence, State Farm paid the McIntoshes the full limits under their flood policy on October 2, 2005.  Not surprisingly, Kerri Rigsby has freely admitted that the Ford report had no influence over the adjustment of the McIntosh flood claim because it did not even exist "when we adjusted the claim."  (Ex. D, Hr'g Tr. at 288:15-22.)

### B.    The Ford Report Is Inadmissible Hearsay

The Ford report cannot create a genuine issue of material fact on any issue in this case because it is based on multiple layers of inadmissible hearsay that are not subject to any exception to the hearsay bar.  "'Evidence inadmissible at trial cannot be used to avoid summary judgment.'"  *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (citation omitted); *see also Vance v. N. Panola Sch. Dist.*, No. 98-60719, 1999 WL 548772, at *1 (5th Cir. July 16, 1999) ("[T]his court does not allow the admission of pure hearsay or speculation as evidence to avoid summary judgment.").

The Ford report is, by definition, hearsay, *i.e.*, an out-of-court statement being proffered by the Rigsbys to prove that the McIntosh home was destroyed by wind and not flood.  *See* Fed. R. Evid. 801(a)-(c).  Thus, the Ford report is inadmissible unless the Rigsbys can prove that the Ford report itself *and* the statements contained therein fall within exceptions to the hearsay rule.  The Ford report cannot be admitted *in toto* under the business records exception of Federal Rule of Evidence 803(6) for two

independent but interrelated reasons.  First, the entire report is premised on a putative eyewitness statement, supposedly conveyed secondhand (thus constituting double and triple hearsay), that does not fall within any exception to the hearsay rule.  *See* Fed. R. Evid. 805.  "To be admissible, both levels of hearsay must come within exceptions to the hearsay rule."  *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 280 (5th Cir. 1991).  "'[I]f the source of the information is an outsider . . . Rule 803(6) does not, by itself, permit the admission of the business record.  The outsider's statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the regular course of business have.'"  *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 729 n.5 (10th Cir. 1993) (quoting *Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 271 (5th Cir. 1991)) (alterations in original).  "[T]he business records exception does not embrace statements contained within a business record that were made by one who is *not* a part of the business if the embraced statements are offered for their truth."  *United States v. Vigneau*, 187 F.3d 70, 75 (1st Cir. 1999).

Second, the business records exception does not apply where, as here, "the source of information or the method or circumstances of preparation [of the business record] indicate lack of trustworthiness."  Fed. R. Evid. 803(6); *see United States v. Skilling*, 2006 WL 1006622, at *5 (S.D. Tex. Apr. 13, 2006).

### 1.     Mr. Ford's Report Is Based on Hearsay Statements of an "Eyewitness Account" That Did Not Occur, Rendering It Wholly Unfounded

Mr. Ford's recent deposition establishes that the conclusion in his report is based on inaccurate and inadmissible hearsay.  Specifically, Mr. Ford testified that:  (i) he found a 5½-foot waterline in the McIntosh home (*see* Ex. D, Ford Dep. at 114:1-115:11, 119:12-14); (ii) there was evidence of water damage to the McIntosh home (*see id.* at 129:14-16, 164:4-10); and (iii) in 2005, he believed that the photos of the McIntosh home depicted flood damage (*see id.* at 55:14-57:11, 119:9-11).  Mr. Ford also reviewed photograph after photograph of the first floor of the McIntosh home, and testified that the damage appeared to be caused by floodwater.  (*See id.* at 151:2-20, 152:2-153:21.)  Yet he ignored all of the physical evidence indicating that the first floor was predominantly damaged by flood, and opted

instead to rely almost entirely on a purported "eyewitness account" of wind-driven debris that was supposedly relayed, <u>first</u>, by Mike Church to Mr. McIntosh, and then, <u>second</u>, from Mr. McIntosh to Mr. Ford.  (*See id.* at 127:6-14.)  In his report, Mr. Ford contends:

> According to Mr. McIntosh, a neighbor – Mike Church – reported that houses were blown apart and debris was thrown into the McIntosh home at approximately 8 AM and the floodwater began rising at 11 AM.

(Ex. AA, Ford Rep. at 2.)  Crucially, Mr. Ford admitted that if this "eyewitness account" was inaccurate, then he would have concluded that flood – not wind – caused most of the damage to the first floor of the McIntosh home.  (*See* Ex. D, Ford Dep. at 164:4-24; *see also id.* at 128:15-129:2.)

But, fatally to the Ford report, this so-called "eyewitness account" ***never*** occurred.  Mr. Church did not see any debris blow into the McIntosh house.  Nor did he tell Mr. McIntosh that he did.

> I did not see any debris blown into the McIntosh home during Hurricane Katrina.  I never told Chris McIntosh that I saw debris blown into his house during Hurricane Katrina.  In fact, to the best of my recollection, I never even looked at the McIntosh house on August 29, 2005, until the storm was over, and I don't recall anything about damage to the McIntosh house that day.

(Ex. E, Church Aff. ¶ 4.)  In fact, Mr. Church has "no personal knowledge of how much damage to the McIntosh house was caused by wind and water during Hurricane Katrina."  (*Id.* ¶ 5.)

Not surprisingly, because that conversation never took place, Mr. McIntosh does not recall Mr. Church telling him that debris was thrown into the McIntosh home.  (Ex. J, T. McIntosh Dep. at 60:7-61:7, 63:6-64:9.)  Nor did Mr. McIntosh recall telling Mr. Ford anything about a statement by Mr. Church about wind-driven debris.  (*Id.*)  Since the record expressly refutes the entire basis of the Ford report, it falls apart like a house of cards.

Moreover, even if the mythical conversation which Mr. Ford reports that he had with Mr. McIntosh actually occurred (which it did not), it would be inadmissible unless the Rigsbys could show that (i) Mr. Church's supposed statements to Mr. McIntosh ***and*** (ii) Mr. McIntosh's alleged statements to Mr. Ford both fall within an exception to the hearsay rule.  They do not.  The statement attributed by

Mr. Ford to Mr. McIntosh would have been made during the adjustment of the wind claim and *after* he received full payment for his flood claim. A "self-serving statement" made to an insurance adjuster by a person seeking insurance payments "simply cannot provide the 'circumstantial guarantees of trustworthiness' required" by the hearsay exceptions. *Rock*, 922 F.2d at 283 (citation omitted); *see also Nyiri v. Aktiebolaget Electrolux*, 2005 WL 6032846, at *5 (S.D. Miss. June 16, 2005) (excluding statement made to insurance adjuster as lacking "circumstantial guarantees of trustworthiness").

> **2.      The Ford Report Is Not Subject to the Business Records Exception Because the Circumstances Surrounding Its Preparation Indicate a Complete Lack of Trustworthiness**

The fact that Mr. Ford ignored all of the physical evidence, choosing instead to base his entire report on an eyewitness account that never occurred, also indicates that the Ford report is not trustworthy. Indeed, Forensic's President, Bob Kochan, had grave concerns about the Ford report's complete lack of empirical support as early as October 13, 2005 – the day after Mr. Ford produced his report on the McIntosh property. (*See* Ex. CC, Kochan Dep. at 54:3-56:2.) Notably – and contrary to the Rigsbys' central theory of the case – Mr. Kochan began to question the validity of the Ford report several days *before* Lecky King voiced her concerns about it. On October 13, 2005, Mr. Kochan sent an e-mail to his colleagues at Forensic noting the Ford report lacked "supportive evidence of the wind direction and surge levels" and stating: "I am concerned that we may be relying too heavily on what some desperate homeowner who is also concerned about their own insurance coverage may have told us." (Ex. DD, Kochan 10/13/05 e-mail.) Mr. Kochan later told Mr. Ford that he did not consider the McIntosh report methodologically sound, stating: "When I did the peer review of this home loss, I wondered to myself how you found it to be a wind loss when so much of the structure appeared to be unaffected by the wind," and "we both have to admit that it looks very much like flood damage from the photos that you used in your report." (Ex. EE, Kochan 10/17/05 e-mail.) Four days later, on October 17,

2005, Ms. King first reviewed the Ford report and expressed similar concerns.  (*Id.*; *see also* Ex. FF,

King Dep. at 209:7-210:12.)

Through further investigation, Mr. Kochan eventually determined that Mr. Ford was **not** acting

in an objective, professional manner.  Rather, Mr. Ford had lost the ability to function objectively and

was disregarding abundant physical evidence of flood damage because Mr. Ford was distraught over the

fact that his daughter's new house had been severely damaged by storm surge during Katrina.

Q.      At some point did you come to the conclusion that Brian Ford was biased?

A.      Yes, I did.

Q.      And approximately when is it that you reached that conclusion?

A.      When **he** personally was talking to me and **began to cry and verbalized that his own daughter['s] . . . home became totally flooded** . . . and that she had just recently purchased it.  I mean, he gave me a very sad story of her situation, and that they were having to live with him, and he had a tree on his house and so forth.
        So **it became very evident that he was being affected emotionally by the circumstances that his neighbors and he himself and his family were all encountering**.

(Ex. CC, Kochan Dep. at 74:4-20 (emphasis added).)

Mr. Kochan further testified that State Farm was completely justified in questioning the validity

of Mr. Ford's conclusions:

Q.      In your opinion, Mr. Kochan, was [Lecky King] right that the photographs showed extensive water damage to the first floor of [the McIntosh] house?

A.      **I hate to say it, but she was absolutely right.**

Q.      And the data that was in the file supported the unmistakable conclusion that there was water damage to that first floor, didn't it?

A.      **Absolutely.**

(*Id.* at 261:16-262:4 (emphasis added).)

Based on this record, the Ford report cannot qualify under the business records exception to the

hearsay rule.  "The overarching theory for the Rule 803 exceptions is that, under certain circumstances,

a statement, although it is hearsay, may still possess circumstantial guarantees of trustworthiness

33

sufficient to justify its admission as evidence." *Rock*, 922 F.2d at 280. "Whether evidence is admissible under Rule 803(6) is 'chiefly a matter of trustworthiness.'" *Skilling*, 2006 WL 1006622, at *5 (citation omitted). Hearsay documents containing "glaring inaccuracies" or other false statements "indicate a lack of trustworthiness" and are thus inadmissible. *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 560 (5th Cir. 1980), *abrogated on other grounds sub nom. Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438 (11th Cir. 1991); *see also United States v. Spano*, 421 F.3d 599, 603-04 (7th Cir. 2005) (false statements "indicate lack of trustworthiness") (citation omitted). And evidence of Mr. Ford's motivation to "fabricate such statements creates too great a risk of inaccuracy or untrustworthiness to provide the circumstantial guarantees of trustworthiness contemplated by the hearsay exceptions." *Rock*, 922 F.2d at 280. "'[W]hen the record keeper . . . is a principal with a strong motive to falsify the records, the district judge may deem them so unreliable as to be unworthy of consideration by the jury . . . .'" *Spano*, 421 F.3d at 604 (citation omitted); *see also Romano v. Howarth*, 998 F.2d 101, 108 (2d Cir. 1993) (statement should have been excluded as untrustworthy, stating, "there is still a dark cloud hovering over this particular business record").

## VI.   THE RIGSBYS' REVERSE FALSE CLAIM SHOULD BE DISMISSED

The Amended Complaint also contains a claim under 31 U.S.C. § 3729(a)(7) (2006), the "reverse false claims" provision of the FCA. Unlike a direct false claim, which involves an "improper payment to defendant *from* the Government," a reverse false claim involves "no payment *to the* Government when payment is otherwise obligated." *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003). But the McIntosh claim, which constitutes the only claim at issue, cannot constitute both a false claim *and* a reverse false claim. Since the McIntosh claim involved a claim for payment of money *from* the government, it cannot simultaneously constitute "an obligation" by State Farm "to pay . . . money . . . *to* the Government." 31 U.S.C. § 3729(a)(7) (emphasis added).

34

Recognizing that this case does not involve a reverse false claim, the Rigsbys explicitly stated that they "do not oppose the motion[] to dismiss Count IV against State Farm" in their Consolidated Pre-Hearing Response to All Dispositive Motions.  ([264] at 4.)  A concession contained in an "opposition to the motion to dismiss" is treated "as a 'judicial admission'" since it is "a 'deliberate, clear and unequivocal' statement . . . made in the course of judicial proceedings."  *Chow v. Aegis Mortgage Corp.*, 185 F. Supp. 2d 914, 916 (N.D. Ill. 2002) (citations omitted); *see also, e.g.*, *Stallard v. United States*, 12 F.3d 489, 495-96 (5th Cir. 1994).

Similarly, at the May 2009 evidentiary hearing, the Rigsbys in open court not only described what a reverse false claim is, but also freely admitted that the McIntosh claim does ***not*** involve a reverse false claim.  (Ex. D, Hr'g Tr. at 237:20-238:11.)  "A concession or stipulation by counsel in open court is the equivalent of a judicial admission and binds the party making it."  *In re Menell*, 160 B.R. 524, 525 n.3 (Bankr. D.N.J. 1993), *aff'd*, 37 F.3d 113 (3d Cir. 1994).  Yet the claim remains in the Amended Complaint.  It should not.  It should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should grant State Farm's motion for summary judgment and dismiss the Rigsbys' lawsuit in its entirety and with prejudice.

This the 16th day of August, 2010.

Respectfully submitted,

STATE FARM FIRE AND CASUALTY COMPANY

By:    /s/ E. Barney Robinson III (MSB # 09432)
        Robert C. Galloway (MSB # 4388)
        Jeffrey A. Walker (MSB # 6879)
        E. Barney Robinson III (MSB # 09432)
        Benjamin M. Watson (MSB # 100078)
        Amanda B. Barbour (MSB # 99119)
        ITS ATTORNEYS

OF COUNSEL:

BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
Post Office Drawer 4248
Gulfport, MS  39502
(P)(228) 575-3019
(E) bob.galloway@butlersnow.com

BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
200 Renaissance at Colony Park, Suite 1400
1020 Highland Colony Parkway (39157)
Post Office Box 6010
Ridgeland, MS 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) jeff.walker@butlersnow.com
(E) barney.robinson@butlersnow.com
(E) ben.watson@butlersnow.com
(E) amanda.barbour@butlersnow.com

Michael B. Beers (ASB-4992-S80M), PHV
BEERS, ANDERSON, JACKSON, PATTY & FAWAL, P.C.
Post Office Box 1988
Suite 100
250 Commerce Street (36104)
Montgomery, AL  36102
(P) (334) 834-5311
(F) (334) 834-5362
(E) mbeers@beersanderson.com

*PRO HAC VICE*

James R. Robie (CA State Bar # 67303), PHV
ROBIE & MATTHAI
Suite 1500
Biltmore Tower
500 South Grand Avenue
Los Angeles, CA  90071
(P) (213) 706-8000
(F) (213) 706-9913
(E) jrobie@romalaw.com

*PRO HAC VICE*

## CERTIFICATE OF SERVICE

I, E. Barney Robinson III, one of the attorneys for State Farm Fire and Casualty Company, do hereby certify that I have this day caused a true and correct copy of the foregoing instrument to be delivered to the following, via the means directed by the Court's Electronic Filing System:

C. Maison Heidelberg
Ginny Y. Kennedy
MAISON HEIDELBERG P.A.
795 Woodlands Parkway, Suite 220
Ridgeland, MS 39157
(P) (601) 351-3333
(F) (601) 956-2090
(E) maison@heidlebergpa.com

August J. Matteis, Jr.
Craig J. Litherland
Benjamin R. Davidson
GILBERT OSHINSKY LLP
11 New York Avenue, NW
Suite 700
Washington, DC 20005
(E) matteisa@gotofirm.com
(E) litherlandc@gotofirm.com
(E) davidsonb@gotofirm.com

COUNSEL FOR CORI RIGSBY AND KERRI RIGSBY

Jeffrey S. Bucholtz
Joyce R. Branda
Patricia R. Davis
Jay D. Majors
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
(P) (202) 307-0264
(F) (202) 514-0280

Stan Harris
Alfred B. Jernigan, Jr.
Felicia C. Adams
UNITED STATES ATTORNEY'S OFFICE
Southern District of Mississippi
Suite 500
188 East Capitol Street
Jackson, MS 39201
(P) (601) 965-4480
(F) (601) 965-4409

ATTORNEYS FOR THE UNITED STATES

Larry G. Canada
Kathryn Breard Platt
GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
701 Poydras Street
Suite 4040
New Orleans, LA 70139
(P) (504) 525-6802
(F) (504) 525-2456

ATTORNEYS FOR HAAG ENGINEERING CO.

This the 16th day of August, 2010.

/s/ E. Barney Robinson III (MSB # 09432)
E. Barney Robinson III (MSB # 09432)

Jackson 5481052v1

2