**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA ex rel.;
   CORI RIGSBY; AND KERRI RIGSBY     RELATORS/COUNTER-DEFENDANTS

v.                        CASE No. 1:06-cv-433-LTS-RHW

STATE FARM FIRE & CASUALTY
   COMPANY, et al.         DEFENDANTS/COUNTER-PLAINTIFFS

**MEMORANDUM IN SUPPORT OF MOTION TO RECONSIDER SCOPE OF**
**PROCEEDINGS IN LIGHT OF EVIDENCE ADDUCED IN DISCOVERY**

    Cori and Kerri Rigsby ("Relators" or the "Rigsbys"), respectfully submit this

memorandum in support of their Motion to Reconsider Scope of Proceedings in Light of

Evidence Adduced in Discovery.

**I.**    **PRELIMINARY STATEMENT**

      To date, this Court has limited discovery to the McIntosh claim in order to "strike a

balance between the Relators' interest in identifying … other allegedly false claims and the

defendants' interest in preventing a far ranging and expensive discovery process ….".[1]  In its

Order dated August 10, 2009, this Court similarly stated that trial proceedings will be limited to

the issue of whether the McIntosh claim was a false claim.[2]  As stated, the boundaries were

imposed to promote efficiency, balance and equity.[3]

      It is undisputed, however, that the question of whether State Farm engaged in a scheme to

defraud the government is relevant to whether the McIntosh claim is false.  Indeed, if State Farm

---

[1] [343] at 10-11.

[2] *Id.* at 10.

[3] *Id.*

engaged in a scheme to shift wind losses from their homeowners' policies to the government-issued NFIP flood policies, it is far more likely that as a result of this scheme, State Farm intentionally submitted a false claim with respect to the McIntosh property.

As set forth more fully below, Relators, through limited discovery, have already obtained sufficient evidence to demonstrate that State Farm engaged in a broad, systemic, intentional scheme to defraud the government. Moreover, discovery has revealed that State Farm's scheme extends far beyond the McIntosh flood claim.

Discovery thus far has revealed that State Farm intentionally carried out the following scheme:

- *State Farm Instructed Adjusters that Hurricane Katrina was a "Water Storm"*

Discovery confirmed Kerri Rigsby's testimony from the summary judgment hearing that State Farm instructed its adjusters that all significant property damage from Hurricane Katrina was caused by flood waters and not wind. Indeed, the high-ranking State Farm employees who were deposed testified that Hurricane Katrina's winds were not strong enough to destroy homes. Accordingly, State Farm instructed its adjusters to assume that all major damage was caused by flooding and therefore to pay flood limits immediately for all heavily damaged properties.

- *State Farm Forced Engineers to Change the Conclusions of Their Reports*

State Farm pressured engineering companies to change the conclusion of reports that found wind to be the predominate cause of damage. For example, interrogatories and documents produced by Forensic demonstrated that State Farm forced Forensic to change the conclusions in at least 19 engineering reports. In every one of those reports, the conclusion changed from finding wind as the cause of loss to finding flood water as the predominant cause. State Farm

then intentionally removed the original reports, which found wind damage, from its claims files to hide those reports from policyholders and the NFIP.

- *Instructed Adjusters to use Xact Total Instead of Assessing Actual Flood Damage*

In all storms prior to Hurricane Katrina, adjusters were required by the NFIP to prepare a line-by-line "stick built" estimate of the actual flood damage to homes unless those homes had been completely destroyed. After Hurricane Katrina, the NFIP issued expedited claims handling procedures in FEMA Memorandum 5054 that allowed adjusters to omit line-by-line estimates in two very narrow circumstances: (a) for homes that had standing water for an extended period of time; and (b) for homes that were "washed off their foundations" by flood. State Farm ignored FEMA's directive and instructed their adjusters to use Xact Total, a square-foot value estimator, rather than perform a line-by-line estimate on all homes with significant damage (*i.e.*, where the damage "appeared to exceed policy limits"). Juan Guevara, State Farm's primary liaison with the NFIP, testified that State Farm was not required to follow FEMA Memorandum 5054, but rather was provided a special deal that allowed State Farm alone to use Xact Total, rather than a line-by-line estimate, for all homes that suffered damage that "appeared to exceed policy limits." David Maurstad, the head of NFIP at the time, testified that there were no "special deals" for any insurer. Accordingly, State Farm's adjustment of flood claims following Hurricane Katrina did not comply with FEMA's requirements.

- _Covered Up the Fact that State Farm Did Not Prepare Line-by Line Estimates._

Discovery showed that State Farm took affirmative and intentional steps to hide the fact that State Farm adjusters were not performing line-by-line estimates, as required by the NFIP. State Farm created fictitious line-by-line estimates to go alongside their Xact Total estimates in flood files so that NFIP reinspectors and others would believe that homes like the McIntosh property were adjusted using line-by-line estimates rather than a simple square foot estimate. Gerald Waytowich, State Farm's purported expert who also is a fact witness because of his role as an NFIP reinspector for Hurricane Katrina claims, testified that the McIntosh claim was in fact adjusted using a line-by-line estimate.  In other words, he believed that State Farm's fictitious line-by-line estimate in the file was actually a line-by-line estimate of flood damage to the McIntosh property.

Accordingly, by carrying out this scheme to intentionally and systemically overpay flood claims, State Farm put itself in position to deny uniformly all wind claims alleging major damage.

*          *          *

Thus, even with the limited discovery taken by the Relators, there is more than substantial evidence to show that State Farm engaged in a systemic scheme to defraud the government.  Under the current Case Management Order, Relators will present evidence of this scheme in the first trial phase because the scheme clearly is relevant to whether the McIntosh claim is a false claim.  The scheme is what shows the intent behind State Farm's fraudulent payment of the McIntosh claim.

The Relators respectfully suggest that the Court should now re-examine the scope and/or parameters of the proceedings.  A single trial will be far more fair and efficient to the parties

because (1) determination of whether the McIntosh claim was false cannot be dispositive of the Relators' claims; and (2) the second phase trial will include substantially redundant evidence of State Farm's scheme.

First, a trial on the McIntosh claim cannot resolve this entire matter because *the scheme* – not the McIntosh claim – is the threshold issue in this litigation.  The McIntosh claim reveals and illustrates components of the overall scheme, but the scheme and the McIntosh claim are not one and the same.  Rather, the McIntosh claim is just one of many claims resulting from the scheme.  Therefore, as discovery has revealed a scheme extending far beyond McIntosh, trying the McIntosh claim alone cannot resolve this litigation.  For example, while the Relators contend that the McIntosh claim is a false claim and believe they can convince the jury on this point, if the jury decides that more than $250,000 in flood damage existed at the McIntosh home, a verdict still could establish:  (1) a scheme; and (2) an attempt by State Farm submit false claims within the scheme.  Such a verdict would *not* disprove a prevalent scheme that impacted many other claims and resulted in colossal losses imposed on the Government, and therefore this potential verdict would not promote an end to the ultimate questions presented in this litigation.

Second, a second trial would include substantially redundant testimony and documentary evidence.  The Relators would, for the second time, testify and present testimony of the defendants and multiple third party witnesses on the subject of whether State Farm executed a systemic scheme to defraud the government.

Accordingly, the Court should reconsider the scope of the proceedings, allow the parties to take an additional four months of discovery in connection with additional false claims, and allow the parties to try the Relators' claims in a single trial, or grant such alternate relief the Court deems expedient to promote an end to the ultimate questions presented in this litigation.

## II.    THE SCHEME

As described above, discovery revealed that State Farm engaged in a widespread scheme to defraud the government.  This scheme clearly applied to many claims beyond McIntosh.

### A.    State Farm Employees Adjusted Claims As if Wind Caused No Major Damage, Ignoring Conflicting Evidence.

Kerri Rigsby testified at the May 2009 summary judgment hearing that adjustors were instructed that Hurricane Katrina was a "water storm" and that major damage to properties necessarily was caused by flooding.[4]  The deposition testimony of State Farm's high-level employees confirmed Kerri Rigsby's testimony; they all testified that Katrina's winds were not strong enough to destroy homes.  Discovery also revealed, however, that State Farm was wrong.  Katrina's winds did destroy homes, and State Farm ignored or suppressed evidence proving that point.

This Court cited Kerri Rigsby's testimony in its August 10, 2010 Order, as follows: "Kerri Rigsby testified that during this meeting the person giving instructions for adjustors and their supervisors to follow told the audience Hurricane Katrina was a 'water storm' and the adjustors should go out and 'hit the limits' of flood insurance policies."[5]  State Farm employees Dave Randel, Stephan Hinkle, and John Conser directly validated Kerri Rigsby's testimony by confirming that they simply did not believe that Hurricane Katrina's winds were strong enough to cause significant damage to homes.

Dave Randel, who oversaw Lecky King and State Farm's Gulfport office, testified that "the wind damage was not significant.  It was a few blown shingles or some soft metals that were

---

[4] May 20, 2009 Hearing Transcript at 205:22-206:25.

[5] [343] at 4-5.

damaged or something like that."[6]  He also testified that "[t]here was not significant wind damage in coastal areas away from the water that showed that winds significantly damaged the houses to the extent of a total loss, unless there was some extenuating circumstance."[7]  Stephan Hinkle, State Farm's claims consultant who was the ultimate authority for all coverage decisions related to Hurricane Katrina, agreed.[8]  He testified that he would be "confident in making the statement" that, absent extenuating circumstances like a tree falling into a house, "no houses were destroyed by the wind prior to being touched by flood."[9]  He even testified that Hurricane Katrina's winds were probably not strong enough to blow down a live tree: "if you had a dead tree, a huge dead oak tree, for example. . . its conceivable that it could have been blown down."[10]  John Conser, State Farm's team manager who approved the use of Xact Total for the McIntosh claim, also testified that he did not believe wind damage to be significant.  Mr. Conser testified that "flood was such an obvious no brainer that it was very easy to discern the flood losses and take care of 'em."[11]

 The testimony of State Farm's high-level employees and the instructions they gave to adjusters directly contradicted the *actual* experiences of homeowners, such as those in McIntoshes' neighborhood.  For example, Linda Mucha, who lived two houses over from the McIntoshes, testified in her deposition that she witnessed her home being destroyed by wind

---

[6] Excerpt of Deposition of David Randel, dated June 23, 2010 ("Randel Dep.") at 34:25-35:7, attached as **Exhibit A** to Relators' Motion.

[7] *Id.* at 35:21-25.

[8] Excerpt of Deposition of Stephan Hinkle, dated June 23, 2010 ("Hinkle Dep.") at 11:7-8, attached as **Exhibit B** to Relators' Motion.

[9] *Id.* at 99:25 – 101:20.

[10] *Id.* at 101:8-15.

[11] Excerpt of Deposition of John Conser, dated June 17, 2010 ("Conser Dep.") at 92:13-15, attached as **Exhibit C** to Relators' Motion.

before the flood waters arrived.  She testified that when she took shelter in a neighbor's house across the street a little before 9:00 a.m., she saw that—although no flood waters were visible— the roof of her garage had been blown off and reduced to a "pile of trash and wood in the front yard."[12]  She also saw a large oak tree in her yard that had been completely uprooted.[13]  The tree was so big that Dr. Mucha and her husband could not wrap their arms around it, and the tree's roots were more than six feet tall.[14]  All of this occurred before any observable storm surge.[15]  At 10:30 a.m., Dr. Mucha looked at her house and saw that it was "completely gone."[16]  By that point, water had reached her front yard and the street, but the water was not deep and had not yet entered the home where Dr. Mucha was staying.[17]

Mike Church, another McIntosh neighbor, attested that he took his family upstairs between 8:45 a.m. and 9:00 a.m. to escape wind-driven debris after Hurricane Katrina's winds drove his deck into the French doors and back windows of his house.[18]  He also testified that he himself went upstairs after what appeared to be a large tree was blown into the first floor of his home.[19]  Remarkably, Mike Church was mentioned as an eyewitness in Brian Ford's engineering report of the McIntosh house, yet neither Lecky King nor anyone else at State Farm attempted to contact Mr. Church before forcing Forensic to draft a second report with a different conclusion.[20]

---

[12] Excerpt of Deposition of Linda Mucha, dated May 4, 2010 ("Mucha Dep.") at 15:10-19-21, attached as **Exhibit D** to Relators' Motion.

[13] *Id.* at 19:9-21.

[14] *Id.*

[15] *Id.*

[16] *Id.* at  27:1-29:5.

[17] *Id.*

[18] May 14, 2009 Affidavit of Mike Church, Exhibit P30 to May 20, 2009 Hearing, at 2.

[19] *Id.*

[20] *See* October 12, 2005 Engineering Report of Brian Ford, Exhibit P-1 to May 20, 2009 Evidentiary Hearing.

State Farm's decision to ignore Mr. Church's testimony demonstrates one of the ways in which it also engaged in a widespread and intentional scheme to force engineers to change any and all reports that conflicted with State Farm's instructions that wind did not cause major damage to properties.

### B.   State Farm Conspired to Change Engineers' Conclusions of Wind Damage in Numerous Reports, Not Just the McIntosh Report.

#### 1.   Dual and Differing McPeak Reports Were Produced.

Early in discovery, State Farm refused to produce claims files from any properties other than the McIntoshes'.  This Court then compelled State Farm to produce information from claims files located within half a mile of the McIntosh home, noting that such information has been "routinely" produced.[21]

On March 12, 2010, pursuant to the Court's Order, State Farm produced the claims file of Owen and Shirley McPeak, who lived several doors down from the McIntoshes.  The engineering reports used to adjust the McPeak claim were strikingly similar to the reports used to adjust the McIntosh claim.  Specifically, Brian Ford examined the home on October 7, 2005, and on October 11, 2005, Forensic issued a report that stated unequivocally that the home had been damaged by the wind.[22]  The October 11, 2005 report contained no mention of water damage and was signed by Ford, with Robert Kochan, President and Chief Executive Officer of Forensic, as a peer reviewer.[23]  Like Brian Ford's report for the McIntosh home, this report was not kept in State Farm's claims file.

---

[21] [413] at 2-3.

[22] October 11, 2005 Engineering Report of Brian Ford.  Forensic Prod. 5-27-10 12357-12359.  Attached as **Exhibit E** to Relators' Motion.

[23] *Id.*

Instead, State Farm's claims file contains a different report created after the October 11 report.[24] The second report was authored by Kochan himself and peer-reviewed by Jack Kelly.[25] This report concluded that the McPeak home was destroyed by flood water, and it did not mention wind damage.[26]

### 2.   Relators are Aware of at Least Nineteen (19) Changed Reports.

McIntosh and McPeak are not isolated examples of State Farm's coercing, intimidating, and ultimately conspiring with Forensic to change and hide reports. On January 11, 2010, Forensic responded to Relators' interrogatory that asked Forensic to identify each engineering report that was "reviewed, updated, changed, or altered in anyway after such report was provided by State Farm."[27] Out of the approximately 120 engineering reports Forensic had provided to State Farm, Forensic's answer included a list of nineteen engineering reports that Forensic altered after first providing the report to State Farm.[28] All of these changed reports initially found that wind caused substantial damage, and then were changed to conclude that flood was the predominate cause.

In his June 30, 2010 deposition, Robert Kochan confirmed that Forensic's discovery responses were accurate and that Forensic had changed its engineering reports at State Farm's request.[29] When asked whether anyone from State Farm ever questioned an engineering report

---

[24] Excerpt of Deposition of Robert Kochan, dated June 30, 2010 ("Kochan Dep.") at 148:11-149:12, attached as **Exhibit F** to Relators' Motion.

[25] *Id.*

[26] *Id.* at 153:23-154:7.  Kochan reached these conclusions in the face of Brian Ford's  handwritten notes in the Forensic file that neighbors witnessed a home on the street "explode[]" at 8:00 a.m., which was well before the water reached the home.

[27] *Id.* at 199:21–200:16.

[28] GBEO Forensic 000138, attached as **Exhibit G** to Relators' Motion.

[29] Ex. F. Kochan Dep. at 199:21-200:16.

that found flood damage to be the predominant cause of damage to a home, Kochan testified that

he "can't recall one" instance of that happening.[30]

### 3. State Farm Intentionally Concealed the Fact That It Changed Reports.

Discovery has further revealed that State Farm's conspiracy to change reports was

deliberate and deliberately secret.  Robert Kochan testified that when he met in person with

Lecky King in October 2005, about the engineering reports Forensic had written, Lecky King

"gave me back the first two reports . . . and said effectively redo these."[31]  Kochan also testified

that "on repeated occasions" Forensic would "swap out" its revised report for the initial report.[32]

When asked whether State Farm was complicit in Forensic's decision to "swap out" reports, Mr.

Kochan responded, "I would take it one step further that they suggested it."[33]

Numerous e-mails produced in the Forensic production confirmed extensive report "swap

outs."  One such e-mail in the Forensic files indicated that David Haddock told Jack Kelly that

"the report he is holding has not been seen outside of SF" and that Haddock "is mailing that

original back [to Kelly]" so that "the new report will replace it."[34]  In a separate e-mail on a

separate case, Kelly stated that State Farm wanted a new report "finalized so that no draft will

exist which they see as being beneficial to both SF and FAEC in this particular case."[35]

---

[30] *Id.* at 216:16-23.

[31] *Id.* at 113:19-114:2.

[32] *Id.* at 192:14-23.

[33]  *Id.* at 193:6-25.  Kochan explained that it was far more work for Forensic to issue a completely new report than it was to simply add any supplemental information or data to the original report, but at State Farm's suggestion, Forensic agreed to swap out reports.

[34]  February 1, 2006 email from John Kelly to Robert Kochan, Forensic 5-27-10 000946, attached as **Exhibit H** to Relators' Motion.

[35]  January 24, 2006 email from Jack Kelly to Randy Downs, Forensic 5-27-10 003002, attached as **Exhibit I** to Relators' Motion.

Lisa Wachter, a State Farm adjuster, began reviewing engineering reports in place of Lecky King at some point in November.[36]  Wachter was quite candid in how she reviewed engineering reports.  She testified that she asked engineering firms to change their reports if, for example, the findings were not "consistent with the conclusion."[37]  She further testified that if she asked an engineering firm to change its report, she might also ask the firm to issue an addendum, but "if the engineering firm indicated. . . it would be easier for them just to make the clarification and reprint the report, then the original report, at their request may have been mailed back to the engineering company."[38]

In contrast to these practices, State Farm's employees who were above Lecky King conceded that all engineering reports should remain in the file once they are made.  For example, Dave Randel testified that any interactions with engineers should be contained in the claims file, and he would expect policyholders to be provided with copies of all engineering reports.[39] Stephan Hinkle similarly testified that both reports should "absolutely" be included in the claims file, and that it was a "requirement" for State Farm to share the reports with the policyholders because "we have nothing to hide."[40]  Terry Blalock, testifying as State Farm's 30(b)(6) witness, confirmed that under State Farm's procedures, "if a document is created through – in the process

---

[36] Excerpt of Deposition of Lisa Wachter, dated June 17, 2010 ("Wachter Dep.") at 44:10-19 attached **Exhibit J** to Relators' Motion.

[37] *Id.* at 43:17-44:5.

[38] *Id.* at 46:20-47:5.

[39] Ex. A, Randel Dep. at 72:18 – 73:4; 80:4-80:11.

[40] Ex. B, Hinkle Dep. at 83:8-20, 84:20-85:22.

and handling of a claim, it should be maintained in the claims file."[41]  Also, "if something was

taken from the [claims] file, then that would be a breach of the records management program."[42]

     Thus, even though Relators have been limited in the discovery they have been permitted

to take thus far, the overwhelming evidence indicates that State Farm pressured engineers to

change their reports and then took active steps to conceal these actions in violation of its own

corporate policies.  These intentional actions were not limited to the McIntosh claim, but rather

were part of State Farm's systemic scheme.

    C.    **State Farm Encouraged Its Adjusters to Ignore NFIP Requirements by Allowing Them to Use Xact Total, Rather Than Requiring a Line-by-Line Estimate to Calculate Actual Flood Damage for Homes Like the McIntoshes'.**

     The NFIP Claims Manual requires that "repair estimates should be prepared room-by-

room, on a unit-cost basis, clearly indicating dimensions and unit costs, except when the building

has been *completely destroyed*."[43]  NFIP Director David Maurstad testified that prior to

Hurricane Katrina, flood claims had to be adjusted using a line-by-line stick build estimate.[44]

Maurstad also testified that following Hurricane Katrina, he tasked the NFIP Director of claims

to come up with a method that "I could ultimately approve that could guide the Write Your own

Companies to handle claims in an expedited process specific to this . . . disaster, to Katrina."[45]

Maurstad testified that FEMA Directive W-5054 embodied the only expedited claims procedures

that he authorized.[46]   That directive allowed adjusters to use a square foot value estimator

---

[41]  Excerpt of Deposition of Terry Blalock testifying as State Farm's 30(b)(6) witness, dated July 9, 2010 ("Blalock Dep.") at 10:25 – 11:6, attached as **Exhibit K** to Relators' Motion.

[42] *Id.* at 24:7-20.

[43] May 20, 2009 Hearing Transcript at 156:2-7.

[44] Excerpt of Deposition of David Maurstad, dated June 2, 2010 ("Maurstad Dep.") at 225:11-21, attached as **Exhibit L** to Relators' Motion.

[45] *Id.* at 62:15-25.

[46] *Id.* at 108:15-109:21.

instead of a line-by line estimate in two very narrow circumstances:  (1) when a home "had standing water in it for an extended period of time"; or (2) when a home was "washed off its foundation by flood water."[47]

Discovery revealed that State Farm ignored the NFIP and Memorandum W-5054. Rather than follow the NFIP's rules, State Farm expressly applied their own rules, which directly conflicted with Memorandum W-5054.  David Maurstad testified that that in developing W-5054, he solicited ideas from various insurance companies for FEMA to consider.[48]  As part of that process, State Farm submitted a proposal to the NFIP on September 13, 2005, just one week before David Maurstad issued the actual directive.[49]  Remarkably, Juan Guevara, State Farm's principle contact with the NFIP, testified that unlike all the other insurers, State Farm did not have to follow Memorandum 5054, but rather could play by its own rules, as stated in State Farm's September 13th proposal.[50]  Specifically, Guevara asserted that "5054 is different than the document we received approval to use," and in fact, that State Farm's claims handling practices did not change as a result of W-5054 being issued because it continued to adjust claims based on the September 13th proposal.[51]

Guevara's admission is an enormous and dispositive indictment because there is a very important difference between State Farm's September 13 proposal and the actual directive that was issued by FEMA.  Under the September 13 proposal, State Farm sought permission to use Xact Total "where a site visit was completed and [the damage] appeared to exceed policy

---

[47] FEMA Directive W-5054, Exhibit P-6 to May 20, 2009 Hearing ("W-5054), at 1.

[48] Ex. L, Maurstad Dep. at 91:16- 92:5.

[49] Excerpt of Deposition of Juan Guevara, dated April 14, 2010 ("Guevara Dep.") at 67:13-68:18, attached as **Exhibit M** to Relators' Motion.

[50] *Id.* at 83:15-84:3.

[51] *Id.* at 69:16-70:2, 94:17-22.

limits."[52]  But that part of State Farm's proposal *was not adopted* in Maurstad's final Memorandum.  Rather, under FEMA Directive W-5054, Xact Total could be used only if the home had been in standing water for at least five days, or if the home had been washed off its foundations.[53]

In addition to his testimony, Juan Guevara's emails reveal State Farm's intent to ignore FEMA Directive W-5054.   On September 22, 2005, the day after W-5054 was issued, Juan Guevara emailed Jim Shortley because he wondered why State Farm's proposal regarding the use of Xact Total for policy limit losses was rejected.[54]  Mr. Guevara quoted the language in W-5054 requiring all claims (other than those related to slabs or homes in standing water) to be adjusted using the company's "normal claims handling procedures," and he stated, "I read this as having to write a complete line by line estimate even if the repairs will exceed the policy limits."[55]  Guevara is absolutely correct about what W-5054 means.  Nonetheless, he and State Farm chose to ignore W-5054 and deliberately adjust claims based on a proposal that FEMA did not accept.[56]

On September 29, 2005, a week later, Juan Guevara emailed Jim Shortley *a second time* asking if he had an opportunity to review the question.[57]  Jim Shortley did not respond to Guevara's email.  David Maurstad testified that W-5054 contains all of the expedited flood

---

[52] *Id.* at 85:11-20.

[53] W-5054 at 1.

[54] September 27, 2005 email from Juan Guevara to Jim Shortley, USARIGSBY00015870-71, attached as **Exhibit N** to Relators' Motion.

[55] *Id.* at USARIGSBY00015871.  Guevara's email makes clear that State Farm's principle contact with the NFIP understood that under State Farm's "normal claims handling procedures," a "complete line by line estimate" would have been required for the McIntosh claim.

[56] Ex. M, Guevara Dep. at 94:13-22.

[57] *Id.* at USARIGSBY00015870.

claims handling procedures.  And contrary to Guevara's testimony, Maurstad further said there were "absolutely not" any side agreements with particular insurance companies.[58]  Maurstad also testified that no one below him, including Jim Shortley, had the authority to issue any procedures that contradicted W-5054.[59]

Thus, the discovery process has revealed that State Farm knew that using Xact Total rather than a line-by-line estimate for homes like the McIntosh's (and all others not in standing water or washed off their foundations) directly violated FEMA Directive W-5054.  Nonetheless, State Farm decided to apply its own version of NFIP's rules across the board.  As set forth below, State Farm took the additional step of covering up this activity.

### D.   State Farm Tried to Hide from the NFIP and Others That It Failed to Perform Line-by-Line Estimates.

It is undisputed that the McIntosh flood file does not contain a line-by-line, stick built estimate of flood damage to the McIntosh property.[60]  Rather, it contains an Xact Total estimate of the value of the McIntosh home based on a square foot estimate of the house.  It also contains a print-out that appears to be a line-by-line estimate of a house of similar square footage that is *not* the McIntosh home.  In the summary judgment hearing, Michael Ferrier testified that this fictitious line-by-line estimate was simply a reformatted version of the Xact Total estimate that was "easier to follow."[61]

---

[58] Ex. L, Maurstad Dep. at 184:7-10.

[59] *Id.* at 182:2-7.

[60] *See* Testimony of Michael Ferrier, May 20, 2009 Hearing Transcript at 116:2-6.  Kerri Rigsby also testified that the line by line estimate in McIntosh's file was a "fictitious estimate" generated by Xact Total that did not reflect the McIntosh home.  Testimony of Kerri Rigsby, May 21, 2009 Hearing Transcript at 209:1-2.  As Rigsby explained, the Xact Total report "says it's a five-bedroom house with a garage.  Mr. McIntosh does not have a five-bedroom house.  He has a four-bedroom house, and he didn't have a garage; he had a carport. . . . It does not represent what the house is. . . It does not represent the damage."  *Id.* at 209:10-15.

[61] *Id.* at 122: 6-10;  83:24-85:7.

While State Farm was never able to explain the purpose of the fictitious estimate, its purpose became quite clear during the deposition testimony of Gerald Waytowich, State Farm's purported expert witness who also is a fact witness due to his role of being an NFIP reinspector for Hurricane Katrina claims.  State Farm offered Waytowich as an expert to testify, in part, regarding whether State Farm's handling of the McIntosh claim was in compliance with FEMA regulations.[62]  Waytowich testified that State Farm asked him to review the McIntosh flood file as if he were reinspecting it for FEMA.[63]  During his deposition, Waytowich testified that as part of the reinspection process, NFIP employees looked for line-by-line estimates in the flood files and then compared each item in the estimate with the photographs of the home to ensure that the itemized payments were proper.[64]

Remarkably, Waytowich, an actual FEMA reinspector, identified the fictitious estimate in the McIntosh flood file as real "line-by-line written estimate" of McIntosh's home.[65] Waytowich further concluded that in comparing the line-by-line estimate to the photographs of the damage, he was satisfied that "everything that's in here. .. was estimated and everything is correct in here."[66]  Thus, even after spending forty to fifty hours reviewing the McIntosh file, Waytowich still believed that the fake estimate with the Xact Total print out was a true assessment of flood damage that occurred to the McIntosh home.[67]   When asked if he were to later find out that the line-by-line estimate he had reviewed was not in fact a representation of the

---

[62]  [415] at 2.

[63]  Excerpt of Deposition of Gerald Waytowich, dated June 4, 2010 at 45:6-22, attached as **Exhibit O** to Relators' Motion.

[64]  *Id.* at 63:10-19.

[65]  *Id.* at 59:9-12.

[66]  *Id.* at 69:7-15.

[67]  *Id.* at 84:18-19.

McIntosh house, Waytowich agreed that he would be surprised, and he would question whether the McIntosh claim was adjusted correctly.[68]

Thus, despite State Farm's repeated assertions that the NFIP approved its procedures, it is now clear that State Farm intentionally and fraudulently hid the truth. There is no question that Waytowich and other NFIP reinspectors believed at the time of their reviews that State Farm's false line-by-line estimates were real. Accordingly, the NFIP would have had no reason to question the appropriateness of the adjustment of claims like the McIntosh home, which was not eligible for the expedited procedures of FEMA Memorandum 5054. Indeed, the NFIP believed that State Farm applied normal procedures (*i.e.*, line-by-line estimates) to the McIntosh property and all other claims that did not involve slabs or homes in standing water.

As set forth below, the Relators now respectfully request that the Court allow them to seek further discovery to determine the scope and extent of this remarkable scheme.

**III.    The Court  Should Allow Relators to Take Discovery into the Scope and Extent of State Farm's Scheme to Submit False Claims and try Defendants' Liability under the False Claims Act in a Single Proceeding.**

The Court's August 10, 2009 Order explained that although the McIntosh claim is "the only instance of State Farm having submitted an allegedly false claim of which the Relator Kerri Rigsby has first hand knowledge. . . the Relators' complaint alleges McIntosh was just one among many similar false claims…"[69] The Court initially decided to limit proceedings to the McIntosh claim in order to "protect the interests of both parties" and "strike a balance between the Relators' interest in identifying these other allegedly false claims and the defendants' interest

---

[68] *Id.* at 69:16-70:4.

[69] [343] at 10.

in preventing a far ranging and expensive discovery process that relates only to claims that are not, for now, specifically identified."[70]

The Relators acknowledge this Court's discretion to determine how the trial in this case should proceed, but Relators contend that the evidence adduced in discovery justifies a revisiting of the parameters of this case at this time.  First, whatever interests State Farm may have had in preventing a far-ranging discovery process should now be considered in light of the evidence of State Farm's fraudulent scheme and the overwhelming likelihood that the McIntosh claim is not unique.  Second, given this evidence, there are no efficiencies to be gained by limiting trial initially to the McIntosh claim.

> **A.     Whatever Interest State Farm May Have Had in Avoiding Discovery is Outweighed by the Undeniable Evidence of its Scheme to Defraud the Government.**

The validity of State Farm's interest in avoiding an  expensive discovery process has to be assessed against the likelihood that the discovery process will reveal further details of the scope of its scheme to defraud the federal government.  In *U.S. ex rel. Grubbs*, the Fifth Circuit recognized that in the False Claims Act Rule 9(b) and the active oversight of district court judges play an important role in "prevent[in] nuisance suits and the filing of baseless claims as a pretext to gain access to a 'fishing expedition.'"[71]  Relators have demonstrated that the allegations in this case cannot seriously be equated with a nuisance suit.  Permitting Relators to take discovery into State Farm's scheme including, for example, other instances where it pressured engineers to change conclusions in their reports would not amount to a fishing expedition because Relators have provided ample evidence of State Farm's scheme to defraud the federal government.

---

[70] *Id.*

[71] *U.S. ex rel. Grubbs v. Kananganti*, 565 F.3d 180, 191 (5th Cir. 2009).

**B.    There are No Efficiencies to Be Gained by
Limiting Trial Initially to the McIntosh Claim.**

Under Federal Rule of Civil Procedure 42(b), "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, cross claims, or counterclaims."  Decisions under Rule 42 are "within the sole discretion of the trial court."[72]   In *Conkling*, the Fifth Circuit affirmed a trial court's decision to limit the initial phase of a RICO trial to one particular agreement, because the agreement served as the "lowest common denominator" in that  all of the RICO allegations depended upon finding fraud in one particular agreement.[73]  Similar facts are not present in this case

In *U.S. ex rel. Grubbs*, the Fifth Circuit reversed a district court's dismissal of a False Claims Act complaint and held that "if [a complaint] cannot allege the details of an actually submitted false claim, [it] may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."[74]  The Fifth Circuit based its holding on the fact that it did not want to adopt a pleading standard that would require a complaint to allege more facts than a relator would be required to prove at trial.[75]  The court then explained that, if at trial, a relator proves the existence of a scheme to submit false claims, a reasonable jury could conclude that false claims had been submitted to the government even if the relator was unable to identify specific false claims.[76]

Even though Relators have not been permitted to take broad discovery into the scope of State Farm's scheme, there is ample evidence showing that the McIntosh claim is just one

---

[72] *Conkling v. Turner*, 18 F.3d 1285, 1293 (5th Cir. 1994) (citation omitted).

[73] *Id.* at 1294.

[74] 565 F.3d at 190.

[75] *Id.* at 189.

[76] *Id.* at 189-90.

instance of State Farm's broader fraud on the federal government.[77]  If at the close of trial, a jury were to conclude that the McIntosh claim was not false, for example because the home sustained more than $250,000 of flood damage, the larger questions of State Farm's liability under the False Claims Act would not have be answered, and further legal proceedings would be needed.

Moreover, much of the testimony in a later proceeding on State Farm's fraudulent scheme would necessarily be duplicative of evidence introduced in a trial limited to the McIntosh claim.  In False Claims Act cases, "direct evidence of a person's intent to deceive is rarely, if ever, available" and more often "the jury may infer intent to defraud from all the facts and circumstances surrounding the transaction in question."[78]  In proving that the McIntosh claim was false, Relators will introduce evidence of State Farm's broader claims-handling practices in Hurricane Katrina, including its interactions with FEMA, its account of the weather conditions, and its role in pressuring engineers.  This same evidence would be included in a later trial on the scope of State Farm's scheme.

## IV.    CONCLUSION

For all the foregoing reasons, the Court should permit Relators to take discovery regarding the scope of State Farm's scheme to submit false claims and try the Defendants' liability under the False Claims Act in a single trial, or grant such alternate relief the Court deems expedient to promote an end to the ultimate questions presented in this litigation.

---

[77] The Court also stated that it was "by no means certain" the original source bar is applicable to this case because "the public disclosures are based upon the Relators' allegations and not the other way around." [343] at 2.  To the extent the Court finds, or has found, that this action is not based upon a public disclosure, then under 31 U.S.C. § 3730(e)(4), Relators would not be required to qualify as "original sources," and the McIntosh claim would be legally indistinguishable from the other instances of State Farm's scheme.  *Cf Rockwell Int'l Corp. v. United States*, 548 U.S. 457 (2007) (discussing the legal implications of a Relator not qualifying as an original source).

[78]  *U.S. ex rel. Longhi v. Lithium Power Tech. Inc.*, 513 F. Supp. 2d 866, 878 (S.D. Tex.), *aff'd* 573 F.3d 458 (5th Cir. 2009) (citation omitted).

Respectfully submitted this the 16th day of August, 2010.

      /s/ C. Maison Heidelberg

| | |
|---|---|
| August J. Matteis, Jr. (admitted *pro hac vice*) | C. MAISON HEIDELBERG, MB #9559 |
| matteisa@gotofirm.com | mheidelberg@heidelbergharmon.com |
| Craig J. Litherland (admitted *pro hac vice*) | GINNY Y. KENNEDY, MB #102199 |
| litherlandc@gotofirm.com | gkennedy@heidelbergharmon.com |
| Benjamin Davidson (admitted *pro hac vice*) | OF COUNSEL: |
| davidsonb@gotofirm.com | HEIDELBERG HARMON PLLC. |
| Derek Y. Sugimura (admitted *pro hac vice*) | 795 Woodlands Parkway, Suite 220 |
| sugimurad@gotofirm.com | Ridgeland, Mississippi  39157 |
| GILBERT LLP | Phone No.      (601) 351-3333 |
| 1100 New York Avenue NW, Suite 700 | Fax No.        (601) 956-2090 |
| Washington, DC 20005 | |
| Phone No.      (202) 772-2200 | |
| Fax No.        (202) 772-3333 | |

Attorneys for Kerri Rigsby and Cori Rigsby

## <u>CERTIFICATE OF SERVICE</u>

I, C. Maison Heidelberg, attorney for Cori Rigsby and Kerri Rigsby, do hereby certify that I have this **<u>16th day of August, 2010</u>** caused the foregoing document to be filed with the Court's CM/ECF system, which will cause notice to be delivered to all counsel of record.

Don Burkhalter, Esq.
UNITED STATES ATTORNEY
  FOR MISSISSIPPI
188 East Capitol Street, Suite 500
Jackson, MS 39201

Felicia Adams, Esq.
ASSISTANT U.S. ATTORNEY
188 East Capitol Street, Suite 500
Jackson, MS 39201

Joyce R. Branda, Esq.
Patricia R. Davis, Esq.
Jay D. Majors, Esq.
UNITED STATES DEPARTMENT OF JUSTICE
Commercial Litigation Branch
Civil Division
601 D Street, NW
Washington, DC 20004

Larry G. Canada, Esq.
Kathryn Breard Platt, Esq.
Galloway, Johnson, Tompkins, Burr & Smith
701 Poydras Street, Suite 4040
New Orleans, LA 70139
(p) 504-525-6802
ATTORNEYS FOR HAAG ENGINEERING CO.

Robert C. Galloway, Esq.
Emerson Barney Robinson, III, Esq.
Benjamin M. Watson, Esq.
Jeffrey A. Walker, Esq.
Amanda B. Barbour, Esq.
BUTLER, SNOW, O'MARA,
    STEVENS & CANNADA, PLLC
P.O. Box 22567
Jackson, MS 39225
(p) 601-948-5711

Michael B. Beers, Esq.

BEERS, ANDERSON, JACKSON
  PATTY & FALWAL, PC
250 Commerce Street, Suite 100
Montgomery, AL 36104
(p) 334-834-5311
ATTORNEYS FOR STATE FARM MUTUAL
INSURANCE COMPANY

Robert D. Gholson
GHOLSON BURSON ENTREKIN & ORR, P.A.
55 North 5th Avenue
P.O. Box 1289
Laurel, MS 39441-1289
ATTORNEYS FOR FORENSIC ANALYSIS
ENGINEERING CORPORATION


/s/    C. Maison Heidelberg