IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA ex rel.
CORI RIGSBY and KERRI RIGSBY             RELATORS/COUNTER-DEFENDANTS

v.                                       CASE NO. 1:06cv433-LTS-RHW

STATE FARM FIRE AND CASUALTY COMPANY     DEFENDANT/COUNTER-PLAINTIFF

and

FORENSIC ANALYSIS & ENGINEERING CORPORATION;
HAAG ENGINEERING CO.; and ALEXIS KING                        DEFENDANTS

### STATE FARM'S RESPONSE MEMORANDUM IN OPPOSITION TO RELATORS' [738] MOTION FOR RECONSIDERATION

Robert C. Galloway (MSB # 4388)
Jeffrey A. Walker (MSB # 6879)
E. Barney Robinson III (MSB # 09432)
Benjamin M. Watson (MSB # 100078)
Amanda B. Barbour (MSB # 99119)

BUTLER, SNOW, O'MARA, STEVENS &
CANNADA, PLLC
Post Office Drawer 4248
Gulfport, MS 39502
(P) (228) 575-3019
(E) bob.galloway@butlersnow.com

BUTLER, SNOW, O'MARA, STEVENS &
CANNADA, PLLC
200 Renaissance at Colony Park, Suite 1400
1020 Highland Colony Parkway (39157)
Post Office Box 6010
Ridgeland, MS 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) jeff.walker@butlersnow.com
(E) barney.robinson@butlersnow.com
(E) ben.watson@butlersnow.com
(E) amanda.barbour@butlersnow.com

Michael B. Beers (ASB-4992-S80M), PHV
BEERS, ANDERSON, JACKSON, PATTY &
FAWAL, P.C.
Post Office Box 1988
250 Commerce Street, Suite 100 (36104)
Montgomery, AL  36102
(P) (334) 834-5311
(F) (334) 834-5362
(E) mbeers@beersanderson.com

*PRO HAC VICE*

James R. Robie (CA State Bar # 67303), PHV
ROBIE & MATTHAI
Biltmore Tower, Suite 1500
500 South Grand Avenue
Los Angeles, CA  90071
(P) (213) 706-8000
(F) (213) 706-9913
(E) jrobie@romalaw.com

*PRO HAC VICE*

## **TABLE OF CONTENTS**

**Page**

Table of Authorities ................................................................................................ ii

I.      Preliminary Statement ................................................................................1

II.     The Rigsbys Have Waived Any Challenge to the August 10, 2009 Order.....................4

III.    The Rigsbys' Motion for Reconsideration Is Premised on Legal Error ...........................5

      A.      The Court Correctly Determined That This Case Must Be Dismissed if the McIntosh Claim Is Not a False Claim................................................................5

      B.      The Court's Case Management Order Is Consistent with *Grubbs* .....................7

      C.      The Court's Case Management Order Is Consistent with *Branch*....................10

      D.      Restarting Discovery Does Not Promote Judicial Economy ............................12

IV.     The Record Expressly Contradicts the Rigsbys' "Scheme" Theory................................13

      A.      The FEMA Witness Testimony Establishes Conclusively That the McIntosh Flood Claim Was Properly Adjusted ...........................................14

      B.      The Rigsbys' Attempt to Cobble Together a Scheme from the Nineteen Peer-Reviewed Engineering Reports Is Belied by the Record....................................17

            1.      State Farm Did Not "Force" Forensic to Change Its Engineering Reports ..........18

            2.      The Nineteen Reports Do Not Establish a "Fraudulent Scheme".........................21

            3.      The McPeek Reports Further Demonstrate That the Rigsbys' "Scheme" Allegations Are Meritless .............................................................23

      C.      The Rigsbys Attempt to Create a False Conflict between the Testimony of State Farm's Employees and the McIntosh Neighbors................................................26

      D.      XactTotal Valuations Do Not Support the Rigsbys' "Scheme" ........................29

V.      Conclusion ..............................................................................................31

# <u>TABLE OF AUTHORITIES</u>

Page

*Gagne v. State Farm Fire & Casualty Co.*, No. 1:06-cv-711-LTS-RHW, 2008 WL 7959086 (S.D. Miss. Dec. 12, 2008) ............................................................... 23

*Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169 (5th Cir. 1994) .............................. 9

*Rockwell International Corp. v. United States*, 549 U.S. 457 (2007) ...................... 2, 7

*SingleEntry.com, Inc., v. St. Paul Fire & Marine Insurance Co.*, 117 F. App'x 933 (5th Cir. 2004) .................................................................................................. 17

*United States v. Prabhu*, 442 F. Supp. 2d 1008 (D. Nev. 2006) ............................... 17

*United States ex rel. Aflatooni v. Kitsap Physicians Service*, 314 F.3d 995 (9th Cir. 2002) ...................................................................................................... 1, 5, 6

*United States ex rel. Branch Consultants, L.L.C. v. Allstate Insurance Co.*, 668 F. Supp. 2d 780 (E.D. La. 2009) ("*Branch I*") .............................................. 2, 10, 11

*United States ex rel. Branch Consultants, L.L.C. v. Allstate Insurance Co.*, 2:06-cv-04091-SSV-SS (E.D. La. Aug. 13, 2010) ("*Branch II*") ........................... 2, 3, 11

*United States ex rel. Crews v. NCS Healthcare of Illinois, Inc.*, 460 F.3d 853 (7th Cir. 2006) ............................................................................................................ 7

*United States ex rel. Farmer v. City of Houston*, 523 F.3d 333 (5th Cir. 2008), *cert. denied*, 129 S. Ct. 570 (U.S. 2008) ................................................................. 14

*United States ex rel. Fried v. West Independent School District*, 527 F.3d 439 (5th Cir. 2008) .......................................................................................................... 11

*United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009) .............. 2, 7-9, 12

*United States ex rel. Gudur v. Deloitte Consulting LLP*, 512 F. Supp. 2d 920 (S.D. Tex. 2007), *aff'd sub nom. United States ex rel. Gudur v. Deloitte & Touche*, No. 07-20414, 2008 WL 3244000 (5th Cir. Aug. 7, 2008) ........................................ 6

*United States ex rel. Hebert v. Dizney*, 295 F. App'x 717 (5th Cir. 2008) ................. 1

*United States ex rel. Owens v. First Kuwaiti General Trading & Contracting Co.*, 612 F.3d 724 (4th Cir. 2010) .............................................................................. 14

*United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432 (3d Cir. 2004) ............. 7

*United States ex rel. Stebner v. Stewart & Stevenson Services, Inc.*, 305 F. Supp. 2d
694 (S.D. Tex. 2004), *aff'd*, 144 F. App'x 389 (5th Cir. 2005) .......................................................5, 6

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765
(2000) ...............................................................................................................................................17

## I.   PRELIMINARY STATEMENT

After over a year of proceeding through protracted discovery and motion practice without ever voicing a single objection to the Court's August 10, **2009** Order ([343] & [344]), the Rigsbys now want the Court to "reconsider" its decision to limit the trial in this action to the McIntosh claim in the first instance.  According to the Rigsbys, the Court's ruling was reached in error because the "determination of whether the McIntosh claim was false cannot be dispositive of the Relators' claims."  ([740] at 5.) The Rigsbys further contend that, even if a "jury decides that more than $250,000 in flood damage existed at the McIntosh home," and thus finds in State Farm's favor, they should still be allowed to continue litigating this case because they have also pled a fraudulent "scheme."  (*Id.*)  The Rigsbys are mistaken.  As this Court has expressly held, whether the McIntosh claim was false is a dispositive threshold issue.  This is so because "[t]he McIntosh claim is the only instance of State Farm's having submitted an allegedly false claim of which the Relator Kerri Rigsby has first hand knowledge, i.e., direct and independent knowledge sufficient to support the Court's subject matter jurisdiction."  ([343] at 10.)  Thus, if "the McIntosh flood insurance payments were justified" based on the amount of flood damage to the McIntosh property, the case must be dismissed because there is simply no false claim that could serve as a basis for either liability or jurisdiction.  ([261] at 3; *accord* [343] at 3, *id.* at 10 ("[T]he Amended Complaint identif[ies] only one specific instance of misconduct:  the McIntosh claim.").)

This Court's holding on this point is unassailable.  As the Fifth Circuit observed, "'[i]t seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim.'"  *United States ex rel. Hebert v. Dizney*, 295 F. App'x 717, 722 (5th Cir. 2008) (quoting *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 997 (9th Cir. 2002)).  "The False Claims Act, then, focuses on the submission of a claim, **and does not concern itself with whether or to what extent there exists a menacing underlying scheme**." *Aflatooni*, 314 F.3d at 1002 (emphasis added).

1

The propriety of the McIntosh claim takes on heightened significance in this case because it is jurisdictional. As the United States Supreme Court made clear, courts are required to assess their jurisdiction at each successive phase of an FCA case. Thus, a demonstration at the summary judgment stage or at trial "that the original allegations were false will defeat jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007).

Having correctly concluded that the propriety of the McIntosh flood insurance payment was a threshold issue, the Court's August 10, 2009 Order put in place a process that is virtually identical to the one that was approved by the Fifth Circuit in *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009). *Grubbs* instructs the district court to tailor discovery in *qui tam* cases to address dispositive threshold issues first, "with a summary judgment following on the heels of the complaint," *id.* at 191, which is precisely what this Court did.

Nothing in the recent discovery order by the Eastern District of Louisiana in *United States ex rel. Branch Consultants, L.L.C. v. Allstate Insurance Co.*, 2:06-cv-04091-SSV-SS (E.D. La. Aug. 13, 2010) ("*Branch II*"), supports the Rigsbys' request that the Court vacate its August 10, 2009 decision, continue the trial, and order plenary discovery. While the relator in *Branch* makes certain "flood fraud" allegations that are similar to the McIntosh allegation, this case is both factually and procedurally worlds away from *Branch*. In *Branch*, the court permitted Branch to obtain discovery regarding properties beyond those enumerated in the complaint. In reaching this conclusion, the court stressed that the *Branch* complaint provided detailed descriptions of fifty-seven properties that were allegedly misadjusted, including multiple properties where flood policy limits were paid and "there was very little flood damage or no flood damage at all." *United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.*, 668 F. Supp. 2d 780, 797-98 (E.D. La. 2009) ("*Branch I*"). The court concluded that "***the presence of a large number of fraudulent adjustments*** suggests that there are many more examples of the same conduct." *Branch II*, slip op. at 38 (emphasis added).

2

In this case, the Rigsbys do not identify "a large number of fraudulent adjustments" involving properties where there was little or no flood damage. Rather, the only property identified is the McIntosh home, which inarguably, as the Rigsbys acknowledge, "sustained substantial flood damage." ([343] at 3.) In fact, to this day, neither of the Rigsbys can testify that the McIntosh house sustained less than $250,000 in flood damage. (Ex. A, K. Rigsby Dep. at 89:17-25; Ex. B, C. Rigsby Dep. at 175:14-176:8.) There is simply no basis to infer a comprehensive flood fraud scheme from a single allegation of overpayment that even the Rigsbys cannot confirm was false.

Moreover, *Branch* is still in the earlier stages of discovery. Thus, the *Branch* court's order "[a]ssum[ed] that Branch's allegations are true," *Branch II*, slip op. at 38, and invited the defendants to "file motions for summary judgment" to determine if Branch could "supply evidence to support the allegations it asserts." *Id.* at 28. This case is far past the pleading stage. Under *Rockwell*, the Court cannot simply "assume" that the Rigsbys' "allegations are true." Indeed, after stating in its February 12, 2009 Order that if "the McIntosh flood insurance payments were justified . . . I will dismiss this action on its merits" ([261] at 3), this Court held a two-and-a-half-day evidentiary hearing and then issued its August 10, 2009 Order. At that point, the Court found that there were factual disputes regarding the McIntosh claim that "must be resolved by further proceedings." ([343] at 9.)

In sum, the Court's February 12, 2009 and August 10, 2009 Orders correctly concluded that this case could not proceed if the McIntosh flood insurance payment was justified. Consistent with *Rockwell* and *Grubbs*, the Court then ordered "further proceedings" to probe this threshold jurisdictional issue. The schedule set forth in the Court's Case Management Order ("CMO") for discovery, dispositive motions and trial was a natural outgrowth of these findings. For over a year, the Rigsbys marched through discovery without raising any objection to the August 10, 2009 Order or the CMO. The Rigsbys have not proffered and cannot proffer any legitimate reason to reverse course at this juncture. Accordingly, the Rigsbys' motion for reconsideration should be denied.

## II. THE RIGSBYS HAVE WAIVED ANY CHALLENGE TO THE AUGUST 10, 2009 ORDER

Any objection that the Rigsbys could have raised to the August 10, 2009 Order has long been waived. In the intervening year since the Court issued that Order, the Rigsbys voiced absolutely no objection to the Court's schedule. Rather, the Rigsbys waited to file their motion for reconsideration until a month *after* discovery closed and State Farm filed its motions for summary judgment. In the interim, the Rigsbys actively engaged in extensive discovery and motion practice without ever hinting that they believed the Court's ruling was erroneous. In fact, as recently as July 7, 2010, after the close of discovery, the Rigsbys affirmatively represented to the Court that "***the central matter of this phase of the litigation [is]*** whether State Farm submitted a fraudulent claim for payment on ***the McIntosh property***." ([680] at 1 (emphasis added).)

Of course, the Rigsbys did not challenge the Court's conclusion that the McIntosh flood claim is the threshold issue in this case and, indeed, expressly acknowledged that position at the evidentiary hearing:

> Your Honor, in order to show that there is a false claim here, we need to offer evidence that State Farm submitted the claim knowing that it was false. We also need to show affirmatively that the claim was false, that there was not, in fact, $250,000 worth of flood damage to the McIntosh house. . . . ***We're addressing the question, in fact, was there $250,000 of damage to the McIntosh house.***

(Ex. C, Hr'g Tr. at 354:21-355:12 (Statement of counsel for the Rigsbys); *see also* Hr'g Tr. at 238:8-11 ("There's only one claim at issue here.").)

The Rigsbys attempt to obfuscate the untimeliness of their objection to the August 10, 2009 Order by claiming that they have newly discovered "evidence" of a fraudulent scheme. This argument is legally and factually infirm. At its core, the Rigsbys' contention that the "determination of whether the McIntosh claim was false cannot be dispositive of the Relators' claims" ([740] at 5) is a direct – and manifestly erroneous – challenge to this Court's *legal* determination that this case must be dismissed if

4

the payment of the McIntosh flood claim was justified.  The Rigsbys could have made their argument a year ago.  They did not and it is now waived.

Moreover, the Rigsbys' so-called newly discovered "evidence" is neither "new" nor "evidence." Rather, the "scheme" that the Rigsbys claim was "confirmed" in discovery is no different from the "scheme" they claim is supported by the now-discredited Brian Ford report.  It is the same "scheme" that the Rigsbys advanced at the evidentiary hearing in May 2009.  It is the same "scheme" that they alleged in their pleadings years ago.  ([16] ¶¶ 56-64.)  In short, there is nothing "new" here, and all of their "new evidence" is an artificial contrivance that should be afforded no legal weight.

### III.  THE RIGSBYS' MOTION FOR RECONSIDERATION IS PREMISED ON LEGAL ERROR

#### A.  The Court Correctly Determined That This Case Must Be Dismissed if the McIntosh Claim Is Not a False Claim

The Rigsbys' motion for reconsideration is premised entirely on the erroneous legal assertion that a "determination of whether the McIntosh claim was false cannot be dispositive of the Relators' claims."  ([740] at 5.)  Without citation to any authority, the Rigsbys contend that even if a "jury determines that more than $250,000 in flood damage existed at the McIntosh home," they should still be allowed to try their allegations of a fraudulent scheme.  (*Id.*)  The Rigsbys have it exactly backwards.

As this Court has previously recognized, "the essential question in this action is whether there was an overpayment of the McIntosh flood claim."  ([343] at 3.)  This is so because "[t]he McIntosh claim is the only instance of State Farm's having submitted an allegedly false claim" that is identified in the Amended Complaint.  (*Id.* at 10.)  Thus, if "the McIntosh flood insurance payments were justified," there is simply no false claim and the Court must "dismiss this action on its merits."  ([261] at 3.)

This Court's Order is fully consistent with the firmly established case law holding that "[e]vidence of an actual false claim is 'the *sine qua non* of a False Claims Act violation.'"  *Aflatooni*, 314 F.3d at 1002 (citation omitted).  "Without a false or fraudulent claim, FCA liability, as a matter of law, does not attach to [defendants]."  *United States ex rel. Stebner v. Stewart & Stevenson Servs., Inc.*,

305 F. Supp. 2d 694, 704 (S.D. Tex. 2004) (granting defendants' motion for summary judgment where the relator "failed to establish the occurrence of a false or fraudulent claim"), *aff'd*, 144 F. App'x 389, 394-95 (5th Cir. 2005); *see also United States ex rel. Gudur v. Deloitte Consulting LLP*, 512 F. Supp. 2d 920, 944-50 (S.D. Tex. 2007) (granting summary judgment dismissing FCA claims because "[r]elator has failed to present evidence that any claims submitted on the basis of its recommended rates were false claims for FCA purposes"), *aff'd sub nom.*, *United States ex rel. Gudur v. Deloitte & Touche*, No. 07-20414, 2008 WL 3244000 (5th Cir. Aug. 7, 2008).

Contrary to the Rigsbys' suggestion, a relator cannot obviate the need to prove an actual false claim by alleging a fraudulent scheme. For instance, in *Aflatooni* – which was specifically cited with approval by the Fifth Circuit in *Hebert* – a physician brought a *qui tam* action, alleging that his employer and others conspired to submit false bills to Medicare for medical services that were not performed. In opposing a motion for summary judgment, relator submitted a letter from a pathologist stating that his bills had been altered by one of the center's managing partners without his knowledge or consent. Relator claimed that he had been told that about a quarter of the nearly 10,000 yearly bills had been altered in this fashion. He argued that summary judgment should be denied because he had presented evidence of a clear pattern of billing fraud by the center. The court disagreed, holding that although relator proffered evidence of a fraudulent scheme, he could not survive summary judgment because he failed to identify an actual false claim, which is an essential element of any FCA claim. The court explained that the FCA "focuses on the submission of a claim, ***and does not concern itself with whether or to what extent there exists a menacing underlying scheme***." *Aflatooni*, 314 F.3d at 1002 (emphasis added). "[I]t is the claim itself that is ***central*** to [relator's] action." *Id.* (emphasis added). Thus, "[i]t seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim." *Id.* at 997.

Similarly, in *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 434 (3d Cir. 2004), relator alleged that a pharmacy defrauded Medicaid by repackaging and reselling medications that were returned to the pharmacy.  Relator contended that the pharmacy "must have resold returned medications to Medicaid by virtue of the large volume of Medicaid business it conducts."  *Id.* at 439.  The district court had previously found that these allegations met Rule 9(b).  But while relator "survived this first step, he then succumbed at the summary judgment stage for failure to establish a necessary element of FCA liability," namely, that Medicaid had actually paid for one of the redispensed medications.  *Id.* at 439 n.10.  The court found that relator's inability to tie the pharmacy's business practices to the "actual submission of a false claim" was "fatal to this *qui tam* action."  *Id.* at 434, 440.  *See also United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 856 (7th Cir. 2006) (affirming summary judgment where the relator "did not provide a single false claim that was actually submitted").

The Rigsbys' inability to establish that the McIntosh claim is false takes on added significance in this case because, in addition to being an essential element of their FCA claim, it is jurisdictional.  As this Court recognized in its August 10, 2009 Order, "[t]he McIntosh claim is the only instance of State Farm's having submitted an allegedly false claim of which the Relator Kerri Rigsby has first hand knowledge, i.e., direct and independent knowledge sufficient to support the Court's subject matter jurisdiction."  ([343] at 10.)  In *Rockwell*, the Supreme Court made clear that the Court must evaluate its subject matter jurisdiction at each stage of the litigation.  Thus, even if the allegations in the Rigsbys' Amended Complaint met Rule 9(b), a "demonstration that the original allegations were false will defeat jurisdiction."  *Rockwell*, 549 U.S. at 473.

### B.    The Court's Case Management Order Is Consistent with *Grubbs*

The ***only*** FCA case that the Rigsbys discuss in their twenty-one page motion is the Fifth Circuit's decision in *Grubbs*, 565 F.3d 180.  However, the inferences that the Rigsbys attempt to extract from *Grubbs* are incorrect.  *Grubbs* addressed the wholly unrelated issue of the threshold under Rules 9(b)

and 12(b)(6) for pleading the FCA's ***presentment*** requirement, *i.e.*, that the defendant actually submitted the false claim to the government for payment. Specifically, relator Grubbs was a psychiatrist who alleged that he uncovered a scheme to fraudulently bill Medicare for services certain doctors did not perform. The court found that Grubbs had pled with specificity: (i) "the date, place and participants" of a meeting where he was told of the fraudulent billing scheme and instructed how he could participate in it; (ii) how the nursing staff offered to assist him in creating false bills; and (iii) "***specific dates that each doctor falsely claimed to have provided services to patients and often the type of medical service***." *Id.* at 191-92 (emphasis added). In light of these specific allegations of multiple false claims, the court held that, at the motion to dismiss stage, it was reasonable to infer that the false bills were presented to the government for payment.

In sharp contrast, the Rigsbys have identified only a ***single*** claim – the McIntosh claim – that is even potentially false. Moreover, this case has advanced far past the Rules 9(b) and 12(b)(6) pleading stage and is now controlled by Rule 56. *Grubbs* specifically recognized that even if a claim is sufficiently pled to survive a motion to dismiss, trial courts should identify the dispositive issues and order "tailored" discovery "with a summary judgment following on the heels of the complaint." *Id.* at 191. Thus, the Fifth Circuit approved a process virtually identical to the one already implemented by this Court.

> Rule 9(b) also prevents nuisance suits and the filing of baseless claims as a pretext to gain access to a "fishing expedition." A complaint that includes both particular details of a scheme to present fraudulent bills to the Government and allegations making it likely bills were actually submitted limits any "fishing" to a small pond that is either stocked or dead. Defendants either have or do not have evidence that the alleged phony services were actually provided; they either have or do not have evidence that recorded, but unprovided or unnecessary, services did not result in bills to the Government. ***Discovery can be pointed and efficient, with a summary judgment following on the heels of the complaint if billing records discredit the complaint's particularized allegations. That is the balance Rule 9(b) attempts to strike. And it works best when access to discovery does not inevitably include all discovery's powers but is tailored by the district court to the case at hand.*** And the detail must be sufficient to allow this tailoring. Rule 9(b) should not be made to shoulder all the burden of policing abusive discovery. Its balance draws upon the vigilant hand of the district court judge.

*Id.* (emphasis added).

This Court's approach in this case is further buttressed by the fact that this Court's subject matter jurisdiction turns on the propriety of the McIntosh flood claim. As the Fifth Circuit admonished, discovery must be limited in the first instance to resolving jurisdictional issues:

> When a party challenges subject matter jurisdiction, the court is given the authority to resolve factual disputes, along with the discretion to devise a method for making a determination with regard to the jurisdictional issue. The court's authority to consider evidence presented beyond the pleadings allows it to devise a procedure which may include considering affidavits, allowing further discovery, hearing oral testimony, conducting an evidentiary hearing. ***If the court chooses to allow additional discovery, it should be limited to only that which is necessary to determine the preliminary jurisdictional issue.***

*Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (citations omitted).

In keeping with *Grubbs* and *Moran*, the Court's August 10, 2009 Order expressly recognized that the single instance of alleged flood fraud identified by the Rigsbys was the McIntosh flood claim, which was essential to this Court's subject matter jurisdiction. Thus, the Court "tailored" discovery to resolve this threshold and dispositive issue, and reserved decision as to additional discovery until this threshold jurisdictional issue was resolved.

> The McIntosh claim is the only instance of State Farm's having submitted an allegedly false claim of which the Relator Kerri Rigsby has first hand knowledge, i.e., direct and independent knowledge sufficient to support the Court's subject matter jurisdiction. . . . Yet the Relators' complaint alleges McIntosh was just one among many similar false claims State Farm and the other defendants conspired to submit. In order to protect the interests of both parties, I must strike a balance between the Relators' interest in identifying these other allegedly false claims and the defendants' interest in preventing a far ranging and expensive discovery process that relates only to claims that are not, for now, specifically identified.

> Accordingly, I will limit the presentation of evidence in this action to facts relevant to the McIntosh claim.

([343] at 10.) The Rigsbys voiced no objection to this Court's Order, which was issued over a year before the Rigsbys filed their motion for reconsideration. In fact, the Rigsbys actively participated in voluminous discovery for nearly a year, affirmatively asserting as recently as July 7, 2010, that "the

central matter of this phase of the litigation [is] whether State Farm submitted a fraudulent claim for payment on the McIntosh property." ([680] at 1.)  Discovery is now closed and State Farm has filed its motions for summary judgment.  *Rockwell* and *Grubbs* – as well as this Court's prior Orders – make clear that if the Rigsbys cannot prove that the McIntosh claim was false, their FCA case must be dismissed.

### C.    The Court's Case Management Order Is Consistent with *Branch*

Although the decision was issued ***before*** the Rigsbys filed their motion for reconsideration ([738]), as an afterthought following the filing of their motion, the Rigsbys filed a notice of supplemental authority enclosing the Eastern District of Louisiana's recent discovery discussion in *Branch II*.  Nothing in *Branch II* supports the Rigsbys' suggestion that they do not have to demonstrate that the McIntosh claim was false in order to proceed with their FCA claim.  To the contrary, *Branch II* strongly supports this Court's decision to limit "[t]he trial of this action . . . to the McIntosh [flood] claim" ([363] at 1) in the first instance, as well as its conclusion that if "the McIntosh flood insurance payments were justified," the Court "will dismiss this action on its merits."  ([261] at 3.)

As is the case here, the *Branch* relators alleged that certain WYO insurance companies and adjusters mischaracterized wind damage as flood damage in order to avoid paying wind claims.  But unlike this case – which alleges a single false claim – the *Branch* complaint "describes in detail the results of Branch's examination of fifty-seven properties" that were allegedly misadjusted, including many properties where flood policy limits were paid and "there was very little flood damage or no flood damage at all."  *Branch I*, 668 F. Supp. 2d at 797-98.  Branch further alleged that these fifty-seven examples were gleaned from hundreds of properties that Branch employees personally inspected and had direct and independent firsthand knowledge of.  *Id.* at 798.

Based, in part, on several of the same public disclosures that State Farm identified in its pending motion for summary judgment on the claims of Cori Rigsby ([737]), the *Branch* court held that there had

been public disclosures of Branch's fraud allegations. *Branch I*, 668 F. Supp. 2d at 797. Nevertheless, the court found that it had subject matter jurisdiction over the case because Branch's fifty-seven examples of fraud identified individual insurance companies and adjusters who were not previously identified in the public disclosures and provided "qualitatively different . . . information" about these flood claims. *Id.* at 798.[1] Notably, the court declined to exercise jurisdiction over several defendants where Branch failed to identify a specific flood claim or flood adjustment with the requisite particularity. *Id.* at 806.

During the discovery phase, a dispute arose as to whether the discovery should be limited to the properties specifically identified in the complaint. The court concluded that Branch could obtain discovery regarding other properties because "[a]ssuming that Branch's allegations are true, ***the presence of a large number of fraudulent adjustments*** suggests that there are many more examples of the same conduct." *Branch II*, slip op. at 38 (emphasis added). The court also noted that if "Branch cannot supply evidence to support the allegations it asserts . . . the correct response is to file motions for summary judgment." *Id.* at 28. Indeed, the court's discovery order specifically referenced the court's modified briefing schedule for defendants' summary judgment motions. *Id.* at 44.

This case is both factually and procedurally different from *Branch* for a host of reasons. First, the Rigsbys do not identify "a large number of fraudulent adjustments" involving properties where there was little or no flood damage. Rather, this case involves a single flood claim adjustment to the McIntosh property, which inarguably "sustained substantial flood damage." ([343] at 3.) There is

---

[1] Unlike the *Branch* defendants, State Farm was specifically identified in the public disclosures. *See Branch I*, 668 F. Supp. 2d at 792. The *Branch* court's finding that the fifty-seven examples of alleged fraud were "qualitatively different" than those referenced by the public disclosures, *id.* at 798, stands in stark contrast to this case, where State Farm was identified by name in the *Cox/Comer* complaint and the Rigsbys can only point to a single alleged instance of fraud. As the Fifth Circuit has underscored, "[e]ven if [a relator] uncovered some nuggets of new, *i.e.*, non-public information, his claims of fraud are based at least in part on allegations ***already publicly disclosed*.**" *United States ex rel. Fried v. W. Indep. Sch. Dist.*, 527 F.3d 439, 442 (5th Cir. 2008) (emphasis added). By definition, a single instance is a "nugget," not a "scheme."

simply no basis to infer a comprehensive flood fraud scheme from a single allegation of overpayment. This is especially true given that the Rigsbys admittedly spent months combing though State Farm's claim files and computer databases in 2005 and 2006 in an attempt to support their flood fraud claim, and came up with nothing.

Second, this case has proceeded well past the pleading stage. The deadline for discovery has now passed, State Farm's motions for summary judgment have been filed, and the trial is just around the corner. If the Rigsbys cannot prove that the McIntosh flood claim was false, nothing in *Branch II* suggests that this case should not be dismissed. Conversely, if the Rigsbys prevail, the Court can revisit the scope of discovery at that time.

Third, the gloss that the Rigsbys are attempting to apply to the *Branch II* discovery order is inconsistent with *Grubbs*. *Grubbs* makes clear that trial courts should identify the dispositive issues and order "tailored" discovery that is "pointed and efficient" "with a summary judgment following on the heels of the complaint," 565 F.3d at 191, which is exactly what this Court did. However, permitting the Rigsbys to reopen discovery to explore their ill-conceived scheme allegations is neither "pointed" nor "efficient." Here, there is a single allegation of an overpayment of the McIntosh flood claim, which even the Rigsbys cannot state was false. That is, to this day, neither of the Rigsbys can testify that the McIntosh house sustained less than $250,000 in flood damage. Kerri Rigsby swears that she does not know whether the McIntosh home sustained less than $250,000 in flood damage. (Ex. A, K. Rigsby Dep. at 89:17-25; *see also* Ex. C, Hr'g Tr. at 300:14-301:3.) Nor can Cori Rigsby rule out that the McIntosh house sustained $250,000 in flood damage. (Ex. B, C. Rigsby Dep. at 175:14-176:8.)

### D.    Restarting Discovery Does Not Promote Judicial Economy

The Rigsbys proffer "judicial economy" as the ostensible basis for asking this Court to restart discovery. It would be hard to imagine anything less economical than following the course that the Rigsbys suggest. Since this Court issued its August 10, 2009 Order, extensive discovery has been taken.

Notwithstanding "the extensive discovery that ha[d] already been conducted with respect to [the McIntosh] claim" ([343] at 10), and the Court's expectation that there would not "be much in the way of additional preparation necessary to bring this case to trial" (*id.*), the parties have taken forty-four depositions, thousands of pages of documents have been produced, experts have produced reports and been deposed, and dozens of interrogatories have been asked and answered.

Expanding and restarting discovery to include the adjustment of properties unrelated to the McIntosh property, as the Rigsbys suggest, would likely involve years of additional discovery.  At a minimum, State Farm would be entitled to depose all of the property owners and the claims adjusters regarding any allegedly improper adjustments.  Expert reports would have to be done or redone and experts would have to be deposed or redeposed.  All of this procedure would entail additional motion practice, including a whole new round of discovery motions, evidentiary motions, and dispositive motions.

Of course, if the Rigsbys cannot prove that the McIntosh claim is false, all of this massive undertaking is a complete waste of Court and party time and resources, because "[t]he McIntosh claim is the only instance of State Farm's having submitted an allegedly false claim of which the Relator Kerri Rigsby has first hand knowledge, i.e., direct and independent knowledge sufficient to support the Court's subject matter jurisdiction."  ([343] at 10.)  Thus, under *Rockwell*, if the Rigsbys cannot prove that the McIntosh claim is false, the case must be dismissed as a matter of law.  There is simply nothing "economical" about postponing a decision on this threshold issue any longer.

## IV. THE RECORD EXPRESSLY CONTRADICTS THE RIGSBYS' "SCHEME" THEORY

As the Rigsbys' motion for reconsideration is based on a legal fallacy, this Court need not delve into the merits of the Rigsbys' "scheme" allegations.  Even if this Court were to examine the purported basis for the Rigsbys' attempt to reopen discovery, the record demonstrates that the Rigsbys' "scheme" amounts to no scheme at all.  Rather, it is an artificial contrivance of distortions and misrepresentations.

13

The record in this case after nearly a year of copious discovery establishes that State Farm's payment on the McIntosh flood claim was fully justified by the substantial flood damage to the McIntosh property and did not violate the FCA.  Specifically, (i) the testimony of *three* former Federal Emergency Management Agency ("FEMA") officials directly responsible for overseeing and implementing the National Flood Insurance Program ("NFIP") establishes that the adjustment and payment of the McIntosh flood claim was proper (*see* [735] at 13-26); (ii) the actual cost to repair the flood damage to the McIntosh home exceeded $525,000, of which ***$473,630.76*** in repairs qualified for coverage under a flood policy (*id.* at 6-10); and (iii) the centerpiece of the Rigsbys' entire case – the after-the-fact Brian Ford engineering report – is based on an "eyewitness account" that the putative eyewitness swears never occurred.  (*Id.* at 30-32.)

In light of this record, the Rigsbys appear to have virtually given up trying to prove that the McIntosh flood claim was false.  Instead, they seek refuge in broad, uncharted discovery into ***other*** properties, ***other*** files, ***other*** reports, and ***other*** claims in what the Fourth Circuit recently termed "a suit in search of a wrong, rather than a wrong in search of a verdict."  *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 735 (4th Cir. 2010).  The "substantial evidence" the Rigsbys claim to proffer in support of a "systemic scheme" ([740] at 4) is, in fact, no evidence at all.

A.    **The FEMA Witness Testimony Establishes Conclusively That the McIntosh Flood Claim Was Properly Adjusted**

In their previous briefing, the Rigsbys attacked the testimony of David Maurstad, the head of the NFIP after Hurricane Katrina, as "incomplete," and offered instead a supposedly competing "account" from their purported expert Louis Fey.  ([729] at 12.)  Despite the fact that "the 'FCA is ***not*** an appropriate vehicle for policing technical compliance with administrative regulations,'" *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 340 n.12 (5th Cir.) (emphasis added) (citation omitted), *cert. denied*, 129 S. Ct. 570 (U.S. 2008), the Rigsbys now contend that Mr. Maurstad's testimony

somehow proves that State Farm "ignored" NFIP requirements by "expressly apply[ing] their own rules, which directly conflicted with Memorandum W-5054." ([740] at 14.)  But the Rigsbys attempted to garner Mr. Maurstad's support for this proposition at his deposition, and Mr. Maurstad *expressly rejected it*.

Mr. Maurstad testified that in the wake of Hurricane Katrina, line-by-line estimates were not necessary where, as here, flood damage far exceeded policy limits:

> [I]t was common sense and reasonable for one to look at the policy and know what the policy limits were and look at the damaged property and know that if the damage far exceeded the policy limits, that in this circumstance, in the aftermath of Katrina, *it didn't make sense to go through the normal, all itemized line-by-line claim adjusting process*.

(Ex. D, Maurstad Dep. at 149:9-150:13.)  And, despite the Rigsbys' protestations to the contrary, Mr. Maurstad made clear that this principle was inherent in W-5054:

> Q.      And you did – does FEMA 5054 say that?
>
> A.      I think FEMA – I think 5054, reasonably interpreted, leads one to that conclusion, that that's what we were trying to accomplish.

(*Id.* at 150:14-20 (objection omitted).)

The Rigsbys seek to apply their own interpretation of W-5054 in order to fit their disjointed narrative, but Mr. Maurstad twice described W-5054 as a "guiding document" (*id.* at 108:15-23, 109:7-15), and explained that if someone "had a question about how to go about resolving a claim," he could "go to Jim Shortley directly and say, 'Here's the situation, how do we handle it?'  And they may get direction in that manner."  (*Id.* at 113:3-17.)

This is exactly what State Farm did.  State Farm's liaison to the NFIP, Juan Guevara, was in regular contact with Mr. Shortley after Hurricane Katrina.  Mr. Shortley testified that he spoke to Mr. Guevara "probably three, four times a week" after Katrina.  (Ex. E, Shortley Dep. at 154:20-25.) Conspicuously absent from the Rigsbys' briefing is Mr. Shortley's sworn testimony in which he explained that, as early as August 31, 2005 – two days after Katrina struck – the NFIP was affirmatively

15

telling insurance companies that they could forego drafting line-by-line estimates where the damages exceeded policy limits:

> Well, we were telling the companies and adjusters that if there is a structure that is damaged beyond policy limits, that they didn't have to write a line-by-line unit or line-by-line, room-by-room estimate beyond that.

(Ex. E, Shortley Dep. at 21:25-22:7.)  After W-5054 was released, Mr. Guevara contacted Mr. Shortley to clarify the application of W-5054 to State Farm's procedures, and Mr. Guevara explained that, based on his discussions with Mr. Shortley, W-5054 did not change State Farm's XactTotal procedures.  (Ex. F, 4/14/10 Guevara Dep. at 94:17-22.)

Mr. Shortley corroborated Mr. Guevara's account.  At his deposition, Mr. Shortley testified that W-5054 did **not** "revoke" FEMA's prior authorization to forego a line-by-line estimate if the flood claims adjuster conducted a site inspection and "observed damages that would exceed the coverage limits."  (Ex. E, Shortley Dep. at 47:9-25.)  In fact, Mr. Shortley testified that a line-by-line estimate would not have been necessary where (as with the McIntosh adjustment) the flood adjuster performed a site visit, determined that the property damage exceeded policy limits, and documented that loss with photographs, scope notes, and diagrams.  (*Id.* at 27:7-28:3; *see also id.* at 175:3-176:16 (he had "no problem with" State Farm's use of XactTotal where a site inspection revealed damages in excess of flood policy limits).)

Accordingly, the Rigsbys' contention that the April 14, 2010, deposition testimony of Mr. Guevara constitutes "an enormous and dispositive indictment" ([740] at 14) is incorrect.  Nor can the Rigsbys explain why they sat on this supposed "enormous and dispositive indictment" for *over four months*, or why, on July 7, 2010 – nearly three months after this supposed "enormous and dispositive indictment" – the Rigsbys still recognized that the knowing falsity of the McIntosh flood claim was "the central matter of this phase of the litigation."  ([680] at 1.)

16

Again, the Rigsbys attempt to make a scheme out of whole cloth by mischaracterizing the record to this Court.  Messrs. Maurstad and Shortley, FEMA officials vested with powers delegated by the executive branch of the federal government to craft NFIP policies, have squarely rejected the Rigsbys' reading of W-5054.  As *qui tam* relators, the Rigsbys are simply assignees of a portion of any claim that FEMA might have for damages based on the adjustment of the McIntosh flood claim.  *See Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773-74 & n.4 (2000).  "An assignee steps into the shoes of the assignor and takes the assigned rights subject to all defenses that an opposing party might be able to assert against the assignor."  *SingleEntry.com, Inc., v. St. Paul Fire & Marine Ins. Co*., 117 F. App'x 933, 935 (5th Cir. 2004).  Thus, the Rigsbys, as assignees, are bound by the testimony of the NFIP's former administrator, just as the government would be if it had brought this claim directly. *See, e.g.*, *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1028-31 (D. Nev. 2006) (dismissing the government's FCA claim alleging Medicare billing fraud where the government's witnesses stated that the government's rules concerning billing procedures were "rife with confusion").

## B.   The Rigsbys' Attempt to Cobble Together a Scheme from the Nineteen Peer-Reviewed Engineering Reports Is Belied by the Record

Unable to demonstrate that the McIntosh flood claim was false, the Rigsbys now contend that "interrogatories and documents produced by Forensic demonstrated that State Farm forced Forensic to change the conclusions in at least 19 engineering reports."  ([740] at 2.)  Their sweeping declarations of "changed reports" are demonstrably false and do nothing to warrant continuing the trial in this action.

Far from demonstrating any sort of "scheme," the nineteen reports to which the Rigsbys refer were part of Forensic's efforts in quality control.  Indeed, several days *before* Lecky King voiced her concerns about the Ford report on the McIntosh property, Bob Kochan (Forensic's president) and William Forbes (a senior Forensic engineer) began to question the validity of reports prepared by Brian Ford and another engineer, Manny Mannon, as part of Forensic's internal peer review process.  (*See, e.g.*,

17

Ex. G, Kochan Dep. at 53:3-56:2, 59:10-60:14; Ex. H, 10/13/05 E-mails from B. Kochan, Bates No. NW5CDs-009346; Ex. I, 10/12/05 E-mail from W.  Forbes, Bates No. NW5CDs-005419.)

On several occasions, Forensic's internal peer review mechanism caught and rectified errors, whether they were grammatical or substantive, before any report was issued to State Farm.  (*See, e.g.*, Ex. G, Kochan Dep. at 50:13-22, 61:10-68:8, 73:5-19.)  Other times, faulty work product evaded the peer review process because the peer reviewer only had access to a fraction of the photographs taken by the inspecting engineer, and would defer to the conclusions of that engineer.  (*See, e.g.*, *id.* at 141:2-9, 262:13-263:25; Ex. J, 10/25/05 E-mail from W. Forbes, Bates No. NW5CDs-005430.)

Ultimately, however, Mr. Kochan determined that the conclusions drawn by Messrs. Ford and Mannon were not supported by the physical evidence in a number of cases, and he became "concerned with the quality of the report[s]."  (Ex. G, Kochan Dep. at 256:20-257:5; *see also id.* at 69:19-70:8, 74:4-20, 76:15-77:2, 181:22-182:1.)  Accordingly, Forensic expanded its quality control efforts by reviewing all of the reports issued by Messrs. Ford and Mannon.  (*See id.* at 101:21-103:18, 231:7-12, 238:17-23.)  State Farm did not give Forensic a list of nineteen reports to review, nor did State Farm dictate what conclusions Forensic should reach.  (*See id.* at 104:13-106:8.)  Rather, Forensic was simply ensuring that it was providing "technically accurate information," which is what it was "hired . . . to do."  (*Id.* at 16:24-17:9, 238:17-23.)

The Rigsbys now characterize Forensic's attempt to provide technically accurate engineering reports as a "scheme" wherein State Farm "forced Forensic to change the conclusions in at least 19 engineering reports."  ([740] at 2.)  The Rigsbys' verbiage is, once again, belied by the record.

### 1.      State Farm Did Not "Force" Forensic to Change Its Engineering Reports

The Rigsbys' contention that State Farm "forced Forensic to change [its] conclusions" (*id.*) is expressly contradicted by the record.  Mr. Kochan testified repeatedly that changes were made to

engineering reports during the routine peer review process and State Farm did ***not*** force Forensic to change its conclusions.

> Q.     Was it your understanding that the phone call [from Lecky King] was an instruction on what conclusions should be reached?
>
> A.     No, sir.
>
> . . . .
>
> Q.     Did [Ms. King] tell you what results she expected you to conclude?
>
> A.     No. No.
>
> . . . .
>
> Q.     [D]id Lecky King tell you what results she wanted articulated as conclusions in those reports?
>
> A.     No.

(Ex. G, Kochan Dep. at 15:24-16:2, 17:14-16, 45:13-46:3.)

When questioned by the Rigsbys' counsel, Mr. Kochan confirmed that State Farm never requested – either directly or indirectly – that Forensic change conclusions in engineering reports.

> Q.     [A]re you saying State Farm never directly told you to change a report; is that what you're saying?
>
> A.     They never directly or inferred to me to change our report.
>
> Q.     They never indirectly mandated that you change reports?
>
> A.     They never mandated to me that we should change our reports; and none of my people suggested, especially Jack Kelly, that they had done so.
>
> Q.     You left out a word in my question.  I said they never indirectly mandated that you change reports as a condition to continue employment?
>
> A.     ***I will agree to that; to me, they never indirectly requested that – or indicated that we should change a report.***

(*Id.* at 189:24-190:15.)

Mr. Kochan further testified that Ms. King never asked Forensic to change the conclusions reached in an engineering report.  Rather, she asked him to "make sure that whatever [Forensic's]

conclusions were that they had supportive documentation via photographs or comments or opinions that supported those . . . conclusions." (*Id.* at 17:17-22.)  Mr. Kochan explained that this request was perfectly proper because "[t]hat's what we're paid to do." (*Id.* at 17:10-18:11.)  Mr. Kochan confirmed that he would have "rebelled" (*id.* at 83:13-84:5) if State Farm had asked him to remove unfavorable conclusions from engineering reports, and there was no "chance in Hades" that he would ever compromise his integrity or the integrity of his company to obtain further assignments from State Farm. (*Id.* at 88:6-10.)

Similarly, Brian Ford, the author of the first engineering report on the McIntosh property, testified that Ms. King never instructed him to change the conclusions in his report.

> Q.     [Ms. King] didn't ask you to change your report, did she?
>
> A.     No, sir.

(Ex. K, Ford Dep. at 118:12-14.)  When questioned by the Rigsbys' counsel, Mr. Ford confirmed this point.

> Q.     You were also asked a number of questions about – or one question about whether Ms. Lecky King asked you to change your report.  Do you remember Mr. Galloway asking you that question?
>
> A.     Yes.
>
> Q.     And the answer to that was no, I believe.
>
> A.     She did not ask me to change the report.

(*Id.* at 186:20-187:1.)

Unable to support their "changed reports" theory with any evidence, the Rigsbys try to make Forensic's internal review process seem nefarious.  First, the Rigsbys assert that Mr. Kochan stated that Forensic "would 'swap out'" engineering reports.  ([740] at 11.)  But Mr. Kochan expressly rebuffed the suggestion:

> Q.     Why did Forensic and State Farm swap out reports?
>
> MR. ROBIE:  Assumes facts not in evidence.

A.      I don't know that we did.

Q.      Well, you took the McIntosh original report you said from Ms. King when you met with her?

A.      I replaced it with – I redid it.  I didn't swap it out.  I redid it.

(Ex. G, Kochan Dep. at 179:10-18.)  Mr. Kochan further testified that he had never even "thought about" that term before his deposition, nor did he ask Mr. Kelly, the engineer on most of the later engineering reports, to "swap out" reports or ask State Farm to "swap out" reports.  (*Id.* at 267:6-268:6.)

The Rigsbys further argue that State Farm attempted to "conceal" "changed" reports by returning an engineering report to Forensic.  But the sticky note on the Ford report on the McIntosh property specifically stated "Put in wind file."  (Ex. L, Ford Report Sticky Note.)  Kerri Rigsby admitted that this sticky note evinced Ms. King's intent to retain and maintain that report.  (Ex. M, K. Rigsby 6/20/07 *Marion* Dep. at 143:11-144:12.)

The Rigsbys also argue that Lisa Wachter, a State Farm trainer during Hurricane Katrina, "asked engineering firms to change their reports if, for example, the findings were not 'consistent with the conclusion.'"  ([740] at 12.)  Ms. Wachter actually testified that if an engineering firm's factual findings were not "consistent with what the conclusion was . . . [she] may or may not have called to request additional information."  (Ex. N, Wachter Dep. at 43:17-44:5.)  She did not recall "ever asking or calling Forensics to change reports" although she "did have contact with Forensics and other engineer[ing] firms that [she] may have asked for additional information or clarification to their findings in their report[s]."  (*Id.* at 43:7-14.)

In sum, the evidence flatly contradicts the Rigsbys' claim that State Farm "forced Forensic to change [its] conclusions" in engineering reports.  ([740] at 2.)

### 2.      The Nineteen Reports Do Not Establish a "Fraudulent Scheme"

The Rigsbys refer to nineteen sets of engineering reports – comprising the McIntosh engineering reports and engineering reports on eighteen other properties culled from approximately 120 Forensic

engineering reports – as evidence of a "systemic scheme to defraud the government."  ([740] at 2, 4.)
According to the Rigsbys, "in every one of those reports, the conclusion changed from finding wind as
the cause of loss to finding flood water as the predominant cause."  (*Id.* at 2.)  This statement is simply
false.  When the initial reports are compared with the revised, peer-reviewed reports for these eighteen
properties, at least four of these initial draft reports found significant damage caused by ***flood***.  (*See* Ex.
O, King Decl. at ¶ 5.)  Moreover, for at least six properties, the revised report concluded that ***wind*** was a
significant contributing factor to the damage to the property.  (*See id.*)  In fact, one revised report found
***no flood*** damage whatsoever, and another revised report concluded that there was ***more wind*** damage
than originally reported in the first report.  (*Id.*)  Far from evidencing a "systemic scheme to defraud the
government," ([740] at 4), these revised reports demonstrate a review process focused on providing an
accurate damage assessment.

The eighteen properties are further inapposite for a host of other reasons.  Notably, ***ten*** of the
properties did ***not*** have a Katrina-related flood claim with State Farm (*see* Ex. P, 8/13/10 Blalock Aff.
¶¶ 4-5; Ex. O, King Decl. at ¶ 5), and therefore cannot have any connection with the Rigsbys' supposed
"scheme," because State Farm could not have overpaid on a flood claim that did not exist.  Similarly, at
least ten of the properties were reduced to slabs.  (*See* Ex. O, King Decl. at ¶ 5.)  As this Court has
recognized, "FEMA approved payment of SFIP limits" where "insured dwellings" were "left as slabs,
pilings, or empty shells," and therefore, slab cases are beyond "the outer limits of the potential claims
involved in this action."  ([343] at 10-11.)  State Farm could not have overpaid on a flood claim where
FEMA approved payment of full flood policy limits.

The Rigsbys' theory is further undercut by the fact that at least nine of the initial reports were
never sent to State Farm.  Though the Rigsbys claim that State Farm "coerc[ed], intimidat[ed], and
ultimately conspir[ed] with Forensic to change and hide reports . . . after first providing the report to
State Farm" ([740] at 10), the record shows that almost half of the reports were amended during

Forensic's internal peer review process and were **never** provided to State Farm.  (*See, e.g.*, Ex. G, Kochan Dep. at 59:10-68:8, 101:21-103:18, 106:16-109:19, 253:3-15; Ex. O, King Decl. at ¶ 5.) Obviously, if "State Farm had never received [a] report . . . they couldn't ask me to change it."  (Ex. G, Kochan Dep. at 261:5-8.)

In short, each of the other eighteen additional properties identified by the Rigsbys as evidence of a supposed "scheme" falls into one or more of the categories above.  In other words, **not a single one** can be part of the Rigsbys' alleged "scheme."  As this Court aptly noted in another context, "[i]t is not enough for Plaintiff to charge State Farm with sinister conduct or motives as far as the discovery process goes (which the Court does not find from a review of the materials supporting the application for review), and the Court is not going to allow Plaintiff to pursue a never-ending story backed by speculation."  *Gagne v. State Farm Fire & Cas. Co.*, No. 1:06-cv-711-LTS-RHW, 2008 WL 7959086, at *1 (S.D. Miss. Dec. 12, 2008) (Senter, J.).

### 3.     The McPeek Reports Further Demonstrate That the Rigsbys' "Scheme" Allegations Are Meritless

In an attempt to prove a "scheme" that did not exist, the Rigsbys focus on one of the nineteen reports:  the McPeek report.  According to the Rigsbys, the so-called "dual and differing McPeak [sic] reports" are a prime example of  State Farm's "coerc[ion]" and "intimidat[ion]."  ([740] at 9-10.)  In fact, the McPeek reports prove that the Rigsbys' "scheme" theory is illusory.

First, the Rigsbys mischaracterize the initial McPeek report, stating that "[t]he October 11, 2005 [McPeek] report contained **no mention** of water damage."  ([740] at 9 (emphasis added).)  The October 11, 2005 McPeek report clearly states that "[t]here was no roof damage, except for a few missing shingles," and that "[t]he watermark line in the house is approximately **four feet** above the first floor interior flooring."  ([738-5] at 2 (emphasis added).)

Second, the Rigsbys ignore that:  (i) the McPeek property did not have a flood insurance policy with State Farm when Katrina struck; and (ii) the only claim that State Farm adjusted on the McPeek

property was the homeowners claim.  (*See* Ex. P, 8/13/10 Blalock Aff. ¶¶ 4-5.)  Therefore, as a matter of logic and law, the McPeek adjustment cannot be part of any "scheme to defraud the government" by mischaracterizing wind damage as flood damage.  ([740] at 2.)

Third, the Rigsbys suggest that the October 11, 2005 McPeek report was part of a supposed "scheme" because "this report was not kept in State Farm's claims file."  ([740] at 9.)  What the Rigsbys leave unmentioned is that the October 11 report was not in State Farm's claims file because Forensic ***never sent it to State Farm***.  Mr. Kochan made this point perfectly clear at his deposition.

> Q.      And if we look at number 71, the McPeek file, what does it tell you about the October report that you were asked so many questions about?
>
> A.      ***That it had not been filed or issued.***
>
> Q.      Never delivered to State Farm?
>
> A.      Based on this X [in Forensic's records].
>
> Q.      Your company records, your business records show that October report was never delivered to State Farm, doesn't it?
>
> A.      ***That's what this says.***

(Ex. G, Kochan Dep. at 253:3-12; *see also* Ex. O, King Decl. at ¶ 5.)

Tellingly, the reason that the Rigsbys advance this erroneous charge regarding the placement of the October 11 McPeek report is to bolster their claim that State Farm intentionally omitted the Brian Ford engineering report from the McIntosh homeowners file.  However, the record shows that the Ford report on the McIntosh property was, in fact, ordered to be put and maintained in the McIntosh homeowners file.  But ***the Rigsbys*** took it.

Contrary to the Rigsbys' current theory that State Farm sought to "conceal" engineering reports, Ms. King placed a sticky note on the Ford report on the McIntosh property that specifically stated:  "Put in wind file."  (Ex. L, Ford Rep.)  This sticky note hardly evinces an intent to "conceal" the report.  To the contrary, Kerri Rigsby has admitted that Ms. King "expected her notes to be followed."  (Ex. M, K. Rigsby 6/20/07 *Marion* Dep. at 143:11-144:12.)

24

Though Ms. King intended the report to remain in the wind file, at some point Kerri Rigsby took the original report with the original sticky note to her house.  Around January 2006, the original Ford report, along with the original sticky note, emerged in Kerri Rigsby's house.  (Ex. Q, Lee *Thornton* Dep. at 51:16-52:23.)  There, Kerri Rigsby showed fellow adjuster Dana Lee the Ford report with the original sticky note and asked her, "'Well, what do you think about the note?'"  (*Id.* at 52:14-53:14, 87:15-88:13.)  Ms. Lee inspected the sticky note, flipping it over and looking at the other side, and ultimately concluded that the sticky note did not reveal any sort of fraud:  "I didn't think it was unusual – I didn't think that that looked unethical or like somebody – fraudulent, somebody was trying to hide anything or do anything unusual."  (*Id.* at 53:15-54:17; *see also id.* at 54:18-55:10.)  Later, the Ford report, with the original sticky note, was found in the law offices of Dickie Scruggs.  Beth Jones, Mr. Scruggs's former administrative assistant, recently testified that she saw the Ford report at the Scruggs Law Firm with the original "sticky note" on it, establishing that Kerri Rigsby gave these to her then-attorney.  (Ex. R, Jones Dep. at 59:17-60:20.)

Ironically, the Rigsbys are correct that "[t]he engineering reports used to adjust the McPeak [sic] claim were strikingly similar to the reports used to adjust the McIntosh claim" ([740] at 9), albeit not for the reasons that they assert.  Both the earlier McIntosh and McPeek reports were authored by Mr. Ford.  And in both cases, Mr. Ford ignored abundant physical evidence of flood damage, relying instead on a putative "eyewitness" account to conclude that wind damage caused the bulk of the damage to the properties.  (*See* Ex. L, Ford McIntosh Report at 2-3; McPeek Report [738-5].)  In fact, the language used in the two reports is virtually identical.

- Ford McIntosh Report:   "According to Mr. McIntosh, a neighbor – Mr. Mike Church – reported that houses were blown apart and debris was thrown into the McIntosh house at approximately 8 AM and the floodwater began rising at 11 AM." (Ex. L, Ford Rep. at 2.)

- Ford McPeek Report:    "*According to* Mr. McPeek, *a neighbor* across the street *reported that houses were blown apart and debris was thrown into the* McPeek *house at approximately 8 AM, and the floodwater rising* followed *at* 10:27AM.  ([738-5] at 2 (language identical to that in Ford McIntosh Report italicized).)

Of course, the record now makes clear that Mr. Church did *not* see any debris blown into the McIntosh house. Nor did he tell Mr. McIntosh that he did.

> I did not see any debris blown into the McIntosh home during Hurricane Katrina. I never told Chris McIntosh that I saw debris blown into his house during Hurricane Katrina. In fact, to the best of my recollection, I never even looked at the McIntosh house on August 29, 2005, until the storm was over, and I don't recall anything about damage to the McIntosh house that day.

(Ex. S, Church Aff. ¶ 4.) In fact, Mr. Church has "no personal knowledge of how much damage to the McIntosh house was caused by wind and water during Hurricane Katrina." (*Id.* ¶ 5.)

Not surprisingly, because this conversation never took place, Mr. McIntosh does not recall Mr. Church telling him that debris was blown into the McIntosh home. (Ex. T, T. McIntosh Dep. at 60:7-61:7, 63:6-64:9.) Nor did Mr. McIntosh recall telling Mr. Ford anything about a statement by Mr. Church about wind-driven debris. (*Id.*)

Mr. Ford's McPeek report corroborates Mr. Kochan's belief that Mr. Ford – who concluded that wind damaged the McPeek property despite the fact that there was a four-foot floodline and almost "no roof damage" ([738-5] at 2) – was "biased," that he "overlook[ed]" evidence, that the "physical evidence did not support [his] conclusions," and that "there has been a proven history that [Mr. Ford was] incorrect." (Ex. G, Kochan Dep. at 74:4-6, 76:15-77:2, 157:1-12, 181:22-182:1, 256:20-257:5.) Far from showing that State Farm "coerc[ed], initimat[ed], and ultimately conspir[ed] with Forensic to change and hide reports," the earlier McIntosh and McPeek reports only demonstrate that Mr. Ford cut and pasted fabricated, secondhand "witness statements" into engineering reports so as to justify wind conclusions in the face of abundant physical evidence to the contrary. They reveal no "scheme" by State Farm.

## C.     The Rigsbys Attempt to Create a False Conflict between the Testimony of State Farm's Employees and the McIntosh Neighbors

In support of their "scheme," the Rigsbys argue that "high-ranking State Farm employees who were deposed testified that Hurricane Katrina's winds were not strong enough to destroy homes." ([740]

at 2.)  The Rigsbys ignore the fact that the three witnesses they reference – Dave Randel, Stephan Hinkle, and John Conser – all testified that Hurricane Katrina caused wind damage across Mississippi.

- David Randel testified:  "We had wind claims all across the Gulf Coast area of Mississippi, and there – there was wind damage." (Ex. U, 6/23/10 Randel Dep. at 35:12-36:6.)

- Stephan Hinkle testified:  "I've already testified that it's possible that even a small wind . . . not peak wind, but even a less than peak wind, there could be damage to the home from wind prior to the surge.  Yes, that is possible and most probably likely in some cases." (Ex. V, Hinkle Dep. at 109:7-17; *see also, e.g., id.* at 112:11-113:4.)

- John Conser testified that the McIntosh home had "some wind damage." (Ex. W, Conser Dep. at 98:4-18.)

Nor did any of these witnesses rule out the possibility that wind might have caused damage to a particular house.  Rather, they offered their general understanding of the strength of Katrina's winds – an understanding that is validated by the fact that the McIntosh house was not blown down by wind, nor were the vast majority of the other homes on their street that are shown standing post-Katrina.  For instance, Mr. Randel testified:

> We didn't find anything that would have suggested during the course of our investigations, ***for the most part***, that wind caused properties to be completely blown away, but it was clearly evident that flood caused damage.

(Ex. U, 6/23/10 Randel Dep. at 35:7-11.)  Similarly, Ms. King testified that each property had to be individually evaluated to determine if a house was destroyed by wind:

> Q.  Would it seem more likely to you based on your experience that if there was a single house completely gone on one street that it would have been caused from wind rather than surge?
>
> A.  If – you have to consider everything when you're looking at these losses, and it's going to depend on where the house sat, how far back from the water, what other houses were in front of that house.  You know, ***I can't make that determination without seeing the hypothetical that you're asking me***.
>
> Q.  So if you had a cluster of houses – if there were a cluster of houses that were being adjusted in Hurricane Katrina and only one was missing, it would require a careful causation analysis; is that right?
>
> A.  I think ***all losses require a causation analysis***, yes, sir.

(Ex. X, King Dep. at 180:5-24 (objection omitted).)

The Rigsbys argue that the testimony of State Farm's employees "directly contradicted the actual experiences of homeowners, such as those in the McIntoshes' neighborhood." ([740] at 7 (emphasis omitted).) To support this argument, the Rigsbys mischaracterize the testimony of McIntosh neighbors such as Dr. Linda Mucha. According to the Rigsbys, Dr. Mucha – who rode out the storm at the Briscoe house – "witnessed her home being destroyed by wind before the flood waters arrived" and saw that "the roof of her garage had been blown off." ([740] at 7-8.) But Dr. Mucha testified that she did ***not*** see her house being destroyed or her garage roof blow off. (Ex. Y, Mucha Dep. at 41:3-42:1, 107:21-108:8.)[2] Although Dr. Mucha "believe[s] the garage roof was the initial factor in [her] house ending up severely damaged," she testified that flood "water took the entire thing." (*Id.* at 41:3-42:1.) Not surprisingly, Dr. Mucha applied for, received, accepted, and retained her full flood insurance policy limits from her flood insurance carrier, Farm Bureau. (*Id.* at 60:12-16, 62:11-16.)[3]

Kacie Denny, who also stayed at the Briscoes' house during Hurricane Katrina, ***actually saw*** the Muchas' garage and testified that it was "bobbing up and down ***as it floated away***." (Ex. AA, Denny Dep. at 31:17-32:5.) At that time, the garage was partially submerged, but its roof was still attached. (*Id.* at 32:13-33:4.) While Dr. Mucha did not see her garage roof blow off, she did testify that she saw "waves at [her] slab." (Ex. Y, Mucha Dep. at 46:11-13.)

---

[2] Dr. Mucha, who testified at points that her "sequence could be off" and that she was "confused" about the timing of events (Ex. Y, Mucha Dep. at 26:10-12, 109:21-110:1), claimed that her husband, Ron Mucha, told her that their roof had blown off. (*Id.* at 15:25-17:9.) Mr. Mucha is an "excitable" man with a heart condition who was "pretty distraught" on the day of Hurricane Katrina. (Ex. Z, Briscoe Dep. at 41:12-42:14; Ex. AA, Denny Dep. at 41:15-42:3.) Dr. Mucha explained that she attempted to calm her husband's nerves by pouring him two shots of bourbon. (Ex. Y, Mucha Dep. at 27:3-14.) At some point, Mr. Mucha also took medication for his heart. (Ex. AA, Denny Dep. at 41:15-42:3.)

[3] The Muchas' house was also reduced to a slab and therefore, the Rigsbys concede that it is not "like the McIntosh home." ([729] at 9.) In fact, the record strongly suggests that the Muchas' house was not well constructed. (*Cf.* Ex. U, 6/23/10 Randel Dep. at 35:12-36:6.) The Muchas built their own house and acted as their own general contractor. (Ex. Y, Mucha Dep. at 86:3-13.) And even the Rigsbys' expert, John Fowler, whose sole purpose is to opine on the Mucha house, contends that it "was not designed for winds greater than 100 mph." ([409-7] at 7.) This is borne out by the fact that the Mucha slab was surrounded by houses that remained standing after Hurricane Katrina. (*See* [748] at 2.)

The Rigsbys also try to rely on a statement from Mike Church that was made in an unrelated case that had nothing to do with the McIntosh property.  In sharp contrast, Mr. Church's sworn affidavit in **this** case establishes conclusively that Mr. Church "did **not** see any debris blown into the McIntosh home during Hurricane Katrina," he "**never** told Chris McIntosh that [he] saw debris blown into his house during Hurricane Katrina," and he has "**no** personal knowledge of how much damage to the McIntosh house was caused by wind and water during Hurricane Katrina."  (Ex. S, Church Aff. ¶¶ 4-5 (emphasis added).)  Thus, Mr. Church's sworn statements in this matter prove that the Ford report – which is the cornerstone of the Rigsbys' "scheme" allegation – is inherently unreliable and was properly questioned by State Farm.

### D.      XactTotal Valuations Do Not Support the Rigsbys' "Scheme"

The Rigsbys contend that "State Farm tried to hide from the NFIP and others that it failed to perform line-by-line estimates" by supposedly passing off XactTotal valuations as line-by-line estimates in cases where, as here, the property at issue sustained flood damage in excess of policy limits, but was not reduced to a slab.  ([740] at 16-18.)  Once again, this argument is belied by the record.  As explained above and in State Farm's [734] motion for summary judgment, Messrs. Maurstad and Shortley expressly permitted State Farm and other insurance companies to forego line-by-line estimates where the flood damage exceeded policy limits.  In other words, State Farm had – and has – nothing to "hide."

In a concerted effort to make the XactTotal valuation seem underhanded or sneaky, the Relators label it a "fictitious estimate" and argue that "State Farm was never able to explain [its] purpose."  ([740] at 17.)  The Rigsbys are fully aware of the purpose of the XactTotal valuation because they asked several questions about it at Mr. Conser's deposition.  As Mr. Conser explained, the purpose of creating the XactTotal valuation is to ensure that depreciation was properly accounted for in accordance with NFIP policies:

Q.      What does it mean to save Xact Total to an estimate?

A.     In order to justify to the NFIP that we did consider depreciation, and that the house either did or did not qualify for replacement cost coverage, you needed to convert the Xact Total short form to the long form, and then convert that to an estimate format so that they could see the depreciation was properly applied.

. . . .

Q.     Why do you need to show depreciation?

A.     Because it's – there are some things under the NFIP policy that only qualify for actual cash value settlement.  Carpeting comes to mind right off the top of my head. Appliances.

. . . .

Q.     So anytime the adjustor adjusted a claim using Xact Total, the adjustor would then have to print it out, depreciate the appropriate items, and include that in the file?

A.     Just so that it's reflected in the file for the NFIP, yes, sir.

Q.     And that was an NFIP requirement?

A.     It's part of their policy, sir.

(Ex. W, Conser Dep. at 62:25-65:19.)

Ignoring the answers to their questions, the Rigsbys instead surmise that the only purpose of the XactTotal valuation is to mislead FEMA reinspectors like Gerald Waytowich, who determined that of the $525,689 the McIntoshes spent to repair flood damage, *$473,630* qualified for coverage under the flood policy.  (*See* Waytowich Rep. [492-2] at 3.)  Although Mr. Waytowich initially mistook the long-form XactTotal valuation of the McIntosh house, he later made clear that there was no stick-build estimate in the file.  (Ex. BB, Waytowich Dep. at 125:11-14.)   While the Rigsbys attach special significance to whether an XactTotal valuation could be mistaken for a line-by-line estimate, Mr. Waytowich established that the Rigsbys' faux outrage is of no concern at all to a FEMA reinspector such as himself, as long as the flood file was properly documented with photographs, as is the case here. (*See id.* at 36:25-38:6.)  In fact, Mr. Waytowich expressly denied that he would need to review a line-by-line estimate to determine what was damaged by flood.

> Q.      Okay.  So what in – do you have to then go and look at the line item estimate you testified to earlier . . . in order to tell what was damaged by flood?
>
> A.      *No.*  You could look at the scope notes again and the photographs of what flood damage is, what is the flood damage in this file.

(*Id.* at 101:4-13; *see also id.* at 162:11-17 (objection omitted).)  With respect to the McIntosh property, for example, Mr. Waytowich explained that the photographs alone demonstrate that the flood damage exceeded the flood policy limits.  (*See id.* at 95:9-13; *see also id.* at 47:6-18; Waytowich Rep. [492-2] at 3.)

As with all of the Rigsbys' other attempts to construct a "scheme," this one fails as well.

## V.      CONCLUSION

In its February 12, 2009 and August 10, 2009 Orders, the Court recognized that the threshold issue in this litigation is whether the payment of the McIntosh flood claim was justified.  To balance the parties' interests, the Court implemented a discovery and trial process that is virtually identical to the one endorsed by the Fifth Circuit in *Grubbs*.  For over a year, the Rigsbys actively participated in copious discovery without ever raising an objection to this Court's Order.  Now, after discovery is closed, summary judgment motions have been filed, and the trial is looming, the Rigsbys suddenly want the Court to reconsider its August 10, 2009 Order and reopen discovery.  The Rigsbys' challenge to the Court's August 10, 2009 Order is both untimely and based on a discredited legal premise.  Accordingly, the Court should deny the Rigsbys' motion for reconsideration.

This the 17th day of September, 2010.

Respectfully submitted,

STATE FARM FIRE AND CASUALTY COMPANY

By:      /s/ E. Barney Robinson III (MSB # 09432)
         Robert C. Galloway (MSB # 4388)
         Jeffrey A. Walker (MSB # 6879)
         E. Barney Robinson III (MSB # 09432)
         Benjamin M. Watson (MSB # 100078)
         Amanda B. Barbour (MSB # 99119)

ITS ATTORNEYS

31

OF COUNSEL:

BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
Post Office Drawer 4248
Gulfport, MS  39502
(P)(228) 575-3019
(E) bob.galloway@butlersnow.com

BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
200 Renaissance at Colony Park, Suite 1400
1020 Highland Colony Parkway (39157)
Post Office Box 6010
Ridgeland, MS 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) jeff.walker@butlersnow.com
(E) barney.robinson@butlersnow.com
(E) ben.watson@butlersnow.com
(E) amanda.barbour@butlersnow.com

Michael B. Beers (ASB-4992-S80M), PHV
BEERS, ANDERSON, JACKSON, PATTY & FAWAL, P.C.
Post Office Box 1988
Suite 100
250 Commerce Street (36104)
Montgomery, AL  36102
(P) (334) 834-5311
(F) (334) 834-5362
(E) mbeers@beersanderson.com

*PRO HAC VICE*


James R. Robie (CA State Bar # 67303), PHV
ROBIE & MATTHAI
Suite 1500
Biltmore Tower
500 South Grand Avenue
Los Angeles, CA  90071
(P) (213) 706-8000
(F) (213) 706-9913
(E) jrobie@romalaw.com


*PRO HAC VICE*

## <u>CERTIFICATE OF SERVICE</u>

I, E. Barney Robinson III, one of the attorneys for State Farm Fire and Casualty Company, do hereby certify that I have this day caused a true and correct copy of the foregoing instrument to be delivered to the following, via the means directed by the Court's Electronic Filing System:

C. Maison Heidelberg
Ginny Y. Kennedy
MAISON HEIDELBERG P.A.
795 Woodlands Parkway, Suite 220
Ridgeland, MS 39157
(P) (601) 351-3333
(F) (601) 956-2090
(E) maison@heidlebergpa.com

August J. Matteis, Jr.
Craig J. Litherland
Benjamin R. Davidson
GILBERT OSHINSKY LLP
11 New York Avenue, NW
Suite 700
Washington, DC 20005
(E) matteisa@gotofirm.com
(E) litherlandc@gotofirm.com
(E) davidsonb@gotofirm.com

COUNSEL FOR CORI RIGSBY AND KERRI RIGSBY

Jeffrey S. Bucholtz
Joyce R. Branda
Patricia R. Davis
Jay D. Majors
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
(P) (202) 307-0264
(F) (202) 514-0280

Stan Harris
Alfred B. Jernigan, Jr.
Felicia C. Adams
UNITED STATES ATTORNEY'S OFFICE
Southern District of Mississippi
Suite 500
188 East Capitol Street
Jackson, MS 39201
(P) (601) 965-4480
(F) (601) 965-4409

ATTORNEYS FOR THE UNITED STATES

Larry G. Canada
Kathryn Breard Platt
GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
2510 14th Street
Suite 910
Gulfport, MS 39501
lcanada@gjtbs.com
kplatt@gjtbs.com

ATTORNEYS FOR HAAG ENGINEERING CO.

This the 17th day of September, 2010.

*/s/ E. Barney Robinson III* (MSB # 09432)
E. Barney Robinson III (MSB # 09432)

Jackson 5595870v1

34