IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA ex rel.
CORI RIGSBY and KERRI RIGSBY        RELATORS/COUNTER-DEFENDANTS

v.        CASE NO. 1:06cv433-LTS-RHW

STATE FARM FIRE AND CASUALTY COMPANY   DEFENDANT/COUNTER-PLAINTIFF

and

HAAG ENGINEERING CO.; and ALEXIS KING        DEFENDANTS

### STATE FARM FIRE AND CASUALTY COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE FORENSIC SETTLEMENT AGREEMENT

Robert C. Galloway (MSB #4388)
Jeffrey A. Walker (MSB #6879)
E. Barney Robinson III (MSB #09432)
Benjamin M. Watson (MSB #100078)
Amanda B. Barbour (MSB #99119)

BUTLER, SNOW, O'MARA, STEVENS &
CANNADA, PLLC
Post Office Drawer 4248
Gulfport, MS  39502
(P) (228) 575-3019
(E) bob.galloway@butlersnow.com

BUTLER, SNOW, O'MARA, STEVENS &
CANNADA, PLLC
200 Renaissance at Colony Park, Suite 1400
1020 Highland Colony Parkway (39157)
Post Office Box 6010
Ridgeland, MS 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) jeff.walker@butlersnow.com
(E) barney.robinson@butlersnow.com
(E) ben.watson@butlersnow.com
(E) amanda.barbour@butlersnow.com

Michael B. Beers (ASB-4992-S80M), PHV
BEERS, ANDERSON, JACKSON, PATTY &
FAWAL, P.C.
Post Office Box 1988, Suite 100
250 Commerce Street (36104)
Montgomery, Alabama 36102
(P) (334) 834-5311
(F) (334) 834-5362
(E) mbeers@beersanderson.com

*PRO HAC VICE*

James R. Robie (CA State Bar # 67303), PHV
ROBIE & MATTHAI
Biltmore Tower, Suite 1500
500 South Grand Avenue
Los Angeles, California  90071
(P) (213) 706-8000
(F) (213) 706-9913
(E) jrobie@romalaw.com

*PRO HAC VICE*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................i

INTRODUCTION .........................................................................................................1

THE SETTLEMENT AGREEMENT IS INADMISSIBLE.............................................2

I.    THE SETTLEMENT AGREEMENT CONTAINS MULTIPLE
LEVELS OF INADMISSIBLE HEARSAY. ...........................................2

    A.    The Settlement Agreement is Hearsay........................................2

    B.    The Alleged Out of Court Statements Contained in the
Settlement Agreement are Hearsay within Hearsay. ..................2

    C.    There Is No Applicable Hearsay Exception for the Settlement
Agreement or the Double Hearsay it Contains. ..........................4

    D.    The Hearsay Bar Is Particularly Appropriate Here as Forensic's
Statements Are Inherently Untrustworthy. .................................5

        1.    Mr. Kochan Testified that Forensic Made No
Consideration of State Farm's "Financial Interests. ......................7

        2.    Mr. Kochan Testified that State Farm Never Told
Forensic to Conclude that Damage Was Caused by
Water.................................................................9

        3.    Mr. Kochan Testified that the 19 Engineer Reports
Were Properly Reevaluated. ..........................................11

        4.    Mr. Kochan Agreed that Forensic Was Retained Solely
to Determine the Predominant Cause of Damage..........................14

    II.    RULE 408 REQUIRES EXCLUSION OF THE SETTLEMENT
AGREEMENT...............................................................16

    III.    THE SETTLEMENT AGREEMENT IS NOT RELEVANT AND IS
UNDULY PREJUDICIAL. ...............................................16

    A.    The Settlement Agreement Is Irrelevant under Fed. R. Evid.
402...............................................................16

B.      The Settlement Agreement Is Unduly Prejudicial, Confusing,
        Misleading and Should be Excluded Pursuant to Fed. R. Evid.
        403 ............................................................................................................... 17

CONCLUSION ............................................................................................................... 18

CERTIFICATE OF SERVICE ...................................................................................... 21

State Farm Fire and Casualty Company respectfully submits this memorandum in support of its motion *in limine* to exclude the Forensic settlement agreement [693-1].

## INTRODUCTION

On July 15, 2010, Forensic Analysis & Engineering Corporation filed a motion seeking dismissal of the claims against it based on a settlement agreement Forensic entered into with Relators Cori and Kerri Rigsby. ([693].)  Although the Court initially granted Forensic's motion and dismissed it from the case ([713]), the government has sought reconsideration of the dismissal.  ([723] & [724].)  Although Forensic's status is in limbo, State Farm nevertheless opposes any attempt by the Rigsbys to refer to or to introduce into evidence any portion of the settlement agreement, which is inadmissible hearsay.[1]

In addition to being inadmissible hearsay, the settlement agreement is also the product of the Rigsbys' financial ruin of Forensic through this and other litigation.  Forensic's principal, Robert Kochan, testified that the only way to save Forensic was to enter into a settlement with the Rigsbys – in effect, under duress.  Although the settlement agreement contains recitations of certain alleged conduct by Forensic and State Farm, these unsworn recitations are clearly part of the "price" of the putative settlement and are contradicted by Mr. Kochan's sworn testimony.  Mr. Kochan testified that at no point did State Farm attempt to improperly influence Forensic's conclusions concerning the McIntosh property or any other property.  As Mr. Kochan's sworn testimony and other undisputed evidence negate these unsworn purchased recitations, they are irrelevant and any probative value is substantially outweighed by their unfair prejudicial effect.

---

[1] It is State Farm's understanding that the government may ultimately consent to the dismissal of Forensic, but may forego its interest in any settlement proceeds.  Should any party seek approval of such an arrangement, State Farm would object to the Rigsbys' recovering any proceeds in excess of the statutory cap provided in 31 U.S.C. § 3730(d).

## THE SETTLEMENT AGREEMENT IS INADMISSIBLE

**I.      THE   SETTLEMENT   AGREEMENT   CONTAINS   MULTIPLE   LEVELS   OF INADMISSIBLE HEARSAY.**

**A.      The Settlement Agreement is Hearsay.**

The settlement agreement and its so-called "admissions" are inadmissible hearsay.   The document is unquestionably "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).   It goes without saying that "[h]earsay is not admissible" absent an applicable exception.  Fed. R. Evid. 802.  Therefore, the Rigsbys should be precluded from offering into evidence or otherwise referring to the settlement agreement since it is inadmissible hearsay.  *See Pavlica v. Behr*, 2005 WL 3181586, *2 (S.D.N.Y. 2005); *GenSci OrthoBiologics v. Osteotech, Inc.*, 2001 WL 36239743 (C.D. Cal. 2001) (statements made within a settlement agreement are hearsay).

**B.      The Alleged Out of Court Statements Contained in the Settlement Agreement are Hearsay within Hearsay.**

Although the settlement agreement itself is hearsay, it also contains multiple levels of hearsay.  For example, the settlement agreement states:

10.    WHEREAS Forensic admits that at State Farm's request, Forensic sent a second professional engineer to re-evaluate 19 loss sites, and Forensic admits that it changed the conclusions in those 19 reports based on the second engineer's inspection and after the initial reports were already sent to State Farm;

11.    WHEREAS Forensic admits that it was asked not to perform a thorough structural evaluation or cost appraisal of the amount of damage identified at a given site, and Forensic agreed to follow State Farm's instructions to describe only the predominant cause of damage to a home when attributing that damage to wind or flood;

([693]-1.)

2

The first paragraph above purports to discuss what State Farm "request[ed]." Any such alleged request is hearsay. Similarly, the second paragraph asserts what State Farm supposedly "asked" of Forensic; the "instructions" State Farm gave to Forensic; and what Forensic "agreed" to do. All of these assertions are out of court statements purportedly attributable to Forensic or State Farm.

Federal Rule of Evidence 805 provides that where hearsay is included within hearsay (as here), "each part of the combined statements [must] conform[] with an exception to the hearsay rule provided in these rules." "[T]he mere fact that one level of a multiple-level statement qualifies as 'non-hearsay' does not excuse the other levels from rule 805's mandate that each level satisfy an exception to the hearsay rule for the statement to be admissible." *United States v. Dotson*, 821 F.2d 1034, 1035 (5th Cir. 1987); *see also Kelly ex rel. Kelly v. Labouisse*, 2009 WL 427103, *3 (S.D. Miss. 2009).

For example, in *Old Line Life Ins. Co. v. Brooks*, 2007 WL 892448, *4 (S.D. Miss. 2007), the court considered an affidavit in which the affiant relayed a statement that had been made to her by her father. According to the affidavit, the affiant's father told her of a telephone conversation that he overheard in which the affiant's sister was plotting the father's death. The father's statement to the affiant was hearsay. Additionally, pursuant to Rule 805, the statements made during the telephone conversation that were recounted by the father to the affiant were likewise hearsay. The court excluded both layers of hearsay. *Id*.

Here, the settlement agreement is itself hearsay. So, too, are the purported statements contained therein that are attributed to representatives of State Farm and/or Forensic. This double hearsay must be excluded pursuant to Rule 805.

C.   **There Is No Applicable Hearsay Exception for the Settlement Agreement or the Double Hearsay it Contains.**

The co-conspirator exception does not apply in this situation. Fed. R. Evid. 801(d)(2)(E). Even if there were a conspiracy (which State Farm expressly denies), "[i]n order to fit the co-conspirator exception, a statement must have been made (1) by a co-conspirator of a party, (2) during the course of the conspiracy, and (3) in furtherance of the conspiracy." *McConnell*, 988 F.2d at 533; Fed. R. Evid. 801(d)(2)(E). "A statement is made in furtherance of the conspiracy if it advances the ultimate objectives of the conspiracy." *United States v. Snyder*, 930 F.2d 1090, 1095 (5th Cir. 1991). Here, however, Forensic's supposed "admissions" in the settlement agreement were not made "during" or "in furtherance of" any alleged conspiracy. Rather, they are at most "revelations of [alleged] past conduct," which have the effect of "*frustrating* [an alleged] conspiracy," and therefore do not qualify for the hearsay exemption. *In re Sunset Bay Assocs.*, 944 F.2d 1503, 1519 (9th Cir. 1991) (emphasis added); *see also, e.g.*, *Krulewitch v. United States*, 336 U.S. 440, 442 (1949) (statement of co-conspirator implicating another co-conspirator is inadmissible if, when statement is made, "the central aim of the alleged conspiracy . . . had long since ended in success or failure"); *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 559 (11th Cir. 1999) (statements that merely "spill the beans" do not further a conspiracy); *United States v. Vowiell*, 869 F.2d 1264, 1267 (9th Cir. 1989) (statements made "after the chief objective of the conspiracy had ended in either success or failure" do not fall within co-conspirator exemption).

In *Padron Warehouse Corp. v. Realty Associates Fund III, L.P.*, 377 F. Supp. 2d 1259, 1267 (S.D. Fla. 2005), for example, a defendant's incriminating statements regarding the purported involvement or knowledge of two co-defendants in an alleged conspiracy were held inadmissible to prove the truth of the matter asserted. The court held that the co-conspirator

4

exemption did not apply because "the objectives of the conspiracy . . . had long since been achieved, and the alleged conspiracy had long since ended," and the defendant who made the admission "was not trying to conceal the conspiracy or prevent detection . . . [but rather was] disclosing the alleged wrongful acts." *Id.* at 1268.  As any claimed conspiracy in this matter has "long since ended," and Forensic's statements were not made during or in furtherance of any alleged conspiracy, its putative "admissions" do not fall within the co-conspirator exemption.

Similarly, Forensic's supposed "admissions" are not admissible against State Farm as statements against interest.  *See* Fed. R. Evid. 804(b)(3).  Initially, this hearsay exception applies only if the declarant is unavailable. *See id.*; *see also* Fed. R. Evid. 804(a) (defining "unavailability"); *Pavlica v. Behr*, 2005 WL 3181586, at *2 (S.D.N.Y. Nov. 29, 2005) (settlement agreements held inadmissible as hearsay because settling defendants were not unavailable within the meaning of Rule 804(a)).  Here, however, the settlement agreement expressly requires Forensic to "make its employees available to testify at trial in the Suit" if requested by the Rigsbys.  ([693]-1 at 3-4.)  Moreover, Forensic's principal, Mr. Kochan, has already given a deposition in this action in which he was extensively questioned by both counsel for State Farm and the Rigsbys.  (Dep. of R. Kochan at *passim*, Ex. A to State Farm's Motion.)

**D.    The Hearsay Bar Is Particularly Appropriate Here as Forensic's Statements Are Inherently Untrustworthy.**

Ultimately, "[t]he hearsay rule . . . is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact." *Chambers v. Mississippi*, 410 U.S. 284, 299 (1973).  The hearsay bar is particularly apposite in this case as the supposed "admissions" by Forensic are nothing more than an attempt by the Rigsbys to manufacture evidence by taking Forensic and Mr. Kochan to the brink of economic ruin.  Mr. Kochan testified that his decision to settle with the Rigsbys was "[a]bsolutely" the result of the Rigsbys

5

having pushed Mr. Kochan and Forensic "to a position of near bankruptcy." (Dep. of R. Kochan at 35:17-23, Ex. A to Mtn.)  In fact, Mr. Kochan testified that he and Forensic "have probably spent or incurred about a quarter of a million dollars worth of legal expenses and associated costs." (*Id.* at 28:22-28:24.)  He also noted that "we've lost about half that much or more, again in lost business revenue because of the potential stigma associated with these lawsuits." (*Id.* at 28:24-29:2.)

Mr. Kochan had no choice but to settle due to the damage the Rigsbys caused him and his company:

> A.   It's a business decision, purely.  I couldn't continue to defend myself.  I couldn't afford to continue to defend myself.  I tried to go pro se, but apparently in the State of Mississippi, that's not allowed for a corporation.  And I'm not in a position to properly reimburse my attorney's firm for their efforts.  So I wanted to allow them to get out, but they – apparently the courts would not allow that.  So I'm sort of between a rock and a hard place.  And if I tried to continue to defend ourselves, as I believe strongly we are – should be defending, we can't afford that, to go – between now and the time you go to court.  So I felt that the offer by the realtors [sic.] while way beyond our physical ability to pay at the moment is the best thing for the corporate's [sic] well-being.

> Q.   Is it your view that it's a decision you had to – it's a decision you had to accept in order to guarantee your own business survival?

> THE WITNESS:      There is no question in my mind that if we did not – if we attempted to continue to defend ourselves, we would not be able to do so and would have to close the doors.

(*Id.* at 35:25-36:23 (alterations in original; objection omitted).)

Given the Rigsbys' strong-arming of Forensic and Mr. Kochan, the settlement agreement and its contents are particularly untrustworthy and the Court must apply the hearsay rule and bar the agreement.  This conclusion is especially true in light of Mr. Kochan's deposition testimony that refutes each of these purported "admissions."  Indeed, in Mr. Kochan's testimony given after

the signing of the settlement agreement, he confirmed that neither State Farm nor Forensic engaged in the wrongdoing that the Rigsbys assert:

> Q.   In reaching this Settlement Agreement, Mr. Kochan, is it your intent to express the view that State Farm did anything wrong in handling its Katrina claims?
>
> A.   Could any of us have done things better?  Yes.  Did we, our firm, do anything knowingly improperly or incorrect?  No.  Did State Farm's representatives who spoke to me personally or to my staff that I'm aware of do anything that was directly improper?  I do not – no, the answer is no.
>
> Q.   It's not your intention in executing this agreement to accuse State Farm of wrongdoing, is it?
>
> A.   It is not my intention to claim that State Farm did anything wrong to us.
>
> Q.   Is it your intention that this document should reflect any – any view that FAEC did anything wrong?
>
> A.   Definitely not.
>
> Q.   Either to State Farm or State Farm's policyholders.
>
> A.   As I said, definitely not.
>
> Q.   And is it your intention in executing this arrangement to express the view that State Farm somehow had an improper arrangement with FAEC?
>
> A.   No.

(Dep. of R. Kochan at 36:25-37:25 (objection omitted).)

Despite this testimony, Forensic's "admissions" drafted by the Rigsbys for inclusion in the settlement agreement suggest that Forensic and State Farm engaged in wrongdoing.  ([693]-1 at 2.)  Each of these "admissions" is inadmissible hearsay.  Further, when each of these "admissions" is considered in light of Mr. Kochan's sworn testimony, it is clear that it is not true, untrustworthy, irrelevant, unduly prejudicial, and should not be offered as evidence at any trial of this action.

## 1.   Mr. Kochan Testified that Forensic Made No Consideration of State Farm's "Financial Interests."

Putting aside the fact that Forensic was retained following Mr. McIntosh's request for an engineer in connection with the homeowners claim, and after the payment of the flood claim, in

paragraph 8 of the settlement agreement, Forensic purportedly "admits" that "it understood State

Farm's financial interests in having engineering reports submitted by Forensic that attributed the

cause of storm damage to flood rather than storm winds."  When asked about this, Mr. Kochan

testified that neither he nor Forensic had any such "understanding":

> Q.    If we look at Paragraph 8 on page 2 of this Settlement Agreement, it has a statement that says:  "Whereas, Forensic admits that it understood State Farm's financial interests in having engineers – engineering reports submitted by Forensic that attributed the cause of storm damage to flood rather than storm winds."  Can you tell me please when it is that you gained that understanding?
>
> A.    Well, like I just said, it would be late in the game.  We were working on reports well into late 2006 or at least middle part of 2006.  So it would be well within that time frame.
>
> Q.    Did anybody from State Farm express that opinion to you; namely, that they had a financial interest in having the cause of damages attributed to water?
>
> A.    It really never came up to the best of my knowledge.
>
> Q.    They didn't instruct you that you needed to find water damage in order to save them money?
>
> A.    No, that was never stated.
>
> Q.    Was – was it ever implied in your conversations?
>
> A.    I do not ever recall such a – such a conversation.  If – if it had, I would not have been willing to continue to support that – that engineering effort.
>
> Q.    You wouldn't have been part of that program, would you have?
>
> A.    My firm, my staff knew that we would not write what other people want us to say.
>
> Q.    And is it – is it your testimony, Mr. Kochan, that the reports that were done by your firm were, in fact, honest and accurate to the best of the ability of your staff?
>
> A.    To my knowledge, at the time and subsequently having reread them, I believe that to be the case.
>
> Q.    And you'll stand by that testimony even today?
>
> A.    Yes, I will.

(*Id*. at 32:11-34:9 (objection omitted).)

> ### 2. Mr. Kochan Testified that State Farm Never Told Forensic to Conclude that Damage Was Caused by Water.

In paragraph 9, Forensic supposedly "admits" that it "believed State Farm would not continue employing Forensic unless Forensic agreed with State Farm's assessment that the properties where secondary reports were requested were damaged predominately by water instead of wind and focused on any possible evidence of flood damage to support that finding." ([693]-1.) Yet again, Mr. Kochan's testimony is to the contrary:

> Q.    . . . . Do you mean to say in that paragraph, Mr. Kochan, that you continued to work for State Farm with the knowledge that you had to find in secondary reports that damage was predominantly caused by water instead of wind?
>
> A.    I did not – I do not – I did not mean by agreeing to this statement that we had to find water damage versus wind damage.
>
> Q.    What did you intend to say?
>
> A.    What I intended to say is that I do – at the time we did believe that we would not be continued – we would not be able to continue working for State Farm and providing technical reports unless we redid, reevaluated the three reports that Lecky King specifically handed me to redo when I met with her; and that we would relook at all of the reports that Brian Ford and Manny Mannon had done and verify their proper technical accuracy.
>
> Q.    So let me break that down a little bit.  On the front end you thought you could only continue working for State Farm if you – if you relooked at the three reports that Lecky was complaining about?
>
> A.    That's correct.
>
> Q.    And those were the McIntosh reports – the McIntosh report, the Mullins report?
>
> A.    I'm sorry, I thought – I'm confused about the three, yeah.
>
> Q.    Okay.  But in looking at those –
>
> A.    It's the first three reports that we turned in, period.
>
> Q.    Okay.
>
> A.    One was by Manny and two were by Brian I believe.
>
> Q.    And when you looked at those reports, did you find that in any of the others, beside McIntosh, that somebody had neglected to report water damage, which was apparent from the investigation?

A.      Yes.  Manny's report had to be revised.

Q.      And that was appropriately revised?

A.      Yes, it was.

Q.      Because he had inappropriately failed to report water damage, which was obvious and discernible?

A.      He inappropriately or ineffectively evaluated all of the facts that were present on the scene and – at the time of his investigation and drew a conclusion based on insufficient data.

Q.      So it was – it was appropriate to relook at that file?

A.      In my opinion, yes.

Q.      And the conclusions you reached after reevaluating it were accurate – accurate and truthful?

A.      I believe so, yes.

….

Q.      Did Lecky King instruct you that that was the conclusion you were to find [that damage to the house was predominately cased by the storm surge and waves associated with that surge]?

A.      No.

Q.      Did anybody from State Farm instruct you that you had to find that conclusion?

A.      No.

Q.      How did you reach that conclusion?

A.      Well, first of all, Jack Kelly reached it.

Q.      Right.

A.      And with the – with the conclusion associated with additional evidence provided, weather information by Jack – I'm sorry, by William Forbes and all of us looked at it, so we agreed.

….

Q.      Well, is it – is it your view that it's important for your operation to be able to identify when an engineer is not competently doing a job?

A.      Oh, absolutely.

Q.      And do you – are you critical of a client like State Farm who questions the competency of an engineer in a situation like this?

A.      As I've stated before, it is their job to – it was, I'm sorry, Lecky King's job in my opinion, my understanding to get a technically accurate report from the firms that she hired to do the work.  And it is our job as that firm to provide a very – as technically accurate of work as we possibly can.

10

(*Id*. at 93:23 – 95:25; 99:14 - 101:5 (objection omitted).)

> ### 3. Mr. Kochan Testified that the 19 Engineer Reports Were Properly Reevaluated.

In paragraph 10, Forensic purportedly "admits" that "at State Farm's request, Forensic sent a second professional engineer to re-evaluate 19 loss sites, and . . . that it changed the conclusions in those 19 reports based on the second engineer's inspection and after the initial reports were already sent to State Farm." ([693]-1.) Putting aside for a moment the Rigsbys' grossly misleading reference to the 19 reports, Mr. Kochan's deposition testimony establishes that there was nothing improper about this review:

> A.  And when I agreed to Number 10, I agreed to the wording such that when I went and met with Lecky King, it was her intent, at least I believed it was to be her intent, that it was our job to verify and evaluate all of the work that Brian Ford had already done, all right. And, therefore, I took on that responsibility and had my firm take on the responsibility to go and relook at all of the work assignments that he had already done prior to this date. And we did that.
>
> So while you will find by going through these files that not every one had been issued to State Farm by any means, the reality is we did look at every one – we reevaluated every one that Brian Ford had done and Manny Mannon had done.
>
> Q.  So Paragraph 10 realistically could be more accurately stated as Forensic agreed that it would review all reports done by Brian Ford; that it conducted an evaluation of those; and where it found that the reports were not complete or in error, it corrected them?
>
> A.  That would be a more precise statement, yes.
>
> Q.  The – the fact that a second engineer took – took a look at the 19 files that were identified by Forensic in its January answers to interrogatories doesn't imply that the second engineer was doing something inappropriate, does it?
>
> A.  You mean the first engineer?
>
> Q.  Either the first or the second engineer.  The fact that you had a second engineer looking at it wasn't inappropriate, was it?
>
> A.  I don't see how it could possibly be inappropriate to have a second set of eyes look at anything.

Q.     And is it your opinion, Mr. Kochan, that the second engineer's evaluation was honest and valid?

A.     Jack [Kelly]'s as honest as the day is long.  There is no question about it.

Q.     And it's – it's not your testimony, is it, that State Farm actually gave you this list of 19 files and told you to go pull these files and reevaluate?

A.     No, that was not meant to be understood that way.

Q.     In fact, they never did that, did they?

A.     No.

Q.     And the fact that you felt, based on your discussions with Lecky, that you should go back and look at Brian Ford and Manny Mannon's work did not constitute in your opinion a command or instruction on her part that you change the conclusions of the file, did it?

A.     We didn't know – when I – when I gave the direction that we were going to relook at every one of those, we had no way of knowing at that point whether or not any of them, one or all, were going to be changed.

Q.     Right.  Or merely supplemented with additional findings consistent with the facts?

A.     That was a possibility also.

Q.     Right.  In fact, that also occurred, didn't it?

A.     Those were supplemental issues when we were asked specifically to go back and add – look at something additionally that was developed or evaluated.

Q.     Right.  But no one from State Farm told you what conclusion to reach on any of these files, did they?

A.     No one asked – no one, excuse me, specifically told us what – what the results of any of our evaluations should have been.

Q.     That was left to your professional judgment and the judgment of the engineers working for you?

A.     That is true.

Q.     Also, State Farm never specifically came to you and said, "We want you to pull these 19 files and – and reevaluate them," did they?

A.     No, sir.

(*Id*. at 102:20 – 106:8 (objections omitted).)

Moreover, when the 19 reports are individually analyzed, it is obvious that this so-called "admission" is grossly misleading.  When the initial reports are compared with the revised, peer-

reviewed reports for these eighteen properties, at least four of these initial draft reports found significant damage caused by *flood*.  (*See* A. King Decl. at ¶ 5, [765-15].)  Additionally, for at least six properties, the revised report concluded that *wind* was a significant contributing factor to the damage to the property.  (*See id.*)  In fact, one revised report found *no flood* damage whatsoever, and another revised report concluded that there was *more wind* damage than originally reported in the first report.  (*Id.*)  Far from evidencing a "systemic scheme to defraud the government," ([740] at 4), these revised reports demonstrate a review process focused on providing an accurate damage assessment.

The eighteen properties are further inapposite for a host of other reasons.  Notably, *ten* of the properties did *not* have a Katrina-related flood claim with State Farm (*see* T. Blalock Aff. ¶¶ 4-5, [765-16]; A. King Decl. at ¶ 5, [765-15]), and therefore cannot have any connection with the Rigsbys' supposed "scheme," because State Farm could not have overpaid on a flood claim that did not exist.  Similarly, at least ten of the properties were reduced to slabs.  (*See* A. King Decl. at ¶ 5, [765-15].)  As this Court has recognized, "FEMA approved payment of SFIP limits" where "insured dwellings" were "left as slabs, pilings, or empty shells," and therefore, slab cases are beyond "the outer limits of the potential claims involved in this action."  ([343] at 10-11.)  State Farm could not have overpaid on a flood claim where FEMA approved payment of full flood policy limits.

Any attempt by the Rigsbys to use these other reports is further undercut by the fact that at least nine of the initial reports were never sent to State Farm.  Though the Rigsbys claim that State Farm "coerc[ed], intimidat[ed], and ultimately conspir[ed] with Forensic to change and hide reports . . . after first providing the report to State Farm" ([740] at 10), the record shows that almost half of the reports were amended during Forensic's internal peer review process and were

***never*** provided to State Farm. (*See, e.g.*, Ex. A, Kochan Dep. at 59:10-68:8, 101:21-103:18, 106:16-109:19, 253:3-15; A. King Decl. at ¶ 5, [765-15].) Obviously, if "State Farm had never received [a] report . . . they couldn't ask me to change it." (Ex. A, Kochan Dep. at 261:5-8.)

In short, each of the other eighteen additional properties identified by the Rigsbys as evidence of a supposed "scheme" falls into one or more of the categories above. In other words, ***not a single one*** can be part of the Rigsbys' alleged "scheme." As this Court aptly noted in another context, "[i]t is not enough for Plaintiff to charge State Farm with sinister conduct or motives as far as the discovery process goes (which the Court does not find from a review of the materials supporting the application for review), and the Court is not going to allow Plaintiff to pursue a never-ending story backed by speculation." *Gagne v. State Farm Fire & Cas. Co.*, No. 1:06-cv-711-LTS-RHW, 2008 WL 7959086, at *1 (S.D. Miss. Dec. 12, 2008) (Senter, J.). The Rigsbys should not be allowed to rely on this misleading "admission."

### 4. Mr. Kochan Agreed that Forensic Was Retained Solely to Determine the Predominant Cause of Damage.

In paragraph 11, Forensic supposedly "admits" that "it was asked not to perform a thorough structural evaluation or cost appraisal of the amount of damaged identified at a given site, and [that] Forensic agreed to follow State Farm's instructions to describe only the predominant cause of damage to a home when attributing that damage to wind or flood." ([693]-1.) On this point, Mr. Kochan testified that there was nothing improper about the scope of Forensic's assignment:

Q.    . . . "Forensic admits that it was asked not to perform a thorough structural evaluation or cost appraisal." In fact, you were – you were never asked to do that?

A.    That's correct.

Q.    And did anybody tell you don't do that under any circumstances or it was just never part of your assignment?

14

A.    It was never part of our assignment.

Q.    I just want to make sure that I understand this.  This looks like it's a direction, don't you dare, don't you ever do that.  I don't think it was ever part of the discussion, was it?

A.    There actually was one or two discussions sort of with the individual adjuster when the assignment was made, could we tell him how much it was going to cost or what needed to be done.

Q.    Right.

A.    And we said in effect, no, that's not what we do because we're not even licensed – or not insured, excuse me, we're not insured to do that kind of analysis and evaluation.  We don't have the – we did not have the original drawings and information associated with each residence, so we could not give a valid evaluation.

Q.    Well, the wording on this is a little peculiar.  It says:  "Forensic admits that it was asked not to perform a thorough structural evaluation or cost appraisal."  Did, in fact, State Farm come to you and say, "Don't you perform a structural evaluation or cost appraisal"?

A.    Yes.  State Farm said, "We don't want you to do that."

Q.    Okay.

A.    All right.  "All we want you to do is tell us what caused the problem."

Q.    Right.  And that's exactly what you were qualified and willing to do?

A.    Correct.

Q.    Did you ever make a proposal that you take on any greater engineering role than that?

A.    No.

Q.    And you would have refused to do that, if I understand you correctly?

A.    We would have – if we had been asked to do that, we would have required a lot more information, a lot higher fee and different individuals.

Q.    You would have had to bring in additional engineers?

A.    That's correct.

Q.    You just weren't equipped to do it?

A.    We were not equipped at the time to do it, that's correct.

(*Id*. at 110:16-112:23 (objection omitted).)

To say the least, it is unusual to have "admissions" such as these in a settlement agreement, particularly where the party making the "admissions" continues to deny any

15

wrongdoing in the same settlement agreement.  ([693]-1 at 2.)  Mr. Kochan's testimony exposes the contrived statements that the Rigsbys inserted into the settlement agreement for the untrustworthy shams that they are.

## II.    RULE 408 REQUIRES EXCLUSION OF THE SETTLEMENT AGREEMENT.

Fed. R. Evid. 408 prohibits the introduction into evidence of compromises and offers to compromise in an effort to "prove liability for . . . a claim . . . ."  "The spectre of a subsequent use [of a settlement agreement] to prejudice a separate and discrete claim is a disincentive which Rule 408 seeks to prevent."  *See Branch v. Fid. & Cas. Co. of New York*, 783 F.2d 1289, 1294 (5th Cir. 1986).     Indeed, where the settlement agreement is "admitted for the jury's consideration in determining liability and the quantum of damages[,] [a]dmission for that purpose [is] error."  *Id*.; *see Arceneaux v. Shell Oil Co.*, 200 F.3d 814 (5th Cir. 1999).  This prohibition applies to the settlement agreement at issue.

Although Rule 408(b) allows the use of a settlement agreement for certain purposes, such as to show " a witness's bias or prejudice," none of these exceptions is applicable.  Instead, this is a classic case of an attempt to use a settlement agreement to prove liability.  Rule 408 prohibits any such use by the Rigsbys and the settlement agreement must be excluded.

## III.   THE SETTLEMENT AGREEMENT IS NOT RELEVANT AND IS UNDULY PREJUDICIAL.

### A.    The Settlement Agreement Is Irrelevant under Fed. R. Evid. 402.

As detailed above in Section I.D., each of the unsworn supposed "admissions" made by Forensic is contradicted by Mr. Kochan's subsequent sworn deposition testimony.  Of course, to be relevant, the settlement agreement must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 402.  The fact that Mr. Kochan has sworn that

16

these "facts" are not true renders them irrelevant and inadmissible.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999); *Heil v. Santoro*, 147 F.3d 103, 110-111 (2d Cir. 1998); *Morales v. City of New Jersey*, 2009 WL 1974164, *7 (D.N.J. 2009); *United States v. $715,031.27 Seized from Wachovia Bank*, 587 F. Supp. 2d 1275, (N.D. Ga. 2008); *Kafu v. Kelly Services*, 2007 WL 465533, *5 (D.S.C. 2007).  Indeed, "one of the grounds for excluding settlement agreements is '[t]he evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position.'"  *Software Tree, LLC, v. Red Hat, Inc.*, 2010 WL 2788202, * 2 (E.D. Tex. 2010) (quoting advisory committee's note ¶ 1 to Fed. R. Evid. 408).

> **B.     The Settlement Agreement Is Unduly Prejudicial, Confusing, Misleading and Should be Excluded Pursuant to Fed. R. Evid. 403.**

Any probative value of the settlement agreement "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."  Fed. R. Evid. 403.  To present the settlement agreement to the jury in this action in light of Mr. Kochan's sworn testimony as detailed above would not only hopelessly confuse the jury, but would also be unduly prejudicial to State Farm.

> Federal Rule of Evidence 403 generally precludes the admission of settlement agreements, the fact of settlement and the terms of settlement on public policy and relevancy grounds because its minimal probative value is outweighed by the danger of unfair prejudice and misleading the jury.  Moreover, the prejudice created by the admission of such evidence cannot be cured through a limiting instruction to the jury.

*Mavrinac v. Emergency Medicine Ass'n of Pittsburgh*, 2007 WL 4190714, *2 (W.D. Pa. 2007); *see also Trout v. Milton S. Hershey Medical Ctr.*, 572 F. Supp. 2d 591, 597 (M.D. Pa. 2008)

(finding that admission of settlement agreement "would lead to juror confusion and cause undue prejudice to plaintiffs' case.").[2]

## CONCLUSION

The settlement agreement is hearsay within hearsay and inherently untrustworthy.  To this end, Mr. Kochan's testimony puts the Rigsbys' contrived "admissions" in the proper light:

Q.    In your view, Mr. Kochan, do you think you've been wrongfully accused of wrongdoing by the Rigsbys?

A.    I know we have been wrongfully accused by not only the Rigsbys, but the other Plaintiffs, previous Plaintiffs in this – this long litigation process.

Q.    And can you tell me to the best of your ability what accusations you believe have been wrongfully made against you and your company?

A.    In a nutshell, we've been accused of colluding, working with State Farm knowingly to adjust the results of our technical efforts to such a degree that they – the reports would help the insurance firm not to have to pay either all or partially for potential losses.

Q.    Did that occur?

A.    It did not occur.  We did not work in any way in any kind of collusion with State Farm or any other insurance company for that matter.

. . . .

Q.    [A]nd do you continue to believe, Mr. Kochan, that the claims made against you by the Plaintiffs in this case are groundless, false and fraudulent?

. . . .

A.    I'll go to my deathbed thinking that, yes.

(Dep. of R. Kochan at 29:15-30:12; 269:19-269:25 (objections omitted).)

For the foregoing reasons, State Farm respectfully moves the Court to prohibit the Rigsbys from offering into evidence or otherwise referring to the Forensic settlement agreement

---

[2] *See Wilkins v. P.M.B. Systems Engineering, Inc.*, 741 F.2d 795, 798 n.2 (5th Cir. 1984) ("[B]ecause of the adverse prejudicial effect of non-settling defendants, the plaintiff, or both, resulting from some of the manipulations possible under the Mary Carter device, and because of the inherent power of a trial court to enforce settlement agreements reached in cases pending before it, and to determine the validity of such agreements, it is important that the trial court retain a significant degree of discretion in approving and enforcing Mary Carter agreements, as well as in disclosing their terms to the jury.") (internal citations omitted).

at any evidentiary procedure, including trial and in connection with any motion other than this one or any further motion practice in connection with the approval of the settlement.  ([693]-1.)

      This the 27th day of September, 2010.

                        Respectfully submitted,

                        STATE FARM FIRE AND CASUALTY COMPANY

By:     s/*Benjamin M. Watson* (MSB #100078)
           Robert C. Galloway (MSB # 4388)
           Jeffrey A. Walker (MSB # 6879)
           E. Barney Robinson III (MSB #09432)
           Benjamin M. Watson (MSB #100078)
           Amanda B. Barbour (MSB # 99119)

           ITS ATTORNEYS

OF COUNSEL:

BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
Post Office Drawer 4248
Gulfport, MS   39502
(P)(228) 575-3019
(E) bob.galloway@butlersnow.com


BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
200 Renaissance at Colony Park, Suite 1400
1020 Highland Colony Parkway (39157)
Post Office Box 6010
Ridgeland, MS 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) jeff.walker@butlersnow.com
(E) barney.robinson@butlersnow.com
(E) ben.watson@butlersnow.com
(E) amanda.barbour@butlersnow.com

Michael B. Beers (ASB-4992-S80M), PHV
BEERS, ANDERSON, JACKSON, PATTY & FAWAL, P.C.
Post Office Box 1988
Suite 100
250 Commerce Street (36104)
Montgomery, Alabama 36102
(P) (334) 834-5311
(F) (334) 834-5362
(E) mbeers@beersanderson.com

*PRO HAC VICE*

James R. Robie (CA State Bar # 67303), PHV
ROBIE & MATTHAI
Suite 1500
Biltmore Tower
500 South Grand Avenue
Los Angeles, California  90071
(P) (213) 706-8000
(F) (213) 706-9913
(E) jrobie@romalaw.com

*PRO HAC VICE*

## <u>CERTIFICATE OF SERVICE</u>

I, Benjamin M. Watson, one of the attorneys for State Farm Fire and Casualty Company,

do hereby certify that I have this day caused a true and correct copy of the foregoing instrument

to be delivered to the following via the means directed by the Court's CM/ECF System:

C. Maison Heidelberg
Ginny Y. Kennedy
MAISON HEIDELBERG P.A.
795 Woodlands Parkway, Suite 220
Ridgeland, MS 39157
(P) (601) 351-3333
(F) (601) 956-2090
maison@heidlebergpa.com
ginny@heidelbergpa.com

Scott D. Gilbert
August J. Matteis, Jr.
Craig J. Litherland
Benjamin R. Davidson
GILBERT LLP
11 New York Avenue, NW
Suite 700
Washington, DC 20005
gilberts@gotofirm.com
matteisa@gotofirm.com
litherlandc@gotofirm.com
davidsonb@gotofirm.com

COUNSEL FOR CORI RIGSBY AND KERRI RIGSBY

Patricia R. Davis
Jay D. Majors
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
(P) (202) 307-0264
(F) (202) 514-0280

21

Alfred B. Jernigan, Jr.
Felicia C. Adams
UNITED STATES ATTORNEY'S OFFICE
Southern District of Mississippi
Suite 500
188 East Capitol Street
Jackson, MS 39201
(P) (601) 965-4480
(F) (601) 965-4409
(E) felicia.adams@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

Larry G. Canada
Kathryn Breard Platt
GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
2510 14th Street
Suite 910
Gulfport, MS 39501
lcanada@gjtbs.com
kplatt@gjtbs.com

ATTORNEYS FOR HAAG ENGINEERING CO.

THIS the 27th day of September, 2010.


                        By:     s/*Benjamin M. Watson* (MSB #100078)
                                Benjamin M. Watson (MSB #100078)

Jackson 5578818v1

22