**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA**
***EX REL.* CORI RIGSBY and KERRI RIGSBY**                                          **RELATORS**

**V.**                                                **CIVIL ACTION NO.1:06CV433 LTS-RHW**

**STATE FARM FIRE AND CASUALTY COMPANY, *ET AL.***                    **DEFENDANTS**


**MEMORANDUM OPINION**
**CONCERNING STATE FARM FIRE AND CASUALTY COMPANY'S**
**MOTION [739] TO DISMISS FOR RELATORS' VIOLATION OF SEAL ORDER**

The Court has before it the motion [739] of State Farm Fire and Casualty
Company (State Farm) to dismiss this action on the grounds that the Relators have
made public statements and disclosed materials in violation of the seal requirement of
the False Claims Act (FCA), 31 U.S.C. §§3729 - 3733.

State Farm has submitted forty-nine exhibits in support of this motion.  These
exhibits identify the following instances of disclosures alleged to be seal violations:

1.    A July 28, 2006, e-mail from Zach Scruggs (then one of the
      Relators' attorneys) to Joseph E. Ree (Ree), a representative
      of ABC News.  This exhibit contains no substantive statement
      concerning this action, but the e-mail references prior and
      apparently on-going communications between the correspondents.

2.    An August 7, 2006, e-mail from Beth Jones (Jones) (Executive Assistant
      to Richard F. Scruggs, one of the Relators' attorneys) to Ree.
      This exhibit is apparently a cover note for the delivery of engineering
      reports referenced therein.  The e-mail does not identify the reports
      by referring to any particular property, any particular engineer, or
      any particular engineering company.

3.    An August 7, 2006, a thirty-eight page PDF sent by Jones to Ree
      containing a pleading entitled "Relator's Evidentiary Disclosure
      Pursuant to 31 U.S.C. §3730."

4.     Excerpts taken for a deposition given by Cori Rigsby (CR) on November 19, 2007, in the case styled *McIntosh v. State Farm Fire and Casualty Company*, Civil Action No.1:06CV1080 LTS-RHW (the McIntosh case). This testimony references three mid-August, 2006, interviews given by CR to a local newspaper, the *Sun Herald*; to "AP" (which I assume is a reference to The Associated Press news organization); and to Brian Ross of the ABC news magazine "20/20." The testimony also makes reference to an interview with *Glamour* on a date not specified.

5.     A transcription of the August 25, 2006, ABC news magazine "20/20." The subject of the lead story in this television program was entitled "Blowing in the Wind," and the story dealt with the Relators' allegations that State Farm had deliberately mischaracterized property damage caused by wind as damage caused by storm surge flooding. Both of the Relators appear in this television presentation and discuss the substance of these allegations against State Farm.

6.     Excerpts taken from a deposition given by Kerri Rigsby (KR) on April 30 and May 1, 2007, in the McIntosh case. This testimony also makes reference to the August 25, 2006, ABC news magazine "20/20."

7.     An August 14, 2006, e-mail from Richard Scruggs to Michael Kunzelman (Kunzelman), an "AP" employee, containing an "SF [State Farm] Disclosure PDF." The attachment appears to be another copy of "Relators Evidentiary Disclosures Pursuant to 31 U.S.C. §3130" except for the omission of the pages containing the style of the case and the pages containing the table of contents.

8.     An August 22, 2006, e-mail from Jones to Kunzelman containing, as a PDF attachment, the engineering report on the McIntosh property prepared by Brian Ford (Ford) for the use of State Farm. This report was prepared while Ford was working for Forensic Engineering (Forensic). This attachment includes a copy of the front page of the report bearing a note "Put in Wind file - Do NOT Pay Bill Do not discuss."

9.     The PDF attachment containing the December 16, 2005, engineering report on property belonging to Minh Nguyen prepared by John B. Kelly (Kelly) for the use of State Farm. Kelly was working for Forensic at the time he prepared this report.

10.    The PDF attachment containing the October 20, 2005, engineering report on the McIntosh property prepared by Kelly for the use of State Farm. Kelly was working for Forensic at the time he prepared this report.

11.     The PDF attachment containing the January 31, 2006, engineering report on the Nguyen property prepared by Kelly for the use of State Farm. Kelly was working for Forensic at the time he prepared this report.

12.     A September 18, 2006, e-mail from Jones to Joseph Treaster (Treaster) of *The New York Times*.  This e-mail also contains a PDF attachment of what appears to be another copy of "Relators Evidentiary Disclosures Pursuant to 31 U.S.C. §3130" except for the omission of the pages containing the style of the case and the pages containing the table of contents.

13.     A portion of a *New York Times* article entitled "A Lawyer Like a Hurricane."  This article appeared on March 16, 2007.  The portion of the article State Farm has submitted is about Richard Scruggs's involvement in the litigation of Hurricane Katrina damage claims, and there is no substantive discussion of the substance of the FCA complaint or the allegations contained in the Relators' complaint.

14.     A January 22, 2007, e-mail from Jones to Treaster.  The one-page e-mail reads, in its entirety: "Dick [Scruggs] asked that I send this to you in confidence. Beth" There is no indication what material was sent along with this e-mail.

15.     A June 6, 2007, e-mail from Jones to "rey@cbsnews.com" with a PDF attachment containing a copy of "Relator's First Amended Complaint for Damages Under the False Claims Act, 31 USC §3729 Et Seq."

16.     Excerpts taken from a deposition given by Rex Deloach (Deloach) as the Rule 30(b)(6) representative of SLF, Inc., the successor in interest to the Scruggs Law Firm, on August 4, 2010, in the case at bar. Deloach testified concerning a "Bloomberg article" that described Richard Scruggs's having flown to Bloomington (the town in which State Farm's offices are situated) to pick up a package that may have contained documents related to this litigation. Deloach testified that the package contained no such documents and was in fact sent to Bloomington in order for Richard Scruggs to go there and retrieve it as part of a ruse.  Deloach testified that there were no communications by the Scruggs Law firm to United States Representative Gene Taylor concerning this action or specifically concerning the Relators or the claim related to the McIntosh property.  According to Deloach, Richard "had cautioned the Rigsby sisters [the Relators] not to talk about the *qui tam* case [the case at bar]."  Deloach also testified that his discussions with Zach Scruggs and Charlene Bosarge (Richard Scruggs's secretary) indicated they had never revealed the existence of the case at bar to the media prior to August 1, 2007.

-3-

17.    A February 28, 2007, Associated Press article by Kunzelman concerning the potential for certification of a class action against State Farm for claims related to Katrina damage.  This proposed class action was never approved.  The class action was proposed in the wake of the settlement Richard Scruggs reached with State Farm for the individual clients he and the Scruggs Katrina Group represented.

18.    Excerpts from a June 28, 2010, deposition given by Richard Scruggs in the case at bar.  Richard Scruggs gave no substantive testimony during this deposition, invoking his rights under the Fifth Amendment in response to every question posed by State Farm's counsel.

19.    Excerpts from a June 25, 2010, deposition given by CR in the case at bar.  CR testified that she did not know whether Jones has sent anything related to the case at bar to Kunzelman, and she testified that she did recall meeting with United States Representative Gene Taylor at the behest of her then attorney Richard Scruggs on one occasion.

20.    A four-page document entitled: "Congressional Record – House of Representatives Proceedings and Debates of the 109th Congress, Second Session Thursday, September 21, 2006."  The subject of the document is identified as "*H6903 Bad Faith Actions and Policies of State Farm Insurance in Mississippi."  This document, without making a specific reference to the case at bar, does refer to allegations that State Farm had mischaracterized wind damage as flood damage, and Representative Taylor refers to the Relators by name, describing them as "whistleblowers."  The document reflects a specific and detailed accusation that State Farm violated the FCA.  Representative Taylor calls for an investigation by the inspector general of the Department of Homeland Security.

21.    A February 28, 2007, "Statement of U. S. Representative Gene Taylor before the Financial Services Committee Subcommittee on Oversight and Investigations regarding Insurance Claims Payment Process on the Gulf Coast."  This document makes an explicit reference to the case at bar: "The Scruggs Law Finn [sic] represents the [Relators] in a False Claims Act filing against State Farm and Renfroe.  That federal fraud case is still active."  The statement repeats the allegation that State Farm's claims adjusting practices and the claims adjusting practices of Allstate, Nationwide, and USAA violated the FCA.

-4-

22.     Excerpts from a Privilege Log [739-22] filed by The Rendon Group, a
        public relations firm.

23.     Excerpts from the deposition testimony of John Rendon (Rendon) not
        submitted because of "issues relating to the Consent Protective Order."

24.     Excerpts taken from a deposition given on July 29, 2010, by Sandra
        Libby, Rule 30(b)(6) designee for The Rendon Group, in the case at
        bar.  In these excerpts, the witness identifies certain documents as
        business records of The Rendon Group. The documents referred
        to were apparently produced in the form of a CD-ROM by Rendon in the
        course of litigation conducted in Washington, D.C.  The deposition does
        not specifically identify any of these documents.

25.     A memorandum from Ainsley Perrien (Perrien) to Rendon dated January
        24, 2007.  This document is mainly concerned with a disagreement
        between Richard Scruggs and State Farm over "the whistleblowers in the
        case" (presumably the Relators and presumably the case at bar), but the
        memorandum makes no specific reference to the case at bar or to the
        allegations of the Relators' Amended Complaint.

26.     A memorandum from Sid Backstrom (Backstrom) to Perrien dated
        January 25, 2007.  Attached to this memorandum is an e-mail
        exchange among the members of the Scruggs Katrina Group (SKG)
        concerning the group settlement reached with State Farm for SKG's
        individual clients.  There is no reference to the case at bar or to the
        allegations of the Relators' Amended Complaint.

27.     An exchange of memoranda (apparently via e-mail) between Perrien
        and Jill Rosenbaum (apparently with CBS News) dated February 11 and
        12, 2007.  There is no specific reference to the case at bar or the
        underlying facts, and the exchange primarily concerns a disagreement
        between Richard Scruggs and State Farm over the terms of a proposed
        class action settlement agreement. The disagreement concerns the
        Relators' relationship with their former employer, Renfroe, and Renfroe's
        action against the Relators in Alabama.

28.     A memorandum from Perrien to Rendon, Bryan Rich, and Robert Pace
        dated February 15, 2007.  Attached is a letter, also dated February 15,
        2007, from Richard Scruggs to United States Senator Trent Lott and
        United States Representative Gene Taylor.  This letter suggests that the
        Relators be invited (or subpoenaed) to testify at Congressional hearings
        concerning claims handling practices followed by State Farm after Katrina.
        The letter describes, in general terms, the facts set out in and the legal
        theory followed in preparing the Relator's Amended Complaint in the case

-5-

at bar, but the letter does not mention the pending *qui tam* action, nor does it refer to a potential action under the FCA.

29.     A memorandum dated February 16, 2007, from Zach Scruggs to Perrien referring to a request for information from Melba Newsome (Newsome), a writer for *Glamour*.

30.     A memorandum dated February 19, 2007, from Perrien to the Relators concerning "the wiki page" and also concerning an interview requested by Newsome.

31.     A memorandum dated February 20, 2007, from Perrien to Zach Scruggs concerning a potential television series entitled "Business Crimes" to be broadcast on CNBC and the Relators' potential participation in the preparation of a story for that series.  The memorandum refers to a "gag order" and to "a lawsuit," but it is not clear to me whether these references concern the case at bar or the Alabama litigation between E. A. Renfroe and the Relators.

32.     A memorandum dated February 15, 2007, from Robert Page (Page) to Perrien concerning "a potential Wiki entry."  The material attached to this does not refer specifically to the case at bar, nor does it refer to State Farm's handling of flood insurance claims.

33.     A brief (two line) e-mail dated February 17, 2007, from Perrien to the Relators asking for their thoughts on "the wikipedia thing and also about the radio show."

34.     A short (four line) e-mail dated February 17, 2007, from KR to Perrien approving the "'wikipedia thing'" and expressing uncertainty about the scope of an order entered by Judge Acker in the Alabama litigation with Renfroe.

35.     An e-mail exchange dated February 21, 2007, among Perrien, KR, CR, and Page concerning clarification of certain information to the entry in *Wikipedia* about the Relators.

36.     An e-mail exchange dated February 21, 2007, among Perrien, CR, and Page forwarding the revised *Wikipedia* entry.

37.     An e-mail exchange dated February 20, 2007 between Perrien and the Relators requesting final approval by the Relators of the revised *Wikipedia* entry.

38.     An e-mail dated February 21, 2007, from KR to Perrien approving

the revised *Wikipedia* entry.

39.     An e-mail exchange dated March 15, 2007, between Perrien and
        Zach Scruggs concerning an article carried in the March 14, 2007,
        edition of the *Wall Street Journal* entitled "Mississippi Justice" and
        written responses critical of that article.

40.     An e-mail exchange dated March 21, 2007, between Perrien and
        KR concerning a set of photographs, presumably of the Relators.

41.     An e-mail exchange dated May 14, 2007, between Zach Scruggs
        and Perrien concerning "National Whistleblowers Week" and
        a statement by United States Senator Chuck Grassley in support of that
        event.

42.     A memorandum dated April 13, 2007, between Jay Majors and
        Anthony DeWitt concerning receipt of unspecified "Supplemental
        Disclosures."

43.     An e-mail exchange dated May 22, 2007, between the SKG and
        The Rendon Group.  Attached to this e-mail are copies of a post
        by David Rossmiller on his website, Insurancecoverageblog.com, and
        a copy of the Relators' Amended Complaint

44.     An e-mail exchange dated May 22, 2007, from Backstrom to
        Perrin stating that the seal on the New Orleans *qui tam* case "just got
        lifted."

45.     An e-mail dated May 24, 2007, from Joel Feyerherm to Rendon
        concerning investigations of Allstate Insurance Company's claims
        handling practices following Katrina.

46.     An e-mail dated May 29, 2007, from Perrien to Rendon
        concerning the progress of government investigations of Allstate and
        Nationwide Insurance Company and concerning the lifting of the seal
        in the New Orleans *qui tam* suit.

47.     An e-mail dated June 5, 2007, from Perrin to Rendon concerning
        efforts to "reach out to DHS [presumably the Department of Homeland
        Security] and Justice" in connection with the investigations being
        conducted by these agencies and concerning related political issues.

47.     An e-mail dated August 6, 2007, sent by Backstrom to a number of
        recipients concerning the lifting of the stay in the case at bar.

48.     A 106-page compilation of e-mails concerning media contacts
        with the SKG.

State Farm contends that the disclosures reflected in these documents constitute
such egregious violations of the FCA's seal requirement, 31 U.S.C. §3730(b)(2), that
dismissal of this action is justified.

## Standards and Factors To Be Taken Into Consideration

I find no case decided by the Fifth Circuit Court of Appeals directly dealing with
the issue State Farm has framed, but I do find decisions made by courts of appeal in
other federal circuits.  In these decisions, certain basic principles have been
established:

1.      The failure to follow the sealing requirements of 31 U.S.C. §3730(b)(2)
is not jurisdictional, and the violation of those requirements does not require
dismissal of the *qui tam* complaint in all circumstances. *U.S. ex rel. Lujan v.
Hughes Aircraft Co.*, 67 F.3d 242 (9th Cir.1995).  The Sixth Circuit has
established a *per se* rule that failure to follow the sealing requirements of the
FCA requires dismissal of the complaint, *U.S. ex rel. Summers v. LHC Group,
Inc.*, 623 F.3d 287 (6th Cir. 2010), but no other circuit court has adopted this
*per se* rule.

2.      The failure to file a False Claims Act complaint under seal and
a failure to observe the other procedural requirements set out in the Act
(service of the complaint on the government with certain written disclosures)
may support a district court's exercise of discretion to impose the sanction
of dismissal. *U.S. ex rel. Summers v. LHC Group, Inc.,* 2009 WL 1651503 (M.D.
Tenn) aff'd 623 F.3d 287 (6th Cir. 2010); *United States ex rel. Pilon v. Martin
Marietta Corp.,* 60 F.3d 995 (2d Cir.1995); *U.S. ex rel. Mailly v. Healthsouth
Holdings, Inc.*, 2010 WL 149830 (D.N.J.); *Taitz v. Obama*, 707 F.Supp.2d 1
(D.D.C. 2010); *U.S. ex rel. Le Blanc v. ITT Industries, Inc.*, 429 F.Supp.2d 303
(S.D.N.Y. 2007).  Where the proper sealing procedure and the other procedural
requirements under the FCA have been followed at the time the complaint is
filed, dismissal may yet be justified by post-filing disclosures in certain
circumstances.  *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242
(9th Cir.1995).

3.      Where the proper filing procedure is followed and the relator thereafter
makes post-filing disclosures concerning an FCA action, the rule followed by the
majority of the circuits requires the district court to weight three factors to
determine the appropriate sanction, if any, that should be imposed:

        a.      The harm suffered by the government from post-filing

disclosures made by the relators;

b.      The relative severity of the violation of the seal requirement; and

c.      Whether there is evidence of bad faith or willfulness in making the disclosures.

These three factors are discussed at length in *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242 (9th Cir.1995). (the *Lujan* case) While Lujan followed the proper statutory procedure when she filed her FCA action, Lujan improperly disclosed the nature and existence of her *qui tam* case in a post-filing interview with a major media outlet during the time the complaint was still under seal.  The district court granted the defendant's motion to dismiss.  Lujan appealed.  The court of appeals found that Lujan's giving this interview was a clear violation of the seal provisions of 31 U.S.C. §3730(b)(2).  The district court's order of dismissal was, however, reversed.  In reversing, the court of appeals discussed these three factors and remanded the case to the district court for consideration of the merits of the defendant's motion after consideration of these factors.

In the *Lujan* case, by establishing these three factors to guide the discretion of the district court, the court of appeals was attempting to honor the balance Congress struck, in enacting and amending the FCA, between the relator's need to promptly initiate an FCA case and the government's need for adequate time to investigate the facts the relator alleges and to evaluate the merits of the relator's charges.  The court of appeals determined that the purpose of the sealing requirement was to afford the government a fair opportunity to conduct its investigation without "tipping off" the FCA defendant that a government investigation is underway.

The cases dealing with this issue only indirectly address the question of exactly what information the sealing requirement is intended to keep confidential.  Is the seal intended to insure the confidentiality of the information underlying an FCA complaint, or is the seal intended only to prevent disclosure of the fact that a government investigation is under way, or both?  The answer to this question determines whether a relator's disclosure of the facts underlying the *qui tam* action constitutes a violation of the seal requirement in and of itself, or whether a violation of the seal order occurs only when the disclosure of those facts is accompanied by a disclosure that a *qui tam* complaint has been filed.

In most reported decisions, the *qui tam* relator has inside information sufficient to suggest, at least to the relator's satisfaction, that false or fraudulent claims are being submitted to the government.  This information is usually not widely known, nor is this information ordinarily a matter of public interest or public discussion.  So the sealing requirement of the FCA normally operates to prevent both the disclosure of the information in the complaint, i.e. of the information that indicates the facts and

-9-

circumstances in which the false claims are generated, and also the fact that a *qui tam* action has been filed and a potential government investigation triggered.

Since the purpose of the seal is to protect the interest of the government by allowing a period of time for the government to investigate the allegations and facts disclosed by a relator without "tipping off" the defendant, in my view, a disclosure of the facts underlying the *qui tam* action alone, without the disclosure that those allegations had led to the filing of the *qui tam* action, does not necessarily constitute a violation of the seal order.  A disclosure that is limited to factual allegations is far less likely to indicate to the defendant that a government investigation is underway.  This is particularly true when the identical wrongful act (mischaracterizing wind damage as flood damage) would be both an FCA violation and a violation of the terms of a private insurance policy.  Where the information is already a matter of heated and substantial public discussion before the *qui tam* complaint is filed, the information itself cannot be concealed–nor public discussion curtailed– no matter how strictly the seal provision is enforced and observed.

## The Facts and Circumstance of the Case at Bar

 State Farm has not alleged that the Relators failed to initially follow the required statutory procedures.  State Farm contends that the Relators' post-filing actions violated the seal requirements under the FCA.

The complaint in this action was filed under seal on April 26, 2006. On July 5, 2006, the United States moved the Court, under 31 U.S.C. §3730(b)(3), to extend the 90-day sealing period to afford the government additional time to make its decision whether to intervene in this action.  This request was granted, and subsequent orders further extended the sealing period.  The seal was partially lifted on January 1, 2007, to allow the Relators to make certain disclosures in judicial proceedings in related but independent litigation in Alabama.  The Relators' First Amended Complaint was filed May 22, 2007, and the stay was fully lifted on August 1, 2007.

The first question I must consider is the effect of the partial lifting of the seal on January 1, 2007.  At the time Magistrate Judge Walker entered his order partially lifting the seal, this action had been filed and sealed for some seven months.  In partially lifting the seal, the Court authorized the Realtors to make disclosures concerning this action to judicial officers presiding in the Alabama litigation.  The order partially lifting the seal does not specify that the judicial disclosures themselves be made under seal, and this order could therefore be reasonably interpreted to authorize these judicial disclosures in pleadings and other documents distributed to the litigants and their attorneys in the Alabama litigation.  This type of disclosure would effectively make the original seal of the *qui tam* case moot. In these circumstances, I consider the relevant period of the seal to be from April 26, 2006, (the filing of the original FCA complaint) through January1, 2007 (the partial lifting of the seal).

During this period, the Relators and the attorneys who were then representing them in private litigation against State Farm, (Richard Scruggs, representatives of the Scruggs Law Firm, and the participants in the Scruggs Katrina Group, a joint venture involving a number of Mississippi attorneys) made many public statements accusing State Farm of misconduct in its claims adjusting practices.  These attorneys represented a large number of individual property owners who were making claims against State Farm and against other insurers named in the Relators' original *qui tam* complaint for benefits allegedly owed under various homeowners policies.

The adjusting practices these attorneys (and many other litigants and attorneys pressing similar policy claims) alleged included attempts by the insurers (State Farm and others) to avoid payment of wind damage claims on the grounds that the damage in question was caused by storm surge flooding.  Damage from storm surge flooding is excluded from coverage under State Farm's (and other insurers') homeowners policies, while damage done by hurricane winds is included in coverage under these policies. This specific type of alleged misconduct (wrongfully characterizing wind damage as flood damage) would have the effect of reducing the benefits owed for wind damage. The same alleged misconduct would also produce inflated flood damage claims in cases where the claimants were insured under both a homeowners policy and a flood policy.

Indeed, counsel for State Farm, during oral argument of this motion, invited the Court's attention to a complaint filed by other litigants who not only made these allegations (deliberate mischaracterization of damage causation), but also alleged directly that the insurers' conduct created inflated and false flood insurance claims under the National Flood Insurance Program.  *Cox, et al. v. National Mutual Ins. Co., et al.* Civil Action No.1:05cv436 LG-RHW.  The complaint was not an FCA case, and the complaint was not filed under seal.  The pleadings making these allegations were a matter of public record long before the Relators' FCA action was filed.

Some of the public statements made by the Relators and their attorneys were widely broadcast through the new media, perhaps the best example being a segment of the ABC news magazine "20/20" that aired on August 25, 2006.  The segment was entitled "Blowing in the Wind." The transcript of this segment (Item 5 above) contains excerpts from interviews with both Relators, and in these interviews the Relators discuss their contention that State Farm undertook to unfairly characterize wind damage as water damage and thereby avoid paying policyholders' legitimate claims. But neither this program nor most of the other interviews and statements submitted by State Farm in support of this motion specifically discuss or disclose the existence of this FCA suit.

State Farm has identified three instances when the attorneys then representing the Relators disclosed the existence of this FCA action and the underlying fact the Relators alleged in support of this action.  These three instances all occurred during the time before the partial lifting of the seal.  These are the disclosures of the document

entitled "Relators Evidentiary Disclosures Pursuant to 31 U.S.C. §3130" on August 7, 2006, (Item 3 above); on August 14, 2006, (Item 7 above); and on September 18, 2006, (Item 12 above).

The Congressional Record entry (Item 20 above) reflects an allegation made by United States Congressman Gene Taylor that State Farm "stole from the taxpayers" by improperly mischaracterizing wind damage as flood damage.  This Congressional Record entry specifically refers to the FCA.  But Congressman Taylor's statement does not make specific reference to this FCA action, and I find no evidence in the record that Congressman Taylor reached his conclusions based on information he received from the Relators.

The February 15, 2007, letter from Richard Scruggs to Senator Lott and Congressman Taylor (item 28 above) does refer to this *qui tam* action, and Congressman Taylor's February 28, 2007, statement (item 21 above) could reasonably be inferred to have been based, at least in part, on information supplied in this letter. But both the letter and the statement occurred several weeks after the partial lifting of the seal.  The other disclosures that indicate that a *qui tam* action had been filed, the disclosure of a copy of the Relators' amended complaint on June 6, 2007 (Item 15 above) and on May 22, 2007 (Item 43 above), also occurred after the seal had been partially lifted on January 1, 2007.

The other instances identified by State Farm reflect, to one degree or another, disclosures and discussions of the underlying facts, but they contain no disclosure of the existence of this FCA action.  Nor do these other instances reflect allegations that State Farm's actions involve the submission of false claims to the government.  These other instances characterize State Farm's alleged misconduct as attempts to avoid paying legitimate wind damage claims and make no reference to claims for reimbursement under the National Flood Insurance Program.  This distinction is important, because the purpose of the seal requirement is to protect the interest of the government by allowing a period of time for the government to investigate the FCA allegations and facts disclosed by a relator without "tipping off" the defendant that such an investigation is underway.  Absent a disclosure that a government investigation is underway, a discussion of the underlying facts does not necessarily compromise the government's investigation.  This is certainly true in the circumstances that existed after Hurricane Katrina, when the question of whether storm damage was attributable to wind or to water permeated much of the public discourse in this area.  There were literally thousands of damage claims in which this issue was a critical factor, and the public discussion of this issue began almost as soon as the flood waters receded and adjustors were deployed to begin assessing the damage done by the storm.

In this case, the government declined to intervene, and since the government has not disclosed its reason for staying out of the case, it is difficult to gauge what damage, if any, the disclosures discussed below may have done to the government's interests.  While the pleadings in this case clearly indicate that the  government is

-12-

actively monitoring the progress of the case, the government has filed no pleading the Court could use to determine the extent of the damage, if any, the government believes it has sustained.  Likewise, there is nothing in the State Farm submissions to support a finding of fact that the disclosures harmed the government's interests.

I find no evidence that the early disclosures the Relators' attorneys made to media outlets (Items 3, 7, and 12 above) led to a public disclosure in the news media that this action had been filed.  Without such a public disclosure, these violations of the seal could not have impaired the government's ability to investigate the Relators' allegations. There would have been nothing to "tip off" State Farm that a government investigation was underway.  Thus, despite the violation of the seal order by the Relator's attorneys (Items 3, 7, and 12 above) before the seal was partially lifted on January 1, 2007, I see no evidence in the record that would support a finding that these disclosures hampered the government's investigation or otherwise compromised the government's ability to make its investigation.

The impact of these disclosures (Items 3, 7, and 12 above) was not so severe as that of the disclosure discussed in the *Lujan* case.  There the filing of the FCA case was publicly disclosed in a major media outlet at an early point in the litigation.

It is also apparent to me that the Relators' role in making these disclosures was not an active one.  While a party is responsible for the actions taken by his attorney, there is nothing in the record to suggest that the disclosures in question (Items 3, 7, and 12 above) were authorized by or made at the suggestion of the Relators.  Absent some evidence that would support the inference that the Relators approved, authorized, or initiated these disclosures (Items 3, 7, and 12 above) I find no basis to conclude that the Relators have acted willfully or in bad faith.

It is abundantly clear that Richard Scruggs and the SKG used formidable public relations resources, including use of The Rendon Group, in an effort to control the public perception of the issue at the heart of this *qui tam* action, i.e. whether State Farm deliberately mischaracterized wind damage as flood damage in assessing claims under the insurance policies it was adjusting.  As far as the wind damage claims are concerned, these attorneys were acting well within their rights as advocates for their clients who had homeowners policy claims.  These attorneys were not free to disclose the existence of this *qui tam* action, and had their improper disclosures (Items 3,7, and 12 above) led to accounts in the public media indicating that such an action was underway, the government's ability to investigate the Relators' allegations might well have been compromised.  But that is not the case disclosed in the record before me.

Based on all of these considerations, I do not believe dismissal of this action for violations of the seal provisions of the FCA to be appropriate.  I will therefore deny State Farm's motion [739] to dismiss.  An appropriate order will be entered.

**DECIDED** this date, the 24th of January, 2011.

                            s/ L. T. Senter, Jr.
                            L. T. SENTER, JR.
                            SENIOR JUDGE