IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.;<br>   CORI RIGSBY; AND KERRI RIGSBY | RELATORS/COUNTER-DEFENDANTS |
| v. | CASE No. 1:06-cv-433-LTS-RHW |
| STATE FARM FIRE & CASUALTY<br>   COMPANY, et al. | DEFENDANTS/COUNTER-PLAINTIFFS |

### RELATORS' RESPONSE TO
### STATE FARM'S SUPPLEMENTAL MEMORANDUM [877]

Cori and Kerri Rigsby ("Relators") respectfully submit this Response to State Farm's Supplemental Memorandum (docket entry [877] ("Motion")).

**I.   PRELIMINARY STATEMENT**

State Farm's continued attempt to rely on *Branch* as helpful precedent is remarkable. *Branch* was dismissed because the relator in that case had no direct and independent knowledge of a fraudulent scheme. Rather, the relator based its entire case on a number of exemplar properties where insurers allegedly shifted losses from homeowner policies to flood policies. From those examples of allegedly overpaid flood claims, the *Branch* relator asserted that there should be an inference of a fraudulent scheme. The problem was that the relator did not identify a single example of a property for which the same insurer issued both the flood and the wind policies. In other words, of all the examples the *Branch* relator cited and relied upon, not one involved a single insurer. What made matters worse is that the *Branch* relator apparently alleged

that there were properties with single insurers:  "Branch's contention that it 'never alleged that Fidelity issued the homeowners' policies on the [exemplar] properties' is plainly disingenuous."[1]

Judge Vance apparently learned for the first time at the summary judgment stage that there were no examples of a property where one insurer adjusted both the flood claim and the wind claim.  Accordingly, since the *Branch* relator's only basis for fraud was an inference to be drawn from a number of overpaid flood claims, its entire case evaporated once Judge Vance learned that none of the insurers had any incentive to shift losses on any of the properties at issue.

Moreover, the *Branch* decision affirmatively helps the Rigsbys' position because the decision emphasizes that a relator need not allege specific examples of false claims, but rather must have direct and independent knowledge of the fraudulent scheme.  Judge Vance explained that "a relator need not be an original source of the actual false claims made by the defendant to the government;" rather, a relator "must be an original source of the core information underlying its complaint . . . at a minimum, that information must include who committed the fraud and the basic mechanisms involved."[2]

The Rigsbys easily satisfy that standard.  They have alleged from the earliest stages of this case that State Farm engaged in a fraudulent scheme.  They have direct and independent knowledge of the precise mechanisms that State Farm used to carry out the fraud.  Specifically, the Rigsbys have direct and independent knowledge of State Farm:

- Instructing adjusters that because Hurricane Katrina was a "water storm" adjusters should presume that the major damage they witnessed was caused by flooding;

---

[1] *United States ex rel Branch Consultants, L.L.C. v. Allstate Ins. Co.*, No. 06-cv-4091 (E.D. La. Jan. 24, 2011) [875] at 51 (the "*Branch* Decision").

[2] *Id*. at 65.

- Instructing adjusters to use Xact Total rather than prepare a line item estimate for any homes whose damage appeared to exceed the policy limits;

- Instructing adjusters to rerun their Xact Total estimates until they "hit the limits" of the flood policy;

- Instructing adjusters to only pay for obvious and discernible wind damage under the homeowners policy and to rely on engineering reports to assess and pay wind damage claims;

- Forcing engineers to change the conclusions in their reports when the conclusions did not support State Farm's position that wind damage in Hurricane Katrina was relatively minor; and

- Cancelling all pending orders for engineering reports when it became apparent that engineers did not agree with State Farm's incorrect belief that Hurricane Katrina was a water storm.

Thus, McIntosh is not merely an exemplar case from which the Rigsbys seek to raise an inference of fraud by the fact that State Farm overcharged the government for flood damage. Rather, McIntosh is a quintessential example of a fraudulent adjustment for which each and every aspect of the fraudulent scheme was implemented. The Rigsbys were told to look exclusively for flood damage when dealing with major losses. Kerri Rigsby was dispatched to the McIntosh property with Cody Perry, and because the house suffered major damage, they assumed it was from flooding. The Rigsbys were told to go out and hit the flood limits by using Xact Total, even in cases where the homes were not completely destroyed. Kerri Rigsby witnessed the use and approval by State Farm management of Xact Total on the McIntosh home. The Rigsbys witnessed Lecky King commandeer the process of influencing and intimidating engineers to find flood damage instead of wind damage. Kerri Rigsby found the two conflicting reports on the McIntosh property. Accordingly, the Branch decision supports the strength of the Rigsbys' position as relators in this case.

## II.   ARGUMENT

### A.   The Relator's Actual Knowledge of the Scheme is Sufficient.

As Relators described in their initial notice, the *Branch* Decision recognizes that a Relator need not provide examples of actual false claims to qualify as an original source if the relator has direct and independent knowledge of a scheme by which false claims were submitted.[3]  The *Branch* Decision says this explicitly:

> [T]his Court has ruled that a relator need not be an original source of the actual false claims made by the defendant to the Government . . . [A] relator must be an original source of a certain core of information, such as the basic *modus operandi* of the fraud.  Branch, therefore, must be an original source of the core information underlying its complaint in order for the Court to have jurisdiction.  At a minimum, that information must include who committed the fraud and the basic mechanisms involved.[4]

State Farm argues that "the court dismissed Branch's complaint *for failure to identify a false claim*" because at the summary judgment stage, Branch was required to come forth with "competent evidence of an actual false claim."[5]  If State Farm's interpretation were correct, the *Branch* Decision would have been much simpler.  Branch admitted that the three insurers in question did not issue wind policies for any of the exemplar properties in its complaint, yet the court did not treat this admission as dispositive.[6]  Instead, the court went on to assess whether, even without exemplar properties, Branch still qualified as an original source based on its direct

---

[3]  *Id.* at 65.

[4]  *Id*.  State Farm contends that in the quoted language, Judge Vance was using the word "claim" to refer to "an actual submission of that claim to the government" rather than an "exemplar false property."  Motion at 6.  But this interpretation cannot be reconciled with the second half of the quotation.  If Judge Vance meant to say that a relator must identify a specific exemplar property, then Judge Vance would not also have considered it sufficient for a relator to be an original source of the "core information" such as who committed the fraud and the modus operandi involved.

[5]  Motion at 5 (emphasis added).

[6]  *Branch* Decision at 51 ("Branch now admits, however, that Fidelity did not issue wind policies for any of the exemplar properties"), 58 ("As it does with Fidelity, Branch now admits that American Reliable did not insure any of the exemplar properties against wind damage"), and 59 ("Branch admits that ANPAC did not issue wind policies for any of the exemplar properties").

4

and independent knowledge of the broader scheme it alleged.  If the *Branch* court had agreed with State Farm that, as a matter of law, a relator must identify specific false claims to qualify as an original source, most of the *Branch* Decision would have been completely unnecessary.

### 1. A Relator Must Be an Original Source of "Core Information."

The *Branch* Decision recognized that a relator under the False Claims Act need only be an original source of the "core information" in its complaint.[7]  Judge Vance analyzed several relevant cases to explain the "core information" requirement.  *See Branch* Decision at 62 (citing *United States v. New York City Health & Hosp. Corp.*, No. 95-cv-7659, 2000 WL 1610802 (S.D.N.Y. Oct 27, 2000) (*"New York Medical College I"*); *aff'd sub nom United States v. New York Medical College*, 252 F.3d 118, 121 (2d Cir. 2001) ("*New York Medical College II*")).  The relators in *New York* were former executives of a New York City hospital who, raised questions about certain billing practices the hospital utilized.[8]  The city of New York eventually audited the hospital, and the relators brought suit alleging that the hospital had submitted false claims based on the audit report's conclusions.[9]  The District Court in *New York I* noted that the purpose of the original source requirement is "to encourage persons with first-hand knowledge of the fraudulent misconduct . . . to come forward" while "preclude[ing] people with second hand information from trying to bring suit."[10]  The court then found that the plaintiffs were not original sources because "plaintiffs did not have any independent knowledge of fraudulent conduct.  They did not discover any information upon which the fraud allegations are based, nor did they make any firsthand observations of such fraud during the course of their employment . . . ."[11]  Indeed, the

---

[7] *Id.* at 62-65

[8] *New York Medical College I* at *1

[9] *New York Medical College I* at *2.

[10] *New York Medical College I* at *4 (citation omitted).

[11] *Id.* at 4-5.

5

relators in *New York* "concede[d] that they learned the facts underlying the FCA complaint from audit reports."[12] The Second Circuit affirmed this ruling, also finding that, "as the amended complaint clearly evidences, the source of the core information underlying plaintiff's allegation of fraud is the two audits conducted" by a third party.[13]

The *Branch* Decision then cited several other cases which similarly assessed whether a relator had direct and independent knowledge of the core allegations in the complaint in light of reliance on second hand sources and public disclosures. In *United States ex rel. Smith v. Yale*, 415 F. Supp. 2d 58, 72, 82 (D. Conn. 2006) ("Smith") the district court also applied the test that "although a relator need not possess *all* relevant information in order to have independent knowledge, he or she must possess substantive information about the particular fraud" or the "core information" upon which the allegations are based. *Smith* found the relator's information wanting because "Relator has simply failed to show that he would have had knowledge of the fraud without the information *obtained from other sources*."[14] *See also United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1163 (10th Cir. 1999) (affirming dismissal of claim where "it seems evident that most of the core information contained" in the complaint came from "independent research and investigation" conducted by the relator's attorney and not the relator himself).

---

[12] *New York Medical College I* at *5.

[13] State Farm mischaracterizes *New York Medical College I* and *New York Medical College II* when it cites them for the proposition that "knowledge of a fraudulent scheme is insufficient to meet the original source requirement in the absence of direct and independent knowledge of actual overcharges." Motion at 8. The *New York* decisions did not distinguish between a relator's knowledge of actual overcharges and a relator's knowledge of a broader scheme. Both decisions found that the relators did not have direct and independent knowledge of *any* of the allegations in their complaint because those allegations were entirely based on an audit report.

[14] *Smith* 415 F. Supp. 2d at 84 (emphasis added).

## 2. Branch's Claims were Dismissed Due to a Lack of Core Information, Not a Failure to Identify Particular False Claims.

The *Branch* relator's claims were dismissed because, without the exemplar properties cited in its complaint, there was no support for the core allegations that originated with that relator. "The entire theory of Branch's original complaint is that the defendants shifted losses from wind to flood in order to avoid making payments under the wind policies."[15] The Court initially had found that Branch's theory satisfied the False Claims Act's jurisdictional requirements because "the presence of a large number of fraudulent adjustments suggests that there are many more examples of the same conduct – a 'scheme' even."[16] But at the summary judgment stage, Branch's theory unraveled once Branch admitted that the insurers in question did not issue both wind and homeowner policies for any of the exemplar properties identified in its complaint.

The key difference between this case and *Branch*, however, is that in *Branch*, the alleged exemplar properties were, in fact, the only information that originated with the relator. Without those exemplar properties, Judge Vance found that the relator's allegations amounted to "the same kind of general allegations of loss-shifting fraud as the allegations contained in numerous public disclosures."[17] Thus, Branch's claims were dismissed because the relator was not in fact an original source of any of the core information.

However, the *Branch* Decision carefully distinguishes a relator's suspicion that false claims may have been submitted from a relator's direct and independent knowledge of wrongdoing. As examples, *Branch* first cited the Supreme Court's decision in *Rockwell Int'l Corp. v. United States*, 549 U.S. 457 (2007). The relator in *Rockwell* alleged that its former

---

[15] *Branch* Decision at 51

[16] *Branch* Decision at 53, citing [615] at 38.

[17] *Id.*

7

employer submitted false claims arising out of the operations of a nuclear weapons plant.  One of the allegations made by the relator was that the piping system the company was developing to manufacture concrete blocks was incapable of producing solid cement blocks to store toxic sludge.[18]  This allegation proved to be incorrect, and for some period of time, the piping system initially worked as planned.[19]  However, a year and a half after the relator ceased working for the nuclear weapons plant, the piping system became defective when a plant employee began using an incorrect ratio of toxic sludge in the cement blocks.[20]  The Supreme Court held that the relator did not have direct and independent knowledge because the piping system became defective while the relator "was no longer employed" by the plant.[21]   The Rockwell relator "did not know that the [piping system] had failed; he predicted" and it was a "failed prediction" because he did not correctly identify the source of the failure.[22]

*Branch* also relied on the Fourth Circuit's decision in *United States ex rel Vuyyuru v. Jadhav*, 555 F.3d 337 (4th Cir. 2009), where, after the relator's single example of fraud was discredited, his claim was dismissed because "mere suspicion that there must be a false or fraudulent claim lurking around somewhere simply does not carry his burden of proving that he is entitled to original source status."[23]  The relator in *Vuyyuru* was the publisher of the Virginia Times, and he admitted that the allegations in his suit were "actually derived from" a Virginia Times article.[24]  The *Branch* court concluded that "[i]n *Vuyyuru*, as in the present case, the only

---

[18] *Rockwell*, 549 U.S. at 460-61.

[19] *Id.* at 461-62.

[20] *Id.* at 475-76.

[21] *Id.*

[22] *Id.*

[23] *Branch* Decision at 56 quoting *Vuyyuru*, 55 F.3d at 353

[24] *Vuyyuur* 55 F.3d at 343, 346

8

exemplar or exemplars have been disproved and the relator cannot be considered an original source as to a broader scheme based on mere suspicion or public information."[25]

Importantly, *Branch* did not find that, without exemplar properties, a relator can only speculate that there may have been wrongdoing. Rather, the court analyzed Branch's remaining allegations and found them to be faulty because they were "the same kind of general allegations of loss-shifting fraud as the allegations contained in numerous public disclosures."[26] By implication, if Branch had been involved in insurer adjustments of flood claims and had actual knowledge to support its allegations that insurers engaged in a scheme to defraud the government, its claims would have survived despite the lack of identification of specific false claims. The failure of the exemplar properties required dismissal only because Branch lacked that experience and knowledge.

### B. The Rigsbys Have Actual Knowledge of State Farm's Scheme to Defraud the Government.

In contrast to the *Branch* relator, the Rigsbys are original sources of State Farm's scheme to defraud the government because they had direct and independent knowledge of that scheme before they filed their complaint.[27] The fundamental components of the scheme that Relators identified in their compliant have been confirmed, not revealed, through the discovery process:

- Instructing adjusters that because Hurricane Katrina was a "water storm" adjusters should presume that the major damage they witnessed was caused by flooding;

---

[25] *Branch* Decision at 56.

[26] *Id.* at 54.

[27] State Farm contends that the Rigsbys cannot "retroactively recast themselves as original sources based on" anything they learn in discovery. Motion at 10. But the Rigsbys are original sources of State Farm's scheme to defraud the government based on their first-hand experience with that scheme, and the Rigsbys had that experience and knowledge at the time they filed their complaint.

9

- Instructing adjusters to use Xact Total rather than prepare a line item estimate for any homes whose damage appeared to exceed the policy limits and to rerun their Xact Total estimates until they "hit the limits;"

- Instructing adjusters to only pay for obvious and discernible wind damage under the homeowners policy and to rely on engineering reports to assess and pay wind damage claims;

- Forcing engineers to change the conclusions in their reports when the conclusions did not support State Farm's position that wind damage in Hurricane Katrina was relatively minor; and

- Cancelling all pending orders for engineering reports when it became apparent that engineers did not agree with State Farm's incorrect belief that Hurricane Katrina was a water storm.[28]

The Relators did not *suspect* that State Farm *may have* defrauded the government, they know that State Farm defrauded the government because they were instructed to adjust flood claims following Hurricane Katrina in a way that shifted losses to the federal government. As to McIntosh, every aspect of this scheme was implemented in the way the McIntosh claim was adjusted. The Relators' direct and independent knowledge makes State Farm's scheme the threshold issue in this litigation.

---

[28] *See* Relators' Consolidated Post-Hearing Brief [348] at 7-14

THIS the 25th of February, 2011                           Respectfully submitted,

                                                                               /s/ C. Maison Heidelberg
C. MAISON HEIDELBERG, MB #9559
GINNY Y. KENNEDY, MB #102199

OF COUNSEL
August J. Matteis, Jr. (*admitted pro hac vice*)              HEIDELBERG HARMON PLLC
Craig J. Litherland (*admitted pro hac vice*)                 795 Woodlands Parkway, Suite 220
Benjamin Davidson (*admitted pro hac vice*)                   Ridgeland, Mississippi 39157
Derek Sugimura (*admitted pro hac vice*)                      Phone No.  (601) 351-3333
Lucian C. Martinez, Jr. (admitted pro hac vice)               Fax No.  (601) 956-2090
                                                              mheidelberg@heidelbergharmon.com

GILBERT LLP
1100 New York Avenue NW, Suite 700
Washington, DC 20005
Phone No.  (202) 772-2200
Fax No.  (202) 772-3333
matteisa@gotofirm.com
litherlandc@gotofirm.com
davidsonb@gotofirm.com
sugimurad@gotofirm.com
martinezm@gotofirm.com

                                                             Attorneys for Kerri Rigsby and Cori Rigsby

**CERTIFICATE OF SERVICE**

  I, C. Maison Heidelberg, attorney for Cori Rigsby and Kerri Rigsby, do hereby certify that I have this 25th day of February, 2011 caused the foregoing document to be filed with the Court's CM/ECF system, which will cause notice to be delivered to all counsel of record.

        Don Burkhalter, Esq.
        UNITED STATES ATTORNEY
         FOR MISSISSIPPI
        188 East Capitol Street, Suite 500
        Jackson, MS 39201

        Felicia Adams, Esq.
        ASSISTANT U.S. ATTORNEY
        188 East Capitol Street, Suite 500
        Jackson, MS 39201

        Joyce R. Branda, Esq.
        Patricia R. Davis, Esq.
        Jay D. Majors, Esq.
        UNITED STATES DEPARTMENT OF JUSTICE
        Commercial Litigation Branch
        Civil Division
        601 D Street, NW
        Washington, DC 20004

        Larry G. Canada, Esq.
        Kathryn Breard Platt, Esq.
        Galloway, Johnson, Tompkins, Burr & Smith
        701 Poydras Street, Suite 4040
        New Orleans, LA 70139
        (p) 504-525-6802
        ATTORNEYS FOR HAAG ENGINEERING CO.

        Robert C. Galloway, Esq.
        Emerson Barney Robinson, III, Esq.
        Benjamin M. Watson, Esq.
        Jeffrey A. Walker, Esq.
        Amanda B. Barbour, Esq.
        BUTLER, SNOW, O'MARA,
         STEVENS & CANNADA, PLLC
        P.O. Box 22567
        Jackson, MS 39225
        (p) 601-948-5711

Michael B. Beers, Esq.
BEERS, ANDERSON, JACKSON
  PATTY & FALWAL, PC
250 Commerce Street, Suite 100
Montgomery, AL 36104
(p) 334-834-5311
ATTORNEYS FOR STATE FARM MUTUAL
INSURANCE COMPANY


        /s/    C. Maison Heidelberg___

2