## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA *ex rel*.** | § | |
| **CORI RIGSBY and KERRI RIGSBY** | § | **RELATORS/** |
| | § | **COUNTER-DEFENDANTS** |
| | § | |
| **v.** | § | **Civil No. 1:06CV433-HSO-RHW** |
| | § | |
| **STATE FARM FIRE AND** | § | **DEFENDANT/** |
| **CASUALTY CO.** | § | **COUNTER-PLAINTIFF** |
| | § | |
| **and** | § | |
| | § | |
| **HAAG ENGINEERING CO.** | § | **DEFENDANT** |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is the Motion for Summary Judgment [734] filed by Defendant State Farm Fire and Casualty Company ["State Farm"], in which the remaining Defendant Haag Engineering Co. ["Haag"] has joined [742]. Relators Cori Rigsby and Kerri Rigsby have filed a Response [767] in opposition to the Motion, and State Farm has filed a Rebuttal [780]. The parties have also filed various Notices [873], [874], [875], [889], of intervening or supplemental authority with respect to the present Motion. State Farm has further filed a Supplemental Memorandum [877-1] in support of this and other Motions, to which Relators have filed a Response [883], and State Farm a Rebuttal [887].

There are other Motions [736], [738], [878], [880], also pending in this cause. However, in its Supplemental Memorandum [877-1] in support of its for Summary Judgment [734], State Farm questions this Court's jurisdiction under the False Claims Act ["FCA"], 31 U.S.C. §§ 3729, *et seq*., asserting that Relators' remaining

exemplar property, the property of Thomas and Pamela McIntosh, is not a false

claim, such that this Court should dismiss this case for lack of subject matter

jurisdiction.  Supp. Mem. [877-1], at pp. 2–5.  Because the Court is duty bound to

examine the basis of its subject matter jurisdiction, the Court must resolve the

Motion for Summary Judgment [734] before addressing any of the other pending

Motions.  After consideration of the Motion for Summary Judgment, the related

pleadings, the record, and the relevant legal authorities, and for the reasons

discussed below, the Court finds that the Motion for Summary Judgment [734]

should be granted in part and denied in part.

## I.  BACKGROUND

Relators Cori Rigsby and Kerri Rigsby initiated this action by filing their

Complaint [2] on April 26, 2006, *in camera* and under seal, pursuant to the FCA.

Relators asserted that Defendants violated §§ 3729(a)(1), (a)(2), (a)(3), and (a)(7) of

the Act.[1]  They identified State Farm,[2] Nationwide Insurance Company, Allstate

---

[1]In 2009, Congress amended 31 U.S.C. § 3729 in the Fraud Enforcement and Recovery Act of 2009 ["FERA"].  Pub.L. 111-21, § 4(a), May 20, 2009, 123 Stat. 1621.  Subsections 3729(a)(1),(a)(2), (a)(3), and (a)(7) were redesignated as subsections 3729(a)(1)(A), (B), (C), and (G), respectively.  Most of these amended subsections apply only to conduct occurring on or after the date of enactment, which was May 20, 2009.  *See* Pub.L. 111-21, § 4(f), May 20, 2009, 123 Stat. 1625.  However, subsection 3729(a)(1)(B), formerly subsection 3729(a)(2), applies retroactively to all claims pending on or after June 7, 2008.  *Id.*; *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n.1 (5th Cir. 2010).  Relators filed this action in 2006, and the First Amended Complaint [16] was pending on June 7, 2008.  The Court will therefore apply the current, 2009 version of § 3729(a)(1)(B), *in lieu* of the earlier version contained in § 3729(a)(2).  *See Steury*, 625 F.3d at 267 n.1.  However, because the conduct involved here occurred before the 2009 revisions to the statute, the Court will apply the earlier versions of §§ 3729(a)(1), (a)(3), and (a)(7) to Relators' other claims.  *See id.*; *see also, e.g., United States v. Caremark, Inc.*, 634 F.3d 808, 814–15 (5th Cir. 2011) (applying pre-2009 version of § 3729(a)(7) to

Insurance Company, USAA Insurance Company, Forensic Analysis Engineering Corporation, Exponent, Inc.,[3] Haag Engineering Co., Jade Engineering, Rimkus Consulting Group, Inc., and Structures Group, as Defendants.

Relators were employees of E.A. Renfroe, Inc., with which State Farm contracted to assist in the adjustment of insurance claims following Hurricane Katrina. Relators' Am. Compl., at pp. 4, 7–8, 16. Relators allege that Defendants conspired to illegally shift their responsibility to pay claims for wind damage on homeowner's insurance policies to the government, through the National Flood Insurance Program ["NFIP"], by classifying wind damage to properties covered by both a homeowner's policy and a flood policy as storm surge damage, thereby shifting insurers' potential wind losses to the government under the NFIP. In short, Relators assert that Defendants knowingly submitted false flood claims to the government which were in fact wind claims.

---

conduct prior to 2009). Relators allege that State Farm's failure to reimburse the National Flood Insurance Program, which is the subject of their reverse FCA claim under § 3729(a)(7), is ongoing, such that the conduct should be deemed to have occurred after the date of the amendment. Relators' Resp. [767], at p. 35. However, whichever version of this subsection the Court applies, the result as to this particular claim would be the same.

[2]The Complaint and First Amended Complaint named State Farm Mutual Insurance Company as a Defendant. The Court entered an Agreed Order [516] on May 18, 2010, correcting a clerical error as to State Farm's proper name. All references to "State Farm Mutual Insurance Company" were changed to "State Farm Fire and Casualty Company." Agreed Order [516], at p. 2.

[3]The Complaint and First Amended Complaint named Exponent Failure Analysis as a Defendant. The Court entered an Order [81] on March 27, 2008, granting Relators' Motion to Amend to change the name of Exponent Failure Analysis to Exponent, Inc. Order [81], at p. 1.

Relators filed their First Amended Complaint [16] on May 22, 2007, also *in camera* and under seal, identifying as Defendants those named in the original Complaint [2], and adding E.A. Renfroe, Inc., Jana Renfroe, Gene Renfroe, and Alexis King as Defendants.  In addition to the four counts contained in their original Complaint, Relators asserted a fifth count for retaliation, pursuant to 31 U.S.C. § 3730(h), against Defendants State Farm and E.A. Renfroe, Inc.  In a Memorandum Opinion [343] and Order [344], entered on August 10, 2009, Senior United States District Judge L.T. Senter, Jr., granted summary judgment on this claim, leaving only the four claims raised in the original Complaint.

On January 10, 2007, Magistrate Judge Robert H. Walker entered an Order [8] partially lifting the seal.  At Relators' request, the Court granted permission to disclose the existence of this case to any judicial or court officers who were assigned to a specific, related case pending in the United States District Court for the Northern District of Alabama.  Order [8], at p. 1.  On August 1, 2007, the Court granted a second Motion to Unseal filed by Relators, and directed the Clerk of Court to unseal this case in its entirety.  Order [25], at p. 1.

On January 31, 2008, the United States of America filed a Notice [56] that it would not be intervening in the case at that time.  Pursuant to 31 U.S.C. § 3730(c)(3), it stated that it retained "the right to intervene in this case at any time 'upon a showing of good cause,'" and that its "investigation of and attention to this case will continue."  Notice [56], at p. 1.  To date, the United States has not intervened.

Relators later sought dismissal of their claims against certain Defendants, to which the United States consented [63], [257], [313].  Accordingly, Judge Senter dismissed Relators' claims against Defendants Nationwide Insurance Company, USAA Insurance Company, and Allstate Insurance Company by Order [192] dated June 20, 2008; against Defendants Rimkus Consulting Group, Inc., Jade Engineering, Exponent, Inc., and Structures Group, by Order [260] dated January 5, 2009; and against Defendants E.A. Renfroe, Inc., Gene Renfroe, and Jana Renfroe, by Order [319] dated May 18, 2009.  The Court subsequently granted Defendant Forensic Analysis Engineering Corporation's unopposed Motion to Dismiss [693], based upon Forensic's settlement with Relators, in an Order [713] dated July 29, 2010.  However, the United States filed a Notice [798] of its rejection of the proposed settlement, and submitted its own Motion to Dismiss Forensic, without prejudice as to the United States.  The Court granted the United States' Motion, and dismissed the claims against Forensic  without prejudice in an Order [835] entered on November 29, 2010.

As for Defendant Alexis King, she filed a Motion to Dismiss [732] on August 16, 2010, pursuant to Federal Rule of Civil Procedure 12(b)(5), for failure to timely serve process as required by Rule 4(m).  Relators did not oppose her Motion.  *See* Relators' Notice [761].  Judge Senter granted King's Motion by Order [825] entered November 23, 2010.  The only Defendants now remaining before the Court are Haag and State Farm, who filed the present Motion [734] on August 16, 2010, seeking summary judgment.  On April 12, 2011, this matter was reassigned to the undersigned for all further proceedings.

5

## II. DISCUSSION

A.   Standard of Review

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Meyers v. M/V Eugenio C.*, 842 F.2d 815, 816 (5th Cir. 1988).

To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that there exists a genuine issue of material fact.  *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).  If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment."  *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) (citing *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1991)).

The existence of a factual dispute does not preclude summary judgment if the dispute is neither material nor genuine.  *Lyle v. Dedeaux*, 39 F.3d 320, 1994 WL 612506, *2 (5th Cir. 1994) (citing *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986)).  "A fact is 'material' if its resolution in

favor of one party might affect the outcome of the lawsuit under governing law.  An

issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict

for the nonmoving party."  *Hamilton*, 232 F.3d at 477 (citing *Anderson*, 477 U.S. at

248).  In deciding whether summary judgment is appropriate, the Court views facts

and inferences in the light most favorable to the nonmoving party.  *Lyle*, 1994 WL

612506, at *2.

B.     Analysis

      Judge Senter has previously determined that "[t]he sole remaining

specifically-identified instance offered in support of the allegations of the amended

complaint involves the claim of Thomas and Pamela McIntosh (the McIntoshes)."

Mem. Op. [343], at pp. 2–3.  Defendants now contend that Relators cannot prevail on

their direct FCA claims, on grounds that they cannot offer any evidence which would

raise a genuine issue of material fact that the McIntoshes' flood claim was false, or

that Defendants knew that the McIntoshes' flood claim was false at the time

Defendants submitted it.  State Farm's Mem. [735] in Supp. of Mot., at p. 7.

Defendants also argue that Relators' reverse FCA claim, brought under § 3729(a)(7),

fails, because the McIntosh claim cannot be both a false claim and a reverse false

claim, *id.* at p. 40, and because Relators have confessed this claim, *id.* at p. 41.

1.     Direct FCA Claims

      The United States Court of Appeals for the Fifth Circuit has stated that, to

prove a direct violation of the FCA, a plaintiff must establish "(1) . . . a false

statement or fraudulent course of conduct; (2) made or carried out with the requisite

scienter; (3) that was material; and (4) that caused the government to pay out money

7

or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (quotation omitted).  Defendants challenge Relators' ability to prove the first two elements of their direct FCA claim.

a.    *Defendants' Argument That the Claim Was Not False*

The parties do not dispute that State Farm paid the McIntoshes their flood policy limits of $250,000.00 on the building coverage under their flood policy. Relators maintain that the actual flood damages to the McIntoshes' home were less than $250,000.00, such that State Farm's reimbursement claim submitted to the NFIP on the McIntosh property was false.  Defendants contend that Relators cannot point to any competent summary judgment evidence to support this overpayment allegation.  State Farm's Mem. [735] in Supp. of Mot., at p. 12.

Relators respond that, according to their insurance claims adjustment and repair cost expert, David Favre, the McIntoshes were, at best, entitled to approximately $130,000.00 under the flood policy, thereby creating a material fact question on the falsity of State Farm's claim for reimbursement submitted to the government.  Relators' Resp. [767], at p. 19.  While Defendants argue that Favre's report is inadmissible and his estimate irrelevant, State Farm's Mem. [735] in Supp. of Mot., at pp. 12–15, the Court previously addressed these issues, granting in part and denying in part State Farm's earlier Motions to exclude Favre, Mem. Op. [821], at pp. 1–4; Order [822], at p. 1.

Specifically, Judge Senter granted State Farm's Motions in part as to Favre's opinion that State Farm was operating under a conflict of interest in adjusting the McIntoshes' flood claim, but denied its Motions in all other respects.  Mem. Op.

[821], at pp. 1–4; Order [822], at p. 1.  Judge Senter also found unpersuasive State

Farm's position that, because the McIntoshes' property has been repaired, any

estimate of the repair cost is now irrelevant.  Mem. Op. [821], at p. 3.  Favre's

testimony is therefore properly before the Court as summary judgment evidence.

Defendants themselves have presented countervailing expert testimony.  If the jury

were to believe Favre's flood damage estimates, it could find that State Farm's

request for reimbursement for the McIntosh flood claim was false.  Based on the

present record, Relators have submitted sufficient summary judgment evidence to

create a genuine question of material fact as to this issue, and Defendants' request

for summary judgment must be denied as to Relators' direct FCA claim.

> b.   *Defendants' Argument That the Claim Was Not Knowingly False*
> *When Made*

Defendants next argue that Relators cannot show the claim was knowingly

false when it was made.  State Farm's Mem. [735] in Supp. of Mot., at p. 18.

Defendants maintain that the testimony

> demonstrates that the procedures State Farm used for handling
> Katrina-related flood claims were:  (i) developed with FEMA; (ii)
> approved by FEMA; (iii) implemented in accordance with FEMA
> guidelines; and (iv) fully consistent with FEMA claims-handling
> practices.

*Id.* at p. 19.

According to Defendants, the Federal Emergency Management Agency's ["FEMA"]

knowledge of State Farm's adjusting practices precludes a finding that Defendants

acted with the requisite scienter, or intent, and State Farm representatives believed

in good faith that the McIntosh claim was not false.  *Id.* at pp. 23–27.

9

Relators counter that State Farm's adjustment of the McIntoshes' flood claim did not comply with FEMA regulations.  Relators' Resp. [767], at pp. 24–29.  They maintain that FEMA's alleged knowledge of State Farm's adjustment practices does not automatically preclude a showing of the requisite scienter, since they claim that State Farm was not completely candid with FEMA.  *Id.* at pp. 23–33.  Relators add that Defendants' good faith argument is unavailing in light of Kerri Rigsby's testimony that State Farm instructed adjusters that Hurricane Katrina was a "water storm," which created an "incorrect presumption" by Cody Perry, the individual who adjusted the McIntoshes' flood claim with Kerri Rigsby, that "the damage the home sustained was caused by flood."  Relators' Resp. [767], at pp. 3–5.

To prove that Defendants acted with the intent sufficient to violate the FCA, Relators "must demonstrate the Defendants had (1) actual knowledge of falsity, (2) acted with deliberate ignorance of the truth or falsity of the information provided, or (3) acted with reckless disregard of the truth or falsity of the information provided . . . ."  *Longhi*, 575 F.3d at 468.  In the context of FCA cases, the Fifth Circuit "hesistate[s] to grant summary judgment when a case turns on a state of mind determination."  *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (citing *International Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991)).  At this juncture, the Court is persuaded that Relators have adduced sufficient evidence to create a material fact question as to whether Defendants possessed the requisite state of mind to violate the FCA.

Among other things, at issue here is the use of certain adjusting tools referred to as "Xactimate" and "XactTotal."  State Farm's corporate representative, Michael

Ferrier, explained at a hearing Judge Senter held in this matter on May 20 through 22, 2009, that Xactimate and XactTotal are both part of the overall Xactimate program. Hr'g Tr., at p. 51. The Xactimate estimate provides what is commonly known as a "line-by-line" or "stick built" estimate of damage to a structure, both of which are item-by-item estimates. *Id.* at pp. 51, 115. XactTotal, by contrast, does not provide a "stick built," or item-by-item, estimate. *Id.* at pp. 116, 127. "It's just a technique to estimate the value or the damages to a building that isn't as time-consuming as going line by line by line." *Id.* The XactTotal result can be converted into an estimate format, so that the user can look room by room and line by line at the estimate, *id.* at pp. 51, 122, but it is not a program which is designed to give the user an item-by-item analysis of the flood damage to a home, *id.* at p. 124. Ferrier explained that XactTotal gives the user a "very similar valuation of a very similar home with the same type of items" to the home the user is adjusting. *Id.* at p. 126. Relator Kerri Rigsby stated that "it's strictly you put in a square foot price and it spits out an estimate." *Id.* at p. 210. Ferrier testified that XactTotal is used in all flood claims to determine the value of a particular structure, for the purpose of ensuring that it is insured for 80% of its value. *Id.* at pp. 119–120.

According to Ferrier, Xactimate is an "estimating platform," which State Farm also uses on every single flood claim. *Id.* at p. 120. However, he agreed that, when an adjuster observes a constructive total loss, an adjuster uses XactTotal to document any payment in the file. *Id.* at pp. 181–182. XactTotal gives the adjuster

an idea as to the total value of the building, and from that, he "can surmise that this would have been a policy limit loss." *Id.* at p. 182.

In this case, State Farm used XactTotal to adjust the McIntoshes' claim. *Id.* at p. 119–20. The parties apparently do not dispute that State Farm did not follow the Xactimate, or "line-by-line" or "stick build" procedure, in adjusting the McIntosh flood claim. Ferrier testified that, "[b]ecause of the extent of the damage and the photographic evidence, it was so clearly and obviously a policy limit loss that the decision was made to do XactTotal." *Id.* at p. 138.

According to Relator Kerri Rigsby, at a State Farm meeting held after Hurricane Katrina, she and other adjusters and team managers were told to expedite the claims handling process by utilizing XactTotal. *Id.* at p. 210. She testified that they were told "to use XactTotal if the house was a slab, popsicle stick, or cabana." *Id.* She explained that

> a slab would mean the house was gone and there was nothing left but a foundation. And then a popsicle stick was considered pilings. Then the cabana, there would still be a roof. Majority of the home would be gone, but maybe there would still be a roof.

*Id.* at p. 211.

Kerri Rigsby further testified that, if a property was severely damaged, but did not fall into one of these three categories, the adjuster could employ XactTotal if he obtained permission from his State Farm team manager. *Id.* at pp. 211–212.

Because the McIntosh home was not a "slab,"a "popsicle stick," or a "cabana," the adjuster on the claim, Cody Perry, received permission from his State Farm team manager to use the XactTotal program to calculate the value of the

McIntoshes' dwelling.  *Id.*, at p. 228.  He then separately calculated an estimate of wind damage using Xactimate.  Perry then subtracted this figure along with non-recoverable depreciation from the XactTotal valuation figure, and converted the resulting number to an XactTotal estimate.  The result was a line-by-line breakdown of a theoretical house similar to the McIntoshes' home, as opposed to a line-by-line estimate of the McIntoshes' actual home.  *See, e.g.,* Hr'g Tr., at pp. 59–60, 73–75, 80–81, 100, 114, 125, 128, 131–132.  Kerri Rigsby explained that she and Perry could "manipulate [the XactTotal estimate] some if you want to, but we didn't.  Like I said, the McIntosh estimate is showing a five-bedroom house with a garage.  That's not what his house was."  *Id.* at p. 210.  Ferrier testified that, had the XactTotal estimate of the McIntoshes' home produced an estimate which was less than $250,000, the adjuster "would have stick built the estimate or [sic] a line-by-line estimate."  *Id.* at p. 182.

Of relevance here, the parties dispute the propriety of State Farm's use of XactTotal in a loss situation like that of the McIntosh property.  Relators point to a Memorandum from FEMA Director David Maurstad, "FEMA Directive W-5054" [709-5], to "Write Your Own Principal Coordinators and the NFIP Servicing Agent," dated September 21, 2005, which Relators contend provides the only expedited claims handling procedures which were permitted after Hurricane Katrina.  Relators' Resp. [767], at p. 13.  FEMA Directive W-5054 outlined three processes, developed by FEMA, which could be utilized for expedited handling of claims which met certain criteria.  FEMA Directive W-5054 [709-5], at p. 2.  The Directive explained that

13

Process # 1 should be used to expedite the claims handling of structures that have or have had standing water in them for an extended period of time.  In order for your company to participate in this process, you must be able to acquire a reliable square foot measurement so that an accurate value can be developed.  Some companies have a homeowner policy base that largely matches the flood policy base and may develop the square foot measurement from that information.

Process # 2 is to be used when it has been determined that the structure has been washed off its foundation by flood water and the square foot measurements are known.  The company should use the same settlement procedures as in process # 1.  All other claims require a site visit and will be handled using the company's normal claim procedures (process # 3).

*Id.*

Relators' position is that this memorandum was in force at the time Cody Perry adjusted the McIntosh claim.  Because it is undisputed that the McIntoshes' damage did not satisfy the criteria of either Process #1 or Process #2, Relators maintain that State Farm was required to use its normal claim handling procedures, under Process #3.  According to Relators, this would not permit  use of programs like XactTotal.  Relators' Resp. [767], at p. 13.  Relators cite the testimony of Juan Guevara, State Farm's principal contact with FEMA, who testified that on September 13, 2005,  prior to the issuance of FEMA Directive W-5054, he had proposed to FEMA the use of a different expedited claims handling process.  Dep. of Juan Lopez Guevara, Jr. [767-8], at pp. 69–70, attached as Ex. "8" to Relators' Resp. Guevara asserted that he received approval from FEMA to use this different process, and that such approval survived after the issuance of FEMA Directive W-5054.  *Id.* at p. 70.  Guevara proposed to use a method like XactTotal "[w]here a site visit was completed and [the losses] appeared to exceed policy limits."  *Id.* at p. 85.  Ferrier testified at the May 20 through 22, 2009, hearing that whether or not it actually had

14

to, State Farm did comply with FEMA's Process #3 in handling the McIntosh claim, because State Farm used its "normal estimating practices."  Hr'g Tr., at pp. 148–150. However, Ferrier acknowledged that "a lot" of justification for adjusting the McIntosh flood loss through the XactTotal software came through "verbals" from FEMA.  *Id.* at p. 158.  Ferrier also stated that "there are references within [FEMA Directive] 5054 that XactTotal is an accepted method. . . ."  *Id.*

Relators counter that, because State Farm's proposal was not adopted in the later issued FEMA Directive governing expedited claims handling procedures, State Farm was not permitted to use XactTotal, except in the two situations specified by FEMA, which were delineated as Process #1 and Process #2.  Relators' Resp. [767], at p. 13.  Relators also point to a September 22, 2005, email from Guevara to FEMA employee Jim Shortley, in which Guevara stated as follows:

> The attached is the proposal that we agreed to for handling Hurricane Katrina flood files.  Compared to the FEMA bulletin W-5054 there are a number of changes or point [sic] that are not clear.
>
> These are the issues that need to be cleared up.
> *   *   *
> ·    If a file is referred to the field as per attachment A of the bulletin it states "If a claim requires a site visit it will be handled using the company's normal claim procedures".  I read this as having to write a complete line by line estimate even if the repairs will exceed the policy limits.  In our process for a field inspection, we agreed if the building was damaged beyond repair that we could use our evaluation tool instead of writing a line by line estimate. It would not make sense to approve the use of evaluation total for an In-Office handled claim then require a line by line estimate if a field inspection is done on a loss that is above policy limits.
> *   *   *
> I would appreciate your response as soon as possible because this is having an impact on the current handling process.

Sept. 22, 2005, email from Guevara to Shortley [738-14], at pp. 1–2.

One week later, on September 29, 2005, Guevara sent another email to Shortley inquiring whether Shortley "had a chance to review and give [Guevara] a response to these questions?"   Sept. 29, 2005, email from Guevara to Shortley [738-14], at p. 1.

In his deposition, Guevara testified that he did not recall any specifics, but that Shortley indicated to him in a telephone conversation that FEMA Directive W-5054 did not change anything State Farm had been doing prior to the date of the Directive's issuance.  Dep. of Juan Lopez Guevara, Jr. [767-8], at pp. 93–94, attached as Ex. "8" to Relators' Resp.  Guevara further testified that had there been a change, he would have transmitted a communication to the field about the change, something he did not do.  *Id.*

Shortley testified that he could not recall whether he agreed that State Farm could use XactTotal to adjust such claims, but that he would not have objected to it. Dep. of James S.P. Shortley [767-17], at pp. 178–179, attached as Ex. "17" to Relators' Resp.  He also stated, however, that, an adjuster would be required to perform a line-by-line estimate of damages at least until the adjuster reached the flood policy limits.  *Id.* at p. 128.

Relators contend that Guevara's unanswered emails to Shortley, along with Guevara's and Shortley's lack of memory on the subject, indicate that State Farm sought, but did not receive, permission to use XactTotal in situations like the McIntoshes' claim.  Relators' Resp. [767], at p. 26.  Even assuming such approval did exist, Relators further fault State Farm for not requiring a line-by-line estimate, at least up to the $250,000.00 flood policy limits on the McIntoshes' home, as Shortley indicated was required.  *Id.* at p. 32.  Relators maintain that "State Farm's broader

16

use of XactTotal enabled its adjusters to quickly pay the limits of flood claims, like the McIntosh claim, without actually assessing the damage caused by flood." *Id.* at p. 13. Defendants insist that State Farm was not required to use the "line-by-line" method in cases where the flood damage clearly exceeded policy limits. Rebuttal [780], at p. 7.

The record is less than clear on the question of whether the XactTotal adjusting procedure was appropriate or otherwise permitted by FEMA in cases like the McIntoshes', at least in initially determining flood damage up to the $250,000.00 flood policy limit. Particularly given the verbal nature of a number of the alleged approvals and their centrality to this dispute, the Court cannot say that Defendants have carried their burden of demonstrating that there is no genuine issue of material fact as to whether they had FEMA approval to employ XactTotal on the McIntosh claim.

Even accepting as true Defendants' contention that State Farm was allowed to use XactTotal on the McIntoshes' property, genuine issues of material fact nevertheless remain for trial on the question of scienter, or intent. At the hearing Judge Senter conducted on May 20 through 22, 2009, on various pending Motions to Dismiss, Relator Kerri Rigsby testified, in relevant part, as follows:

> Q.   Did the procedures at State Farm change at all for adjusting flood claims after Hurricane Katrina?
> A.   Yes.
>
> Q.   After Hurricane Katrina hit, just so we're clear, during Hurricane Katrina adjusting? Sorry about that.
> A.   Yes.
>
> Q.   Okay.

A.     It did.

Q.     How did you learn that State Farm's procedures for adjusting claims, flood claims changed after Hurricane Katrina hit?

A.     I first knew that by a meeting that we had shortly after we were over in the Gulfport office. We had a large group meeting with the -- all the adjusters, and it was in the main building in the large room, and I can remember the building wasn't repaired yet. There was no furniture in there. We had to bring in chairs and kind of sat in a big circle. And we were told at that time by two State Farm employees how this storm would be handled as far as flood.

Q.     And how many people do you think were in the room?

A.     I would say over a hundred. It was a large group. It was one of the only times, if not the only time, we were all in there, you know, packed together.

Q.     What did you learn from that meeting about how the procedures for adjusting flood claims were going to change for Hurricane Katrina?

A.     Well, again, there were two State Farm trainers guiding the meeting. One was named Dave Runge, and one was named Jodi Prince, who are normally State Farm trainers. Jodi Prince at this storm was promoted to a team manager position for that --for this storm. Anyway, we were told that this was a water storm and we were going to be expediting the claim procedure, and that we were to go out and hit the limits.

Q.     Okay. You said a few things in there, and I'm going to break it down. What do you mean this was a water storm, or what were you told it meant that Hurricane Katrina was a water storm at the time?

A.     Well, we were advised that the damage at Katrina was caused by water or tidal surge, floodwater or tidal surge. They stated that there was no question -- this was, like I said, maybe a couple of weeks after the storm hit and we all were in Gulfport. They said there was no question that this was a water storm, and we were to get money to the policyholders as quick as we could through the flood policy, and that we were to hit limits when we got out there, if the home was severely damaged.

Q.     Okay. And as to Hurricane Katrina being a water storm, did you get any reports or papers or data or anything at that meeting you're talking about?

A.    No. They didn't provide us with anything. They just said they -- it was a water storm.

Q.    Did you ever get anything in writing that talked about what the weather was like in Katrina from State Farm?

A.    Later on, several weeks later, we received a Haag report.

Q.    What was that?

A.    It was a -- it was an engineering report that gave examples of things along the Coast, and it stated that Katrina had -- you know, what kind of damage was caused by Katrina, that the water came I believe it said about 12 hours before the wind, and that the damage along the Coast was caused by water, so it's --

                                *  *  *

A.    So anyway, we received the -- later we received the report, and it -- again, it said that the water came about 12 hours before the wind, that it -- high tidal surge.  So we received that later and were advised to use that in processing claims.  Every team manager had one on their desk, and we were given a PowerPoint presentation saying, *This is what happened*, you know, *If you're told it happened any other way, it didn't.  This is how it happened.* So once we were given that report, you know, that's what we, of course, used, but before that, we were just told it's water.

Q.    Okay. So the report was consistent or inconsistent with what you were told in the first meeting that you described[?]

A.    Oh, no, it was -- it was exactly what we were told in the first meeting.

Q.    Okay. And another thing you said, and I haven't asked you about it yet, but you said that State Farm said it was a water storm and told you to hit limits.  What does that mean?  I got the water storm part.  Move on to the hit limits.

A.    They said to hit limits, meaning hit policy limits. They said these policyholders were misplaced, they didn't have a home, they didn't have anywhere to go, get out there and pay them limits.

Q.    Meaning the limits of the flood policy?

A.    Yes, the limits of the flood policy. And they gave us a tool. They said, *Okay. And to do this, you're going to need to use XactTotal, an expedited claims handling procedure.*

Hr'g Tr., at pp. 204–208 (emphasis in original).

Based on these alleged instructions she received from State Farm, Kerri Rigsby testified that she and the adjuster, Cody Perry, made no independent determination as to the cause of loss to the McIntoshes' property.  *Id.* at pp. 285–286. According to Rigsby, the reason "the McIntosh claim was falsely adjusted was because we were told it was water damage."  *Id.* at pp. 298–299.

Even assuming the adjusting method employed by State Farm was an appropriate one to use under the circumstances, as Defendants claim, Relators have presented evidence that the underlying data which the adjuster utilized was intentionally skewed at the outset in favor of finding flood damage, as a result of allegedly erroneous and fraudulent information and instructions given by State Farm, and later buttressed by the Haag report.  If the Court accepts Relators' version of the facts as true, as it must at the summary judgment stage, there remain genuine disputes of material fact for trial on the question of whether Defendants possessed the requisite state of mind to violate the FCA.  Construing all facts in Relators' favor, a jury could conclude that State Farm and Haag conspired to provide erroneous or false information to Cody Perry, who then employed that information in adjusting the loss on the McIntosh property, in an effort to shift State Farm's potential losses on wind claims to the NFIP.

By allegedly instructing adjusters, such as Cody Perry and Kerri Rigsby in this case, that Hurricane Katrina caused predominantly flood damage, and by requiring adjusters to proceed from that premise in adjusting flood claims, a jury could find that a false flood claim was knowingly submitted to the government in the McIntoshes' case, even if adjusters were using an appropriate or approved damage

estimation method.  In other words, Relators have adduced evidence that adjusters proceeded from a false presumption of flood damage, which was allegedly intentionally interjected into State Farm's Hurricane Katrina claims adjustment by Defendants, and which prompted adjusters to initially determine that flood policy limits were exceeded, thereby justifying use of the XactTotal method under State Farm's expedited claims handling process.

In sum, considering the record as a whole, and reviewing the evidence presented in the light most favorable to Relators and resolving all doubt in their favor, as the Court must at this stage, there remain genuine issues of material fact on Relators' direct FCA claims.  These questions include, but are not limited to, whether the McIntosh flood claim was false and whether Defendants possessed the requisite scienter.  Summary judgment in Defendants' favor on these claims will be denied.

2.  <u>Reverse FCA Claim</u>

Defendants maintain that Relators have confessed that dismissal of this claim, contained in Count IV of the First Amended Complaint, is either unopposed or appropriate.  State Farm's Mem. [735] in Supp. of Mot., at p. 35.  Relators disagree and assert that this Count remains pending.  Relator's Resp. [767], at pp. 29–30.

The Fifth Circuit has explained that

[c]laims under 31 U.S.C. § 3729(a)(7) require proof that the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7). This is known as a reverse false claim because the effect of the defendant's knowingly false statement is a failure to pay the Government when payment is required. A direct claim, on the other hand, occurs when a false claim for payment is submitted to the Government. *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 652 (5th Cir. 2004).

21

*United States v. Caremark, Inc.*, 634 F.3d 808, 814–15 (5th Cir. 2011) (footnote omitted).

>    The Fifth Circuit has held that § 3729(a)(7)

>    does not extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed (and as to which no formal proceedings to do so have been instituted) and which do not arise out of an economic relationship between the government and the defendant (such as a lease or a contract or the like) under which the government provides some benefit to the defendant wholly or partially in exchange for an agreed or expected payment or transfer of property by (or on behalf of) the defendant to (or for the economic benefit of) the government.

*United States ex rel. Marcy v. Rowan Companies, Inc.*, 520 F.3d 384, 391 (5th Cir. 2008) (quoting *United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, (5th Cir. 2004)).

As Defendants point out, Relators' Consolidated Pre-Hearing Response [264] to all dispositive Motions stated that they did not oppose dismissal of Count IV as to State Farm and Haag.  Relator's Consolidated Resp. [264], at p. 4.  At the hearing Judge Senter held in this case on May 20 through 22, 2009, Relators' counsel stated as follows:

>    We've dismissed the reverse false claim -- we didn't even dismiss it.  We just said we wouldn't oppose it, so technically it's still in play.  If they are calling this a reverse false claim, then we would submit that now we withdraw our agreement and we'd like to keep it in play.  But we don't need to because a reverse false claim is not what's at issue here.  A reverse false claim is if the government -- if you falsely represent that you don't need to make a payment that you owe to the government, so, like, a tax return might be a good example of it.

>    *This is a false claim.  There's only one claim at issue here.  There was a continuing duty to make sure that that claim was not false.  So we're not in the reverse false claim situation at all.*

Hr'g Tr., at pp. 237–238 (emphasis added).

The only reasonable interpretation of this argument is that Relators have no reverse FCA claim, and dismissal is therefore warranted.

Defendants alternatively submit that summary judgment is appropriate on the reverse FCA claim because, under 31 U.S.C. § 3729(a)(7), the McIntosh claim cannot constitute both a false claim and a reverse false claim. State Farm's Mem. [735] in Supp. of Mot., at p. 34. Relators respond that, because there remain genuine issues of material fact as to whether the McIntosh claim was false, there are also genuine issues of material fact as to whether State Farm is "improperly avoiding an obligation to pay money to the government, and thus, whether State Farm is liable under the reverse false claims provisions of the FCA." *Id.* at p. 29. However, even assuming State Farm would be required to reimburse the government for any overpayment on the McIntoshes' flood claim,[4] Relators have not demonstrated that the repayment obligation or the nature of State Farm's relationship with the government would constitute a separate and independent

---

[4]The Court has not been directed to any statutory or regulatory provision detailing the reimbursement required in such a situation. Relators do point to FEMA Memo W-3029, which provides options for Write Your Own insurance carriers to resolve overpayments when the reported amount paid for a loss exceeds the reported policy limit for the policy. Memo W-3029 [432-3], at pp. 2–3. The Court is not persuaded this memorandum is controlling here. The parties do not seem to dispute that the government could have a putative reimbursement claim in the event of an overpayment on a flood policy claim. The Court assumes, without deciding, that the reimbursement claim would be against State Farm, rather than against the McIntoshes. *But cf. United States v. Fowler*, 913 F.2d 1382, 1384–86 (9th Cir. 1990) (holding that government could not be estopped from seeking reimbursement, and could not have waived its right to reimbursement, of a flood claim from defendant insureds who were erroneously paid on a flood insurance policy which was improperly issued by their insurance carrier, because defendant insureds were not eligible for National Flood Insurance Program).

reverse FCA claim, as opposed to an obligation to reimburse overpayment on a direct claim.

In its Rebuttal [780], State Farm cites *United States ex rel. Branch Consultants, LLC v. Allstate Ins. Co.*, 668 F. Supp. 2d 780 (E.D. La. 2009), for the proposition that Relators cannot state a claim against Defendants under the reverse FCA provision because there was no obligation to pay money to the government at the time the claim was made. Rebuttal [780], at p. 19. In *Branch Consultants*, under similar facts and with substantially similar allegations as those presented here, the district court held that the relator could not maintain a reverse FCA cause of action for an insurer's alleged failure to reimburse the government. *Branch Consultants*, 668 F. Supp. 2d at 811–12. The Court finds *Branch Consultants* persuasive on this point. In addition to essentially acknowledging that this case does not present a reverse FCA scenario, Relators have not shown that, as a matter of law, they can pursue such a claim under the facts alleged in this case. Summary judgment on this claim is appropriate. *See* FED. R. CIV. P. 56(a).

### III.  CONCLUSION

For the reasons stated herein, the Court finds that Defendants' Motion for Summary Judgment should be granted in part and denied in part.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, for the reasons stated herein, the Motion for Summary Judgment [734] filed by Defendant State Farm Fire and Casualty Company on August 16, 2010, in which remaining Defendant Haag Engineering Co., has joined [742], is **GRANTED IN PART**, to the extent it seeks dismissal of Relators' reverse FCA claim, pursuant to 31 U.S.C. §

3729(a)(7), contained in Count IV of the First Amended Complaint, and is **DENIED IN PART** in all other respects.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Relators' reverse FCA claim, pursuant to 31 U.S.C. § 3729(a)(7), contained in Count IV of the First Amended Complaint, is **DISMISSED WITH PREJUDICE**.  Relators' other claims remain pending for resolution at trial.

**SO ORDERED AND ADJUDGED,** this the 30th day of September, 2011.

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE