IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA ex rel.
CORI RIGSBY and KERRI RIGSBY                    RELATORS/COUNTER-DEFENDANTS

v.                                                              CASE NO. 1:06cv433-HSO-RHW

STATE FARM FIRE AND CASUALTY CO.            DEFENDANT/COUNTER-PLAINTIFF

---

**STATE FARM'S MEMORANDUM IN SUPPORT OF ITS
FED. R. CIV. P. 50(B) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
AND, ALTERNATIVELY, A NEW TRIAL PURSUANT TO FED. R. CIV. P. 59(A)**

BUTLER, SNOW, O'MARA, STEVENS &
CANNADA, PLLC
Robert C. Galloway (MB # 4388)
Post Office Drawer 4248
Gulfport, MS  39502
(228) 575-3019

BUTLER, SNOW, O'MARA, STEVENS &
CANNADA, PLLC
Michael B. Beers (ASB-4992-S80M)
250 Commerce Street, Suite 203
Montgomery, AL  36104
(334) 832-2900

BUTLER, SNOW, O'MARA, STEVENS &
CANNADA, PLLC
Phil B. Abernethy (MB # 1023)
E. Barney Robinson III (MB # 09432)
Amanda B. Barbour (MB # 99119)
200 Renaissance at Colony Park, Suite 1400
1020 Highland Colony Parkway (39157)
Post Office Box 6010
Ridgeland, MS 39158-6010
(601) 948-5711

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................1

STANDARD FOR RULE 50 JUDGMENT AS A MATTER OF LAW .........................................2

I. NO REASONABLE JURY COULD FIND THAT THE MCINTOSH FLOOD CLAIM WAS
   FALSE ................................................................................................3
   A. NO EVIDENCE SHOWS THAT THE MCINTOSH HOME SUFFERED LESS THAN
      $250,000 – OR $0 DAMAGE -- IN COVERED FLOOD DAMAGE ...................................3
      1. KERRI RIGSBY, BRIAN FORD, LOUIS FEY, AND RALPH SINNO ALL
         TESTIFIED THAT THE MCINTOSH HOME SUSTAINED FLOOD DAMAGE..........4
      2. THE RIGSBYS DID NOT QUANTIFY THE UNDISPUTED FLOOD
         DAMAGE ................................................................................5
   B. THE RIGSBYS' "TOTAL LOSS" THEORY IS LEGALLY UNTENABLE ............................6

II. NO REASONABLE JURY COULD FIND THAT THE MCINTOSH FLOOD CLAIM WAS
    "KNOWINGLY" FALSE.............................................................................9
    A. NO WITNESS FOR THE RIGSBYS TESTIFIED THAT THE CLAIM WAS
       KNOWINGLY FALSE WHEN PAID......................................................11
    B. THE TESTIMONY OF THE FEMA WITNESSES PRECLUDES ANY FINDING OF
       GUILTY KNOWLEDGE..................................................................12
    C. PUTATIVE REGULATORY VIOLATIONS OR BREACHES OF "INDUSTRY
       STANDARDS" ARE NOT EVIDENCE OF GUILTY KNOWLEDGE ................................16
    D. THE FORD REPORT, AND ITS REJECTION, ARE NOT EVIDENCE OF GUILTY
       KNOWLEDGE..........................................................................17
    E. ANY INSTRUCTION TO JUST ASSUME FLOOD DAMAGE AND "HIT THE
       LIMITS" IS IRRELEVANT TO THE MCINTOSH FLOOD CLAIM ...................................19

III. THERE IS NO PROOF OF A "FALSE RECORD OR STATEMENT" ...........................................19

IV. NO EVIDENCE SHOWS THAT STATE FARM "PRESENTED" THE MCINTOSH FLOOD
    CLAIM TO THE GOVERNMENT OR THAT THE GOVERNMENT PAID STATE FARM...............21
    A. THERE IS NO PROOF OF STATE FARM'S PRESENTMENT OF THE MCINTOSH
       FLOOD CLAIM ........................................................................21
    B. THERE IS NO EVIDENCE THE GOVERNMENT PAID STATE FARM $250,000 ............22

V. IN THE ALTERNATIVE, STATE FARM REQUESTS A NEW TRIAL UNDER RULE 59(A) ..........23

CONCLUSION...............................................................................................24

### TABLE OF AUTHORITIES

<u>CASES</u>

*Allison Engine Co. v. United States ex rel. Sanders*,
   553 U.S. 662 (2008)..................................................................... 2, 21

*Anthony v. Chevron USA, Inc.*,
   284 F.3d 578 (5th Cir. 2002). ........................................................ 3

*Arkoma Basin Project Ltd. Partnership v. West Fork Energy Co.*,
   384 F. App'x 375 (5th Cir. 2010).................................................... 22

*Boeing Co. v. Shipman*,
   411 F.2d 365 (5th Cir. 1969) ........................................................ 3

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)...................................................................... 6

*Capital Traction Co. v. Hof*,
   174 U.S. 1 (1899)......................................................................... 1

*Commercial Contractors, Inc. v. United States*,
   154 F.3d 1357 (Fed. Cir. 1998)..................................................... 23

*Corban v. United Servs. Auto Ass'n*,
   20 So. 3d 601 (Miss. 2009)........................................................... 7

*Fenner v. Gen. Motors Corp.*,
   657 F.2d 647 (5th Cir. 1981) ................................................ 3, 5, 23

*Flibotte v. Pa. Truck Lines, Inc.*,
   131 F.3d 21 (1st Cir. 1997)........................................................... 2

*Goodner v. Hyundai Motor Co.*,
   650 F.3d 1034 (5th Cir. 2011) ...................................................... 3

*In re Bank of New York Mellon Corp.*,
   851 F. Supp. 2d 1190 (N.D. Cal. 2012) ......................................... 22

*Jones v. State Farm Fire & Cas. Co.*,
   677 F. Supp. 2d 923 (E.D. La. 2009).............................................. 6

*Kampen v. Am. Isuzu Motors, Inc.*,
   157 F.3d 306 (5th Cir. 1998) ........................................................ 6

*Penthouse Owners Ass'n, Inc. v. Certain Underwriters at Lloyd's, London*,
  2011 WL 6698521 (S.D. Miss. Dec. 21, 2011) ........................................... 7

*Poynter v. Ratcliff*,
  874 F.2d 219 (4th Cir. 1989) ................................................................. 23

*Ralston Purina Co. v. Hobson*,
  554 F.2d 725 (5th Cir. 1977) ................................................................. 4

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ............................................................................. 3

*Robichaux v. Nationwide Mut. Ins. Co.*,
  2007 WL 2783325 (S.D. Miss. Sept. 21, 2007) ....................................... 7

*Robin v. Wilson Bros. Drilling*,
  719 F.2d 96 (5th Cir. 1983) ................................................................... 23

*Rousseau v. Teledyne Movible Offshore, Inc.*,
  812 F.2d 971 (5th Cir. 1987) ................................................................. 23

*Rutherford v. Ill. Cent. R.R. Co.*,
  278 F.2d 310 (5th Cir. 1960) ................................................................. 1

*Scott v. Harris*,
  550 U.S. 372 (2007) ............................................................................. 4

*Shows v. Jamison Bedding, Inc.*,
  671 F.2d 927 (5th Cir. 1982) ................................................................. 23

*SingleEntry.com, Inc. v. St. Paul Fire & Marine Ins. Co.*,
  117 F. App'x 933 (5th Cir. 2004) .......................................................... 15

*Smith v. Transworld Drilling Co.*,
  773 F.2d 610 (5th Cir. 1985) ................................................................. 23

*Turner ex rel. Turner v. Atl. Coast Line R.R. Co.*,
  292 F.2d 586 (5th Cir. 1961) ................................................................. 24

*United States ex rel. Farmer v. City of Houston*,
  523 F.3d 333 (5th Cir. 2008) ....................................................... 9, 10, 17

*United States ex rel. Hobbs v. MedQuest Assocs., Inc.*,
  711 F.3d 707 (6th Cir. 2013) ................................................................. 17

*United States ex rel. Hopper v. Anton,*
    91 F.3d 1261 (9th Cir. 1996) ........................................................................ 17

*United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.,*
    491 F.3d 254 (5th Cir. 2007) ........................................................................ 16

*United States ex rel. Steury v. Cardinal Health, Inc.,*
    625 F.3d 262 (5th Cir. 2010) ........................................................................ 17

*United States ex rel. Taylor-Vick v. Smith,*
    513 F.3d 228 (5th Cir. 2008) ................................................................... 2, 10

*United States ex rel. Totten v. Bombardier Corp.,*
    380 F.3d 488 (D.C. Cir. 2004) ..................................................................... 21

*United States ex rel. Williams v. Renal Care Group, Inc.,*
    696 F.3d 518 (6th Cir. 2012) ................................................................. 16, 24

*United States v. Prabhu,*
    442 F. Supp. 2d 1008 (D. Nev. 2006) .......................................................... 16

*United States v. Southland Mgmt. Corp.,*
    326 F.3d 669 (5th Cir. 2003) ................................................................. 16, 17

*Vt. Agency of Natural Res. v. United States ex rel. Stevens,*
    529 U.S. 765 (2000) ................................................................................. 1, 15

*Weisgram v. Marley Co.,*
    528 U.S. 440 (2000) ................................................................................... 2, 6

## STATUTES

31 U.S.C. § 3729(a)(1)(B) ................................................................... 19, 20, 21

INTRODUCTION

The right to "trial by jury" guaranteed by the Constitution means a trial "in the presence and under the superintendence of a judge empowered . . . to set aside their verdict, if, in his opinion, it is against the law or the evidence." *Capital Traction Co. v. Hof*, 174 U.S. 1, 13-14 (1899). This Court has a duty to set aside a jury verdict and enter judgment when it is necessary to "protect[] neutral principles of law from powerful forces outside the scope of law – compassion and prejudice." *Rutherford v. Ill. Cent. R.R. Co.*, 278 F.2d 310, 312 (5th Cir. 1960).

This principle is particularly powerful in this case where the trial focused on flood damage to the McIntosh home – damage that was evaluated for State Farm by Kerri Rigsby, one of the *qui tam* relators. After she inspected the home with adjuster Cody Perry, both concluded there was more than $250,000 in flood damage to the McIntosh home. There is ample support for the conclusions reached by Ms. Rigsby and Mr. Perry: incontrovertible photographic, physical, and testimonial evidence that the McIntosh home was inundated with floodwater that severely damaged the home. Three former Federal Emergency Management Agency ("FEMA") officials charged with administering the National Flood Insurance Program ("NFIP") – the agency the Rigsbys claim was defrauded – testified not only that the covered flood damage to the McIntosh home clearly exceeded $250,000, but also that State Farm's adjustment of the McIntosh property was fully consistent with NFIP claims-handling practices. As *qui tam* relators, the Rigsbys are assignees of any claim the United States might have arising out of the adjustment of the McIntosh claim, and as such are bound by the testimony of FEMA's former administrator, its former head of claims, and one of its general adjusters. *See Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773-74 & n.4 (2000). The jury's verdict in this case – no covered flood damage to the McIntosh home – is manifestly unreasonable when viewed against this factual backdrop. *See* Appendix A (providing uncontradicted photographic evidence of flood damage several of the items covered by the SFIP).

To sustain their claims under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, the Rigsbys were required to prove that "State Farm knowingly presented . . . a false or fraudulent claim . . . knowing that the claim was false or fraudulent at the time it was made." (Jury Instr. 8 & 10.) The Rigsbys failed to prove *any* of these essential elements.

First, the Rigsbys failed to proffer sufficient proof by which a reasonable jury could find that the McIntosh house suffered less than $250,000 in covered flood damage, let alone find that there is zero damage.

Second, there is insufficient evidence to support a finding that State Farm acted knowingly, i.e., that there was "'"guilty knowledge of a purpose on the part of [the defendant] to cheat the Government"' or '"knowledge of guilty intent."'" *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (alteration in original; citations omitted).

Third, the Rigsbys did not proffer any evidence that State Farm actually "presented" the McIntosh flood claim to the government for payment. *See Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671 (2008) (alteration in original), *superseded on other grounds*, Pub. L. No. 111-21, 123 Stat. 1617 (2009).

For the reasons explained below and for the reasons previously set forth in its oral and written motions and briefing ([1083] & [1086]) under Rule 50, which State Farm expressly renews, State Farm respectfully requests that this Court dismiss the Rigsbys' claims with prejudice. In addition and in the alternative, State Farm asks the Court to conditionally grant a new trial pursuant to Rules 50(c)(1) and 59.

### STANDARD FOR RULE 50 JUDGMENT AS A MATTER OF LAW

Rule 50 "allows the trial court to remove cases or issues from the jury's consideration 'when the facts are sufficiently clear that the law requires a particular result.'" *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000) (citation omitted). "[I]t is perfectly appropriate for a judge to refuse to direct a verdict, permit the jury to consider a case, and thereafter to grant judgment notwithstanding the verdict." *Flibotte v. Pa. Truck Lines, Inc.*, 131 F.3d 21, 25 (1st Cir. 1997).

"In entertaining a motion for judgment as a matter of law, the court should review ***all of the evidence*** in the record," not simply the evidence favorable to the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (emphasis added) (citing *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc); *accord*, *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1040 & n.7 (5th Cir. 2011).

The nonmoving party cannot survive a Rule 50 motion by relying on unreasonable inferences "'at war with uncontradicted or unimpeached facts.'"  *Fenner v. Gen. Motors Corp.*, 657 F.2d 647, 651 (5th Cir. 1981) (citation omitted).  In *Fenner*, the court affirmed the grant of defendant's Rule 50 motion because the jury's verdict required it to draw an inference that was unreasonable in light of the evidence that "was so overwhelmingly in favor of the defendant."  *Id.*  "Plaintiffs are not entitled to a verdict based on speculation and conjecture."  *Id.*; *accord Anthony v. Chevron USA, Inc.*, 284 F.3d 578, 583 (5th Cir. 2002).

### ARGUMENT

**I.     NO REASONABLE JURY COULD FIND THAT THE MCINTOSH FLOOD CLAIM WAS FALSE**

The Rigsbys argued in closing that the McIntoshes were not entitled to a single penny under their flood policy because their home was rendered a "total loss" by wind before the floodwaters surged through the house.  (Tr. at 1866:5-11.)  The Rigsbys further argued that the McIntoshes' house was covered under ***either*** their homeowners policy ***or*** their flood policy – but "***not both***."  (Tr. at 1867:1-8.)  The Rigsbys' argument and the resulting jury verdict are at odds with the law and the evidence.

**A.     NO EVIDENCE SHOWS THAT THE MCINTOSH HOME SUFFERED LESS THAN $250,000 – OR $0 DAMAGE -- IN COVERED FLOOD DAMAGE**

Because the evidence overwhelmingly demonstrates that the McIntosh home suffered at least ***some*** compensable flood damage during Katrina, the Rigsbys were required to present evidence that would allow the jury to calculate the amount of covered flood damage and then determine if the covered loss was less than $250,000.  (*See* Special Verdict Form [1092] Qs. 1 & 2.)  Having made a tactical decision not to call their valuation expert, David Favre, and to

proceed solely under their "total loss" theory, the Rigsbys failed to introduce any evidence that could have enabled the jury to make this finding.

 1. **KERRI RIGSBY, BRIAN FORD, LOUIS FEY, AND RALPH SINNO ALL TESTIFIED THAT THE MCINTOSH HOME SUSTAINED FLOOD DAMAGE**

Every witness who testified on the subject admits that the McIntosh home suffered flood damage during Hurricane Katrina.[1]  For example, Kerri Rigsby, an FEMA-certified flood claims adjuster, testified that she currently "believe[s] [the McIntoshes] had both wind and water damage to that home."  (Tr. at 315:18-23; *accord id.* at 309:20-22.)  She also acknowledged that the great majority of the substantial damage to the McIntosh house, a waterfront property, went from the ground up to about five feet (*see id.* at 283:20-25), which is consistent with flood damage and inconsistent with wind damage. Mr. Ford testified that there was evidence of water damage to the McIntosh home (*see* Ford Dp. at 119:12-14, 129:14-16, 164:4-10)

Dr. Sinno admitted that the house sustained flood damage, namely, "water inside the house at McIntosh did wash out to the sheetrocks and did sheetrock damage, washout. * * * This is damage by floodwater. Yes. This is architectural damage. This is cosmetic damage."  (Tr. at 537:11-13 & 648:1-2; s*ee id.* 557:10-12; 585:4-6; 585:7-16.).

In addition to this testimony and the incontrovertible photographic evidence of flood damage to the home,[2] *see* (App. A), Mr. Perry's "scope" notes of the McIntosh home list numerous items as being damaged by flood.  These are clearly covered under the flood policy, and include:  a Rheem furnace; a Jacuzzi tub with a granite surround; a marble, six-jet shower; an oven; a microwave; a side-by-side refrigerator-freezer; a dishwasher; a garbage disposal; several sinks and toilets; multiple built-ins and cabinets; carpet; and a large mirror.  (*See* DS-3 at 264-67.)  Mr. Fey specifically endorsed these scope notes, testifying that Ms. Rigsby and Mr.

---

 [1] (*See, e.g.*, Tr. at 315:18-23 (K. Rigsby); Ford Dp. at 119:9-14; Tr. at 537:11-13, 557:10-12, 585:4-16, 646:8-23, 648:1-2 (Sinno); Tr. at 728:10-13, 729:20-22 (Fey); *see also* Tr. at 728:18 (Fey)) ("There's no doubt there was water in the house").

 [2] *See Scott v. Harris*, 550 U.S. 372, 378-81 (2007) (instructing courts to view record in light of photographic evidence and to disregard self-serving testimony that is contradicted by such evidence); *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729 (5th Cir. 1977) ("Evidence manifestly at variance with the laws of nature and the physical facts is of no probative value and may not support a jury verdict.").

Perry "did a good job with the scope" and "the scope was accurate." (Tr. at 728:10-13, 729:20-22, *see* Tr. at 727:25-728:18.)   Even if the Rigsbys had proved the McIntosh home sustained severe structural damage due to wind, these items still had value and were covered under their Standard Flood Insurance Policy ("SFIP").[3]

This Court recognized that – even according to the Rigsbys' witnesses – the McIntosh home sustained flood damage:

> [I]t seems to me in this case we have testimony from – I haven't heard anybody say there was no flood damage to the property. . . .  I've heard a lot of people, including Dr. Sinno, acknowledge there was flood damage to the [property].  He took the position there was not structural damage, or I think he uses the phrase architectural and maybe cosmetic, and I think he talked about a washout from the area where the waterline was.  I know there is dispute about exactly whether it was three or five feet, but he acknowledged there was some flood damage.

(Tr. at 818:4-15 (statement of the Court).)  The Court further observed:  "It just seems to me that if there was damage caused by some flooding, it would be payable under the [flood] policy." (Tr. at 822:2-4.)  Thus, the jury's finding of zero dollars in covered flood damage "is 'at war with [these] uncontradicted or unimpeached facts.'"  *Fenner*, 657 F.2d at 651 (citation omitted).

## 2.   THE RIGSBYS DID NOT QUANTIFY THE UNDISPUTED FLOOD DAMAGE

Because the McIntosh home undisputedly sustained covered flood damage, the Rigsbys bore the burden of quantifying that flood damage to prove that it did not exceed $250,000.  As the Court correctly observed, the Rigsbys would need to put on expert testimony to quantify "how much it would cost to replace that kind of architectural damage [Dr. Sinno] talked about." (Tr. at 821:22-24.)  The Rigsbys did not proffer such evidence.

Dr. Sinno could not quantify the undisputed flood damage to the McIntosh home because, as the Court observed, Dr. Sinno "is not a valuation expert." (Tr. at 1720:2.)  Dr. Sinno himself admitted this.  (Tr. at 587:9-11.)  The Rigsbys' so-called industry expert, Mr. Fey, cannot fill the evidentiary gap as he offered no opinions on the cause or the amount of flood damage to the McIntosh home.  (Tr. at 710:12-711:5, 729:11-14.)  To the extent that their

---

[3] The fact that this covered property was damaged by flood is also consistent with the fact that the Rigsbys are not claiming that the $100,000 flood claim for the McIntoshes' personal property was false. (*See* Tr. at 337:18-20.)

experts' testimony could be construed as including valuation opinions, those opinions are properly disregarded as inadmissible. "Inadmissible evidence contributes nothing to a 'legally sufficient evidentiary basis.'" *Weisgram*, 528 U.S. at 454 (citation omitted). "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *see also Kampen v. Am. Isuzu Motors, Inc.*, 157 F.3d 306, 318 (5th Cir. 1998) (expert testimony consisting of "'conclusory, unsupported assertions'" does not create genuine fact issue) (citation omitted). Nothing in Dr. Sinno's testimony supports the Rigsbys' burden to quantify the undisputed flood damage suffered by the McIntosh home. Thus, there is no evidence to sustain a verdict that the McIntoshes were not entitled to a single penny under their flood policy, even assuming the home was severely damaged by wind or was a "total loss" by wind.[4]

## B. THE RIGSBYS' "TOTAL LOSS" THEORY IS LEGALLY UNTENABLE

Presenting no valuation expert testimony, the Rigsbys proceeded solely on the theory that "there was no flood damage" because the McIntosh home was a "total loss under the wind policy." (Tr. at 1799:15-19 (Rigsby counsel).) Their theory and the resulting verdict are premised on a fundamental misapplication of the law to the undisputed facts that established the home experienced flood damage.

A policyholder "whose property sustains damage from both flood and wind may clearly recover for his segregable wind and flood damages, ***except*** to the extent that he seeks to recover twice for the same loss." *Jones v. State Farm Fire & Cas. Co.*, 677 F. Supp. 2d 923, 928 (E.D. La. 2009) (emphasis in original), *aff'd*, 392 F. App'x 347 (5th Cir. 2010). "'Loss to property can

---

[4] Robert McVadon testified that it would have cost over $525,000 to repair damage to the first floor and restore it to its pre-Katrina condition. While he was not offering an expert opinion that all of the first-floor damage was caused by storm surge and flood, his observation of a waterline four and a half to five feet above the floor, his testimony that the photographs of the first floor shortly after Katrina were consistent with a waterline of that height, and his experience in inspecting and repairing numerous flood-damaged houses following Katrina is strong and undisputed evidence that there was more than $250,000 in flood damage, certainly that there was more than ***zero*** flood damage, to the McIntosh house.

consist of *many losses* because property can consist of *many elements*, and "loss" need *not* refer *only* to the *totality of the damage* and in fact *should not when different forces have caused different damage*.'" *Corban v. United Servs. Auto Ass'n*, 20 So. 3d 601, 614 (Miss. 2009) (boldface added) (quoting 32 *Appleman on Insurance* § 192.03[H] (2d ed. 2008)).

The Rigsbys erroneously argue, based solely on Dr. Sinno's testimony, that the McIntoshes' recovery of any flood insurance proceeds would be an impermissible "double recovery" because their house was rendered a "total loss" by wind. (*See* Rigsby Am. Trial Br. [1082] at 2-6.) As this Court correctly explained in another Katrina case, however, "the familiar principle that an insured may not receive a double recovery" is "another way" of saying "that the insured's recovery may not exceed *its actual loss*." *Penthouse Owners Ass'n, Inc. v. Certain Underwriters at Lloyd's, London*, 2011 WL 6698521, at *8 (S.D. Miss. Dec. 21, 2011) (Ozerden, J.) (emphasis added). That is, if the insurance proceeds already collected satisfy the insured's total loss, he cannot collect additional proceeds under another insurance policy. But "[t]o the extent the insured has losses that exceed the amount he collects under one insurance policy, he may legitimately claim those uncompensated losses under any other available insurance policy, and the second insurer's liability for those damages will be governed by the terms of that second policy." *Robichaux v. Nationwide Mut. Ins. Co.*, 2007 WL 2783325, at *3 (S.D. Miss. Sept. 21, 2007). Thus, in *Penthouse Owners*, the Court held that it "need *not* reduce" an insured's recovery under its commercial insurance policy "to prevent double recovery" where the sum of the wind damage found by the jury and the flood proceeds it already obtained did not together exceed the actual value of the building. *Penthouse Owners*, 2011 WL 6698521, at *11-12 (emphasis added) (addressing the amount of coverage on Buildings 2 and 3).

The Rigsbys cannot shortcut the principles of insurance law this Court applied in *Penthouse Owners* by calling the McIntosh home a "total loss" due to wind. There is no competent evidence that wind damage suffered by the McIntosh house (and covered by the McIntoshes' homeowners policy) before the arrival of Katrina's floodwaters equaled or exceeded the value of the McIntosh home. The jury was instructed that the McIntoshes' flood

policy covered "'direct physical loss by or from flood,'" i.e., "'loss or damage to insured property, directly caused by a flood.'"  (Jury Instr. 8 (quoting SFIP).)  Even if the jury believed that wind and flood water concurrently caused damage to the home, this would not preclude coverage under the SFIP because the SFIP policy does not exclude coverage for damage caused by both flood and wind.

There is no competent evidence of:  (i) the quantification of Dr. Sinno's wind damage; or (ii) the pre-Katrina value of the McIntosh home.  The Court highlighted these deficiencies.  (Tr. at 1719:6-1720:9).

Having failed to present any expert valuation evidence to support their ad hoc "total loss" theory, the Rigsbys erroneously relied on the $512,000 XactTotal replacement cost estimate and Mr. McVadon's testimony about the $946,000 that the McIntoshes spent to repair and redesign their home after Katrina. (Tr. at 1866:12-25.)  (closing argument).  These figures are not estimates or quantifications of wind damage, and thus they do not reasonably support a finding of  a "total loss by wind."

First, the Rigsbys argued that based on the XactTotal estimate, "[t]he house was worth $512,000."  They relied on XactTotal to quantify the value of the home and then in almost the same breath, told the jury that the $512,000 XactTotal figure was part of a "false record" – a "fake house thing that [State Farm] put in" the flood file to defraud the government.  (Tr. at 1870:9-11; *see id.* at 1865:15-17 (arguing that XactTotal was used "to put fake documents into [the flood] file to fool FEMA").)  In fact, Kerri Rigsby testified that "you cannot hold the value to the house to that program [viz., XactTotal]. It's a ballpark. . . . It's not an exact science, that XacTotal."  (Tr. at 274:12-21.)

Second, Mr. McVadon testified that his $946,000 figure was his "total bill to the McIntoshes." (Tr. at 1515:7-9).  It not only included costs to repair the damage caused by Katrina but  costs to make other numerous and substantial non-Katrina-related "architectural changes" to their home.  (*Id.* at 1546:23-1547:3; *see id.* 1494:5-1495:4, 1499:14-24, 1531:12-1532:9 (identifying the changes.)  In an effort to determine the McIntoshes' cost to repair ***all***

8

Katrina damage, the Rigsbys asked Mr. McVadon to back out the costs of these upgrades.  But Mr. McVadon testified he had not calculated that amount.  (*Id.* at 1531:18-1532:16.)  Thus, the Rigsbys attempt to convert the cost of McVadon's total renovation into an estimate of wind damage failed, and no evidence plausibly supports the Rigsbys' closing argument that "[i]t cost 946 to repair" the McIntosh house.  Indeed, Mr. McVadon testified that his costs of repair for any "wracking" to the home was, at most, $31,618.  (*See* Tr. at 1505:10-13, 1545:10-16.)  The Rigsbys did not proffer a competing figure.

The Rigsbys failed to prove that the McIntosh flood claim was false under the FCA.  Their arguments are devoid of evidence, wholly inconsistent, and contrary to well established insurance law, as well as the clear terms of the NFIP flood policy.  The jury verdict must be vacated and judgment granted to State Farm.

## II.   NO REASONABLE JURY COULD FIND THAT THE MCINTOSH FLOOD CLAIM WAS "KNOWINGLY" FALSE

The undisputed physical evidence found and documented by Kerri Rigsby and Cody Perry, and relied on by John Conser, provides overwhelming support for their conclusion that the McIntosh home suffered flood damage exceeding the limits of the flood policy.  They relied on FEMA directives as they understood them.  There was no basis for the jury to conclude that the September 2005 adjustment of the claim was tainted by guilty knowledge, or even that it was unreasonable, much less wrong, when it was made.  Under leading Fifth Circuit case law, there was no reasonable basis for the jury to find that State Farm submitted a knowingly false claim.

In *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333 (5th Cir. 2008), the relator alleged that the City of Houston and its contractor, the Houston Area Urban League ("HAUL"), defrauded the Department of Housing and Urban Development ("HUD") by submitting false and fraudulent claims for emergency home repairs that allegedly intentionally overstated the amount and quality of building materials needed or actually used to make the repairs. *Id.*; *see Farmer*, 523 F.3d at 335-36.  When HUD investigated the relator's claim, it found that "the reimbursements received by HAUL were exorbitant" and expelled HAUL from the program.  *Id.* at 336 n.3.

The Fifth Circuit affirmed judgment as a matter of law in favor of the defendant, explaining that HAUL's many regulatory violations must be viewed in light of the fact that: (i) HAUL's expert opined that subjective factors go into a repair cost estimate; (ii) HAUL operated in a complex regulatory arena; and (iii) HUD's regulations were not always "cut-and-dry." *See id.* at 340-42. The court concluded these circumstances were "certainly insufficient for a reasonable jury to find culpability greater than negligence" *id.* at 343, and even when the circumstances were taken as a whole, "the jury could not find liability under these facts, because of the FCA's onerous *mens rea* requirement of at a minimum, reckless indifference." *Id.*

Similarly, in *Taylor-Vick*, the relator was the former office manager for doctors who allegedly defrauded Medicare by "up-coding" reimbursement requests for services they did not perform. *See* 513 F.3d at 229. To prove guilty knowledge, the relator's expert reviewed the doctors' billing records and determined there was a pattern of up-coding that indicated false claims were being made. *Id.* The relator argued that a jury could infer guilty knowledge from these multiple instances of up-coding. The Fifth Circuit disagreed, explaining that this type of circumstantial evidence was insufficient to establish guilty knowledge under the FCA. The court acknowledged that the relator had, in fact, identified multiple instances of up-coding, but there were also instances of underbilling. Thus, the most that could be inferred from the billing records was that the doctors "were merely negligent billers, which does not offend the FCA." *Id.* at 232.

*Farmer* and *Taylor-Vick* reflect the "long-established rule of this Circuit that to show a violation of the FCA, the evidence must demonstrate '"guilty knowledge of a purpose on the part of [the defendant] to cheat the Government"' or '"knowledge of guilty intent."'" *Taylor-Vick*, 513 F.3d at 231 (alteration in original; citations omitted). This, in turn, requires **the Court** to determine whether the relator has adduced a sufficient quantum and quality of evidence to establish that the claim was knowingly false when it was submitted for payment.

There is no such evidence here. The Rigsbys admit that Mr. Perry and Ms. Rigsby did **not** "knowingly commit[] fraud." (Tr. at 831:2-3 (Rigsby counsel).) Nor is there any evidence

that John Conser, the only State Farm employee involved in paying the flood claim, knowingly paid a false claim.

### A.   NO WITNESS FOR THE RIGSBYS TESTIFIED THAT THE CLAIM WAS KNOWINGLY FALSE WHEN PAID

Kerri Rigsby testified that she recommended paying flood policy limits on the McIntosh house because she *believed* it had suffered more than $250,000 in flood damage. (Tr. at 268:6-15.)  She believed Mr. McIntosh was entitled to that amount.  (Tr. at 340:2-4.)  She also testified that the only other people involved in the payment of the flood claim, Cody Perry and John Conser, believed it was owed as well (Tr. at 343:11-20) -  beliefs that Mr. Perry and Mr. Conser confirmed.  (Tr. at 1013:8-11; 1102:10-15; 1105:6-14.)

The Rigsbys' experts support the good faith belief of the three adjusters that Mr. McIntosh was owed $250,000 on his flood claim when paid.  Mr. Fey testified that the flood scope notes were good and he could not identify one item that should not have been included in the scope, (Tr. at 727:25-728:18) – a scope that lists the items the $250,000 was paid to compensate.  Dr. Sinno's opinions, formed two years after the flood claim was paid, are irrelevant to the issue of what was known at the time the claim was paid.  Nothing Dr. Sinno could say or opine negates the physical evidence of flood damage or the reasonableness of the Rigsby/Perry/Conser conclusions, which were documented with their photos of the house. After inspecting the property for several hours, Perry found no evidence of wracking[5] anywhere, including the roof.  (*See* Tr. at 1008:19-1009:2, 1055:23-1057:13.)  Even Sinno conceded that flood or storm surge can distort or hide wind damage, and that signs of wracking damage would not be known to an adjuster.  (Tr. at 576:23-577:1; 578:5-13.)

Ms.  Rigsby testified that she could not imagine a tornado causing the lower floor damage and that she had never heard of any type of wind causing the lower floor damage either. (Tr. at 298:5-9; 299:11-18.)   Similarly, Mr. Perry had never seen wind damage cause this type of

---

[5] The difference of opinion between Dr. Sinno and Cody Perry about the significance of the crack in the brick veneer column on the rear of the McIntosh home is not evidence of anything other than a difference of opinion. It is certainly not evidence of guilty knowledge.

damage to the lower floor. (Tr. at 973:17-21.)  The damage was consistent with damage done by storm surge (Tr. at 308:13-15), which is why Kerri Rigsby, Cody Perry, and John Conser believed when the claim was paid, it was duly owed.  Even Mr. Ford supports the adjusters' belief that the damage was consistent with storm surge. (Ford Dp. at 119:9-15.)

The only reasonable inference to draw from this evidence is that State Farm had a good faith belief that payment of the McIntosh flood claim was proper.  It dispels any notion that State Farm was consciously indifferent as to the truth or falsity of the amount owed when it paid this claim.  (Tr. at 1008:19-1009:2, 1055:23-1057:13).

### B.   THE TESTIMONY OF THE FEMA WITNESSES PRECLUDES ANY FINDING OF GUILTY KNOWLEDGE

The Rigsbys relied on a disjointed list of purported breaches of regulations and industry standards to support their argument of knowing misconduct. They asserted that the single adjuster program initiated by FEMA could create conflicts of interest for State Farm (and presumably for any other WYO insurer). They claimed the purported characterization of Katrina as a water storm was somehow a misrepresentation. They argue it was improper to have closed the McIntosh flood claim before the engineering report ordered for the homeowners claim had been received; that it was improper to have placed the XactTotal report in the flood file; and that State Farm "ignor(ed) the directive of 5054."  (Tr. At 801:20-25.)  The testimony of three former FEMA officials charged with administering the NFIP established that these contentions all focused on conduct that was either affirmatively encouraged by or known to, FEMA.  As a matter of law, the evidence and conclusions urged by the Rigsbys cannot support a finding of guilty knowledge.

The Rigsbys asked the jury to infer guilty knowledge based on a purported financial incentive to shift wind claims to flood in order to avoid payment.  No such inference was appropriate, since that system was created by FEMA itself.  David Maurstad, head of the NFIP at the time of Katrina, testified that FEMA developed the Single Adjuster Program to respond to complaints from policyholders that "it was taking too long for the [flood] claims to be handled." (Tr. at 1128:22-1129:1.)  FEMA expressly required Write-Your-Own ("WYO") providers like

State Farm to adhere to the Single Adjuster Program and adjust and pay both wind and flood claims.  As a result, no inference of guilty knowledge can reasonably or properly be drawn from a WYO provider's decision that the amount owed for a flood claim exceeds the amount owed for a wind claim.  (*Id.* at 1126:6-1127:7.)

Likewise, any statement from Lecky King or others at State Farm that Katrina was a "water storm" is wholly consistent with the information provided by FEMA to the insurance industry.  Mr. Maurstad testified that he toured the Gulf Coast region shortly after Katrina struck, witnessed catastrophic flood damage, and concluded "that there were going to be a lot of flood policies where the policy limits were going to be paid."  (Tr. at 1136:22-23.)

Contrary to the Rigsbys' assertion that guilty knowledge can be inferred from the fact that State Farm paid the McIntosh flood claim before its receipt of the engineering report, Mr. Maurstad testified that he did not want WYO adjusters to delay payment of flood claims.  (Tr. at 1138:1-7.)  He also confirmed that the adjustment procedures that State Farm put in place to adjust the McIntosh home were consistent with FEMA directives.  (*Id.* at 1140:17-1141:1.)  He further testified that he "decided very early on that I wanted those claims taken care of as quickly as possible," (*id.* at 1136:24-25), and that it "was a very high priority of mine that these [flood] claims be handled promptly and fairly" (*id.* at 1138:1-7), and that FEMA – not State Farm – was urging adjusters to streamline adjustment protocols for flood claims.

Q:      And was it State Farm pushing FEMA to relax its rules and requirements?

A:      This was me pushing and the program pushing on behalf of the policyholders.

(*Id.* at 1143:21-24.)

Crucially, Mr. Maurstad also expressly rejected the Rigsbys' assertion that a line-by-line estimate had to be done for flood claims that did not fall within categories 1 or 2 of W-5054.  (*Id.* at 1157:21-1158:2.)  Rather, W-5054, which was issued after the adjusters inspected the McIntosh house, was promulgated to give adjusters additional flexibility in adjusting flood claims.  (*Id.* at 1157:5-14).

13

Likewise, James Shortley, Director of Claims for the NFIP from 1990 to 2007, testified that after Katrina struck, he recognized immediately that some "fairly major" expedited claims-handling procedures would have to be put in place in order to "settle the [flood] claims as quickly as possible." (Shortley Dp. at 16:11-18:2.) Mr. Shortley's testimony establishes that State Farm's use of XactTotal for the adjustment of the McIntosh flood claim was consistent with sound claims-handling practices. In particular, he testified that as early as August 31, 2005 – two days after Katrina struck – FEMA told WYO companies that it was *not* necessary to construct a stick-build damage model if, after a site inspection, the adjusters concluded that the flood damage exceeded policy limits. (*Id.*) Mr. Shortley further testified that W-5054 did *not* "revoke" FEMA's prior authorization to forego a stick-build estimate if the flood claims adjuster conducted a site inspection and "observed damages that would exceed the coverage limits." (*Id.* at 47:9-25.) In fact, he testified that a stick-build estimate would not have been necessary where (as here) the flood adjuster performed a site visit, determined that the property damage exceeded policy limits, and documented that loss with photographs, scope notes, and diagrams. Mr. Shortley authorized this process in talks with Ms. King and State Farm NFIP liaison Juan Guevara. (*Id.* at 27:7-28:3.)

Gerald Waytowich, a General Agent for NFIP at the time of Katrina, reviewed the McIntosh flood claim file using the same standards and criteria that he would have employed if he were performing a reinspection for FEMA. Mr. Waytowich concluded that: (i) photographs of the McIntosh property show extensive damage to the lower portion of the house that is indicative of storm surge damage (Waytowich Dp. at 51:13-16, 51:18); (ii) flood damage is "clearly damages way beyond [the] $250,000" policy limits (*id.* at 47:13-18); (iii) the McIntosh flood claim was properly scoped and the claim file was adequately documented (*id.* at 46:18-22); (iv) McIntosh property was considered a "total loss" under NFIP adjusting guidelines because the flood damage exceeded policy limits (*id.* at 158:19-22, 158:24-25, 159:03-12, 159:14); (v) the use of XactTotal was consistent with the training given by FEMA for handling Katrina

claims (*id.* at 47:6-8, 47:10-11, 47:13-23, 47:25); and (vi) the McIntosh flood claim file justified a $250,000 flood payment (*id.* at 48:17-21, 48:23-24).

Under cross-examination by the Rigsbys' counsel, Mr. Waytowich testified that he had not previously reviewed Brian Ford's October 12, 2005 engineering report. He stated he would not expect to find the Ford report in the McIntosh flood file because it was ordered in connection with the adjustment of the wind claim and was not even issued until ten days after the flood claim was closed. (Waytowich Dp. at 155:10-156:15.)  Mr. Waytowich further testified that even if the report was in the flood file or otherwise provided to him, it would not have changed his opinion that State Farm properly handled the flood claim based on the substantial documentation of flood damage in the file. (Waytowich Dp. at 147:3-17; *see also id.* at 141:19-143:17 (Ford report did not change his opinion "that based on what I've seen in this file, they exceeded the $250,000 on flood damage").)

The testimony of these FEMA witnesses is fully consistent with that of State Farm's employees and reflects their knowledge and understanding of the application of the SFIP.  For instance, Ms. King testified that Mr. Maurstad and Mr. Shortley specifically instructed her to pay flood claims in flood-stricken areas "as quickly as possible, immediately" (Tr. at 1249:10-19), and that FEMA was "absolutely aware that Xactotal was being used" in constructive total loss cases.  (*Id.* at 1243:24-1244:2.)  Thus, the procedures State Farm used for handling Katrina-related flood claims – including the McIntosh flood claim – were fully consistent with FEMA claims-handling practices.  This evidence precludes a finding that State Farm's adjustment of the McIntosh flood claim was knowingly false for two reasons.

First, as *qui tam* relators, the Rigsbys are assignees of a portion of any claim that the United States might have for damages based on the adjustment of the McIntosh flood claim. *See Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773-74 & n.4 (2000). "An assignee steps into the shoes of the assignor and takes the assigned rights subject to all defenses that an opposing party might be able to assert against the assignor." *SingleEntry.com, Inc. v. St. Paul Fire & Marine Ins. Co.*, 117 F. App'x 933, 935 (5th Cir. 2004).  Thus, the

Rigsbys are bound by the testimony of FEMA's former administrator, just as the government would be if it had brought this claim directly. *See, e.g.*, *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1028, 1030-31 (D. Nev. 2006).

Second, it is well established that "the government's knowledge of the falsity of a statement or claim can defeat FCA liability on the ground that the claimant did not act 'knowingly.'" *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (en banc) (Jones, J., specially concurring); *see also United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 491 F.3d 254, 263 (5th Cir. 2007).

This Court recognized that government knowledge can negate a finding of guilty knowledge, but it declined to instruct the jury on the government knowledge defense because it was unclear whether FEMA "knew about the particulars of the [McIntosh] claim." (Tr. at 1808:1-3.) While it is true that in *Laird* and *Southland* the government knew the particulars of the specific allegedly false claim, the doctrine extends to cases where the government knows and approves the ***process*** through which the claim is generated. This is such a case. Here, the Rigsbys rely upon the very process known, approved and recommended by the government as evidence that the defendant acted recklessly or with deliberate ignorance of the falsity of the claim. *See, e.g., United States ex rel. Williams v. Renal Care Group, Inc.*, 696 F.3d 518, 523-26, 531 (6th Cir. 2012) (even though the government did not know the details of the particular claims, the defendants did not exhibit "reckless disregard" of agency regulations because they "sought clarification on the ***rules*** from [government] officials," and the responsible government agencies had conducted periodic reviews of the subsidiary without voicing concerns over the "ownership structure" of parent and subsidiary).

### C.   PUTATIVE REGULATORY VIOLATIONS OR BREACHES OF "INDUSTRY STANDARDS" ARE NOT EVIDENCE OF GUILTY KNOWLEDGE

As shown above, the testimony of the witnesses establishes that all of the Rigsbys' so-called "evidence" of guilty knowledge was either affirmatively encouraged by, or known to, FEMA. There is no evidence that contradicts any of the directives or expectations communicated to State Farm. To deem State Farm's conduct in handling the McIntosh claim

evidence of reckless disregard or deliberate ignorance is to read the guilty knowledge requirement out of the FCA. "The FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010) (citation omitted). As the Fifth Circuit has explained, "the "FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of [agency] regulations are not fraud unless the violator knowingly lies to the government about them." *Farmer*, 523 F.3d at 340 n.12 (alterations in original) (quoting *Southland*, 326 F.3d at 682 (Jones, J., specially concurring)). Notably, every federal court of appeals to consider the issue has concluded that "[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA." *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996); *accord, United States ex rel. Hobbs v. MedQuest Assocs., Inc.*, 711 F.3d 707, 714 (6th Cir. 2013).

Mr. Fey testified repeatedly that he was in court  "to talk about industry standards and how they compare to what State Farm did" (Tr. at 709:24-710:3), using some variation of the term many times. A breach of an industry standard can, at most, support a finding of ordinary negligence. But State Farm was not tried for negligent claims adjusting; it was tried for fraud. The evidence the Rigsbys adduced through Fey does not rise to the level of "reckless disregard" or "deliberate ignorance" required by the law. *See Farmer*, 523 F.3d at 338 (FCA's "*mens rea* requirement is not met by mere negligence or even gross negligence").

### D.   THE FORD REPORT, AND ITS REJECTION, ARE NOT EVIDENCE OF GUILTY KNOWLEDGE

Neither the Brian Ford engineering report, the centerpiece of the Rigsbys' proof, nor the fact that Ms. King questioned its conclusion and agreed to have a second engineer re-inspect the property, is evidence that State Farm paid the McIntosh flood claim knowing there was less than $250,000 in covered flood damage.

First, it is uncontroverted that the Ford report was received after the flood claim was paid.[6] Thus, the only relevance the Ford report may have is to a reverse false claim, which was dismissed by the Court.

Second, under the Rigsbys' theory of a putative "scheme," Ms. King reacted negatively to the Ford report because it undercut State Farm's alleged plan to underpay wind claims since the Ford report listed wind as the predominant cause of the damage to the McIntosh property. (Tr. at 831:2-14.)  There is no evidence linking the Ford report to knowing overpayment of the flood claim.  The Rigsbys cannot bootstrap Ms. King's response to the Ford Report into evidence of a "scheme."  The adjustors had already paid the claim and, as conclusively shown, there was no proof they had knowingly paid a false claim.  Indeed, the adjustors' lengthy inspection of the entire McIntosh home and their detailed scope notes detailing its flood and wind damage coupled with the simultaneous payment of the flood and wind claims are all evidence that fully rebuts any such alleged scheme.  Moreover, the Ford report further documented the indisputable physical evidence of flood damage found by Rigsby and Perry.

Putative evidence that State Farm did not *repay* money *after* it had paid the flood claim is *not* evidence that its initial payment of the claim was knowingly false *when presented*, which is what the Rigsbys were required to prove.  (*See* Jury Instr. 10.)  Instead, the Rigsbys confused – if not misled – the jury by arguing that State Farm had an obligation to "pay that money back to NFIP."  (Tr. at 1867:9-18.)  An obligation to repay money might be relevant to a *reverse* false claim, which the Court has already dismissed.  ([898] at 21-24.)  But it is not evidence that "State Farm *knowingly presented*" a false claim "knowing that the claim was false or fraudulent *at the time it was made*."  (Jury Instr. 9 & 10 (emphasis added).)

---

[6] The issue of whether State Farm had guilty knowledge is measured at the point when the McIntosh claim was presented to the government for payment.  (Jury Instr. 9.)  As this Court noted, the Rigsbys did not adduce any proof establishing when, if ever, the McIntosh claim was presented to the government for payment.  (Tr. at 1761:2-4.)  Without proof of presentment, the Rigsbys' attempt to prove that the Ford report is evidence that "State Farm knowingly. . . *presented* a false or fraudulent claim" (Jury Instr. 9) is necessarily incomplete.  (Tr. at 1761:16-25.)  *See infra,* at Part IV (discussing the absence of proof of presentment).

**E.   ANY INSTRUCTION TO JUST ASSUME FLOOD DAMAGE AND "HIT THE LIMITS" IS IRRELEVANT TO THE MCINTOSH FLOOD CLAIM**

Witness after witness testified that State Farm adjusters were ***not*** told to assume flood damage or to redo XactTotal estimates until they "hit the limits" of the flood policy, as Ms. Rigsby claims.  She failed to name anyone who made the alleged statement, and she called on no witness who supported her testimony.  But even if her unique recollection is fully credited, it is ultimately irrelevant to the adjustment of the McIntosh flood claim.  Both Ms. Rigsby and Mr. Perry testified that they spent four to six hours inspecting, measuring, adjusting, and making notes and diagrams about the property.  (*See, e.g.*, Tr. at 278:11-17 (K. Rigsby); 980:19-981:4, 1013:2-7 (Perry).)  In fact, Mr. Perry spent 45 minutes to an hour on the McIntoshes' roof, inspecting it for wind damage and found no evidence of wracking.  (*See* Tr. at 1008:19-1009:2, 1055:23-1057:13.)

According to Ms. Rigsby, the instruction to "hit the limits" meant the following: Adjusters should run XactTotal, and if the initial run did not hit the flood limits, then the adjusters were to modify the inputs and keep running XactTotal until the limits were hit.  (Tr. at 213:12-214:22.)  Here, however, both Ms. Rigsby and Mr. Perry testified that values on the *initial* XactTotal computation significantly exceeded the McIntoshes' policy limits.  Thus, any putative instructions to assume flood damage or to review the estimate until the adjustor "hit the limits" are irrelevant.

**III.   THERE IS NO PROOF OF A "FALSE RECORD OR STATEMENT"**

The Rigsbys identified two "records or statements" that they contended triggered liability under 31 U.S.C. § 3729(a)(1)(B):  the "omission of the original Brian Ford report" in the flood file; and the use of the "long-form XacTotal" and placing it in the claim file.  (Relators' Am. Trial Br. [1082] at 11.)  The Rigsbys do not contend that the Ford report is a "false record or statement," 31 U.S.C. § 3729(a)(1)(B); to do so would undermine their entire case.  But they did not, and could not, explain how an "omission" constitutes a "record or statement."  By definition, an "omission" of a record is the absence of a record or statement.

State Farm did not "make[]" or "use[]" the Ford report, nor did it "cause[]" the Ford report "to be . . . used." 31 U.S.C. § 3729(a)(1)(B). While State Farm indirectly "cause[d]" the Ford report "to be made" (albeit to determine the scope and extent of the McIntoshes' claim under their **homeowners** policy), State Farm did not ask Mr. Ford to create a false record.

Nor is the presence of the long form XactTotal printout in the flood claim file "a false record or statement." 31 U.S.C. § 3729(a)(1)(B). The Rigsbys do not contend that any State Farm employee manipulated the XactTotal program in any way such that the XactTotal printout is false. Nor do the Rigsbys dispute that the XactTotal printout is a true and correct report based on the information gathered from Mr. McIntosh and the inspection, and generated by Ms. Rigsby and Mr. Perry.[7] As already noted, the Rigsbys *affirmatively relied on* the XactTotal printout and its $512,000 figure in their closing, arguing that "[t]he house was worth $512,000" and "you have $512,000 in value." (Tr. at 1866:13-14, 22.)

The XactTotal printout is exactly what it purports to be: an XactTotal printout. What the Rigsbys are actually arguing is that State Farm used a *true and correct* XactTotal printout to mislead FEMA. But even if that were true (and there was no evidence that it was true), there is no liability under 31 U.S.C. § 3729(a)(1)(B) for making or using a true "record or statement." Nor is it a secret that XactTotal does not generate a perfect representation of a house. As Ms. Rigsby testified: "It's not an exact science, that Xactotal. It is simply putting in a square foot and you are getting back a spec house, basically. It doesn't reflect the home." (Tr. at 274:15-17.) Further, the flood file makes clear, *no fewer than three times*, that State Farm used an XactTotal valuation to adjust the flood claim. (*See* DS-3 at 105, 106, 214.) Because the only record proffered by the Rigsbys to support their claim is, by definition, not a "false record or statement," 31 U.S.C. § 3729(a)(1)(B), State Farm is entitled to judgment as a matter of law.

---

[7] The NFIP requires WYO carriers to value the house in order to determine if the insured is owed actual cash value or replacement costs. Thus, every flood file must contain documentation of the valuation program, such as XactTotal, to support the payment. (*See* Tr. at 1090:3-24, 1093:21-24, 1098:22-1099:2.)

## IV. NO EVIDENCE SHOWS THAT STATE FARM "PRESENTED" THE MCINTOSH FLOOD CLAIM TO THE GOVERNMENT OR THAT THE GOVERNMENT PAID STATE FARM

### A. THERE IS NO PROOF OF STATE FARM'S PRESENTMENT OF THE MCINTOSH FLOOD CLAIM

To recover under 31 U.S.C. § 3729(a)(1), a relator must "prove that the defendant 'present[ed]' a false or fraudulent claim to the Government." *Allison Engine*, 553 U.S. at 671 (alteration in original). Where, as here, the relator does not proffer evidence of presentment to the government, the (a)(1) cause of action must be dismissed. *See, e.g.*, *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 492 (D.C. Cir. 2004) (en banc) (Roberts, J.).

The Rigsbys did not introduce any evidence establishing that State Farm "presented" the McIntosh flood claim "to an officer or employee of the United States Government." When pressed by the Court during argument on State Farm's motion, which pointed out this deficiency for the *second* time, the Rigsbys simply: (i) speculated that State Farm must have presented the claim to the government because it was part of the WYO program; and (ii) argued that the jury could infer presentment from a foundationless, hypothetical question posed to Ms. King (Tr. at 1760:8-16).

The Rigsbys simply assumed that because State Farm was a WYO carrier, it must have presented the McIntosh flood claim to the government. But as the Court pointed out, the Court "ha[s]n't heard any real explanation as to the mechanics of how [the WYO arrangement] worked." (Tr. at 1766:9-12.) As the Court noted, without proof of presentment, the Rigsbys' attempt to prove that the Ford report is evidence that "State Farm knowingly. . . *presented* a false or fraudulent claim" (Jury Instr. 9) is necessarily incomplete. (Tr. at 1761:16-25.) The Rigsbys, who bore the burden of proof on the issue, presented no evidence on how State Farm made claims, requested payment, or was reimbursed under the WYO arrangement. The Rigsbys' counsel have no idea how State Farm was supposedly paid by the government (*see id.* at 1766:17-19), or even in what month the McIntosh flood claim was supposedly presented (*see id.* at 1763:21-23). By definition, this is speculation, which does not "establish a conflict in

substantial evidence" sufficient to avoid dismissal, particularly with regard to a fundamental statutory requirement such as presentment. *See Arkoma Basin*, 384 F. App'x at 379.

The Rigsbys cannot twist a hypothetical question about the Ford report – and Ms. King's response, which assumed for the purposes of the Rigsbys' hypothetical (and contrary to the undisputed record) that the McIntosh home was rendered a slab – into "substantial evidence" of presentment. (Tr. at 821:11-14; see also King Dp. at 135:16-25.) They never established that Ms. King had personal knowledge of whether State Farm presented the McIntosh flood claim to the government, or whether the government ever paid or reimbursed State Farm for paying the McIntosh flood claim. Ms. King's answer to the Rigsbys' hypothetical does not "'establish a conflict in substantial evidence.'" *Arkoma Basin*, 384 F. App'x at 379 (citation omitted). In sum, the Rigsbys did not introduce any evidence establishing that State Farm "presented" the McIntosh flood claim "to an officer or employee of the United States Government," and their (a)(1) claim fails.

The Rigsbys' failure to proffer evidence of presentment is also fatal to their "false records" cause of action under subsection (a)(1)(B) (formerly subsection (a)(2)). The Court's instructions to the jury underscored this fact. The Court instructed that the Rigsbys must prove State Farm made or used a false record or statement "that was material . . . to a false or fraudulent **claim**." (Jury Instr. 11 (emphasis added); *see* Special Jury Verdict Form Q. 4 [1092].) "Claim" is defined as "any request or demand . . . for money, that **is presented** to an officer, employee, or agent of the United States." (Jury Instr. 12 (emphasis added).) Thus, if there is no presentment, there is no false claim and no liability under subsection (a)(1)(B). *Cf. In re Bank of New York Mellon Corp.*, 851 F. Supp. 2d 1190, 1195-99 (N.D. Cal. 2012) (dismissing the "false records" cause of action under the identically worded subsection of the California False Claims Act because plaintiffs failed to allege presentment).

### B.    THERE IS NO EVIDENCE THE GOVERNMENT PAID STATE FARM $250,000

"In order to recover FCA damages," the plaintiff "must prove that [the government] sustained an actual loss as a result of the [defendant's] false or fraudulent claim." *Commercial*

*Contractors, Inc. v. United States*, 154 F.3d 1357, 1371-72 (Fed. Cir. 1998).  Yet the Rigsbys, who have the burden of proof,  did not adduce any evidence that the government ever paid or reimbursed State Farm for the McIntosh flood claim, and State Farm cannot be ordered to return money when there is no evidence it was paid that money in the first instance.  The jury's verdict to the contrary simply ***assumes*** that the McIntosh flood claim was presented to the government and paid to State Farm.  Such rank "speculation and conjecture" cannot sustain the jury's verdict. *Fenner*, 657 F.2d at 651.

## V.   IN THE ALTERNATIVE, STATE FARM REQUESTS A NEW TRIAL UNDER RULE 59(A)

When considering a Rule 59 motion for a new trial, the district court "weighs all the evidence." *See Robin v. Wilson Bros. Drilling*, 719 F.2d 96, 98 (5th Cir. 1983).  Weighing the evidence includes assessing the credibility of witnesses.  *Poynter*, 874 F.2d at 222; *see Shows*, 671 F.2d at 933-34.  The court "need not view [the evidence] in the light most favorable to the nonmoving party."  *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).  The Rule 59 "standard, of course, is lower than that for a" Rule 50 motion.  *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982).  "[A] new trial can be appropriate even when a judgment n.o.v. is not."  *Rousseau v. Teledyne Movible Offshore, Inc.*, 812 F.2d 971, 971 (5th Cir. 1987).

The Rigsbys wholly misled the jury in closing about (a) State Farm's ability to rely on the directions that FEMA gave State Farm prior to and during Katrina about how to adjust and handle claims; (b) whether the difference of opinion about the source of wracking is evidence of guilty knowledge; and (c) the absence of evidence by State Farm about the pressure or physical force of the flood water having the capacity to damage the McIntosh home. Because the Rule 59 standard is lower, the Court may - and should - grant a new trial under Rule 59 even if it declines to enter judgment as a matter of law under Rule 50(b).  Likewise, if the Court grants State Farm's Rule 50(b) motion, it should also conditionally grant a new trial under Rule 50(c)(1) for these same reasons and because the jury plainly misapplied the instructions as given to the evidence.

## CONCLUSION

State Farm recognizes that no policy argument can override a jury verdict supported by ample evidence.  This, however, is not such a verdict, and, if left undisturbed, may be seen beyond this courtroom as, "impos[ing] a burden on government contractors far higher than what Congress intended when it passed [the FCA]."  *United States ex rel. Williams v. Renal Care Group, Inc.*, 696 F.3d 518, 531 (6th Cir. 2012).

In this case, treble damages may be imposed on State Farm for the adjustment of the McIntosh flood claim where there is (i) incontrovertible photographic, physical, and testimonial evidence that Katrina inundated the McIntosh house with floodwater; and (ii) testimony by three former FEMA officials demonstrating that the covered flood damage to the McIntosh property plainly exceeded $250,000, and State Farm's adjustment of the McIntosh property was fully consistent with FEMA claims-handling practices.  Allowing this verdict to stand will be understood to vastly expand FCA liability, effectively allowing juries to set their own standards for government contractors and to disregard the reasoned judgments of the government officials empowered by Congress to implement federal programs, even when those government officials testify that the defendant did not violate its guidelines.  The Court has a "duty to maintain the integrity of substantive law" by entering judgment as a matter of law.  *Turner ex rel. Turner v. Atl. Coast Line R.R. Co.*, 292 F.2d 586, 589 (5th Cir. 1961) (Wisdom, J.).

For all the foregoing reasons, State Farm respectfully asks this Court to grant State Farm's motion for judgment as a matter of law in its entirety and dismiss the Rigsbys' claims with prejudice.  State Farm further respectfully asks the Court to conditionally grant a new trial pursuant to Rule 50(c)(1).  Alternatively, State Farm respectfully asks the Court to grant its motion for a new trial under Rule 59(a) and for any other general or special relief as may be appropriate.

This, the 6th day of May, 2013.

Respectfully submitted,

By:   s/ *E. Barney Robinson III* (MB # 09432)
Robert C. Galloway (MB # 4388)
Michael B. Beers (ASB-4992-S80M)
Phil B. Abernethy (MB # 1023)
E. Barney Robinson III (MB # 09432)
Amanda B. Barbour (MB # 99119)

ITS ATTORNEYS

OF COUNSEL:

BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
Post Office Drawer 4248
Gulfport, MS  39502
(P) (228) 575-3019
(E) bob.galloway@butlersnow.com

BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
250 Commerce Street, Suite 203
Montgomery, AL  36104
(P) (334) 832-2900
(F) (334) 832-2901
(E) michael.beers@butlersnow.com

BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
200 Renaissance at Colony Park, Suite 1400
1020 Highland Colony Parkway (39157)
Post Office Box 6010
Ridgeland, MS 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) phil.abernethy@butlersnow.com
(E) barney.robinson@butlersnow.com
(E) amanda.barbour@butlersnow.com

<u>**CERTIFICATE OF SERVICE**</u>

I, E. Barney Robinson III, one of the attorneys for State Farm Fire and Casualty Company, do hereby certify that I have this day caused a true and correct copy of the foregoing instrument to be delivered to the following via the means directed by the Court's CM/ECF System:

C. Maison Heidelberg
Ginny Y. Kennedy
HEIDELBERG HARMON, PLLC
795 Woodlands Parkway, Suite 220
Ridgeland, MS  39157
(P) (601) 351-3333
(F) (601) 956-2090
mheidelberg@heidelbergharmon.com
gkennedy@heidelbergharmon.com

August J. Matteis Jr.
William E. Copley
Derek Y. Sugimura
WEISBROD, MATTEIS & COPLEY, PLLC
1900 M Street NW, Suite 850
Washington, DC  20036
amatteis@wmclaw.com
dsugimura@wmclaw.com

COUNSEL FOR CORI RIGSBY AND KERRI RIGSBY

Jeffrey S. Bucholtz
Joyce R. Branda
Patricia R. Davis
Jay D. Majors
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC  20044

Lynn Murray
AUSA
UNITED STATES ATTORNEY'S OFFICE
Southern District of Mississippi
501 East Court Street, Suite 4.430
Jackson, MS  39201
(P) (601) 965-2835
lynn.murray@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

THIS the 6th day of May, 2013.

By:      s/*E. Barney Robinson III* (MB # 09432)
          E. Barney Robinson III (MB # 09432)

# Appendix A



DS-230.0001

"Eyewitness photo" showing storm surge waves at McIntosh house

# Front Porch Columns



DS-289

Scrape marks showing height of storm surge waves at McIntosh front porch.

# Master Bath Tub and Carpet



DS-135.0001



DS-183.0001

# Cook Top



DS-113.001



DS-162.001

# Wet Bar, Sink, Ice Maker



DS-126.0001



DS-141.0001

# Sink, Disposal and Refrigerator



DS-116.0001



DS-160.0001

# Tile Floors



RIGMCI0502-17

DS-117.0001



DS-29.0001

# Hardwood Floors



RIGMCI0502-16

DS-122.0001



RIGMCI0506-23

DS-168.0001

DS-168.0001

# Stairs and Railing



RIGMCI0502-16

DS-122.0001



DS-279.0001

# Master Bedroom Carpet



DS-131.001



P729

# Back Steps



DS-144.0001



DS-186.0001