# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

UNITED STATES OF AMERICA ex rel.
CORI RIGSBY and KERRI RIGSBY,  RELATORS/COUNTER-DEFENDANTS

    v.       CASE No. 1:06-cv-433-HSO-RHW

STATE FARM FIRE & CASUALTY  DEFENDANTS/COUNTER-PLAINTIFFS
COMPANY, et al.

---

**RELATORS' MEMORANDUM IN SUPPORT OF MOTION TO INITIATE
DISCOVERY REGARDING THE EXTENT OF STATE FARM'S PROVEN
SCHEME TO DEFRAUD THE FEDERAL GOVERNMENT, IMPOSE
MAXIMUM CIVIL PENALTY, AWARD MAXIMUM RELATORS' SHARE,
AND AWARD RELATORS THEIR ATTORNEYS' FEES, EXPENSES AND COSTS**

August J. Matteis, Jr. (admitted *pro hac vice*)
amatteis@wmclaw.com
William E. Copley (admitted *pro hac vice*)
wcopley@wmclaw.com
Derek Y. Sugimura (admitted *pro hac vice*)
dsugimura@wmclaw.com
Timothy M. Belknap (admitted *pro hac vice*)
tbelknap@wmclaw.com
WEISBROD MATTEIS & COPLEY PLLC
1900 M Street NW, Suite 850
Washington, DC 20036
Phone No. (202) 499-7900

*Attorneys for Cori Rigsby and Kerri Rigsby*

C. MAISON HEIDELBERG, MB #9559
mheidelberg@heidelbergharmon.com
GINNY Y. KENNEDY, MB #102199
gkennedy@heidelbergharmon.com
OF COUNSEL:
HEIDELBERG HARMON PLLC.
795 Woodlands Parkway, Suite 220
Ridgeland, Mississippi  39157
Phone No. (601) 351-3333
Fax No. (601) 956-2090

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

PROCEDURAL HISTORY ........................................................................................... 2

ARGUMENT .............................................................................................................. 6

I.  The Court Should Allow Relators to Take Discovery Regarding the Full
    Extent of State Farm's Proven Fraud Against the Federal Government. ........................... 6

    A.  Relators are Entitled to Discovery Regarding the Full Scope of the
        State Farm Scheme to Commit Fraud that They have Alleged with
        Particularity, Substantiated with Evidence, and Proven
        Successfully to a Jury at Trial .................................................................... 6

    B.  Any Argument By State Farm that this Case Should Be Limited to
        the McIntosh House is Belied by State Farm's Approach to
        Litigation in this Case and the Inconsistent Position It has Taken
        Before Another Court. ............................................................................. 10

II. The Court Should Require State Farm to Pay the Maximum Civil Penalty
    Under the False Claims Act. ...................................................................................... 13

III. The Court Should Award Relators the Maximum 30 Percent Relators'
    Share that the False Claims Act Authorizes. .............................................................. 14

IV. Relators are Entitled to an Award Against State Farm of the Attorneys
    Fees, Costs, and Expenses that they Necessarily Incurred to Prove State
    Farm's Fraud. ......................................................................................................... 19

CONCLUSION ........................................................................................................... 22

ii

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott v. BP Exploration & Prod. Inc.*,
  781 F. Supp. 2d 453 (S.D. Tex. 2011) ...................................................... 8

*Branch Consultants, L.L.C. v. Allstate Ins. Co.*,
  Civ. A. 06-4091, 2007 WL 3118310 (E.D. La. Oct. 17, 2007) ................................ 12

*City of Riverside v. Rivera*,
  477 U.S. 561 (1986)........................................................................ 19

*Copeland v. Marshall*,
  641 F.2d 880 (D.C. Cir. 1980) .............................................................. 19

*Covington v. District of Columbia*,
  57 F.3d 1101 (D.C. Cir. 1995)............................................................... 21

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)........................................................................ 20

*Henson v. Columbus Bank & Trust Co.*,
  770 F.2d 1566 (11th Cir. 1985) ............................................................. 19

*In re Superior Crewboats, Inc.*,
  374 F.3d 330 (5th Cir. 2004) ........................................................... 11, 12

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
  426 F.3d 694 (3d Cir. 2005) ................................................................ 21

*Purdue v. Kenny A. ex rel. Winn*,
  559 U.S. 542, 130 S. Ct. 1662 (2010)................................................... 20, 21

*Robertson v. Bell Helicopter Textron, Inc.*,
  32 F.3d 948 (5th Cir. 1994) ................................................................. 9

*Saizan v. Delta Concrete Prods. Co., Inc.*,
  448 F.3d 795 (5th Cir. 2006) ............................................................... 20

*U.S. ex rel Alderson v. Quorum Health Group, Inc.*,
  171 F. Supp. 2d 1323 (M.D. Fla. 2001)..................................... 14, 15, 16, 18, 19

*U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.*,
  579 F.3d 13 (1st Cir. 2009) ................................................................. 9

*U.S. ex rel. Fox v. Northwest Nephrology Assocs., P.S.*,
  87 F. Supp. 2d 1103 (E.D. Wash. 2000)...................................................... 16

*U.S. ex rel. Grubbs v. Kanneganti*,
  565 F.3d 180 (5th Cir. 2009) ........................................................ 1, 5, 7, 8

*U.S. ex rel. Jajdelski v. Kaplan, Inc.*
  No.11-16651, 2013 WL 520418 (9th Cir. Feb. 13, 2013) ....................................... 9

*U.S. ex rel. Johnson Pochardt v. Rapid City Reg'l Hosp.*,
    252 F. Supp. 2d 892 (D.S.D. 2003) ....................................................................14, 15, 16, 18

*U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*,
    530 F. Supp. 2d 888 (S.D. Tex. 2008) ...................................................................................13

*U.S. ex rel. Lusby v. Rolls-Royce Corp.*,
    570 F.3d 849 (7th Cir. 2009) ...................................................................................................9

*U.S. ex rel. Miller v. Bill Harbert Intern. Const.*, Inc.,
    501 F. Supp. 2d 51 (D.D.C. 2007) .........................................................................................13

*U.S. v. NEC Corp.*,
    11 F.3d 136 (1993) .........................................................................................................17, 18

**Regulations**

28 C.F.R. § 85.3....................................................................................................................2, 13

**Statutes**

31 U.S.C. § 3729 ..................................................................................................................2, 13

31 U.S.C. § 3730 ..............................................................................................................2, 14, 19

## PRELIMINARY STATEMENT

When the jury rendered its unanimous verdict on April 8, 2013, finding that Defendant State Farm Fire and Casualty Co. ("State Farm") knowingly defrauded the Government for the full $250,000 value of the National Flood Insurance Program ("NFIP") claim it submitted for the McIntosh house, this case ceased being about whether State Farm committed fraud and became about how much.  For seven years – last month marked the seventh anniversary of this case – Relators have sought to prove that State Farm perpetrated a massive scheme to defraud the federal government of potentially hundreds of millions of dollars.  With the fact of State Farm's fraud now proven, it is time for Relators Kerri Rigsby and Cori Rigsby ("Relators") to investigate, and this Court to ascertain, the magnitude of State Farm's fraud.

Relators have earned the right to conduct that investigation.  Generally, a *qui tam* plaintiff becomes entitled to "a ticket to the federal discovery apparatus" once he or she merely pleads with the particularity pursuant to Federal Rule of Civil Procedure 9(b) "a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009).  In light of the alleged magnitude of State Farm's fraud and the discovery required, this Court has asked Relators to bear extraordinary burdens that far exceed those imposed upon ordinary False Claims Act ("FCA") plaintiffs to gain full access to discovery.  Beyond requiring Relators to plead both State Farm's scheme and its false claim regarding the McIntosh house with specificity, this Court has conditioned the Relators' access to discovery on their ability to prevail on State Farm's successive motions for summary judgment, in a pre-discovery evidentiary hearing, on State Farm's serial motions for reconsideration and for re-reconsideration, and ultimately to prove to a jury that State Farm submitted an exemplar false claim.  The Court did so to protect the interests of the parties, but State Farm now is a proven fraudfeasor.  Relators have met each and every

burden over the past seven years, culminating in the jury's unanimous verdict in the Relators'

favor for the full amount that the Relators sought.

In addition to opening discovery regarding the full scope of State Farm's fraud, the FCA

provides that this Court also should impose a civil penalty on State Farm and award Relators a

share of the Government's recovery.  The FCA's civil penalty provision, 31 U.S.C.

§ 3729(a)(1)(G) as modified by 28 C.F.R. § 85.3(a)(9), renders State Farm liable to the federal

government for an additional fine in the amount of $5,500 to $11,000, and the relevant

circumstances in this case warrant imposition of the maximum fine.  Likewise, the FCA's

provision governing the award to a prevailing *qui tam* plaintiff in a case in which the government

has declined to intervene, 31 U.S.C. § 3730(d)(2), provides that relators are entitled to recover

"not less than 25 percent and not more than 30 percent of the proceeds of the action."  In light of

the seven years of arduous litigation that Relators have endured to prove the existence of State

Farm's scheme to defraud the federal government, a maximum relator share is warranted.

Finally, Relators now are entitled to an award against State Farm of all expenses, fees,

and costs that they necessarily incurred to prove State Farm's intentional fraud upon the

Government.  In light of the vigor with which State Farm has litigated, relitigated, and re-

relitigated the issues in this case for seven years, this Court should award Relators the entirety of

the expenses, fees, and costs that Relators expended (subject to the billing discretion Relators'

counsel already have exercised) in successfully withstanding State Farm's litigation onslaught.

## **PROCEDURAL HISTORY**

Relators initiated this case by filing a complaint to hold State Farm accountable for its

systematic fraud on the Government arising out of Hurricane Katrina on April 26, 2006.[1]  As this

Court has recognized, the Relators have alleged in their complaint that the McIntosh claim they

---

[1] [1].  The Court lifted the seal in August 2007.  [25].

just proved at trial before a unanimous jury "was just one among many similar false claims."[2] Since the inception of this case, Relators have sought discovery regarding the full extent of State Farm's fraud, and State Farm has argued that such discovery should be postponed until Relators could overcome successive hurdles to demonstrate the validity of their claims.  As the Jury's April 8, 2013 unanimous verdict indisputably now establishes, Relators' claims are valid.

In 2008, State Farm and other defendants filed numerous dispositive motions challenging this Court's jurisdiction and whether Relators had stated a claim adequately.[3]  In February 2009, this Court responded to those motions by requiring Relators to prove in an evidentiary hearing conducted prior to discovery that State Farm's flood insurance payments for the McIntosh house were not "justified, as a matter of law," including with expert testimony.[4]  During a three-day hearing, Kerri Rigsby, Dr. Ralph Sinno, John Kelly, and State Farm's witnesses testified regarding damage to the McIntosh property, and the schematic fraud that tainted State Farm's training, management, and claims-adjusting practices.  At the conclusion of that hearing, this Court found that Relators' claims had merit and denied State Farm's dispositive motions.[5]

Nevertheless, the Court at the time did not permit Relators to take discovery regarding the full extent of State Farm's fraud.  The Court expressly noted that "[t]he allegations of the Amended Complaint go well beyond the two specific instances of misconduct specifically identified."[6]  The Court also acknowledged "Relators' interest in identifying [State Farm's] other allegedly false claims" under the scheme they plead.[7]  Nevertheless, the Court only allowed Relators to take limited discovery regarding the McIntosh claim and certain aspects of State

---

[2] [343] at 10.
[3] *See, e.g.*, [91], [96], [98], [106], [108], [115], [156], [160], [161], [179], [181].
[4] [261].
[5] [343]
[6] *Id.* at 3.
[7] *Id.* at 10.

Farm's scheme based on its desire to balance Relators' interest in full discovery with State Farm's "interest in preventing a far ranging and expensive discovery process."[8]  The Court, however, did conduct its own preliminary investigation regarding "the outer limits of the potential claims involved in this action" and required State Farm "to submit, *in camera*, a list containing the name of the insured, the address of the property, and the amount of flood insurance paid, for all SFIP claims" that met certain criteria.[9]

Having failed to defeat Relators in a pre-discovery summary judgment evidentiary hearing, State Farm filed three more summary judgment motions at the close of the initial phase of discovery.  State Farm argued that Richard Scruggs's alleged violation of the FCA's seal provision was fatal to the Relators' claim.[10]  State Farm argued, remarkably in light of the evidence and the already-held three-day evidentiary hearing, that the McIntosh claim was not false as a matter of law.[11]  State Farm also argued that Cori Rigsby was not a proper relator.[12]

In January 2011, this Court rejected State Farm's argument that the alleged seal violations warranted dismissal of this case.[13]  In September 2011, this Court denied State Farm's motion for summary judgment on the McIntosh claim, finding genuine issues of material fact as to the falseness of the claim.[14]  State Farm requested interlocutory review of the Court's decision regarding the seal provision.  This Court granted State Farm's request, but the Fifth Circuit ultimately denied review.[15]

Having failed to persuade the Court that Relators' claims are infirm legally, State Farm aggressively sought to limit the evidence that Relators could present, making numerous

---

[8] *Id*. at 4.
[9] *Id.* at 10-11.
[10] [739].
[11] [734].
[12] [736].
[13] [871].
[14] [898].
[15] [903].

unwarranted attempts to: exclude fact witnesses;[16] exclude expert witnesses;[17] exclude centrally relevant evidence, such as Brian Ford's report and related statements;[18] seek reconsideration of those orders,[19] which the Court denied in a sentence;[20] and remarkably seek re-reconsideration of those same orders,[21] which this Court again denied.[22]

After the initial phase of discovery, Relators again sought leave to conduct discovery regarding the full breadth of State Farm's fraud on the government based on, among other authorities, *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009).[23]  In opposition, State Farm argued that discovery regarding the full scope of its alleged fraud would be premature because "whether the McIntosh claim was false is a dispositive *threshold* issue."[24] Even State Farm in its brief acknowledged that Relators would be entitled to discovery regarding the full scope of its fraud should it lose the McIntosh trial:

> Of course, *if* the Rigsbys cannot prove that the McIntosh claim is false, all of this massive undertaking is a complete waste of Court and party time and resources…. Thus, under *Rockwell*, *if* the Rigsbys cannot prove that the McIntosh claim is false, the case must be dismissed as a matter of law. There is simply nothing "economical" about postponing a decision on this *threshold* issue any longer.[25]

This Court denied Relators' motion.[26]

Prior to the jury trial on just the McIntosh house, State Farm further sought to restrict the evidence that Relators could present by filing a total of 11 motions in limine.[27]  In contrast,

---

[16] [687], [841].
[17] [294], [296], [298], [300], [705], [706], [709], [715], [719], and [720].
[18] [778], [781], [826], and [840].
[19] [842], [844].
[20] [869], [870].
[21] [907], [909], [911].
[22] [947], [948].
[23] *See* [901].
[24] *See* [766] at 1 (emphasis added); *see also id.* at 2, 4.
[25] [766] at 13.
[26] [949].
[27] *See* [965], [967], [968], [970], [979], [982], [984], [985], [1060], [1061], and [1063].

Relators filed one motion in limine.[28] At trial, Relators presented evidence regarding how State

Farm defrauded the federal government with a scheme that reached far beyond the McIntosh

house.  Specifically, Relators proved that State Farm:

- Instructed its adjustors to find flood damage and not wind damage;[29]

- Coerced engineers and an engineering firm to alter reports to reflect flood rather than
  wind as the primary cause of damage to houses in Mississippi;[30]

- Impermissibly used XacTotal to find a total flood loss rather than the required item-
  by-item estimate to improperly eliminate pre-existing wind damage from its coverage
  analysis;[31] and ultimately

- Presented a flood claim for the McIntosh home to the Government despite knowing
  that wind rendered the McIntosh home a total loss before any flood arrived.[32]

After a two-week trial, it took the jury less than three hours to find that State Farm knowingly

defrauded the federal government for the entire $250,000 flood claim that it presented regarding

the McIntosh House pursuant to the National Flood Insurance Program.

## ARGUMENT

I.   **The Court Should Allow Relators to Take Discovery Regarding the Full Extent of
     State Farm's Proven Fraud Against the Federal Government.**

     A.   **Relators are Entitled to Discovery Regarding the Full Scope of the State
          Farm Scheme to Commit Fraud that They have Alleged with Particularity,
          Substantiated with Evidence, and Proven Successfully to a Jury at Trial.**

          Having proven before a unanimous jury that State Farm intentionally defrauded the

federal government for the entire value of the $250,000 flood claim for the McIntosh house that

---

[28] *See* [988].

[29] *See, e.g.*, Testimony of K. Rigsby, Mar. 26, 2013, at 212:19-213:22.

[30] *See, e.g.,* Testimony of B. Ford (by deposition), at 62:8-63:13; P050, email from A. Sammis to R. Kochan re
conversation with A. King (Oct. 17, 2005); DS-630, email from R. Down to R. Kochan et al., re resumption of State
Farm work (Oct. 18, 2005).

[31] *See, e.g.*, Testimony of K. Rigsby, Mar. 26, 2013, at 60:5-24 (describing use of Xact Total); P083, FEMA
Memorandum W-5054 (describing expedited claims-handling procedures); P296, email from J. Guevara to J.
Shortley re "normal claims procedures" required line-by-line estimate (Sep. 29, 2005); Testimony of J. Shortley (by
deposition) at 156:19-157:3 (no separate deals were made for State Farm) and 127:10-128:5, 128:7-24, 131:11-15,
131:17-22 (FEMA required line by line until policy limits).

[32] *See, e.g.* DS-4.003, adjuster's field note stating that structural column was cracked and bowed; P259, engineer
request for McIntosh property; Testimony of A. King (by deposition) at 134:13-17 (Must reimburse FEMA).

it submitted pursuant to the NFIP, Relators have earned the right to take discovery regarding the full scope of State Farm's now indisputable fraud.   When Judge Senter ruled that there should be a trial on the McIntosh house, he made clear that his intent was to "strike a balance between the Relators' interest in identifying these other allegedly false claims and the defendants' interest in preventing a far ranging and expensive discovery process that relates only to claims that are not, for now, specifically identified."[33]   To deny Relators full discovery after they have proven the existence of State Farm's fraud to a unanimous jury would not be a "balance."   On the contrary, it would sacrifice the Relators' acknowledged interest in this litigation, disregard the burdens they have endured, and constitute an unprecedented ruling that a proven fraudfeasor's interest in avoiding an "expensive discovery process" outweighs the Relators', the Government's, and the taxpayers' interest in uncovering exactly how much fraud the fraudfeasor committed.

The Fifth Circuit made clear that Relators are entitled to the discovery they seek in *U.S. ex rel. Grubbs v. Kanneganti*, holding that Federal Rule of Civil Procedure 9(b), rather than a federal jury, serves the "screening function, standing as a gatekeeper to discovery …."  565 F.3d 180, 185 (5th Cir. 2009).  Here, Relators have satisfied the far greater burden of obtaining a jury verdict documenting State Farm's fraud regarding the McIntosh house as the "gatekeeper to discovery."  Relators carried that unprecedented burden to a unanimous jury verdict, so Relators clearly are entitled to discovery regarding the entirety of State Farm's fraud.

In *Grubbs*, the Fifth Circuit rejected the proposition that a relator must plead, much less prove at trial, the particulars for how a defendant presented a false claim to obtain access to discovery.  The relator in that case was a hospital psychiatrist who had alleged that the hospital and other doctors engaged in a scheme to "bill[ ] Medicare and Medicaid for services not performed."  *Id.* at 183-85.  In particular, Dr. Grubbs alleged a conversation he had regarding the

---

[33] Memorandum Opinion, [343], at 10.

fraud with the defendant doctors, the date and place of that conversation, and interactions with other hospital staff seeking to assist him with fraudulent billing. *Id.* at 191-92. Dr. Grubbs also alleged some details on "at least one overt act of false billing for each [defendant]," but no "exact billing numbers or amounts" or other presentation of false claims to the government. *Id.* at 184, 192. The Fifth Circuit found that such allegations satisfied Rule 9(b) and warranted discovery not just as to the single false billing alleged for each defendant doctor, but for the entire scheme involving those doctors, because "[t]hat fraudulent bills were presented to the Government is the logical conclusion of the particular allegations in Grubbs' complaint even though it does not include exact billing numbers or amounts." *Id.* at 192.

In reaching this result, the Fifth Circuit specifically rejected the proposition that a relator must plead specific instances of false billing to gain discovery regarding an adequately plead fraud scheme, holding that "a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190. Indeed, the Fifth Circuit's rule is the only rule that makes sense, as "[i]n many cases, the defendants will be in possession of the most relevant records, such as patients' charts, doctors' notes, and internal billing records" needed to prove the fraud. *Id.* at 191.

Moreover, the Fifth Circuit has held that district courts, in acting as gatekeepers to federal discovery (ordinarily through the application of Rule 9(b)), must do so in a manner that will "achieve the remedial purpose of the [FCA]." *Id.* at 190; *Abbott v. BP Exploration & Prod. Inc.*, 781 F. Supp. 2d 453, 467 (S.D. Tex. 2011). "The purpose of the False Claims Act, of course, is to discourage fraud against the government, and the whistleblower provision is intended to

encourage those with knowledge of fraud to come forward." *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). Denying a relator discovery regarding the full scope of a fraudulent scheme that he or she can plead with specificity would undermine the deterrent, remedial, and incentive effects of the FCA, limit the government to recovering only a small fraction of the proceeds of proven fraudulent schemes, and in effect render the FCA toothless. No statutory text, legislative history, or case law supports such a result.

The other federal Courts of Appeals are in accord. The Ninth Circuit in *U.S. ex rel. Jajdelski v. Kaplan, Inc.* recently held that it was "align[ed] with the Fifth Circuit's approach" and required only "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted" to allow a relator discovery regarding the full scope of an alleged scheme. No.11-16651, 2013 WL 520418 at *2 (9th Cir. Feb. 13, 2013) (quoting *Grubbs*, 565 F.3d at 190). The Seventh Circuit, in *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, held that a relator satisfied Rule 9(b) – and thus was entitled to the full range of the defendant's fraud – even though the relator had "not seen" any particular false bills by alleging the contracts, specifications, noncompliance of certain types of parts, the defendant's general certification of compliance, and the federal government's payments for the parts. 570 F.3d 849, 853-54 (7th Cir. 2009). The First Circuit applied the same analysis in *U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.*, holding:

> Although Duxbury does not identify specific claims, he has alleged the submission of false claims across a large cross-section of providers that alleges the "the who, what, where, and when of the allegedly false or fraudulent representation." In particular, Duxbury has identified, as to each of the eight medical providers (the who), the illegal kickbacks (the what), the rough time periods and locations (the where and when), and the filing of the false claims themselves.

579 F.3d 13, 30 (1st Cir. 2009) (citations omitted).

In short, other federal Courts of Appeals have joined the Fifth Circuit in confirming that a relator who alleges a fraudulent scheme with requisite particularity is entitled to discovery regarding the full extent of the scheme so alleged and not limited to discovery regarding only the examples of that fraud plead in a complaint.  In this case, this Court previously has acknowledged that "[t]he allegations of the Amended Complaint go well beyond the two specific instances of misconduct specifically identified."[34]  The McIntosh claim that Relators just proved at trial before a unanimous jury "was just one among many similar false claims."[35]  By our research, this is the only FCA case in which a court has required a relator to prove a false claim at trial as a prerequisite to obtaining discovery regarding the full scope of a defendant's fraud. The Court imposed this unprecedented burden to balance Relators' acknowledged "interest in identifying [State Farm's] other allegedly false claims" with State Farm's "interest in preventing a far ranging and expensive discovery process."[36]  That balancing now is complete.  As a proven fraudfeasor, State Farm has no cognizable interest in "preventing a far ranging and expensive discovery process" into the full extent of its fraud.

**B.      Any Argument By State Farm that this Case Should Be Limited to the McIntosh House is Belied by State Farm's Approach to Litigation in this Case and the Inconsistent Position It has Taken Before Another Court.**

State Farm's vexatious approach over seven years of litigation confirms that it has understood from the outset that this case is about its broad scheme to defraud the Government and not just a single $250,000 claim for the McIntosh house.  The ponderous docket in this case, which as of April 30, 2013 contains 1096 entries, evidences the vigor with which State Farm has sought to litigate the case.  It has filed more than 52 substantive motions.[37]  It has litigated every

---

[34] [343] at 3.
[35] [343] at 10.
[36] [343] at 4.
[37] *See* May 3, 2013 Declaration of Timothy Belknap at ¶7, attached as Exhibit A.

issue in this case to the greatest length possible, including seeking reconsideration and even re-reconsideration as a matter of routine.[38]  The docket identifies at least nine lawyers who currently are representing State Farm in this matter.

In numerous filings in this case, State Farm likewise has acknowledged that the trial on the McIntosh house was merely a threshold test and that this case would progress to a full adjudication of the entire scope of State Farm's fraud.  In opposing discovery, State Farm has resisted discovery regarding other properties on the basis that such discovery was premature until Relators prevailed at trial regarding the McIntosh house, arguing that "the only issue in this case *at this time* is whether or not there was an overpayment of the McIntosh flood claim by the federal government as a result of a knowingly false submission by State Farm,"[39] and "[t]his Court has been crystal clear that discovery must be reasonably related to the McIntosh flood claim in order to be permissible *at this stage of the case*."[40]  In fact, State Farm has characterized the McIntosh claim as the "threshold" issue in this litigation more than a dozen times.[41]

Moreover, State Farm should be judicially estopped from even attempting to construe this case as encompassing less than the full scope of its fraud against the Government arising out of Hurricane Katrina in light of the position it took successfully in *United States ex rel. Branch Consultants, LLC v. Allstate Insurance Co.*,  No. 06-cv-4091 (E.D. La. Aug. 28, 2007) ("*Branch*").  Generally, judicial estoppel is invoked where "intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice."  *In re Superior Crewboats, Inc.*, 374 F.3d 330, 334-35 (5th Cir. 2004).  The Fifth Circuit

---

[38] *See* [938] Relators' Memorandum in Support of Motion for Sanctions Pursuant to 28 U.S.C. s 1927.
[39] State Farm Memorandum in Support of Motion for Protective Order, [396], at 4 (emphasis added).
[40] State Farm Memorandum in Support of Motion to Quash, [632], at 4 (emphasis added).
[41] *See, e.g.*, State Farm's Response in Opposition to Relators' [738] Motion for Reconsideration, [765], at 1; State Farm's Response Memorandum in Opposition to Motion to Relators' [738] Motion for Reconsideration, [766], at 5, 6, 8, 13, and 35; State Farm's Rebuttal in Further Support of Its Motion for Reconsideration of this Court's November 18, 2010, Opinion [821] & Order [822] Re: David J. Favre, Sr., [867], at 3; State Farm's Notice of Intervening Authority, [873], at 2 and 3; State Farm's Supplemental Memorandum, [877-1], at 5 and 10.

has specified three requirements for judicial estoppel: "(1) the party is judicially estopped only if

its position is clearly inconsistent with the previous one; (2) the court must have accepted the

previous position; and (3) the non-disclosure must not have been inadvertent."  *Id.* at 335.

State Farm's successful characterization of Relators' allegations of fraud in this case as

"Katrina-wide" in *Branch* precludes it under these factors from now arguing before this Court

that this case is limited to the McIntosh house.  In *Branch*, State Farm argued under the FCA's

first-to-file rule, 31 U.S.C. 3730(b)(5), that this case bars all other FCA claims alleging that State

Farm defrauded the federal government by diverting its liability for wind damage under

homeowners policies to the NFIP.  It quoted Relators' complaint for the allegation that State

Farm "made *a corporate decision* to misdirect and misallocate *claims* from those of hurricane

coverage (which a company would be required to pay from its reserves or reinsurance) to flood

claims that could be submitted and paid directly from the United States Treasury."[42]  State Farm

repeatedly referred the multiple fraudulent claims alleged in this case, not merely a single

claim.[43] State Farm then expressly characterized the allegations in this case as "Katrina-wide":

> The Rigsby sisters allege that the scheme to falsely attribute wind damage
> to flood policies funded by the federal government "was Katrina-wide": it
> affected Mississippi, it "also affected Louisiana."[44]

The Eastern District of Louisiana accepted State Farm's expansive view of the scope of

this case, holding that this case barred the claims against State Farm in *Branch* under the FCA's

first-to-file rule.  *See Branch Consultants, L.L.C. v. Allstate Ins. Co.*, Civ. A. 06-4091, 2007 WL

3118310 at * 2 (E.D. La. Oct. 17, 2007) *aff'd in relevant part, rev'd in part and remanded sub*

*nom. U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371 (5th Cir. 2009).  Nor is

---

[42] Supplemental Mem. in Support of Defs' Mot. to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Fed.
R. Civ. P. 12 (b)(1), 12(h)(3), and 31 U.S.C. § 3730(b)(5), [148], at 2, filed in *U.S. ex rel. Branch Consultants, LLC
v. Allstate Ins. Co.*, No. 06-cv-4091 (E.D. La. Aug. 28, 2007) (emphasis added), attached as Exhibit B.
[43] *Id.* at 3.
[44] *Id.* at 6.

there a tenable argument that State Farm inadvertently failed to mention to the *Branch* court its

view that this case regards only a single house, when the entire point of its motion to the *Branch*

court was that this case was so broad as to preclude claims in Louisiana.

If State Farm were to succeed in arguing that this case is only about one house, it will

have insulated all but one instance of its now-proven fraud from FCA scrutiny by taking

irreconcilable positions about the scope of this case to this Court and to the *Branch* Court.

Judicial estoppel exists to preclude just such duplicitous attempts to manipulate federal courts.

## II.    The Court Should Require State Farm to Pay the Maximum Civil Penalty Under the False Claims Act.

In light of the magnitude of State Farm's intentional fraud upon the federal government,

the Court should assess the maximum civil penalty of $11,000 against State Farm.  In addition to

requiring the Court to award "three times the damages which the government sustains," the

FCA's civil penalties provision in 31 U.S.C. 3729(a), as modified pursuant to 28 C.F.R.

§ 85.3(a)(9), provides that this Court shall impose a civil penalty of not less than $5,500 and not

more than $11,000 upon State Farm for its submission of a false claim to the government.  *See*

*U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*, 530 F. Supp. 2d 888, 900 (S.D. Tex. 2008).

The penalty is mandatory, but this Court has discretion to determine the amount of the penalty

within the range that Congress has prescribed. 31 U.S.C. 3729(a); *U.S. ex rel. Miller v. Bill*

*Harbert Intern. Const.*, Inc.*,* 501 F. Supp. 2d 51, 56 (D.D.C. 2007).  In exercising that discretion,

courts consider the seriousness of defendant's misconduct, the defendant's level of scienter, and

the damage to the United States.  *See Miller,* 501 F. Supp. 2d at 56-57; *see also Longhi*, 530 F.

Supp. 2d at 901.  Where, as here, the fraud is "systematic and knowing," a maximum penalty is

appropriate.  *See Miller,* 501 F. Supp. 2d at 56-57.

In this case, State Farm knowingly employed a systematic fraud in the wake of a devastating natural disaster to enrich itself at the Government's expense. It altered reports, generated fake records, coerced the termination of engineers that did not support its false yet more profitable view of Hurricane Katrina, and ultimately betrayed the trust that the Government had bestowed upon it through the single adjustor program. The maximum civil penalty of $11,000 proportionally is small compared to the $250,000 that State Farm bilked and the $665,000 it avoided paying under the McIntoshes' Home Owner policy. State Farm's fraudulent profiteering in the wake of a natural disaster more than warrants a maximum penalty.

## III.   The Court Should Award Relators the Maximum 30 Percent Relators' Share that the False Claims Act Authorizes.

Relators are entitled to the maximum FCA relator fee of 30 percent in light of the burdens that they have carried, the substantial contributions they have made with no assistance from the government, and the sacrifices they have endured for seven years. Because the Government declined to intervene in this case, the FCA entitles Relators to a share of "not less than 25 percent and not more than 30 percent of the proceeds of the action …." 31 U.S.C. § 3730(d)(2). This Court has discretion to determine the actual percentage of the proceeds it will award to Relators within the range that the FCA specifies. *See U.S. ex rel Alderson v. Quorum Health Group, Inc.*, 171 F. Supp. 2d 1323, 1331 (M.D. Fla. 2001); *U.S. ex rel. Johnson Pochardt v. Rapid City Reg'l Hosp.*, 252 F. Supp. 2d 892, 897 (D.S.D. 2003).

In exercising that discretion, the FCA instructs that the percentage should be based upon "the extent to which the person substantially contributed to the prosecution of the action." 31 U.S.C. § 3730(d)(1). Courts have discerned from the FCA's legislative history three relevant factors in evaluating a relators' contribution: "the significance of the information provided by the relator, the relator's contribution to the final outcome, and whether the government previously

14

knew such information." *Johnson–Pochardt*, 252 F. Supp. 2d at 897 (D.S.D.2003) (discussing S.

Rep. No. 99-345, at 28 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5293); *Alderson*, 171 F.

Supp. 2d at 1337.  In addition, courts consider "the oppressive burden borne by [a relator] in

initiating and sustaining his case." *Alderson*, 171 F. Supp. 2d at 1332.

Each of these factors confirms that Relators are entitled to the maximum 30 percent of

the Government's recovery.  Since the inception of this case, Relators have been the primary

source of the evidence that has proven State Farm's fraud upon the Government.  Relators

testified about how State Farm instructed its adjustors to find flood damage and not wind

damage,[45] how State Farm coerced engineering firms to alter reports to reflect flood rather than

wind as the primary cause of damage to houses in Mississippi,[46] how State Farm used XacTotal

to create fake item-by-item estimates to obfuscate its failure to comply with NFIP and

improperly eliminate pre-existing wind damage from its coverage analysis;[47] and ultimately that

State Farm knew wind rendered the McIntosh home a total loss before any flood arrived.[48]  They

identified specific documents that proved State Farm's knowledge, including notably the Brian

Ford report.[49]  They marshaled experts to confirm that wind, not flood, destroyed the McIntosh

home.[50]  None of this proof would have been possible without Relators.

---

[45] *See, e.g.*, Testimony of K. Rigsby, Mar. 26, 2013, at 212:19-213:22.

[46] *See, e.g.,* Testimony of B. Ford (by deposition), at 62:8-63:13; P050, email from A. Sammis to R. Kochan re conversation with A. King (Oct. 17, 2005); DS-630, Email from R. Down to R. Kochan et al., re resumption of State Farm work (Oct. 18, 2005).

[47] *See, e.g.*, Testimony of K. Rigsby, Mar. 26, 2013, at 60:5-24 (describing use of Xact Total); P083, FEMA Memorandum W-5054 (describing expedited claims-handling procedures); P296, email dated Sep. 29, 2005 from J. Guevara to J. Shortley ("normal claims procedures" required line-by-line estimate); Testimony of J. Shortley (by deposition) at 156:19-157:3 (no separate deals were made for State Farm) and 127:10-128:5, 128:7-24, 131:11-15, 131:17-22 (FEMA required line by line until policy limits).

[48] *See, e.g.* DS-4.003, adjuster's field note stating that structural column was cracked and bowed; P259, engineer request for McIntosh property; Testimony of A. King (by deposition) at 134:13-17 (Must reimburse FEMA).

[49] *See* P001, Engineering Report of Brian Ford dated Oct. 12, 2005.

[50] *See* Testimony of Dr. Keith Blackwell, Mar. 27, 2013, at 441-484 and Dr. Ralph Sinno, Mar. 28, 2013, at 528-659.

Similarly, Relators' contributions to this action for the past seven years have been the only contribution to this action. Courts have recognized that the FCA's "maximum reward" is appropriate for "relators who 'actively and uniquely assist the government in the prosecution of the case.'" *Johnson Pochardt*, 252 F. Supp. 2d at 897 (citation omitted). Thus, "the maximum percentage should be used to encourage and reward relators for whom it is necessary to participate in significant and complex pre-trial matters followed by trial." *U.S. ex rel. Fox v. Northwest Nephrology Assocs., P.S.*, 87 F. Supp. 2d 1103, 1112 (E.D. Wash. 2000). A maximum share also can be warranted even where a case is settled short of trial if the Relators' burdens and contributions are similarly substantial. *See, e.g., Alderson*, 171 F. Supp. 2d at 1337.

Relators are similar to the relator in *Alderson*, in which a district court held:

> Alderson's history describes a man who often acted alone and without ardent supporters and without the reassurance of others who shared his commitment and his conviction. Only his dogged resolution, eventually supported by competent professionals and an occasionally reluctant government, resulted in the millions now available for distribution.

*Id.* at 1338. Yet, in *Alderson*, the government intervened and the relator was given some support. Here, Relators have had only each other for support. As State Farm itself remarked at trial, for seven years Kerri and Cori Rigsby have stood alone against State Farm's litigation onslaught with no help from the federal government. The ponderous docket in this case is a testament to the Relators' contribution and the oppressiveness of the burdens they have endured. Relators certainly were not responsible for making this litigation so vexatious and burdensome. For example, State Farm filed 52 substantive motions in this case, while Plaintiffs filed only 21.[51] State Farm filed motions for reconsideration, and when the Court denied those motions, State Farm filed motions asking the Court to re-reconsider its denial of those motions.[52] State

---

[51] *See* May 3, 2013 Declaration of Timothy Belknap at ¶ 7, attached as Exhibit A.
[52] *See* [938] Relators' Memorandum in Support of Motion for Sanctions Pursuant to 28 U.S.C. s 1927.

Farm filed 11 motions in limine.[53]   Relators filed 1. Yet after seven years of litigation that State

Farm unnecessarily complicated, delayed, and encumbered at every opportunity, Relators

obtained a total victory for the entirety of the $250,000 flood claim that State Farm submitted to

the Government for the McIntosh house.  In short, Relators have more than earned 30 percent.

With respect to the third factor, the evidence at trial confirmed that the Government had

no knowledge of State Farm's fraud until after the Rigsbys came forward.  Former FEMA

witnesses testified at trial that they were not aware of State Farm's fraud.[54]  Indeed, State Farm's

own expert and former FEMA inspector Gerald Waytowich testified that he studied the

McIntosh file for 40 hours, and even he failed to realize that State Farm had used XacTotal to

generate a fake house and give the false impression that State Farm had conducted the requisite

item-by-item inspection to determine the cause of damage to the McIntosh home.[55]

Finally, Relators have endured enormous personal hardships as a result of exposing State

Farm's fraud, and those hardships should further compel the Court to award them the maximum

30 percent of the recovery.  In evaluating Relators' entitlement to a maximum share, this Court

should be mindful of Congress's goal of encouraging relators like the Rigsbys to come forward,

and provide a reward commensurate with hardships they have been required to endure.  As the

United States Court of Appeals for the Eleventh Circuit recognized in *U.S. v. NEC Corp.*,

> [A] *qui tam* relator suffers substantial harm and the *qui tam* provisions of
> the FCA are intended to remedy that harm.  First, a *qui tam* relator can
> suffer severe emotional strain due to the discovery of his unwilling
> involvement in fraudulent activity.  Moreover, the actual or potential
> ramifications on a relator's employment can be substantial.  As several
> courts have recognized, *qui tam* relators face the Hobson's choice of
> "keeping silent about the fraud, and suffering potential liability (and guilty

---

[53] *See* [965], [967], [968], [970], [979], [982], [984], [985], [1060], [1061], [1063].

[54] *See* Testimony of D. Maurstad, Apr. 2, 2013, at 1146:13-1147:1 (confirming his ignorance of the fraud).

[55] *See* Testimony of G. Waytowich (by deposition) offered on April 5, 2013, at 59:9-12 (testifying to his incorrect belief that the McIntosh flood file contained a line-by-line estimate); 61:3-62:6 (testifying that entries on Xact Total printout were actual descriptions of damage); 84:3-19 (spent "40 to 50 hours" preparing report).

consciences), or reporting the fraud and suffering repercussions, some as extreme as dismissal." Finally, the relator can suffer substantial financial burdens as a result of the time and expense involved in bringing a *qui tam* action.

* * *

[T]he FCA's *qui tam* provisions are intended to remedy this harm. Because the harm suffered by a *qui tam* relator is often the type that is difficult or incapable of measurement, Congress chose to compensate these individuals by awarding them a percentage of the government's recovery.

11 F.3d 136, 138 (1993); *see also Alderson*, 171 F. Supp. 2d at 1338.

In this case, Relators have suffered greatly for exposing State Farm's fraud. Relators were fired from their jobs for reporting State Farm's fraud, a grave personal and financial loss that the Eleventh Circuit has described as "extreme." *NEC Corp.*, 11 F.3d at 138. Each of the Relators was making more than $150,000 a year at their jobs as insurance adjustors. As a result of their decisions to expose State Farm's fraud, they did not just lose their jobs, they also lost their professions. They now have been blackballed from the insurance industry, rendered unable to obtain a financial benefit from many years of experience in the only profession they have known, and forced to endure unemployment and to take far less lucrative jobs. *See Johnson Pochardt*, 252 F. Supp. 2d at 902 (enhancing relator's share because "she lost a well-paying job in a field that she loved, in addition to losing full health benefits, life insurance, a retirement plan, and a position on numerous boards and organizations"). This Court's predecessor has held that Relators have no other remedy for these extreme injuries, dismissing their claims pursuant to 31 U.S.C. § 3730(h) on the grounds that their employer (which was working as State Farm's agent), rather than State Farm itself, caused the terminations.[56] Seven years withstanding State Farm's litigation onslaught also has taken the expected personal and emotional toll on them. Accordingly, this is precisely the kind of case in which Courts have awarded "'the statutory

---

[56] *See* Mem. Op., [343]. Relators believe this ruling to be erroneous and reserve their right to challenge this ruling on appeal.

maximum percentage in situations where the relator has suffered personal or professional

hardship.'" *Alderson*, 171 F. Supp. 2d at 1338 (citation omitted).

## IV.   Relators are Entitled to an Award Against State Farm of the Attorneys Fees, Costs, and Expenses that they Necessarily Incurred to Prove State Farm's Fraud.

Having obtained a unanimous jury verdict that State Farm defrauded the Government in

violation of the FCA for the entire $250,000 value of its claim for the McIntosh house, Relators

are entitled pursuant to 31 U.S.C. § 3730(d)(2) to an award against State Farm for all expenses,

fees, and costs that they necessarily incurred to obtain that verdict.  Those expenses, fees, and

costs are substantial because for seven years State Farm has litigated, re-litigated, and in some

instances re-relitigated the issues in this case with a vexatious degree of vigor.[57]  State Farm

"cannot litigate tenaciously and then be heard to complain about the time necessarily spent by

the plaintiff[s] in response." *City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (quoting

with approval *Copeland v. Marshall*, 641 F.2d 880, 904 (D.C. Cir. 1980) (en banc)).  "While [a

defendant] is entitled to contest vigorously [plaintiffs'] claims, once it does so it cannot then

complain that the fees awarded should be less than claimed because the case could have been

tried with less resources and with fewer hours expended." *Henson v. Columbus Bank & Trust

Co.*, 770 F.2d 1566, 1575 (11th Cir. 1985).

In this case, Relators seek fees, costs, and expenses for work performed by the two law

firms that currently represent them, Weisbrod Matteis & Copley, PLLC ("WMC") and

Heidelberg Harmon PLLC ("HH"), and they also submit the fees, costs, and expenses of a

former law firm that previously represented them, Gilbert LLP ("Gilbert").[58]  As detailed in the

---

[57] *See supra*, p. 11.

[58] Relators have been represented by four law firms, only two of which represent Relators currently. The first law firm to represent the Relators, the Scruggs Law Firm, represented them from April 6, 2006 through May 2008. After this Court barred the Scruggs Law Firm from further representing Relators and obtaining any fee in this case for ethics violations, Gilbert undertook the representation from August 2008 through November 2011.  In November

attached declarations and affidavits, WMC and HH have exercised substantial billing discretion with respect to the hourly rate they seek and with respect to the "hours written off as unproductive, excessive, or redundant."[59]   *See Saizan v. Delta Concrete Prods. Co., Inc.*, 448 F.3d 795, 799 (5th Cir. 2006). Accordingly, Relators seek $1,232,735.06 with respect to WMC and $287,346.34 with respect to HH. Relators further ask the Court to determine the reasonableness of Gilbert's requested $4,575,460.00 in fees, and $649,843.67 in expenses and costs and to award Relators the entirety of those amount or the portion of Gilbert's fees, expenses, and costs that the Court deems reasonable after affording Gilbert an opportunity to be heard regarding reasonableness.

Relators seek fees based on a lodestar calculation derived from "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate" for each of the attorneys who have represented the Relators. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). There is a "strong presumption" that the lodestar figure is reasonable. *Purdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 130 S. Ct. 1662, 1673 (2010) "[T]he lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee." *Id.* In evaluating whether the hourly rate sought for the prevailing party's attorney is reasonable, the Court should consider "the quality of a prevailing party's counsel's representation." *Id.*

---

2011, the Rigsbys' lead lawyer, August Matteis, left Gilbert to co-found WMC, and WMC has since represented the Rigsbys, including during the recent trial.  Since August 2008, Relators also have been represented by HH.

[59] Edited billing records for the fees, expenses, and costs of WMC and HH are attached as Exhibits C, D and E, respectively.  Affidavits and declarations averring to the reasonableness of those fees, expenses, and costs and the billing discretion exercised by WMC and HH are attached as Exhibits A, F, G, H, I, J, K, L and M.  Spreadsheets of fees and costs reported by Gilbert to Relators are attached as Exhibits N and O.  Relators invited Gilbert to provide an affidavit or declaration as to the reasonableness of the fees and expenses reflected on those spreadsheets, and Gilbert has declined to do so at this time.  In light of the adversity between Relators and Gilbert, as reflected by the lien that Gilbert has filed against the Relators in this case [991], Relators respectfully request that  this Court direct Gilbert to provide evidence of  the reasonableness of its fees, expenses, or costs in the event that State Farm challenges such reasonableness.  Should this Court decide not to direct Gilbert to present evidence of the reasonableness of its fees, expenses, and costs, Relators still would be entitled to an award based on the Court's determination of reasonableness as "[t]he proper remedy for omitting evidence of billing judgment does not include a denial of fees but, rather, a reduction of the award intended to substitute for the exercise of billing judgment." *Saizan*, 448 F.3d at 799.

Likewise in considering the reasonableness of the hours billed, the Court should consider "the novelty and complexity of a case." *Id.*

The rates that Relators seek for WMC attorneys are substantially discounted from WMC's ordinary rates, consistent with the prevailing rates in the community for representation in similarly complex and vigorously contested litigation,[60] and consistent with the Department of Justice's published Laffey Matrix,[61] which courts have relied upon as evidence of the reasonableness of fees sought in cases arising under federal statutes like the FCA that provide for fee shifting. *See, e.g., Covington v. District of Columbia,* 57 F.3d 1101, 1109 (D.C. Cir. 1995); *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 709 (3d Cir. 2005). HH is a local firm headquartered in Mississippi and the rates Relators seek for the time of HH's attorneys are the same rates that HH charges its other clients for similar complex litigation in this region.[62]

This Court should not impose any reductions regarding the rates and hours Relators have submitted for their attorneys. Indeed if any adjustment is warranted, it is an enhancement. The Supreme Court has approved an enhancement where the "attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted," "particularly where the delay is unjustifiably caused by the defense." *Purdue*, 130 S.Ct. at 1674-75. In this case, WMC and Gilbert have litigated this case and invested hundreds of thousands of dollars for five years without receiving a dime. Accordingly, ask that Court to award Relators' their attorney's fees, costs and expenses in the amount of $1,232,735.06 with respect to WMC and

---

[60] *See* Declaration of A. Matteis at ¶18,, attached as Exhibit G. Published information confirms that the already reduced rates that Relators seek for WMC's attorneys are similar to those of major law firms located within 100 miles of Gulfport. The law firm of Jones Walker LLP has an office in Gulfport and maintains its primary office in New Orleans, and it was reported to charge hourly rates up to $620 in 2010, the last year for which published data on the firm is available. *See* National Law Journal 2010 Billing Survey, a screenshot of which is attached as Exhibit P. The law firm of Adams & Reese, which has an office in Jackson, Mississippi and a primary office in New Orleans, reported billing rates up to $585/hour for experienced senior attorneys. *See* National Law Journal 2012 Billing Survey, attached as Exhibit Q .
[61] A copy of the Department of Justice's current Laffey Matrix is attached as Exhibit R.
[62] *See* Affidavit of Maison Heidelberg, attached as Exhibit H.

$287,346.34 with respect to HH.  Relators further ask the Court to award $5,225,303.67 with respect to Gilbert, or such award that the Court deems reasonable after directing Gilbert to present evidence regarding the reasonableness of its fees, expenses, and costs.

## CONCLUSION

For the foregoing reasons, the Court should allow Relators to take discovery regarding the full scope of State Farm's fraud, impose the maximum civil available penalty upon State Farm, award Relators the maximum Relators' share of the damages imposed against State Farm, and award Relators the full amount of their costs, expenses, and attorneys fees.

Respectfully submitted this on this 6th day of May, 2013.

|  |  |
|---|---|
|  | /s/ August J. Matteis, Jr. |
| C. MAISON HEIDELBERG, MB #9559 | August J. Matteis, Jr. (admitted *pro hac vice*) |
| mheidelberg@heidelbergharmon.com | amatteis@wmclaw.com |
| GINNY Y. KENNEDY, MB #102199 | William E. Copley (admitted *pro hac vice*) |
| gkennedy@heidelbergharmon.com | wcopley@wmclaw.com |
| OF COUNSEL: | Derek Y. Sugimura (admitted *pro hac vice*) |
| HEIDELBERG HARMON PLLC. | dsugimura@wmclaw.com |
| 795 Woodlands Parkway, Suite 220 | Timothy M. Belknap (admitted *pro hac vice*) |
| Ridgeland, Mississippi  39157 | tbelknap@wmclaw.com |
| Phone No.      (601) 351-3333 | WEISBROD MATTEIS & COPLEY PLLC |
| Fax No.        (601) 956-2090 | 1900 M Street NW, Suite 850 |
|  | Washington, DC 20036 |
|  | Phone No.      (202) 499-7900 |

*Attorneys for Cori Rigsby and Kerri Rigsby*

## <u>CERTIFICATE OF SERVICE</u>

I, August J. Matteis, Jr., attorney for Cori Rigsby and Kerri Rigsby, do hereby certify that

I have this **<u>6<u>th</u> day of May, 2013</u>** caused the foregoing document to be filed with the Court's

CM/ECF system, which will cause notice to be delivered to all counsel of record.


<u>/s/      August J. Matteis, Jr.     </u>


23