IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA ex rel.
CORI RIGSBY and KERRI RIGSBY             RELATORS/COUNTER-DEFENDANTS

v.                                       CASE NO. 1:06cv433-HSO-RHW

STATE FARM FIRE AND CASUALTY COMPANY   DEFENDANT/COUNTER-PLAINTIFF

**STATE FARM FIRE AND CASUALTY COMPANY'S
MEMORANDUM IN OPPOSITION TO RELATORS' [1347] BRIEF ADDRESSING SEVERANCE
AND IN FURTHER SUPPORT OF SEVERANCE OF RELATORS' CLAIMS**

State Farm Fire and Casualty Company ("State Farm") submits this memorandum in

opposition to Relator's [1347] Brief Addressing the Severance of Claims and Prospective

Management of this Case and in further support of State Farm's [1352] Memorandum in Support

of Severance of Relators' Claims.

## INTRODUCTION

Having repeatedly requested the opportunity to address the Court regarding severance,

the Rigsbys' brief largely ignores that subject.  Instead, the Rigsbys submitted a scattershot filing

replete with tangential legal theories and arguments—including their theory that the verdict in

the *McIntosh* trial largely obviates any proof of FCA liability for any remaining claims, the

supposed propriety of statistical sampling, predictions of potential damages, and the impact of

*Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016)—all of

which bear little relation to the narrow severance inquiry at hand and none of which is ripe for

review.  To the extent the Rigsbys do address severance, their brief fails to acknowledge this

Court's inherently broad discretion to manage its docket, including the discretion to sever claims.

The Rigsbys instead erroneously contend that severance as contemplated by this Court would be

contrary to the text or purpose of the False Claims Act and would unleash logistical challenges

that the Court could not surmount.

Yet, there is nothing unusual or improper about severing the claims here.  Far from being an "unprecedented" ruling as the Rigsbys contend, this Court has broad discretion to employ severance both under Rule 21 and as a case management tool.  Certainly, nothing in the FCA prohibits severance or otherwise strips the Court of its inherent authority to manage these claims. And given that there are scant instances in which the propriety of severance has been litigated in comparable FCA circumstances, the fact that some FCA cases involving multiple claims have been litigated without severance should give the Court no pause to act here.  To the contrary, given the nature of the Rigsbys' claims, the Rule 21 factors fully support the Court's inclination to sever the claims by property, and State Farm urges the Court to do so.

Ignoring the reality that the claims at issue in this case are property-specific, the Rigsbys' principal argument against severance is their plan to pursue a "scheme" case—presumably meaning that their claims are dependent on "scheme" evidence rather than the circumstances of individual property claims—and their position that they have already proven the supposed "scheme" in the *McIntosh* trial.  While the Rigsbys constantly make this "proven scheme" assertion, it is not so.

The Court specifically instructed the *McIntosh* jury to make findings solely as to the McIntosh claim, which focused exclusively on the McIntosh property.  *See* ([1092] at 1–3.) Indeed, on appeal of the *McIntosh* verdict, the Fifth Circuit likewise examined the evidence pertaining to the McIntosh claim and "stress[ed] that we make no judgments about the actual existence of other potential false claims or records."  *United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457, 470 (5th Cir. 2015), *aff'd on other grounds sub nom. State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 137 S. Ct. 436 (2016).  Moreover, even if some relevant scheme had been established in the *McIntosh* proceeding, it would not alter the

severance analysis, since the Rigsbys still would be required to prove all of the elements of any remaining FCA violations—*i.e.*, of each property-specific claim.

The bottom line is that State Farm's liability in this case, if any, must be determined on a claim-by-claim basis, with each claim being tied to a specific residential property and the unique storm damage, claim adjustment file, and witnesses relevant to that specific claim. This is precisely why severance is appropriate. The significant risk of juror confusion and unfair prejudice to State Farm is unacceptable when such disparate claims—with distinct proof and defenses—are tried together. This Court should reject the Rigsbys' effort to avoid severance by lumping all claims together and trying to establish FCA liability through guilt-by-association or "scheme" evidence, divorced from the unique facts and circumstances of each property claim.

ARGUMENT

I. **THE FALSE CLAIMS ACT DOES NOT PRECLUDE SEVERANCE**

    A. **SECTION 3732(a) OF THE FCA HAS NO BEARING ON SEVERANCE**

The FCA itself makes no mention of severance. Yet, the Rigsbys attempt to morph the FCA's ***venue*** provision, 31 U.S.C. § 3732(a), into an anti-severance dictate. *See* ([1347] at 2–4.) No such transformation is warranted. By its plain terms, section 3732(a) deals only with proper venue. It provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." 31 U.S.C. § 3732(a). This provision says nothing about Rule 21, severance in particular, or any other case management tool available to a district court where venue is proper.

Nor does the Rigsbys' reliance on the FCA's legislative history advance their position. To begin, the meaning of section 3732(a) is plain from its text, so any resort to legislative history is both unnecessary and inappropriate. *See, e.g.*, *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d

620, 622 (5th Cir. 2013) ("If the statutory text is unambiguous, our inquiry begins and ends with

the text." (citing *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004)).  Moreover, the

Rigsbys' selective use of legislative history is misleading, as the portions they reference are

focused on venue—"Section (4) of the bill adds a new section 3732 of title 31 to modernize the

jurisdiction and venue provisions of the False Claims Act …"—and do not speak to the concept

of severance or a court's discretion to manage its docket.  In fact, the very same Senate Report

quoted by the Rigsbys goes on to explain that the new § 3732(a) would not supplant pre-existing

federal case management tools:

> This expansion of jurisdiction and venue is made with a view to more effective
> litigation by the Government as well as convenience and fairness. … However, the
> Committee is aware of the potential for abuse of this section.  Choice of venue could
> turn more upon which court had provided a previous favorable decision to the
> Government than upon other factors of convenience or fairness.  The Committee will
> remain sensitive to these potential abuses.  Of course, a defendant could always move to
> transfer a case where appropriate "in the interest of justice and for the convenience of
> the parties" (28 U.S.C. 1404).

S. Rep. No. 99-345 at 32 (1986).  Rule 21 likewise is focused on effectiveness, convenience, and

fairness in each particular case.  *See* 4-21 MOORE'S FED. PRACTICE – CIVIL § 21.02 (2018) ("In

exercising its discretion under Rule 21, the court must consider 'principles of fundamental

fairness and judicial efficiency.'").  Here, where the alleged false claims are dependent on an

individualized analysis of property-specific facts and circumstances, these principles support

severance.

### B.   COURTS HAVE RELIED ON COMPLEX CASE MANAGEMENT TOOLS – INCLUDING SEVERANCE – IN FCA CASES

Contrary to the Rigsbys' assertions, many district courts, including those within the Fifth

Circuit, have employed severance as an effective case management tool in FCA cases.  *See, e.g.*,

*United States ex rel. Doe v. Taconic Hills Cent. Sch. Dist.*, 8 F. Supp. 3d 339, 344 (S.D.N.Y.

2014); *United States ex rel. Cassaday v. KBR, Inc.*, 590 F. Supp. 2d 850, 863 (S.D. Tex. 2008);

*United States ex rel. N. Santiam Watershed Council v. Kinross Gold USA, Inc.*, No. C 96-3673 TEH, 1998 WL 118176, at *2 (N.D. Cal. Mar. 9, 1998).  And FCA claims have been severed in situations other than against separate FCA defendants.[1]  *See, e.g.*, *United States ex rel. McBride v. Halliburton Co.*, 44 F. Supp. 3d 69, 70 n.2 (D.D.C. 2014) (severance of relator's three employment-related claims); *cf. United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F. Supp. 2d 787, 790 (E.D. Va. 2007) (severance of claims arising from two different contracts defendant had with the Government based on Rule 42(b)).  Although the facts and circumstances of these cases differ, they reaffirm the principle that courts have broad discretion under Rule 21 and Fifth Circuit case law to employ severance upon "examination of the individual case" at hand.  *Applewhite v. Reichhold Chems.*, 67 F.3d 571, 574 (5th Cir. 1995).

In fact, federal courts presiding over FCA cases involving numerous claims submitted by a single defendant but requiring individualized determinations as to each element of an FCA violation have used various case management tools in recognition of (1) the importance of avoiding prejudice with respect to the requirement that falsity be demonstrated for each claim in order for FCA liability to attach, (2) the individualized proof necessary for this showing, and (3) the danger of confusing the jury.  This is evidenced by one of the cases relied upon by the Rigsbys for their assertion that federal courts "routinely preside over FCA cases involving hundreds, or even thousands, of false claims submitted to the government by a single defendant."[2]  ([1347] at 4.)  *United States ex rel. Loughren v. UnumProvident Corp.* involved the

---

[1] Notably, the two cases cited by the Rigsbys to support their proposition that "courts have only severed claims against separate FCA defendants" ([1347] at 5), are *not* FCA cases.  *See San Francisco Tech., Inc. v. The Glad Prod. Co.*, No. 10-CV-00966, 2010 WL 2943537 (N.D. Cal. July 26, 2010) (alleging violations of 35 U.S.C. § 292 for false patent marking); *Josephs v. Sigma-Aldrich Corp.*, No. CV 10-10660, 2010 WL 11541827 (E.D. Mich. May 21, 2010) (same).

[2] The other cases relied upon by the Rigsbys for this point have either been criticized for their method of handling multiple claims, *see, e.g.*, *United States ex rel. Wall v. Vista Hospice Care, Inc.*, No. 3:07cv00604-M, 2016 U.S. Dist. LEXIS 80160, at *38–47, *70–72 (N.D. Tex. June 20, 2016)

court's discretionary use of an initial bellwether trial on the claims of six out of 468,641

claimants, not a single trial of all claims.  604 F. Supp. 2d 259, 260 (D. Mass. 2009).  After a

split verdict was returned, the court entered final judgment as to the two claims where liability

was found in order to allow appeal as to a common legal question prior to continuing with trials

for an additional 55 claimants, noting that in those trials "each claim must be evaluated one-by-

one."  604 F. Supp. 2d 269, 273 (D. Mass. 2009), *verdict vacated*, 613 F.3d 300 (1st Cir. 2010).[3]

     While the *Unum* case did not use Rule 21 severance as its particular case management

tool, nothing in the FCA, in Rule 21, or in Fifth Circuit precedent precludes the use of severance

in appropriate circumstances.  The Rigsbys cite a number of cases to illustrate their contention

that courts do not sever claims in FCA cases.  But the dockets in all but one of those cases do not

reflect any severance motion or briefing, let alone a judicial severance evaluation or decision.

*See United States v. FastTrain II Corp.*, No. 1:12cv21431 (S.D. Fla.); *United States ex rel.*

*Martin v. Life Care Ctrs. of America, Inc.*, No. 1:08cv00251 (E.D. Tenn.); *United States ex rel.*

*Loughren v. UnumProvident Corp.*, No. 1:03cv11699 (D. Mass.); *Robertson v. Bell Helicopter*

*Textron*, No. 4:92cv00535 (N.D. Tex.).  The lone exception is *United States ex rel. Warder v.*

*Fluor Enterprises, Inc.*, where severance was sought but ultimately denied.  And, even in that

_____
*(cont'd from previous page)*
(distinguishing, criticizing, and disagreeing with *United States v. Life Care Centers of America*'s use of sampling and extrapolation to prove liability for multiple claims before granting summary judgment based on the missing causal link tying defendants' policies and alleged scheme to any particular, individual claims), or simply have no application here, given that they followed criminal convictions.  *See United States v. FastTrain II Corp.*, No. 12-Civ-21431, 2017 WL 606346, at *8 (S.D. Fla. Feb. 15, 2017) (applying 31 U.S.C. § 3731(e)); *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) (upholding verdict under pre-1986 FCA following criminal convictions).  These criminal convictions arose out of the <u>exact</u> same conduct as the subsequent FCA cases and thus are nothing like the *McIntosh* verdict which made findings only as to the McIntosh claim.  *See* Section III.A *infra* (addressing the Rigsbys' flawed Seventh Amendment argument).

[3] While the *Unum* relator advocated for the use of statistical sampling and extrapolation following the bellwether trial, the court there excluded the testimony of the relator's proposed statistical expert as unreliable.  604 F. Supp. 2d at 269.  The bellwether jury verdict subsequently was vacated by the First Circuit, and the case settled.

case, the court did so only after applying the Rule 21 factors and determining under the circumstances of that case that severance was not warranted because the underlying claims involved the same transactions and common questions of fact.  No. 09–4191, 2015 WL 159937 (E.D. La. Jan. 13, 2015).[4]  Indeed, *Warder* involved alleged duplicative billing by two defendants for the transportation and installation of the same temporary housing units, thus necessitating a comparative review of the defendants' billing records and the work performed by both companies.  2015 WL 159937, at *3.  The individual characteristics of the housing units themselves were irrelevant to any potential FCA liability in *Warder*; rather, potential liability turned on whether there were duplicative billings.  These underlying facts in *Warder* are far afield from the evidence the Risgbys would need to present to establish FCA liability here based on the improper adjustment of unique property claims.

## II.   THE RULE 21 FACTORS SUPPORT SEVERANCE OF THE ALLEGED FALSE CLAIMS BY PROPERTY

### A.   SEVERANCE IS PROPER DUE TO THE PROPERTY-SPECIFIC FACTS AND CIRCUMSTANCES AT ISSUE

The Rigsbys allege that State Farm submitted individual false claims for distinct and separately insured residential properties.  As such, under the FCA, whether a particular claim meets the standard of a FCA violation will depend on the specific falsity, scienter, materiality, causation, and damages evidence the Rigsbys adduce as to the unique physical property to which each claim pertains.  In analogous circumstances, this Court held that severance was appropriate in an action involving numerous individual property claims against State Farm for Hurricane Katrina-related damage, and the Court ordered that separate complaints be filed for each subject property.  *McFarland v. State Farm Fire & Cas. Co.*, No. 1:06cv466-LTS-RHW, 2006 WL

---

[4] Notably, in applying the Rule 21 factors, the *Warder* court obviously made no finding that the FCA itself precludes severance, as the Rigsbys argue here.

2577852, at *1–2 (S.D. Miss. Sept. 6, 2006), *aff'd*, 2006 WL 3071988 (S.D. Miss. Oct. 25, 2006) (Senter, J.).  The Court's reasoning for severing the claims on a property-by-property basis in *McFarland* applies equally here.

### 1. THE RIGSBYS WOULD HAVE THIS COURT IGNORE THE FACT THAT THE CLAIMS AT THE HEART OF THEIR FCA ALLEGATIONS RELATE TO INDIVIDUAL PROPERTIES

The Rigsbys emphasize certain purported "common facts" among the claims—such as a common insurer (State Farm) and a common storm (Hurricane Katrina)—to suggest that severance is inappropriate, but their arguments are unavailing.  These types of facial commonalities carry no weight in these circumstances, as this Court and other courts have expressly recognized.  For example, in ordering severance of claims involving numerous individual properties in *McFarland*, this Court observed that "[i]n a superficial sense, the hurricane was a common occurrence; however, the storm was vastly different in its effect depending on the specific geographic location of each particular home."  *McFarland*, 2006 WL 2577852, at *1.  Moreover, in affirming the severance order in *McFarland*, Judge Senter dismissed as "simplistic" the plaintiffs' argument that joinder of the individual property claims was appropriate because of "the common occurrences of Hurricane Katrina, the damage it wrought, and the denial of insurance coverage …."  *McFarland*, 2006 WL 3071988, at *1.  As Judge Senter aptly stated in another case, "[t]he nature and extent of the property damage the owners sustain from the common cause, Hurricane Katrina, will vary greatly in its particulars, depending on the location and condition of the property before the storm struck and depending also on what combination of forces caused the damage."  *Comer v. Nationwide Mutual Ins. Co.*, No. 1:05cv436-LTS-RHW, 2006 WL 1066645, at *2 (S.D. Miss. Feb. 23, 2006) (Senter, J.).

Similarly, in a Hurricane Katrina-related action brought by multiple property owners against their common insurer, the United States District Court for the Eastern District of

Louisiana granted the insurer's motion for severance of the individual property claims. *Sucherman v. Metropolitan Prop. & Cas. Ins. Co.*, No. 06-8765, 2007 WL 1484067, at *2 (E.D. La. May 21, 2007).  The court stated that "plaintiffs cannot rely on the fact that one natural disaster, Hurricane Katrina, caused the damage to all of their properties as a basis for joining their claims against Metropolitan," their insurer.  *Id.*  The court pointed out that "[t]he claims involve entirely different factual and legal issues, including each property's respective condition and location before the storm, the value of the properties, and the extent of damage sustained." *Id.*

Here, in order to determine falsity for FCA liability purposes, the Rigsbys must prove— for each property in question—that State Farm falsely represented the amount of the claimed loss that was due to flood.  This Court is familiar with this type of property-specific inquiry into whether the damage was caused by wind or flood (or both).  And, as in *McFarland*, this Court has consistently ordered severance of claims arising from different properties—precisely because of the differing nature and cause of damage to individual properties from Hurricane Katrina. *See, e.g.*, *Comer,* 2006 WL 1066645, at *2–3; *Vaz v. Allstate Prop. & Cas. Co.*, No. 1:06CV481- LTS-RHW, 2006 WL 2583733, at *1–2 (S.D. Miss. Sept. 6, 2006), *aff'd*, [26] (S.D. Miss. Oct. 25, 2006) (Senter, J.); *Bradley v. Nationwide Mut. Ins. Co.*, No. 1:06CV528-LTS-RHW, 2006 WL 2594548, at *1–2 (S.D. Miss. Sept. 6, 2006), *aff'd*, [34] (S.D. Miss. Oct. 25, 2006) (Senter, J.); *see also Guice v. State Farm Fire & Cas. Co.*, No. 1:06cv1-LTS-RHW, 2006 WL 2359474, at *5 (S.D. Miss. Aug. 14, 2006) (Senter, J.) (declining to certify proposed class of homeowners whose insured property was totally destroyed during Hurricane Katrina because of, *inter alia*, the individualized, "particular circumstances of hurricane loss cases"), *reconsideration denied*, 2007 WL 912120, at *1–2 (S.D. Miss. Mar. 22, 2007) (Senter, J.).

The Rigsbys simply ignore the reality that, at the most basic level, their FCA allegations are premised on specific claims for each individual property. Their assertion that "[k]ey witnesses are common across all of the false claims," ([1347] at 11), is not only conclusory and unsupported, it is inaccurate. Putting aside the property-specific details—which themselves will necessitate unique witnesses and documentary evidence[5]—the claims themselves involve a variety of claims adjusters, engineers, and State Farm supervisors. Beyond their broad statement of common "key witnesses," the Rigsbys do not (and cannot) plausibly, let alone actually, claim that the same State Farm adjuster or the same engineer was involved in all of the properties for which the alleged false claims were submitted. As State Farm explained in its opening brief, the circumstances surrounding State Farm's adjustment of each claim invariably is unique for that property. Different independent adjusters processed the claims, different State Farm supervisors reviewed and approved the adjusted claims, and different engineering firms (or engineers) evaluated individual properties when warranted. *See* ([1352] at 6–7.) As such, the claims necessarily will not involve the same witnesses and evidence. And unlike a case in which it might be alleged that a defendant submitted insurance claims for fictitious properties—rendering the details of each claim largely irrelevant—even the Rigsbys are not disputing that the claims here arise from real properties, with real flood insurance policies, which suffered real Katrina-induced storm damages.

---

[5] The Rigsbys admit that "specific details of the wind and flood damage may differ from house to house" but nevertheless argue that certain "common questions" having nothing to do with any particular property favor severance. ([1347] at 7–8.) As support, the Rigsbys cite cases for the idea that claim-specific details do not undermine other common questions in FCA Medicare or Medicaid billing cases. *Id.* at 8. However, of the two cases the Rigsbys cite, only one addressed severance, and that case merely denied the severance motion as moot (without analysis) following the grant of certain motions to dismiss. *United States ex rel. v. Oughatiyan v. IPC The Hospitalist Co.*, No. 09 C 5418, 2015 WL 718345, at *7 (N.D. Ill. Feb. 17, 2015). The other case, *United States ex rel. Woods v. SouthernCare, Inc.*, did not address severance in any way. No. 3:09cv00313-CWR, 2013 WL 5445239 (S.D. Miss. Sept. 30, 2013).

### B.    SEVERANCE WOULD PROMOTE EFFICIENCY AND WOULD AVOID PREJUDICE

Severance would be fully consistent with the principal purpose of Rule 21, which is to allow the trial judge to manage and dispose of a case in a manner that both advances judicial efficiency and is fair to the parties.  *See McFarland*, 2006 WL 2577852, at *1 (stating that two factors courts consider in exercising their discretion in severing claims are whether severance would facilitate settlement of the claims or judicial economy and whether granting severance would avoid prejudice).  Neither efficiency nor fairness would be served here by allowing up to hundreds of factually distinct claims to remain consolidated for a single trial.  Instead, the efficient and just adjudication of the property claims would be severely undermined if the claims are not severed into separate trials.

### 1.    A SINGLE TRIAL OF ALL CLAIMS WOULD BE CONFUSING, TIME-CONSUMING, AND UNDULY PREJUDICIAL TO STATE FARM

The danger of confusing a single jury with up to hundreds of claims, with each claim addressing a distinct property, is palpable.  The Rigsbys bear the burden of proof for each property-specific claim, and the question of whether an individual flood claim is true or false will be resolved based on the facts for that particular property alone.  In light of this property-specific evidence that must be introduced for each individual claim at trial, jury confusion (and resulting prejudice to State Farm) would be virtually guaranteed, as a jury cannot reasonably be expected to distinguish between the critical facts underlying as many as hundreds of distinct claims for as many properties.  Thus, without severance, there would be "little doubt that a jury would find it impossible to give [the Rigsbys'] claims the individual attention and scrutiny which they deserve[.]"  *Baughman v. Lee County, Mississippi*, 554 F. Supp. 2d 652, 654 (N.D. Miss. 2008).

State Farm would be unduly prejudiced by this inevitable confusion, as jurors would conflate distinct claims and begin to consider collective evidence, resulting in a high potential of returned verdicts unsupported by the specific evidence for each individual claim.  This is

precisely the type of prejudice—resulting from the jury being overwhelmed by the volume of evidence that would be expected to be introduced—that Rule 21 is meant to prevent.  *See Ill. Cent. R.R. Co. v. Gregory*, 912 So. 2d 829, 835, 837 (Miss. 2005) (applying Mississippi Rule of Civil Procedure 20(a) and holding that severance of claims was warranted).

### 2.   THE RIGSBYS WOULD NOT BE PREJUDICED BY SEVERANCE, AND THEIR IMAGINED "PARADE OF HORRIBLES" IS UNSUPPORTED

The Rigsbys will not be unduly prejudiced if the claims are tried separately.  As an initial matter, they cannot now complain about the fact that they chose to bring this action against State Farm for multiple claims.  Whether the claims are all part of one complaint—and trial—or multiple complaints, the evidentiary burden for the Rigsbys is the same:  they must prove FCA liability for each alleged false claim, and each alleged false claim pertains to a unique property.

The Rigsbys raise dire predictions of "enormous logistical burdens," "staggering financial and logistical burdens," and "logistical insanity" in an attempt to dissuade this Court from severing their claims.  ([1347] at 9–10.)  But the Rigsbys' "parade of horribles" protests are distortions that deserve little attention.  For example, the Rigsbys' claim that each new case will have to be filed and remain under seal pursuant to 31 U.S.C. § 3730(b)(2), *see* ([1347] at 9), is incorrect,[6] as the FCA's sealing requirement is meant to apply to complaints filed when a person "brings" a new civil action in the name of the Government.  31 U.S.C. §§ 3730(b)(1) & (2). Here, the claims and action already have been "brought," and the Government already investigated them during the seal period.  Under these circumstances, a severance order easily can be fashioned that would not require the already public claims to be re-filed under seal.

The Rigsbys' complaint about the prospect of having to pay multiple *pro hac vice* admission fees for out-of-state attorneys, *see* ([1347] at 10), is equally unconvincing.  As the

---

[6] The Rigsbys cite to 31 U.S.C. § 3730(a)(2), ([1347] at 9), which does not exist.  We assume they intended to cite 31 U.S.C. § 3730(b)(2), which sets forth the initial 60-day seal period.

Rigsbys note, this Court previously signaled its intent to waive filing fees, *see* ([1347] at 9), and, *sua sponte* or upon application, could craft an order that mitigates any undue financial burden caused by both parties' out-of-state counsels' *pro hac vice* obligations.  This consideration should not impact the severance decision in any way.

The Rigsbys also argue that "logistical insanity" would result because they anticipate a proliferation of duplicative court filings that would be "unworkable."  ([1347] at 10.)  This argument, too, would apply equally to all parties and, more importantly, ignores the case management tools available to the Court to mitigate against such a result.  Severance does not mean that common legal questions cannot be consolidated for hearing and decision, nor does it necessarily mean that any evidence that is common to multiple cases cannot be developed in a coordinated manner to avoid repeatedly burdening parties and third party witnesses.  *See, e.g.*, *Demboski v. CSX Transp.*, 157 F.R.D. 28, 30 (S.D. Miss. 1994) (allowing plaintiffs in the severed cases to "attempt to develop appropriate evidence indicating negligence of Defendant common to all or some of the four cases," and finding that "[a]ny evidence so developed in any of the four cases may be utilized as if developed in each case").[7]

### 3.    SEVERANCE WOULD FACILITATE SETTLEMENT OF CLAIMS

Finally, the Rigsbys make the assertion that severance "would make it effectively impossible to settle by erecting unreasonable procedural burdens," ([1347] at 8), but this argument lacks both definition and merit.  Notably, in *McFarland*, this Court predicted that severance of individual property claims would have the opposite effect and instead would have "the obvious benefit of reaching agreed settlements in a promising number of cases."  2006 WL

---

[7] Likewise, the Rigsbys would not necessarily have to file manually a separate and distinct brief or pleading in each applicable case.  For example, the CM/ECF electronic filing system provides a mechanism by which briefs can be filed in one case and designated as being filed in other, related cases, with the Court's permission.

3071988, at *2.  Here, severance may actually promote early resolution of a number of the

individual property claims, where unique grounds exist for early dispositive motions or other

resolution.  And, to the extent certain of the claims set forth certain grounds for early resolution

by the parties, there is no reason the parties should not attempt to resolve those claims.

### III.   THE RIGSBYS' ARGUMENTS ABOUT IRRELEVANT AND UNRIPE ISSUES SHOULD BE IGNORED

In a brief purportedly about severance, the Rigsbys have sought to put the cart before the

horse, teeing up several irrelevant and unripe issues for this Court's consideration when those

issues are plainly inapposite to the severance question.  Indeed, the Rigsbys' brief is little more

than a brief in support of an as-yet-to-be-filed summary judgment motion on whether they have

proven a "scheme" by dint of the *McIntosh* verdict, whether purported violations of FEMA

Directive W-5054 are *per se* violations of the FCA, and whether the Court can skip straight to

calculating purported damages using statistical sampling.  None of these arguments should divert

the Court from the narrow question at hand—that is, whether this Court, in its discretion, should

order severance.  In any event, as explained below, the Rigsbys' arguments lack merit and should

be rejected.

### A.   THE RIGSBYS HAVE NOT ALREADY PROVEN A "SCHEME" AND THE *MCINTOSH* VERDICT DID NOT ESTABLISH FALSITY FOR ANY REMAINING CLAIM

The Rigsbys' mantra that "primary disputes in this case have been decided already,"

([1347] at 11), should be put to rest.  It simply is not true no matter how often the Rigsbys repeat

it.  In fact, aside from the one claim arising from the McIntosh property, neither a jury nor any

court has adjudicated State Farm liable for any other claim or property.  As this Court stated,

"*[e]ach* potential false claim will have to be considered on its merits at the appropriate time."

([1317] Order at 8 (emphasis added).)  As such, for each remaining claim the Rigsbys are able to

pursue, the Rigsbys still must prove falsity, scienter, materiality, causation, and damages.

1.    **The Seventh Amendment's Reexamination Clause Does Not Apply Because the *McIntosh* Verdict Was Limited to the *McIntosh* Case**

The Rigsbys' contention that the Seventh Amendment bars reexamination of issues that they contend were resolved by the jury in the trial of the McIntosh claim is incorrect.  *See* ([1347] at 12–15.)  The *McIntosh* trial resolved issues pertaining only to the McIntosh claim.  The case was tried on that basis, and the Court specifically instructed the jury to make findings as to the McIntosh claim alone.  *See* ([1092] at 1–3.)  Furthermore, in claiming that various issues have been decided for all cases by the *McIntosh* jury, the Rigsbys erroneously point to statements in the Fifth Circuit's opinion that they use out of context.  When examined in context, those statements simply refer to evidence and contentions, not to actual findings made by the jury.  Consequently, the Reexamination Clause plainly is inapplicable.[8]

The Reexamination Clause protects the right to have only one jury decide an issue of fact on the same claim.  *See Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 499–500 (1931).  Such concerns typically arise when, unlike here, a court is considering bifurcating—for trial before different juries—particular issues involving the same claim.  *See Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 318 (5th Cir. 1978) (discussing Seventh Amendment concerns in light of bifurcation of the issues of liability and damages in an antitrust case); *Castano v. American Tobacco Co.*, 84 F.3d 734, 750–51 (5th Cir. 1996) (discussing Seventh Amendment concerns in light of bifurcating for separate juries the question of defendant's and plaintiff's comparative negligence).  The Reexamination Clause does not prohibit another jury from

---

[8] As the Rigsbys note, the parties already have briefed the applicability of the Seventh Amendment's Reexamination Clause.  ([1347] at 12 n.1.)  State Farm incorporates its prior briefing on this subject by reference.  *See, e.g.*, ([1298] State Farm's Rebuttal in Support of its Motion to Reopen Case and for Resolution of Scope of Discovery at 4, 15-19; [1321] State Farm's Memorandum of Law in Opposition to Relators' [1318] Motion for Clarification of This Court's Order [1317] Granting in Part and Denying in Part Motion to Reopen Case and for Resolution of Scope of Discovery at 2–5; [1262] State Farm's Response to the Relators' Principal Post-Appeal Brief Regarding the Scope of Discovery at 8–11.)

reviewing overlapping evidence or from independently deciding an issue where is it not being asked to confirm or reject an earlier jury's finding. *See In re Innotron Diagnostics*, 800 F.2d 1077, 1086 (Fed. Cir. 1986); *Houseman v. U.S. Aviation Underwriter*s, 171 F.3d 117, 1128 (7th Cir. 1999). A final judgment already has been entered as to the McIntosh flood claim. No separate jury will be asked to review the *McIntosh* jury's finding regarding that claim.

The Rigsbys' extensive reliance on *Allison v. Citgo Petroleum Corp*., 151 F.3d 402 (5th Cir. 1998), *see* ([1347] at 12–13), is misplaced. In *Allison*, the Fifth Circuit considered the Seventh Amendment in the context of a putative Title VII class action. In holding that the district court did not abuse its discretion in declining to certify a class, the Fifth Circuit noted that "[i]n order to manage the case, the district court faced the likelihood of bifurcated proceedings before multiple juries." *Allison,* 151 F.3d at 419. The Fifth Circuit stated that "[t]his result in turn increased the probability that successive juries would pass on issues decided by prior ones, introducing potential Seventh Amendment problems and further decreasing the superiority of the class action device." *Id.* at 420.

This case is nothing like *Allison*. Here, ***one*** jury was empaneled to decide ***all*** of the issues pertaining solely to the McIntosh claim. Judge Senter ordered a trial on the McIntosh property because "[t]he McIntosh claim is the ***only*** instance of State Farm's having submitted an allegedly false claim of which the Relator Kerri Rigsby has first hand knowledge." ([343] at 10 (emphasis added).) As the Fifth Circuit observed, the *McIntosh* trial was designed "to ***isolate*** the McIntosh claim for trial." *Rigsby*, 794 F.3d at 469 (emphasis added).

The Rigsbys' attempt to extrapolate generalized findings from an isolated case, ([1347] at 13–15), is manifestly at odds with Fifth Circuit law. For example, in *In re Chevron U.S.A., Inc.*, the trial court entered a case management order providing for the trial of thirty individual cases

16

and applying the "general liability" findings made in those cases to a larger pool of cases.  109

F.3d 1016, 1017 (5th Cir. 1997).  The Fifth Circuit issued a writ of mandamus prohibiting the

district court from using the "results obtained from the trial of the thirty (30) selected cases for

***any purpose*** affecting issues or claims of, or defenses to, the remaining untried cases."  *Id.* at

1021 (emphasis added).  So, too, in *Cimino v. Raymark Industries, Inc*., the Fifth Circuit held

that a class action trial plan that determined the defendant's liability to the entire class—by, *inter*

*alia*, extrapolating from 160 individual cases—violated the defendant's Seventh Amendment

rights.  151 F.3d 297, 320–21 (5th Cir. 1998).  The Fifth Circuit does not permit a district court

to extrapolate jury findings in one case to other untried cases.

 In addition to Judge Senter's case management plan, the *McIntosh* special verdict form,

[1092], confirms that the jury's findings were limited to the adjustment of the McIntosh home:

every interrogatory in the verdict contains a clause limiting the jury's consideration to the

McIntosh flood claim.  For example, Interrogatory One asked the jury to determine whether the

"covered flood damage under the [NFIP] *to the McIntosh House*" was "less than $250,000.00."

([1092] at 1 (emphasis added).)  Interrogatory Three asked whether State Farm submitted "a

false or fraudulent claim for payment or approval in connection *with the McIntosh flood claim*."

*Id.* at 2 (emphasis added).  Interrogatory Number Four asked whether State Farm created "a false

record or statement" material to "*the McIntosh flood claim.*"  *Id.* at 3 (emphasis added).  The

Court's charge to the jury echoes this limitation:  The Court's instruction concerning the general

nature of the allegations in the case being tried states that the Rigsbys "allege that *in connection*

*with the McIntosh flood claim*, defendant State Farm submitted or caused to be submitted a false

claim."  (Trial Tr., vol. 11 [1125] at 1828:22–24 (emphasis added).)  The instructions explaining

the law on the two FCA violations presented to the jury similarly limit consideration to "the

McIntosh flood claim." *Id.* at 1832:21. A second jury will not be called upon to revisit *any* of these findings, rendering the Reexamination Clause inapplicable.

### 2. THE PURPORTED "JURY FINDINGS" RELIED UPON BY THE RIGSBYS WERE NEVER MADE

The Rigsbys contend that the Fifth Circuit's opinion in this case "made clear" that the *McIntosh* jury verdict "'necessarily entailed' findings of fact reaching beyond the McIntosh claim." ([1347] at 13.) However, these purported "findings of fact" are nowhere among the findings the *McIntosh* jury was asked to make. Rather, the statements by the Fifth Circuit cited by the Rigsbys simply describe evidence or contentions, not actual findings made by the jury. For example, the Rigsbys erroneously assert that State Farm may not relitigate whether "'FEMA directive W5054[] required line-by-line estimate[s].'" *Id.* at 13 (alterations in original) (quoting *Rigsby*, 794 F.3d at 469). In actuality, it is indisputable that the Fifth Circuit is describing "evidence" presented by the Rigsbys at trial, not a jury finding. The sentence in the opinion reads: "With respect to the § 3729(a)(1) claim, the Rigsby [sic *presented evidence at trial* that State Farm told its adjusters … that they should use Xactotal in these circumstances rather than FEMA directive W5054's required line-by-line estimate." *Rigsby*, 794 F.3d at 469 (emphasis added).

Similarly, there was no jury finding that "State Farm's use of XacTotal rather than the required line-by-line adjustment was 'widespread.'" ([1347] at 14 (quoting *Rigsby*, 794 F.3d at 469).) Rather, the Fifth Circuit stated that "*witnesses testified* to widespread use of Xactotal." *Rigsby*, 794 F.3d at 469 (emphasis added). Likewise, the jury did not make (and was not asked

to make) a finding that "State Farm did not have 'generalized permission to deviate from FEMA directive W5054.'"  ([1347] at 14 (quoting *Rigsby*, 794 F.3d at 469).)[9]

Nor was there a jury finding that "State Farm officials told adjusters to 'manipulate the totals' in Xactotal to ensure that policy limits were reached."  ([1347] at 14 (quoting *Rigsby*, 794 F.3d at 464).)  Rather, the Fifth Circuit stated that "*[t]here was also evidence* that State Farm officials told adjusters to 'manipulate the totals' in Xactotal to ensure that policy limits were reached."  *Rigsby*, 794 F.3d at 464 (emphasis added).  So, too, the jury did not find that "'[l]ine-by-line estimates were in fact a prerequisite to payment under the NFIP.'"  ([1347] at 13 (quoting *Rigsby*, 794 F.3d at 478 n.14).)  The actual sentence in the Fifth Circuit's opinion simply states: "*FEMA officials testified* that line-by-line estimates were in fact a prerequisite to payment under the NFIP."  *Rigsby*, 794 F.3d at 478 n.14 (emphasis added).

The Rigsbys also assert that State Farm may not litigate whether "State Farm placed a fake Xactotal-generated line-by-line estimate 'in the file to mislead FEMA in violation of 3729(a)(1)(B).'"  ([1347] at 14 (quoting *Rigsby*, 794 F.3d at 480).)  Again, the full context makes clear that there was no jury finding on these issues.  The Fifth Circuit's opinion states that "[t]he jury *could* reasonably have believed that the printout was material, and was placed in the file to mislead FEMA in violation of § 3729(a)(1)(B)."  *Rigsby*, 794 F.3d at 480 (emphasis added).  The Fifth Circuit's statement is merely a comment on the evidence, not a statement as to what the jury found.  Furthermore, as the directly preceding sentence in the opinion makes clear, the "printout" referred to by the Fifth Circuit is "the Xactotal printout for the McIntosh claim."  *Id.*

---

[9] Indeed, the Rigsbys' counsel's closing argument to the jury identified purported reasons that the McIntosh XacTotal form was a "fake false document" that had nothing whatsoever to do with any other case or claim, including that "the document that went into the McIntosh claim file was a document that was not the McIntosh house.  It had a garage, a two-car garage on it."  (Trial Tr., vol. 11 [1125] at 1863:5–14.)  Moreover, even if the jury had found that "State Farm did not have 'generalized permission to deviate from FEMA directive W-5054,'" ([1347] at 14)—which the jury did not find—it would not follow that any such deviation in a non-McIntosh file would constitute a violation of the FCA.

Thus, the Rigsbys' paraphrase is clearly misleading in making the Fifth Circuit's statement appear to be generally applicable to all purported uses of the Xactotal form.[10]

Indeed, when the Fifth Circuit remanded this case for further discovery, far from holding that the Rigsbys had proven any claim but the *McIntosh claim*, the Fifth Circuit "stress[ed] that we make no judgments about the actual existence of other potential false claims or records." *Id.* at 470.  In other words, this case was remanded for further discovery precisely because the Rigsbys' broader allegations had ***not*** been adjudicated in the *McIntosh* trial.[11]

Accordingly, the *McIntosh* jury did not make findings that are applicable or binding with respect to the Rigsbys' remaining claims.[12]  A severance order here will not result in any re-litigation of the claim at issue in *McIntosh*.  The whole purpose of severance is to ensure that the jury is able to focus on the evidence pertaining to the particular property at issue without being confused or influenced by evidence concerning distinct properties.  Any claims that make it to trial going forward will be separate and distinct from McIntosh, rendering the Reexamination Clause inapplicable.

---

[10] In addition, the jury did not make (and was not asked to make) a finding that "State Farm told its adjusters to use the Xactotal program to generate fake line-by-line reports to hide the company's violations of W5054 from FEMA."  ([1374] at 14 (citing *Rigsby*, 794 F.3d at 480.)

[11] Throughout its opinion, the Fifth Circuit was careful to refer to the supposed "scheme" as an "***alleged*** scheme."  *Id.* at 465, 468 (emphasis added).  For instance, the Fifth Circuit noted that, after trial, the Relators moved "for additional discovery to seek out other instances of false claims that were part of the ***alleged*** general scheme," and on appeal "seek further discovery into the same ***alleged*** scheme they argue produced the McIntosh claim."  *Id.* at 465 (emphasis added).

[12] The Rigsbys misleadingly contend that "the Fifth Circuit's decisions regarding facts found by the McIntosh jury cannot be disregarded."  ([1347] at 13 n.2.)  As discussed above, when examined in context, the Fifth Circuit statements cited by the Rigsbys refer to evidence and contentions, not to actual jury findings.  Moreover, the cases cited by the Rigsbys as support for this contention have nothing to do with findings of fact by a jury.  *See Pepper v. United States*, 562 U.S. 476, 506 (2011) (addressing "when a court decides upon a rule of law"); *United States v. Sharma*, 609 F. App'x 797, 802 (5th Cir. 2015) (discussing "law of the case doctrine"); *Cooper Tire & Rubber Co. v. Farese*, 248 F. App'x 555, 558 (5th Cir. 2007) (same).

**B.     RELATORS MISCONSTRUE *ESCOBAR*, WHICH HAS NO RELEVANCE TO THE COURT'S SEVERANCE DETERMINATION AND DOES NOT AUTOMATICALLY ESTABLISH FALSITY**

Also straying far afield of the narrow issue of severance—the only issue currently under consideration—the Rigsbys argue that State Farm's failure to perform line-by-line adjustments in alleged violation of FEMA Directive W-5054 satisfies the standard articulated in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), for implied false certification and thus automatically creates FCA liability for each and every property on which further discovery may be allowed.  *See* ([1347] at 16–17.)  The Rigsbys are mistaken here as well.

The first problem with this contention[13] is that the Rigsbys bootstrap their faulty Seventh Amendment argument with respect to the *McIntosh* trial onto their *Escobar* argument by asserting that certain facts were established or admissions were made at that trial.  But, as explained above, the *McIntosh* trial did not establish anything for claims beyond McIntosh. Even after *Escobar*, a prerequisite for liability under § 3729(a)(1)(B) is the presence of an underlying false claim.[14]  *See Rigsby*, 794 F.3d at 476–77 (explaining that the Rigsbys had to prove that the McIntosh claim was false in order to establish liability under § 3729(a)(1)(A) and

---

[13] The parties already have briefed the impact of *Escobar* on the Rigsbys' claims.  State Farm incorporates its prior briefing on this subject by reference.  *See, e.g.*, (State Farm's Memorandum in Support of Its Motion to Reopen Case and for Resolution of Scope of Discovery [1291] at 2–4; State Farm's Rebuttal in Support of Its [1290] Motion to Reopen Case and for Resolution of Scope of Discovery [1298] at 2–15.)

[14] The Rigsbys are pursuing FCA liability under 31 U.S.C. § 3729(a)(1)(B), *see* ([1293] at 4, 6) (citing 31 U.S.C. § 3729(a)(1)(B)), but *Escobar* addressed potential liability under § 3729(a)(1)(A), not liability under § 3729(a)(1)(B).  *See, e.g.*, *Escobar*, 136 S. Ct. at 1995, 2004.  Section 3729(a)(1)(A) imposes liability on a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," whereas section 3729(a)(1)(B) imposes liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. §§ 3729(a)(1)(A) & (B) (emphasis added).  In other words, liability under section 3729(a)(1)(B) requires there to be a corresponding "false or fraudulent" claim violation before liability can attach to any "false record or statement."

§ 3729(a)(1)(B)); *see also United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir.

2003) (en banc) ("There is no liability under this Act for a false statement unless it is used to get

[a] false claim paid."); *United States ex rel. McLain v. Fluor Enters.*, 60 F. Supp. 3d 705, 712

(E.D. La. 2014) ("Even if relators can point to certifications that were actually false, such

certifications are not actionable unless they were material to a claim for payment that was itself

false or fraudulent.").

      And, beyond the fact that no other alleged false claims were at issue in the *McIntosh* trial

beyond the McIntosh claim, the Rigsbys' *Escobar*-related arguments are based on an entirely

different scheme from the one they presented at that trial.  The "scheme" at trial—and before the

Fifth Circuit on review—was a scheme to shift wind claims to flood claims using engineering

reports.  *See* ([1262] at 2–8.)  Now, the Rigsbys are arguing an entirely different "scheme"—that

is, a scheme to violate FEMA Directive W-5054.  Having previously disavowed any reliance on

a false certification theory with respect to the case they presented to the *McIntosh* jury, *see*

*Rigsby*, 794 F.3d at 478 n.14, the Rigsbys could not have established through the *McIntosh* trial

that a "violation" of W-5054—standing alone—constituted a "false claim" under the FCA,

regardless of what the Supreme Court held in *Escobar* regarding false certification liability.

      In addition, the Rigsbys' attempts to draw parallels between the violations at issue in

*Escobar* and the alleged "violations" of W-5054 lack merit.  The defendant in *Escobar* was

alleged to have made specific false representations about the qualifications and licensing of the

counselors who provided counseling services that, under the applicable regulations, required the

counselors to meet certain minimum standards to be reimbursable.  136 S. Ct. at 2000.  In

endorsing the so-called "implied certification theory," the Supreme Court explained that the

underlying claim must make "specific representations about the goods or services provided" and

that "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 2001.

According to the Rigsbys, the "service" or "good" for which State Farm sought payment from FEMA was mere compliance with W-5054, regardless of whether the damage to the property was correctly paid as flood damage. *See* ([1347] at 17 ("nothing more is required").) However, compliance with a claims processing directive like W-5054 is not equivalent to providing the underlying counseling services at issue in *Escobar*, where the defendant's false statements in that case went to the very qualifications of the providers of the counseling services, and the eligibility for payment by the government was premised on the providers having the required licensing qualifications. *Escobar*, 136 S. Ct. at 2000. As the Supreme Court explained, "by submitting claims for payment using payment codes that corresponded to specific counseling services," the defendant represented that those services had been provided by qualified providers. Those representations were "clearly misleading in context," however, because they concealed the "many violations of basic staff and licensing requirements for mental health facilities." *Id.* at 2000-01. In contrast, any purported misrepresentations from State Farm about compliance with W-5054 could not, and would not, bear on whether a property was or was not in fact damaged by flood and therefore covered by a homeowner's flood policy. *Escobar* does not establish anything with respect to the individual properties now at issue, and it has no bearing on whether severance is an appropriate exercise of this Court's discretion.

C.    **EVEN IF THE *MCINTOSH* TRIAL HAD ESTABLISHED A SCHEME APPLICABLE BEYOND THE MCINTOSH PROPERTY, CAUSATION HAS NOT BEEN ESTABLISHED FOR ANY REMAINING CLAIM**

The Rigsbys' attempt to avoid severance by claiming the existence of a "scheme" is not the cure-all for which they are hoping. Even in "scheme" cases, the relator must still establish that the scheme caused the submission of the alleged false claim. In this case, that would mean

23

proof that the supposed State Farm scheme caused the individual claims assessment teams for each property—including the independent adjuster, engineer, engineering company, and State Farm supervisor—to falsely represent that the property damage was caused by flood.  In other words, the Rigsbys must show a causal connection between each individual in the corporate scheme and the actual false claim that was submitted for payment.  *See United States ex rel. King v. Solvay Pharmaceuticals, Inc.*, 871 F.3d 318, 328–29 (5th Cir. 2017); *United States ex rel. Ruckh v. Salus Rehabilitation, LLC*, No. 8:11cv1303-T-23TBM, 2018 WL 375720, at *8–9 (M.D. Fla. Jan. 11, 2018); *United States ex rel. Wall v. Vista Hospice Care, Inc.*, No. 3:07cv00604-M, 2016 WL 3449833, at *20–21 (N.D. Tex. June 20, 2016).  Due to the unique characteristics and make-up of each property and assessment team, this causation evidence will be property-specific as well.

### D.   DAMAGES HAVE NOT BEEN ESTABLISHED FOR ANY REMAINING PROPERTY

Proof of damages, by definition, will be specific to the property from which the claim arises.  To the extent that the Rigsbys establish that State Farm knowingly submitted a false claim for flood insurance, the damages, if any, will be assessed based on the particulars of that property, just as they were in *McIntosh*.  It goes without saying that no jury or court has made any determination of damages for any claim in this case beyond the McIntosh property.[15]

The Rigsbys nevertheless devote a substantial portion of their brief (three pages plus a fifteen-page "expert" declaration) to an argument that the entire damages inquiry can be

---

[15] Citing to *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458 (5th Cir. 2009), the Rigsbys wrongly argue that the proper measure of damages would be the full payment to the homeowners.  ([1347] at 2.)  The measure of damages at issue in *Longhi*, which involved false statements made to secure research grants, is inapposite to the flood insurance claims at issue here, where the government's damages, if any, would be the difference between the amounts incorrectly paid to homeowners for flood damage and what should have been paid by the government for flood damage.  *See, e.g.*, *United States ex rel. Wall v. Circle C Constr., LLC*, 813 F.3d 616, 617 (6th Cir. 2016) ("Actual damages are the difference in value between what the government bargained for and what the government received.").

shortened via the use of statistical sampling.  ([1347] at 20–23.)  The Rigsbys surmise that this assertion has some bearing on the severance question at hand, but they never make a rational connection.  Of course, the issue here is severance, as the Court ordered the parties to brief "the issue of severing claims by individual property/policy number."  ([1346] at 1).  As such, the current briefing is not an occasion for this Court to decide the propriety of statistical sampling in this case, let alone for determining whether the Rigsbys' purported expert's opinions—conclusory and speculative as they are—may be admissible under the applicable standards.

State Farm respectfully submits that the Court should disregard the expert declaration on the grounds that the use of statistical sampling for damages is well beyond the scope of the severance issue and is premature in any event.  Even so, if the Court is inclined to consider sampling now, State Farm would object to the admission of the proffered declaration prior to State Farm being afforded ample opportunity to brief the issue, obtain a report from the Rigsbys' witness (including the documents relied on), depose the declarant, and submit an expert rebuttal report and declaration as may be warranted.[16]

### CONCLUSION

For the foregoing reasons and those in State Farm's Memorandum in Support of Severance of Relators' Claims, State Farm respectfully requests that the Court sever the claims for each individual property into separate complaints to be tried separately.

---

[16] Any decision on the propriety of sampling should be held in abeyance pending a decision on severance.  If the claims are severed, sampling is moot.  If the claims are not severed, and the Rigsbys still intend to rely on sampling, the Court's consideration of sampling should not be made in the abstract (as the Rigsbys seek to do now) and, instead, should be informed by and made after the Rigsbys clarify their legal theories and identify the properties they believe should be at issue.

This the 26th day of February 2018.

Respectfully submitted,

STATE FARM FIRE AND CASUALTY COMPANY

By:   s/ *E. Barney Robinson III* (MB # 09432)
         Michael B. Beers, *PHV* (ASB-4992-S80M)
         Phil B. Abernethy (MB # 1023)
         E. Barney Robinson III (MB # 09432)
         Amanda B. Barbour (MB # 99119)
         Michael C. McCabe, Jr. (MB # 101548)

ITS ATTORNEYS

OF COUNSEL:

BUTLER SNOW LLP
Post Office Drawer 4248
Gulfport, MS  39502
(P) (228) 575-3025
(E) michael.mccabe@butlersnow.com

BUTLER SNOW LLP
250 Commerce Street, Suite 203
Montgomery, AL  36104
(P) (334) 832-2900
(F) (334) 832-2901
(E) michael.beers@butlersnow.com

BUTLER SNOW LLP
200 Renaissance at Colony Park, Suite 1400
1020 Highland Colony Parkway (39157)
Post Office Box 6010
Ridgeland, MS 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) phil.abernethy@butlersnow.com
(E) barney.robinson@butlersnow.com
(E) ben.watson@butlersnow.com
(E) amanda.barbour@butlersnow.com

CERTIFICATE OF SERVICE

I, E. Barney Robinson III, one of the attorneys for State Farm Fire and Casualty Company, do hereby certify that I have this day caused a true and correct copy of the foregoing instrument to be delivered to the following via the means indicated by CM/ECF:

C. Maison Heidelberg
Ginny Y. Kennedy
HEIDELBERG HARMON, PLLC
795 Woodlands Parkway, Suite 220
Ridgeland, MS  39157
(P) (601) 351-3333
(F) (601) 956-2090
mheidelberg@heidelbergharmon.com
gkennedy@heidelbergharmon.com

August J. Matteis Jr.
William E. Copley
Derek Y. Sugimura
Timothy M. Belknap
WEISBROD, MATTEIS & COPLEY, PLLC
1900 M Street NW, Suite 850
Washington, DC  20036
amatteis@wmclaw.com
wcopley@wmclaw.com
dsugimura@wmclaw.com
tbelknap@wmclaw.com
COUNSEL FOR CORI RIGSBY AND KERRI RIGSBY

Jeffrey S. Bucholtz
Joyce R. Branda
Patricia R. Davis
Jay D. Majors
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC  20044
(P) (202) 307-0264
(F) (202) 514-0280

Lynn Murray
AUSA
UNITED STATES ATTORNEY'S OFFICE
Southern District of Mississippi
501 East Court Street, Suite 4.430
Jackson, MS 39201
(P) (601) 965-2835
lynn.murray@usdoj.gov
ATTORNEYS FOR THE UNITED STATES

THIS the 26th day of February 2018.

By:    s/*E. Barney Robinson III* (MB # 09432)
       E. Barney Robinson III (MB # 09432)