**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA ex rel.
    CORI RIGSBY and KERRI RIGSBY,        RELATORS/COUNTER-DEFENDANTS

           v.                            CASE NO. 1:06-cv-433-HSO-RHW

STATE FARM FIRE & CASUALTY        DEFENDANTS/COUNTER-PLAINTIFFS
    COMPANY, et al.

**JURY DEMAND**

**RELATORS' SECOND AMENDED COMPLAINT**

Plaintiffs and Relators Cori Rigsby and Kerri Rigsby (the "Rigsbys"), by their attorneys, hereby state as follows for their Complaint against Defendant State Farm Fire & Casualty Company ("State Farm"):[1]

**NATURE OF THE ACTION**

1.      This case arises out of State Farm's intentional submission of false claims, statements, and records to the Federal Emergency Management Agency ("FEMA") in violation of the False Claims Act.

2.      State Farm is an insurance company that issues homeowner policies that provide coverage for, among other losses, wind damage but exclude coverage for flood damage.  At the time of Hurricane Katrina ("Katrina"), State Farm also was a "Write Your Own" or "WYO" insurer that participated in the National Flood Insurance Program ("NFIP").  As a WYO insurer, State Farm was authorized to issue flood policies, and adjust and pay flood claims with government money.  These flood policies were the inverse of State Farm's homeowner policies: they covered flood damage but excluded wind damage.

---

[1] Many of the allegations in this Complaint have already been found by a jury, and the Fifth Circuit has held that those findings are supported adequately by evidence in the record.  *See generally United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457 (5th Cir. 2015), *aff'd*, 137 S. Ct. 436 (2016).

3.      To minimize Katrina losses under its homeowner policies, and foist those costs onto the federal government, State Farm embarked on a scheme to falsely characterize wind damage as flood damage.

4.      State Farm falsely instructed its adjusters that Katrina was a "water storm" and that if a home was severely damaged by Katrina, it was caused by flooding, not wind.

5.      Every hurricane's strongest winds precede its highest floodwater.  This means that many properties are rendered total losses by hurricane-force winds before floodwaters even arrive.  But State Farm falsely told its adjusters that Katrina's storm surge preceded the storm's strongest winds and, accordingly, that if a property was a total loss, it was likely rendered such by flooding before high winds arrived.

6.      To mollify restless homeowners whose homes had been severely damaged by Katrina, State Farm had its adjusters quickly authorize limits payments under the government's flood policies if there was evidence of major storm damage, while it delayed investigating and paying its own wind claims.

7.      To induce the federal government into paying flood limits on claims that did not suffer extensive flood damage, State Farm also covertly used a prohibited shortcut computer adjusting program, XacTotal, to manipulate data so that it appeared that properties suffered flood damage well in excess of their flood limits.

8.      Prior to Katrina, when State Farm adjusted its own homeowner claims, it used line-by-line estimates which document, item-by-item, the components of a home that were damaged.  FEMA has always required State Farm to perform the same line-by-line estimates to adjust its flood claims as well.

9.     State Farm continued adjusting its own Katrina wind claims using line-by-line estimates.  However, for flood damage covered by the government's flood policies, State Farm instructed its adjusters instead to use XacTotal, which merely estimated the damage based on a home's square footage and build quality.

10.     In the immediate aftermath of Katrina, FEMA issued a directive that allowed State Farm to use expedited adjusting procedures, such as XacTotal, for homes that had standing water in them for over five days or that were washed off their foundations by flood water. FEMA reiterated, however, that all other claims needed to be adjusted using "normal claim procedures," *i.e.*, line-by-line estimates.

11.     State Farm thrice asked FEMA for permission to use expedited procedures (XacTotal) to adjust homes for which Katrina's damage simply appeared to exceed policy limits, and FEMA declined to grant that request all three times.  Despite this, State Farm used XacTotal instead of line-by-line estimates to adjust flood claims thousands of times (and even admitted to doing so over 500 times).  And when the XacTotal damage estimates did not exceed flood policy limits, State Farm told its adjusters to rerun the program and manipulate the results to reach those limits.

12.     Numerous FEMA officials, and State Farm's own expert, testified about the importance of a line-by-line estimate during the McIntosh trial.  Compliance with FEMA's line-by-line requirement was not only material to the government's decision to pay, it was an actual "prerequisite to payment."  *See Rigsby*, 794 F.3d at 478 n.14.

13.     To obfuscate its failure to prepare the required line-by-line estimates, State Farm generated sham line-by-line estimates which "closely resemble[]," but are not, "line-by-line estimate[s]," and placed them in each claim's flood file.  *See Rigsby*, 794 F.3d at 480.

3

14.     Not content with merely using unauthorized shortcut procedures, State Farm doubled down on its fraud by charging the government the higher rate for conducting a full line-by-line estimate, rather than the discount rate FEMA required insurers to charge for performing expedited estimates.

15.     After fraudulently authorizing limits payments on thousands of flood claims, State Farm tried to cover its tracks.  State Farm buried engineering reports that attributed damage to wind and coerced engineering firms to find flood rather than wind damage.  When a handful of engineering firms refused State Farm's demands to change their conclusions, State Farm cancelled all assignments to those firms, blacklisted them, and refused to pay their invoices.

16.     State Farm later issued a blanket cancellation of all outstanding engineering reports and denied all outstanding wind claims that were awaiting those reports.

17.      "The Rigsbys are the paradigmatic ... whistleblowing insider[s]."  *Rigsby*, 794 F.3d at 475 (alterations original; internal quotation omitted).  They have direct and independent knowledge of State Farm's fraud.  Accordingly, they bring this case on behalf of the Federal Government under the False Claims Act, 31 U.S.C. §§ 3729 et seq. ("FCA").

## THE PARTIES

18.     Relator Cori Rigsby is a citizen and resident of the State of Florida.[2]  During the time relevant to this Complaint, she was a "certified, experienced claims adjuster[] employed by a State Farm contractor that provided disaster claims management services and claims representatives."  *Rigsby* 794 F.3d at 462-63.

19.     Relator Kerri Rigsby is a citizen and resident of the State of Mississippi.  During the time relevant to this Complaint, she was a "certified, experienced claims adjuster[] employed

---

[2] During the time relevant to this Complaint, she was a citizen and resident of the State of Mississippi.

by a State Farm contractor that provided disaster claims management services and claims representatives." *Id.*

20.     Defendant State Farm is a corporation organized under the laws of the State of Illinois, with its corporate headquarters and principal place of business located at One State Farm Plaza, Bloomington, Illinois 71701-0001.  During the time relevant to this Complaint, State Farm was a WYO insurer that participated in the NFIP.

## JURISDICTION AND VENUE

21.     This Court has general personal jurisdiction over Defendant State Farm because, during the time relevant to this Complaint, it regularly transacted business in this District.  State Farm also engaged in conduct in this District upon which Plaintiffs' claims are based and therefore is subject to this Court's specific personal jurisdiction.

22.     This Court has general federal question subject matter jurisdiction over the Plaintiffs' claims under the FCA pursuant to 28 U.S.C. § 1331.  This Court also has jurisdiction pursuant to 31 U.S.C. § 3732, in which Congress specifically endowed this Court with subject matter jurisdiction over actions brought under the FCA.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) for the foregoing reasons and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## GENERAL ALLEGATIONS

I.     **Hurricane Katrina and the National Flood Insurance Program**

24.     Katrina made landfall near the cities of Bay St. Louis and Waveland, Mississippi, on August 29, 2005.  It became the costliest natural disaster in United States history.

25.     Katrina exerted devastating winds over 120 miles per hour, causing massive destruction to homes along Mississippi's Gulf Coast and farther inland.

26.     Katrina caused approximately $125 billion in property damage in Mississippi, damaged or destroyed more than 65,000 homes in Mississippi, and left approximately 44 million cubic yards of debris across southern Mississippi.

27.     Katrina, like many hurricanes, caused damage both through high-speed winds and storm surge, *i.e.*, water pushed toward the shore by the force of the storm.  Storm surge arrives as the hurricane's eye makes landfall, while hurricane-force winds typically precede the storm surge by several hours and can remain destructive as far as 175 miles inland.

28.     Mississippians had two primary forms of insurance available to protect against these perils: (1) homeowner insurance provided by private insurance companies like State Farm; and (2) flood insurance, which the federal government ultimately provides through the NFIP. *See Rigsby*, 794 F.3d at 462-63.

29.     Private homeowner policies, including those that State Farm issued, typically covered wind damage but excluded flood damage from coverage.  *See id.*  Mississippians needed to purchase separate flood insurance policies to obtain coverage for such damage.  *See id.*

30.     Because State Farm and other insurers historically have declined to issue flood insurance or have charged extremely high premiums for it, the federal government underwrites nearly all flood insurance policies issued in the United States through the NFIP.  The federal government ultimately provides this coverage, but private insurance companies participating in the NFIP's WYO program issue flood insurance policies, collect premiums, and adjust and pay flood claims on the government's behalf.  *See id.* at 463.

6

31.     These flood policies were subject to a limit of $250,000 for dwelling coverage and $100,000 for contents coverage and were required to conform to FEMA's Standard Form Insurance Policy ("SFIP"), which in general provides coverage for flood damage and excludes coverage for wind damage.  *See id.*

32.     State Farm participated in the NFIP as a WYO carrier at the time of Katrina.  *See id.*

33.     State Farm and other WYO insurers commonly issued a homeowner's policy and an SFIP flood policy to the same homeowner.  *See id.* at 462-63.

34.     When a hurricane damages a home, WYO insurers are permitted to deploy their own adjusters to determine both its liability for wind damage and the government's liability for flood damage.  *See id.*

35.     WYO insurers like State Farm have an incentive to find that flood, rather than wind, caused damage so that the government, rather than the WYO insurer, will be liable for the loss.  *See id.*  To address this incentive, federal regulations make a WYO insurer the government's fiscal agent and fiduciary and require a WYO insurer to apply the same standards and procedures to adjust its and the government's liability.  *See id.* at 463; *see also* 44 C.F.R. pt. 62, app. A, art. XV.

36.     State Farm frequently acted improperly on that incentive by mischaracterizing Katrina wind damage as flood damage.  Doing so foisted liability onto the government for losses that State Farm was obligated to pay.

**II.     State Farm's Scheme to Defraud the Federal Government Out of NFIP Funds**

**A.     State Farm Falsely Tells Its Adjusters that Most of Hurricane Katrina's Damage Was from Flooding and Trains Them to Find Flood, Rather than Wind, Damage.**

37.     Shortly after Katrina struck, State Farm set up an office in Gulfport, Mississippi to handle claims involving SFIP flood policies.  *See Rigsby*, 794 F.3d at 463.  Alexis "Lecky" King supervised that office.  *See id.*  Soon after the office was set up, King convened a meeting of State Farm's adjusters in that office and instructed them that:

> What you will see is, you will see water damage.  The wind wasn't that strong.  You are not going to see a lot of wind damage.  If you see substantial damage, it will be from water.

*See id.*

38.     None of that was true.  Katrina's winds caused significant structural damage to homes along the Gulf Coast.

39.     State Farm's trainers thereafter reiterated King's false instructions to State Farm's adjusters.  They told the adjusters that Katrina was a "water storm" and that all major damage to homes was caused by flooding.  *See* Second Am. Pre-Trial Order ("Pretrial Order") at 4 (Mar. 25, 2013) [ECF No. 1081].[3]

40.     State Farm also told its adjusters that an engineering company, Haag Engineering, had performed an analysis of the forces generated during the hurricane and that this analysis determined that storm surge flooding preceded the highest storm winds, making it highly unlikely, if not outright impossible, that the insured properties had been extensively damaged by the storm winds before the storm surge flooding.  *See id.*

---

[3] The Rigsbys incorporate by reference all of their allegations from the Pretrial Order.  *See* Pretrial Order at 4-7.

41.     The adjusters accepted these instructions and assumed the information from State

Farm, validated by an engineering company, was truthful and accurate.  *See id.*  But it was not.

*See id.*  Katrina's strongest winds—like those of every hurricane—preceded its highest

floodwater.  *See id.*  Accordingly, many properties were severely damaged by the storm's

powerful winds before floodwaters even arrived.

      **B.**      **State Farm Deliberately Fails to Conduct Line-By-Line Estimates After**
               **FEMA Denied Its Request to Be Exempted from that Requirement.**

42.     To placate homeowners in the immediate aftermath of Katrina, State Farm

encouraged its adjusters to quickly pay the full policy limits under the NFIP flood insurance

policies whenever there was evidence of major damage, while it delayed investigation of, and

payment on, its own wind claims.  *See id.* at 4-5.  State Farm induced the government into paying

policy limits on flood claims by improperly using a shortcut program, XacTotal, to create a paper

record of flood damage that exceeded the flood policy limits, and then creating fake reports to

hide its use of this program.

43.     Prior to Katrina, State Farm's adjusters prepared line-by-line estimates to

document the components of a home that were damaged by wind or flood, usually using a

program called Xactimate.  *See Rigsby*, 794 F.3d at 463; *see also* Pretrial Order at 5.

44.     For Katrina, State Farm continued preparing line-by-line estimates using

Xactimate to adjust losses for its own wind claims.  *See* Pretrial Order at 5.  Yet for Katrina flood

damage, State Farm instructed its adjusters not to perform line-by-line estimates.  *See Rigsby*,

794 F.3d at 464; *see also* Pretrial Order at 5.  Instead, State Farm instructed its adjusters to use

XacTotal, which merely estimates the total value of a home based on its square footage and build

quality. *See Rigsby*, 794 F.3d at 464; *see also* Pretrial Order at 5. XacTotal does not document damage specific to a home, much less whether that damage was caused by flood or wind.

45.     State Farm told its adjusters to manipulate XacTotal to "hit the limits" of SFIP policies. *See Rigsby*, 794 F.3d at 469; Pretrial Order at 5.

46.     State Farm further instructed its adjusters that if the XacTotal estimated value of the home did not exceed the SFIP flood policy limit, they should rerun the program and manipulate the results to reach that limit. *See Rigsby*, 794 F.3d at 464, 474, 479. Jody Prince, a State Farm trainer, sent an email to King and others with the instruction that: "IF the damage to the home APPEAR [sic] to exceed policy limits – the [sic] use Xact Total to pay limits." *See Rigsby*, 794 F.3d at 464. She followed up the next day, writing "You can manipulate the totals" and "write Policy limits." *See id.* at 479.

47.     State Farm's shift from line-by-line estimates to XacTotal to adjust NFIP flood claims for homes that were still standing in the wake of Katrina was a willful violation of the controlling FEMA directive and industry standards. *See* Pretrial Order at 6.

48.     Before Katrina, FEMA always had required WYO insurers to perform line-by-line estimates when adjusting flood claims. *See* Pretrial Order at 5; *see also*, *Rigsby*, 794 F.3d at 463. To expedite the processing of claims for Katrina, however, FEMA issued Directive W-5054 to allow insurance companies to use an expedited procedure, like XacTotal, to pay two categories of claims: when a home (1) "had standing water in it for an extended period of time" (more than five days); or (2) was "washed off its foundation by flood water." *See Rigsby*, 794 F.3d at 463; *see also* FEMA Directive W-05054 ("W-5054") (Sept. 21, 2005), Trial Exhibit DS609.

49.     For all other homes, which FEMA placed in a catchall "Category 3," FEMA
required WYO insurers like State Farm to follow "normal claim procedures." *See Rigsby*, 794
F.3d at 463; W-5054.  State Farm's normal claim procedure was to perform line-by-line
estimates. *See Rigsby*, 794 F.3d at 463; Pretrial Order at 5.  State Farm always had required line-
by-line estimates for hurricane damage. *See Rigsby*, 794 F.3d at 463; Pretrial Order at 5.

50.     W-5054 required line-by-line estimates for Category 3 homes. *See Rigsby*, 794
F.3d at 463, 469, 479-80; Pretrial Order at 5; W-5054.

51.     WYO insurers are paid a fee for every NFIP claim they adjust.  Those fees are set
by FEMA in a published fee schedule that provides a sliding scale of fees a WYO insurer can
charge stated as a percentage value of the claim.  The fees FEMA authorized for estimates at the
time of Katrina included the following values:

| Claim Range | Fee |
|---|---|
| 50,000.01-100,000.00 | 3% |
| 100,000.01-250,000.00 | 2.3%, but not less than $3,000 |
| 250,000.01 and up | 2.1% but not less than $5,750 |

52.     FEMA set forth a revised adjusting fee schedule in W-5054 for Category 1 and  2
homes adjusted with expedited procedures that confirms that it expected line-by-line estimates,
*i.e.*, normal claims handling procedures, for Category 3 homes.  Expedited procedures require
substantially less time and effort to adjust a loss than a line-by-line estimate.  FEMA therefore
set in W-5054 the following much lower fee for Category 1 and 2 homes adjusted with expedited
procedures rather than line-by-line estimates.

> The existing NFIP schedule will be modified for the claims handled by
> process # 1 and # 2.  The fee will be $750 for each claim + $400 if a site

11

visit is necessary at a later date.  Process # 3 will be paid based upon the existing NFIP fee schedule.

W-5054 at 2.

53.     State Farm understood that FEMA through W-5054 still required WYO insurers to conduct line-by-line estimates for Category 3 homes.  Before FEMA issued W-5054, State Farm submitted a proposal that would have allowed WYO insurers to use expedited procedures like XacTotal on Category 3 homes whenever the hurricane damage appeared to exceed policy limits.  FEMA rejected that proposal when it required normal claims handling procedures for Category 3 homes in W-5054.  Then after FEMA issued W-5054, State Farm twice requested permission to use XacTotal to adjust Category 3 homes whenever the hurricane damage appeared to exceed policy limits, and twice again FEMA declined to grant that request:

  a. On September 9, 2005 – while FEMA was still formulating W-5054 – State Farm submitted a proposal that expedited procedures be used whenever "losses appear to exceed policy limits."  When FEMA issued W-5054 on September 21, it excluded that proposal.  *See* W-5054.

  b. The day after W-5054 was issued Juan Guevara, State Farm's principal liaison to FEMA, emailed NFIP claims director James Shortley to ask FEMA to reconsider.  Guevara acknowledged that W-5054 required State Farm to adjust Category 3 claims "using the company's normal claim procedures," which meant "having to write a complete line by line estimate even if the repairs will exceed the policy limits."  Guevara received no response.

  c. Having received no response, Guevara emailed Shortley the same question again on September 29.  Guevara again received no response.

*See Rigsby*, 794 F.3d at 468, 479-80; Pretrial Order at 5.

54.     W-5054 was the operative document for WYO insurers adjusting NFIP claims during Hurricane Katrina.  There were no side deals or separate exemptions for State Farm or any other insurance company.  In other words, State Farm did not have permission to deviate

12

from W-5054 even if a flood loss appeared to exceed coverage limits.  *Rigsby*, at 469; Pretrial

Order at 5.

55.     Nonetheless, State Farm brazenly granted itself the exemption that FEMA

withheld.  State Farm used XacTotal to adjust Category 3 claims for the NFIP not just hundreds

(as it admits), but thousands of times.  *See* Pretrial Order at 6.

56.     Furthermore, State Farm billed FEMA the full amount for those estimates under

FEMA's standard adjusting fee schedule, rather than the lower fee limits FEMA set for estimates

performed with expedited claim procedures like XacTotal.

57.     State Farm never disclosed to FEMA its failure to comply with W-5054.  *See*

*Rigsby*, 794 F.3d at 469.

58.     State Farm even distributed a memorandum directing its adjusters to fraudulently

bill FEMA for line-by-line estimates when using XacTotal.  Also, in the memorandum State

Farm told its adjusters that for properties that were not "slick slabs," did not "have extreme

damage but low limits," and had at least a minimal amount of water in the house, to determine

the "footprint and measurements of [the] insured dwelling" so that an XacTotal estimate could be

completed.

59.     In direct contravention of W-5054's requirement that State Farm use its "normal

claim procedures," *i.e.*, the same procedures State Farm used to adjust claims under its own

homeowner policies, State Farm instructed its adjusters that "[t]his method cannot be used for

other causes of loss but is appropriate only on flood claims."

60.     The memorandum further instructed adjusters only to "complete a full estimate,"

*i.e.*, a line-by-line estimate, if State Farm needed to reconcile its XacTotal estimate with a

policyholder's contractor's estimate.

**C.  State Farm Did Not Conduct the Required Line-By-Line Estimates for W-5054 Category 3 Homes Thousands of Times.**

61.     Judge Senter ordered State Farm to create a list (the "List") identifying "all SFIP claims that meet the following criteria:"

A)  The insured property did not fall within any of the three categories of storm damage for which FEMA approved payment of SFIP limits, *i.e.* insured dwellings that were not left as slabs, pilings, or empty shells; and

B)  For which SFIP limits were paid on the grounds that the property was a constructive total loss; and

C)  For which no "stick built" or Exactimate estimation of the flood damage was made before the SFIP limits were paid.

*See* Mem. Op. at 11 (Aug. 10, 2009) [ECF No. 343]

62.     State Farm's List includes 501 properties.  By including each property on the List, State Farm has admitted that "no 'stick built' or Exactimate [*i.e.*, line-by-line] estimation was made before SFIP limits were paid" on that claim.  Aug. 2009 Order at 11.  State Farm likewise has admitted that each property met neither exception to W-5054's line-by-line requirement, as the List includes only properties "that did *not* fall within any of the … categories of storm damage for which FEMA approved payment of SFIP limits."  *Id.* (emphasis added).

63.     The List is also incomplete.  Based on simple calculations of publicly-available data, thousands of additional properties likely met the criteria necessary for inclusion on the List.

64.     There were 16,939 Katrina flood claims paid in Mississippi.  *See National Flood Insurance Program: New Processes Aided Hurricane Katrina Claims Handling, but FEMA's Oversight Should Be Improved*, Government Accountability Office Report to Congressional Committees at 19 (Dec. 2006).  Policy limits were paid on between 11,593 and 11,925 of those claims, which represented between 68.4% and 70.4% of all Mississippi Katrina flood claims.

*See id.*; Statement of Matt Jadacki, Deputy Inspector General for Disaster Assistance and Oversight, U.S. Department of Homeland Security, before the Committee on Financial Services Subcommittee on Oversight and Investigations and Committee on Homeland Security Subcommittee on Management, Investigations, and Oversight at App'x C (June 12, 2007).

65.    State Farm was a WYO carrier for approximately 9,000 flood claims in Mississippi for which it issued its own homeowner policies.[4]  *See* Testimony of Attorney General Jim Hood, *Insurance Claims Payment Process in the Gulf Coast After the 2005 Hurricanes*, Hearing before the Subcommittee on Oversight and Investigations of the Committee on Financial Services at 21 (Feb. 28, 2007).

66.    Approximately 1,200 of State Farm's 9,000 flood claims were slabs.  *See id.*

67.    Based on the above, approximately 6,156 State Farm flood claims were paid SFIP policy limits.[5]  Of that number, no more than 1,200 were slabs.  Accordingly, approximately 4,956 State Farm policyholders were paid SFIP policy limits on their flood claims that fell into Category 3.[6]

68.    On information and belief, State Farm did not perform line-by-line estimates for most, if not all, of these 4,956 claims before authorizing SFIP limits payments.

69.    NFIP flood claim nos. 24-Z457-904 (the "'904 claim") and 24-Z208-692 (the "'692 claim") are two of the claims that should have been, but were not, included on State Farm's List.

---

[4] This number understates State Farm's liability.  State Farm defrauded the government by using XacTotal to adjust Category 3 homes even when it did not also hold the property's homeowner policy.
[5] Taking the conservative estimate that policy limits were paid on 68.4% of State Farm's Mississippi Katrina flood claims multiplied by State Farm's 9,000 Mississippi Katrina flood claims for which it was the WYO carrier equals 6,156.
[6] 6,156 State Farm Mississippi Katrina flood claims paid policy limits minus 1,200 slabs equals 4,956.

70.   The '904 and '692 claims were not slabs or cabanas.  The '904 claim's roof suffered shingle damage, which would not exist for a slab or cabana.  And the '692 claim's home's walls were still standing.

71.   State Farm paid flood dwelling limits on the '904 claim and '692 claim.

72.   State Farm's records for each claim document that it used XacTotal rather than prepare line-by-line estimates for both claims.

73.   Despite both claims meeting all List criteria, State Farm omitted them from its List.

74.   The List criteria also do not encompass all of State Farm's fraud.  The categories of properties that Judge Senter ordered State Farm to identify in 2009 exclude many properties within the scheme that the Rigsbys proved at trial in 2013.

75.   While State Farm submitted a false claim every time it submitted a flood claim for payment for a W-5054 Category 3 home without performing the requisite line-by-line estimate, for example, the List criteria improperly exclude many such claims by imposing improper limitations such as whether State Farm paid "limits" or whether the property was an "empty shell."

76.   State Farm submitted a false claim every time it certified compliance with a line-by-line estimate requirement with which it did not comply.  It is entirely possible that State Farm failed to conduct a line-by-line estimate of a Category 3 home yet still did not pay the flood insurance policy limits on that claim (*e.g.*, where a home's insured value far exceeded its replacement cost).  Such claims would not appear on State Farm's List, yet would fall within the scope of State Farm's scheme.

77.     The List also omits claims that were "empty shells," but State Farm did not have permission to deviate from the terms of W-5054 for "empty shells."  W-5054 required line-by-line estimates for "empty shells."

78.     Even in cases where State Farm prepared real line-by-line estimates, State Farm overstated in those estimates the amount of damage that was caused by flooding and therefore caused the government to pay more than what was owed under the flood policies.

### D.     State Farm Generated Sham Line-By-Line Estimates to Conceal Its Noncompliance with W-5054.

79.     State Farm systematically created false records in NFIP files to hide its failure to perform the required line-by-line estimates.

80.     To conceal its noncompliance with W-5054's line-by-line requirement, State Farm created a so-called "long form" XacTotal report, which "closely resembled," but is not, "a line-by-line estimate."  *See Rigsby*, 794 F.3d at 480.  Despite the facial resemblance, the "long form" XacTotal report is in fact based on a fake house and contains estimates merely derived from assumptions about what a purportedly typical house of that size in that location may look like.  It is not, as FEMA required, based on actual flood damage to actual houses.

81.     Even though State Farm used XacTotal to adjust damage to the home of Thomas and Pamela McIntosh, for example, its NFIP file for the McIntosh property contained what appeared to be a line-by-line estimate.  The estimate appeared to catalog , item-by-item, the cost of items such as gravel, a stud wall, framing lumber, brick veneer, synthetic stucco, gutters, vinyl windows, wiring, and even light bulbs and fixtures.  But every entry was a fabricated value for an imaginary item that was not based on the adjusters' inspection of the home.  Indeed, the sham

17

estimate in the file included itemized damage to a garage when, in fact, the McIntosh home had a carport and not a garage.

82.     State Farm's sham was effective.  For example, State Farm retained Gerald Waytowich, a FEMA official who trained and supervised FEMA's readjusters, as an expert for the McIntosh trial.  Mr. Waytowich studied State Farm's McIntosh NFIP file for 40-50 hours, yet failed to discern that the XacTotal "long form" was not an actual line-by-line estimate.

83.     The McIntosh flood claim is one of many examples of a false claim submitted pursuant to State Farm's scheme to defraud the government.  *See* Pretrial Order at 6.  It fits squarely within the scheme in that: no line-by-line flood estimate was performed, in derogation of NFIP rules, and any evidence of wind damage was aggressively buried.  *See id.*

**E.     After Paying Flood Limits on Thousands of Claims, State Farm Suppressed Evidence of Wind Causing Damage to Homes.**

84.     After State Farm improperly paid flood limits on thousands of claims, it desperately needed to hide evidence of major wind damage, including engineering reports that concluded that wind, rather than flood, severely damaged many of the homes.

85.     State Farm coerced engineering firms that it hired to find flood rather than wind damage.

86.     State Farm's coercion caused engineering firms to revise numerous reports.

87.     For Example, State Farm hired "an engineering company, Forensic Analysis Engineering Corporation ('Forensic'), to analyze the damage [to the McIntosh property]. Forensic engineer Brian Ford ('Ford') concluded that the damage was primarily caused by wind. His report (the 'Ford Report') was prepared on October 12, 2005."  *See Rigsby*, 794 F.3d at 464; *see also* Pretrial Order at 6.

18

88.     But after State Farm received the Ford Report, it "refused to pay Forensic and withheld the Ford Report from the McIntosh NFIP file.  A note on the Ford Report from King read: 'Put in Wind [homeowner's policy] file—DO NOT Pay Bill DO NOT discuss.'"  *See Rigsby*, 794 F.3d at 464; *see also* Pretrial Order at 6.

89.     King spoke with Ford about his report and told him that "[t]his just can't be wind."  Ford responded that eyewitnesses reported that the house next door blew apart and that debris from that house blew into the McIntosh house, demolishing the windows and doors, to which King responded "Hell, these people are desperate.  They will say anything."  The conversation concluded when Ford told her "he was going to stand on his decision on this one.  And at that point, [King] thanked him for all the work he had done for State Farm and told him we would no longer need his services."

90.     That day, King told Forensic that she was pulling all engineering work from the firm effective immediately.  Forensic's president Robert Kochan immediately traveled from North Carolina to Mississippi to "get back into the working fold of State Farm's investigations."  To get "back into the good graces of State Farm," Forensic fired Ford, directed his engineers to no longer rely on eyewitness statements, and agreed to treat the Ford Report "as if [it] had never been presented to State Farm in the first place."

91.     Forensic also agreed to "reinspect" the McIntosh property.  The second report was "written by another Forensic employee, John Kelly (the 'Kelly Report')."  *Rigsby*, 794 F.3d at 464; *see also* Pretrial Order at 6.  Kelly was an engineer with no relevant experience who began working for Forensic that week.  In his report, Kelly copied substantial portions from Ford's analysis, but changed the conclusion by determining that "water was the primary cause of damage to the McIntosh home."  *Rigsby*, 794 F.3d at 464; *see also* Pretrial Order at 6.

19

92.     State Farm's coercion of engineering firms was not limited to the McIntosh home or Forensic.  Forensic changed numerous other engineering reports.  King testified that she had "concerns" about reports prepared by other engineering firms as well.  King "had these stacks, and she would just openly say, 'All of these reports have to go back.  They all say wind.'"

93.     When an engineering firm concluded that wind damaged a home and refused to change that conclusion, State farm would cancel outstanding assignments and no longer hire that firm.  State Farm even refused to pay the firm's invoices.

94.     King later issued a blanket order to all of State Farm's engineering firms cancelling all outstanding assignments.  *See* Pretrial Order at 6.  She instructed firms not to write a report even if they already had inspected a loss.

95.     State Farm then issued a blanket denial of all outstanding wind claims under its homeowner policies that were pending confirmation by an engineer.  *See* Pretrial Order at 6.

96.     Accordingly, State Farm paid numerous flood claims under the government's SFIP policy for which there had been no appropriate determination of causation.

## III.    Compliance with FEMA Directive W-5054's Line-By-Line Estimate Requirement Was Material to the Government's Decision to Pay.

97.     FEMA Directive W-5054's requirement of a line-by-line estimate was not merely material; it was an actual "prerequisite for payment."  *See Rigsby*, 794 F.3d at 478 n.14.

98.     FEMA regulations required WYO insurers to "comply with written standards, procedures, and guidance issued by FEMA," such as W-5054.  44 C.F.R. pt. 62, app. A, art. II(G)(1); *see also* 44 C.F.R. pt. 62, app. A, art. II(A)(2) ("Companies will also be required to comply with ... guidance authorized by ... [FEMA].").

99.     W-5054 itself stated that the "NFIP's general adjusters will be involved in closely monitoring the performance and procedures of the WYO carriers utilizing this process."  This "signif[ies] that FEMA took compliance seriously."  *See Rigsby*, 794 F.3d at 478 n.14.

100.    Prior to Katrina, FEMA always had required, and State Farm's adjusters always had performed, a line-by-line estimate as the "normal claims handling procedures."  State Farm witnesses Lecky King, Jayme Woody, John Conser, and Mark Drain all have admitted that fact in testimony in this case.

101.    During the bellwether McIntosh trial, two FEMA officials, James Shortley and David Maurstad, testified that before Katrina, FEMA always had required a WYO insurer to perform a line-by-line estimate when adjusting flood claims.  Indeed, "FEMA officials testified that line-by-line estimates were in fact a prerequisite to payment under the NFIP."  *Id.*  For example, Mr. Shortley testified that for FEMA to approve an NFIP flood claim, the line-by-line estimate "would have to be in the file."

102.    State Farm's expert for the McIntosh trial Gerald Waytowich, a FEMA official who trained and supervised FEMA's readjusters, even admitted in his testimony at the McIntosh trial that "you had to do a line item estimate" for Category 3 homes.

103.    FEMA also relied upon the line-by-line estimate to verify that an NFIP claim was paid properly with government funds.

**IV.     State Farm Misrepresented How It Adjusted Katrina Flood Claims by Charging Full Adjusting Fees for Claims It Adjusted with Expedited Procedures (*i.e.*, XacTotal) Rather than the Line-By-Line Estimate FEMA Required.**

104.    As noted above, FEMA also paid WYOs more to conduct the detailed and time-consuming line-by-line estimate than the expedited adjustment procedures WYOs were allowed to use for slabs and homes with standing water in them.

105.    W-5054 specified that Category 1 and 2 claims adjusted using the expedited claim procedure would be paid $750, plus $400 if a site visit was required.

106.    WYOs would continue to be paid, however, "based upon the existing NFIP schedule" to perform line-by-line estimates for all other claims.  Under this fee schedule, for claims between $100,000 and $250,000, WYOs were paid 2.3% of the value of the claim, but not less than $3,000, for adjusting each claim.  In other words, when State Farm "hit the limits" of a $250,000 NFIP claim, it was paid $5,750 for doing so.

107.    In numerous instances, State Farm utilized FEMA's normal fee schedule to bill the NFIP for a line-by-line estimate even though it did not conduct a line-by-line estimate for the claim.

108.    State Farm did not prepare a line-by-line estimate of the Katrina flood damage to the McIntosh home, for example.  Yet State Farm billed the government, using FEMA's normal fee schedule, $5,250 for conducting a line-by-line estimate for the claim.[7]

109.    Nor did State Farm prepare a line-by-line estimate of the Katrina flood damage for the Long Beach, Mississippi property assigned NFIP flood claim no. 24-Z454-236 (the "'236 claim").[8]

110.    The '236 claim did not meet either of W-5054's exceptions to the line-by-line estimate requirement.[9]

---

[7] The McIntosh claim included a flood claim that was paid the policy's $250,000 dwelling limit and $100,000 contents limit.  Pursuant to FEMA's normal fee schedule, State Farm charged 2.1% of $350,000, or $7,350 (plus a $2 cell phone reimbursement to and an unitemized $5 charge) to adjust both claims.

[8] The '236 claim was included on the List of claims for which State Farm admitted it did not conduct a line-by-line estimate for the flood loss.

[9] State Farm likewise has admitted that the '236 claim met neither exception to W-5054's line-by-line requirement.

111.    Instead of the line-by-line estimate W-5054 required, the '236 claim contains a so-called long form XacTotal report, which "closely resembled [but is not] a line-by-line estimate" of a property's flood damage.

112.    Despite not preparing the line-by-line estimate W-5054 required, State Farm billed FEMA the higher rate it was authorized to charge for preparing a line-by-line estimate, as opposed to the flat $750 fee it was authorized to charge for using expedited procedures.  State Farm charged FEMA $4,200 to adjust the '236 claim.[10]

## V.    Cori Rigsby and Kerri Rigsby Are Original Sources Regarding State Farm's Scheme.

113.    Cori Rigsby and Kerri Rigsby are paradigmatic original sources within the meaning of the FCA because they are whistleblowing insiders with personal, direct, and independent knowledge of the allegations in this Complaint who voluntarily provided the information to the government prior to filing this Complaint.

114.    After hearing evidence for three days, this Court held that Kerri Rigsby is an original source regarding State Farm's scheme to defraud the government.

115.    As adjusters who worked for State Farm, the Rigsbys witnessed first-hand State Farm's scheme to defraud the federal government by foisting its liability for wind damage caused by Katrina, and by misrepresenting that it was performing line-by-line estimates that FEMA required in W-5054 when it was not.

---

[10] The '236 claim included a flood claim that was paid the policy's $200,000 dwelling limit and a contents claim that was paid $80,000.  Pursuant to FEMA's normal fee schedule, State Farm charged 2.1% of $280,000, or $5,880 to adjust both claims.

116.   The Rigsbys personally received instruction from Lecky King and other State Farm trainers and supervisors to presume flood damage, "hit the limits" of flood policies, and to use XacTotal rather than the line-by-line estimates that W-5054 required.

117.   The Rigsbys personally were instructed to place into NFIP files long form XacTotal reports that look like line-by-line estimates but are not.

118.   Kerri Rigsby found the Ford Report that King attempted to bury in State Farm's "wind file" to prevent the government from seeing it with a note that said "Put in Wind file – DO NOT Pay Bill DO NOT discuss." She also found the second report by John Kelly, which changed Ford's conclusion and found that flood caused the damage to the McIntosh home. She confronted King about these reports and State Farm's scheme.

119.   Cori Rigsby and Kerri Rigsby worked with their attorneys to investigate personally State Farm's scheme, including reviewing many claim files and providing those files and other evidence of State Farm's scheme to the government long before they filed this case.

120.   Kerri Rigsby saw stacks of engineering reports on King's desk finding that wind rather than flood caused damage to policyholders' homes, and she personally heard King say for that reason that the reports in that stack all had to "go back."

121.   Kerri Rigsby, with Cody Perry, personally adjusted the Katrina damage to the McIntosh home that was the subject of the bellwether trial in this case.

122.   Kerri Rigsby personally confronted Lecky King about State Farm's scheme and how State Farm was wrongly burying evidence of wind damage to avoid paying legitimate claims.

24

## CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF 31 U.S.C. § 3279(a)(1) (1994)
### (Knowingly presenting false claims for payment)
### *Implied False Certification, Express False Certification, and Actual Falsity*

123.    Plaintiffs-Relators Cori Rigsby and Kerri Rigsby incorporate by reference the preceding paragraphs as if set forth fully herein.

124.    Through the acts described above, State Farm knowingly presented false claims for payment to the federal government.  Every W-5054 Category 3 claim that State Farm submitted and paid without disclosing its failure to perform a line-by-line estimate is a false claim.

125.    State Farm submitted an impliedly false certification for at least every property on the List.  For at least every property on the List, State Farm made specific representations to support its claim on the government's fisc when it represented to FEMA that each property incurred flood damage equal to or exceeding the limits of their SFIP policies.

126.    Those misrepresentations were misleading in context.  State Farm was required to ascertain the amount of flood damage by performing line-by-line estimates for all Category 3 homes.  State Farm did not do so.  Any person at FEMA reviewing the NFIP flood payment "would probably—but wrongly—conclude that" State Farm had performed the requisite line-by-line estimate.  *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2000 (2016).

127.    State Farm's failure to perform a line-by-line estimate was not merely material, but an actual "prerequisite for payment."  *Rigsby*, 794 F.3d at 478 n.14; *see also* Section III, *supra*.

25

128.    State Farm never disclosed to FEMA its failure to comply with W-5054; nor did it obtain permission to forego that requirement.  *See Rigsby*, 794 F.3d at 469.

129.    State Farm also submitted an express false certification for at least every property on the List.  Every so-called long form XacTotal report that State Farm placed in a flood file when it did not perform a line-by-line estimate for that claim is a false certification of compliance with W-5054.

130.    Every bill or statement of withdrawal that State Farm sent to the federal government seeking payment for conducting a line-by-line estimate under FEMA's normal fee schedule when it in fact used an expedited procedure, *i.e.*, XacTotal, and therefore should have requested only the limited fee set forth in W-5054 ($750 + $400 for a site visit), is also an express false certification of compliance with W-5054.

131.    State Farm also knew that it was mischaracterizing wind damage as flood damage to foist its liability for damage caused by wind onto the federal government by passing off that damage as caused by flood, and therefore covered by an NFIP flood policy rather than a State Farm-issued homeowner policy.

132.    For example, State Farm told its adjusters to presume flood damage, coerced engineers who found wind damage to change their reports, and ultimately issued a blanket cancellation of all outstanding requests for engineering reports—and a blanket denial to every homeowner with a wind claim, thereby leaving recovery under an NFIP flood policy as the policyholder's only resort.

133.    State Farm at least knowingly was reckless and turned a blind eye to what it knew to be true—that Katrina wind not flood caused a substantial portion of the damage to its policyholders' homes.  By instructing its adjusters to presume flood damage and use XacTotal

26

rather than the FEMA-required line-by-line estimates to actually determine whether wind or flood caused loss to its policyholders' homes, State Farm at a minimum willfully blinded itself to the facts so that it could foist liability for wind damage caused by Katrina onto the federal government.

134.     The claims presented by State Farm were also false or fraudulent in that:

a.      Damage to property that was more properly reflected as wind damage, and structural damage due to wind and flying debris was characterized in adjusters reports as "flood damage" even though it did not meet the definition of "flood" found in the Standard Flood Insurance Policy, 44 C.F.R. Pt. 61, App. A(1).

b.      Claims were submitted for properties that were outside the area designated as flood damaged by FEMA, where there was no evidence that the damage met the definition of "flood" found in the Standard Flood Insurance Policy, 44 CFR Pt. 61, App. A(1).

c.      State Farm submitted claims for flood losses to the federal government when engineering reports stated that the damages were due to wind, not flood.

d.      State Farm submitted costs and expenses for adjusting flood claims that were in fact wind or hurricane claims.

e.      State Farm permitted agents to backdate insurance applications for flood coverage and submit damage claims when, in fact, there was never any coverage for the flood damage.

      f.     State Farm inflated flood claims to the maximum amount possible to foist losses caused by wind onto the federal government.

135.    State Farm's payment of an NFIP claim with government funds is sufficient proof that the claim was presented within the meaning of the FCA.  *See* Mem. Op. at 24-25 (Feb. 21, 2014) [ECF No. 1127].

136.    The claims were paid by the United States government, through withdrawals of funds held by the United States Treasury, consistent with the procedure set up under the NFIP.

137.    Pursuant to 31 U.S.C. § 3729(a)(1) (1994), State Farm is liable for three times the amount it caused the government to pay as a result of these false claims, as well as civil penalties of $5,500 to $11,000 per claim, as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 and 28 C.F.R. § 85.3.

**COUNT TWO**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(B) (2009)**
**(Knowingly making false records and statements material to false or fraudulent claims for payment)**

138.    Plaintiffs-Relators Cori Rigsby and Kerri Rigsby incorporate by reference the preceding paragraphs as if set forth fully herein.

139.    Through the acts described above, State Farm knowingly made false statements and records to support its claims for payment to the federal government.

140.    State Farm made false statements and records to hide its failure to perform line-by-line estimates.  Every so-called long form XacTotal report that State Farm placed in a flood file when it did not perform a line-by-line estimate for that claim is a false record that contains false statements, as is every bill that State Farm sent to the federal government seeking payment for conducting a line-by-line estimate under FEMA's normal fee schedule when it had not performed a line-by-line estimate.

28

141.   The so-called long form XacTotal reports were material to State Farm's claims for payment to the federal government because they "appeared deceptively to be a line-by-line estimate." *See Rigsby*, 794 F.3d at 480.  W-5054 required State Farm to conduct line-by-line estimates for Category 3 homes.  State Farm also placed the so-called long form XacTotal reports into flood files to justify billing the federal government under FEMA's normal fee schedule for line-by-line estimates that were not performed.

142.   Additional false records include:

a.   False adjustment reports which were false in that they misidentified the nature of the damage as flood damage where there was no evidence that the damage met the definition of "flood" found in the Standard Flood Insurance Policy, 44 CFR Pt. 61, App. A(1).

b.   False factual findings reported to FEMA or the Federal Insurance Administration that showed that property was damaged by flood when in fact these properties were outside the area designated as flooded by FEMA.

c.   False statements of adjusters reflecting findings of flood damage when the real structural damage had been caused by wind.

d.   False invoices for the adjustment of flood claims under FEMA's standard adjusting fee schedule, rather than the lower fee limits FEMA established in W-5054 for claims adjusted with expedited procedures, which falsely certified that State Farm had performed full line-by-line estimates.

e.   False attestations of facts on forms directing payment to be made under flood policies.

f. False statements to homeowners, engineers, adjusters, and others in that one report by the same company concluded that the damage was due to wind, and a second, later re-written report reflect that the damage was caused by flood.

g. False expense reports submitted to the Federal Insurance Administration for NFIP adjustment expenses.

143. Pursuant to 31 U.S.C. § 3729(a)(1)(B) (2009), State Farm is liable for three times the amount it caused the government to pay as a result of the false claims that State Farm supported with the material false statements and reports discussed above, as well as civil penalties of $5,500 to $11,000 per claim, as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 and 28 C.F.R. § 85.3.

## **REQUESTS FOR RELIEF**

WHEREFORE, Plaintiffs-Relators Cori Rigsby and Kerri Rigsby request that the Court enter judgment in their favor and against State Farm as follows:

a. That State Farm must cease and desist from violating the False Claims Act;

b. That State Farm must pay an amount equal to three times the total amount that it knowingly and falsely billed the United States;

c. That State Farm must pay a civil penalty in the maximum statutory amount of $11,000 for each false claim, bill, statement, and record that State Farm submitted to the United States in violation of 31 U.S.C. § 3729;

d. That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

e.   That Relators be awarded all costs and expenses incurred in bringing this action, including attorney's fees; and

f.   That the United States, Cori Rigsby, and Kerri Rigsby receive all such other relief as the Court deems just and proper.

## JURY REQUEST

Plaintiffs-Relators Cori Rigsby and Kerri Rigsby hereby request a trial by jury for all issues so triable.

Respectfully submitted on this 30th day of April, 2020.

August J. Matteis, Jr. (admitted *pro hac vice*)
amatteis@wmclaw.com
William E. Copley (admitted *pro hac vice*)
wcopley@wmclaw.com
Pamira Shah Matteis (admitted *pro hac vice*)
pmatteis@wmclaw.com
Matthew S. Krauss (admitted *pro hac vice*)
mkrauss@wmclaw.com
Derek Y. Sugimura (admitted *pro hac vice*)
dsugimura@wmclaw.com
William E. Jacobs (admitted *pro hac vice*)
wjacobs@wmclaw.com
Jonathan H. Silberman (admitted *pro hac vice*)
jsilberman@wmclaw.com
WEISBROD MATTEIS & COPLEY PLLC
1200 New Hampshire Ave., N.W., Suite 600
Washington, D.C. 20036
Tel:  (202) 499-7900

*/s/ C. Maison Heidelberg*
C. Maison Heidelberg, MB #9559
mheidelberg@whjpllc.com
Chadwick M. Welch, MB # 105588
cwelch@whjpllc.com
WATSON HEIDELBERG PLLC
2829 Lakeland Drive
Mirror Lake Plaza
Suite 1502
Flowood, Mississippi 39232
Tel: (601) 939-8900

*Attorneys for Cori Rigsby and Kerri Rigsby*

31

## **CERTIFICATE OF SERVICE**

I, C. Maison Heidelberg, attorney for Cori Rigsby and Kerri Rigsby, do hereby certify that I have this 30th day of April, 2020 caused the foregoing document to be filed with the Court's CM/ECF system, which will cause notice to be delivered to all counsel of record.

*/s/ C. Maison Heidelberg*
C. Maison Heidelberg