IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA ex rel.
CORI RIGSBY and KERRI RIGSBY                    RELATORS/COUNTER-DEFENDANTS

v.                                               CASE NO. 1:06cv433-HSO-RHW

STATE FARM FIRE AND CASUALTY COMPANY   DEFENDANT/COUNTER-PLAINTIFF

### STATE FARM FIRE AND CASUALTY COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, Defendant State Farm Fire and Casualty Company ("State Farm") submits this memorandum of law in support of its Motion to Dismiss the "false certification" claims in the [1623] Second Amended Complaint of Relators Cori and Kerri Rigsby ("the Rigsbys") for Lack of Subject Matter Jurisdiction.

### INTRODUCTION

The False Claims Act ("FCA") deprives federal courts of jurisdiction over claims brought by *qui tam* relators that are based on public disclosures unless the relators are the original sources of the information ("the public disclosure bar"). 31 U.S.C. § 3730(e)(4)(A) (2006).[1]  As set forth below, the public disclosure bar is tested on an individual claim basis.  In other words, the bar may deprive the court of jurisdiction over one claim in a complaint but not another.  And the mere fact that the court has jurisdiction over claims in an original complaint does not mean that the court has jurisdiction over claims that are introduced by complaint amendment.

Thus, the Court's determination that the Rigsbys were the "original sources" of the wind-vs-flood allegations tried in the McIntosh case does not preclude the application of the public disclosure bar to new claims added via the Second Amended Complaint ("SAC").  These new claims are ripe for a jurisdictional determination.  And, as described below, it is clear that the

---

[1] As explained below, the pre-2010 version of the FCA's public disclosure bar applies here.

newly added "false certification" claims in the SAC have been publicly disclosed and that the Rigsbys do not qualify as original sources.  Accordingly, pursuant to the public disclosure bar, this Court lacks subject matter jurisdiction over the false certification claims.

There is no doubt that the SAC seeks to add claims based on false certification liability. In fact, it expressly references three bases for purported FCA liability.  *See* ([1623] at 25) ("COUNT ONE: ... *Implied False Certification, Express False Certification, and Actual Falsity*").  Moreover, consistent with the order of the claims in the caption of Count One, the SAC fundamentally has been altered from the FCA allegations in the [16] First Amended Complaint (the "2007 Complaint").  Unlike the 2007 Complaint – which was the operative pleading in this action for almost thirteen years – the SAC backseats the wind-vs-flood "factual falsity" theory of FCA liability and emphasizes instead two entirely new "false certification" theories of liability that amount to, at most, purported regulatory non-compliance independent of any claim or finding that the underlying property damage was caused by wind instead of flood. In fact, with the focus now on false certification liability, only a handful of passages from the 2007 Complaint remain in the new pleading.

The newly-added false certification claims in the SAC purport to allege express and implied false certifications giving rise to FCA liability[2] based on alleged non-compliance with FEMA guidance Bulletin W-5054 ("W-5054").  First, the SAC purports to impose express and implied FCA liability on the grounds that State Farm allegedly failed to comply with W-5054's guidance to Write-Your-Own ("WYO") carriers, including State Farm, to use "normal claim procedures" when adjusting certain types of Hurricane Katrina flood claims.  According to the

---

[2] Other bases for dismissal of the SAC are set forth in State Farm's June 1, 2020 Motion to Dismiss pursuant to Rules 8(a), 9(b), 10(b), and 12(b)(6).

Rigsbys, W-5054 obligated State Farm to employ a "line-by-line" estimating methodology when adjusting the properties at issue, but State Farm instead used a different methodology referred to as "XacTotal." Second, the complaint alleges that State Farm failed to comply with W-5054 by charging adjustment fees based on a percentage of the flood claim amount rather than a lower fee that applied to certain expedited adjustments.

The Rigsbys bear the burden of establishing this Court's jurisdiction over each of their *qui tam* claims. In anticipation of this challenge, they predictably emphasize the prior rulings on their original source status and assert in the SAC that they are the original sources of all of the allegations. *See, e.g.*, ([1623] ¶ 114.) They also seek to mitigate against application of the public disclosure bar by implausibly contending that the new claims arise out of the prior alleged scheme and by lumping the new claims into the same "Count One" cause of action.

But the Rigsbys' artful pleading attempts cannot prevent application of the public disclosure bar. The new claims – based on regulatory violations arising out of alleged non-compliance with adjustment procedures and fee schedules described in W-5054 – are different from the wind-vs-flood allegations. The Rigsbys cannot rely on the prior original source designation for a different claim as their passport to asserting new claims. In fact, the Supreme Court unequivocally has rejected this very tactic:

> Section 3730(e)(4) [of the FCA] does not permit jurisdiction in gross just because a relator is an original source with respect to some claim. ***We, along with every court to have addressed the question, conclude that § 3730(e)(4) does not permit such claim smuggling***.

*Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 476 (2007) (emphasis added).

While the new false certification allegations lack substantive merit, the threshold questions presented by this Motion are whether these allegations were publicly disclosed and, if so, whether the Rigsbys are the original sources. As explained below, the clear answers are that

they were publicly disclosed – including in a 2007 newspaper article, a 2006 U.S. Government Accountability Office report, and FEMA's own publicly-available administrative reports – and that the Rigsbys are not original sources of the information, as shown in part by their prior testimony where they claimed no knowledge of W-5054 non-compliance.

Accordingly, this Court lacks subject matter jurisdiction over the "false certification" claims in the SAC and must dismiss them.

### BACKGROUND REGARDING THE NEW FALSE CERTIFICATION SCHEMES

I.   **UNTIL NOW, THIS ACTION FOCUSED SOLELY ON THE SAME PURPORTED WIND-VS-FLOOD SCHEME THAT WAS AT ISSUE DURING THE MCINTOSH TRIAL**

Both the original [2] Complaint and the [16] 2007 Complaint described one FCA scheme: that State Farm – acting in concert with other companies and individuals – submitted false flood claims to FEMA by shifting wind damage to flood damage during the aftermath of Hurricane Katrina, such that the flood claims were factually false (*i.e.*, the damage claimed was not actually caused by flood). For example, the 2007 Complaint alleges:

> [D]efendant insurance companies made a corporate decision to misdirect and misallocate claims from those of hurricane coverage (which a company would be required to pay from its reserves or reinsurance) to flood claims that could be submitted and paid directly from the United States Treasury.

([16] ¶ 56.) This purported scheme alleged no W-5054 non-compliance; in fact W-5054 is never mentioned in the 2007 Complaint. Instead, the scheme gave rise to a claim of "actual" or "factual" falsity under § 3729(a)(1) of the FCA, with accompanying false statement liability under § 3729(a)(1)(B). *Id.* ¶¶ 109-12; 117-19.

The only property claim pled with specificity under this purported scheme – the McIntosh property claim – proceeded to trial after this Court determined that one of the relators was an "original source" with respect to that claim. *See* ([343] at 8, 10.) Subsequently, the Fifth Circuit affirmed this Court's original source assessment with respect to the McIntosh claim.

*United States ex rel., Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457, 476 (5th Cir. 2015),

*aff'd on other grounds*, 137 S. Ct. 436 (2016).  In that decision, the Fifth Circuit also addressed

the Rigsbys' request for discovery on this same wind-vs-flood scheme, but beyond the lone

McIntosh claim.  *Id.* at 465 ("The Rigsbys seek further discovery ***into the same alleged scheme***

they argue produced the McIntosh claim." (emphasis added)).  In addressing this discovery point,

the Fifth Circuit reiterated the wind-vs-flood nature of the alleged scheme and pointed to the

Rigsbys' own allegations of "State Farm's scheme to categorize all losses as ***caused by flooding***

***rather than wind*.**"  *Id.* at 468 (emphasis added).

## II.     THE FIFTH CIRCUIT EXPRESSLY LEFT OPEN THE QUESTION OF WHETHER THE PUBLIC DISCLOSURE BAR WOULD APPLY TO CLAIMS BEYOND MCINTOSH

The Fifth Circuit did not hold that the Rigsbys were original sources for any and all

future claims they might seek to pursue in this case.  In fact, the Fifth Circuit said just the

opposite:

> It is plausible that § 3730(e)(4) might come into play again as the district
> court proceeds with this litigation. … However, even if the district court on
> remand should find a public disclosure touching on any possible claims, the
> Rigsbys would not necessarily be barred from pursuing those claims if they
> remain qualified as original sources under § 3730(e)(4)(B).

*Rigsby*, 794 F.3d at 476.  Thus, the Fifth Circuit did not predetermine the Rigsbys' original

source status for any new claims they might seek to pursue in this case.  The Fifth Circuit instead

left that question for this Court to determine in the event that the Rigsbys sought to add claims

and State Farm sought to dismiss them under the public disclosure bar.

## III.    THE NEWLY ADDED FALSE CERTIFICATION CLAIMS ARE DISTINCT FROM THE WIND-VS-FLOOD SCHEME

On remand, the Court allowed limited further discovery into the wind-vs-flood scheme.

And the Court most recently permitted the Rigsbys an opportunity to file an amended complaint

to attempt to set forth their new "false certification" theories of liability.  *See* ([1455]; [1571].)

5

In their SAC, the Rigsbys continue to assert a wind-vs-flood factual falsity scheme, albeit with far less prominence than in the 2007 Complaint. But they do not describe any property other than McIntosh that supposedly led to a false claim on the basis of that scheme. Unless and until they do so, application of the public disclosure bar to those additional wind-vs-flood scheme claims cannot be addressed.[3]

As noted above, the "false certification" claims in the SAC are new. There can be no dispute that the Rigsbys did not previously include any false certification claims in their 2007 Complaint, particularly given the Rigsbys' representations to the Fifth Circuit, which the appellate court confirmed in its opinion: "The Rigsbys contend that this is not a false certification case ...." *Rigsby*, 794 F.3d at 478 n.14.[4]

The false certification schemes – the ones that are targeted for dismissal in this Motion – seek to impose liability on State Farm for supposed failure to follow the procedures and fees set forth in W-5054, a FEMA guidance document issued three weeks into the Hurricane Katrina loss adjustment process. Unlike the wind-vs-flood scheme, which alleges that State Farm acted with

---

[3] State Farm reserves its rights to move to dismiss any new wind-vs-flood claims on public disclosure grounds because the Rigsbys cannot be original sources as to any claims for which they do not have direct and independent knowledge. *See United States ex rel. Monsour v. Performance Accounts Receivable, LLC*, 2018 WL 4682343, at *13 (S.D. Miss. Sept. 28, 2018) (finding assertions that relators were familiar with contracts covering several hospitals all managed by defendant to be "insufficient to create a genuine issue of material fact that Relators were original sources of the allegations relating to hospitals other than" the one where they actually worked); *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 49 (D.D.C. 2007) (claims barred by public disclosure where relator attempted to expand the geographic scope of original allegations related to Medicare fraud at one hospital to allege that the fraud occurred across the entire hospital system).

[4] The Rigsbys first signaled that they might seek to pursue implied false certification liability against State Farm when State Farm sought to reopen (and finally resolve) the remainder of the case in 2017, following the McIntosh trial and appeals. *See* ([1293] at 7.) The Rigsbys asserted that the Supreme Court's decision in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), "granted access to a previously-inaccessible legal theory" of implied false certification, *id.* at 9, but the Rigsbys did not seek leave to amend their complaint at that time. And, regardless of whether an implied false certification theory of liability was available to the Rigsbys prior to 2016, an express false certification theory of liability certainly was available at all times relevant to this lawsuit.

others to shift wind claims to flood claims, the W-5054 false certification claims are unique to

State Farm (no mention of conspiring with other insurers or third parties) and have nothing to do

with whether the underlying adjustment was false or whether the losses actually were caused by

flooding for which FEMA and the National Flood Insurance Program ("NFIP") ultimately was

responsible to the policyholder.  *See, e.g.*, ([1623] ¶ 75) ("State Farm submitted a false claim

every time it submitted a flood claim for payment for a W-5054 Category 3 home without

performing the requisite line-by-line estimate[.]").

The new false certification schemes are based on State Farm's alleged non-compliance

with two aspects of W-5054:

1.   The W-5054 Procedures Scheme:  Implied and express false certification liability for State Farm's use of XacTotal estimation methodology instead of performing a line-by-line estimate on W-5054 Process #3 flood claims, in alleged violation of the "normal claim procedures" language.  ([1623] ¶¶ 124-28, 129.)

2.   The Adjustment Fee Scheme:  Express false certification liability for State Farm's charging the "existing" adjustment fees, rather than limited fees under W-5054, for Process #3 flood claims adjusted using XacTotal.  ([1623] ¶ 130.)

The Rigsbys did not plead these new false certification schemes in their original or 2007

Complaint.  Indeed, as explained more fully below, the Rigsbys were not aware of these

allegations until ***after*** they were publicly disclosed.  For example, the Rigsbys testified in

depositions as late as 2010 that they did not know of anything wrong with – and certainly

nothing that would violate W-5054 in – the use of XacTotal on Process #3 properties.

**IV.   THE W-5054 NON-COMPLIANCE FACTS WERE PUBLICLY DISCLOSED**

The facts underlying these W-5054 non-compliance allegations were publicly disclosed.

In addition to the publicly-available W-5054 Bulletin, a 2007 newspaper article in *The Times-*

*Picayune*, echoing an earlier released GAO report, publicly disclosed State Farm's use of

XacTotal on Process #3 properties and the manner in which adjustment fees were being charged on those properties.  These public disclosures occurred well before the Rigsbys ever attempted to assert their W-5054 Procedures or Adjustment Fee Schemes.  And it was not until *after* additional public disclosures occurred that the Rigsbys first raised the idea that there was any non-compliance with W-5054 involved in State Farm's handling of Process #3 claims.

**ARGUMENT**

## I.   THE PUBLIC DISCLOSURE BAR AND THE "*SPRINGFIELD* TEST"

The applicable, pre-2010 version of the FCA's public disclosure bar[5] "'strips' the court of subject matter jurisdiction."  *United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 325 (5th Cir. 2017).  The bar states:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2006).

The Fifth Circuit applies a three-prong test to analyze the application of the public disclosure bar:

    1)    whether there has been a 'public disclosure' of allegations or transactions,

    2)    whether the *qui tam* action is 'based upon' such publicly disclosed

---

[5] In 2010, Congress amended the FCA and changed the language of the public disclosure bar.  It is well-settled that this amendment does not have retroactive effect and thus does not apply to the SAC false certification claims, all of which stem from Hurricane Katrina claims adjustments in 2005/2006.  *See United States ex rel. Hendrickson v. Bank of Am., N.A.*, 779 F. App'x 250, 252 (5th Cir. 2019) (per curiam) (where *qui tam* complaint was filed in 2016, applying former version of the bar to alleged conduct occurring/claims arising *before* March 23, 2010, and the current version of the bar to alleged conduct occurring/claims arising on or *after* March 23, 2010); *United States ex rel. Lockey v. City of Dallas*, 576 F. App'x 431, 435 n.1 (5th Cir. 2014) (citing *United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 915 (4th Cir. 2013) ("The retroactivity inquiry looks to when the underlying conduct occurred, not when the complaint was filed.")).

8

allegations, and

3)      if so, whether the relator is the 'original source' of the information.

*United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011) (quoting

*Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 450 (5th Cir. 1995)).  As the Fifth

Circuit itself made clear, its prior original source finding with respect to the Rigsbys' wind-vs-

flood factual falsity allegations on the McIntosh claim does not preclude the public disclosure

bar inquiry here with respect to the newly-asserted claims:

> Significantly here, the court must retain subject matter jurisdiction at all
> times throughout the litigation.  "The court can lose jurisdiction over an
> otherwise sound action if the relator amends his complaint to remove the
> basis of the jurisdiction."

*Rigsby*, 794 F.3d at 473 (quoting *Jamison*, 649 F.3d at 327-28).  *See also Rockwell*, 549 U.S. at

473 (holding that a relator must satisfy his original source status as to each theory of fraud in the

complaint as amended).

The first two prongs of the public disclosure inquiry often are combined because the

allegations publicly disclosed in step one must "only be as broad and as detailed as those in the

relator's complaint."  *Jamison*, 649 F.3d at 327.  The term "based upon" does not mean that the

allegations in the SAC are linked directly to the public disclosure, as in cause and effect.  State

Farm only must identify "documents plausibly containing allegations or transactions on which

[the relator's] complaint is based."  *Id*.  Once that identification has been made, the burden ***shifts***

***to the Rigsbys*** to demonstrate that a genuine issue of material fact exists as to whether their false

certification theories are based on the disclosures or whether they are original sources.  And the

question as to whether the Rigsbys have some other source for their allegations arises in the

context of this "original source" inquiry – the third prong of the test – not the public disclosure

inquiry.  *See United States ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 144 (5th

Cir. 2017) ("If the complaint **could have been** synthesized from the disclosures, then we determine if the complainant was the original source of the disclosures." (emphasis added)).

In analyzing whether the allegations in a complaint are "based upon" the identified public disclosures, the Fifth Circuit applies the test described in *United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994) (the "*Springfield* test"):

> Under this approach, "the combination of X and Y must be revealed, from which the readers or listeners may infer Z[.]" Z is an inference of fraud under the FCA, while X and Y are two required elements for the inference: "a misrepresented state of facts *and* a true state of facts." "The presence of one or the other in the public domain, but not both, cannot be expected to set government investigators on the trail of fraud."

*Solomon*, 878 F.3d at 144 (quoting *Springfield Term. Ry. Co.*, 14 F.3d at 654-55 (emphasis in original)). *See also United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 374 (5th Cir. 2017) ("In this case, X is the fact that Abbott presented the devices to the FDA as biliary stents, Y is the fact that most of the stents would not fit in bile ducts but would visit in the vascular tree, and Z is the conclusion that Abbott misstated the intended use of the stents."). The *Springfield* test does not require that every detail be revealed, but only that two necessary items be revealed: the misrepresented state of facts and the true state of facts, such that the Government is put "on the trail of fraud." *Springfield Term. Ry. Co.*, 14 F.3d at 655.

## II.    THE RIGSBYS' FALSE CERTIFICATION THEORIES ARE BASED UPON PUBLIC DISCLOSURES

Here, several public disclosures satisfy the *Springfield* test. First is a June 27, 2007 newspaper article published in *The Times-Picayune*. (Rebecca Mowbray, "Hearing on Flood Claims Is Today, Adjusting Procedure Is One of the Issues," *The Times-Picayune* (June 12, 2007),

Ex. A to Mtn.)[6]  After summarizing W-5054's Processes #1 and #2, which did not require a site visit, the article describes Process #3,[7] going on to report:

> In addition, FEMA waived the line-by-line adjusting that was of concern to participants in the Wooley meeting.  ***Rather than require room-by-room, item-by-item calculation of insured losses, FEMA allowed flood adjusters with two large but unnamed insurance companies to calculate damages by measuring the square footage of each room and characterizing the building materials as high-, medium-, or low-grade, according to GAO report***.
>
> Those two large insurance companies probably made money off of that procedure.  While FEMA scaled back the fee that private companies earned for adjusting claims if satellite photos and house measurements on file made it likely that the home was a total loss, ***FEMA paid the same fees to companies for the easier square-foot adjustments that it paid for the detailed line-by-line adjustments***.

*Id.* at 122 (emphasis added).  This news media article is correct in describing that FEMA did not require line-by-line estimating to be used on Process #3 claims and that it approved the use of an alternative "square foot" adjustment methodology (*e.g.*, XacTotal), thereby undermining the core of the false certification allegations in the SAC.  But for public disclosure purposes, it does not matter whether the news media article portrayed the conduct as fraudulent or even wrong.  The article qualifies as a public disclosure as long as the critical elements of the alleged scheme are detailed.  *See Solomon*, 878 F.3d at 145 ("The public disclosures need not expressly allege fraud.  The question is whether the relator *could have* synthesized an inference of fraud from the public disclosures." (emphasis in original)).  Here, the *Times-Picayune* article details those critical elements of both the W-5054 Procedures Scheme and the Adjustment Fee Scheme: failure to

---

[6] Because a challenge under the public disclosure bar "is necessarily intertwined with the merits," the Fifth Circuit treats a challenge under the bar as a motion for summary judgment.  *King*, 871 F.3d at 325 (quoting *Jamison*, 649 F.3d at 326).

[7] *See* (W-5054, Ex. D to Mtn.) at 1-2 ("All other claims require a site visit and will be handled using the company's normal claim procedures …. Process # 3 will be paid based upon the existing NFIP fee schedule.").

perform line-by-line estimates on Process #3 properties and the charging of fees pursuant to the

typical fee schedule rather than the reduced fees indicated on W-5054 for Processes #1 and #2.  As

such, this article easily satisfies the "X" of the *Springfield* test equation (the misrepresented state

of facts).

A second public disclosure is the U.S. Government Accountability Office ("GAO")

report that was referenced in the *Times-Picayune* article.  That public GAO report also disclosed

the charging of adjustment fees under the existing fee schedule even where no line-by-line

estimate was performed.  Relevant language from that GAO report states:

> In some circumstances where data showed that flood losses exceeded policy
> limits, **FEMA** authorized claims payments to policy limits without site
> visits by certified flood claims adjusters ***or allowed the use of models that
> paid claims based on the square footage of the home and general
> classification by adjusters of the quality of its building materials*** (i.e.,
> flooring and doors).  FEMA authorized payments to its private insurance
> company partners of $750 per expedited claim adjustment—a lower fee
> than would have been paid for a more time-consuming room-by-room, line-
> item-by-line-item visual assessment of flood damage. …

> Because usage of the square foot method by the two companies with
> approved models was not carefully tracked during Hurricanes Katrina and
> Rita, ***FEMA paid the same fee for square foot adjustments as it did for
> regular line-item-by-line-item adjustments that took longer to perform
> and required more extensive documentation***.

(Report No. GAO-07-169, "National Flood Insurance Program: New Processes Aided Hurricane

Katrina Claims Handling, but FEMA's Oversight Should Be Improved" (Dec. 15, 2006), Ex. B

to Mtn.) at 7, 29 (emphases added).  This GAO report, too, easily satisfies the "X" of the

*Springfield* test.

While neither the *Times-Picayune* article nor the GAO report names the "two large write-

your-own insurance companies," a public disclosure need not name particular defendants so long

as it "enable[s] the government to readily identify wrongdoers through an investigation."  *Jamison*,

649 F.3d at 329 (quoting *In re Natural Gas Royalties*, 562 F.3d 1032, 1039 (10th Cir. 2009))

(declining to find public disclosures in documents generally addressing the large Medicare and nursing home industries, with over 86,000 participants combined). State Farm was the largest and most easily identifiable WYO carrier in both Louisiana and Mississippi at the time of Hurricane Katrina. *See* (Excerpted Testimony of Representative Bobby Jindal & Attorney General Jim Hood, Insurance Claims Payment Process in the Gulf Coast After the 2005 Hurricanes, Hearing Before the Subcommittee on Oversight & Investigations of the Committee on Financial Services (Feb. 28, 2007), Ex. C to Mtn.), at 7, 21 ("State Farm Fire and Casualty Company, the largest residential insurer in Louisiana, has 32 percent of the market. … State Farm has one-third of the policies along our [Mississippi] coastal area.").

The "Y" of the *Springfield* test equation (the true state of facts) – publicly disclosing the details of what FEMA "required" in terms of estimating and fees for Process #3 flood claims – is FEMA Bulletin W-5054 itself. *See* (W-5054, Ex. D to Mtn.) W-5054 was a public disclosure as an "administrative report."[8] And it contains the "normal claim procedures" language that – according to the SAC – requires the use of line-by-line estimating for Process #3 claims. *See* ([1623] ¶ 10.)

Moreover, the Rigsbys' complaint allegation that "normal claim procedures" means a line-by-line estimate relies on the McIntosh trial testimony of State Farm adjusters and FEMA witnesses and one internal State Farm email, used as an exhibit at the McIntosh trial. ([1623]

---

[8] *See, e.g.*, *United States ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 625 (N.D. Tex. 2018) (finding an OCC banking circular to be an administrative report because "'to be an administrative report within the meaning of the FCA, a document must (1) constitute official government action and (2) provide information'" and "[t]he threshold for the 'official government action' element is low; all that is required … is that the government release the information in question" (quoting *United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 518 (N.D. Tex. 2012)), *aff'd*, 779 F. App'x 250 (5th Cir. 2019). In addition, W-5054 again was published as an appendix to an Office of Inspector General Report analyzing Hurricane Katrina claims. *See* DHS OIG, Report No. OIG-08-97, "Hurricane Katrina: Wind Versus Flood Issues," at 31-32 (Sept. 26, 2008).

¶¶ 53, 100-02.)  That evidence, too, qualifies as a public disclosure:  "Any information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in a civil hearing for the purposes of section § 3730(e)(4)(A)."  *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 174 (5th Cir. 2004) (quoting *Fed. Recovery Servs., Inc.*, 72 F.3d at 450).[9]

Further, the NFIP Claims Manual, made publicly available following Hurricane Katrina,[10] is an additional public disclosure as to claim procedures as an "administrative report."[11]  The manual provides that "[t]he ***repair estimate should be prepared on a room-by-room, unit-cost basis***, clearly indicating room dimensions and unit costs, except when the building has been completely destroyed.  For buildings that have been destroyed, value determination by a standard insurance industry method, such as Marshall-Swift, Boeckh, etc. is acceptable."  (NFIP, Adjuster Claims Manual, Section II (Change 1 – Jan. 1, 2004), Ex. E to Mtn.), at II.C.2.t (emphasis added).  Here, too, the language in the public disclosure actually undermines the false certification allegations by showing FEMA/NFIP's approval in the second

---

[9] The disclosure of this evidence in a hearing in which the Rigsbys took part does not change the analysis.  "Publicly disclosing the information upon which a *qui tam* suit is based … is clearly different than being an original source of that information."  *United States v. New York Med. Coll.*, 252 F.3d 118, 122 (2d Cir. 2001).  Indeed, even though this fact at first may seem relevant to the original source inquiry, the Fifth Circuit rejected a relator argument for original source status based on "information he discovered through litigation or from conversations with former co-workers" because "[t]his is not direct, independent knowledge but is either secondhand or based on public disclosures."  *Colquitt*, 858 F.3d at 377 (internal citations omitted).  Similarly, the Supreme Court in *Rockwell* refused to credit the relator as an original source for his "prediction," which led to a later criminal investigation unearthing a different false claim.  549 U.S. 457.

[10] *See* ([91-6] Hunter Testimony, Hearing on National Flood Insurance Program at 3 (Oct. 19, 2005)) (noting that "FEMA has finally published the required claims handbook").  The manual was accessible via FEMA's website.  *See* https://web.archive.org/web/20050909165129/http://www.fema.gov/nfip/claimsadj.shtm.

[11] *See, e.g.*, *Hendrickson*, 343 F. Supp. 3d at 625 (finding a Social Security Administration Programs Operations Manual to be an administrative report).

quoted sentence for the type of adjustment method that the Rigsbys now claim was non-compliant, but that point is not important for the public disclosure inquiry.  For purposes of the public disclosure bar, "[t]he focus is on whether they *could have* made the inference," not the "overall probability of someone inferring fraudulent activity from the public disclosures." *Solomon*, 878 F.3d at 146 (emphasis in original).

Accordingly, State Farm has met its burden of identifying a qualifying public disclosure, *i.e.*, "documents plausibly containing allegations or transactions on which [the relator's] complaint is based." *Jamison*, 649 F.3d at 327.

## III. THE RIGSBYS ARE NOT ORIGINAL SOURCES OF THE FALSE CERTIFICATION CLAIMS

The Rigsbys bear the burden of demonstrating that they are original sources of the allegations.  An original source is "an individual who has direct and independent knowledge of the information on which the allegations are based ***and*** has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B) (2006) (emphasis added).  "The test is stated in the conjunctive, meaning a negative answer to either will require dismissal of the complaint."  *Solomon*, 878 F.3d at 146.

Under the applicable, pre-2010 version of the public disclosure bar in the Fifth Circuit:

> Knowledge is direct if it is "derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others."  Moreover, knowledge is independent if it "is not derived from the public disclosure."

*Jamison*, 649 F.3d at 332 (quoting *Reagan*, 384 F.3d at 177).

### a. THE RIGSBYS' ORIGINAL SOURCE STATUS WITH RESPECT TO THE MCINTOSH CLAIM DOES NOT CARRY OVER TO THEIR FALSE CERTIFICATION SCHEMES

The SAC alleges that "this Court held that Kerri Rigsby is an original source regarding State Farm's scheme to defraud the government."  ([1623] ¶ 114.)  But the SAC – while lumping

the factual falsity and false certification claims into a single cause of action and treating them as if they were part of one scheme – actually describes distinct schemes.  Indeed, in the very next sentence, the complaint admits as much:

> As adjusters who worked for State Farm, the Rigsbys witnessed first-hand State Farm's scheme to defraud the federal government [1] by foisting its liability for wind damage caused by Katrina, and [2] by misrepresenting that it was performing line-by-line estimates that FEMA required in W-5054 when it was not.

([1623] ¶ 115) (bracketed numerals added for emphasis).[12]  Scheme 1 is the Rigsbys previously pled factually false wind-vs-flood scheme, which was the only purported scheme at issue in the McIntosh trial.  ([1623] ¶¶ 131-34.)  Scheme 2 is the newly-alleged false certification W-5054 Procedures Scheme.  ([1623] ¶¶ 124-29.)  And, of course, in this passage of the SAC, the Rigsbys omit mention of their additional false certification scheme – Scheme 3 – their newly alleged express false certification Adjustment Fee Scheme.  ([1623] ¶ 130.)  The false certification schemes – arising out of alleged non-compliance with the technical directions in a FEMA bulletin – are fundamentally different from the wind-vs-flood scheme they advanced pre-amendment.  *See Rigsby*, 794 F.3d at 475 (describing the Rigsbys' theory of fraud at the McIntosh trial as an allegation "that State Farm fraudulently misclassified wind damage as flood damage through a variety of means").  As such, the W-5054 non-compliance claims seek to impose FCA liability on State Farm for a different reason – failure to comply with a purported legal requirement – than their wind-vs-flood scheme, which depends on a showing that State Farm knowingly mis-categorized wind damage as flood damage.

---

[12] While the SAC inappropriately combines these schemes into Count One, "courts must analyze the jurisdictional status of each reasonably discrete claim of fraud in a *qui tam* action and do so based on a review of the substance of the complaint, not just how it may be formally structured."  *United States ex rel. Boothe v. Sun Healthcare Grp., Inc.*, 496 F.3d 1169, 1177 (10th Cir. 2007).

Under these circumstances, the Rigsbys cannot transfer their original source status from the wind-vs-flood scheme to the newly-asserted W-5054 non-compliance schemes.  The law does not permit it.  To the contrary, the Supreme Court has weighed in on this very question, holding that relators may not use their original source status as to one theory of fraud to "smuggle" in claims based on a different theory.  In *Rockwell International Corp. v. United States*, the Supreme Court held that an original source exception must be satisfied independently for new allegations added to a complaint through amendment.  549 U.S. at 476.  The relator in *Rockwell* had continued to plead the same result – that building material would fail – but originally had pled the cause for this failure based on a fundamentally different fraud theory, *i.e.*, an underlying defect in the building material different from the one that ultimately caused the failure and which he amended his complaint to add.  *Id.* at 465, 473.  *See also United States ex rel. Kirk v. Schindler Elevator Corp.*, 437 F. App'x 13, 18 (2d Cir. 2011) ("Regardless of [relator's] prior knowledge of and suspicions about other aspects of [defendant's] contracting practices and its compliance …, he lacked direct and independent knowledge of [defendant's] failure to file certain reports."); *United States ex rel. Reagan v. E. Texas Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 853 (S.D. Tex. 2003) ("Here, Plaintiff alleges that Defendants conspired … to defraud the government by getting false and fraudulent [Medicare] claims allowed or paid, in violation of FCA § 3729(a)(3).  Plaintiff also alleges that, after these Medicare claims were paid, University Park, at the direction of East Texas, made false certifications in its annual cost reports … in violation of FCA § 3729(a)(7).  To sustain this court's jurisdiction over these claims of fraud, Reagan must present some evidence to support ***each*** allegation." (emphasis added) (internal quotations and citations omitted)), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

As mentioned, the Fifth Circuit made clear that any new claims would have to withstand a separate public disclosure bar inquiry.  The Court of Appeals recognized "that § 3730(e)(4) might come into play again" and that the Rigsbys would need to "remain qualified as original sources" for any other possible claims.  *Rigsby*, 794 F.3d at 476.  Thus, the SAC's reference to a prior original source determination with respect to McIntosh cannot establish original source status for the newly alleged false certification claims.

> **b.  The Rigsbys Do Not Have Direct or Independent Knowledge of the False Certification Theories**

While the Rigsbys will have an opportunity to attempt to meet their burden of establishing that they have the requisite "direct or independent knowledge" with respect to their false certification claims, the existing record indicates that they will not be able to do so.  In the SAC, the direct and independent knowledge allegations with respect to the false certification claims consist of the following:

- "The Rigsbys personally received instruction from Lecky King and other State Farm trainers and supervisors … to use XacTotal rather than the line-by-line estimates that W-5054 required."  ([1623] ¶ 116.)

- "The Rigsbys personally were instructed to place into NFIP files long form XacTotal reports that look like line-by-line estimates but are not." ([1623] ¶ 117.)

These allegations plainly do not suffice as they speak to only one part of the equation.  To qualify as original sources, the Rigsbys also have to show that they had direct and independent knowledge that the use of XacTotal on Process #3 claims and the charging of adjustment fees under the existing fee schedule allegedly *violated* W-5054 and that they had this knowledge prior to bringing this action.

But the Rigsbys did not assert any claim based on a violation of W-5054 (or even mention W-5054) in the original [2] Complaint or the [16] 2007 Complaint.  In fact, the 2007

Complaint alleged that the percentage-based fee schedule – the one that they now say was improper – ***did*** apply to State Farm's Process #3 adjustments. *See* ([16] ¶¶ 101-07). And it was not until later in the case, at the time of the Pre-Trial Order in 2013, that the Rigsbys even raised whether the use of XacTotal was non-compliant with W-5054 as a contested issue, but only in the context of the false statement aspect of their factually false wind-vs-flood scheme. *See* ([1081] at 11.) This Pre-Trial Order assertion (1) nowhere mentioned adjustment fees, (2) did not assert the procedures used under W-5054 as part of any false certification theory of liability, and, in any event, (3) occurred well after the 2006 GAO report, the 2007 *Times-Picayune* article, and the 2009 and 2010 depositions in the McIntosh proceedings.

Perhaps most tellingly, in their June 2010 depositions, both Rigsbys testified to their belief that the existing percentage-based fee schedule applied to Process #3 properties such as McIntosh. *See* (06/24/10 K. Rigsby Dep. Tr., Ex. F to Mtn.) at 54:7-25; (06/25/10 C. Rigsby Dep. Tr., Ex. G to Mtn.) at 141:23-142:7. In those same depositions, Cori Rigsby testified that she understood that the use of XacTotal had been approved by FEMA. (06/25/10 C. Rigsby Dep. Tr., Ex. G to Mtn.) at 77:1-13; 82:5-11. And Kerri Rigsby likewise testified that she had no "reason to doubt" that FEMA had approved the use of XacTotal. (06/24/10 K. Rigsby Dep. Tr., Ex. F. to Mtn.) at 46:3-47:8.

Moreover, Kerri Rigsby testified in the McIntosh trial that she was "fine" with the use of XacTotal and did not understand it to be inappropriate. *See* (Trial Test. Vol. 2, Ex. H to Mtn.) at 332:22-333:4. Cori Rigsby also testified that she was "not uncomfortable" with the idea that XacTotal had been used, and Kerri Rigsby testified that "[n]o," she did not think there was anything inappropriate with the use of XacTotal to pay a $250,000 flood claim on their mother's Katrina-damaged home. (06/25/10 C. Rigsby Dep. Tr., Ex. G to Mtn.) at 73:12-23; (06/24/10 K.

Rigsby Dep. Tr., Ex. F to Mtn.) at 137:12-25.

Thus, the Rigsbys' new false certification theories could not have come just from the Rigsbys' knowledge that State Farm was using XacTotal. This is akin to *United States ex rel. Solomon v. Lockheed Martin Corp.*, in which the Fifth Circuit held that a relator was not a direct and independent source because he had not made the connection between different parts of his own knowledge until *after* he read a publicly available contract:

> Solomon's FCA claim alleges both the improper use of management reserves and the connection of those budget alterations to obtaining award fee bonuses. Even if we assume Solomon had direct and independent knowledge about the improper use of management reserves, **he lacked direct knowledge about the connection** between management reserves and award fee bonuses. Because the model SDD contract was publicly available and tied cost performance to award fees, Solomon must have direct and independent knowledge of the connection between cost performance and award fees as described in the contract. Solomon himself concedes that based on his own level of knowledge, he could only "suspect" that there might be some relationship between cost performance and award fees. He explicitly states that he needed to ask another Northrop supervisor "whether there was any connection between cost variance numbers and Award Fees[.]" After the supervisor allegedly denied such a connection, Solomon only recognized the connection between cost performance and award fees by reading the SDD contract.
>
> Knowledge can only be independent if it is not derived from the public disclosure. Here, the record makes clear Solomon derived his knowledge about the connection between cost performance and award fees from portions of a contract that were publicly disclosed before he filed his complaint.

878 F.3d at 147 (emphasis added).

Even if the Rigsbys actually developed their false certification theory allegations through information learned in investigating their factually false allegations or through conversations with counsel – rather than through reading W-5054, the GAO report, or the *Times-Picayune* article – that would not serve to qualify them as original sources because such knowledge is not direct and independent. *See Colquitt*, 858 F.3d at 377 ("For periods after he quit the company,

Colquitt argues from information he discovered through litigation or from conversations with former co-workers.  This is not direct, independent knowledge but is either secondhand or based on public disclosures." (internal citation omitted)).  Based on the timeline of when the false certification allegations were raised and the Rigsbys' previous testimony, the Rigsbys cannot meet their burden of showing that they had direct and independent knowledge of either the W-5054 Procedures Scheme or the Adjustment Fee Scheme alleged for the first time in the SAC.

   c.   THE RIGSBYS DID NOT VOLUNTARILY PROVIDE INFORMATION ABOUT THE FALSE CERTIFICATION THEORIES TO THE GOVERNMENT

   Even if the Rigsbys did have direct and independent knowledge of the information underlying their W-5054 non-compliance false certification claims, they still would not qualify as original sources unless they "voluntarily provided the information to the Government before filing" the SAC.  *Solomon*, 878 F.3d at 143; *see id.* at 146 ("The test is stated in the conjunctive, meaning a negative answer to either will require dismissal of the complaint.").  In the SAC, the Rigsbys assert in conclusory fashion that they "provid[ed] those [claim] files and other evidence of State Farm's scheme to the government long before they filed this case."  ([1623] ¶ 119.) These allegations strongly suggest that the Rigsbys did not voluntarily provide any information about their new false certification claims at any time prior to filing the SAC.  Indeed, as detailed above, the Rigsbys did not allege their false certification schemes in their original complaint (or even mention W-5054).  Likewise, the Rigsbys made no mention of these claims or schemes – or even mention W-5054 non-compliance or adjustment fees – in the evidentiary disclosure[13] they

---

[13] In deposition testimony, the Rigsbys also did not refer to XacTotal, W-5054, or adjustment fees as an item they discussed during meetings with the Attorney General's office prior to filing their original complaint.  *See* (11/19/07 C. Rigsby Dep. Tr., Ex. I to Mtn.) at 287:19-288:20.  Moreover, even a mere mention of W-5054 or adjustment fees in the Disclosure Statement, without connecting them to alleged false claims or fraudulent schemes, would not suffice to meet the "voluntarily provided" requirement. *See King*, 871 F.3d at 327 ("For Relators to satisfy the FCA's voluntary pre-suit disclosure requirement of disclosing information underlying their FCA action, their disclosure must—at a minimum—connect

made to the Government prior to commencing this action (the "Disclosure Statement").  *See*

([103-15] (Apr. 24, 2006 Evidentiary Disclosure Pursuant to 31 USC § 3730).)[14]

The Rigsbys' Disclosure Statement does refer to XacTotal, but only in the context of it

being a false statement in support of a wind-vs-flood scheme, not that its use was an unapproved

loss adjustment methodology under W-5054:

> State Farm used a computer program called "XACT TOTAL" to calculate the flood claims and hit policy limits.  The program permitted the agent to put in the square footage and amenities to "rebuild" the home.  Adjusters were instructed to "hit the limits and if you haven't hit the limits on flood, go back and do it again until you do."  The program was first developed for "slabs" but was later used for "cabanas" and other structures without total losses.  One of the relators witnessed five houses where only four feet of mud was in the elevated house.  There was no damage to roof, siding, and other structural elements.  The house was submitted as a total flood loss (to hit the limits) using the XACT TOTAL software.  State Farm continued this program until "Flood Calculator" was developed.

([103-15] at 27.)  Therefore, this disclosure does not assert violations of W-5054's "normal claim

procedures" language or adjustment fee provision – the violations that form the bases for the new

false certification liability claims.

<u>**CONCLUSION**</u>

For the foregoing reasons, State Farm respectfully submits that this Court should grant its

motion to dismiss the false certification claims in the SAC.

---

direct and independent knowledge of information about [defendant's] conduct to false claims submitted to the government, i.e., suggest an FCA violation.").

[14] In addition, because the Rigsbys never raised their false certification schemes in their original or amended complaints and did not include them in their Disclosure Statement, the Government never had an opportunity to evaluate and make an intervention decision with regard to these new schemes, as required by 31 U.S.C. § 3730(b)(2).

This the 1st day of June, 2020.

Respectfully submitted,

STATE FARM FIRE AND CASUALTY COMPANY

By:   s/ *E. Barney Robinson III* (MB # 09432)
Michael B. Beers, *PHV* (ASB-4992-S80M)
Phil B. Abernethy (MB # 1023)
E. Barney Robinson III (MB # 09432)
Amanda B. Barbour (MB # 99119)
Michael C. McCabe, Jr. (MB # 101548)
Douglas W. Baruch, *PHV* (DC Bar # 414354)
Jennifer M. Wollenberg, *PHV* (DC Bar # 494895)

ITS ATTORNEYS

OF COUNSEL:

BUTLER SNOW LLP
Post Office Drawer 4248
Gulfport, MS 39502
(P) (228) 575-3025
(E) michael.mccabe@butlersnow.com

BUTLER SNOW LLP
250 Commerce Street, Suite 203
Montgomery, AL 36104
(P) (334) 832-2900
(F) (334) 832-2901
(E) michael.beers@butlersnow.com

BUTLER SNOW LLP
200 Renaissance at Colony Park, Suite 1400
1020 Highland Colony Parkway (39157)
Post Office Box 6010
Ridgeland, MS 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) phil.abernethy@butlersnow.com
(E) barney.robinson@butlersnow.com
(E) ben.watson@butlersnow.com
(E) amanda.barbour@butlersnow.com

MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, D.C. 20004-2541
(P) (202) 739-3000
(F) (202) 739-3001
(E) douglas.baruch@morganlewis.com
(E) jennifer.wollenberg@morganlewis.com

## <u>CERTIFICATE OF SERVICE</u>

I, E. Barney Robinson III, one of the attorneys for State Farm Fire and Casualty Company,

do hereby certify that I have this day caused a true and correct copy of the foregoing instrument to

be delivered to the following via the means directed by the Court's CM/ECF System:

C. Maison Heidelberg
Chadwick M. Welch
WATSON HEIDELBERG PLLC
2829 Lakeland Drive, Suite 1502
Flowood, Mississippi 39232
P.O. Box 23546
Jackson, Mississippi 39225-3546
(P) 601-503-1935
(F) 601-932-4400
mheidelberg@whjpllc.com
gkennedy@whjpllc.com

August J. Matteis Jr.
William E. Copley
Derek Y. Sugimura
Timothy M. Belknap
WEISBROD, MATTEIS & COPLEY, PLLC
1200 New Hampshire Avenue, NW, Suite 600
Washington, DC 20036
amatteis@wmclaw.com
wcopley@wmclaw.com
dsugimura@wmclaw.com
tbelknap@wmclaw.com

COUNSEL FOR CORI RIGSBY AND KERRI RIGSBY

Jay D. Majors
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
(P) (202) 307-0264
(F) (202) 514-0280

Lynn Murray
AUSA
UNITED STATES ATTORNEY'S OFFICE
Southern District of Mississippi
501 East Court Street, Suite 4.430
Jackson, MS 39201
(P) (601) 965-2835
lynn.murray@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

THIS the 1st day of June, 2020

By:    s/*E. Barney Robinson III* (MB # 09432)
            E. Barney Robinson III (MB # 09432)

53206561.v1

2