**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA ex rel.
   CORI RIGSBY and KERRI RIGSBY,      RELATORS/COUNTER-DEFENDANTS

           v.                         CASE NO. 1:06-cv-433-HSO-RHW

STATE FARM FIRE & CASUALTY         DEFENDANTS/COUNTER-PLAINTIFFS
   COMPANY, et al.

**RELATORS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**OPPOSITION TO STATE FARM'S MOTION TO DISMISS**
**FOR LACK OF SUBJECT MATTER JURISDICTION**

This motion is State Farm Fire and Casualty Company's ("State Farm") latest improper attempt to relitigate issues it already lost in violation of the Fifth Circuit's mandate.  In its brief ("SF Br.") [ECF No. 1635], State Farm again invokes the False Claims Act's ("FCA") public disclosure bar in 31 U.S.C. § 3730(e)(4).  It accuses relators (the "Rigsbys") of "claim smuggling" based on the application of additional legal theories in their Second Amended Complaint ("SAC") [ECF No. 1623] to the scheme they proved at trial.  Such renewed scrutiny is unwarranted because only "new allegations regarding a fundamentally different fraudulent scheme require reevaluation of the court's jurisdiction."  *Rockwell Int'l Corp. v. United States*, 495 U.S. 457, 474 (2007).

The Rigsbys merely consolidated in the SAC their allegations from various parts of the record (as this Court directed in its Order (at 6) denying the Rigsbys' motion for partial summary judgment [ECF No. 1455]), and applied additional legal theories to the same scheme they proved at trial.  Most of the facts were in this Court's pretrial order and thus already part of the Rigsbys' allegations in this case.  *See United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457, 468 n.7 (5th Cir. 2015), *aff'd*, 137 S. Ct. 436 (2016).  The Fifth Circuit already has held that "the Rigsbys are original sources" of the scheme they proved at trial.  *Id.* at 472.  It held that

"[t]he Rigsbys are the 'paradigmatic … whistleblowing insider[s].'"  *Id.* at 474.  It also held that

"[t]heir direct knowledge surpasses that presented by other would-be relators in [the Fifth

Circuit's] original source case law."  *Id.*

Invoking *Rockwell*, State Farm argues that the Rigsbys' "false certification schemes—

arising out of alleged non-compliance with the technical directions in a FEMA bulletin—are

fundamentally different from the wind-vs-flood scheme they advanced preamendment."  SF Br.

at 2.  It artificially breaks the scheme that the Rigsbys proved at trial into three separate parts and

argues that two of those parts are "fundamentally different" and new:

> Scheme 1 is the Rigsbys previously pled factually false wind-vs-flood
> scheme, which was the only purported scheme at issue in the McIntosh trial.
> ([1623] ¶¶ 131-34.)  Scheme 2 is the newly-alleged false certification W-
> 5054 Procedures Scheme.  ([1623] ¶¶ 124-29.)  And … – Scheme 3 – their
> newly alleged express false certification Adjustment Fee Scheme.  ([1623]
> ¶ 130.)

*Id.* at 16.  Under State Farm's framework, the purportedly new "schemes" two and three allege

that State Farm implicitly and explicitly certified compliance with W-5054 while it used

XacTotal rather than the required line-by-line estimate on Category 3 homes.  Yet State Farm's

improper use of XacTotal in violation of W-5054 was a core part of the Rigsbys' allegations and

proof of *how* State Farm defrauded the government.  *See Rigsby*, 794 F.3d at 463, 469, 474-75,

478 n.14, and 480.  Moreover, State Farm argued that the Rigsbys were *required* to prove that its

violations of W-5054 were material to the government's payment decisions.  *Id.* at 478 n.14.

Even if State Farm could relitigate the Rigsbys' original source status, this Court would

be compelled to find that they are original sources for the same reasons.  To qualify as original

sources, the Rigsbys need only have direct and independent knowledge about "some additional

compelling fact" or "a new and undisclosed relationship between disclosed facts."  *Id.* at 473.

State Farm's motion is predicated on a false and unprecedented argument that a relator must

have direct and independent knowledge of *every element* of his or her claim.  SF Br. at 18.  The Fifth Circuit already has held that the Rigsbys have the requisite knowledge because, among other facts, "they were told to use the 'shortcut' Xactotal software even on claims that 'sustained moderate flood damage.'"  *Rigsby*, 794 F.3d at 474.  That fact is as "compelling" to the Rigsbys' false certification claims, even as State Farm frames them, as it is to their wind-vs-flood factual falsity claims.  *See* SF Br. at 2-3 ("According to the Rigsbys, W-5054 obligated State Farm to employ a 'line-by-line' estimating methodology when adjusting the properties at issue, but State Farm instead used a different methodology referred to as 'Xactotal.'").

State Farm also fails to identify public documents that plausibly disclose the allegations in the Rigsbys' SAC.  State Farm tries to meet that burden mainly by mischaracterizing an article in *The Times Picayune* and a GAO report that merely summarized FEMA's grant of permission in W-5054 to Write Your Own ("WYO") insurers to use expedited procedures like XacTotal on Category 1 and 2 homes.  State Farm claims (at 11) that those documents say that FEMA extended such authorization to Category 3 homes, but the documents say no such thing.  Even if they did, the Rigsbys' allegations were not "based upon" them within the meaning of § 3730(e)(4)(A). The article and GAO report were published *after* the Rigsbys pled all of the facts necessary to establish State Farm's improper use of XacTotal.  Even under State Farm's reading, the documents would not disclose fraud by anyone, much less identify State Farm as a potential fraudster.  They also lack the breadth and detail of the Rigsbys' allegations.

State Farm's mischaracterizations are a thinly-veiled attempt to relitigate whether FEMA authorized it to forego line-by-line adjustments on Category 3 homes.  The Rigsbys already have proven that FEMA did *not* give State Farm permission to deviate from that requirement.  *Rigsby*, 794 F.3d at 469.  The Seventh Amendment precludes State Farm from relitigating that issue.

In short, State Farm's motion fails in all respects.  State Farm cannot justify relitigating issues it already lost on appeal.  It cannot establish that the Rigsbys' false certification claims are based on a "fundamentally different scheme" than the factual falsity claims they proved at trial. It cannot credibly deny the Rigsbys' direct and independent knowledge of that scheme.  And it has failed to identify a public document that disclosed "the allegations and transactions" the Rigsbys have pled.  As a result, this Court should deny State Farm's motion.

## **PROCEDURAL HISTORY**

**I.    The Rigsbys Have Pled State Farm's Improper Use of XacTotal Since the Inception of This Case.**

State Farm's improper use of XacTotal always has been central to the Rigsbys' explanation of *how* State Farm shifted liability for wind damage to the NFIP.  "The Rigsbys allege in their original complaint that: 1) they were told to use the 'shortcut' Xactotal software even on claims that 'sustained moderate flood damage;' 2) they were told to manipulate the information entered into Xactotal if the initial analysis did not result in a full payout under the flood policy." *Rigsby*, 794 F.3d at 474.  The Original Complaint states:

> 37.  In addition, when directing adjusters to categorize claims as flood damage and shift responsibility for payment of the claim under flood insurance, State Farm insisted that adjusters "hit limits" when adjusting flood claims.

> 38.  Specifically, adjusters were told that if they initially analyzed a claim and found that the insured had less damage under flood coverage than policy limits allowed, the adjuster was told to go back through the claim a second time to ensure that the flood claim "hit limits."  Adjusters used a computer program designed by State Farm known as "XACT Total" as a shortcut to determine the amount of damage for a claim.  XACT Total was used to make determinations of total flood loss even in homes that sustained moderate flood damage.

Compl. ("Original Complaint") ¶¶ 37-38 (Apr. 26, 2006) [ECF No. 2].  In these paragraphs, the Rigsbys pled every fact necessary to establish State Farm's violations of W-5054.  They pled that

State Farm used XacTotal instead of line-by-line estimates.  They described XacTotal as a "shortcut," alleging that it was used inappropriately.  And they pled that State Farm used it on "homes that sustained moderate flood damage," thereby identifying those homes as within Category 3.

The Rigsbys disclosed all of these facts, and more, to the Government before they filed this lawsuit.  When State Farm previously challenged the Rigsbys' status as original sources, this Court held an evidentiary hearing.  Kerri Rigsby testified at length about her knowledge of all of these facts.  *See* Mot. Hr'g Tr. at 195-246 (May 20-22, 2009) [ECF No. 1149].  She explained how State Farm instructed them to use XacTotal rather than perform line-by-line adjustments:

> We were advised at that original meeting, Go out, hit limits, run XacTotal … Adjusters went out and did that.  Well, we paid the flood limits without a real investigation, certainly without an estimate.

*Id.* at 216:7-13.  Kerri Rigsby then testified that she had told "the United States government what [she] told the Court."  *Id.* at 246:20-22.  To remove any doubt, the Rigsbys further attach a declaration averring that they disclosed these details to the Government before they filed their Original Complaint.  *See* K. Rigsby Decl. ¶¶ 2-10 (July 8, 2020) (attached as Exhibit A).

## II.    State Farm Has Argued That Allegations About Its Misuse of XacTotal Are Part of the Same Scheme That the Rigsbys Have Alleged Since the Inception of This Case.

Prior to the McIntosh bellwether trial, the Rigsbys twice moved to expand the scope of discovery to include the full scope of State Farm's fraud.  *See* Mem. Supp. Mot. Reconsid. Scope of Proceedings ("2010 Scope Br.") (Aug. 16, 2010) [ECF No. 740]; Mem. Supp. Mot. Expand Disc. ("2011 Scope Br.") (Dec. 21, 2011) [ECF No. 914].  They argued that the evidence confirmed State Farm's fraud sufficiently to warrant discovery into the full breadth of State Farm's scheme.  *Id.*  In their first motion, the Rigsbys characterized that evidence as showing that State Farm's use of XacTotal on Category 3 homes violated W-5054:

5

> After Hurricane Katrina, the NFIP issued expedited claims handling
> procedures in FEMA Memorandum 5054 that allowed adjusters to omit
> line-by-line estimates in two very narrow circumstances: (a) for homes that
> had standing water for an extended period of time; and (b) for homes that
> were "washed off their foundations" by flood.  State Farm ignored FEMA's
> directive and instructed their adjusters to use Xact Total, a square-foot value
> estimator, rather than perform a line-by-line estimate on all homes with
> significant damage.

2010 Scope Br. at 3.  State Farm responded by arguing that such evidence could not change the

need for a bellwether trial because its violations of W-5054 were part of the same scheme that

the Rigsbys had alleged since the inception of this case:

> [T]he Rigsbys' so-called newly discovered "evidence" is neither "new" nor
> "evidence."  Rather, the "scheme" that the Rigsbys claim was "confirmed"
> in discovery is no different from the "scheme" they claim is supported by
> the now-discredited Brian Ford report.  It is the same "scheme" that the
> Rigsbys advanced at the evidentiary hearing in May 2009.  It is the same
> "scheme" that they alleged in their pleadings years ago.  ([16] ¶¶ 56-64.)  In
> short, there is nothing "new" here, and all of their "new evidence" is an
> artificial contrivance that should be afforded no legal weight.

SF Opp. to Mot. Reconsid. at 5 (Sept. 17, 2010) [ECF No. 766].  This Court denied the Rigsbys'

motion, and all other pending motions, because State Farm filed a petition for interlocutory

appeal of an unrelated issue.  Order Granting Mot. Interloc. App. (Sept. 30, 2011) [ECF

No. 899].

Once the Fifth Circuit denied the petition, the Rigsbys again moved to expand the scope

of discovery.  They highlighted specific evidence that State Farm used XacTotal in violation of

W-5054, knew W-5054 required line-by-line estimates for Category 3 homes, and used fake line-

by-line estimates to cover up its violations.  2011 Scope Br. at 20.  State Farm provided the same

response, almost verbatim.  SF Opp. to Renewed Mot. Reconsid. at 8 (Jan. 20, 2012) [ECF No.

923].  Thus, State Farm's argument that its violations of W-5054 are somehow new in the SAC

directly contradicts it prior arguments to this Court.

**III.   The Rigsbys Specifically Pled State Farm's Violation of W-5054 In the Pretrial Order, to Which the Pleadings in This Case Were Conformed.**

State Farm's repeated arguments about allegations that are missing from the Original Complaint are misleading, since the Pretrial Order was entered in part to conform the pleadings to the case to be tried.  The Pretrial Order contains the facts State Farm wrongly alleges are new, including State Farm's violations of W-5054:

> Attempting to avoid the line-by-line adjusting directive from NFIP, State Farm sought an exception to this in cases where (1) the home was in standing flood water for many days; (2) the home was completely washed off its foundation; and (3) where damage to the home appeared to exceed policy limits.  For such cases, State Farm requested that its adjustors be allowed to forego the line-by-line estimate and instead simply estimate the value of the damaged home using a variation of the Xactimate estimating program called "Xactotal."  The NFIP approved this approach for the first two categories of homes, but rejected it for the third.  As to category (3) above, even in the face of having requested the variation and having NFIP deny it, State Farm still continued to tell its adjustors to use Xactotal to "hit the limits" of the flood policies on these types of claims and not perform the line-by-line adjustment.  Consequently, State Farm adjusted multitudes of flood claims under NFIP policies in knowing and direct violation of one of the core NFIP adjusting requirements.

Second Am. Pre-Trial Order ("Pretrial Order") at 5 (Mar. 25, 3013) [ECF No. 1081].

**IV.   The Rigsbys Proved State Farm's Improper Use of XacTotal in Violation of W-5054 in the McIntosh Trial, and the Fifth Circuit Found the Rigsbys to Be Original Sources Based in Part on Their Knowledge of Those Violations.**

Contrary to the core premise of State Farm's motion that its violations of and false certifications of compliance with W-5054 are a "fundamentally different scheme" from the one the Rigsbys proved at trial, the Fifth Circuit held that the Rigsbys proved those exact facts:

> Prior to Katrina, State Farm's general policy was to conduct line-by-line and item-by-item estimates of home damages using a program called Xactimate.  In the wake of Katrina, … FEMA authorized WYO insurers— through FEMA directive W5054—to use an expedited procedure to pay two particular types of claims: 1) claims in which a home "had standing water in [it] for an extended period of time" and 2) claims in which the home was "washed off its foundation by flood water."  All other claims fell into a third category that required WYO insurers to follow their "normal claim

procedures."  The Rigsbys presented evidence at trial that State Farm failed to comply with that directive.

*Rigsby*, 794 F.3d at 463.  It held that the Rigsbys were original sources based in part on their knowledge that "they were told to use the 'shortcut' Xactotal software even on claims that 'sustained moderate flood damage.'"  *Id.* at 474.  It held that the Rigsbys' knowledge of these practices "put the government 'on the trail of fraud" perpetrated by State Farm.  *Id.* at 476.

State Farm even argued to the Fifth Circuit that the Rigsbys were required to prove that it violated W-5054, and that such violation was material, as part of their "wind-vs-flood" claim:

> Even were we to agree with State Farm that compliance with W5054 must be a prerequisite for payment in this context, FEMA regulations emphasize that WYO insurers "shall comply with written standards, procedures, and guidance issued by FEMA."  Additionally, directive W5054 itself states that the "NFIP's general adjusters will be involved in closely monitoring the performance and procedures of the WYO carriers utilizing this process," signifying that FEMA took compliance seriously.  Finally, FEMA officials testified that line-by-line estimates were in fact a prerequisite to payment under the NFIP.

*Id.* at 478 n.14 (internal citations omitted).  The Fifth Circuit also documented the centrality and materiality of State Farm's violation of W-5054 to the Rigsbys' false record claim:

> We agree with the district court that evidence adduced at trial could lead a reasonable jury to believe that State Farm deliberately or recklessly did not comply with FEMA directive W5054.  To cite just one example, State Farm's principal FEMA contact, Juan Guevara, wrote in an email shortly after W5054 was circulated that the directive required a line-by-line estimate for a building like the McIntosh home.  And the Xactotal printout for the McIntosh claim so closely resembled a line-by-line estimate that former FEMA adjuster Gerald Waytowich—who testified on behalf of State Farm—confused it for one.  The jury could reasonably have believed that the printout was material, and was placed in the file to mislead FEMA in violation of § 3729(a)(1)(B).

*Id.* at 480.  Thus, the Rigsbys proved in the McIntosh trial that W-5054 required line-by-line adjustments, that State Farm knowingly violated that requirement by using XacTotal instead, and that it used false records to deceive the Government into believing that it had complied—

precisely the allegations that State Farm wrongly contends are "new" in the SAC.

**V.     The Fifth Circuit Rejected State Farm's Argument That Its Use of XacTotal in Violation of W-5054 Was a "Fundamentally Different" Scheme Than the Rigsbys' "Wind vs. Flood" Allegations for Purposes of the FCA's Public Disclosure Bar.**

As it does here, State Farm previously argued to the Fifth Circuit that the Rigsbys'

allegations and proof about its violations of W-5054 were too far afield from their allegations in

the Original Complaint for the Rigsbys to be original sources of the information underlying those

allegations. *Rigsby*, 794 F.3d at 474.  As here, State Farm invoked *Rockwell*'s "claim

smuggling" language.  The Fifth Circuit unambiguously rejected State Farm's argument:

> *We next look to whether the Rigsbys' status as original sources was divested by the pursuit of a different theory at trial, as State Farm argues.* … But the facts here differ substantially from those in *Rockwell*.  The *Rockwell* Court looked to the final pretrial order to evaluate jurisdiction and observed that it had become unmoored from the original allegations underlying the complaint.  But the final pretrial order in this case is replete with allegations about which the Rigsbys had direct and independent knowledge.  The Rigsbys allege in the final pretrial order, for example, that: 1) State Farm told adjusters to use Xactotal to "hit the limits" of flood policies; 2) adjuster Cody Perry handed Kerri Rigsby the Ford Report, which contained King's note; and 3) the Rigsbys attended an adjuster meeting convened by State Farm during which the company's trainers told the adjusters that Katrina was a "'water storm' and that all major damage to homes was caused by flooding." *These allegations formed the basis of much of the trial and they do not significantly diverge from the Rigsbys' original allegations.*

*Id.* at 475 (emphasis added).  State Farm thus already litigated and lost the flawed argument at

the core of its current motion—that the Rigsbys' wind-vs-flood factual falsity theory is

"fundamentally different" from State Farm's use of XacTotal in violation of W-5054.  Indeed,

the Fifth Circuit could not have upheld the jury's false record verdict without holding that the

Rigsbys' status as original sources encompassed State Farm's improper use of XacTotal in

violation of W-5054 because that violation was the sole basis for the Fifth Circuit's decision to

affirm the jury's verdict that State Farm submitted a false record.  *Id.* at 480.

## ARGUMENT

This motion is State Farm's latest improper attempt to relitigate arguments that this Court and the Fifth Circuit already have rejected. The core premise of State Farm's motion is that the additional false certification *legal theories* the Rigsbys added in their SAC are "fundamentally different from the wind-vs-flood scheme they advanced pre-amendment." SF Br. at 16. But artificially labeling a legal theory a "scheme" does not make it any more factual.

State Farm cites no authority for its assumption that applying a new legal theory to previously pled facts creates a new "scheme" that can trigger a new public disclosure inquiry. State Farm's argument is directly contrary to Congress's focus in § 3730(e)(4) on allegations of fact. On its face, § 3730(e)(4)(A) is triggered by public disclosure of "allegations or transactions," which the Fifth Circuit has defined exclusively as issues of fact. *See United States ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 144 (5th Cir. 2017) (defining "allegations" as express accusations of fraud and "transactions" as "a misrepresented state of facts *and* a true state of facts" from which fraud may be inferred). Similarly, Congress in § 3730(e)(4)(B) required a relator to have "direct and independent knowledge of the information on which the allegations are based." The Fifth Circuit has construed this provision to require only knowledge of facts, holding that "[t]he relator's contribution must 'translate into some additional compelling *fact*.'" *Rigsby*, 794 F.3d at 473 (emphasis added).[1] On their face, these

---

[1] State Farm's argument also is contrary to the rules that govern amended pleadings in FCA cases generally. An amended complaint that applies a new legal theory to existing allegations but does not change the underlying scheme is based on the same information as the prior complaint. *See, e.g.*, *United States ex rel. Bledsoe v. Community Health Sys.*, 501 F.3d 493, 518 (6th Cir. 2007) (concluding amended complaint adding details related back to original complaint that alleged same scheme); *United States ex rel. Kolchinsky v. Moody's Corp.*, 162 F. Supp. 3d 186, 198 (S.D.N.Y. 2016) (holding that relators did not need to file amended complaint under seal where new allegations were "variations on a theme" pled in prior complaint); *United States ex rel. Kirk v. Schindler Elevator Corp.*, 926 F. Supp. 2d 510, 518-19 (S.D.N.Y. 2013) (finding amended complaint adding claim of filing false reports and adding details to existing claim of failing to file reports arose from same underlying events for purposes of Rule 15); *United States ex rel. UBL v. IIF Data Sols.*, Civ. No. 1:06-cv-641, 2009 WL 1254704, at *4 (E.D. Va.

provisions are not triggered by applying additional legal theories to already-pled facts.

Nor can State Farm substantiate its argument that the Rigsbys are pleading a fundamentally different factual scheme.  State Farm concedes that its motion hinges on this Court believing that the Rigsbys' allegations that State Farm violated W-5054 are new: "The new claims—based on regulatory violations arising out of alleged noncompliance with adjustment procedures and fee schedules described in W-5054—are different from the wind-vs-flood allegations."  SF Br. at 3.  Yet State Farm's use of XacTotal in violation of W-5054 has been a core part of Rigsbys' case since long before the SAC, and it was *the* basis for the jury's finding that State Farm used a false record in violation of the FCA.  *Rigsby*, 794 F.3d at 480.

Even if State Farm's arguments were not precluded, they lack merit.  State Farm correctly identifies the pre-2010 amendment version of the False Claims Act's so-called public disclosure bar in 31 U.S.C. § 3730(e)(4) as the version that applies in this case.  *Rigsby*, 794 F.3d at 480. The applicable version of the provision states:

> No court shall have jurisdiction over an action under this section based
> upon the public disclosure of allegations or transactions in a criminal, civil,
> or administrative hearing, in a congressional, administrative, or
> Government Accounting Office report, hearing, audit, or investigation, or
> from the news media, unless the action is brought by the Attorney General
> or the person bringing the action is an original source of the information.
>
> For purposes of this paragraph, "original source" means an individual who
> has direct and independent knowledge of the information on which the
> allegations are based and has voluntarily provided the information to the
> Government before filing an action under this section which is based on the
> information.

31 U.S.C. § 3739(e)(4) (2006).  The Fifth Circuit has derived from these provisions a three-part test for whether the public disclosure of information can bar an FCA claim.

It asks "1) whether there has been a 'public disclosure' of allegations or

---

May 5, 2009) (holding that amended complaint that merely added "specificity to the allegations contained in the original complaint" did not need to be filed under seal).

transactions, 2) whether the *qui tam* action is 'based upon' such publicly disclosed allegations, and 3) if so, whether the relator is the 'original source' of the information."

*United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 373 (5th Cir. 2017). Under this test, State Farm bears the "burden to 'first point to documents plausibly containing allegations or transactions on which [the relator's] complaint is based.'" *Id.*

The plain language of § 3730(e)(4) specifies that "the original-source independent-knowledge requirement is only triggered if the claims are based on information that is publicly disclosed." *United States ex rel. Grubbs v. Kannegani*, 565 F.3d 180, 194 (5th Cir. 2009). Nevertheless where, as here, the relators are "'paradigmatic … whistleblowing insider[s],'" the Fifth Circuit has held that a court can render moot any public disclosure by finding that a relator is an original source. *Rigsby*, 794 F.3d at 472, 475. Following the Fifth Circuit's prior approach in this case, the Rigsbys first address why they are original sources.

## I.   The Rigsbys Are Original Sources.

State Farm argues that 31 U.S.C. § 3730(e)(4) precludes the Rigsbys' false certification *legal theories*, even though the SAC merely applies those legal theories to the same *facts* and *scheme* the Rigsbys have alleged since the inception of this case.[2] The argument is precluded by both the jury verdict and mandate in this case, and it substantively lacks merit.

### A.   State Farm Improperly Seeks to Relitigate the Rigsbys' Status as Original Sources for the Same Scheme They Proved in the Bellwether McIntosh Trial.

State Farm's challenge to the public disclosure of the Rigsbys' allegations and the Rigsbys' status as original sources simply regurgitates the same arguments about the Rigsbys' direct and personal knowledge of the same scheme that the Rigsbys proved in the McIntosh trial.

---

[2] State Farm does not even try to argue that the Rigsbys' factual falsity claims are barred. It suggests that such an inquiry must be made for each house, but that suggestion contradicts *Rockwell* and numerous other cases holding that public disclosure and original source status is determined scheme-by-scheme, as well as State Farm's own framing of the issue as scheme-by-scheme in its brief. *See, e.g,*, SF Br. at 6.

1.      **Courts Apply the Public Disclosure Bar and Determine a Relator's Original Source Status on a Scheme-by-Scheme Basis.**

State Farm's attempt to relitigate the Rigsbys' already-proven original source status for the scheme at issue is based on the same misreading of *Rockwell* and, in particular, its "claim smuggling" language, that it argued to the Fifth Circuit. *See Rigsby*, 794 F.3d at 474-75. State Farm acknowledges that, under *Rockwell*, courts evaluate public disclosures and a relator's original source status on a scheme-by-scheme basis. *See* SF Br. at 16 ("The false certification schemes—arising out of alleged non-compliance with the technical directions in a FEMA bulletin—are fundamentally different from the wind-vs-flood scheme they advanced pre-amendment."). Yet it cites no authority for its presumption that applying an additional legal theory to already-pled facts can be "claim smuggling."

*Rockwell* undermines rather than supports State Farm's argument. The Supreme Court applied the public disclosure bar on a scheme-by-scheme basis, including when it noted with approval that "the Government concedes that new allegations regarding a fundamentally different fraudulent scheme require reevaluation of the court's jurisdiction." *Rockwell*, 549 U.S. at 474. It later relied upon three decisions that determined original source status on a scheme-by-scheme basis. *Id.* (citing *United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 98-102 (3d Cir. 2000) (requiring knowledge of "automated chemistry scheme"), *Hays v. Hoffman*, 325 F.3d 982, 990 (8th Cir. 2003) (qualifying relator as original source for scheme to bill Medicare for "apples given as gifts"), and *United States ex rel. Wang v. FMC Corp.*, 975 F.2d 1412, 1415-16 (9th Cir. 1992) (qualifying relator as original source base on "personal knowledge of the Bradley's transmission problems")). When the Supreme Court in *Rockwell* applied these cases to decide whether a relator had engaged in "claim smuggling," it used the term "claim" to refer to the relator's alleged scheme—*i.e.*, the facts giving rise to liability—and

not to any legal theory or instance of false billing.  *See Rockwell*, 549 U.S. at 476 (holding that

relators' "original-source status with respect to his spray-irrigation claim (which related to a time

period different from that for his pondcrete claim) [did not] provide[] jurisdiction with respect to

all of his claims").  Thus, the Rigsbys did not engage in "claim smuggling" by applying

additional legal theories to the State Farm scheme they already had pled and proven.

> **2.      The Fifth Circuit Already Has Held That the Rigsbys Are Original Sources for the Scheme at Issue in This Case.**

The Fifth Circuit already has held that the Rigsbys are original sources for the scheme

they proved in the McIntosh trial, including how State Farm violated W-5054 by using XacTotal

on Category 3 homes.  The mandate rule "compels compliance on remand with the dictates of a

superior court and forecloses relitigation of issues expressly or impliedly decided by the

appellate court."  *Fuhrman v. Dretke*, 442 F.3d 893, 897 (5th Cir. 2006).  In this case, the Fifth

Circuit held that "the Rigsbys are original sources."  *Rigsby*, 794 F.3d at 473.  It held that the

scheme the Rigsbys proved included allegations that State Farm instructed them to "use Xactotal

in these circumstances rather than FEMA directive W-5054's required line-by-line estimate."  *Id.*

at 469.  It called the Rigsbys "'paradigmatic … whistleblowing insider[s].'"  *Id.* at 475.  It held

that "[t]heir direct knowledge surpasses that presented by other would-be relators in our original

source jurisprudence."  *Id.*  And it held that that the Rigsbys' "contributions put the government

'on the trail of fraud.'"  *Id.*  In at least one subsequent case, the Fifth Circuit has continued to cite

to the Rigsbys as illustrative examples of original sources.  *See United States ex rel. King v.*

*Solvay Pharms.*, 871 F.3d 318, 327 n.6 (5th Cir. 2017).

State Farm identifies only one new allegation of *fact* that the Rigsbys alleged for the first

time in their SAC—that State Farm charged the full normal rate when it improperly used

XacTotal to adjust Category 3 homes, rather than the reduced rate FEMA prescribed when such

procedures are permissibly used to adjust damage to Category 1 and 2 homes.  "An amended complaint that merely adds detail to a previously pled cause of action does not reset the clock for when the relator's claims were alleged." *United States ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 46 n.7 (4th Cir. 2016).  This new "rate" allegation is merely additional evidence and detail regarding the same scheme—that State Farm used the XacTotal "shortcut" and misrepresented its compliance, including by charging the rate FEMA reserved for a full line-by-line adjustment.  It is simply another way State Farm conveyed the same misrepresented set of facts to the Government.  The allegation also applies to exactly the same transactions with the Government—the same houses under the same flood policies that State Farm adjusted with XacTotal rather than a line-by-line adjustment to "hit the limits" of NFIP flood policies.

State Farm's attempt to excise the Rigsbys' knowledge of State Farm's use of XacTotal in violation of W-5054 from these holdings is baseless.  The Fifth Circuit held that the Rigsbys are original sources because "they were told to use the 'shortcut' Xactotal software even on claims that 'sustained moderate flood damage.'" *Rigsby*, 794 F.3d at 474.  Indeed, it necessarily found that the Rigsbys were original sources regarding State Farm's violation of W-5054 when it upheld the jury's verdict that "State Farm deliberately or recklessly did not comply with FEMA directive W5054" and placed an "Xactotal printout … in the file to mislead FEMA in violation of § 3729(a)(1)(B)." *Id.* at 480.  State Farm presents no legal basis for this Court to violate the Fifth Circuit's mandate and reconsider these issues.

### B.    The Rigsbys' Knowledge of State Farm's Use of XacTotal Instead of Line-by-Line Adjustments Qualifies Them as Original Sources.

Even if this Court could reexamine whether the Rigsbys are original sources for the scheme they proved at trial, it would be compelled to reach the same result for the same reasons.  State Farm's argument relies on the universally rejected assertion that a relator must have direct

and independent knowledge of every element of his or her claim, including knowledge about how the defendant's conduct violates the law.  *See* SF Br. at 18 (arguing that Rigsbys' conceded knowledge of State Farm's adjusting practices "plainly do not suffice as they speak to only one part of the equation").  Contrary to State Farm's argument, the Rigsbys' knowledge suffices because a relator only needs direct and independent knowledge of "some additional compelling fact" to be an original source.  *Rigsby*, 794 F.3d at 473.

Under § 3730(e)(4)(B), an "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  *Id.*  Knowledge is direct if derived without interruption or gained through a relator's efforts rather than second hand.  *Id.*  Knowledge is independent when it is not derived from public sources.  *Id.*  "In evaluating whether a relator has 'direct and independent knowledge' we must look to the factual subtleties of the case before us and attempt to strike a balance between those individuals who, with no details regarding its whereabouts, simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim."  *Id.*  The relator's contribution must "translate into some additional compelling fact, or must demonstrate a new and undisclosed relationship between disclosed facts, that puts a government agency 'on the trail' of fraud, where that fraud might otherwise go unnoticed."  *Id.*  A decade and a half of litigation has confirmed that the Rigsbys are "'paradigmatic … whistleblowing insider[s]'" and "their direct knowledge surpasses that presented by other would-be relators."  *Id.* at 475.

In arguing otherwise, State Farm advocates for a two-part test for original source status that literally makes it impossible for any relator to qualify as an original source, thereby

depriving § 3730(e)(4)(B) of any possible meaning.  First, State Farm argues (wrongly) that it is not enough for a relator to have "direct and independent knowledge" of what the defendant did, but rather that she also must know why that conduct violated the law.  SF Br. at 18 (arguing that Rigsbys must have direct and independent knowledge that State Farm "*violated* W-5054") (emphasis in original).  Second, it argues that such knowledge *never* can be "independent" because the laws imposing the legal obligation are public.  *See id.* at 20 (arguing that any knowledge Rigsbys obtained "through reading W-5054" cannot be independent because the directive is public).  When these arguments are combined, no relator can be an original source for a false certification claim, and § 3730(e)(4)(B) is rendered surplusage.

State Farm's argument is simply wrong.  The Fifth Circuit and every other court to address the issue has merely required a relator to have "direct and independent" knowledge of the defendant's conduct (*i.e.*, the true state of facts) to qualify as an original source.  State Farm correctly notes (at 8-10) that the Fifth Circuit has adopted the analysis of the D.C. Circuit in *United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994), to determine whether a relator's FCA claim is based on a prior public disclosure.  *See, e.g.*, *United States ex rel. Colquitt v. Abbott Labs*, 858 F.3d 365, 374 (5th Cir. 2017).

The D.C. Circuit in *Springfield* analyzed the terms "allegations" and "transactions" to define the kind of public disclosure that could bar a later FCA claim:

> [I]n common parlance, the term "allegation" connotes a conclusory statement implying the existence of provable supporting facts. The term "transaction" suggests an exchange between two parties or things that reciprocally affect or influence one another.  On the basis of plain meaning, and at the risk of belabored illustration, if X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements.  In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed.  The language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit qui tam actions

> only when either the allegation of fraud or the critical elements of the
> fraudulent transaction themselves were in the public domain.

14 F.3d at 653-54 (citations omitted).  In this formulation "Z is an inference of fraud under the

FCA, while X and Y are two required elements for the inference: 'a misrepresented state of facts

*and* a true state of facts.'"  *Solomon*, 878 F.3d at 144.

State Farm expressly invokes *Springfield*'s formulaic analysis when framing its challenge

to the Rigsbys' original source status, asserting that the Rigsbys must have direct and

independent knowledge of all parts of their claim, X and Y:

> These allegations do not suffice as they speak to only one part of the
> equation.  To qualify as original sources the Rigsbys also have to show that
> they had direct and independent knowledge that the use of XacTotal on
> Process # 3 claims and the charging of adjustment fees under the existing
> fee schedule allegedly *violated* W-5054 and that they had this knowledge
> prior to bringing this action.

SF Br. at 18.  Yet State Farm ignores that *Springfield* rejected that very argument:

> Significantly, the "original source" provision requires the relator to possess
> direct and independent knowledge of the "information" underlying the
> allegation, rather than direct and independent knowledge of the
> "transaction" itself.  On the basis of plain meaning, then, we find that
> § 3730(e)(4)(B) does not require that the *qui tam* relator possess direct and
> independent knowledge of *all* of the vital ingredients to a fraudulent
> *transaction*.  Thus, to revert to previous analysis, the term "information" in
> the "original source" context is not confined to the *combination* of X and Y,
> the two essential elements to the transaction.  This distinction also conforms
> to our understanding of the purposes of the Act.  Rare indeed would be the
> case in which relators could gain "original source" status, if such were the
> standard, because the misrepresented state of affairs, *e.g.* X, would almost
> always have been disclosed to the government independently by the alleged
> defrauder.  If we were to equate "information" with "transaction," we would
> undo Congress' careful choice of wording …. We think it clear, in light of
> the aims of the statute, that "direct and independent knowledge of
> information on which the allegations are based" refers to direct and
> independent knowledge of *any* essential element of the underlying fraud
> transaction (*e.g.*, Y).

*Springfield*, 14 F.3d at 656-57.

State Farm not only ignores *Springfield*'s holding, but also the D.C. Circuit's unassailable

analysis of the text of 31 U.S.C. § 3730(e)(4)(B), and in particular its refusal to interpret Congress's use of two different terms to have the same meaning.  As the Supreme Court held in *Henson v. Santander Consumer USA Inc.*, "when we're engaged in the business of interpreting statutes we presume differences in language like this convey differences in meaning." 137 S. Ct. 1718, 1723 (2017).  State Farm does not try to justify giving different terms, "transactions" and "information," the same meaning when Congress used them in the same statutory subsection.

In *Colquitt*, the Fifth Circuit expressly adopted *Springfield*'s public disclosure analysis and similarly did not equate the "information" required for original source status with every element of the "transaction" comprising the defendant's alleged fraud.  "When the 'investigation or experience of the relator … translate[s] into some additional compelling fact, or … demonstrate[s] a new and undisclosed relationship between disclosed facts,' the relator may proceed as an original source despite public disclosure."  858 F.3d at 376.  State Farm does not try to explain how it makes any sense to interpret "some additional compelling fact" to mean every element of the relator's allegations, as well as the legal analysis showing wrongfulness.

The Fifth Circuit in *Colquitt* then emphasized that a relator's ability to testify about the defendant's actual conduct from first-hand experience is sufficient for original source status:

> That is because a relator who brings new evidence of wrongdoing that may already be in the public domain still strengthens the government's case—what more compelling evidence is there than the testimony of a witness providing an insider's account of the misconduct?—and thus should be allowed to share in the recovery she helped achieve.

*Id.* at 376.  That is precisely what the Fifth Circuit held that the Rigsbys bring to this case as "'paradigmatic … whistleblowing insider[s].'"  *Rigsby*, 794 F.3d at 475.

The Fifth Circuit applied the same analysis in this case.  Like *Colquitt*, it held that a relator needs only direct and independent knowledge of "some additional compelling fact, or must demonstrate a new and undisclosed relationship between disclosed facts."  *Id.* at 473.  It

then found that the Rigsbys were original sources based on their direct and independent

knowledge of three topics that all pertain solely to "Y," *i.e.*, State Farm's actual conduct:

> The Rigsbys allege in their original complaint that: 1) they were told to use
> the "shortcut" Xactotal software even on claims that "sustained moderate
> flood damage"; 2) they were told to manipulate the information entered into
> Xactotal if the initial analysis did not result in a full payout under the flood
> policy; and 3) Rigsby discovered the wind-focused Ford Report as well as
> King's "DO NOT Pay Bill DO NOT discuss" note attached to that
> document and the subsequent flood-focused Kelly Report. These allegations
> were sufficient to confer original source status upon the Rigsbys at the
> outset of the case.

*Id.* at 474.  State Farm cannot reconcile its argument with the Fifth Circuit's holding that "[t]hese

allegations were sufficient to confer original source status upon the Rigsbys." *Id.*

Other circuit courts also have adopted *Springfield*'s holding that a relator only needs

knowledge of the true state of facts to qualify as an original source.  The Eighth Circuit held that

"to qualify as an original source, a relator does not have to have personal knowledge of all

elements of a cause of action," and "[i]f the relator has direct knowledge of the true state of the

facts, it can be an original source even though its knowledge of the misrepresentation is not first-

hand."  *Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1050

(8th Cir. 2002).  The Tenth Circuit also held that "the fact that Relators did not have knowledge

of the actual alleged fraudulent submissions to the Government cannot disqualify them as an

original source." *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1044 (10th Cir. 2004).[3]

---

[3] District Courts in the Fifth Circuit concur.  For example in *United States ex rel. Reagan v. East Tex. Medical Center Regional Healthcare System*, 274 F. Supp. 2d 824, 852-53 (S.D. Tex. 2003), *aff'd*, 384 F.3d 168 (5th Cir. 2004), the Fifth Circuit affirmed a district court's decision holding that a relator "need not have "personal knowledge of all elements of a cause of action," so long as "her evidentiary showing must support at least one essential element of each of the fraud allegations in her complaint."  *See also United States ex rel. Woods v. SouthernCare, Inc.*, No. 3:09-CV-00313-CWR, 2013 WL 5445239, at *2 (S.D. Miss. Sept. 30, 2013) (holding that knowledge of "any essential element of the fraudulent scheme" suffices); *United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins.*, 782 F. Supp. 2d 248, 278 (E.D. La. 2011) (same); *United States ex rel. Integra Med Analytics, LLC v. Creative Sols. In Healthcare, Inc.*, No. SA-17-CV-1249, 2019 WL 5970283, at *11 (W.D. Tex. Nov. 13, 2019) (same).

In this case, even State Farm concedes that the Rigsbys have direct and independent knowledge of its use of XacTotal rather than line-by-line adjustments.  *See* SF Br. at 22 (quoting a portion of Rigsbys' initial disclosure statement to government in which they describe State Farm's improper use of XacTotal rather than performing line-by-line adjustments).

### C.    The Rigsbys' Initial Beliefs About State Farm's Use of XacTotal Are Irrelevant.

State Farm regurgitates an argument that the Fifth Circuit already rejected when it asserts that the Rigsbys cannot be original sources because they testified that they initially believed State Farm when it told them that they could use XacTotal on Category 3 homes.  *See* SF Br. at 19. State Farm made the same argument based on some of the same testimony unsuccessfully to the

---

In the face of this overwhelming and uniform body of federal law, State Farm cites only *Solomon*, 878 F.3d at 147.  The panel there did not purport to state new law or even the standards governing original source status.  In *Solomon*, the Fifth Circuit considered whether the relator had direct and independent knowledge of the allegations in the complaint even though the parties did not brief that issue on appeal. *Id.*  The court addressed none of the circuit precedents discussed above, such as *Rigsby*, 794 F.3d at 475, holding that a relator need only have direct and independent knowledge of "some additional compelling fact, or must demonstrate a new and undisclosed relationship between disclosed facts" and that direct and independent knowledge of a defendant's actual practice is sufficient.  *See, e.g., Colquitt*, 858 F.3d at 376; *Reagan*, 384 F.3d at 179; *United States ex rel. Lockey v. City of Dall.*, 576 F. App'x 431, 437 (5th Cir. 2014).  Indeed, the *Solomon* panel could not overrule these precedents, as "a panel of this court can only overrule a prior panel decision if 'such overruling is unequivocally directed by controlling Supreme Court precedent.'"  *Martin v. Medtronic, Inc.*, 254 F.3d 573, 577 (5th Cir. 2001).  State Farm purports to cite no such intervening Supreme Court precedent.  The *Solomon* court conveyed no intent to deviate from prior circuit precedent, nor any intent to create a split with every other circuit to consider the issue.  Rather, the relator in *Solomon* failed to qualify as an original source because he knew no facts other than those that had been publicly disclosed, and therefore failed to bring "some additional compelling fact" to the case.  878 F.3d at 147.  The relator pled in that case a defendant's "improper use of management reserves *and* the connection of those budget alterations to obtaining award fee bonuses."  *Id.*  Thus, the "Y" in the Springfield formula (the true state of facts) had two parts.  The court assumed that the relator "had direct and independent knowledge about the connection between management reserves and award fee bonuses," which was the part of "Y" that had been publicly disclosed and held that the relator had no such information about the other half of the true state of facts—"budget alterations to obtain award fee bonuses."  *Id.* at 147.  State Farm thus misreads *Solomon*.  *See* SF Br. at 20.  The *Solomon* panel did not deny original source status to the relator because he lacked knowledge of both the "X" and "Y" in the *Springfield* formula.  Rather, it denied original source protection because at best he had knowledge only about the part of "Y" that had been disclosed publicly, and therefore failed to bring "some additional compelling fact" or anything else of value to the case.  *See Rigsby*, 794 F.3d at 475.  The Rigsbys, in contrast, "are the 'paradigmatic … whistleblowing insider[s]'" with direct and independent knowledge of many "compelling facts" beyond those that had been publicly disclosed.  *Id.*

Fifth Circuit, and thus the mandate rule bars this argument.  *See Fuhrman*, 442 F.3d at 897.  In addition, as noted above, this argument lacks merit because the Rigsbys' direct and independent knowledge of what State Farm actually did—its improper use of the XacTotal "shortcut" instead of line-by-line adjustments—is a sufficient "additional compelling fact" to warrant original source status, regardless of whatever else they may have believed.  *Rigsby*, 794 F.3d at 473-74.

In its current motion, State Farm argues that "Kerri Rigsby testified in the McIntosh trial that she was 'fine' with the use of XacTotal and did not understand it to be inappropriate.  *See* Trial Test. Vol. 2, Ex. H to Mtn. at 332:22-333:4."  SF Br. at 19.  It further argues that the Rigsbys cannot be original sources because "Kerri Rigsby likewise testified that she had no 'reason to doubt' that FEMA had approved the use of XacTotal."  *Id.*

As an initial matter, State Farm's invocation of prior testimony confirms that these issues have always been a central part of this case.  Moreover, it made these same arguments based on the same testimony in its prior brief to the Fifth Circuit.  State Farm cited the same page of the same transcript to argue that "she [Kerri Rigsby] further testified that she was "fine" with the use of XacTotal. [Trial Test. Vol. 2, at 333]."  Br. of Cross-App. at 28, *United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, No. 14-60160 (5th Cir. filed Aug. 12, 2014).  It argued that "[a]t trial, she testified that she 'honestly' believed the McIntosh flood payment was justified when she recommended that State Farm pay the limits of that claim, but does not know today whether it was justified."  *Id.*  Thus, the Fifth Circuit already has heard and rejected these arguments.

State Farm also mischaracterizes the testimony it cites.  For example, it argues that "both Rigsbys testified to their belief that the existing percentage-based fee schedule applied to Process #3 properties such as McIntosh."  SF Br. at 19.  When viewed in context, the cited testimony actually was about how they could make more money as adjusters than managers.  K. Rigsby

Dep. at 54:6-55:6 (June 24, 2010) [ECF No. 1464-14].  Moreover, this testimony is consistent

with the Rigsbys' proof that FEMA required State Farm to perform a line-by-line adjustment for

"Process #3" properties and thus authorized the full percentage-based fee for that work.

State Farm also mischaracterizes Kerry Rigsby's trial testimony to assert that "she was

'fine' with the use of Xactotal and did not understand it to be inappropriate."  SF Br. at 19.  She

used the word "fine," but only to convey that State Farm approved use of XacTotal, not FEMA.

Trial Tr., Vol. 2, 333:1-11 (Mar. 26, 2013) [ECF No. 1116].  When asked directly about the

propriety of using XacTotal rather performing a line-by-line adjustment, she responded:

> **Q.** Well, if it's so difficult to go out to a home that's still standing that is
> damaged possibly by water and wind, if it's so difficult to make that
> determination, what possible fraud could happen in using your best
> judgment to adjust that claim?
> **A.** Well, to this particular claim I believe that *the fraud occurred when*, A,
> we didn't—we changed the engineer report.  We didn't investigate more
> when that engineer report came back.  *We could have done a stick build on
> this and should have and didn't.*  I don't believe that we did everything we
> should have done for this policyholder and many others.

K. Rigsby Dep. at 171:10-23 (June 24, 2010) [ECF No.1464-14] (emphasis added).  None of this

matters, however, because the Fifth Circuit already has rejected State Farm's arguments.

> **D.     The Rigsbys Disclosed Any New Allegations to the Government Before They
> Filed the Second Amended Complaint.**

State Farm baselessly asserts (at 21) that "the Rigsbys did not voluntarily provide

information about the false certification theories to the government."  The Rigsbys sent a copy of

the SAC to the Government before they filed it.  Letter from A. Matteis to J. Majors (Apr. 23,

2020) (attached as Exhibit B).  The Rigsbys did not file the SAC until after the Government

responded that the SAC contained no new allegations that could require it to be filed under seal.

*See* Letter from J. Majors to A. Matteis (Apr. 27, 2020) (attached as Exhibit C).  Thus, State

Farm's speculation (at 22 n. 14) that the Rigsbys deprived the Government of "an opportunity to

evaluate and make an intervention decision with regard to these new schemes" is false.

## II.     State Farm Fails to Identify a Public Disclosure of the Allegations in the Rigsbys' Second Amended Complaint.

State Farm also fails to identify a prior public disclosure of the Rigsbys' allegations.  The

FCA's public disclosure provision does not bar a claim where, as here, a relator alleged the

wrongdoing before it was disclosed.  Section 3730(e)(4)(A) only bars "an action under this

section *based upon the public disclosure* of allegations or transactions," and an allegation cannot

be "based upon" a public disclosure it predates.  "Where the relevant fraud is first alleged before

the public disclosure, as occurred here, the suit is plainly not 'parasitic.'"  *Beauchamp*, 816 F.3d

at 45.  The Rigsbys alleged every fact necessary to plead State Farm's use of XacTotal in

violation of W-5054 in their Original Complaint.  *See* discussion *supra* at 4-5.  The Rigsbys filed

that Complaint before all of the purported public disclosures that State Farm identifies, except

for W-5054 and the NFIP claims manual, and those documents disclose neither State Farm's

conduct nor its misrepresentations.  Even if the purported public disclosures had predated the

Rigsbys' allegations, they still could not trigger the public disclosure bar because none of them

disclose the fraud that the Rigsbys have pled, much less with the similar breadth and specificity

that the Fifth Circuit requires.

As noted above, the Fifth Circuit applies the D.C. Circuit's analysis in *Springfield* to

determine whether a relator's FCA claim is based on a prior public disclosure.  *See* discussion

*supra* at 17-19; *Colquitt*, 858 F.3d at 374.  In *Springfield*, 14 F.3d at 653-54, the D.C. Circuit

created a now nearly-universally-adopted formula of $X + Y = Z$ to explain the meaning of

"allegations" and "transactions" in § 3730(e)(4)(A).  In this formulation "Z is an inference of

fraud under the FCA, while X and Y are two required elements for the inference: 'a

misrepresented state of facts *and* a true state of facts.'"  *Solomon*, 878 F.3d at 144.  *Springfield*

explained why courts must require a public disclosure contain either an express allegation of

fraud (Z) or disclose both the misrepresented state of facts (X) and the true state of facts (Y):

> Many potentially valuable *qui tam* suits would be aborted prematurely by a reading of the jurisdictional provision that barred suits when the only publicly disclosed information was itself innocuous.  In terms of the mathematical illustration, when X by itself is in the public domain, and its presence is essential but not sufficient to suggest fraud, the public fisc only suffers when the whistle-blower's suit is banned.

14 F.3d at 654.

Any ambiguity in a purported public disclosure must be construed in the Rigsbys' favor.

A "challenge under the FCA jurisdictional bar is necessarily intertwined with the merits and is,

therefore, properly treated as a motion for summary judgment." *Rigsby*, 794 F.3d at 472.  As a

result, this Court must "view[] the evidence in the light most favorable to the non-moving party,"

(*i.e.*, the Rigsbys) and draw all reasonable inferences in their favor.  *Id.*  None of the purported

disclosures State Farm identifies meet these standards.

### A.      The June 27, 2007, Article in *The Times-Picayune* Does Not Disclose the Allegations or Transactions That the Rigsbys Pled.

As an initial matter, the article that State Farm cites from *The Times-Picayune*, Rebecca

Mowbray, "Hearing on Flood Claims is Today, Adjusting Procedure Is One of the Issues" (the

"*Picayune* Article") [ECF No. 1634-1], was published more than a year *after* the Rigsbys pled

State Farm's improper use of XacTotal in the Original Complaint on April 26, 2006.  *See* Compl.

¶¶ 36-38.  The *Picayune* Article also fails to disclose the fraud scheme that the Rigsbys allege.

Under the *Springfield* test, the *Picayune* Article can qualify as a public disclosure only if it

discloses both X, State Farm's misrepresented state of facts, and Y, the true state of facts—*i.e.*,

State Farm's misrepresentations that it performed the line-by-line adjustments and the truth that

it used XacTotal and presumed flood damage instead.

State Farm misreads the *Picayune* Article as a disclosure that: (1) FEMA authorized it to

use XacTotal to adjust losses to Category 3 homes under W-5054 caused by Hurricane Katrina;
(2) State Farm used XacTotal to adjust such losses to those homes; and (3) FEMA paid it the full
normal rate for those adjustments of Category 3 homes rather than the lower rate FEMA
provided for "expedited procedures."  Most of these conclusions are pure fabrication by State
Farm that have no basis in the article's text, but even if the *Picayune* Article said such things, it
would not disclose the Rigsbys' allegations.  The *Picayune* Article is not clearly written, and any
ambiguities must be construed in the Rigsbys' favor, as this Court must "view[] the evidence in
the light most favorable to the non-moving party."  *Rigsby*, 794 F.3d at 473.

> **1.**     **The *Picayune* Article Does Not Say What State Farm Claims, or Even Discuss the Category 3 Claims at Issue in This Case.**

The *Picayune* Article, like the GAO report it purports to summarize, does not discuss W-
5054 Category 3 homes, but rather merely describes FEMA's authorization of expedited
procedures for Category 1 and 2 homes.  The *Picayune* Article makes this clear in the paragraph
immediately preceding the one that State Farm quotes:

> The expedited procedures approved by the flood program after consultation
> with insurers also allowed companies to settle flood claims without a site
> visit *if satellite and aerial images showed that the home disappeared in
> areas that suffered storm surge, or if the home sat in floodwaters* and the
> damage was likely to have exceeded the policy limits.

*Picayune* Article at 3 (emphasis added).  The article thus provides a layman's summary of the
two categories of homes for which FEMA authorized expedited procedures in W-5054.

State Farm then misrepresents, with no basis in the *Picayune* Article's text, that "the
article describes Process # 3" in the following two paragraphs.  SF Br. at 11.  Nothing in those
paragraphs mentions Category 3 homes.  When the *Picayune* Article states that FEMA
authorized the use of square foot estimator programs developed by "two large but unnamed
insurance companies," it is talking about FEMA approving square foot estimating tools for

Category 1 and 2 homes.  When it says that FEMA allowed use of square foot estimators only "if satellite photos and house measurements on file made it likely that the home was a total loss," it is referring back its prior description of those "satellite photos" that show "that the home disappeared in areas that suffered storm surge, or if the home sat in floodwaters and the damage was likely to have exceeded the policy limits."  *Picayune* Article at 3-4.

State Farm's misreading of the *Picayune* Article becomes even clearer when the Article discusses adjusting fees.  W-5054 states that the reduced fee applies only to Categories 1 and 2:

> The existing NFIP fee schedule will be modified for the claims handled by processes # 1 and # 2.  The fee will be $750.00 for each claim + $400.00 if a site visit is necessary at a later date.  Process # 3 will be paid based upon the existing NFIP fee schedule.

FEMA Bulletin W-5054 at 2 (Sept. 21, 2005) [ECF No. 1632-1]: *see also* SF Br. at 11 n.7 (acknowledging that process #3 adjustments must be paid under normal fee schedule). Thus, when the *Picayune* Article discusses how FEMA may have *overpaid* WYO insurers who used the two square foot estimator programs rather than performing line-by-line adjustments, it only could have been referring to Category 1 and 2 claims, because those are the only categories to which FEMA applied the reduced fee.[4]

Moreover, the Rigsbys proved during the McIntosh trial that State Farm's reading of the *Picayune* Article is false.  As the evidence in the McIntosh trial proved, FEMA never approved any side deal for State Farm or any other WYO to use expedited procedures on Category 3

---

[4] It is true that the Rigsbys allege in the SAC that State Farm overcharged the Government for its use of XacTotal to adjust Category 3 homes by charging the normal adjusting fee for line-by-line adjustments rather than the reduced fee specified in W-5054 ($750 plus $400 for a site visit) for expedited procedures. However, the Rigsbys are not arguing that FEMA actually provided for application of the reduced fee to Category 3 adjustments.  Rather, the Rigsbys argue that the difference in fees is a fair estimate of the difference in value between the estimate the Government received and the estimate it paid for (in addition to the insurance proceeds State Farm caused the government to pay improperly) and that State Farm's charging of the full fee was yet another misrepresentation to the government that it was performing line-by-line estimates when it was not.

homes.  FEMA official James Shortley testified that for Katrina, W-5054 was the "operative document" and that there were no side deals for any insurer.  J. Shortley Dep. at 151:14-18, 156:19-157:3 (June 3, 2010) (Trial Ex. P 791).  As the Fifth Circuit held, the Rigsbys proved at trial that State Farm did not have permission from FEMA to deviate from the requirement that it perform line-by-line estimates on Category 3 homes.  *Rigsby*, 794 F.3d at 469.  In short, State Farm's alternative reading of the *Picayune* Article is not reasonable, but even if it were, this Court must read the Article in the light most favorable to the Rigsbys.

> **2.    Even as Misread by State Farm, the *Picayune* Article Does Not Disclose the Relators' Allegations or Transactions.**

Even if the *Picayune* Article is read as State Farm prefers—*i.e.*, reporting that FEMA gave two unidentified WYOs generalized permission to use XacTotal to adjust Category 3 homes—it would not disclose the Rigsbys' "allegations or transactions."  To constitute a public disclosure under *Springfield*, the *Picayune* Article must disclose *both* the true state of facts and State Farm's misrepresented state of facts to the government.  *Springfield*, 14 F.3d 654-55.  "The presence of one, or the other in the public domain, but not both, cannot be expected to set government investigators on the trail of fraud."  *Solomon*, 875 F.3d at 144.

Under State Farm's misreading, the *Picayune* Article says that FEMA authorized two WYOs to use a square foot estimator like XacTotal on Category 3 homes.  Under such a misreading, the *Picayune* Article might disclose the defense that State Farm litigated and lost,[5] but it would not disclose the fraud that the Rigsbys allege.  A hypothetical article stating that State Farm had *permission* to use XacTotal on Category 3 homes does not disclose the Rigsbys'

---

[5] At trial, State Farm's "argument was that the Xactotal printout was not a false record because State Farm had generalized permission to deviate from FEMA's directive.  *The jury's verdict necessarily entailed a finding that this was not so.*"  *Rigsby*, 794 F.3d at 469 (emphasis added).  The Seventh Amendment's Reexamination Clause precludes any attempt by State Farm to relitigate that issue.  *McDaniel v. Anheuser-Busch, Inc.*, 987 F.3d 298, 305 (5th Cir. 1993).

allegation that State Farm lacked such permission, used XacTotal anyway, and then lied about it.

The Eighth Circuit rejected a similar argument in *Allina*.  The relator in that case alleged that "anesthesiologists billed for personally performing cases in which they were not 'continuously involved' with the patient or the case."  276 F.3d at 1044.  The defendant argued that an audit letter stating that anesthesiologists were personally performing those procedures disclosed the relator's allegations because "the transactions pointed out in the audit are some of the same transactions on which the Association now bases its claims."  *Id.*  The court rejected that argument because "[t]he audit did not reveal what the Association now contends was the true state of the facts, *i.e.*, that the anesthesiologists were not performing the cases they billed for."  *Id.*

### 3.    The *Picayune* Article Does Not Identify State Farm.

To constitute a public disclosure, the *Picayune* Article also must "'provide[] specific details about the fraudulent scheme and the types of actors involved in it' sufficient to 'set the government on the trail of the fraud' and ensure that the government will not 'need to comb through myriad transactions performed by various types of entities in search of potential fraud.'" *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 329 (5th Cir. 2011).  General statements that a type of fraud is "proliferating" are not sufficient.  *United States ex rel. Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 293 (5th Cir. 2012).  As the *Jamison* court noted:

> The government often knows on a general level that fraud is taking place
> and that it, and the taxpayers, are losing money.  But it has difficulty
> identifying all of the individual actors engaged in the fraudulent activity.
> This casting of a net to catch all wrongdoers is precisely where the
> government needs the help of its "private attorneys general."

649 F.3d at 330 (quoting *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 566 (11th Cir. 1994)).

Even if State Farm's misreading of the *Picayune* Article disclosed the fraud that the

Rigsbys allege, it does not even identify State Farm as a potential perpetrator.  State Farm argues

that the *Picayune* Article identifies it by referring to "two large but unnamed insurance

companies" that FEMA purportedly authorized to use square foot estimators on Category 3

homes and implies it was one of those two companies.  SF Br. at 12-13.  The problem with this

argument is that, even if FEMA had authorized "two large but unnamed insurance companies" to

use a square foot estimator to adjust a Category 3 home, the Rigsbys already have proven to a

jury that State Farm was not one of them.  *See Rigsby*, 794 F.3d at 469.

### 4.    The Rigsbys Could Not Have Synthesized the Allegations in Their Second Amended Complaint from the *Picayune* Article.

The *Picayune* Article also cannot preclude the Rigsbys' claims because it is not nearly as

detailed as the SAC.  For an FCA claim to be "based upon" a public disclosure, the "publicly

disclosed allegations or transactions" must be "as broad and as detailed as those in the relator's

complaint."  *Little*, 690 F.3d at 293.  Where, as here, relators allege specific "details about the

scheme," "it is crucial to consider whether the disclosures correspond in scope and breadth."  *Id.*

"An irreducible minimum is that the disclosures furnish evidence of the fraudulent scheme

alleged."  *Id.*  "A guiding query is whether 'one could have produced the substance of the

complaint merely by synthesizing the public disclosures' description' of the scheme."  *Id.*  It is

beyond dispute that the Rigsbys could not have "synthesized" the detailed allegations in their

SAC from the sparse details in the *Picayune* Article.[6]

---

[6] As just a few examples, the *Picayune* Article does not mention: Lecky King (SAC *passim*); State Farm's temporary catastrophe office in Gulfport, Mississippi (*id.* ¶ 37); the Haag Engineering report falsely concluding that Katrina's flooding preceded its highest winds (*id.* ¶¶ 40-41); State Farm's instructions to adjusters that Katrina was a "water storm," they should use XacTotal to "hit the limits" of policyholders' NFIP flood claims, and they should "manipulate the totals" if necessary (*id.* ¶ 46); Juan Guevara and his rebuffed requests for FEMA to authorize State Farm to use XacTotal on Category 3 homes (*id.* ¶ 53); the State Farm memorandum instructing adjusters to bill FEMA for line-by-line estimates when using XacTotal (*id.* ¶ 58); State Farm's creation of a so-called "long form" XacTotal printout that looks like a line-by-line adjustment for submission to FEMA (*id.* ¶ 80); the McIntosh home (*id.* ¶ 81); Forensic

**B.    The GAO Report That State Farm Identifies Does Not Disclose the Allegations or Transactions That the Rigsbys Pled.**

State Farm next identifies GAO Report No. GAO-07-169 ("GAO Report") as a purported public disclosure of its scheme to defraud the government.  SF Br. at 12.  State Farm correctly asserts that the GAO Report and the *Picayune* Article disclose the same facts, as the primary objective of the *Picayune* Article was to summarize the GAO Report.  *Id.*  As a result, the GAO Report fails as a public disclosure of the Rigsbys' allegations for the same reasons as the *Picayune* Article.  Indeed, it confirms State Farm's misreading of both documents by stating that FEMA only authorized the use of square foot estimators on Categories 1 and 2.

State Farm takes a Dr. Frankenstein approach to legal citation when it quotes the GAO Report, grafting together paragraphs from pages 7 and 29 of the GAO Report to draw inferences that the GAO never implied.  The language State Farm quotes from page 7 merely describes how FEMA in W-5054 made new exceptions for Category 1 and 2 homes to its formerly universal requirement for line-by-line adjustments:

> In some circumstances where data showed that flood losses exceeded policy limits, FEMA authorized claims payments to policy limits without site visits by certified flood claims adjusters or allowed the use of models that paid claims based on the square footage of the home and general classification by adjusters of the quality of its building materials (i.e., flooring and doors). FEMA authorized payments to its private insurance company partners of $750 per expedited claim adjustment—a lower fee than would have been paid for a more time-consuming room-by-room, line-item-by-line-item visual assessment of flood damage.

The GAO makes clear that "some circumstances" refer to W-5054 Categories 1 and 2 in the very next sentence that State Farm quotes, which ties those "circumstances" to the reduced $750 fee (plus $400 for a site visit) that W-5054 provided only for Category 1 and 2 adjustments.

---

Engineering (*id.* ¶ 87); the Ford Report (*id.* ¶¶ 87-91); Lecky King's cover note (*id.* ¶ 88); the Kelly Report (*id.* ¶ 91); Kerri Rigsby's conversations with Lecky King (*id.* ¶ 92); James Shortley (*id.* ¶ 101); or NFIP flood claim no. 24-Z454-236 (*id.* ¶ 109).

The paragraph from page 29 that State Farm grafts onto the one from page 7 also does not support its argument.  The GAO Report states that the authorized use of expedited procedures, specifically square foot estimators, was limited to houses washed off their foundations in Mississippi because there was no long-term standing water in the state:

> Similarly, for some other losses in Louisiana, Alabama and Mississippi, FEMA authorized claims adjustments without site visits where structures were washed off of their foundations by flood waters and square foot measurements of the dwellings were known.  While FEMA authorized the use of these approaches, the write-your-own companies made the decision on whether they wished to use expedited processes to adjust claims.  In addition, FEMA authorized the use of a square foot measurement methodology *for homes that had been flooded off of their slabs, pilings, or posts.  In those instances*, damages could be calculated by a certified flood adjuster based on measurements of room dimensions and classification of building materials as high, medium, or low level, rather than a room-by-room, item-by-item calculation of loss amounts.  FEMA authorized payments to its private insurance company partners of $750 per expedited claim adjustment—a lower fee than would have been paid for a more time-consuming room-by-room, line-item-by-line-item visual assessment of flood damage.

GAO Rep. at 27-28 (emphasis added).  The GAO Report makes clear that FEMA considered use of square foot estimators like XacTotal to be an "expedited procedure" to be used only to adjust Category 1 and 2 homes by lumping them together with adjustments performed without site visits: "In some circumstances where data showed that flood losses exceeded policy limits, FEMA authorized claims payments to policy limits without site visits by certified flood claims adjusters or allowed use of models that paid claims based on the square footage of the home and general classification by adjusters of the quality of its building materials."  *Id.* at 12.  The GAO further confirmed the point in the next sentence, which states that "FEMA authorized payments to its private insurance company partners of $750 per expedited claim adjustment."  *Id.*  As discussed above, FEMA specified in W5054 that the "$750 per expedited claim adjustment" applied only to Category 1 and 2 homes.  *See* discussion *supra* at 27.

State Farm therefore misreads the GAO Report's statement that "[b]ecause usage of the square foot method by the two companies with approved models was not carefully tracked during Hurricanes Katrina and Rita, FEMA paid the same fee for square foot adjustments as it did for regular line-item-by-line-item adjustments that took longer to perform and required more extensive documentation." GAO Rep. at 29. This statement can only be read as referring to use of those procedures on Category 1 and 2 claims for which FEMA prescribed the lower fee.

This makes sense because FEMA did not require WYOs to use expedited procedures on Category 1 and 2 homes, and it paid WYOs the full adjusting fee when they performed a full line-by-line adjustment on such homes. FEMA merely offered WYOs "the option to do some expedited adjustments." *Id.* at 28. A number of WYOs chose not to use expedited procedures.[7] Thus, when the GAO Report dicusses potential overpayments because FEMA did not know whether a WYO used a square foot estimator, it is discussing the adjustment of Category 1 and 2 homes, not Category 3 homes as State Farm contends.[8]

But even if this Court were to misread the GAO Report as State Farm requests, it still would fail as a public disclosure of the Relators' allegations for the same reasons as the *Picayune* Article. A hypothetical disclosure that two unidentified WYOs had permission to use square foot estimators on Category 3 homes would not disclose either State Farm's misrepresentation

---

[7] "Representatives of the three insurance companies we visited that did not use expedited processes to a significant extent said that they did not do so for reasons including concerns over the accuracy of flood depth data, delays in the availability of flood depth data, and because their companies did not write homeowners' policies on the dwellings in question, they lacked necessary information (*i.e.*, square foot measurements of the home) that were needed to process claims without site inspections." *Id.*

[8] Moreover, the GAO Report clarifies that that it authorized square foot estimating programs at least in part to address the problem created when the WYO adjusting a claim does not have square foot measurements of the home. In the sentence immediately following the one in which it mentioned that potential impediment to expedited procedures, the GAO Report states: "two large write-your-own insurance companies developed models that were approved by FEMA for use in making square foot estimates of damage for some claims…." *Id.* Thus, read in context, the GAO Report makes clear that FEMA approved the use of square foot estimators as expedited procedures on Category 1 and 2 homes and not, as State Farm misrepresents, as a substitute for performing required line-by-line estimates on Category 3 homes.

that it was performing line-by-line adjustments on those homes or the fact that it was using

XacTotal instead.  The GAO Report does not identify State Farm, and the Rigsbys already have

proven conclusively that State Farm did not have permission from FEMA to deviate from the

requirement in W-5054 that it perform line-by-line adjustments on Category 3 homes.  *Rigsby*,

794 F.3d at 468.  The GAO Report also does not contain any of the details about State Farm's

scheme that the Rigsbys pled in their SAC and earlier pleadings.  Moreover, any ambiguity in the

GAO Report, like the *Picayune* Article, must be construed in the Rigsbys' favor.

    **C.**    **W-5054 and the NFIP Claims Manual Do Not Disclose the Allegations or Transactions That the Rigsbys Pled.**

The Rigsbys' allegations cannot be based on W-5054 and the NFIP Claims Manual as

public disclosures because those documents only describe the rules that FEMA imposed.  They

say nothing about the X or Y in the *Springfield* formula—*i.e.*, State Farm's misrepresentations of

compliance or violations.  The Fifth Circuit held in *Little* that "a restatement of the applicable

law … [is] inadequate to trigger the disclosure bar."  690 F.3d at 293.  If an article that merely

restates a defendant's legal obligations under a statute or regulation cannot qualify as a public

disclosure, neither can the statue or regulatory directive itself.  *See United States ex rel. Monsour*

*v. Performance Accounts Receivable, LLC*, No. 1:16cv38-HSO-JCG, 2018 WL 4682343 at *10

(S.D. Miss. Sept. 28, 2018) (applying *Little* to hold that "invoking the statute was … insufficient

to trigger the public disclosure bar").

    **D.**    **Testimony and Evidence That the Rigsbys Presented in the McIntosh Trial Cannot Constitute Public Disclosures.**

Finally, State Farm argues that the Rigsbys publicly disclosed their own allegations in the

SAC when they presented evidence in the McIntosh trial "that 'normal claims procedures' means

a line-by-line estimate" in W-5054.  SF Br. at 13-14.  This argument fails for at least three

reasons.  First, the Rigsbys alleged this fact before it was disclosed at trial.  *See* discussion *supra*

at 4-7.  The Rigsbys pled every fact necessary to establish State Farm's use of XacTotal in violation of W-5054 in paragraphs 37 and 38 of their Original Complaint.  *See* discussion *supra* at 4-5.  The Rigsbys also specifically alleged that W-5054 required State Farm to perform line-by-line adjustments on Category 3 homes in the Pretrial Order, to which the pleadings in this case were amended to conform.  *See Rockwell*, 549 U.S. at 474; *Rigsby*, 794 F.3d at 468 n.7.

Second, State Farm bases this argument upon cases in which a relator publicly disclosed allegations in a *different* prior litigation.  *See* SF Br. at 14.  For example, State Farm cites *United States v. New York Medical College*, 252 F.3d 118, 121-22 (2d. Cir. 2001), in which a defendant argued that relators disclosed their FCA allegations in a prior state court action.  That scenario is distinguishable because a relator's disclosure of information in the *qui tam* litigation itself is an "allegation" for purposes of the FCA.  As the Supreme Court held in *Rockwell*, "[t]he statute speaks not of the allegations in the 'original complaint' (or even the allegations in the 'complaint'), but of the relator's 'allegations *simpliciter*.'"  549 U.S. at 473.

Finally, a disclosure that FEMA required line-by-line adjustments for Category 3 homes is precisely the sort of "restatement of the applicable law"—*i.e.*, the defendant's legal obligations—that cannot constitute a public disclosure.  *Little*, 690 F.3d at 293.  It discloses neither X nor Y in the *Springfield* test, neither State Farm's actual noncompliance with that requirement, nor its misrepresentation that it complied.  Accordingly, it cannot bar the Rigsbys' false certification claims in their SAC.

## **CONCLUSION**

For the foregoing reasons, this Court should deny State Farm's motion.

Respectfully submitted on this 15th day of July, 2020.

/s/ August J. Matteis, Jr.

C. Maison Heidelberg, MB #9559
mheidelberg@hpwlawgroup.com
Chadwick Welch, MB #105588
cwelch@hpwlawgroup.com
HEIDELBERG PATTERSON WELCH PLLC
207 W. Jackson Street, Suite 200
Ridgeland, MS 39157
Tel: (601) 790-1583

August J. Matteis, Jr. (*pro hac vice*)
amatteis@wmclaw.com
William E. Copley (*pro hac vice*)
wcopley@wmclaw.com
Janet L. Goetz (*pro hac vice*)
jgoetz@wmclaw.com
Matthew S. Krauss (*pro hac vice*)
mkrauss@wmclaw.com
Derek Y. Sugimura (*pro hac vice*)
dsugimura@wmclaw.com
William E. Jacobs (*pro hac vice*)
wjacobs@wmclaw.com
Jonathan H. Silberman (*pro hac vice*)
jsilberman@wmclaw.com
WEISBROD MATTEIS & COPLEY PLLC
1200 New Hampshire Ave., N.W., Suite 600
Washington, D.C. 20036
Tel:  (202) 499-7900

*Attorneys for Cori Rigsby and Kerri Rigsby*

## <u>CERTIFICATE OF SERVICE</u>

I, August J. Matteis, Jr., attorney for Cori Rigsby and Kerri Rigsby, do hereby certify that I have this 15th day of  July, 2020, caused the foregoing document to be filed with the Court's CM/ECF system, which will cause notice to be delivered to all counsel of record.

_____/s/August J. Matteis, Jr.\_\_\_\_\_

August J. Matteis, Jr.
